IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

THOMAS H. BATES,                        )
                                        )
                Plaintiff,              )
                                        ) Case No.
vs.                                     ) CIV-21-00705-JD
                                        )
STATE FARM FIRE & CASUALTY              )
COMPANY,                                )
                                        )
                Defendant.              )

CERTIFIED COPY

*   *   *   *

VIDEOCONFERENCE DEPOSITION OF JON DEREK VANDORN

TAKEN ON BEHALF OF THE PLAINTIFF

ON JUNE 28, 2022

IN OKLAHOMA CITY, OKLAHOMA

COMMENCING AT 10:09 A.M. CST

*   *   *   *

INSTASCRIPT, L.L.C.
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA  73102
405.605.6880
schedule@instascript.net

REPORTED BY:  THERESA L. McDANIEL, C.S.R.

EXHIBIT

2

exhibitsticker.com

                    A P P E A R A N C E S


Appearing via videoconference on behalf of the
Plaintiff

     MR. BRAD MILLER
     Attorney at Law
     MILLER, JOHNSON, JONES, ANTONISSE & WHITE, PLLC
     500 Northwest 6th Street, Suite 300
     Oklahoma City, Oklahoma  73102
     E-mail: bmiller@mjjaw.com


Appearing via videoconference on behalf of the
Defendant

     MS. PAULA M. WILLIAMS
     Attorney at Law
     GABLE GOTWALS
     BOK Park Plaza
     499 W. Sheridan Avenue, Suite 2200
     Oklahoma City, Oklahoma  73102
     E-mail: pwilliams@gablelaw.com


VIDEOCONFERENCE MONITOR:

     MS. SAMANTHA KARNIEWICZ, Archive Media

Jon Derek VanDorn
6/28/2022                                                    Page: 22

Q     And who are those people that are Emery, Emery, Diamond Homes?

A     General contractor that constructed the home.

Q     Now, have you ever given testimony on the analysis and opinions of insurers giving or doing their work?

A     I'm sorry, could you repeat that?

Q     Yes.  Have you ever actually testified in any case that involved your analysis of claims handling by an insurance company?

A     No, I have never offered claims handling opinions.

Q     Have you written any reports offering claims handling opinions in any way?

A     No, sir.

Q     Have you offered any reports for any entity, defendant, plaintiff, I don't care, lawyer, that comments on insurer matters?

A     Only to the extent that it discusses their estimate and how it was written in the same way that a contractor would write their estimate.

Q     Have you critiqued an insurance claims person or an insurance employee in a report written by you or a deposition for the way they wrote an

to write estimates and how contractors do it.  Did I

hear that right?

A    Yeah, I think they write their estimates in

similar ways, yes.

Q    All right.  Now, do you think that insurance

company claims people have any additional duties to

the insured than the contractor has to a customer or

a potential customer?

A    Yes, I believe they are different

relationships, so I'm not sure if they have

additional duties or what they are.  I'm not

providing opinions on that.

Q    Okay.

A    I do understand their relationship is

different.

Q    You mentioned earlier that you had some

belief that typically a lawsuit brought against an

insurance company in first-party actions is going to

include a claim of bad faith.  Do you remember saying

that?

A    I'm sorry, say that again.

Q    You just mentioned earlier, you brought up

that bad faith is a term that you're aware of,

because in first-party lawsuits typically against

insurers, you see a claim of bad faith among others,

You know that, right?

A    Yes.

Q    And I promise you, I will not get irritated with you if you need me to explain questions over and over again, because I'm well known for confusing things, not on purpose, but it happens, all right?

A    Okay.

Q    Now, I do want to know what Derek VanDorn thinks about this matter and every part of it that's important to me.  And so, you know, it's important to me and my client that you understand me before you start answering.  Will you do that?

A    Yes.

Q    All right.  Now, back to my effort at asking you the last question.  Do you expect that you are going to testify in any way about good faith claims handling as regard to what happened with the Bates by State Farm?

A    I won't provide any opinions or testimony that discuss good faith or bad faith claims handling.

Q    Okay.  Very good.  Well then, are there reports you have written in the past that make commentary on what's typical in estimate writing when dealing with insurance companies from the insurance company's perspective besides this one?

edge of a shingle to be a half inch from the outermost portion of the tab inward?

A    Not that I'm aware of.  It was just relevant to this case.

Q    And is there an industry study or publication, authoritative journal article, any sort of scientific, as you say, study that would identify the so-called face of the shingle as being everything inside the half-inch perimeter toward the edge of the shingle?

A    No, these parameters were set because they were unique to this case.

Q    Did Mr. Swain write some information that you read that said something about identifying the half-inch edge of the shingle?

A    No, he didn't.  I'm not sure why he measured them.  He just did.  And so it was useful for this discussion.

Q    Are you saying that all 60 plus blemishes have been measured by Mr. Swain?

A    No.

Q    Well, how many were measured?

A    I can't tell you how many.  Many of the photographs in his productions were.

Q    How can you tell us that any particular

A    Not within one hundredths of a square inch.

Q    All right.  Now, have you ever seen any one sort of journal article that identifies a measurement of a -- of the edge area of a shingle like you have done here on Page 17 of the report you kicked out this last Sunday?

A    I have not.

Q    Have you seen anybody in all your experience, whether it be training or maybe Haag material that you have read, or even in this -- in litigation where someone else besides you has attempted to conclude that something is or is not hail based on where it lays relative to the edge of a shingle?

A    I have read documentation where it's discussed that hail is random and indiscriminate in where it hits and causes damage, and so this is all unique to this case as a way to demonstrate specific to this case that discussion.

Q    Why didn't you do this when you first wrote your report in March of 2022?

A    I didn't have the Swain photographs at that time.

Q    But you had the Aegis photos, right?

A    Yes.

could do that if you wanted to, right?

A   I guess a person could do that, yes, but, you know, wouldn't have a reason to go on the roof with that objective.

Q   You would not have a reason to do that?

A   Right, based on what I knew going into the inspection.

Q   When you -- okay.  What did you know going into the inspection?

A   That I was going out to look at a roof that had been -- that there was some sort of debate of whether there was hail damage or wear and tear damage.

Q   You did not know that from the -- did you look at the claim file?

A   I did.

Q   Okay.  So whatever was in the claim file, you had access to that information before you went on the roof, correct?

A   That's true.

Q   And there was a focus in the claim file, at least in places, of identifying the damage being to the edges of the shingle as if that was some reason to dismiss it being hail.  You do remember that, don't you?

Jon Derek VanDorn
6/28/2022

Q    Well, did you -- did you document that in your report?

A    Sure.  Well, not in my report, but they are documented in my photographs.

Q    Well, sir -- okay.  Did you ever identify in your report that there was flaking, curling, cupping, cracking, closed or popped blisters on this roof?

A    I did not.

Q    And you did not attribute the damage in what you call the blemishes to any of those causes; is that fair?

A    I did not attribute the blemishes to a specific cause, no.

MR. MILLER:  All right.  Can you take -- take these down?

Q    (By Mr. Miller)  Are you -- are you saying, sir, that -- today would you testify that you believe blistering, closed blistering, crack -- popped blistering, cracking, curling, cupping or flaking, or footfall for that matter, had anything to do with the 60 plus blemishes that -- I'm sorry, the 40 plus blemishes that you saw with your own eyes inside your test squares?

A    Yeah, I'm not providing a direct cause to those blemishes.

Q    So you would not and have not?

A    I have not, no.  It's -- it's a combination or any of them remain a possibility.

Q    As does hail?

A    Some of it may be hail.

Q    Sure.  Did you write that in your report anywhere, anywhere, that some of this may be from hail on that roof?

A    I did not.

Q    And that -- and I'm talking about even the most recent one from Sunday, did you write what you thought, that some of these blemishes could have been from hail?  Did you write that anywhere?

A    I did not.

MR. MILLER:  Let's take a break for a minute, okay?

MS. WILLIAMS:  How long do you want, Brad?

VIDEOCONFERENCE MONITOR:  Going off the record.  The time is 2:39 p.m. Central.

(A break was had from 2:39 p.m. to 3:02 p.m.)

VIDEOCONFERENCE MONITOR:  We are back on the record.  The time is 3:02 p.m. Central.

Q    (By Mr. Miller)  Mr. VanDorn, is there anything you want to go back and revisit, clarify, add to or take away from?

Jon Derek VanDorn
6/28/2022

You ready?

A    Ready.

Q    Now, what I'm trying to find out is if you can tell me whether this was a one-by-four, a one-by-six, a one-by-eight, a one-by-ten or a one-by-12 that was decking this roof.

A    I cannot.

Q    I want to know if you have any idea what the spacing was in any particular place or across the roof between the one-by decking boards that you saw about an inch of?

A    I did not have a visual observation of that.

Q    Okay.  Do you have some other observation that would tell you what the spacing was across this roof of the decking boards?

A    Well, I know to install a three-tab composition roof, it would be a solidly sheathed decking, so there would be minimal spaces between the boards.

Q    What would be the spaces?

A    One eighth to a quarter inch is what would be expected.

Q    All right.  So if the decking that was under those shingles was more than a quarter-inch spacing, that would be decking that needed to be modified,

replaced, repaired, if you were going to stay within the warranty of the Malarkey shingle; is that your testimony?

A    If the roof were being replaced and it were necessary to replace the roof, the decking would then be exposed, and issues where gaps are too large could be addressed on a board-by-board basis.

Q    That's what I'm asking.  Should the gaps in the boards be addressed, in other words, repaired, for that tab shingle if the spacing between the decking boards was more than an eighth to a quarter inch?

A    I don't believe Malarkey addresses that in the decking section of their installation instructions.  But as a best practice, yes, I believe more than a quarter inch would warrant consideration for replacement.

Q    All right.  What about the code, does the code address whether or not spacing between decking boards should be attended to when replacing a roof?

A    No, decking discusses only solidly sheathed decking.  It gives allowances for lumber decking or board decking like this, and then otherwise refers to the installation instructions of the manufacturer.

Q    Well, when does -- according to code, when

does solidly sheathed decking no longer reach that definition based on the spacing by one-bys?

A    Don't recall it specifically addressing it.

Q    Well, how about this, you're a -- you're a contracting guy.  You make a living giving opinions about construction, right?

A    Right.

Q    All right.  So if you -- if you pull the shingles and felt off of a deck on a roof and there were spaces between the one-bys, half inch and greater randomly across the roof, if you were going to put a three-tab shingle back down, would you do that before you addressed by repairing those spaces?

A    I believe if I saw large gaps or other issues in the boards that were going to make a nailable surface difficult, I would address them on a board-by-board basis.

Q    And, also, would you agree that at some point one-bys that are spaced too greatly are no longer solidly sheathed by what's meant in the code?

A    Yeah, I think if spaces become wider than solidly sheathed, such as space decking, which is typically applied under wood roofs, then, yeah, that becomes something other than solidly sheathed.

But in this case, I know of no -- I have --

I know of no issue with that because Aegis replaced this roof in 2013 with this existing shingle on the existing decking.

Q    And you're saying because Aegis did that in 2013 without addressing the decking, it must have been solidly sheathed?  Is that what you're indicating?

A    It should have been, because that was the code at that time as well.

Q    Well, for some reason, Aegis believed that the decking was going to have to be replaced.  Why was that?

A    Well, I addressed that in my report, but there has been a misconception.  That's not unique to Aegis where somehow a confusion has been created that one-by decking does not meet the definition of solidly sheathed, when, in fact, it does.

Q    How about this, you say -- you said several times that Malarkey does not address the spacing of decking, is what your testimony is, correct?

A    Yes, that -- their paragraph on decking talks about one-by being permissible.

Q    Well, what about the rest of their information?  You said -- I don't just want to talk about a paragraph.  Does Malarkey address what's

meant by solidly -- solidly sheathed decking when it comes to spacing on one-bys?

A    Not that I recall.

Q    All right.  Good.  Now, but what about the industry standard across the board generally?  I know every company has a little bit different words, but, generally speaking, what is considered one-by spacing that is too great by manufacturers to be deemed solidly sheathed?

A    When it's addressed by manufacturers that limit the one-by decking, my recollection is that it's when it's greater than one quarter of an inch.

Q    All right.  So -- and just to be clear about it for the Jury, in other words, when the space between the one-bys is a quarter -- greater than a quarter inch, then --

A    Right.

Q    -- that's when the manufacturers that do address it want there to be a change in the spacing so there is a nailable surface, fair?

A    Correct, yes.

Q    And one way to do that is put plywood over it.  That's one way?

A    Right, that would correct the issue.

Q    Or you could still use decking, one-by

decking.  You just have to pull it in so that -- in some way so that there is no over quarter space, right?

A    Right.

Q    And then you have solidly sheathed again, right?

A    Correct.

Q    Do you generally believe that in the construction trade in Oklahoma, solidly sheathed deck is considered decking that has no more than a quarter-inch space between the boards?

A    Only if that's what the manufacturer's instructions say.

Q    Well, so should an insurance company that has GAF that requires, let's say, an eighth-inch space just tell the insured that, "Hey, put Malarkey on there, they don't talk about it, it will all be good," even though the space is an inch?

        MS. WILLIAMS:  Object to form.

        THE WITNESS:  I think -- my belief is that it would be a case-by-case basis depending on the manufacturer of the shingle.

Q    (By Mr. Miller)  Do you have an adjuster's license today?

A    I do not.

Jon Derek VanDorn
6/28/2022                                                                    Page: 181

measured the blemishes on the roof.  As far as I know, that's not typical, and I have only seen it done whenever an engineer or an inspector is trying to document consistencies in the size of impacts.

And it did turn out that just about every impact he measured was three quarters of an inch.  But at the same time, he measured a spatter on the vent cover that was three quarters of an inch, so he may have been trying to show some consistency there.

Q    Did you call him and ask him?

A    No, I have not talked to Mr. Swain.

Q    Did you try?

A    No.

Q    I mean, he's a witness in the case, I guess. He was up there anyway.  But you have not -- he's listed, I think, even by -- I was thinking he was listed on State Farm's list, I think.  Did you ask to talk to him?

MS. WILLIAMS:  Object to form.

THE WITNESS:  No.

Q    (By Mr. Miller)  I can't remember if I asked you this.  Did you ever get up in the attic to look at the underside of the decking?

A    I did not.  It wasn't available on that day.

Q    Did you ask?

A     No, I don't think I did.

Q     I mean, there were representatives of the Bates family there.  We have already talked about that.  A lawyer from my office was there.  You knew that, right?

A     I did -- well, I didn't -- I didn't know who was there.  I didn't know a member of the Bates family lived in that house.  I knew there were what I believed to be tenants, and so there was some minor communication between Mr. Marks and them.

Q     I don't -- I didn't represent, or I didn't mean to, to say that the Bates lived there.  That's not my question, okay?

Let me say it again to make sure that I said the right thing and you heard the right thing.  There was someone representing my firm there and Mr. Marks was there at the Bates home when you were up there. Did you ever ask either one of them if you could get access to the attic?

A     No, I did not.

Q     What about the lawyer -- I'm assuming there was a lawyer representing State Farm there with you, right?  Who was there?

A     I don't remember who it was, but, yeah, there was someone from Gable Gotwals there.

Q    You don't know if it was -- you don't think it was Lance or Paula, or it might have been one of them?

A    It was not Lance or Paula.

Q    Okay, okay.  All right.  But you did not ask anybody from Gable Gotwals, who represents State Farm, if you could get up in that attic?

A    That's correct.

Q    And, by the way, getting up in the attic would allow you to see what the decking looked like, wouldn't it, usually?

A    Sure.  Most cases, you can see the underside of the one-by decking and determine its size.

Q    I mean, any kind of decking, you're going to -- it's almost always -- unless it's an unusually insulated kind of a roof, almost always in Oklahoma you can see the raw wood making up the decking from the attic space of a house in Oklahoma; isn't that true?

A    That's true.  Unless spray foam insulation is sprayed against it, you can see it.

Q    Yes.  Right.  Is there anything you want to go back and talk about some more?

A    No, I can't think of anything.

Q    Any part of your testimony you would like to

C E R T I F I C A T E

STATE OF OKLAHOMA      )
                      )    SS:
OKLAHOMA COUNTY        )

            I, Theresa L. McDaniel, Certified Shorthand

Reporter within and for the State of Oklahoma,

certify that the above-named witness was by me sworn

to testify to the truth; that the Videoconference

Deposition was taken by me in stenotype and

thereafter transcribed and is a true and correct

transcript of the testimony of the witness; that the

Videoconference Deposition was taken by me on June

28, 2022, in the City of Oklahoma City, State of

Oklahoma; that I am not a relative, employee,

attorney or counsel to any party in this case or a

relative or employee to any counsel in this case or

otherwise financially interested in this action; and

that the witness elected to exercise their right to

review the Videoconference Deposition transcript

prior to its filing.

            IN WITNESS WHEREOF, I have hereunto set my

hand and official seal this 5th day of July, 2022.

_____
THERESA L. McDANIEL, C.S.R.
Certificate No. 995
Expires: December 31, 2022