IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

THOMAS H. BATES,                    )
                                    )
        Plaintiff,                  )
                                    )
-vs-                                )        No. CIV-21-00705-JD
                                    )
STATE FARM FIRE AND CASUALTY        )
COMPANY,                            )
                                    )
        Defendant.                  )

* * * * *

REMOTE VIDEOCONFERENCE DEPOSITION OF

TRESA DUNNICAN JACOME

TAKEN ON BEHALF OF THE PLAINTIFF

IN HOT SPRINGS, ARKANSAS

ON MARCH 25, 2022

COMMENCING AT 10:05 A.M.

* * * * *

INSTASCRIPT, L.L.C.
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA  73102
405.605.6880
schedule@instascript.net

REPORTED via Zoom BY:  BETH A. McGINLEY, CSR, RPR, RMR

EXHIBIT
4-EXCERPT

handle State Farm claims, and so they called me and asked me if I wanted to deploy for that hurricane, and I agreed to do that.

Q    So is that the first time that you actually worked and was paid as an insurance adjuster during that, as you call it, little hurricane?

A    Yes, sir, but I did not work that hurricane because they did not have the claims coming in, so they released me and sent me to California.

Q    Okay.  You mentioned that part of the reason that they were ready to deploy you was you had been certified through State Farm.

Did I get that right?

A    Yes, sir.

Q    Okay.  What did you have to do to get certified through State Farm?

A    So there is a two-day class that is approximately 16 hours that you go to.  In my case, I went to Dallas.  And they teach you how to calculate waste on roofs and how to determine square footage of rooms and some of the basic skills that you would need as an adjuster that -- to estimate how to repair the damages that you observed.

And they also go through some of the examples of what's covered in wind events versus flood events,

specifically like for hurricanes, where water --

flooding is not covered, but the wind and the water that

comes into the roofs, because of the wind damages, are

covered, that kind of thing.

Q    I see.  And this two-day class in Dallas, was it put on by State Farm?

A    It was put on by E.A. Renfroe training, but their program is approved by State Farm, that you are required to go through, before State Farm will allow to add you on their roster as adjusters.

Q    Now, had you undergone any other training to be an adjuster before taking the certification class?

A    No, sir.  I just went through the actual training for -- you know, to pass the adjuster licensing exam, but not training for handling claims.

Q    How -- you know, I'm -- I think I know a little bit about that, but I may not.

When you're talking about the part to get to take the test for the adjuster license --

A    Yes, sir.

Q    -- is that more a discussion of the policies and rules and how the -- a lot of the states do things, to make sure you're doing things legally for an adjuster?

A    Correct.

Tresa Dunnican-Jacome
3/25/2022                                                    Page: 21

Q    I see.  Another training?

A    Yes, sir.

Q    I gotcha.

So did you go to the training in Alabama for a State Farm claim?

A    Yes, sir.

Q    And was this put on by E.A. Renfroe or State Farm?

A    State Farm.

Q    Okay.  And how -- did you say it took two days to do that?  I missed that.

A    Yes, sir, but they're not all State Farm training.  I mean, there's some -- like, there was one training that Renfroe put on for Xactimate, wanting to make sure you understood the basics of Xactimate.  State Farm had trainings, like their annual trainings that are required, ethics, the -- making sure that you handle claims as efficiently as possible, and make sure that you take the course for -- on keeping the claims confidential, things like that.

They're more -- they're not specifically claim handling, they're more practice related.

Q    Gotcha.  I think I gotcha.  Let me make sure.

So it sounds like the part that State Farm taught you down in Alabama was really focused on

describe, from your memory, what the State Farm ethics training was in those couple days in Alabama when you were first deployed?

A    That our job was to find coverage, as afforded under a policy, no more, no less, and to honestly and accurately estimate for the damages.  Not to add to, not to take away from.

Q    Okay.  And anything else you can remember about the ethics training with State Farm?

A    No, sir.  I think I've covered everything that sticks out.

Q    Okay.  Now, in your world, do you believe that State Farm -- as an institution, I'm talking about, not humans, but the business -- wants you to do what they trained you to do under the ethics provisions that you learned in the very first couple of days that you were in Alabama, on your very first deployment as an adjuster?

A    Yes, sir.

Q    Okay.  And so the -- the general view that I think you stated, as I hear it, is you're supposed to pay what you owe under the contract, nothing more, nothing less, right?

A    Yes, sir.

Q    And -- and that would be your obligation to

Tresa Dunnican-Jacome
3/25/2022
Page: 36

A    Yes, sir.

Q    Did you have to sit through that again?

A    Well, it's done online on your computer, so you can do other trainings.

Q    I see.  All right.  And then was some of the training that you received over those three days related to -- specifically to wildfire adjusting?

A    Yes, sir.

Q    Was that the primary thing that was talked about, besides the general training like you had in Alabama, as far as you can remember?

A    Yes, sir.

Q    All right.  Now, I take it that wildfire training has nothing to do with hail; is that fair?

A    No, sir, it does not.

Q    Okay.  And was some of this video training just like you'd seen in Dallas, type of thing?

A    Yes, sir, but it was more -- more of it was done in person.

Q    Okay.  All right.  And maybe PowerPoint kind of pictures and things?

A    Yes, sir.

Q    All right.  But is it right that the real point of the focus, at least, was to get you all prepared for what you were going to see as a result of a

area of Oklahoma City.  That means that I am not going to be working claims that is in Sacramento, California, because it is local to the area that is specified under that proximity.

Q    All right.  Okay.  And even if you're deployed as an independent to come and work proximity adjuster claims, even in that context, I guess you're telling me you're going to be in a region, an area, and stay there during that deployment?

A    Yes, sir.

Q    Ah, okay.

Now, have you ever actually adjusted claims where you were not on site as the frontline person looking at the damage?

A    Yes, sir.

Q    When did you do that?

A    During my training for State Farm as adjuster -- as a staff adjuster, they had me working REIP claims. And then when I was in the large loss reconciliation unit, I was also doing the large loss, but I was not on the site of the losses.

Q    Now, I -- I kind of understood you to say the reconciliation unit was kind of an in-office paperwork --

A    But they were California claims.

Tresa Dunnican-Jacome
3/25/2022                                                                    Page: 56

Q    Yeah.  But -- but somebody else would have been out on the frontline doing the adjusting in that case, for instance; is that right?

A    They were -- there was somebody else that was in the field that did the actual inspection in the original State Farm estimate.  I continued adjusting, but I was remote in an office versus on site.

So I could not meet with the contractor.  I talked to them on the phone.

Q    I gotcha.

So if I hear you right, in those situations, you considered the frontline person in the field to be an inspector and you were still the adjuster, using the inspector's eyes and ears and photos and analysis of what they saw and experienced?

A    Yes, sir.

Q    And you said you also did the same thing when you went inside to State Farm as an employee and were working some of those REIP claims.

Did I hear that right?

A    Yes, sir.  So because I was an experienced adjuster when I was hired by State Farm, during part of the training when there was a lot of the stuff that I've already went through, I was -- I had the capacity to also work claims, but I could not -- I did not have the

capacity to go out and inspect because there were so many different classes.

So I adjusted REIP claims, which is those roof claims for the hail and wind that was inspected by independent companies like Ladder -- a Ladder Now or Seek Now.

Q    I see.

All right.  So in the cases of the REIP claims that you worked for -- inside of State Farm's buildings, the Ladder Now, or whatever you call them, those people are the inspectors who are providing you the information from the eyes and ears, touch, whatever, and then you're using that as it's submitted to you to adjust the claim?

A    Yes, sir.

Q    All right.  How long did you do that?

A    I did that for several weeks, until I was out of the training -- official training, and then I went to -- in the field and followed adjusters.

Q    And how -- how do you prefer to do it, inside the office and have an inspector on the ground out there, or out in the field?

A    No, I prefer in the field.

Q    Why is that?

A    Because when I'm adjusting a claim, I prefer to see the damage firsthand, so that I know that I've

Tresa Dunnican-Jacome
3/25/2022                                                                              Page: 96

A     Yes, I used to complete them as my own.

Q     Huh?

A     You know, my own companies, I did complete exit interviews.

Q     Gotcha, gotcha.

So -- so, roughly, middle to end of January is when you're finished with Ms. Wienstroer, best you can remember, right?

A     Yes, sir.

Q     And then I believe this claim file says you were up on the Bates roof the 23rd day of February. Does that sound right?

A     Yes, sir.

Q     Now, up to that time, how many roofs do you reckon that you handled for hail, possible hail damage on your own, that month -- that three weeks?

A     I would say I was scheduling three a day for a couple of weeks, and some of them was water, but probably the majority of them were roofs, which had to deal with hail.

Q     Okay.

A     So, I don't know.

Q     Did you go -- did you go look at a roof every day, or just some of the days of the week?

A     I would say at least three to four days a

week.

Q    Okay.  And --

A    I don't believe I scheduled it for all five days of the week, because generally I tried to work a paper day or two in a week.

Q    Okay.  And now Ms. -- what was Ms. Wienstroer's job with you, as far as you knew it, as you could see it?

A    She was a trainer to ensure that, when I accessed a roof, I was safe, and to show me what was hail damage and what was wear, to ensure that I understood, whenever I was inspecting, you know, that -- from my training, that I was accurate.  And if I wasn't, then she would explain what she was seeing.

Q    Yeah.  And that -- during that process, were you already a part of Ms. Draper's team?

A    Yes, sir.

Q    Had you done any training with Ms. Draper on a roof?

A    No, sir.

Q    All right.  Did you have any other training with anybody on Ms. Draper's team, besides what you did with Kelly Wienstroer?

A    Wienstroer.  No, sir.

Q    Wienstroer?  Okay.

All right.  So I want to make sure I understand.  The people in Tulsa were not part of Ms. Draper's team?

A    No, sir.

Q    Gotcha.

Do you remember the names of those two people?

A    No, sir.  Because I think I only went on, like, four inspections, two each, maybe.

Q    How many inspections do you think you did with Ms. Wienstroer?

A    Maybe 10.  Maybe.

Q    Now, did you ever go look at roofs with anybody else at State Farm, once you became your own standalone adjuster, having completed the time with Ms. Wienstroer?

A    On one other claim with Kelly.

Q    Why was that?

A    Because it was a recent hail event, and we went back and did a second inspection, because I had covered half or two-thirds of the roof, and we needed to verify that the other part was damage that needed to be covered, because it was a slope that was facing away from the storm.

Q    So was this something that was related to the time you had spent with her originally, or was this

Tresa Dunnican-Jacome
3/25/2022                                                            Page: 107

Q    All right.  So, just so we can be clear, when you are being trained to learn how to do hail damage recognition for State Farm, up until the time you got to go out with Kelly Wienstroer, if I hear you right, it was online, and it was by these modules that are either PowerPoints or videos, correct?

A    Correct.

MR. LEFFEL:  Objection, form.  You can go ahead.

Q    (By Mr. Miller) Was there any classroom work, while you were at State Farm, to train you at all?

A    No, sir.

Q    Some people have -- being deposed -- have talked about going to Bloomington to --

A    Yes, sir.

Q    -- go into this facility where they actually have what they claim is hail-damaged roofs and that kind of thing.

Had you made it to that place ever?

A    No, sir, because we had COVID shutdowns.

Q    Okay.  So by the time -- or at least during the 10 months you were a State Farm employee, you did not have any, what I'd call, hands-on training, until you got to go out with Kelly for those couple of weeks in January.  Fair?

Q    Okay.

A    -- looking at hail.

Q    All right.  So in the 30 or so -- you said it could have been more, but 30 or so roofs that you looked at, for what was supposed to be as turned-in hail damage, you -- your estimate is you replaced six of those roofs?

A    Yes, sir.

Q    Now, does that include the ones that were partial replacements?

A    No, sir.

Q    Okay.  How many times do you think you replaced a partial roof?

A    Maybe two.

Q    All right.  So is it fair to say that, if you were replacing six roofs and partial two, shouldn't there be at least eight times you were sending Ms. Draper pictures?

A    No, sir, because those were later on --

Q    Oh --

A    -- and it was after recent hail --

Q    I see.

A    -- as in the hail occurred within a week or two.

Q    And why would that matter, being recent hail?

Tresa Dunnican-Jacome
3/25/2022                                                                    Page: 133

A     Well, because of the fact that that occurred after I had been working for several months, and it's just the hail that came down, on the most recent event, did damage to the shingles, to where there was bruising and fracturing of the mats.  So there was never a dispute on those.

Q     So when you say that it was because it was recent, is there some -- is there something about the recency that mattered in those?

A     No, it was because that was a very large hail dam- -- I mean, they were 3-inch diameter hail that fell, so it did substantial damage that was just easily identified; whereas, prior events, we had not had hail that large in that area for several years.  So most of those had already been repaired long before we were getting claims put in.

So the ones that were being put in for claims, the majority of those did not have hail damage.  It was more they were wear.  Whereas, that last event was so big, I mean, people turned in the claims because they were very large hail.

Q     Now, what you know about wear -- you keep calling it wear.  What you know about that is completely and totally what you learned from State Farm's training modules, right?

A    That and Haag, yes, sir.

Q    Haag.  Yes, Haag.

And do you know how it is that Haag is hooked up with State Farm, if they are?

A    No, sir.

Q    Do you know why it is that State Farm's allowing Haag's training modules to be on their website?

A    My understanding is that they are experts in wind and hail damage.

Q    Sure.  I mean, there's lots -- probably lots of engineers out there, expert in that, but -- I'm guessing.  But why is it Haag is -- gets their materials on the State Farm site, if you know?

A    I do not know.

Q    In any event, it's pretty important, as far your ability to decide what is and isn't hail, to rely on those -- what those modules show.

That's fair, isn't it?

A    Yes, sir.

Q    Now -- so, just to put a point on this, whatever number of hail claims you went to look at, 30 or more, you were estimate- -- I know it's an estimate, but you're estimating that you paid for replacement on all or part of what you think is probably six to eight roofs?