IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

THOMAS H. BATES,

         Plaintiff,

VS.                                         Case Number
                                            CIV-21-705-JD
STATE FARM FIRE AND CASUALTY
COMPANY,

         Defendant.

CERTIFIED COPY

* * * * *

DEPOSITION OF JONATHAN MARKS
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON JUNE 23, 2022
COMMENCING AT 9:00 A.M.

* * * * *

INSTASCRIPT, LLC
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA   73102
405.605.6880
schedule@instascript.net

Reported by:  Cheryl D. Rylant, CSR, RPR

EXHIBIT

4

                        A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

        SHAWNA LANDEROS
        MILLER, JOHNSON, JONES, ANTONISSE & WHITE
        500 NW 6th Street, Suite 300
        Oklahoma City, OK  73102
        405.896.4388
        slanderose@mjjaw.com

APPEARING FOR THE DEFENDANT:

        LANCE E. LEFFEL
        TAYLOR PESHEHONOFF
        GABLE GOTWALS
        One Leadership Square, 15th Floor
        211 North Robinson
        Oklahoma City, OK  73102-7255
        405.235.5582
        lleffel@gablelaw.com
        tpeshehonoff@gablelaw.com

ALSO PRESENT:

        GARY BATES
        MARIAN BATES

TABLE OF CONTENTS

PAGE

EXHIBIT INDEX.......................... 3
STIPULATIONS.......................... 4

JONATHAN MARKS:

EXAMINATION BY MR. LEFFEL............... 5
EXAMINATION BY MS. LANDEROS............ 94
EXAMINATION BY MR. LEFFEL.............. 110
EXAMINATION BY MS. LANDEROS............ 111

REPORTER'S CERTIFICATE................. 113
JURAT................................. 114
ERRATA SHEET.......................... 115

EXHIBIT INDEX

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena to Testify at a Deposition in a Civil Action | 5 |
| 2 | Jonathan Marks - file | 13 |
| 3 | Aegis Roofing File Notes (Aegis Roofing_00014-138) | 22 |
| 4 | Text Messages | 44 |
| 5 | Plaintiff's List of Expert Witnesses | 63 |
| 6 | 3/10/21 Email from Marks to Bivins, (SF.BATES 000288-299) | 88 |

REQUEST FOR INFORMATION/DOCUMENTS

| DESCRIPTION | PAGE |
|---|---|
| Emails in native format | 88 |

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of JONATHAN MARKS may be taken on behalf of the Defendant, on June 23, 2022, in Oklahoma City, Oklahoma, by Cheryl D. Rylant, Certified Shorthand Reporter, pursuant to Subpoena and in accordance with the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question and the responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * *

created on 5/3 of '19; is that correct?

A. I don't see a -- oh, yeah.  Yes.

Q. It kind of goes kind of like our claims file.

A. Oh, it goes up.

Q. Yeah.

A. Okay.

Q. Our claim notes from the State Farm claim file is kind of produced the same way; you've got to go from the back and then the bottom up.

A. Okay.

Q. So, you've got a note here -- I don't know -- middle of the page roughly that's dated 5/6 of '19 at 8:19 a.m.  Do you see that?

A. Uh-huh.

Q. And I think I talked to you about this before.  When it says Jonathan Marks in that -- you know, after the timestamp, that generally indicates that would be a note that you made?

A. I typed that in, yes.

Q. And it says:

"Inspected roof on Saturday.  Has some hail damage but not sure enough.  Was insured with Kirk Fuqua but now Chaumont.  Told Mr. Bates to hold off filing a claim until I get back with him."

Jonathan Marks
6/23/2022                                                                 Page: 25

Did I read that right?

A. Yes.

Q. To your knowledge, was any of the hail damage that you reported seeing on your note there in 2019 -- was that ever repaired?

A. No.

Q. Can old hail damage start to look different over time?

A. Yes.

Q. Start to look similar to wear?

A. Over a long period of time, I think it can.

Q. Rains, winds, other weather events come in and maybe you started off with fresh hail that had granules crushed in the mat but those granules may start to wash off over time.  True?

A. Not crushed.  I wouldn't use that term.  I think maybe embedded or -- because hail doesn't normally crush a granule.

I'm sorry, so I got off track.  Can it -- would you restate that?

Q. I think I was asking if, over time, it can start to look like wear?

A. Yeah, over a long period of time.

Q. What did you mean when you wrote that there was hail damage but you were not sure it was enough?

A. I didn't know if they should file a claim right then. I just -- you know, I always try to be very fair in my assessments. As a matter of fact, I'm very conservative in my assessments because if somebody is referring me out to look at something, I don't want them to be filing a claim that they're not going to get, you know, compensation for. And I just -- I had a little bit of doubt in my -- in my mind. That's what I remember.

Q. It looks like the next -- well, not the next entry, but the top entry on this page kind of jumps forward from 2019 and now you've got a note that's from January 7th of '21. Do you see that there?

A. Uh-huh.

Q. And it states:

"Emailed Gary Bates, Tom's son, to see if he wants to go ahead and file a claim or wait until the next storm."

Did I read that right?

A. You did.

Q. And can you tell me what was done in reference to at that point?

A. Well, it had been -- I had it in some kind of diary, you know. If you go back to the -- that first page, you see a status. It says "signed contract

verifying finances" right after where it says

Tom Bates.

Q. Gotcha.

A. I -- these statuses are something that I'll just go back and I'll check periodically.  And I -- and I knew -- so that's January '21; so it had been a year and a half.

I was just checking in with him because the file was still open and just seeing if he wanted to -- if he was still interested potentially in filing a claim.  But I knew that I needed to go on out and inspect again because if the same damage was there, we would be in the same position.  So I went out and looked at it again.

Q. So, it sounds like the Bates are sort of biding their time not filing a claim until everyone agreed that there was sufficient damage to total the roof.  Is that the idea?

A. I don't think they were necessarily wanting to file a claim I mean -- or pushing to file a claim. Obviously, there had been 16 or 18 months or so go by.  And I don't know that Gary or Marian and I had any other conversation on -- about this particular thing.

So -- but, yeah, I just -- you know, normal --

I have one in there, I thought I'd see where this was going.  Maybe -- Januarys are usually pretty slow; so I had extra time on my hands.

Q. Sure.  I get that.

Well, the date of loss that is eventually given for the claim that was pursued here was 7/2 of 2020. Did you have any input on using that date?

A. I think after I inspected, which probably was shortly after that log entry on January 7th, 2021, I would have -- yeah.  On January 30th, 2021, I asked Eve in my office to run an updated AccuWeather report to get hail dates.

Q. Okay.  And so, that was one of the dates that you found and you utilized that?

A. We knew that State Farm was using a lawsuit -- I don't know what the word is -- a statute basically that it needed to be -- the damage needed to occur between -- within one year of the date of loss.  And so, yes, we regularly would try to help find a date that fell within that claim period.

Q. And it looks like on the records we've got that the claim was actually reported on 2/4/21.  It sounds like that would have been within a week of your inspection; is that right?

A. Let's see.  So, I inspected on the 29th.

means that their -- their very bad decking that's on there right now or their 1x8 or board decking, however you want to call it, can be upgraded with code enforcement.

Q. Now, as we -- oh, I'm sorry.

A. It also provides for updating electrical in the case of a fire, updating plumbing in the case of a fire.  I mean, every policyholder should have option OL.

Q. Now, I think we talked about this a minute ago, but the Bates made a claim on this property in 2012 and your company did the replacement and it was completed sometime in 2013; is that correct?

A. Correct.

Q. And at that time, you installed the Malarkey shingle; is that correct?

A. Correct.

Q. Was that an impact-resistant shingle?

A. It wasn't.  At the time, it wasn't designated that, but it became a class 4 shingle.  That same one on their roof did become a class 4.

Q. Without the characteristics changing, they classified it as class 4?

A. I don't know.  I do not know that.  I think -- let me see if the name changed.  Malarkey.

I don't want to -- if I need --

A. No.  I probably was personally.

Q. So, when the roof was replaced in 2012, to your knowledge, was the decking replaced?

A. No.  It was repaired.

Q. You had some boards that needed to be popped out, you could put those back in?

A. I think there was some repairs made to it, yes.

Q. And I believe that, on this 2021 claim, you've taken the position that the decking is not code compliant; is that correct?

A. Correct.

Q. What do you rely upon to opine that the current roof decking is not code compliant?

A. Well, I think, in 2013, there was a Moore tornado.  So decking wasn't really an issue prior to the 2013 Moore tornado.  And then the municipality of Moore set up some kind of mandate, if you will, that any roofs getting replaced that had that kind of decking had to have it replaced.  We call it 1x8 decking or plank decking or board decking.  It's all the same thing.  I might refer to it each way. But it's more susceptible to storm damage.

Now, they were primarily looking at it from a

Jonathan Marks
6/23/2022

home and Jacqueline helped make that happen.

Q. Okay.

A. So we talked about all of that.

As I was looking, I don't know if she had marked anything or not. But, yeah, we had a nice courteous conversation about how she came to be an adjuster in Oklahoma. And then we, you know, started talking about the roof.

Q. How long do you think you looked at the roof together?

A. 20 minutes, maybe.

Q. Was anyone else present for the inspection?

A. No.

Q. Anything else you recall discussing with Tresa during that meeting?

A. I know she hadn't looked at very many roofs. And she really -- I know she didn't really like looking at roofs. I mean, she was pretty willing to share that information; so I knew that she didn't have much experience.

Q. Well, in your 2/24/21 note, you state you inspected with her. And then you note:

"While she acknowledged the damage that looks like hail, she said her boss Jacqueline Draper will not agree and will not

pay for it.  Tresa called me back after she forwarded photos and said Jacqueline indeed said the damage is wear and tear."

Did I read that right?

A. You did read that right.

Q. And I think I left off:

"Thanked Tresa for following up and said we will be in touch."

Right?

A. Yeah.  I kept it very professional.

Q. Well, when did Tresa tell you that she thought that this was hail damage to the roof?

A. So, we were on the roof looking at stuff and she, you know, just said basically -- she had already -- I think that's what it was.  When we first drove up, she had said that she didn't see any hail or wasn't going to pay for hail or something like that.  And I said, "Well, then let's look at it together."  And so we did.

And somewhere along the line, I said, "Well, what are you looking for?  What exactly are you looking for?"

She said, "I'm looking for a hail impact that breaks the" -- and I don't know if she used the word "break," but she did reference penetrate, break,

Jonathan Marks
6/23/2022

split, crack, something the mat of the shingle.

And I immediately went over to a hail impact, one of hundreds, and pulled up a shingle where there was an obvious break in the mat and I showed it to her. And I said, "Do you mean like this?" Those were my exact words. I do remember that distinctly because I also remember her exact response and it was, "That might be hail."

Q. Okay. Did you have to break the seal to look at the shingle?

A. No.

Q. It was already broken?

A. Yes.

Q. Did you read any of the depositions that have been given in the case?

A. No.

Q. So, you've not read Mrs. Jacome's deposition?

A. No.

Q. Were you aware that she testified that she told you she thought what she was seeing was wear and tear?

A. I was not aware that she said that in her deposition.

Q. Have you seen the text messages that she sent to Jacqueline Draper the same day she inspected with

firsthand, even if he knew of them, could have been considered unreasonable or in bad faith."

Were you aware of that finding?

MS. LANDEROS:  Object to the form.

THE WITNESS:  No.

Q. (By Mr. Leffel)  Now, as we discussed, you also contacted Mr. Swain about this particular loss event; correct?

A. Correct.

Q. Why did you contact Mr. Swain?

A. Well, because I felt strongly that the roof had hail damage, and I knew I needed to try to get somebody else to corroborate that because State Farm was denying a second inspection.

And, furthermore, I had another one where I personally, out of Aegis Roofing proceeds -- or out of our own pocket paid for an engineer on one where -- that State Farm improperly denied and paid for that engineer myself.  So, I was willing to do that again.

Q. Who was the engineer that you used on the other claim?

A. Kerry Parker I think was his name.

Q. Kelly Parker?