IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

THOMAS H. BATES,

     Plaintiff,

VS.                                              Case Number
                                                 CIV-21-705-JD
STATE FARM FIRE AND CASUALTY
COMPANY,

     Defendant.

CERTIFIED COPY

* * * * *

DEPOSITION OF AMY LYNNE LANIER
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON JUNE 24, 2022
COMMENCING AT 9:05 A.M.

* * * * *

INSTASCRIPT, LLC
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA  73102
405.605.6880
schedule@instascript.net

Reported by:  Cheryl D. Rylant, CSR, RPR

EXHIBIT

8

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

        SHAWNA LANDEROS
        MILLER, JOHNSON, JONES, ANTONISSE & WHITE
        500 NW 6th Street, Suite 300
        Oklahoma City, OK  73102
        405.896.4388
        slanderose@mjjaw.com

APPEARING FOR THE DEFENDANT:

        LANCE E. LEFFEL
        TAYLOR PESHEHONOFF
        GABLE GOTWALS
        One Leadership Square, 15th Floor
        211 North Robinson
        Oklahoma City, OK  73102-7255
        405.235.5582
        lleffel@gablelaw.com
        tpeshehonoff@gablelaw.com

TABLE OF CONTENTS

                                                            PAGE

EXHIBIT INDEX.......................... 4
STIPULATIONS.......................... 5

AMY LYNNE LANIER:

EXAMINATION BY MR. LEFFEL.............. 6
EXAMINATION BY MS. LANDEROS........... 120
EXAMINATION BY MR. LEFFEL.............. 130

REPORTER'S CERTIFICATE................. 134

                    EXHIBIT INDEX

NO.    DESCRIPTION                          PAGE

1    Subpoena to Testify at a Deposition  5
     in a Civil Action, 6/24/22

2    Subpoena to Testify at a Deposition  6
     in a Civil Action, 5/2/22

3    Amy Lanier Document Production in    6
     Response to Subpoena

4    Bates vs. State Farm, Plaintiff's    68
     List of Witnesses

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of AMY LYNNE LANIER may be taken on behalf of the Defendant, on June 24, 2022, in Oklahoma City, Oklahoma, by Cheryl D. Rylant, Certified Shorthand Reporter, pursuant to Subpoena and in accordance with the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question and the responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * *

Amy Lanier
6/24/2022

with Mr. Marks and one of his colleagues, did you have any other discussions with Mr. Marks about your departure or your intent to depart from State Farm?

A. I believe after I left State Farm and went to AFR, I might have called him and said, "Hey, just so you know, I'm switching over to AFR, left State Farm, got this job."

I mean, it might have been just a -- kind of a "In case you try to reach me for State Farm, I'm not there anymore" kind of phone call.

Q. Well, tell me, why did you agree to serve as a witness for the Bates in this case?

A. I just felt like -- I mean, I'm just here to tell the truth.  And, again, the reason why I left State Farm is I wasn't happy with what I was being -- you know, it still upsets me, but what I was told that I couldn't do on claims after being with the company for 15-plus years and feeling like I knew what I was doing, I knew what hail damage was, and to be -- I mean, my authority was totally taken away from me on totaling roofs.  So, I was told that I had -- everyone on our team did not have any authority anymore to total roofs because we were paying for too many roof claims.  When we had -- when we did an inspection, we were not allowed to -- when

you're on a roof with a roofer, you point out where there's hail or they point -- usually they're the ones saying, you know, "What about this one?  What about this one?"  And we would -- we had the authority to say okay and we'd circle it, "Yes, that's hail, yes, that's hail," and then we would count them up and decide if the roof was a total or if the slope was a total.

We didn't have authority to do that anymore. We had to take pictures with our phone on top of the roof in front of a roofer -- sometimes in front of a roofer if they got up there with us -- and I had to send those pictures over to Jacqueline.  And she would ask, "Well, was it -- it doesn't look like the granules are crushed into the mat on that one" or, you know, "What does it feel like under -- under the mat," or, you know, just other questions.  And if I wasn't able to reach her via cell phone, then I had to -- I just felt like there was such pressure because I had to try to make up -- either tell the roofer...

I mean, honestly at the beginning when we were told that, I would just tell the roofers, "Look, I don't have authority to total roofs anymore.  I'm going to come out here and I'm going to take

pictures, but I'm not going to be able to tell you if that's hail."

And I would get into -- I mean, roofers would say, "You mean to tell me you can't tell me if that's hail -- right now is that hail or not?"

"I can't tell you that."

And it was just very stressful for me to know what I knew, if it was or not, but I couldn't say. "You know, are you going to total this roof or no?"

"I can't tell you that."

So, I mean, it was -- it was upsetting.  It was kind of embarrassing for me because here I am going up there on a roof and I'm representing -- I'm supposed to have experience and I did have experience and I knew, but, yet, I couldn't say anything. I mean, so it was -- it was upsetting.

And then, on top of that, when I was told that is not hail or it's not new hail, to call it wear and tear and to deny a claim, I felt -- I felt bad.  My conscience was really getting to me because I would have to stand in front of an insured or call them and say, "I'm sorry, I can't -- I can't total your roof. It's wear and tear."  And in my mind, on -- now, there are some that I -- you know, I didn't total every single roof and it wasn't that -- that's not

Amy Lanier
6/24/2022

what I'm saying here.  I'm saying that on the ones that I legitimately felt like there was some damage from hail, from new hail that I felt like that the roof should be totaled, that I was told to deny the whole thing, and that -- that was difficult.  And that happened numerous times, over and over again.

So, I mean, there were times that I went home and -- anyway, there were times that I got really upset at home after some of those conversations.

So, that's -- I just -- I'm just here to tell what my truth is and what my experience was.

Q. Okay.  At any point during this time frame, when you felt like your authority was being taken away from you --

A. Yes.

Q. -- did you ever address that with anyone at State Farm?

A. Well, I had -- we all had conversation -- when I say "we all," I mean other people on my team had conversations with Jacqueline about our concerns. I mean, it was -- we all did get our authority taken away.  It wasn't that I felt like it; we were told we did not have authority to total any roofs, that before we -- before we totaled a roof, we had to send her pictures either via text message on our phones or

email her pictures or give her a call with our
pictures pulled up once we've uploaded them into the
computer and go over those pictures.

So, before I could put anything in the file
notes-wise besides "inspected roof," maybe, you know,
"complete notes to follow," you know, something like
that, just so somebody else could go in and see that
I did inspect it, I had to talk to her and find out
what she's going to let me do and what I needed to
say on it.

Q. Did you use scope sheets at your inspections?

A. Yes.

Q. And you were still filling out your
scope sheets when you inspected and took the
photographs.  True?

A. Partially.  I mean, you know, I would mark
some things sometimes.  I -- I definitely --
you know, the measurements were there.  I'd draw out
where my test squares were.  You know, just kind of
depending on the phase, like when I was able to reach
her -- if I was up on a roof and I was able to reach
her, then I would -- if she said, "Yeah, that
definitely looks like hail.  Let's see -- you know,
if you have some soft metal damages, let's see
those," you know, so then I would send those.  And if

she -- then, you know, there were times that -- I'm not saying every time she said, "Don't total," you know, "Deny, deny."  But the majority of them, in my experience -- now, there were other -- three other -- two other adjusters that worked the same territory.  But in my experience, most of them were not paid for.

So, just depending on what that conversation was and when that conversation was done -- if it was up on the roof where she said, "Yes, okay, go ahead and that's going to be a total, I agree with what your assessment is," then I would mark everything up and I'd put my notes in.

Q. So, there were instances when you may have submitted documentation for the file and Ms. Draper would agree that there was hail damage.  True?

A. Yes.

Q. And there were instances when maybe you thought something was hail and she disagreed?

A. Yes.

Q. Is there any element of subjectivity in calling damage on a roof, in your opinion?

A. On subjectivity?

Q. Is there any subjectivity to the process?

A. I believe, yes, there is subjectivity.  But I

my discussion.

Q. Yeah.  So, you said that you didn't -- it sounds like you're saying, after you started working with Jacqueline, you didn't mark your test squares with chalk?

A. Not all the time because I was told that I needed to send pictures to her with that information so that she could tell me whether or not it was totaled or not.

Q. Do you still count hail hits on roofs?

A. I tried to.  If I was able to reach her, I would count them.  It was just -- it was very difficult and very awkward.  I just remember it being very awkward as to what I was going to be able to do on roof claims.

Q. Did you still make calls based on your test squares and the hits that you counted that you -- you know, to -- did you still total certain slopes on certain roofs that you investigated?

A. I had to wait and hear back from her whether or not I could.

Q. But ultimately you still totaled slopes on roofs; right?

A. If she told me I could, yeah.  I just couldn't make that decision on the fly right there,

you know, on the roof.

Q. Do you still fill out a scope sheet?

A. I filled out the scope sheet, but I remember leaving some things off sometimes if we were going discuss it further, if I couldn't reach her and then having to, you know, fill that out and then even waiting to put my notes in the file because I was told -- I believe there was one at the very beginning where I put in my notes -- and I don't remember a claim or a number or anything like that -- but that I put in there "talked to TM," you know, something about was told not -- you know, "the roof will not be a total loss" or something to that effect.  Then I was told after that one that I did not -- do not put her name in there.

Q. Do you still take photos?

A. Yes.

Q. Still prepare estimates?

A. Yes.

Q. Do you still talk to contractors?

A. Yes.

Q. What is collateral damage?

A. Collateral damage would be any -- from what I can remember -- it's been a while -- but collateral damage is any damage that's not direct damage to the

A. Yes.

Q. Did you still look for -- at the granules to determine whether they were embedded or crushed into a mat?

A. Yes.

Q. Anything else you remember about what you were trained to identify as hail damage by State Farm?

A. I just remember with Jacqueline that it was more about, you know, feeling like -- you know, sometimes feeling the underside of the shingle to see if it actually embedded further into the mat. You know, there was "old" versus "new hail" terms, but the term "new hail" -- well, no.  The term "old hail" we were prohibited to use in our log entries because sometimes she would tell me that that was wear and tear, but I didn't agree with that. Why -- why were we -- because when I -- to kind of back up.  This just kind of reminded me of it.

When I used to, before her, do an inspection on a roof, there might be -- you know, let's say it's a 10-year-old roof.  Okay?  And the shingles were damaged recently by a storm in May.  But maybe they had another storm maybe in May of last year, but they had been with us for 10 years and they hadn't turned

in a claim.  My training, up until Jacqueline, was that, you know, if they've got old and new hail damage, you put that in your notes.  You know, "I found, you know, hail hits from current storm, old and new hail damage, total of all, you know, warrants replacement" or something to that effect.  "Roof is not reparable due to old and new hail damage on the roof."

But I was told not to use the word "old hail damage," that we needed to use the word "wear and tear."

So, on some -- some claims, you know, if maybe it was just lots of old damage but they've, you know, been with us for a while and it was -- it was still hail but they just -- they were trying to either save their deductible or try to wait and make sure it was actually totaled because they didn't want to have some more claims, you know, then that was something where we would deny that claim under her.  But we wouldn't call it "old hail damage," we would -- I was -- I was directed to, in my notes, to say "wear and tear."

Q. We talked earlier about the fact that one of the jobs of an adjuster is to determine that the damage that's being claimed occurred during the

I'm sure that there was some other, you know -- I just don't remember specifically anything.

Q. Okay.

A. But definitely no Haag certification.

Q. Anything else that was different about the Haag training that you felt was different than what you --

A. I just remember -- because I did ask the question because it just kind of opened my eyes a little bit to just some differences of opinion on what I considered hail and what I was -- just recently coming off of another job with another company, you know, a lot of it was in line, but then there was some other stuff where we talked about old damage and, you know, things like that that kind of stood out. I really now more firmly -- after taking that training, more firmly believe about what old damage looks like and things like that.

Q. Ms. Lanier, do you dislike Jacqueline Draper?

A. I thought she was a great person. She had a great personality. I didn't get to know her that well, but I liked her. I just didn't -- I mean, the practices were -- I didn't really agree with the practices. But...

Q. Did you have any experience with Ms. Draper

that you felt demonstrated that Ms. Draper was untruthful or dishonest?

A. I think -- looking back, I think she had good intentions, but the fact that she didn't let me make that decision and if I disagreed with that decision, I would -- in my notes, I had to wait to put my notes in until I talked to her about what the coverage decision was going to be, and so then I had to put in the notes as if that was my decision.  So I didn't -- I felt uneasy about that.  I don't know that that was a dishonesty, I just feel like that was a directional coverage opinion and her direction on what -- how I needed to -- how we needed to do our claims.  It wasn't just me, it was everyone that kind of had -- that we had to do that.

Q. Did you have conflicts with Ms. Draper while working with her?

A. No.  I mean, I would tell her, "I'm just not sure.  I feel like we should total this roof," or whatever.  But there was never any arguments or anything that I would consider a conflict with her.

Q. Speaking over the 20-plus-year term that you were there, did you have a positive experience working at State Farm?

A. I did.

MR. LEFFEL:  I have confirmed I have no further questions at this time.

THE WITNESS:  Okay.

EXAMINATION

BY MS. LANDEROS:

Q. Amy, Ms. Lanier, I have just, I think, a couple.

A. Sure.

Q. When you had said that, you know, in the beginning you would make a note that you had sent, you know, the pictures to your team manager and your team manager said, "This is not hail," but then you were told to not put her name in the file anymore.

A. Yes.

Q. Who told you that, to not put the name in the file anymore?

A. Jacqueline did.

Q. When you had, you know, mentioned in one of these meetings that you were concerned about the way claims were being handled under Jacqueline Draper and that you were afraid that the company was going to get sued, did you ever get a response to that?

A. The -- I had that conversation with Janice and Kelly and also mentioned that to Jacqueline, but I think that the conversation with Jacqueline was

Amy Lanier
6/24/2022

can't do."

But, yes, then after -- I guess somehow it went back to her in some way because then we got the direction to not -- we are not to say anything about that anymore.

Q. And when you say "her," do you mean Ms. Draper?

A. Yes.  Sorry.  Yes.

Q. I think we kind of alluded to this, but I want to make sure that this has been asked at least.

Old hail, does that equal wear and tear?

A. No.  My opinion is it does not because you can differentiate between old hail that has maybe worn -- I mean, yeah, old hail will wear just like any other damage on a roof will wear.  But wear and tear to a roof is not inclusive of -- when I used to put my log entries and my notes in the files, I would differentiate between if I found old hail with wear and tear, the same as I would differentiate between old hail, wear and tear, and maybe some blistering or bruising or nail pops or wind damage, missing shingles.  I would differentiate those things in my mind and separate those out.

Q. Now, under the policy with State Farm, any of the homeowners policies, hail is a covered cause of

loss, isn't it?

A. Yes.

Q. Is wear and tear a covered cause of loss?

A. No.

Q. And so, by changing the wording in your file, you are no longer allowed to say "old hail," you have to say "wear and tear" --

A. Yes.

Q. -- does that indicate to you that they were trying to get something that initially would have been a covered cause of loss into something that was not a covered cause of loss?

MR. LEFFEL:  Objection, leading, calls for speculation.

You can go ahead.

THE WITNESS:  Okay.  In my mind, when I got that direction, I felt like it was kind of like a coverup, but I -- you know, I just followed the direction of what they told me to do.  And again, that's part of what kind of ate away at me in the new practices and things like that that we were told to do.

Q. (By Ms. Landeros)  We talked a little bit about your authority level.  And I know you mentioned the number 75,000.  And if I'm understanding your