1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
   THOMAS H. BATES,              )
 3                              )
                  Plaintiff,    )
 4                              )
     vs.                        ) Case No. 21-CV-705
 5                              )
   STATE FARM FIRE AND CASUALTY,  )
 6                              )
                  Defendant.    )
 7

 8

 9

10

11              TRANSCRIPT OF

12          SHARON ARNOLD TRIAL TESTIMONY

13         NOVEMBER 3, 2022, at 9:06 A.M.

14   BEFORE THE HONORABLE JODI W. DISHMAN, JUDGE PRESIDING

15

16

17

18

19

20

21

22

23

24             Recorded by mechanical stenography
25       Transcript produced by computer-aided transcription
```

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  StenoLogic@cox.net

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3        Mr. Robert Bradley Miller
 4        bmiller@mjjaw.com
 5        Ms. Shawna L. Landeros
 6        slanderos@mjjaw.com
 7        Miller, Johnson, Jones, Antonisse & White
 8        500 Northwest Sixth
 9        Suite 300
10        Oklahoma City, Oklahoma 73102
11        405-896-4388
12
13   FOR THE DEFENDANT:
14        Mr. Lance Leffel
15        lleffel@gable.com
16        Ms. Paula M. Williams
17        pwilliams@gablelaw.com
18        Ms. Taylor J. Freeman Peshehonoff
19        tpeshehonoff@gablelaw.com
20        GableGotwals
21        499 West Sheridan Avenue
22        Suite 200
23        Oklahoma City, Oklahoma 73102
24        405-235-5500
25
```

3

1                            EXAMINATION INDEX

2    SHARON ARNOLD                                        PAGE

3         DIRECT BY MR. MILLER                              4

4         CROSS BY MR. LEFFEL                             128

5         REDIRECT BY MR. MILLER                          184

6         RECROSS BY MR. LEFFEL                           198

7         FURTHER REDIRECT BY MR. MILLER                  200

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sharon Arnold                                                          4
Direct Examination by Mr. Miller

1       (This transcript contains only the excerpted trial

2    testimony of Sharon Arnold:)

3            THE COURT:  Plaintiff, please call your next witness.

4            MR. MILLER:  We would call Sharon Arnold.

5       (The witness is sworn.)

6            THE COURT:  Mr. Miller, if I could have a moment.

7       (Discussion off the record between the clerk and Court.)

8            THE COURT:  Mr. Miller, you may proceed.

9            MR. MILLER:  Yes.

10       Can I go ahead and hand her this, Judge -- the transcript?

11            THE COURT:  Okay.

12            MR. MILLER:  I meant to put it up there, and I

13    forgot.

14       That's the --

15            THE WITNESS:  Thank you.

16            MR. MILLER:  -- transcript of your deposition.

17            THE WITNESS:  Okay.

18                        DIRECT EXAMINATION

19    BY MR. MILLER:

20    Q.   All right.  Ms. Arnold, please tell us your name.

21    A.   Sharon Denise Arnold.

22    Q.   And, Ms. Arnold, what do you for a living?

23    A.   I work for State Farm Insurance.

24    Q.   How long have you done that?

25    A.   November 15th will be 29 years.  Long time.

Sharon Arnold                                                      5
Direct Examination by Mr. Miller

1   Q.   All right.  So this month's your anniversary at

2   State Farm?

3   A.   It is.

4   Q.   Are you planning on making a career of it, sounds like?

5   A.   Yes, sir.

6   Q.   So you'll be there until you decide to retire?

7   A.   Yes.

8   Q.   Now, your job -- we've heard a lot in this trial already,

9   but let's just get a few of the particulars.

10       What do you do for State Farm today?

11  A.   I am considered a proximity section manager.

12  Q.   Tell us what that means.

13  A.   So I have responsibilities for all of my first-line

14  managers.  I have five managers right now that are in

15  production, one who has just been hired.  So I have

16  responsibilities -- training, coaching, developing them;

17  performing performance assessments; salary administration.

18       Then I have also the claims specialists that would report

19  to those managers, and I'm -- basically oversee all of the

20  quality; making sure that we're, you know, handling files with

21  quality.

22       I also make sure that all of our claims specialists,

23  managers are fully licensed.

24       I make sure that we are upholding the policies and

25  procedures.

Sharon Arnold                                                          6
Direct Examination by Mr. Miller

1  Q.   And you work out of what office?

2  A.   I -- we -- I work virtually.  I can travel to Oklahoma,

3  but I work out of an office -- I really work out of my home

4  now, but I do have the opportunity to work out of an office in

5  Dallas.

6  Q.   I see.

7       When you say out of your home, do you live in the Dallas

8  area?

9  A.   Yes, sir.  I live in Lantana.

10 Q.   Now, what is the territory you currently have been

11 assigned?

12 A.   The territory that I currently have is the entire state of

13 Texas -- I mean -- I'm sorry.  I live in Texas -- the entire

14 state of Oklahoma.

15          THE COURT:  Mr. Miller, if you'll give us a moment.

16          MR. MILLER:  Yes.

17          THE CLERK:  You're okay.

18          THE COURT:  I just don't want the jury to be

19 distracted.

20          MR. MILLER:  Appreciate that.

21     (Discussion off the record between Ms. McGuire and the

22 clerk.)

23          THE COURT:  Mr. Miller, please proceed.

24 Q.   (By Mr. Miller) How long have you had Oklahoma as your

25 territory?

Sharon Arnold                                                      7
Direct Examination by Mr. Miller

1   A.   I have had Oklahoma since 2018.

2            MR. MILLER:  Okay.  Judge, I'm hearing feedback when

3   I -- I didn't hear it before.  Do you hear that, a ringing?

4        Maybe I just have ringing in my ears, but --

5            THE WITNESS:  No, I can hear it too.

6            MR. MILLER:  Is it maybe -- am I too loud?

7        I feel like the closer I get, the worse it gets.

8            THE COURT:  Let's go off --

9            MR. LEFFEL:  It helps me to hear when you're close to

10  the microphone.

11           THE COURT:  Let's go off the record.

12       (Discussion off the record.)

13           THE COURT:  Okay.  Please proceed.

14           MR. MILLER:  Okay.

15  Q.   (By Mr. Miller) All right.  Does that make any difference?

16  A.   I don't hear it now.  Maybe?

17           MR. MILLER:  The.  Bad thing is I'm not sure how I'm

18  going to do this without the tablet.

19       All right.  Thank you.

20  Q.   (By Mr. Miller) All right.  So --

21           MR. LEFFEL:  That wasn't it.

22  Q.   (By Mr. Miller) Oklahoma.  How long have you had Oklahoma

23  as your section?

24  A.   I have fully had Oklahoma as my section the earlier part

25  of this year.  I used to have Oklahoma and West Texas, but now

Sharon Arnold                                                              8
Direct Examination by Mr. Miller

1   I solely just have Oklahoma.

2   Q.   Okay.  But -- and even when you had West Texas, you had

3   all of Oklahoma?

4   A.   I did, uh-huh.

5   Q.   All right.  So how long have you been the section manager

6   over Oklahoma, whether it was in other places or not?

7   A.   Sure.  Since 2018.

8   Q.   And, I -- I take it, you had another job before that.

9   Were you promoted to this job before that?

10   A.   No.  In -- I was promoted to my current role in 2014.

11   Q.   Okay.

12   A.   So I just -- I just had responsibilities for different

13   states.

14   Q.   And had you been a team manager before that?

15   A.   I was.  I was a team manager for 16 years.

16   Q.   And then, before that, you were a --

17   A    -- specialist, uh-huh.

18          THE REPORTER:  One at a time.

19          THE COURT:  Mr. Miller, one at a time.

20   Q.   (By Mr. Miller) And as a section manager, though, just so

21   we can be clear, that is essentially the person over however

22   many team managers you happen to be assigned, and you are the

23   ultimate responsibility for the reports to the team managers

24   from adjusters --

25   A.   That's correct.

Sharon Arnold                                                          9
Direct Examination by Mr. Miller

1   Q.   -- right?

2        And so, roughly, how many total adjusters and team

3   managers are you currently overseeing?

4   A.   Roughly, about 62.

5   Q.   And is that roughly what it's supposed to be for you?

6   A.   It is.  We try to have at least about, maybe, eight

7   specialists per manager.  So we just -- as I mentioned earlier,

8   we just hired one additional manager, and we just have hired an

9   additional eight specialists that are coming in.  So they're

10  not in training yet, but they still are under my purview.

11  Q.   I see.

12       Now, the -- the manager spot that you -- you filled, was

13  that, by any chance, Jacqueline Draper's spot?

14  A.   No, huh-uh.

15  Q.   That was filled, though, I take it?

16  A.   It was filled, uh-huh.

17  Q.   I see.

18       All right.  And about when was it that she left?

19  A.   She left in -- see, this is 2022, so she would have left

20  in 2021?

21       20 -- 2020.

22       '21.  Maybe '21.

23  Q.   Are you --

24  A.   I'm trying to think.  It was in October, September.

25       This is 2022, so she left -- it's been a year.  It's been

Sharon Arnold                                                          10
Direct Examination by Mr. Miller

1   a year --

2   Q.    Are you --

3   A.    -- that she's been gone.  That's right.

4   Q.    Fair enough.

5         Now, from your perspective, as the section manager, what

6   do you think a proximity adjuster is supposed to be responsible

7   for, generally?

8   A.    So generally, they are responsible for what we call

9   "upholding our commitment to our policyholders," and that is,

10  just simply stated, we pay what we owe promptly and

11  efficiently.

12        So my expectation from my adjusters would be to go out.

13  They are to do a solid investigation, listen to all sides.  Any

14  information a policyholder would want to share, we want to look

15  at that, or their -- if they have a -- an -- you know, somebody

16  that's helping them out.  It could be a contractor.  It could

17  be an agent.  We listen to all facts that they want to submit.

18        And so they're just primarily to -- to look and to gather

19  all the information that they can, make the best decision.

20  They apply the policy provisions that we have, any sort of

21  exclusions that may apply.

22  Q.    Now, part of the reason that managers exist in an

23  organization like yours is to make sure that the people on the

24  front line or, in your case, the people at the middle and the

25  front line are following the practices that are required by the

Sharon Arnold                                                    11
Direct Examination by Mr. Miller

1  company that hires them.  Is that fair?

2  A.    That's correct.

3  Q.    And of course, also the laws.  That's important; right?

4  A.    Correct.

5  Q.    And there are laws that deal with State Farm's duties in

6  Oklahoma and everywhere.  Fair?

7  A.    That's correct.

8  Q.    Now, I think you said something about audits.  Apparently,

9  that's part of how you, as the section manager, can sort of

10  check up on what's going on in the different teams; right?

11  A.    That's correct.

12  Q.    And so you're taking -- I won't go all into it, but we

13  talked about this in your deposition.  You're taking random

14  samplings of -- every so often, every quarter or so --

15  A.    Uh-huh.

16  Q.    -- of claim files, and you're looking at them from every

17  team?

18  A.    Correct.

19  Q.    Now, we've heard a lot about wear and tear, and of course,

20  that's something that's actually mentioned in an insurance

21  policy; right?

22  A.    That is correct.

23  Q.    And wear and tear happens, I think, as you put it -- kind

24  of like the way you said it, it happens to just about

25  everything that we -- every piece of property's going to have

Sharon Arnold                                                    12
Direct Examination by Mr. Miller

 1  some wear and tear in it --

 2  A.    Uh-huh.

 3  Q.    -- unless it's packed in a -- I guess a -- a -- oh, I'm --

 4  iceberg.  That's what I was trying to think of.

 5        But basically, things are going to deteriorate; right?

 6  A.    Right.

 7  Q.    And under just general deterioration over time, that's not

 8  something that at least the State Farm Insurance policy covers?

 9  A.    That's correct.  That's a specific exclusion in the

10  policy.

11  Q.    Sure.

12        And that's generally the way it works with insurance

13  policies.  They generally don't insure things that wear out of

14  their own natural weight in time?

15  A.    Right.

16  Q.    Okay.  Now, when it comes to hail claims, your adjusters

17  at proximity have some responsibility; correct?

18  A.    What do you mean "responsibility"?

19  Q.    Do they handle hail claims?

20  A.    They do handle hail claims, yes.

21  Q.    Yes.

22        And I don't think you've talked about that yet, or I

23  missed it if you did.  Tell us what your adjusters' role is

24  with hail claims.

25  A.    So the adjusters can handle, really, any perils; right?

1        So fires -- we handle fires.  We handle water.  We handle

2    wind/hail.  Primarily in Oklahoma, that is what most of our

3    claims are -- are wind/hail.  But they can handle thefts,

4    vandalisms, anything that comes in to them.

5        So -- but specific to what Mr. Miller's asking, if they

6    receive a hail claim, they will go out.  They'll set an

7    inspection.  If they can physically climb it, they will go out

8    and -- would be my expectation -- they would get up on that

9    roof.  They would look at every single slope.  They would look

10   at all elevations, which is -- you're looking at the front of

11   the house; right?

12        It's the front of the house.

13        They would look at all elevations.  They would look at

14   anything -- what we would consider collateral.  They're just

15   looking for, you know, things that might tell them -- after, of

16   course, we've talked to the policyholder, because that's the

17   first thing we start -- we want to know what the policyholder

18   saw; right?

19        "Were you home when this storm happened?

20        "So kind of talk to us a little bit about that."

21        But we're going to -- we're going to go out, and we're

22   going to definitely take -- do a diligent investigation and

23   make sure that we're looking at all aspects of the house.

24   Q.   And that's your expectation?

25   A.   Yes, sir.

Sharon Arnold                                                      14
Direct Examination by Mr. Miller

1   Q.   Obviously, at your level, since you've been a section

2   manager, you rely heavily on your team managers to make sure

3   that the adjusters are doing and trained to do what they're

4   supposed to?

5   A.   Absolutely.

6   Q.   Right.

7        And, I mean, that's about the only way it could work.

8   Isn't that fair?

9   A.   I -- I would agree with that.  I -- I -- I'm not involved

10  in the day-to-day handling of the claims.

11  Q.   Right.

12       Or training; right?

13       I mean, a new adjuster comes onto one of your teams.  I

14  say "your team," but truly, there's someone between you and the

15  new adjuster?

16  A.   Correct.

17  Q.   And that person is responsible for making sure that the

18  new adjuster knows what they're doing and the kind of claim

19  that's been assigned --

20  A.   Right.

21  Q.   -- right?

22       And -- and it would be kind of -- I mean, in your world,

23  wouldn't it be kind of silly to expect the section manager to

24  be able to know about 60 or 65 adjusters -- I'm sure they roll

25  in and roll out some, but it'd be hard to know about them

1  specifically on the front line day to day.

2  A.   I would think -- I would say that I would agree with that.

3       You know, I do, do some ride-alongs.  I'm able to come up

4  to Oklahoma and, you know, observe and watch what they do.

5  It's more of a quality control check.  I'm observing my team

6  manager, how they're coaching, if they need to coach the rep.

7       But, yeah, I mean, for the most part, that's what their --

8  the manager is their primary source.  They certainly can call

9  me, and I do talk to my adjusters, you know, without the

10 manager on the phone.  Sometimes too, if I have a question, if

11 they're sending me an authority request or -- and, really, just

12 to kind of get to know and establish a rapport, right, with my

13 employees, because I don't get to see them very often, so...

14 Q.   Yeah.

15      So I'm not suggesting that you don't do all those things,

16 but, again, as far as daily contact and knowing what's

17 happening, that's not the role you took on when you became a

18 section manager.

19 A.   Right.  I don't manage the day-to-day activities of the

20 claim units.

21 Q.   And while I don't doubt for a second that you put some

22 effort into getting out in the field and -- and being with your

23 team managers and -- and the people under them -- for instance,

24 I mean, you'd never been on a roof with Jacqueline Draper;

25 right?

Sharon Arnold                                                    16
Direct Examination by Mr. Miller

1   A.    No.  I've not been a roof with Jacqueline.

2   Q.    So, again, it's not to say that you haven't been on roofs

3   with other team managers, but you hadn't made it around to

4   Jacqueline Draper at the time that, at least, I deposed you

5   and, I guess, even till this day.

6   A.    No, I hadn't, because when Jacqueline started with me in

7   2019, I -- I probably -- it was later in the year, and I may

8   not have traveled -- I'd have to go back to my notes to look,

9   but then COVID hit; and when COVID hit in March of 2020, I

10  mean, we -- they pretty much -- we didn't -- we didn't inspect,

11  so --

12  Q.    Well, in fact, Jacqueline started in the summer of 2019,

13  as she will testify to later.

14        Maybe she did yesterday.

15        Did you know we had a little snafu?

16  A.    I heard there was some technical --

17  Q.    Yeah.

18  A.    -- thing, yeah.

19  Q.    So I can't exactly remember the things we managed to get

20  out of her, but it will happen that she's told -- will tell us

21  or did tell us that about in the summer of 2019 is when she

22  started.

23        So you had her about six or eight months before COVID shut

24  us down; right?

25  A.    Right.

Sharon Arnold                                                    17
Direct Examination by Mr. Miller

1   Q.   Okay.  In any event, this wear-and-tear thing, even a

2   worn-out roof -- not that that has anything to do with our case

3   probably, but even a worn-out roof can be covered by a

4   State Farm Insurance policy; right?

5   A.   If -- in the -- in the sense -- if we're talking -- if

6   there's hail -- if the roof is worn out, and we can certainly

7   find hail or if a tree were to fall or if it were to be damaged

8   by a fire, we would definitely pay for that roof.

9   Q.   Well, that -- thank you, and I was getting to that.

10       But I just want to make sure that everyone understands

11  there's no exclusion that you're aware of, of ever seeing at

12  State Farm that would exclude a roof on a policy; right?

13  A.   Well, yes, there are exclusions in the policy, so we do

14  have exclusions for wear and tear, deterioration.

15  Q.   No, no.  That's not what I'm asking you.

16  A.   Okay.

17  Q.   Now, if -- if I'm -- if I'm not making myself clear,

18  please ask me to explain it, because I do that to a lot of

19  people.  All right?

20  A.   Okay.

21  Q.   You spent a whole day with me one day, didn't you?

22  A.   I did.

23  Q.   Okay.  All right.  But the questions -- a lot of them I'm

24  asking, like this one -- I asked you then, and you answered

25  then.  Do you remember me asking you the question then?

Sharon Arnold                                                    18
Direct Examination by Mr. Miller

1    A.    I...

2    Q.    Must not?

3    A.    Can you ask me again?

4    Q.    Yeah, yeah.

5          So what I was asking you just now is you're unaware of a

6    specific exclusion at State Farm that, "On a covered house,

7    we're not going to cover your roof"; correct?

8          They don't do that.  If they cover the house, they cover

9    the roof.

10   A.    Oh, I apologize.

11         Yeah.  I mean, yes, if -- if we insure the home, we're

12   going to insure all components of the house.

13   Q.    Okay.

14   A.    I apologize.  Yes.

15   Q.    And -- and even if it's a -- a worn-out roof, if

16   State Farm covers the house, then they're going to cover the

17   roof.

18   A.    Right, as long as -- yes.

19   Q.    And like you started to say a moment ago, if there's been

20   a hailstorm, and it damages that worn-out roof --

21   A.    Uh-huh.

22   Q.    -- then State Farm's going to cover that roof just like if

23   it was a brand-new one.

24   A.    That's correct.

25   Q.    Now, of course, the adjustment of -- of the value could

Sharon Arnold                                                    19
Direct Examination by Mr. Miller

1   change, right, on the ACV, for instance --

2   A.    Correct.

3   Q.    -- right?

4         So let's help the -- with one more explanation for the

5   people here:  that the actual cash value is how you pay first

6   on a claim for a roof; correct?

7   A.    That is correct.

8   Q.    And State Farm's practice is to figure out what it would

9   cost to replace that roof --

10  A.    Uh-huh.

11  Q.    -- right?

12        And then the computer helps you, based on the age and the

13  condition of the roof -- the computer that -- the big

14  State Farm computer in the sky, it helps the adjuster know what

15  to depreciate on the roof; right?

16  A.    That's correct.

17  Q.    And the depreciation is expressed in a percentage;

18  correct?

19  A.    That's correct.

20  Q.    So if it's a fairly new roof that they're paying the ACV,

21  it might have a 10 or 15 or 20 percent depreciation; right?

22  A.    It could.  I mean, depreciation is not just age alone.

23  It's age and condition.  I think you'd mentioned that too.

24        So, I mean, they have the ability to change if, you know,

25  a roof -- let's say it's eight or nine years old, but it's

Sharon Arnold                                                    20
Direct Examination by Mr. Miller

1   really worn out.  Maybe there's not enough ventilation on the

2   roof, because that can really damage a roof a lot quicker.

3   They have the ability to go in and change, like, the condition,

4   if it's average, below average, or if it's above average.

5   Q.   Yeah.

6        But, Ms. Arnold, that's not what I'm asking you.  I'm just

7   saying simply that -- and I'm being theoretical here.  I'm

8   making an example that's theoretical.

9   A.   Okay.

10  Q.   But the point is that, if it's a pretty new roof, then

11  you're going to have a -- a -- a lower percentage -- 10, 15, 20

12  percent deduction; right?

13  A.   Sure, yes.

14  Q.   And that that deduction, then, is going to mean that the

15  ACV payment will be, maybe, 80 percent or 85 percent of the

16  replacement value of the roof, depending on the circumstances.

17  A.   Correct.

18  Q.   Okay.  And if it's a really old roof, I mean, it -- it

19  really had outlived its life, but now the hail's hit it, then

20  you might deduct it 50 or 60 or 70 -- I don't know what -- the

21  most you ever do, but you can deduct it as much as makes sense;

22  and then the ACV value that's paid up-front is going to be 20

23  or 30 or 40 percent of the value of replacement.

24  A.   That's correct.

25  Q.   And then, once you replace the item, you're going to get

Sharon Arnold                                                    21
Direct Examination by Mr. Miller

1   the money -- the rest of the money on the estimate if

2   everything goes like it's supposed to.

3   A.    Right, if -- if they spend what actually we have estimated

4   for.    Correct.

5   Q.    Yes, ma'am.    Thank you.

6        Now, in -- in the same vein goes all the other things that

7   might be damaged by a storm:    the metal; the gutters, which

8   would be metal; the -- a garage door.    Whatever it is, if it's

9   covered, and you're going to pay for it, you give the actual

10  cash value, and then you pay the rest, if they replace it.

11  A.    That's correct --

12  Q.    And --

13  A.    -- or -- or we could, on occasion, if a signed contract is

14  presented -- we could release the moneys up-front to the

15  policyholder.

16  Q.    Okay.    But when you do decide to make it an ACV situation,

17  that depreciation is important in determining how much the

18  homeowner is going to get up-front; right?

19  A.    That's correct.

20  Q.    Because sometimes the homeowner just decides, "I don't

21  want to go any further.    I'm happy with the ACV.    I don't want

22  to replace the roof jack on my house if that's all you're

23  paying me for.    I'll just leave it."

24  A.    Uh-huh.

25  Q.    That happens; right?

Sharon Arnold                                          22
Direct Examination by Mr. Miller

1    A.    Yes.

2    Q.    And so they're never going to get the rest of the money

3    because they don't replace it under that scenario; right?

4    A.    That's correct.

5    Q.    Sure.

6          Now, just to be clear, when you're talking about the value

7    on a roof jack on a house --

8    A.    Uh-huh.

9    Q.    -- the same equation happens.  You put in the age and the

10   condition in the computer, and it tells the adjuster, bing,

11   "This is how much you're going to depreciate that thing";

12   right?

13   A.    That's correct.

14   Q.    The more -- the older -- excuse me.

15         The older the age that's inputted, the more the deduction

16   is going to be.  The more the depreciation is going to be --

17   A.    That's correct.

18   Q.    -- right?

19   A.    That is correct, uh-huh.

20   Q.    In your vernacular, your definition, what's a field

21   shingle?

22   A.    I would consider the field of the shingle -- when you're

23   looking at it, you have your edges.  It would be the interior

24   part of that shingle.

25   Q.    So basically, everything inside the edges?

Sharon Arnold                                                        23
Direct Examination by Mr. Miller

1    A.    Correct.

2    Q.    Is there a certain measurement --

3              THE COURT:  Sorry.  I didn't get an answer.

4              THE WITNESS:  I'm sorry.  That's correct.

5              THE COURT:  "That's correct."

6              THE WITNESS:  Yes.

7              THE COURT:  Make sure -- you can move that microphone

8    up --

9              THE WITNESS:  Okay.

10             THE COURT:  -- so you can still be in your seat --

11             THE WITNESS:  I felt like I was, like, right on it.

12   Maybe that was me making a --

13             THE COURT:  You can pull -- you can physically --

14             THE WITNESS:  Okay.

15             THE COURT:  -- pull it.

16             THE WITNESS:  Okay.

17             THE COURT:  There you go.

18             THE WITNESS:  There you go.

19   Q.    (By Mr. Miller) So is there a measurement in your world

20   about what an edge is when it's talking about that versus the

21   field of the shingle?

22   A.    Not to my -- not that I know of, huh-uh.

23   Q.    Never seen that in 29 years and 15 days -- 13 days?

24   A.    I mean, it -- it -- in the training that we do, it may

25   have said it in there, but it's not something that I -- that I

Sharon Arnold                                                    24
Direct Examination by Mr. Miller

1   really focus on.  I mean, we have the edges.  We have the field

2   of the shingle.

3   Q.    Right.  Right.  That's fine.

4         I'm just trying to understand, in the industry that you've

5   been in for 20-, almost, 9 years --

6   A.    Uh-huh.

7   Q.    -- and by the way, during that time, have you been, in

8   some way or another, connected to this kind of adjusting where

9   people go out and look at rooves and decide what the damages?

10  A.    Yes.

11  Q.    So you've got almost 29 full years of that very thing --

12  A.    Uh-huh.

13  Q.    -- right?

14  A.    Uh-huh.

15  Q.    Is that a "yes"?

16  A.    Yes, sir.

17  Q.    Need to have --

18  A.    Sorry.

19  Q.    Verbal answers are good.

20  A.    Sorry.

21  Q.    Okay.  All right.

22        So in all that time -- I just want to be clear -- you've

23  not ever seen -- that you can remember -- anybody try to

24  calculate the difference between an edge and the field of the

25  shingle in a measurement?

Sharon Arnold                                                    25
Direct Examination by Mr. Miller

1    A.    I've never seen that.

2         And -- and honestly, it really doesn't make a difference.

3    If it's an edge, the field -- if it's damaged, it's damaged,

4    and we're going to pay for that, so...

5    Q.    Well, that's what you're supposed to do; right?

6    A.    Correct.

7    Q.    Yeah.  Okay.  Fair enough.

8         Now, is it important to get up on that roof, when there's

9    a hail claim, to decide if there's really damage from hail?

10   A.    Yes.

11   Q.    Why is that important?

12   A.    Because a lot of times, you know, if we -- if we're out

13   there, and we see that there is no damage, maybe collateral, we

14   definitely want to get up and make sure that there is no damage

15   to the roof; and that is just part of the investigation and

16   part of what we expect our adjusters to do when we have a hail

17   claim.  That is one claim that we absolutely put a set of eyes

18   on.

19   Q.    And not just a set of eyes, because you could put eyes on

20   the roof from the ground; right?

21   A.    I mean, you can -- you can see the roof, but you can't

22   really get up on the roof and look at the shingles per se.

23   Q.    Right.  Right.

24   A.    And you can't really -- you could not do a proper

25   inspection if you're looking at it from the ground.

Sharon Arnold                                                    26
Direct Examination by Mr. Miller

1   Q.   Right.

2        In fact, you can't even know for sure there's hail once

3   you get on the roof unless you get close to the place that you

4   see a possibility of damage?

5   A.   I think it just depends.  You know, if -- if you're up

6   there -- if -- if we have a hailstorm like we did in Norman

7   late -- earlier last year where we had 4-inch hail, when you

8   get up, you're going to be able just to see that.  You don't

9   have to really get down; but when you have, you know, smaller

10  hailing, it can be sometimes difficult to see.

11  Q.   And I should have been more specific, yeah.

12       That hailstorm in Norman, you could just drive down the

13  street from the road and see it; right?

14       Did you -- did you go to Norman?

15  A.   No.  I didn't.  Not after that.

16  Q.   Oh, so you haven't actually experienced the Norman thing?

17  A.   No.  I've just seen a lot of the photos.

18  Q.   Okay.  Well, in any event -- fair enough.

19       So there can be hail damage that you cannot see till you

20  get close to it?

21  A.   Yes.

22  Q.   And -- and by "close to it," what would you say when the

23  hail damage is not the kind you can see from the steps of the

24  ladder, but how -- how close do you often expect your folks to

25  get?  Is it as close as it takes?

Sharon Arnold                                                        27
Direct Examination by Mr. Miller

1   A.    Yeah.  I mean, it's based on, yeah, what -- what they

2   feel.  I mean, they all have different levels of -- and

3   depending on what they see.  I mean, they're going to look at

4   the soft metals.  That's, really, a good indication sometimes

5   of maybe what we should potentially see on the roof.

6         And like I'd mentioned earlier, collateral.  We're

7   definitely looking at that to kind of see what kind of size --

8   we do have tools that we can look at that are weather reports

9   that kind of tell us atmospherically what fell but doesn't

10  necessarily mean that's what actually hit the roof.

11        So depending on what they see up there, they may have to

12  get down.  They may have to feel the shingle to see if there's

13  a potential what -- if we have hail, if it's -- if -- if the

14  bruise is -- if it's soft on the shingle.

15  Q.    Well, one of the things that's expected of the adjuster is

16  to chalk, mark, up the -- the roof.  So they have got to get

17  right on it; right?

18  A.    Oh, absolutely.

19  Q.    I mean, they have got to be touching, at least with a

20  piece of chalk --

21  A.    They do.

22  Q.    -- the roof --

23  A.    Uh-huh.

24  Q.    -- and they're supposed to mark a square --

25  A.    Right.

Sharon Arnold                                                    28
Direct Examination by Mr. Miller

1  Q.   -- which is 10 by 10 --

2       (Reporter interruption.)

3  Q.   (By Mr. Miller) We get a little conversational sometimes,

4  and I -- I'm sorry for my contribution of that.  I'll try to be

5  a little slower.  Okay?

6       Now, what I was trying to find out is there's a process

7  that each slope is marked demonstrating what a 10-by-10 --

8  10-feet-by-10-feet area is --

9  A.   Uh-huh.

10 Q.   -- right?

11 A.   That's correct.

12 Q.   And that's just not a State Farm thing.  That's a standard

13 thing in the industry, isn't it?

14 A.   Yes.

15 Q.   And then you identify inside that square the number of

16 hail strikes at least until you've got enough for whatever the

17 current count is required of a particular insurer; right?

18 A.   The -- the count -- so yes and no.  We are looking in that

19 10-by-10 area for a certain number of hits, and that certain

20 number of hits is based on the manufacturer and the cost.

21      So they have to -- the adjusters have to look up what the

22 actual shingle is on the roof, and then the manufacturer will

23 tell us how many hits in that -- excuse me -- that 10-by-10

24 area is enough to say that we should total that roof -- or

25 total that slope.

Sharon Arnold                                                    29
Direct Examination by Mr. Miller

1    Q.    That's -- that's fine.

2          The -- but the point is that it can be, depending on the

3    circumstances it sounds like, six, seven, eight, nine.

4    That's -- that's the kind of numbers we're talking about;

5    correct?

6    A.    It can be as low as four.

7    Q.    Four?

8    A.    But, yes, it can --

9    Q.    So -- so whatever -- whatever the rule is that you say you

10   go by, if you find four of those, in that case, inside the

11   square, then the adjuster's supposed to consider that slope in

12   need of replacement?

13   A.    That -- that's correct.

14   Q.    All right.  Now, you said something about touching it.  In

15   fact, you told me in the deposition that you expect the -- the

16   adjusters to touch and push on things they think might be

17   damaged to see if it -- if it moves; right?

18   A.    Right.  If -- if they think it's a potential hail hit, I

19   would expect them -- excuse me -- I would expect them to, you

20   know, if they can, you know, touch -- make -- well, definitely

21   touch it, because you can definitely tell if it's a soft -- if

22   it's a bruised area on a shingle.

23   Q.    Sure.

24          And -- and are -- every hail impacts that you can see with

25   your eyes on the shingle, are they always capable of being felt

Sharon Arnold                                                           30
Direct Examination by Mr. Miller

1    as well?

2    A.    They should be.

3    Q.    And -- and so an adjuster -- it's important that they're

4    trained to be up on a roof with somebody that knows what it

5    feels like to push on a place where there is suspected damage

6    so they can discern what feels like a bruise from hail and

7    what's something else; right?

8    A.    They could.

9    Q.    Oh, you -- you don't -- you don't want your adjusters to

10   have experience, before they're making their own decision,

11   about what it feels like to push on a place of suspected damage

12   to know if it's consistent with a hail bruise?

13   A.    No, no, no.  I apologize.

14         What I'm say- -- I -- I just misunderstood the question.

15         Yes, if -- if they -- if they are up there, and they see

16   damage, I would want them and I would hopefully expect that

17   they would have had some experience being able to know what it

18   feels like.

19   Q.    Let me start again, then, to be clear about it.  All

20   right?

21         Again, we -- we understand that you're not the one

22   training all the adjusters anymore, and you haven't for eight

23   years now.  I mean, you may have something to do with it, but

24   that's not your everyday job.  Fair?

25   A.    That's correct.

Sharon Arnold                                                         31
Direct Examination by Mr. Miller

1    Q.    But you do have expectations, which, I assume, are

2    supposed to be enforcing State Farm's expectations; right?

3    A.    That's correct.

4    Q.    And I'm sure there are corporate expectations about so

5    many things we couldn't possibly talk about them all today, I'm

6    sure; right?

7    A.    Correct.

8    Q.    But when it comes to this particular one, if an adjuster

9    is turned loose on their own, by themself, to go handle any

10   sort of claim, would you agree that the things that are

11   expected to be found, if it's consistent with damage and

12   coverage, they should have had some experience in recognizing

13   that firsthand?  Do you agree with that?

14   A.    I would expect, yes.  I mean, if -- if we have new reps,

15   sometimes, you know, they may not 100 percent -- when they're

16   looking at something, they may -- they may have an opinion of

17   what they see, and so that's why we have the team managers, you

18   know.  That's -- that is, really, part of their role, as I

19   mentioned.  I mean, they coach.  They train.  They develop.

20        And so they can call the managers to ask, you know, "Hey,

21   what do you think about this?"

22        "You know, my -- is my line of thinking -- are you seeing

23   what I'm seeing?"

24        They can do things like that.

25        So, you know, if -- if somebody -- I would like to see --

Sharon Arnold                                                    32
Direct Examination by Mr. Miller

 1   I don't know, you know, all of the training, because as you

 2   mentioned, I'm not involved with their -- on a day-to-day

 3   training.

 4        But if they felt the need to be able -- if you can get up

 5   there and see that it's a bruise, you may not have to touch it;

 6   right?

 7        But if you have something that might be questionable that

 8   you think's a bruise, I would -- I would want them to -- to be

 9   able to touch it.  If they could potentially lift the shingle,

10   I would want them to feel underneath it.

11   Q.   Okay.  So -- and -- and lifting and feeling under the

12   shingle might be adequate, even if you don't want to lift it up

13   enough to see it.  Is that what you're saying?

14   A.   When you -- a lot of times, if -- I mean, I wouldn't want

15   them to damage the roof because, you know, the roof --

16   they're -- they're sealed; but if -- if it's easy, where they

17   can lift it up, and they can feel -- not with their eyes, but

18   they -- I ask them to put their hands underneath it because you

19   can see -- it's like a divot.  It feels like a divot.

20        It doesn't have to break the mat.  The mat is the square

21   part of that shingle -- that field shingle.  It doesn't have to

22   break that mat, but when a hailstone strikes that mat, you're

23   going to definitely feel a little bit of indentation --

24   Q.   Sure.

25        The --

Sharon Arnold                                                   33
Direct Examination by Mr. Miller

 1   A.   -- on the shingle.

 2   Q.   -- the indentation is going to be on the topside going

 3   down, but on the bottom side, kind of --

 4   A.   Concave, right.

 5   Q.   Yeah.

 6        It concaves?  Is that the word?

 7   A.   Uh-huh.

 8   Q.   Okay.  So -- but -- but as you mentioned, if -- if you're

 9   not sure, and you're an adjuster, you need to push on it and

10   see if it's got that kind of apple bruise kind of feel, right,

11   that softness?

12   A.   Right, if you think it's a hail hit.

13   Q.   Yeah.

14        And -- and -- right.

15        And -- and you got to know what that feels like by having

16   felt, something you know because of your training, was a bruise

17   from hail.  You agree with that?

18   A.   Well, I -- I mean, I -- I think folks would understand

19   what -- really, what a bruise would be.  I mean, we -- we get

20   bruises.  I mean, you know, like, as you mentioned, the apple

21   being soft on a bruise.  If -- if we're saying a bruise, if you

22   touch it, whether you've had training on it, if you knew that

23   it was soft, and you felt that that was a -- a hail-damaged

24   bruise, then we would be paying for that.

25   Q.   Well, now, I'm asking a simple question not about what

Sharon Arnold                                                      34
Direct Examination by Mr. Miller

1   could happen.

2        I'm asking do you expect, before a new adjuster is sent to

3   make decisions all by their lonesome about whether something's

4   hail damage, that they're going to have been exposed to what it

5   feels like when somebody experienced can tell them, "That is

6   what hail damage feels like"?

7   A.   They -- they see that in their training and when they go

8   to -- we have -- it's called the "Oakland Avenue Building,"

9   when they send them back for a couple of weeks, and they do get

10  that experience.

11  Q.   And that's what you want them to have?

12  A.   Yes, absolutely.

13  Q.   All right.  By the way, you're not saying that -- that

14  it's the same to touch a bruised apple and push on it as it is

15  to damaged hail (verbatim) on a roof, are you?

16       It's not the same feel.

17  A.   No, no.  I'm just saying that -- you had -- you had

18  mentioned --

19  Q.   Right.

20  A.   -- the apple --

21  Q.   Because it --

22  A.   -- scenario but just saying it's soft.  It's concave.  I

23  mean, that's kind of what we're...

24  Q.   People in your world use the apple example all the time.

25  You've used it; right?

Sharon Arnold                                              35
Direct Examination by Mr. Miller

1    A.   I -- I haven't used it, no.

2    Q.   Oh.

3         Well, in any event, the point is that a bruised apple is

4    softer, generally, than the -- the push that you would place

5    on -- on a -- what you think is damaged hail (verbatim).  It's

6    not going to feel the same; right?

7    A.   I -- I don't know that I agree -- I don't know that I

8    agree with that, but, I mean, it, you know, depends on the

9    material on the roof.  I mean, if the roof is very worn out, it

10   could -- it could feel extremely soft if there's a hail hit on

11   there.

12   Q.   Okay.  So even that's varied.  That's fine with me.

13        So you're saying, depending on the way the roof is, it

14   could be really soft, or it could be less soft but still

15   something you could push on?

16   A.   If -- if it -- if they -- if they feel that it's a bruise,

17   they should be able to push on it, yes.

18   Q.   Right.

19        All different than an apple.  Fair?

20   A.   It's -- it's not the same material.

21   Q.   Right.  Exactly.

22        Okay.  Good enough.

23        now, has there been any change that you can point to in

24   the State Farm residential insurance contract that most people

25   that have State Farm would be abiding by in the way that the

Sharon Arnold                                                      36
Direct Examination by Mr. Miller

1   business of taking care of hail damage has happened in the

2   last -- in your experience that you can think of?

3   A.   No.  There has been no change.

4   Q.   All right.  So for almost 29 years, the same contract you

5   started with, it -- I shouldn't say it that way.

6        The provisions that deal with how you adjust a hail claim

7   and pay a hail claim, they're the same for 29 years at

8   state farm?

9   A.   That's correct.  We -- as I mentioned earlier, we -- we

10  uphold our commitment to our policyholders, and at the end of

11  the day, we pay what we owe, and that claim philosophy has

12  never changed.  We always --

13  Q.   That --

14  A.   -- try to pay what we owe.

15  Q.   That's what you expect to happen?

16  A.   Absolutely.

17  Q.   All right.  But I'm asking a little different question.

18  I'm talking about the policy provisions that deal with what

19  happens in a hail claim.

20       Those provisions --

21  A.   Uh-huh.

22  Q.   -- are they generally the same thing since you started?

23  A.   Generally.  I mean, some policies could have an ACV

24  endorsement on it, so it may restrict what we could eventually

25  pay, but -- or not what we pay, but it would -- it would affect

Sharon Arnold                                                    37
Direct Examination by Mr. Miller

1   a policyholder being able to get replacement cost benefits

2   back.  We would always still make that ACV payment.

3       But for the most part, I mean, that general policy has not

4   changed.

5   Q.   Right.

6       In other words, I'm really just -- and I appreciate that

7   distinction.  Thank you.

8       But I'm really just talking about the evaluation of how

9   you figure out what is hail and what is hail damage versus not.

10  That's a 29-year thing at least?

11  A.   Right.

12  Q.   Okay.

13           MR. MILLER:  Now, if you could put up PX2.06.

14  Q.   (By Mr. Miller) Can you see that?

15  A.   Yes.

16  Q.   And that is the -- it's already been admitted.

17           THE COURT:  Counsel, what number did you say?

18           MR. MILLER:  Did I say "P"?

19           THE CLERK:  Uh-huh.

20           THE COURT:  J.

21      Okay.

22           MR. MILLER:  J.

23           THE COURT:  Make sure --

24           MR. MILLER:  Yes.

25           THE COURT:  -- and get that right just so we don't

Sharon Arnold                                                              38
Direct Examination by Mr. Miller

1    show something that hasn't --

2              MR. MILLER:  Yes.

3              THE COURT:  -- been admitted, but this has been

4    admitted.

5         Thank you, Mr. Miller.

6              MR. MILLER:  So sorry, Judge.  I...

7         All right.  Hope I don't do that again.

8    Q.   (By Mr. Miller) All right.  JX2.06.  This is the

9    "Commitment to Our Policyholders."  This is right up front in

10   the OGs, isn't it?

11   A.   It is.

12   Q.   And it's kind of central, maybe one of the very first

13   things that State Farm starts training new claims people, maybe

14   all people, on?

15   A.   That's correct.

16   Q.   All right.  I want to ask you particularly about, at this

17   point, the "Diligent Investigation" portion.  You and I have

18   talked about this before.  I just wanted you to tell the jury

19   what you consider the responsibility of the adjuster, your

20   expectation on your teams, when they are supposed to be

21   performing a diligent investigation of the facts.

22   A.   So my expectation is to listen to all sides, all

23   information.

24        As I mentioned before, the very first thing we're going to

25   do when we get a claim is we're going to call the policyholder;

Sharon Arnold                                                    39
Direct Examination by Mr. Miller

1   and we're going to get their side of the story, you know, what

2   happened, were they there.

3        And then I would expect, if we need -- if it's a hail

4   claim, as it is in this case, I would expect them to go out and

5   do an inspection.  We have a lot of virtual tools, so if it's

6   something that, maybe, we don't need to physically go in and

7   inspect, we could work with the policyholder to virtually

8   inspect that.

9        But I would expect them to, you know, look at all of the

10  relevant policy information, make sure that they have looked at

11  any kind of prior losses that an insured may have, potentially

12  ask them about that if it's pertinent to the claim that they've

13  now submitted.

14       I would expect them to explain all of those coverages to

15  the policyholder.

16       Again, if it -- in this case, we're talking about a hail

17  file, so they would go out.  They would do an inspection.  They

18  would look at all aspects of the home, the exterior.  We would

19  look at any sort of other structures that might be on the

20  property, like mailboxes -- you'd mentioned mailboxes, and we

21  have a mailbox in this case -- fences, just anything, to help

22  us tell the -- the entire story of truly what happened out at

23  the loss.

24  Q.   Sure.

25       And -- and I think one of the things that I brought this

Sharon Arnold                                                    40
Direct Examination by Mr. Miller

1   up with you for is what you said in your deposition.  You also

2   said, "and consider all the insured's information"?

3   A.    Absolutely.

4   Q.    Okay.  That hadn't changed?

5   A.    No, it has not.

6   Q.    And you've always expected that whether you were a team

7   manager or a section manager; right?

8   A.    That is correct.

9   Q.    Also, to reasonably evaluate.  That's something that's

10  mentioned in the same --

11  A.    Uh-huh.

12  Q.    -- commitment.

13        Can you tell us what that means?

14  A.    Reasonably evaluate is kind of what I was just indicating

15  before.  I mean, we're going to -- we're going to look at all

16  of the information that's available to us to try to make the

17  best decision that we can and apply our policy provisions,

18  so...

19  Q.    Objectively?

20  A.    Correct.

21  Q.    Right?

22        Not -- not to the interest of State Farm; right?

23  A.    That's correct.

24  Q.    Not what some boss wants us to save money about.  That's

25  not supposed to happen; right?

Sharon Arnold                                                    41
Direct Examination by Mr. Miller

1   A.   That's correct.

2   Q.   You're not in the business of saving money when you owe a

3   claim.   Fair?

4   A.   That's correct.

5   Q.   There's all kinds of ways you guys manage your risk on

6   that, that has nothing to do with it -- with the payment of the

7   claim.   If you owe it, you're supposed to pay it.

8   A.   That's absolutely correct.   That is our claim philosophy.

9   Q.   Yes.

10       And that's your expectation?

11  A.   That is my expectation.

12  Q.   That's what you say; right?

13  A.   That is.

14  Q.   And that's what State Farm says.

15          THE COURT:   Mr. Miller, slow down, now.

16          MR. MILLER:   Ah.

17  Q.   (By Mr. Miller) "Yes"?

18  A.   Yes.

19  Q.   That's what State Farm says they are about; right?

20  A.   That is correct.

21  Q.   Probably just about every insurer, maybe every insurer,

22  probably says that too.   Wouldn't you reckon?

23  A.   I -- I would hope so, yes.

24  Q.   Yeah.

25       All right.   Okay.   Now --

Sharon Arnold                                                    42
Direct Examination by Mr. Miller

1          MR. MILLER:  Thank you.  You can take that down for

2    now.

3    Q.   (By Mr. Miller) Now, did you know Amy Lanier?

4    A.   I do know Amy Lanier.

5    Q.   And how long had you worked with Amy?

6    A.   Let me just back up.  I know Amy from a professional

7    stand- -- I don't know her personally.

8         Amy -- so when I came to Oklahoma in 2018, she was a

9    claims specialist in this section.

10   Q.   In the section that --

11   A.   In Oklahoma.

12   Q.   -- ended up -- in the -- all right.  Gotcha.

13        And ended up being eventually Jacqueline Draper's team?

14   A.   She did.  She didn't start out with Jacqueline.  There was

15   a different team manager.

16        Steve Imhoff had that territory, and then Steve retired,

17   and that's what created the opening, and, then, that's when

18   Jacqueline was hired.

19   Q.   Right.

20        But when you say she didn't start out with Jacqueline,

21   isn't it right that, when Jacqueline Draper came in, she

22   inherited several adjusters, and one of them was Amy?

23   A.   She did, yes.

24   Q.   Yes.

25        Okay.  And I believe you don't have any idea why Amy

Sharon Arnold                                                    43
Direct Examination by Mr. Miller

1   decided to move on from State Farm; correct?

2   A.    From my recollection, she obtained a position with another

3   insurance carrier, and so, when they do that, you know,

4   unfortunately, we -- we can't let them work out their two

5   weeks.  So we -- we do pay them, but we ask them to turn all of

6   their equipment in, if they're going to go to a competitor.

7   Q.    See, I -- I didn't ask about all that.  I asked why.

8         Do you know why she left?

9              MR. LEFFEL:  Objection.  Argumentative.

10             THE COURT:  Sustained.

11  Q.    (By Mr. Miller) Why did she leave?  Do you know?

12  A.    She left to go to a competitor.

13  Q.    Well, she did leave to go to a competitor, but is that why

14  she left?

15  A.    I don't know why she left.

16  Q.    That's all I asked you.

17  A.    Oh, I'm sorry.  I apologize.

18        Yeah.  No.  I -- I don't know the reason why she went to

19  go seek another job with a competitor, but I know that she did

20  leave --

21  Q.    Okay.

22  A.    -- to go to a competitor.

23  Q.    All right.  Now, during your time as section manager while

24  Amy Lanier was there, you knew of no issue with her work;

25  correct?

Sharon Arnold                                                    44
Direct Examination by Mr. Miller

1  A.   Not to my -- I mean, she wasn't on any formal performance

2  counseling --

3  Q.   Right.

4  A.   -- no.

5  Q.   And it wasn't something that you -- was in the air around

6  her or anything, you know, that you knew about.  Fair?

7  A.   Fair.  No.

8  Q.   And when you say "performance counseling," like, she was

9  not, as far as you ever knew, requiring retraining or

10 redirecting or anything like that?

11 A.   I mean, that would be something that the -- the team

12 manager could better answer.  I mean, that would be Jacqueline.

13     I -- I don't really get involved in the day-to-day

14 management and coaching of that.  I mean, certainly, there

15 could be things that, you know, if Jacqueline saw things in a

16 file or, you know, observed when she did riding-alongs -- if

17 she wanted her to do some retraining, she could do that.

18     When I say "performance counseling," that's more of a --

19 like, more of a formal, like, written -- you know, handwritten

20 notes that the employee signs, that we sign.  If that -- if it

21 gets to that situation, then absolutely, I'm involved in those;

22 but the day-to-day coaching, I'm not involved in.

23 Q.   Well, ma'am, you did answer it in your deposition a few

24 months ago.  I asked you the same question, and you said that

25 you had no memory of -- of Amy Lanier being in need of

Sharon Arnold                                                    45
Direct Examination by Mr. Miller

1   redirection or retraining.

2   A.   I don't know -- that's what I'm saying.  I don't know that

3   100 percent.  That, Jacqueline could answer.

4        I'm just saying, if she did, Jacqueline would be the one

5   that would provide that training to her.

6   Q.   That's why I said, "Do you have any memory of it, ma'am?"

7   A.   No, I do not.

8   Q.   All right.  Now, is it typical that new adjusters do not

9   have the full authority that they're going to have once they

10  get enough experience to do the job?

11  A.   That's correct.

12  Q.   And you want -- at least for the time that it takes to put

13  them up to speed, you want them to have some oversight by their

14  team manager to approve or alter whatever decisions they want

15  to make; correct?

16  A.   We -- I don't know that I would say "alter," but I would

17  say that they -- they do -- when our adjusters come out of

18  training, we may give them, maybe, 5,000, because they've been

19  trained, and so we want them to be able to utilize the skills

20  and the tools that we've just given them.

21       So, you know, if we do that, right, because they have not

22  handled the claims, we want to make sure that they are

23  estimating; and we want to make sure that they are definitely

24  applying the policy provisions correctly; and so that is where

25  that oversight comes in from a manager; and so we do limit

Sharon Arnold                                                    46
Direct Examination by Mr. Miller

1   their authority; and then, once they can demonstrate

2   competency, then those levels start increasing.

3   Q.   Sure.

4        And when you say "give them 5,000," you don't mean you

5   give them $5,000.

6   A.   We don't give them physically 5,000.  That's just their --

7   they can pay a claim up to $5,000.

8   Q.   Gotcha.

9        So if there's a claim of $5,000, they can pay it; but,

10  still yet, until they've demonstrated their understanding to

11  their team manager, then they're supposed to get approval of

12  what they're doing and be reviewed; correct?

13  A.   They don't have to.  If it's within their authority --

14  let's just say it's 5,000 -- they have the ability to handle

15  that claim up to then.

16       But, you know, when folks are new, they often have

17  questions, and they may pick up the phone and call the manager,

18  or they may call a peer.  We have a lot of resources available,

19  especially to our new folks, if they can't get ahold of

20  somebody to ask those questions.

21  Q.   Well, do you remember me asking you the same question in

22  your deposition?

23  A.   Maybe.

24  Q.   Do you, or don't you?

25  A.   I -- I'd have to go back and look at the -- I mean, I know

Sharon Arnold                                                           47
Direct Examination by Mr. Miller

1   you don't have it on here, so I'd have to go back and look.

2   Q.   Give me just a minute here so I can find it.

3        If you'll go to page 142.

4   A.   Get my glasses out and...

5   Q.   And I'm at line 12.

6        Are you ready for me to read you the question I read to

7   you back on April 4th of 2022?

8   A.   Yes.  Line 12, uh-huh.

9   Q.   All right.  My question was, "That's fair enough, but I'm

10  asking a different question.  If the adjuster without authority

11  to deny or approve -- I assume they have no authority to deny

12  or approve when they are new; is that right?"

13       And you said?

14  A.   "That's correct," if they have no authority.

15  Q.   Right.

16       "They have no authority to deny or approve when they are

17  new"; right?

18  A.   Right, but the question is, "If the adjuster without

19  authority."

20       So I -- I -- if I -- when I answered that question, what I

21  mean is, if they have zero authority -- we were talking about

22  somebody that had $5,000.

23       If they have -- if they have any sort of monetary

24  authority, they have the ability to handle the claim; but if

25  they have no authority, then they absolutely have to run

Sharon Arnold                                                        48
Direct Examination by Mr. Miller

1    everything by the manager --

2    Q.    Ma'am --

3    A.    -- because the manager would have to physically go into

4    the system to put money into the system for them to pay that

5    claim.

6    Q.    Ma'am, I asked you, "I assume they have no authority to

7    deny or approve when they are new; is that right?"

8          And you said, "That's correct"; right?

9    A.    That is what it says here, but I'm -- if -- if I'm going

10   back -- and I'd have to go back to the questions before and

11   after because, again, we're -- you're asking me questions that

12   are in a line here.

13         If I -- if I'm reading that question again, you're saying

14   if I assume they have no authority.  If they have no authority,

15   then they have to go to the manager to be able to deny a claim

16   or to approve a claim.

17   Q.    Well, the next question, let's read it.

18   A.    Okay.

19   Q.    "Because like you said, you want their decisions to be

20   reviewed, and the reviewer is the team manager"; correct?

21   A.    That's correct.

22   Q.    Okay.  Now, when somebody is new, is it expected that the

23   team manager is going to make some kind of documentation in the

24   file if they have agreed with the adjuster's decision on a

25   claim?

Sharon Arnold                                                          49
Direct Examination by Mr. Miller

1    A.    Not necessarily.

2    Q.    All right.  Let's go to page 144 at 9.

3          It's a long question.  You ready?

4          You there?

5    A.    Yes.

6    Q.    "Okay.  Well, so I want to make sure we're talking about

7    the other area where you're paying some of it and you're

8    denying some of it, and the adjuster has no authority to do

9    either one of these things, are you saying that you would

10   expect your manager to put a note in the file, claim file,

11   explaining that they looked at it and things were proper in the

12   investigation and they are approving part of it and denying

13   part of it?"

14         And what'd you say?

15   A.    I said, "Yes, that would be my expectation."

16   Q.    All right.  Now, by the way, when Ms. Jacome testified

17   yesterday --

18   A.    Uh-huh.

19   Q.    -- we used her transcript from her deposition.

20   A.    Uh-huh.

21   Q.    And when she read that out, she agreed that, at the

22   deposition time, that she didn't have authority to pay a full

23   roof replacement on a hail claim for three to four months until

24   she proved herself.

25         Is that consistent with what you might expect someone to

Sharon Arnold                                                    50
Direct Examination by Mr. Miller

1   be required to do?

2   A.   Yes.

3   Q.   And if that's the case, then, in that case, her team

4   manager would have been involved; right?

5   A.   A team -- her -- it could have been her, or if Jacqueline

6   was out, it would have been another one of my team managers,

7   yes.

8   Q.   I just said a "team manager."

9   A.   Uh-huh.

10  Q.   Right?

11  A.   Yes.

12  Q.   Okay.  Very good.

13       Now, is it fair to say that you have no idea if Ms. Jacome

14  ever lifted a shingle on the Bates's roof to feel under it?

15  A.   I don't know that.

16  Q.   You do agree, don't you, that, if an adjuster finds the

17  damage on the topside questionable, okay, that you would expect

18  them to lift the shingle and feel underneath it?

19  A.   If they could, yes.

20  Q.   Sure.

21       And is it true you've never met Ms. Jacome?

22  A.   I've never physically met her.  I've spoken with her on

23  the phone.

24  Q.   And it's also true that you have no idea at all how she

25  was trained or what her experience was; correct?

Sharon Arnold                                                    51
Direct Examination by Mr. Miller

 1  A.    The only thing that I remember about Tresa -- I mean,

 2  certainly, she went through training; and we send our adjusters

 3  through a lot of training, continually; but prior to

 4  State Farm, she was an independent adjuster, I believe; and she

 5  did a lot of large loss handling for the firm that she worked

 6  for.

 7  Q.    Let me ask it more specifically --

 8  A.    Okay.

 9  Q.    -- because I think that's how I asked it before, more

10  specifically.

11        Did you have any idea how Ms. Jacome had been trained or

12  how -- what kind of experience she had with hail investigation?

13  A.    Not -- no, not directly.

14  Q.    When you say "not directly," did you have indirect

15  knowledge of her hail investigation experience?

16  A.    No.  What I'm saying is I don't do the training.  We have

17  a -- a -- a whole training department that we send through, and

18  then we have continual training that we do, refreshers that we

19  do, every single year on all kinds.  We can do it on wind/hail.

20  We do it on water.  We can do it on fires.

21  Q.    Sure.

22        Well, I mean, if Ms. Jacome testified right there in that

23  chair yesterday that she managed to go through two different

24  trainers in Tulsa and spend a couple of weeks with

25  Kelly Wienstroer -- you know her --

Sharon Arnold                                                    52
Direct Examination by Mr. Miller

1  A.   I do.

2  Q.   -- and go up on a few roofs -- six to eight roofs that

3  were called in for hail damage, but she never managed to see a

4  single roof where the person she was with identified the damage

5  as hail damage and that then she got turned loose to do her own

6  business, would that surprise you?

7  A.   That -- I -- I -- that would surprise me, yes.  I --

8  I didn't -- I -- again, I don't handle the day-to-day, so I'm

9  not sure exactly what her experience was, other than the formal

10 training that we, at State Farm, give them; and, then, they do

11 ride with trainers; and they do ride with experienced

12 adjusters.

13 Q.   Sure.  Sure.  I don't doubt that they do, and she did.

14 She did.

15      But she didn't get to see what hail was, according to

16 those people.

17 A.   Okay.

18 Q.   You didn't -- that surprises you?

19 A.   I -- yes, because that's --

20 Q.   Okay.

21 A.   -- primarily -- like I said, the claims that we handle

22 are -- are wind and hail.

23 Q.   Yeah.  Okay.

24      Well, at least the ones she went on got denied, according

25 to her.  Okay?

Sharon Arnold                                                      53
Direct Examination by Mr. Miller

 1        I don't -- that's all I know.

 2        No one ever told you that?

 3   A.   No, sir.

 4            MR. MILLER:  Let's look at JX1.257, please.

 5   Q.   (By Mr. Miller) Ma'am, this is an email from a contractor

 6   named Jonathan Marks.  You ever heard of that name, except in

 7   this case, of course?

 8   A.   Yeah, just that he's one of the contractors, a roofer.

 9   Q.   Right.

10        I think -- I think, maybe, I'd asked you at your

11   deposition a similar question -- had you ever heard of

12   Jonathan Marks -- and at least on that day you had not.

13   A.   No, I had not.

14   Q.   Okay.  In any event, he's with a company called

15   Aegis Roofing.  It's kind of spelled a little different than

16   what it sounds.

17        It's right there.  You can see it.

18        That mean anything to you at all, other than this case?

19   A.   No, sir.

20   Q.   All right.  Here, he's sending an email in to the agent's

21   employee named Shari -- State Farm agent.  See that?

22   A.   Uh-huh.

23   Q.   Do you know -- you have to give me words.

24   A.   Sorry.  Yes.

25   Q.   Do you know Shari?

Sharon Arnold                                                      54
Direct Examination by Mr. Miller

1    A.    I do not know Shari.

2    Q.    But when it's a State Farm agent, you recognize that's

3    part of the State Farm family; right?

4    A.    It -- it -- we do consider them part of the State Farm

5    family, but they are independent contractors, so they're not

6    our employees.

7    Q.    Well, I understand that, but they certainly are captive to

8    State Farm in what they do.

9    A.    Correct.

10   Q.    In other words, by "captive," in -- in our world, that

11   means they just sell State Farm products.

12   A.    That's correct.

13   Q.    That's the rule; right?

14   A.    That's correct.

15   Q.    Okay.  Now, here, there's a whole bunch of attachments in

16   the email; and I think, if I remember right, you had not seen

17   that email back in real time; correct?

18   A.    When I was prepping for that deposition and looking

19   through the file notes, because my involvement was strictly

20   just to sign a letter, I didn't look at this, but this is --

21   this is a document in the claim file.

22   Q.    Sure.  Yes, ma'am.

23         Now, actually, it's not this particular document, because

24   this one was printed from Shari Bivins's computer.  You can see

25   that in the upper left-hand corner.

Sharon Arnold                                                         55
Direct Examination by Mr. Miller

1    A.    Right.  Right.

2    Q.    But -- but there's a similar one in the claim file.  It

3    just doesn't have her name up there; is that --

4    A.    It -- I'd have to look at the document --

5    Q.    Yeah.

6    A.    -- but it's -- it's the same -- it's the "from," the "to,"

7    from what I recall, looking in the file.

8    Q.    And just to be clear, what you're saying is, at the time

9    of your deposition, you had not seen the email.

10   A.    No.

11   Q.    But you have now.

12   A.    Yes, I have seen it.

13   Q.    Because you and I talked about it.

14   A.    We did.

15   Q.    Yeah.

16         Now, if we could look at the body of the email.

17               MR. MILLER:  Thank you, Janna.

18   Q.    (By Mr. Miller) And this cursive script, I guess you call

19   it, gets me a little confused, but there's a place in there

20   where Mr. Marks is talking about some pipe jacks that were

21   missed.  Can you find that?

22               MR. MILLER:  Oh, thank you, Janna.

23   A.    Yeah.

24   Q.    (By Mr. Miller) You see that?

25   A.    Yes.

Sharon Arnold                                                  56
Direct Examination by Mr. Miller

1    Q.   You remember us talking about that at the deposition?

2    A.   Yes.

3    Q.   And according to Mr. Marks, he was just pointing out that

4    there was a mistake here.  He didn't attach any animus to it,

5    no ugliness.  He just said this is one thing to consider;

6    right?

7    A.   Yes.

8    Q.   And -- and that's something that you'd want to know;

9    right?

10   A.   Absolutely.

11   Q.   Right.

12        I mean, you're supposed to, like you said a couple of

13   times, pay for what you owe.

14   A.   That's correct.

15   Q.   And so your expectation, after this is seen by the person

16   that handles it:  They should get back into the file, find out

17   if he's right.  That'd be the first thing; right?

18   A.   Uh-huh.  That's correct.

19   Q.   And if you decide that he's right, then what you'd expect

20   is they would adjust all the payments that have been made to

21   whatever they're supposed to be and -- and -- and reissue some

22   kind of a clarification.  Fair?

23   A.   Fair.

24   Q.   And that might mean -- in this case, it would mean more

25   money if they were right.

Sharon Arnold                                                    57
Direct Examination by Mr. Miller

1    A.    That would be correct --

2    Q.    Sure.

3    A.    -- because if we paid -- if he's saying that we -- which

4    we did.  We paid for three roof -- two roof pipe jacks, and he

5    said five jacks were damaged.

6    Q.    Yeah.

7          And I think it actually turns out, in the end, when you

8    look at the papers, that he was wrong.  You paid for three --

9    A.    Uh-huh.

10   Q.    -- and missed two.

11   A.    Right --

12   Q.    Yeah.

13   A.    -- and we actually paid for the flashing, so it really

14   wasn't the actual pipe jacks themselves.  It was the flashing.

15   Q.    I see.

16         But in the end, you ended up -- did you know that, during

17   the middle of the litigation, about -- I don't know -- couple,

18   four months ago, State Farm sent the money after we took some

19   of y'alls' depositions?

20   A.    We did, because that's where we saw -- this was

21   postlitigation, so anytime -- as I mentioned, at any time we

22   get information where we may have missed something -- I mean,

23   we are human.  We're going to make mistakes, and so what we

24   have is a reconciliation process.

25         So when a contractor will send in -- whether it's an

Sharon Arnold                                                    58
Direct Examination by Mr. Miller

1    email, or they send in an estimate, we're definitely going to

2    take a look at that; and we're going to try to figure out, you

3    know, if -- if we did miss something, because we can; and then

4    we certainly make good on that.  We --

5    Q.    Right.

6          And -- and --

7    A.    -- correct our mistake.

8    Q.    -- that should have happened back on March 10th; right?

9    A.    Is that when this came in?

10   Q.    Yes, or -- or a -- within a few days of March 10th, when

11   they could get around to it.  It wasn't like an emergency.

12         But somebody -- Ms. Jacome's the one that handled this,

13   according to her.  She should have done something about that;

14   right?

15   A.    I would have expected her to -- if -- if they are saying

16   that there's additional damage, we probably should have looked

17   at it at that point, yes.

18   Q.    Now, when you looked at the claim file, you know, in fact,

19   that that did not happen; right?

20   A.    I'd have to go back to the claim file to look at the

21   dates, but if you're saying here, if -- you know, I -- when --

22   when suit was filed, if they sent it right after -- the file

23   was February 24th, and they sent it in on March 10th, and he's

24   saying they're damaged, we should have had some sort of

25   conversation about that, yes.

Sharon Arnold                                                    59
Direct Examination by Mr. Miller

1   Q.   Well, yeah.  That -- that would have been --

2   A.   Couple -- just, yeah --

3   Q.   -- 18 --

4   A.   -- couple of weeks.

5   Q.   -- months, 17 months after the suit -- or I'm sorry --

6   after the email --

7   A.   Uh-huh.

8   Q.   -- that it got paid.  You know that; right?

9   A.   Correct.

10  Q.   And it only -- it only happened because of questions that

11  were being asked in depositions; right?

12       You know that.

13  A.   I -- yeah, I saw that in the file, that, yes, after the

14  depositions came out, that we noticed that there was damage,

15  and then we made payment.

16  Q.   Well --

17  A.   I mean, again --

18  Q.   -- you should have noticed it because I talked to you

19  about it, right, on April 4th; right?

20  A.   Well, no, because I hadn't seen this email.

21  Q.   On April 4th, you saw it, when you got -- got your

22  under-oath deposition; right?

23  A.   Right.

24  Q.   Okay.  Now, ma'am, there is no note in the file where

25  anybody even makes an analysis, like, maybe they got it wrong

Sharon Arnold                                                    60
Direct Examination by Mr. Miller

1   twice, but they didn't do that at all.

2        This got ignored by Ms. Jacome, apparently; right?

3   A.   That would be a question you'd have to ask her.

4   Q.   No, I'm asking you.

5        According to the notes in the file, when somebody does a

6   reconciliation of any kind --

7   A.   Uh-huh.

8   Q.   -- even if they decide they're wrong about what they're

9   saying --

10  A.   Uh-huh.

11  Q.   -- it's supposed to go to the claim file in some way;

12  correct?

13  A.   And it could in some way, yes.  It doesn't have to be in a

14  file note, but it could be, you know, something that they have

15  scanned and put into the claim file, yes.

16  Q.   Yes.

17       In other words, whether it's the claim file itself or in

18  the claim notes, which are in the claim file, you'd expect to

19  find some reconciliation, if everyone's doing what they're

20  supposed to, back then.

21  A.   That's correct.

22  Q.   And -- and by the way, this is all about a second

23  inspection; and you know that Ms. Draper was also involved in

24  supposedly reviewing the whole file; and she said, "No second

25  inspection."  You know that; right?

Sharon Arnold                                                              61
Direct Examination by Mr. Miller

1   A.   Yes.

2   Q.   And you'd expect her to be involved in that, wouldn't you?

3   A.   Yes.

4   Q.   Certainly, for someone like Ms. Jacome, for sure; right --

5   pretty new?

6   A.   When they're new, yes.

7   Q.   Yeah.

8        But -- but generally, there -- the team manager's going to

9   be involved in the second inspection decision anyway.  Isn't

10  that about right?

11  A.   They don't have to be involved in all of the second

12  inspection requests.  If -- if the adjuster -- you know, after

13  they've seen, you know -- if they've missed quite a bit of

14  things, they may go back out.

15       I mean, again, they're human.  They -- they -- they're

16  going to miss things.

17       Or if a contractor calls and says, "Hey, you know, we've

18  gotten out here.  We found more damage that we didn't see upon

19  our inspection," we may want to go back out there and take a

20  look.

21       But, you know, she...

22       Ask me that question one more time.  I got off on a train

23  of thought and now -- what did you just ask me?

24  Q.   What I said was you'd expect that a team manager would

25  generally be involved in discussing second inspections.

Sharon Arnold                                                        62
Direct Examination by Mr. Miller

1   A.   Oh, they can be.  A lot of times, if they're going to say

2   no to a second inspection, that's definitely where I would want

3   my team manager to weigh in on that.

4   Q.   Okay.  Well, I appreciate that distinction.  That makes

5   a lot of sense.

6        If they're going to deny it, the -- the front-line

7   adjuster, especially if it's the same person that was out

8   there --

9   A.   Yes.

10  Q.   -- right, they're a little -- at least slightly conflicted

11  because they've already been out there.  Would you agree?

12  A.   I don't agree with that.

13  Q.   Oh, none of them; right?

14       None of them would take it in a conflict way?

15       None of them would say, "Oh, I already did that"?

16  A.   No.

17  Q.   Is that --

18  A.   No.

19  Q.   None of them.

20       Is that a State Farm thing, that you just erase that from

21  everyone's mind as a human being?

22  A.   I don't think I understand what you're asking me.

23  Q.   Well, what I'm saying is don't you think it's generally

24  how humans act, that if they think they did it right the first

25  time, they're a little -- might be a little awkward about

Sharon Arnold                                                        63
Direct Examination by Mr. Miller

1  thinking they need to go back out there?

2              MR. LEFFEL:  Objection.  Calls for speculation.

3              THE COURT:  Sustained.

4  Q.   (By Mr. Miller) All right.  Look, in any event, I think we

5  can -- we can agree, then, that Ms. Draper should have been

6  involved -- and was --

7  A.   Uh-huh.

8  Q.   -- in the decision to deny a second inspection in this

9  case for sure.

10 A.   She was involved, yes.

11 Q.   Well, if she actually looked at the file and the email and

12 things attached to the email right here, it's not exactly hard

13 to see that there is something that needs to be reconciled with

14 these pipe jacks.  Agreed?

15 A.   It's agreed, but it doesn't necessarily mean that we have

16 to do another inspection.

17 Q.   Well, I didn't say that.

18 A.   Okay.

19 Q.   But if -- if Ms. Draper's seeing it like she's supposed to

20 be, if she's reviewing it like she's supposed to be, you'd

21 expect her to turn around, even if you deny the inspection, and

22 say to Ms. Jacome, "Hey, you need to reconcile this.  Learn

23 from this and make the proper notes from this and get them paid

24 right for this"; right?

25             MR. LEFFEL:  Objection.  Compound.

Sharon Arnold                                                        64
Direct Examination by Mr. Miller

1          THE COURT:  Sustained.

2   Q.   (By Mr. Miller) Would you agree that you'd expect

3   Ms. Draper, as one of your team managers, if she's really

4   reviewing this, to have Ms. Jacome learn from it and fix it?

5   A.   If -- if she -- if she's looking at this, and she sees it,

6   I would have expected her to get with Ms. Jacome to say, "Hey,

7   let's go back to your scope notes.  Let's see -- did you miss

8   something?  You know, let's call the contractor, see if he's

9   got photos."

10       It's not something that necessarily would have to have a

11   second inspection done on.

12       We -- we -- we have a good relationship with -- with

13   our -- with our roofers out there for the most part, and they

14   will just snap a photo for us, and we'll handle it, you know.

15   We try to do it quickly and efficiently.

16       But, yes, if -- if she saw this in here, I would have

17   hoped that she would have said, "Hey, you probably need to take

18   a look at this.  Let's verify, number -- first of all, that

19   they are damaged."

20   Q.   And you mentioned that you have good relationships with

21   your roofers, and they might snap a picture, but ultimately, do

22   you agree that it's the responsibility of the insurer to pay

23   the claim right?

24   A.   Absolutely.

25   Q.   And if that means you have to go back out -- "you" being

Sharon Arnold                                                        65
Direct Examination by Mr. Miller

1   State Farm, don't mean you personally.

2       If you have to go back out to -- to figure it out, that's

3   just what you have to do.

4   A.   We do, yeah.

5   Q.   Yeah.

6       And you cannot delegate that duty to anybody else.

7   Agreed?

8   A.   Delegate going out for the second inspection?

9   Q.   Delegate your duty to properly investigate and evaluate

10  the claim.

11  A.   That's -- that's correct, yes.

12  Q.   That's absolutely right; correct?

13      Okay.  Now, back to the point.  Did you know that there

14  was also mistakes made by Ms. Jacome about whether this was an

15  ACV policy or an RCV policy?

16  A.   I did see that in the file notes --

17  Q.   Right.

18  A.   -- yes.

19  Q.   And so -- so there's another mistake, because --

20  A.   Uh-huh.

21  Q.   -- the letter that she sent out back on February 23rd --

22  A.   Uh-huh.

23  Q.   -- whether Ms. Draper approved it or not, can't tell from

24  the file, but it identified this rent house as being on a

25  replacement cost policy; right?

Sharon Arnold                                                    66
Direct Examination by Mr. Miller

1  A.    That's correct.

2  Q.    In other words, it told the insured that, "All these

3  things that we did say were damaged, like a garage door and --

4  and the metals and -- and some screens, those things -- if you

5  replace them, you're getting your money -- the rest of your

6  money back"; right?

7  A.    She did.

8  Q.    You also admit -- which is a mistake.

9  A.    It is a mistake, yes.

10 Q.    And -- and another mistake they made -- and you mentioned

11 the scope notes.

12       If -- if you would have gone back to those scope notes

13 that you talked about doing, had Ms. Draper actually been

14 looking at this and -- and seeing it, then what's on that scope

15 note needs to be right; correct?

16       You'd want it to be right.

17 A.    We -- that's -- yes, we want -- we would like for it to be

18 right, yes.

19 Q.    And let's make sure everybody knows what a scope note is.

20 Tell us what that is.

21 A.    So a scope note -- we have what are called "roof scoping

22 sheets," and so that's where the adjusters just make notations

23 as they are walking around the roof.  If there's damage to

24 screens, if there's damage to the siding, you know, they'll

25 make -- they have -- it's got the actual picture of the roof,

Sharon Arnold                                                      67
Direct Examination by Mr. Miller

1    and so they can denote on that -- on the diagram, if there is

2    damage, you know, what that damage is and where it's associated

3    on the roof.

4    Q.   All right.  And in this particular roof, do you remember

5    from the claim file, or do I need to show you, the age of the

6    roof based on State Farm's own records of when they replaced it

7    last -- or paid to replace it last?

8    A.   Yeah.  I believe it was nine years, because they did have

9    a prior claim that we had replaced the roof.

10   Q.   Yes.

11        So I think the claim was 2012.  Does that sound right?

12   A.   That sounds right.

13   Q.   And -- and now we're in 20- -- early 2021, when this claim

14   is being evaluated; right?

15   A.   Correct.

16   Q.   Okay.  And so everybody knows -- in fact, it's in the very

17   first information back way (verbatim) in February 5th --

18   Ms. Jacome puts in there -- that -- that this roof was

19   replaced -- I think it was May, but anyway, sometime -- I'm

20   sorry -- damaged in -- sometime in 2012.  It's in the -- it's

21   in the claim file.

22   A.   Uh-huh.

23   Q.   It's in the claim notes.

24            THE COURT:  Ms. Arnold, you have to give a verbal

25   response.

Sharon Arnold                                                    68
Direct Examination by Mr. Miller

1        THE WITNESS:  I'm sorry.

2   A.   Yes.

3   Q.   (By Mr. Miller) I'm just going to start reporting to the

4   court reporter and -- not to be rude but that -- without

5   messing the record up, I'm -- you can then give us a word.

6   Okay?

7   A.   Okay.

8   Q.   Kind of like we did in the deposition.  Do you remember

9   that?

10  A.   Yes.

11  Q.   Okay.  Now...

12       Well, let's just -- let's just look at some of those scope

13  notes and see, on this nine-year-old roof, what Ms. Jacome

14  wrote.

15       MR. MILLER:  If you could take us to JX2 -- -1.287.

16  I hope that's the right number.

17       There we go.

18  Q.   (By Mr. Miller) Do you recognize the -- the note here?

19  A.   Okay.  I do.

20  Q.   And you've seen -- I can't imagine how many thousands of

21  these things you've seen.

22  A.   That's correct.

23       THE COURT:  She's going -- she's going to pull that

24  monitor forward.

25       Mr. Miller, while she does that, what was the page number?

Sharon Arnold                                                              69
Direct Examination by Mr. Miller

1            MR. MILLER:  287 of -- of JX1, Judge.

2            THE COURT:  Thank you.

3            MR. MILLER:  All right.  Ready for me?  Go?

4            THE COURT:  Yes.  Please proceed.

5   Q.   (By Mr. Miller) I was asking:  You've seen lots of these,

6   haven't you?

7   A.   I have.

8   Q.   And -- and there's a -- I think there's usually -- is

9   there usually three pages?

10       Is it two or...

11  A.   The roof scoping sheet is generally just one, and then we

12  have what are called "elevation scope sheets," and so that

13  would be if we -- you know, when we're walking around the

14  houses, then we're making notations of -- if we see any damage

15  or not.

16  Q.   Okay.  Okay.  In any event, here, you can tell it's the

17  Bates property; right?

18  A.   Yes.

19  Q.   And there on the left, under the claim number, it says

20  "ages, layers, and predominant pitch"; right?

21  A.   Yes.

22  Q.   And -- and by the way, predominant pitch -- that's the

23  slope of the roof, I guess; right?

24  A.   Yes.

25  Q.   And layers -- you guys want to know, in the insurance

Sharon Arnold                                                    70
Direct Examination by Mr. Miller

1    business, how many different layers of shingles there are on

2    that roof.

3    A.    That's correct.

4    Q.    And -- and by the way, sometimes people -- I don't know if

5    they do it much anymore, but people sometimes just lay another

6    layer of them right on top of the last ones; right?

7    A.    They do.

8    Q.    Don't much care of that, do you?

9          That's not so good?

10   A.    Well, that's -- that's really the policyholder's

11   preference, but, you know, we go, and we abide by what the

12   jurisdictional laws are, the codes are, for that particular

13   jurisdiction that they live in --

14   Q.    Okay.

15   A.    -- so, yeah.

16   Q.    I was making kind of an assumption there.

17         But here, over on the right, it says it's a 4/12 pitch;

18   right?

19   A.    It does.

20   Q.    And that's -- that's -- in your business, that's a very

21   common thing to see for -- for a residential home; right?

22   A.    4/12s, we don't typically see.  I mean, that's a pretty --

23   a low slope; but typically, we're going to see 5s or 6s; but, I

24   mean, it's not uncommon to see a 4.

25   Q.    Oh.

Sharon Arnold                                              71
Direct Examination by Mr. Miller

1        Even in Oklahoma, 4/12's not common?

2   A.   I -- not -- not the ones that I have seen too much.

3   That's -- that's pretty low --

4   Q.   Okay.

5   A.   -- but...

6   Q.   Well, anyway, it's not unheard of.  We'll just do that.

7   A.   Yeah.

8   Q.   Right?

9   A.   Yes.

10  Q.   And it says that the layers -- there's just one; correct?

11  A.   That's correct.

12  Q.   But here, Ms. Jacome writes in what number for the age of

13  the roof?

14  A.   She wrote "15."

15  Q.   Now, where would she have come up with that?

16  A.   I have no idea.  You would have to ask her that question.

17  Q.   Well, she said yesterday it was a mistake, as I recall,

18  but is that the kind of thing that -- it's not a big thing, but

19  it's the kind of thing that indicates something's not right.

20  Agreed?

21  A.   I mean, absolutely.  I mean, it -- she -- she just made a

22  mistake on that just like we've talked about; and in those

23  types of things, you know, when, you know, she's out there,

24  she's writing.  She's inspecting with the roofer.

25        You know, again, you'd -- you'd really have to ask -- if

Sharon Arnold                                                      72
Direct Examination by Mr. Miller

 1  you talked to her yesterday, whatever she said, but she made a

 2  mistake.

 3      I mean, that's why we have a reconciliation process at

 4  State Farm, you know.  We are going to miss things.  We are

 5  human beings; and we do make mistakes; and so, when things are

 6  brought to our attention, we should, as we've talked about

 7  earlier -- right then, yes, we should have taken care of it;

 8  but we did take care of it when we got in there, and we saw.  I

 9  mean, that's why we have oversight at State Farm.  I mean, we

10  do -- we do make mistakes.

11  Q.   Well, when you say you took care of it, you took care of

12  it after you were sued; correct?

13  A.   We took care of it after postlitigation, when we were

14  talking about.

15  Q.   But --

16  A.   And the only thing -- the only thing that I'll say about

17  that is, you know, Jacqueline does have notes in the file where

18  she did review, but she was reviewing the roof for a second

19  inspection, and so should she have caught that?

20      Absolutely should have.

21      But again, it's -- it's a mistake; and when it was, again,

22  brought to our attention, we did make good on it.  That's what

23  we do.

24  Q.   Time out.

25  A.   We were not trying to not pay the time.

Sharon Arnold                                                          73
Direct Examination by Mr. Miller

1   Q.   Time out.

2        The only reason I'm even asking you about the scope notes

3   is you brought them up because you said that's what someone

4   should go look at --

5   A.   Yes.

6   Q.   -- once you find out that the email says that you've

7   missed some roof jacks; right?

8   A.   Yes.

9   Q.   And so it was pointed out to you very clearly, if anybody

10  read the email.  Agreed?

11  A.   It was in the email, yes.

12  Q.   And at least two people were supposedly reading the email:

13  Jacome and Draper; right?

14  A.   Correct.  That's correct, yes.

15  Q.   All right.  Well, let's see.

16       My point is not so much to be picky.  My point is just

17  exactly how many mistakes can be made before somebody, if

18  they're actually reviewing the new adjuster's work, might get a

19  clue about a second inspection.  That's my point.  So let me

20  not bury the lead for you.

21       You ready?

22       You ready to go?

23  A.   Yes.

24            MR. MILLER:  Let's look at JX1.273, bottom half of

25  that.

Sharon Arnold                                                          74
Direct Examination by Mr. Miller

1      Thank you.

2  Q.    (By Mr. Miller) Now, here is the estimate that Ms. Jacome

3  did, back when she was out there on February 23rd of 2021, of

4  the so-called soft metals.  You see that?

5  A.    Yes.

6  Q.    And it identifies different kinds of soft metals:  a -- an

7  attic vent cover and a flashing for a pipe jack -- it says one

8  of those, I guess, if I'm reading it right -- and a -- a

9  flashing for a couple more pipe jacks and, then, exhaust cap

10  for the roof --

11  A.    Uh-huh.

12  Q.    -- right?

13  A.    That's correct.

14  Q.    And -- and this is -- this represents what she actually

15  paid; right?

16  A.    That's correct.

17  Q.    So when you say you replaced the flashings, just not the

18  jacks themselves, actually, you replaced the flashings for

19  three pipe jacks; correct?

20  A.    Correct.  We paid for one that was a 6-inch, and then we

21  paid for two smaller ones.

22  Q.    Yes.

23      The point is I thought I heard you say a moment ago that

24  you actually fixed all the flashings.  You just didn't replace

25  the jacks, but maybe I misunderstood you.

Sharon Arnold                                                    75
Direct Examination by Mr. Miller

1    A.    No.  What the estimate is saying here is that we are

2    taking care of the flashing, which the flashing is the part

3    around the jack.

4    Q.    Yeah.

5    A.    The jack is the --

6    Q.    Okay.

7    A.    -- is the stack itself.

8    Q.    All right.  In any event, let's see what she said here

9    about that age issue.

10        You see that the -- the -- the deal wants you to populate

11   some information about how old this particular item is.  You

12   see that?

13   A.    Yes.

14              MR. LEFFEL:  Objection.  Cumulative.

15              THE COURT:  Overruled.

16   Q.    (By Mr. Miller) And Ms. Jacome has put in "20 years" for

17   all of these roofing materials on this 9-year-old roof;

18   correct?

19   A.    That's correct.

20   Q.    And by the way, this summer, when all the reconciliation

21   happened during the lawsuit, that's something else that got

22   changed that's been pointed out.  They -- they put all of those

23   to "10" for some reason; right?

24        Did you know that?

25   A.    I -- I looked back at that estimate.  I -- I know that

Sharon Arnold                                                    76
Direct Examination by Mr. Miller

1    they did change the depreciation --

2    Q.    Well, it --

3    A.    -- to reflect accurately.

4    Q.    Well -- accurately?

5          It might have been 10 this summer, but it wasn't 10 last

6    year when -- when the claim was worked, was it?

7          It was 9; right?

8    A.    If the -- I -- I don't know when the actual roof was

9    replaced.  I know when we paid for it, because I can go back to

10   the 2014 -- or the 2012 claim, and see, but we never

11   received -- I don't have an estimate in that file.  We just

12   paid an ACV payment at that time.  They did have a replacement

13   cost policy at that time.

14   Q.    You're saying that you don't have an Aegis signed-off

15   estimate page that says, "We've replaced the roof," with a date

16   on it in the claim file of --

17   A.    Not in that 2014 claim file.

18   Q.    2012?

19   A.    Or the 2012.  I'm sorry.  Yeah.

20   Q.    Well, in any event, my point is this:  If -- if the

21   jury -- I won't waste our time looking for it, but if the jury

22   sees 10 years from this summer, that ignores the fact that that

23   should have been done last February '21, which would have made

24   it 9 years.  Agreed?

25   A.    If -- if they physically replaced the roof, right, on --

Sharon Arnold                                                    77
Direct Examination by Mr. Miller

 1  in the year of 2014.  I don't know when that roof was replaced.
 2  Q.   It's 2013.
 3       Did anybody ask?
 4  A.   Not in the file, no.
 5  Q.   Have you ever asked?
 6  A.   No, I have not.
 7  Q.   Before they just unilaterally sent money -- the law firm
 8  over here -- did -- did anybody ask that you know of?
 9  A.   Did anybody ask what?
10  Q.   You're still the supervisor, ultimately, of this claim as
11  far as the claims manager -- claims -- sorry -- section
12  manager; right?
13  A.   That's correct.
14  Q.   I mean, this is still your claim.
15  A.   That's correct.
16  Q.   If something gets done on this claim like happened this
17  summer, it's still your ultimate responsibility, unless we go
18  above you --
19  A.   That's correct.
20  Q.   -- right?
21       There's also a mailbox missed.  I think you mentioned
22  earlier that you knew about that --
23  A.   Right.
24  Q.   -- right?
25       Did you see anywhere in the claim file that anybody caught

Sharon Arnold                                                    78
Direct Examination by Mr. Miller

1    that whenever the email came in from Mr. Marks?

2    A.   I'd have to go back and look at the physical document, but

3    I don't remember seeing anything about the mailbox.

4    Q.   Well, the fact is the mailbox got paid this summer too,

5    didn't it?

6    A.   It did, yes.

7    Q.   Which means it didn't get paid last year; right?

8         You're not --

9    A.   That's correct, yes.

10   Q.   You're not going to pay twice?

11   A.   No, we're not going to pay it twice.

12   Q.   I'm sorry if I've asked you this.  You can just stop me if

13   I did.  I know I asked you if you'd ever been on a roof with

14   Jacqueline Draper.  We talked about that; right?

15   A.   Yes.

16   Q.   Right.

17        Did I ask you if you knew that Ms. Jacome had never been

18   on a roof with Jacqueline Draper?

19   A.   No.

20   Q.   Well, let me ask you now.

21        Did you know that Ms. Jacome, in all her time, even as a

22   brand-new baby adjuster with State Farm looking at hail claims,

23   had never been on a roof with Jacqueline Draper?

24   A.   No, I did not know that.

25   Q.   Did you know that, according to Ms. Jacome, who told us

Sharon Arnold                                                    79
Direct Examination by Mr. Miller

1  yesterday again, she'd never had any hail training of any sort

2  from Jacqueline Draper?

3       Did you know that?

4  A.   Well, because her training would come from our training

5  partners and, then, the refreshers that she would take from

6  Haag.  So, I mean, when you say "training," I -- I guess I

7  would need you to be more specific.

8       That she took her out -- if you're saying that she never

9  took her out, it could be that she -- she didn't need to, or

10 she hadn't had an opportunity to go and ride with her.

11 Q.   Ma'am, I don't know -- I don't want to get all cut down in

12 semantics here about training or not.

13      All I mean is that, according to Ms. Jacome, and it seemed

14 like she's a little perplexed about it, that she never got any

15 exposure to what hail damage is looking like or how she's

16 supposed to adjust it from the lady that was her manager.

17      I'm asking if you knew that.

18 A.   No.  No.

19 Q.   And when I say "never," I don't mean just as of February

20 23rd of '21.  I literally mean till she left, I think, in the

21 end of September, if I remember right.

22      Did you know that?

23 A.   Well, I would have to go back and look, because as I

24 mentioned, you know, she was a -- she was a new rep, and newer

25 reps are going to make mistakes, which, again, is why we don't

Sharon Arnold                                                    80
Direct Examination by Mr. Miller

1  give them a lot of authority.

2       And so, when Tresa came in, she -- I think she was only in

3  production for a very limited time, and then that is when COVID

4  hit, and we could not.  We could not ride with our adjusters.

5  If they were inspecting, they, you know, were fully masked up,

6  you know, with the approval of the policyholder.

7       So that would have been part of the reason why she -- to

8  the time that she left that Jacqueline would not have had the

9  opportunity to have ridden with her.

10 Q.  Ma'am, I -- I don't know about riding in the same car,

11 have no idea; but I know that, according to Ms. Jacome, she was

12 put to the task of being her own adjuster with no help with a

13 ride-along sometime around the end of January of '21.

14       MR. LEFFEL:  Objection.  Facts not in evidence.

15       THE COURT:  Overruled.

16 Q.  (By Mr. Miller) All right.  So all I want to know is, up

17 to that time, if she had been with other trainers, people like

18 Kelly and trainers out of Tulsa, what would have prevented her

19 from being in -- with Jacqueline Draper in some capacity, some

20 way?

21 A.  Again, I -- that would be a question you would probably

22 have to ask Jacqueline.  I mean, if Jacqueline felt that, you

23 know, she was being trained by some of our most experienced

24 adjusters that are out there every single day, she probably

25 felt that that sufficed; but, you know, that would be what I

Sharon Arnold                                                    81
Direct Examination by Mr. Miller

1   would think that would happen, but that would be something you

2   would have to ask Jacqueline.

3   Q.   Well, if -- if I need to ask her, why are you answering

4   for her?

5        You just did.

6   A.   Because I'm trying to answer your question.

7   Q.   Oh.

8             MR. MILLER:  Well, Judge, I'm going to ask that you

9   at least consider asking her to just answer the question so we

10  can get through this.

11            THE COURT:  Mr. Miller, my review is she did answer

12  your question.

13            MR. MILLER:  All right.

14  Q.   (By Mr. Miller) Now, ma'am, here's what I am trying to get

15  out of you.  Maybe I'm not asking it very well.  All right?

16       When do you think the COVID thing changed things at

17  State Farm?  What year was that?

18  A.   That was March of 2020.

19  Q.   Okay.  And this claim was worked February -- hope I got

20  the right date -- February 23rd of 2021 --

21  A.   Uh-huh.

22  Q.   -- right?

23  A.   Uh-huh.

24  Q.   "Yes"?

25  A.   Yes.  That's correct.

1    Q.   And I think I got the right date:  that according to

2    Ms. Jacome, she started with State Farm November 8th of 2020.

3    All right?

4    A.   Okay.

5    Q.   So she had been with State Farm -- after COVID, had been

6    with State Farm for, according to your estimate, seven months,

7    eight months; right?

8    A.   I thought that Tresa had started with us in 2019 and then

9    came into production in 20- -- I'd have to go back and look,

10   but I thought she was before COVID.

11   Q.   Well, that's -- that -- do you know --

12   A.   I'd have to look at that.

13   Q.   -- that she replaced -- did she replace Amy Lanier?

14   A.   There were a couple of different people.  She had a lot of

15   new people on her team at that time.

16        She could have replaced Amy.  I think she did -- I think

17   she did replace Amy.

18        We had a couple of different openings on her team, so I

19   don't remember 100 percent, because we could move them around.

20   We were just trying to get folks in.

21   Q.   All right.  Let's do it like this.  All right?

22        You say March 2020 is when everything changed at State

23   Farm for COVID; right?

24   A.   Everything changed as far as our inspections.

25   Q.   Right.

Sharon Arnold                                                          83
Direct Examination by Mr. Miller

1      And ride-alongs and all the things --

2   A.    Yes.

3   Q.    -- that might affect manager training --

4   A.    Yes.

5   Q.    -- right?

6      But assume for a moment that Ms. Jacome knows when she

7   started, okay, and that she's right when she said it was

8   November 8th of 2020.

9   A.    Okay.

10  Q.    All right?

11     And that this claim was one of the very first ones she

12  worked when she just took off in the end of January or

13  beginning of February of 2021.  All right?

14     "Yes"?

15  A.    Correct.

16  Q.    So if she had managed somehow to be with two different

17  trainers out of Tulsa and with Kelly Wienstroer to -- for a

18  week or two in 2021, that's well into the COVID experience.

19  Agreed?

20  A.    That is correct, but we were still under COVID

21  restrictions, and, you know, again, managers were -- we were

22  not riding with our adjusters.

23  Q.    Well, I don't know about riding with them.

24     All I know is -- bottom line, all I really wanted to know

25  is were you aware that, according to Ms. Jacome, she had never

Sharon Arnold                                                          84
Direct Examination by Mr. Miller

1  gotten any hail training from her boss?

2       Did you know it?

3  A.   I didn't, no.

4  Q.   All right.  Had -- have you ever, to this day, seen the

5  texts that were exchanged between Ms. Jacome and Ms. Draper on

6  this roof, other than in your deposition?

7  A.   I've -- I've talked to our attorneys about it.  I've seen

8  the -- the text thread, yes --

9  Q.   Okay.

10 A.   -- after.

11 Q.   But prior to your deposition, I believe your testimony was

12 you'd never seen them.

13 A.   I -- no, I had not.

14 Q.   And they -- they weren't in the claim file; right?

15 A.   No, they were not.

16 Q.   And you had reviewed the claim file, and of course, you

17 can't review the texts if they're not in the claim file --

18 A.   That's right.

19 Q.   -- right?

20      And everything that's -- that matters, anything that's

21 pertinent, to a claims decision is supposed to be in the claim

22 file; correct?

23 A.   I -- I would agree.  If it's pertinent to the claim file,

24 yes.

25 Q.   Yes.

Sharon Arnold                                                            85
Direct Examination by Mr. Miller

1      All right.  Have you ever speaked (verbatim) to Thomas

2  Bates?

3  A.    No, I have not.

4  Q.    Have you ever spoken to his son, Gary Bates?

5  A.    No, I have not.

6  Q.    Have you ever exchanged any emails with either one of

7  them?

8  A.    No, I have not.

9  Q.    Or any other kind of communications?

10  A.    The only thing that I have done is I can -- not with them

11  directly, no.

12  Q.    Okay.  Now, is there anything at all from your examination

13  of the claim file that would make you believe that anybody in

14  the Bates family was anything other than truthful and up-front

15  with State Farm about any question they were asked?

16  A.    No.

17  Q.    So that's how it was.  They were truthful and up-front.

18      If they had a -- anybody had a question, they could ask

19  it.  Appears they would tell it.

20  A.    Absolutely.

21  Q.    And -- and by the way, do you agree that that's a pretty

22  good way to get information?

23      If you have a question about somebody's house or, really,

24  anything involving a claim, it's possible that the homeowner

25  might know.

Sharon Arnold                                              86
Direct Examination by Mr. Miller

1   A.   Yes.

2   Q.   And -- and I think you've even said at the beginning the

3   adjuster should utilize that resource and communicate with that

4   homeowner about questions they have.

5   A.   Yes.

6   Q.   And is there anything at all wrong at State Farm with an

7   insured asking that they deal -- the adjuster deal with someone

8   in their family?

9   A.   No.  Absolutely not.

10  Q.   That happens all the time, doesn't it?

11  A.   It can, yes.

12  Q.   There's no doubt in my mind that State Farm has a bunch of

13  people that have been with them for a long time; right?

14  A.   Policyholders or --

15  Q.   Yes.  I'm sorry.

16  A.   Yes.

17  Q.   And -- and oftentimes, they age and grow older and

18  hopefully live a nice long life, and eventually, they start

19  using resources, like their family, to help them with claims.

20  That's normal.

21  A.   Yes, it is.

22  Q.   Now, is there anything at all in the claim file from your

23  review that would indicate that anybody had anything ugly to

24  say about Jonathan Marks, the contractor from Aegis?

25  A.   No.

Sharon Arnold                                                        87
Direct Examination by Mr. Miller

1   Q.   Is there anything in the claim notes that would indicate

2   anybody actually had a conversation with him as far as

3   documenting what it was?

4   A.   Documenting what, what was?

5   Q.   The conversation.

6   A.   The only thing I remember reading from the file notes is

7   Tresa did -- or Ms. Jacome did notate that she did the

8   inspection.  In even her roofing scope, she said that she had

9   inspected the roof with Mr. Marks.

10  Q.   No.  Right.

11       His name's there, and it's -- it's certainly on her --

12  A.   It's on her -- in her --

13  Q.   -- her --

14  A.   -- inspection note.

15  Q.   In her inspection note, it just says, "He's the

16  contractor."

17  A.   Uh-huh.

18  Q.   Right?

19       "Yes"?

20  A.   Yes.

21  Q.   But my question is more specific.

22  A.   Okay.

23  Q.   Is there anything in the claim file that you saw anywhere

24  that would indicate anyone with State Farm ever actually

25  documented a conversation of any kind with Jonathan Marks?

Sharon Arnold                                                            88
Direct Examination by Mr. Miller

1   A.    Not that I recall from the file notes.

2   Q.    All right.  Now, you mentioned earlier that you signed one

3   letter, and that's really what you did in this particular

4   claim; right?

5   A.    That's correct.

6   Q.    And you are referring to the -- State Farm's response to

7   the Oklahoma Insurance Department complaint that the Bateses

8   made.

9   A.    That's correct.

10          MR. MILLER:  If you could put that up for me, it's

11  JX1.113.

12          Excuse me.  Pardon me.

13  Q.    (By Mr. Miller) This is dated March 5th -- I can't see the

14  date.  What is that?

15          March 15th of '21.

16          MR. MILLER:  I have the wrong number, don't I?

17          Give me a second, please.  We're going to -- I think we're

18  going to talk about that one in a little bit.

19          Excuse me a moment.

20          And, Janna, if you find it before me, just let me know.

21          MS. MCGUIRE:  Exhibit 1, page 1.

22          MR. MILLER:  Give me one second to call that -- to

23  call that up.

24          Yes.  Very good.

25          If you'd put up JX1.110.

Sharon Arnold                                                           89
Direct Examination by Mr. Miller

1    Q.   (By Mr. Miller) All right.  What's the date on this --

2    this letter, ma'am?

3    A.   April 15th of '21.

4    Q.   Well, coincidentally, it was on the same day that the

5    letter was sent to Mr. Bates; right?

6         I think we just saw -- or was that March 15th?

7         Oh, well --

8    A.   I'd have to look --

9    Q.   -- never mind.

10   A.   -- at the --

11   Q.   Never mind.

12        All right.  So we can tell this is the Oklahoma Department

13   of Insurance because that's what it says; right?

14   A.   Yes.

15   Q.   And at the bottom of it --

16        MR. MILLER:  If you could show us that, Janna, just

17   so we know who -- who executed it.

18   Q.   (By Mr. Miller) -- that would be you.

19   A.   That is correct.

20   Q.   And I think it's typical --

21        MR. MILLER:  And leave it right there for a minute.

22   Q.   (By Mr. Miller) It's typical for you to sign off on these

23   things; correct?

24   A.   That is correct.

25   Q.   Now, you don't -- you don't often actually draft them, if

Sharon Arnold                                                    90
Direct Examination by Mr. Miller

1    I remember what you told me.

2    A.    That's correct.  The team managers draft the response.

3    Q.    Right.

4          And so they draft them, but you -- you have the

5    opportunity to look at them as much as you want to and then

6    execute them and send them out the door to the insurance

7    department when you're ready.

8    A.    That's correct.

9    Q.    I just -- I'm curious what this means at the bottom:

10   "attachments."

11         First thing has letters and numbers.  Can you tell me what

12   that is?

13   A.    That would be the fire policy to which this -- it's

14   Fire Policy 8103.3.  So that would be the rental dwelling

15   policy.

16   Q.    It always confused me, till I -- I started doing some of

17   this kind of work, why they call so many things "fire policy,"

18   but it's a general residential policy that covers not only fire

19   but things like hail --

20   A.    Correct.

21   Q.    -- right?

22         And you-all, in the business, just still call them "fire

23   policies."

24   A.    Right.

25   Q.    Okay.  Now, the next thing:  The State Farm estimate.

Sharon Arnold                                                    91
Direct Examination by Mr. Miller

1      Would that have been the estimate we looked at a few

2  moments ago that had the 20-year-old metal?

3  A.   It should be.  I'd have to look at the dates to make --

4  yes, it should be.

5  Q.   Yeah.

6      And, then, the next thing:  And photos.  What are those?

7  A.   Those would be just photos in the file that we are sending

8  to the Department of Insurance to -- to support the decision

9  that was made on the claim file.

10 Q.   Those would be State Farm's photos?

11 A.   Yes.

12 Q.   Okay.  And, then, the second inspection denial.  Is that

13 going to be that letter --

14 A.   Yes.

15 Q.   -- that -- that -- I'm going to have to look at to get the

16 date right, but bottom line is that's the letter that went to

17 the Bateses that was signed off by Ms. Jacome maybe back -- it

18 was actually March 15th.  Does that sound right?

19 A.   I'd have to look --

20 Q.   Okay.

21 A.   -- at the date, but --

22 Q.   That's fine.

23     Let's just do that real quick, and we'll come back to

24 this -- one -- I'm going to make you work a little bit --

25 113 -- so we can get that letter right -- date right.

Sharon Arnold                                                    92
Direct Examination by Mr. Miller

1              MR. MILLER:  Yeah, there we go.

2    Q.   (By Mr. Miller) This is to Mr. Bates.  It's March 15th, so

3    it's about a month before the one to the insurance

4    department --

5    A.   Uh-huh.

6    Q.   -- correct?

7    A.   Correct.

8    Q.   And -- and that is regarding the denial of the second

9    inspection.  Fair?

10   A.   That's correct.

11   Q.   And by the way, I think there's going to be a claim note

12   that the jury's seen that has Mr. -- Ms. Draper saying that she

13   sent that to you -- "that" being the insurance -- insurance

14   department's letter -- in the draft form I think the same day

15   as this was -- was sent out.

16        Does that surprise you, that it might have been around for

17   a month?

18   A.   Well, I wouldn't have seen the denial letter, so --

19   Q.   Not what I'm trying to ask you.

20        I think that there's indication that she sent you the

21   draft OID response --

22   A.   Uh-huh.

23   Q.   -- Insurance Department response, like -- something like

24   March 15th, and I'm saying would it surprise you to know that

25   it took till April 15th that it got out the door, or is that

Sharon Arnold                                                    93
Direct Examination by Mr. Miller

1    about right?

2    A.    That wouldn't have been right because we have time frames

3    that we have to respond to the Department of Insurances, and so

4    if -- and usually, it's typically 10 days, so there should not

5    have been a month delay in that.  We would have had to have

6    asked for extensions from the Department of Insurance.

7    Q.    And is that an unusual thing to do?

8    A.    We don't typically like to do that.  We like to be very

9    timely with our responses to them, so -- but on occasion, if we

10   are not able to accurately resolve or even contact the

11   policyholder, then we will ask for that extension, if we need a

12   little bit more time.

13   Q.    Okay.  I -- I -- I'm -- I'm going to go ahead and correct

14   this.  I made a mistake.

15        Would you look at JX1, page 17?

16        JX1, page 17.

17        I should quit doing things from memory.  I'm sorry.

18        Let's just do this real quick and make it clear.

19        So you can see the red letters there.  That's going to be

20   Jacqueline Draper's letters; right?

21   A.    Yes.

22   Q.    And -- because she's the only manager of any kind that

23   wrote anything in this claim file; right?

24   A.    Uh-huh.

25   Q.    "Yes"?

Sharon Arnold                                                    94
Direct Examination by Mr. Miller

1   A.   Yes.

2   Q.   And -- and we've talked about this already, but if it's in

3   red, it's some kind of manager; right?

4   A.   That's correct.

5   Q.   And -- and here's the actual time -- is April 9th.

6   April 9th.  So I apologize for that.

7        So she apparently sent it to you April 9th, and you got it

8   out the door six days later.  That's probably a more accurate

9   way of -- or more expected.

10  A.   Probably, yes.

11  Q.   Yes.

12       But you can see, on April 9th, she sent it -- "Wrote

13  response" -- see that? -- "and sent."

14       I'm assuming that means to you.

15  A.   Correct.

16  Q.   Yeah.

17       Okay.  Very good.

18       Anyway, sorry about that confusion.

19       Let's go back to the OID response.  It's JX1.110.

20       Now, we've already covered that you're the one that looks

21  at it and signs it, but you don't write it, typically; right?

22  A.   That's correct.

23  Q.   Is it fair to say that, in this particular case, you have

24  no memory of actually looking at the file -- the claim file in

25  that time frame to see and check whether what's in this letter

Sharon Arnold                                                                95
Direct Examination by Mr. Miller

1   is accurate?

2   A.   I -- I -- that's typically what I do, but I don't remember

3   this one in particular.

4   Q.   Right.

5        And so -- and that's fine.

6        But the point is it's -- even the -- the decision about

7   what to send to the OID, that's all prompted by your team

8   manager; and you can change it if you want to, of course, but

9   they're going to have all of it ready for you to consider.

10  A.   Right.  I'm going to take a look at it.  I'm -- I'm going

11  to look at it to make sure that it makes sense, that it's

12  logical, and that it accurately represents what the claim file

13  has.

14  Q.   And is it also fair to say that you have no actual memory

15  of this particular letter from back then?

16  A.   That's correct.

17           MR. MILLER:  You can take that down.

18       Thank you.

19  Q.   (By Mr. Miller) Do -- do you expect that your people that

20  report to you, whether a manager or an adjuster, is going to

21  give it their best to explain a denial to the insured or the

22  insured's family member, as the case may be, so that they can

23  understand it?

24  A.   Yes.

25  Q.   And if that takes more than once or however many times or

Sharon Arnold                                                    96
Direct Examination by Mr. Miller

1  something in writing, whatever it takes, because everybody's in

2  a different place in life, they should do that?

3  A.    Yes.

4  Q.    And that's what you would say to them if anybody asked?

5  A.    Yes.

6  Q.    I mean, if somebody came complaining, "I tried three

7  times," you might help them find a new way to do it so that it

8  would work; right?

9  A.    I think it would just depend on the nature of what it is,

10 because sometimes we'll explain things, and it can be

11 semantics.  It can be, you know -- sometimes they just want to

12 hear a final word.

13       So sometimes they will call me, you know, and they --

14 because they want that extra set of eyes to say; and I can say

15 to them, "Yeah, absolutely, we made the right decision."

16       And, you know, sometimes I can, maybe, explain it a little

17 differently than, maybe, they did.  I...

18 Q.    No, I didn't -- that's not what I meant to ask you.

19 A.    Okay.

20 Q.    All I said is, even if one of your people comes and says,

21 you know, pulling their hair out, "This person's just not

22 understanding me" --

23 A.    Uh-huh.

24 Q.    -- then you might help them figure out a new way to

25 approach it.

Sharon Arnold                                              97
Direct Examination by Mr. Miller

1    A.    Sure.

2    Q.    Maybe put it in writing, or maybe you help them by

3    calling, like you just said.

4    A.    Yeah.  I -- I would -- I would pick up the phone and call.

5    Q.    Yeah.  Yeah.

6          Okay.  Now, do you also expect that the folks that work on

7    your teams are going to be responsive to inquiries by insureds,

8    communicate with them?

9    A.    Yes.

10   Q.    Get back with them; right?

11   A.    Yes.

12   Q.    Definitely not okay to ignore a communication from the

13   insured; right?

14   A.    That's correct.

15   Q.    And that includes the insured's representative, if

16   State Farm's aware that they're supposed to be dealing with the

17   representative --

18   A.    That's correct.

19   Q.    -- right?

20         And of course, in this case, you could see from the file

21   that people, from the very beginning, were dealing with

22   Gary Bates; right?

23   A.    We were -- well, the file reflects that Mr. Bates --

24   Thomas Bates submitted the claim and that we talked to

25   Mr. Bates first.

Sharon Arnold                                                      98
Direct Examination by Mr. Miller

1    Now, it doesn't say "Gary Bates" or "Thomas Bates," but it

2    says "Mr. Named Insured," which the only named insured that we

3    have on the policy is -- is Thomas Bates.

4    But later on in the file, Gary Bates, the named insured's

5    son, comes in too, and -- and we're having conversations with

6    them.

7    Q.   All right.  Well, that's fine.

8    The -- the bottom line is that, if -- if the

9    representative of the insured has permission, and you've been

10   dealing with them, then it's expected that people are going to

11   respond to them as the representative of the insured.

12   A.   Yes.

13   Q.   All right.  Now, I had, at your deposition, shown you

14   JX1.268.

15           MR. MILLER:  Put that up now.

16   Well, that's not it.

17   I'm apparently going to get this wrong all day.

18           THE COURT:  Mr. Miller, if we --

19           MR. MILLER:  Yes.

20           THE COURT:  -- could sidebar with the lawyers.

21           MR. MILLER:  Yes.

22   (Bench conference on the record after headsets check.)

23           THE COURT:  Mr. Miller, how much more time do you

24   have with this witness?

25           MR. MILLER:  Let me --

Sharon Arnold                                                        99
Direct Examination by Mr. Miller

1          THE CLERK:  Judge, Ms. Williams can't hear you.

2          THE COURT:  Okay.

3          THE CLERK:  Hold on.  Let me go --

4          THE COURT:  Okay.

5          THE CLERK:  -- see what it is.

6          THE COURT:  Okay.  Ms. Williams, can you hear me?

7     Okay.  Mr. Miller, we're at 10:46.  We've been with this

8  witness on your examination for an hour and 45 minutes.  How

9  much more time do you need?

10          MR. MILLER:  I would say less than 10 minutes.

11          THE COURT:  Okay.  Did it --

12          MS. LANDEROS:  I can't hear.

13          THE COURT:  Who said, "I can't hear you"?

14          MS. LANDEROS:  I'm sorry.  I can hear okay.

15          THE COURT:  Okay.  Mr. Miller says, "Less than 10

16  minutes."

17     I just remind you-all that, you know, that we're covering

18  some ground that's been covered with some other witnesses, so

19  please streamline and focus given the time constraints.  I

20  don't want to cut lawyers off, but we really need to have a

21  focused presentation of the evidence.

22     Mr. Miller, I'm going to let you finish your examination.

23     And then, Mr. Leffel, before you begin, we will take our

24  morning recess.

25     Any questions before we conclude?

Sharon Arnold                                                              100
Direct Examination by Mr. Miller

 1              MR. MILLER:  No.

 2              MR. LEFFEL:  No, Your Honor.

 3              THE COURT:  Okay.  Thank you all.

 4         (End of bench conference.)

 5              THE COURT:  Thank you, Counsel.

 6         Mr. Miller, please proceed.

 7              MR. MILLER:  Let's try JX1.237.

 8    Q.   (By Mr. Miller) Okay.  This is an email that is in the

 9    claim file; correct?

10    A.   Yes.

11    Q.   Okay.

12    A.   Yes.

13    Q.   And -- and --

14    A.   (Unintelligible.)

15    Q.   -- it's from BatesGM, and it's to -- AOL.  It's to

16    State Farm; right?

17    A.   Yes.

18    Q.   And you recognize the address of State Farm.  That's a

19    typical way for people to email, isn't it?

20    A.   Yes.

21    Q.   And the date of it is April 8, so it's going to be just

22    about a week before the OID letter went out; right?

23    A.   That's correct.

24    Q.   Okay.  And here, there are some attachments.  Do you know

25    what those are?

Sharon Arnold                                                          101
Direct Examination by Mr. Miller

1  A.   It looks like those should be photos.  They're JPEGs.  I

2  think those are photos.

3  Q.   Do you remember seeing the attached photos in the file

4  that were with this?

5  A.   I can -- no, I don't.  I remember clicking through and

6  looking through, because there's several attachments even to

7  this from my looking at the file.

8       There were also some other communications that Mr. Bates

9  had with Shelly (verbatim) Bivins, I thought, that was on the

10 same thread, but I could be...

11      I -- I don't remember.  I'd have to physically look at

12 those.

13 Q.   All right.  In any event, of course, there's a lot in

14 this -- in this email, but the part that I wanted to ask you

15 about first was there's a place where it talks about the

16 supervisor's supervisor -- you see that? -- or supervisor of

17 supervisors?

18 A.   Okay.

19 Q.   You -- you --

20 A.   Yes --

21 Q.   -- find that?

22 A.   -- I do see that, uh-huh.

23 Q.   "I -- I demand an experienced adjuster and supervisor of

24 supervisors look at the photos I have attached"; right?

25 A.   Yes.

Sharon Arnold                                                    102
Direct Examination by Mr. Miller

1   Q.   Now, the supervisor of supervisors would be you.

2   A.   I would have to ask Mr. Bates what he means there, but

3   if -- if I'm looking at this, it could potentially mean that it

4   would be me.

5   Q.   Okay.  Well -- okay.

6        You did say it was you in your deposition.

7   A.   Okay.  Yeah.

8   Q.   Okay.

9   A.   Yes.

10  Q.   And you actually never saw this email.

11  A.   No.

12  Q.   In fact, you hadn't even seen it, I don't think, at the

13  time of your deposition; correct?

14  A.   No, huh-uh.

15  Q.   You agree that somebody should have responded to that

16  email?

17  A.   Yes.

18  Q.   And in fact, you think Ms. Draper, as the team manager,

19  should have responded to that email; correct?

20  A.   I think she could have responded to it.  I think Tresa

21  could have -- or Ms. Jacome could have responded to it.

22       I don't -- I don't necessarily think that it absolutely

23  had to be Jacqueline.

24  Q.   Well, what did you say in your deposition?  Do you

25  remember?

Sharon Arnold                                                                103
Direct Examination by Mr. Miller

1    A.   I'd have to go back and look.

2    Q.   Okay.  Let's see.  If we could go to your deposition at

3    page 107, line 17.

4         You there?

5    A.   Not yet.

6    Q.   You ready?

7    A.   Okay.  I am, yes.

8    Q.   And if you need to read context, it's fine.

9         But we're talking about this email there; right?

10   A.   Yes.

11   Q.   All right.  And I asked the question, "Okay.  So your

12   expectation of your team manager, in this case Ms. Draper,

13   would be to handle this e-mail and talk to Mr. Bates about what

14   he's saying here, correct?"

15        And you said?

16   A.   I did say, "Yes."

17        Yes.  Yeah.

18        I mean --

19   Q.   Correct?

20   A.   -- yeah.  Yes.

21   Q.   Okay.  Now -- and I didn't just ask it once.  Go to page

22   11 of 108 (verbatim).

23   A.   Oh, I just shut it.  Hold on one second.  I'm sorry.

24   Q.   That's all right.

25        Page 108, line 11.

Sharon Arnold                                                    104
Direct Examination by Mr. Miller

1   A.   Okay.

2   Q.   And I asked, "So what I want to know is if you're -- I

3   can't remember if I've already asked you this, but what I want

4   to know right now is do you -- are you testifying that, as the

5   section manager, you would have expected your team manager, in

6   this case Ms. Draper, to have responded to Mr. Bates's e-mail

7   and talk to him about this claim?"

8        And you said the second time what?

9   A.   I did -- I -- I said, "Yes," uh-huh.

10  Q.   All right.  Okay.  Now, is it your -- still your testimony

11  that you deny ever hearing the phrase "hail focus" being rolled

12  out as a program of any kind at State Farm?

13  A.   That's correct.

14  Q.   And -- and by that, I mean you-all do have program

15  rollouts, like on water damage; right?

16  A.   Yes, that is correct.

17  Q.   And I don't know if they're always called the "focus," but

18  sometimes it's a water damage -- whatever they call it, but

19  it's kind of "let's focus on water damage claims."

20  A.   Right.  It's just -- it's training.  It's a refresher

21  course --

22  Q.   Right.

23  A.   -- yeah.  We have it on water.  We have it on wind/hail.

24  We have it on fires.

25  Q.   Sure.

Sharon Arnold                                                      105
Direct Examination by Mr. Miller

1      And your testimony, just to be clear:  You were never

2   involved at State Farm while Jacome -- Ms. Jacome was on a team

3   that you managed the team manager of with any rollout, any

4   program, any plan to make hail focus -- those two words

5   together -- part of the program?

6   A.   No.

7   Q.   Do you still feel like you did in your deposition:  that,

8   based on your review of this file, that you have no criticism

9   of the adjuster?

10  A.   After our deposition and the questions, you know, and --

11  and certainly for preparing for today, I did go back and look;

12  and if I was going to be a little nitpicky in the file, there

13  are some criticisms I would have.

14  Q.   Did you change your answer of your deposition when you

15  read it?

16  A.   No.

17  Q.   You know, you had the -- remember, the 30 days to read it?

18  A.   Yes.

19  Q.   And you took it.  You asked for it, didn't you?

20       You didn't waive it.  You said, "I want to read it."

21  A.   Oh, I didn't -- no, I didn't ask for the deposition.

22  Those are always provided to us.

23  Q.   Well, all right.  Do you -- do you -- well, that's fine.

24       The bottom line is you read it, and you were given the

25  opportunity to change anything you wanted to; right?

Sharon Arnold                                                    106
Direct Examination by Mr. Miller

1   A.   Correct.

2   Q.   In fact, there's something called an "errata sheet" at the

3   end of it -- always is -- and you can fill that out to your

4   heart's content; right?

5   A.   Correct.

6   Q.   But you didn't change any of those answers, did you?

7   A.   I did not.

8   Q.   Also asked if you had any criticism, in the deposition, of

9   the team manager, Jacqueline Draper, or the way, generally,

10  State Farm handled the claim.

11  A.   Uh-huh.

12  Q.   And then you said no.  Is that still your testimony?

13  A.   Yes.

14  Q.   One last area I'd like to talk to you about:  I had -- you

15  remember I had asked you whether or not it was part of the

16  claims-handling goal -- goal on your watch that the adjusters

17  and team managers consider how to involve fairness in handling

18  a claim.  Do you remember those questions?

19  A.   Yes.

20  Q.   And you remember telling me that fairness is not part of

21  the process.  It's not part of the job.  Remember that?

22  A.   When I went back and reread my deposition, we were

23  talking -- you were asking me about the job description; and,

24  then, what I was commenting on was fair being in that; and we

25  talked about and, ultimately, we got to, after several

Sharon Arnold                                                    107
Direct Examination by Mr. Miller

1   questions -- was, when you pulled up the commitment to our

2   policyholders, it does say -- the first line in there is to be

3   fair --

4   Q.   It's --

5   A.   -- and so we were trying to determine what that definition

6   of "fair" was.

7   Q.   Well, there's no doubt that's when you changed your

8   answer, when we pulled up the commitment to policyholders,

9   which, right at the jump start, when it's talking about being a

10  good neighbor, one of the commitments is to be fair.

11  A.   Right --

12  Q.   Now --

13  A.   -- but, again --

14  Q.   -- you're -- well, let's just read it then.  Okay?

15       Let's read what -- what was asked and what -- what was

16  said.  All right?

17       Let's go to page 56.

18       I'm sorry.  Give me one moment here.

19       All right.  Here we go.  Page 56, line 8.

20       "Well, what do you think it means to be a fair claims

21  handler"; right?

22       And you said what?

23  A.   I said, "My claim handlers, what I expect them, is to, you

24  know, appropriately investigate each and every claim on its

25  merits."

Sharon Arnold                                                    108
Direct Examination by Mr. Miller

1   Q.   And I said, "Okay.  What does -- what -- how does that fit

2   into your definition of how you fairly handle a claim, or does

3   it?"

4   A.   Right.

5   Q.   And what did you say?

6   A.   I said, "I don't know that fair even comes into play.  We

7   are making a determination based on a set of facts and speaking

8   with the insureds and collecting all of the information we need

9   to make an accurate coverage determination."

10  Q.   All right.  And we talked about it for quite awhile, and I

11  came back around to it, and look at page 59, line 7.

12       You there?

13  A.   I am.

14  Q.   Line 7?

15  A.   Yes.

16  Q.   And I said, "Well, does State Farm use the word fair in

17  their description of what an adjuster is supposed to do?"

18       And you said what?

19  A.   Wait.  I'm sorry.

20       Where are you at?

21  Q.   Page 59.

22       What did I say?

23       59.

24  A.   Oh, you said "57."

25  Q.   Oh, I apologize.

Sharon Arnold                                                          109
Direct Examination by Mr. Miller

1          59.

2    A.    Okay.

3    Q.    Line 7.

4    A.    Okay.

5    Q.    "Well, does State Farm use the word fair in their

6    description of what an adjuster is supposed to do?"

7    A.    Right.

8          And I said, "No," there, and --

9    Q.    Just read the only word you said.

10   A.    Okay.  "No."

11   Q.    What is that?

12   A.    I said, "No."

13   Q.    Now, let's go ahead and put up what I did next and that is

14   show you JX2.6, if we can.

15         And right there, at the -- the first bullet, I think it

16   is -- first bullet in the commitment to policyholders, it says,

17   "We should."

18         That is talking to adjusters, isn't it?

19   A.    That is, uh-huh.

20   Q.    "Listen, be fair, be open, and carry out our part of the

21   bargain under the contract in good faith"; right?

22   A.    That's correct.

23   Q.    Now, are you trying to tell the jury that's not part of

24   the job description of an insurance adjuster?

25   A.    When I was answering this question and I -- when I thought

Sharon Arnold                                                    110
Direct Examination by Mr. Miller

1   you were asking me the question, I thought you were saying did

2   that word specifically go into our job description.

3        This is our commitment to our policyholders.

4   Q.   Is there some place where I actually use the words "job

5   description"?

6   A.   You said "description" -- in the --

7   Q.   Did --

8   A.   -- claim handler's description.

9   Q.   Were you looking at a job description?

10  A.   No.

11  Q.   We don't even have a job description in this case.  You

12  know that; right?

13  A.   That's correct.

14  Q.   All right.  So...

15           MR. MILLER:  Judge, I believe that's all for now.

16       Thank you, ma'am.

17           THE COURT:  Okay.  Thank you-all.

18       Members of the jury, at this time, we're going to take our

19  morning recess.  During this recess, do not talk with any

20  witness, with any party or persons seated at counsel tables,

21  with any of the lawyers or their staff, anyone in the audience

22  observing, or with anyone else.

23       Also, do not talk about the trial with anyone else.  This

24  includes communicating by electronic means, such as emails,

25  texts, social media postings, like Facebook, Twitter, or

Sharon Arnold                                                    111
Direct Examination by Mr. Miller

1   similar sites, or any other means.

2        Do not attempt to gather any information relating to the

3   case on your own or visit any places mentioned in the case.

4        Do not attempt to do any research on the Internet.

5        Avoid reading or listening to any reports about the case

6   in the media.

7        Do not discuss the case, even among yourselves, until the

8   end of the trial when I've instructed you on the law, and you

9   have gone into the jury room for your deliberations.

10       Keep your minds open and free and do not form an opinion

11  one way or the other until the case is submitted to you, and

12  you retire to consider your verdict.

13       This instruction will apply during every recess throughout

14  the trial.

15       This also governs those in the courtroom, whether involved

16  in the trial or not.  You are not to speak to the jury.  My

17  usual instructions continue to apply.

18       And the Court will be in recess for 20 minutes.

19       (Jury exits.)

20          THE COURT:  Ms. Arnold, you may step down.  When we

21  come back, you'll go ahead and have your seat before the jury

22  returns, but you may step out and exit the courtroom.

23       (Witness exits.)

24       (Discussion off the record between the Court and clerk,

25  after which discussion was had on the record and not contained

Sharon Arnold                                                      112
Direct Examination by Mr. Miller

1    herein per the Court's order, Docket Number 145.)

2              THE COURT:  Let's take -- I want to give you-all an

3    opportunity to use the restroom and to stretch your legs, so

4    if -- in 10 minutes, if the lawyers will meet back in my

5    chambers -- that will be at 11:10 by this clock, maybe 11:13 by

6    your watches -- and then we will further inquire from there.

7         Anything further from the parties?

8              MR. MILLER:  No.

9              THE COURT:  I'm sorry.  Mr. Miller?

10             MR. MILLER:  No.  No.

11             MR. LEFFEL:  No, Your Honor.

12             THE COURT:  Okay.  We are on our recess.  Thank

13   you-all.

14        (Recess taken.)

15        (Sealed in-chambers discussion had on the record but not

16   contained herein.)

17             THE COURT:  Counsel, on the record outside the

18   presence of the jury, I do not intend, unless you-all ask me to

19   do so, to completely read the entire preliminary instructions

20   again.  I intend to emphasize, following my instructions, that

21   they determine facts, and I will add that they will have copies

22   of the exhibits introduced in the -- into evidence in the jury

23   room and then to reread my instruction on notes.

24        Anything further by either party?

25             MR. MILLER:  Not me.

Sharon Arnold                                                    113
Direct Examination by Mr. Miller

1          MR. LEFFEL:  No, Your Honor.

2          THE COURT:  Okay.

3       (Discussion off the record.)

4       (Jury enters.)

5          THE COURT:  Members of the jury, before Mr. Miller --

6   sorry -- before Mr. Leffel proceeds with the examination of

7   Ms. Arnold, I wanted to remind you of some of your duties as

8   jurors.

9       As you'll recall, at the beginning, I gave some

10  preliminary instructions -- I call those "my usual

11  instructions" -- and I ask that you-all to continue to follow

12  those.  It is vital to the administration of justice that you

13  fully understand and faithfully perform these duties.

14      It is my duty to determine all of the law applicable in

15  this case and to inform you of that law by these instructions

16  and by the instructions that I have given to you throughout the

17  case and also the instructions that I will give to you after

18  all evidence has been received.

19      It is your duty to accept and follow all of these

20  instructions as a whole, not accepting one or more of these

21  instructions and disregarding the others.  You must follow the

22  law as I instruct whether you agree with it or not.

23      It is your duty as jurors to determine the facts of this

24  case from the evidence produced in open court.  You and you

25  alone are the judges of the facts.  You should consider only

Sharon Arnold                                                    114
Direct Examination by Mr. Miller

1   the evidence introduced while the court is in session.

2        It is then your duty to apply the law, as determined by

3   the Court, to the facts, as determined by you, and thus render

4   a verdict.  You should not allow sympathy or prejudice to

5   influence your decision.  Your decision must be based upon

6   probabilities and not possibilities.  It may not be based upon

7   speculation or guesswork.

8        The evidence you are to consider will consist of the

9   testimony of the witnesses; the exhibits, if any, admitted into

10  evidence; any facts admitted or agreed to by the attorneys; and

11  any stipulated facts or stipulations, which I instruct you to

12  accept as true.

13       The term "witness" means anyone who testifies in person,

14  by video, or by deposition, including the parties.

15       I will note that you will have copies of the exhibits

16  admitted into evidence with you in the jury deliberation rooms

17  after the instructions, after closing argument, and when you

18  retire to render a verdict.

19       I'll also remind you that -- not to discuss, before this

20  case is finally submitted to you for decision, the case with

21  anyone, including your fellow jurors, or form or express any

22  opinion about it.

23       And just as a reminder for all, you may not take notes

24  during the course of the trial.  There are several reasons for

25  this.  It is difficult to take notes and at the same time pay

Sharon Arnold                                                        115
Cross-examination by Mr. Leffel

1   attention to what a witness is saying.

2        Furthermore, in a group the size of yours, certain persons

3   will take better notes than others, and there is a risk that

4   the jurors who do not take good notes will depend upon the

5   notes of others.  The jury system depends upon all jurors in a

6   civil action paying close attention and arriving at a unanimous

7   decision.  I believe that the jury system works better when the

8   jurors do not take notes.

9        Counsel, anything further?

10       And we can go off the record if there are any further

11  instructions for the jurors.

12             MR. MILLER:  No, Judge.

13             MR. LEFFEL:  No, Your Honor.

14             THE COURT:  Okay.  Mr. Leffel, you may proceed.

15             MR. LEFFEL:  Thank you.

16                        CROSS-EXAMINATION

17  BY MR. LEFFEL:

18  Q.   Good morning, Ms. Arnold.

19  A.   Good morning.

20       Good morning.  Pull that up.

21  Q.   All right.  So being the second guy up, I want to go back

22  and talk about some things that you may have discussed with

23  Mr. Miller.  There are going to be places where I (verbatim)

24  may have asked you a question that I'm not going to ask you

25  because they already know what the section manager does at

Sharon Arnold                                                         116
Cross-examination by Mr. Leffel

1   State Farm.  Okay?

2   A.    Okay.

3   Q.    But the first thing that I wanted to talk to you about is

4   you were asked at one point -- I apologize.  Let me grab

5   something real quick here.

6        You were asked about the policy and -- and about how

7   payment is made in the policy.  Do you recall that?

8   A.    Yes.

9   Q.    Okay.  Now, if the policy has what's called an "actual

10  cash value endorsement," then, if that is in effect -- remember

11  talking about the -- the initial payment's ACV?  Then you get

12  the replacement cost benefits or the depreciation gets paid?

13  You remember that?

14  A.    That's correct.

15  Q.    If the policy is ACV only on -- on, say, the roof, how

16  does that work?

17  A.    If the policy carries the ACV endorsement, then all we

18  could pay would just be that depreciated amount.  They would

19  not be entitled to replacement cost benefits.

20  Q.    Okay.

21        MR. LEFFEL:  Ms. Wright, would you mind showing us

22  Joint Exhibit 6 at page 30, and if you could pull up the policy

23  forms and endorsements that's there on the left column.

24        You got it.

25  Q.    (By Mr. Leffel) Does this policy that covered the Bates

Sharon Arnold                                                            117
Cross-examination by Mr. Leffel

1    property have that actual cash value roof covering endorsement?

2    A.   It does.

3    Q.   Okay.  Another thing that you were asked about was what is

4    the field, and what is the edge of the shingle.  Do you recall

5    that?

6    A.   Yes.

7    Q.   We've heard that many of the claims handlers at State Farm

8    received training on things like hail identification from Haag.

9    Are you familiar with that?

10   A.   Yes, I am.

11   Q.   Okay.  Have you ever watched any of the Haag videos?

12   A.   Yes, I have.

13   Q.   Okay.  If the Haag videos advise that, in their

14   assessment, the edge is within one-half inch from the edge into

15   the shingle, do you dispute that?

16   A.   No.

17   Q.   You remember talking about bruising?

18   A.   I do.

19   Q.   Okay.  Do you think that you could easily instruct someone

20   to know the difference between how this podium feels versus,

21   maybe, how the back of Mr. Miller's chair feels?

22   A.   Yes.

23   Q.   And what would you expect for someone to think about how

24   wood feels?

25   A.   That it would be extremely hard.

Sharon Arnold                                                        118
Cross-examination by Mr. Leffel

1   Q.   And what do you think that someone might say about the

2   leather backs of the chairs?

3   A.   That it would be soft.

4   Q.   Do you think that you could hand an eight-year-old an

5   apple and say, "There's a bruise on this apple.  It's a soft

6   spot.  Find it"?

7   A.   I do.

8   Q.   Do you think that an eight-year-old would be able to

9   figure that out?

10  A.   Yes.

11  Q.   Okay.  So there's a science to this, but it's not rocket

12  science, is it?

13  A.   Right.

14  Q.   Okay.  Now, one of the things we heard about -- and it may

15  have been from Mr. Mendoza, an individual that testified by

16  video, but he was talking about some of his training.

17       And by the way, he -- he -- he sits at a desk.  He's not

18  really a field guy.  Why would a guy -- and -- and one of his

19  jobs on this claim was hail reconciliation.

20       Why would a guy that sits at a desk all day go to all the

21  State Farm training on hail identification?

22  A.   All of our adjusters receive that training.  We -- we --

23  we have a -- an initial training class that we go through.

24  It's -- it's from Haag.  It's quite extensive.  It goes through

25  all kinds of roofing materials.  It talks about, gosh,

Sharon Arnold                                                    119
Cross-examination by Mr. Leffel

1   directionality that we see for wind damage.  It does

2   specifically talk about hail.  It talks about mechanics of a

3   roof, like, how different materials and components work on a

4   roof.

5        But all of our adjusters take that all -- all over the

6   country, and then, yearly, we take refreshers on that as well.

7   Q.   Okay.  Well, one of the things I remember him talking

8   about was something called a "mock-up room."  Do you know what

9   that means?

10  A.   The only thing I could think of:  He's talking about a

11  mock-up room prior to COVID.

12       I know we've talked a lot about COVID, but prior to COVID,

13  all of our new-to-roll trainings go to corporate -- our

14  corporate office in Bloomington, so they get to see corporate.

15       And then we have our training facilities there, and they

16  do have mock-ups.  They have roofs there.  They have -- you

17  know, they -- that's where they kind of get their base

18  estimating going.  They go in, ask them -- you know, they give

19  them a room, and they say, "Hey, how would you estimate this?"

20       And so that's -- I -- I would assume that's what he's

21  talking about when he says "mock-ups."

22  Q.   Do you -- do you think that you have those type of mock-up

23  rooms in some of your other hubs, like in Dallas or Irving?

24  A.   I don't know the answer to that.

25  Q.   Okay.  And -- and I've -- I've seen them, but what I want

Sharon Arnold                                                          120
Cross-examination by Mr. Leffel

1   to ask you, for the -- have you seen one?

2   A.   I've been to the one in Bloomington.

3   Q.   Okay.  And I've -- and I've seen them elsewhere, but have

4   you -- I've seen what I would describe almost like an oversized

5   dollhouse --

6   A.   Yes.

7   Q.   -- or like a -- or slightly smaller than a kid's

8   playhouse, and it's got all kinds of different roofing surfaces

9   on it.  Have you seen that?

10  A.   I've not seen it in person.  I have seen pictures of it.

11  Q.   And -- and -- and irrespective of -- of whether, you know,

12  you happen to be trained during a time when there were some

13  hailstorms, does everybody get training in those types of

14  classroom settings on what hail looks like?

15  A.   Everybody should be trained.  I know the training was a

16  little different, though, when the COVID year happened because

17  we couldn't send them to Bloomington, so...

18       I'm -- I'm not responsible for the training, so I'm not

19  100 percent sure of, actually, every single thing that they --

20  they see, but they should have some training towards that.

21  Q.   Did I understand your testimony correctly that, as far as

22  you're concerned, in your 29 years, how people are trained to

23  identify hail has been consistent?

24       Did I hear that right?

25  A.   Yes.

Sharon Arnold                                                          121
Cross-examination by Mr. Leffel

1   Q.    I think you also said that as far as how you would

2   approach a hail claim and how you would apply the policy has,

3   more or less, stayed the same?

4   A.    That's correct.

5   Q.    Okay.  Let me ask you this, though:  Does the science of

6   buildings and hail identification evolve over time?

7   A.    It does, and that is -- again, even with roofing, with

8   just regular building materials, it changes, and that's why we

9   do so much training at State Farm.  It's yearly.  Of course,

10  we're talking about wind/hail here.

11       As I mentioned, we take a very extensive training class

12  initially, and then, every year after that, we do refreshers,

13  all the way from myself down to all of my adjusters and all of

14  our adjusters and the fire company.

15       But we do.  I mean, products change.  Materials change.

16  Products become better.  We do have what are considered

17  hail-resistive shingles, impact-resistive shingles, you might

18  hear, and so, you know, that's just the evolution of shingles.

19  We used to just have, like, just composition shingles, and now

20  we have, you know, tile roofs.  We have wood shake roofs.  We

21  have composition.  We have architectural.  There's a lot of

22  different materials.

23  Q.    Is how -- is the question of how you might identify hail

24  on a wood shake, which growing up in Edmond, everybody seemed

25  to have, and no one has today --

Sharon Arnold                                                        122
Cross-examination by Mr. Leffel

1    A.   Uh-huh.

2    Q.   -- is that, maybe, different than what it's going to take

3    to look at a Malarkey Class 4, you know, composite shingle?

4    A.   Yes.

5    Q.   Okay.  Do you -- did you ever -- did you ever know that,

6    at one point in time, it was state-of-the-art, apparently, in

7    medicine to use leeches to treat certain conditions in human

8    beings?  Did you ever hear that before?

9    A.   Briefly, yes.

10   Q.   Has your doctor ever recommended that you use leeches to

11   be treated?

12   A.   No.

13   Q.   Okay.  An example of where something has evolved over

14   time.

15   A.   Right.

16   Q.   When I had my first football helmet, it had one bar.  It

17   was plastic.  It had four little cubes of -- of foam, and that

18   was considered sufficient to protect my head.

19        Have football helmets changed and evolved over the years

20   as science has evolved?

21   A.   Definitely.

22   Q.   To your knowledge, do they make them specialized to heads

23   today?

24   A.   They do.

25   Q.   Okay.  And is that true in your industry with insurance

Sharon Arnold                                                                123
Cross-examination by Mr. Leffel

1   and hail identification?

2   A.   Yes.

3   Q.   Okay.  Do you remember being asked about lifting a

4   shingle?

5   A.   Yes.

6   Q.   Okay.  And -- and -- and did I understand that you're

7   talking about your -- the reason you might be lifting would be

8   for further confirmation of whether there's hail damage?

9   A.   Yes.

10  Q.   Okay.  Is it required to lift a shingle in order to verify

11  that there's hail damage?

12  A.   No, it's not required.

13  Q.   Okay.  Are there reasons that you -- that -- well, let me

14  just ask it this way:  Does State Farm encourage its adjusters

15  to always break a seal on a shingle?

16  A.   We don't encourage us breaking a seal at all.  I mean, if

17  we can -- if it's loose, and we can get up underneath there --

18  we don't want to cause any further damage to the roof, so if --

19  if it's loose enough, and they can, you know, get their hand up

20  underneath the bottom of it, that's what we would want them to

21  do if they had any question of whether or not it was a hail

22  strike.

23  Q.   Okay.  And why -- what are some reasons that you would

24  not -- you would tell them not to break that seal if it wasn't

25  necessary?

Sharon Arnold                                                    124
Cross-examination by Mr. Leffel

1    A.   If they didn't think it was a hail hit on the roof.  If

2    they -- if they thought that -- I mean, there's a lot of

3    different things that can happen.  You can have installation

4    marks on a roof.  You can have footfall.  And so, if they felt

5    like it was not -- only time I would -- I would want them, if

6    they really had a question -- if they could get underneath

7    there, is if they have some question of whether or not it was

8    actually hail damage to the roof.

9    Q.   I also seem to recall that you testified with Mr. Miller

10   that you are not certain what specific training was given to

11   Ms. Jacome.

12   A.   That's correct.

13   Q.   Okay.  As section manager, do you still have to go through

14   training from time to time?

15   A.   I do.

16   Q.   Okay.  As a section manager for Oklahoma, are you

17   generally aware of the type of training that your claims

18   specialists receive?

19   A.   Yes.

20   Q.   Okay.  And what types of training would you have

21   anticipated that -- that someone coming on board and -- and --

22   around 2021 would have received?

23   A.   They -- they go through a pretty extensive training

24   program where they go through the policy -- several policies,

25   actually.

Sharon Arnold                                                      125
Cross-examination by Mr. Leffel

1      They would then move into more of the Estimatics, and they

2  would then -- if they were new, they would take, as I

3  mentioned, that full-length video -- it's -- I think it's

4  almost eight hours of training from Haag, initially, on that.

5      They would do -- there's water videos that we teach them,

6  plumbing mechanics, the differences between drain lines and

7  supply lines in a home.

8      We -- we basically teach them how to construct a home from

9  the ground up, because a lot of times we have to deal with

10 fires that have definitely just -- there's just a slab when we

11 go out there, unfortunately.

12     So they have to be skilled, and -- and that comes over

13 time.  That's not something that a brand-new adjuster -- we

14 would expect to have that skill set, but over time, they would

15 build those skills to be able to really go out and physically

16 rebuild that home from the ground up.

17 Q.   Once this -- these various forms of classroom training are

18 done, do they then evolve out to, maybe, doing works in the

19 field with another adjuster?

20 A.   Yes.

21 Q.   What's a ride-along?

22 A.   A ride-along could be either with a peer, a claims

23 specialist, on their team that has more experience.  They could

24 do a ride-along with them.

25     The technical term that we use for ride-along is a team

Sharon Arnold                                                    126
Cross-examination by Mr. Leffel

1   manager riding along with a specialist; or I can also do a

2   ride-along, and my -- my role in that is, really, to observe

3   the team manager, if there's any coaching that needs to be done

4   for the specialist, what the specialist is doing, making sure

5   that they are -- all of the expectations that I had mentioned

6   earlier that they are doing when they're out at the house.

7   Q.    And when you go out on these, you know, ride-alongs, I

8   guess, to get the -- the field training, do you kind of have to

9   just take what you get as far as, like, whatever claims are

10  coming in, that's what they're going to get to see?

11  A.    That's correct.

12  Q.    Okay.  Well, I think the evidence in this case is that

13  Ms. Jacome was getting her ride-along training somewhere around

14  the time frame of, like, December of '20 into January of '21.

15  Are you with me?

16  A.    Yes.

17  Q.    Typically, are December and January big-time hail event

18  months?

19  A.    No.

20  Q.    So it might have just been that there just wasn't an

21  opportunity to see a lot of hail during that time frame.  Does

22  that happen?

23  A.    Yes.

24  Q.    Okay.  There was also a fair amount of discussion about

25  Mr. Marks's email and about how many pipe jacks we need to pay

Sharon Arnold                                                        127
Cross-examination by Mr. Leffel

1   for.  You remember that?

2   A.    Yes.

3   Q.    Okay.  By the way, and you may not know, do you know -- do

4   you know what a -- the cost is on, like, a pipe jack?

5   A.    It was on our estimate, but I don't remember.  I --

6   Q.    Okay.

7   A.    -- I -- I think it's less than $50.

8   Q.    Okay.  Let me -- and by the way, you -- you're aware, as

9   was discussed, that, during this litigation and, I think, maybe

10  not long after your deposition, State Farm did issue a

11  supplemental payment that covered pipe jacks, mailbox, and

12  depreciation; right?

13  A.    That's correct.

14  Q.    Okay.  And -- and -- and -- and when -- and when -- when

15  it's confirmed that something that -- that State Farm owed is

16  not paid, does State Farm pay it?

17  A.    We do.

18  Q.    Does it matter if it's -- if it's three months or three

19  days after the initial payment?

20  A.    No.

21  Q.    Okay.  I want to show you something, and let's start, if

22  we could, with Joint Exhibit 3-6.

23        Okay.  I think this is probably a picture that the jury

24  has seen by now, but can -- I -- I -- I've heard this called a

25  couple of different things.

Sharon Arnold                                                     128
Cross-examination by Mr. Leffel

1        Is it an HVAC cover?

2   A.   It should be.  A vent cap.

3   Q.   Okay.

4   A.   Call it a vent cap.

5   Q.   And -- and as we've all discussed, it's -- it's been

6   damaged.  Has it not?

7   A.   It has.

8   Q.   Okay.

9            MR. LEFFEL:  I want to -- I want to identify that

10  one.  Take that down.  If you could take us to Joint Exhibit

11  17, and if you could, if you will highlight the "Proposal"

12  section there so that we can all see that.

13       Yeah, right there.  You got it.

14       Thank you.

15  Q.   (By Mr. Leffel) So the first thing that it's telling us

16  here is that, you know, this is -- and do you understand this

17  was -- this was the 2012 claim, roof was replaced in '13, and

18  it was a -- it was a full roof replacement?  Okay?

19  A.   Okay.

20  Q.   And this is from Aegis, and the first thing they're

21  telling us is that they took two layers off.  That's typical in

22  a roof replacement; right?

23  A.   I mean, it can.  I mean, we -- that's why we have the

24  little layers on there, because that's an additional amount of

25  money if there's two roof layers, but typically, we don't see

Sharon Arnold                                                    129
Cross-examination by Mr. Leffel

1   that, but that's up to the policyholders.

2   Q.   The next line says "install two large low-profile vents."

3        Do you know what that refer to?

4   A.   Those are the round -- the -- the bigger -- almost look

5   like flying saucer-type vents on the roof.

6   Q.   Are they closer to the -- like, they're -- they're close

7   down to the shingle?

8   A.   Yes.

9   Q.   I think -- I sometimes describe -- it looks to me like a

10  salad bowel that's been turned upside down.

11  A.   Right.

12  Q.   Okay.

13  A.   Yeah.

14  Q.   And I think we've seen some photos.  I'm not going to pull

15  one up now.

16       Take a moment for yourself -- and -- and then there's

17  installing those; and -- and in insurance parlance -- and --

18  and I know you can't speak for Aegis, but in insurance

19  parlance, if you're taking something off that's already there

20  and -- and putting it back, do you call that "remove and

21  replace"?

22  A.   Yes.

23  Q.   If you're installing something that wasn't there, that

24  would be an addition?

25  A.   Yes.

Sharon Arnold                                                        130
Cross-examination by Mr. Leffel

1   Q.    Okay.  So, then, the next item, for example, says,

2   "replace plumbing vent flashings with new flashings."

3         Do you see that?

4   A.    I do.

5   Q.    Okay.  I want you to look through that entire invoice, and

6   tell me if you can find anywhere that, as you read it, Aegis

7   replaced those HVAC vent caps.

8   A.    No.

9   Q.    Okay.  You remember talking about Ms. Jacome's scope

10  sheets?

11  A.    Yes.

12  Q.    Okay.  And I think we noted there that -- I think, if I'm

13  remembering -- remembering correctly, somewhere she put

14  15 years on the age of the roof.  Do you remember that?

15  A.    Yes.

16  Q.    Okay.  And we all agree that's not right?

17  A.    That's correct.

18  Q.    Okay.

19              MR. LEFFEL:  Pull up, if we could --

20  Q.    (By Mr. Leffel) Before we do this, let me -- let me ask

21  you this:  When and where are those scope sheets typically

22  completed?

23  A.    I think some -- it just depends.  I mean, every adjuster's

24  a little different.

25        I can speak from my experience.  I would try to do as much

Sharon Arnold                                                        131
Cross-examination by Mr. Leffel

1   as I could before I got out there, you know, all the claim

2   number and things that I'd already known talking to the

3   policyholder, but they could do all of it once they get to

4   the -- the risk.

5   Q.    We probably have a photo like this in this file, but

6   sometimes in a claim file, have you seen where someone takes a

7   picture of their scope sheet?

8   A.    Yes.

9   Q.    Some of -- some of them laminate them and use them again;

10  right?

11  A.    They do.

12  Q.    And so sometimes you'll see where somebody's up on a roof,

13  and they -- they're -- they take a picture of their scope sheet

14  with the shingles behind them.  Have you seen that?

15  A.    Yes.

16  Q.    Okay.  So it might be that you're up on the roof, and

17  you're noting how many pipe jacks there are; right?

18  A.    Yes.

19  Q.    Okay.  I want to take a look at Joint Exhibit 1 at

20  page 21, if we could, and I'm going to represent to you that

21  this is -- it -- if we were to go up a page -- and I'm not

22  going to go there to save time.

23        This is her inspection note from February 23rd, and if we

24  could highlight it up there, I want you to see if you can tell

25  me what she listed in her claim notes as being the age of the

Sharon Arnold                                                    132
Cross-examination by Mr. Leffel

1    roof.

2    A.    She had listed nine years.

3    Q.    Okay.  So she -- did she get it right in the claim file?

4    A.    She did.

5    Q.    If -- if -- if -- if I'm out on the roof at a, you know,

6    4/12 pitch, and I write down something, but then I get back to

7    the office, and I put my notes in there, what's going to

8    control in that situation?

9    A.    I'm sorry?  The last part?

10   Q.    If I -- if I'm out on the roof, and I'm counting pipe

11   jacks or writing the age of the roof, but then I get back to

12   the -- to my computer and -- and -- and enter my notes, which

13   would trump:  what I put in the file or what I may have put in

14   my notes?

15   A.    I would say what I put in my notes.

16   Q.    Okay.  You recall talking about the -- the text messages

17   that were exchanged between Ms. Jacome and Ms. Draper?

18   A.    Yes.

19   Q.    Okay.  And have -- I don't think they were brought up, but

20   have you seen those before?

21   A.    I have.

22   Q.    Okay.  And having reviewed those and having reviewed this

23   file, would you have expected those particular notes -- would

24   have been necessary for them to be in the claim file?

25   A.    I don't think so.  I mean, the nature of those is -- she's

Sharon Arnold                                                      133
Cross-examination by Mr. Leffel

1   a newer rep, and she's just looking for affirmation or

2   validation for what she was seeing.  So it's -- you know, that

3   happens quite often between our specialists and managers.  They

4   talk often about just claim information and -- you know, to

5   help them make the appropriate determination.

6   Q.   Okay.  And just a minute ago we were looking at

7   Ms. Jacome's inspection note.

8          MR. LEFFEL:  In fact, if you don't mind, if you

9   wanted to pull that back up, that's JX1 and, I think, 21.

10  Q.   (By Mr. Leffel) Having reviewed those and --

11         MR. LEFFEL:  And -- and in fact, if you could

12  highlight...

13       Let's -- well, pull out of that.

14       Can -- can -- I'm sorry.

15       I can't -- I need to get up here, I guess.

16       Can you go to her inspection note?

17       So -- so go down.

18       Not on this -- it's not on this page.

19          MS. WILLIAMS:  20.

20         MR. LEFFEL:  Okay.  Right there, and if we can pull

21  up what she said of the roof.

22  Q.   (By Mr. Leffel) So I'm going to you ask to look at this,

23  but you're familiar -- familiar with the text messages; right?

24  A.   Yes.

25  Q.   Is the information, the types of things that were being

Sharon Arnold                                                        134
Cross-examination by Mr. Leffel

1   discussed by Ms. Draper and Ms. Jacome, reflected in

2   Ms. Jacome's inspection note?

3   A.    In her inspection note here?

4   Q.    Yes.

5   A.    Yes.

6   Q.    Yeah.

7         For example, I don't -- you know, I -- I --

8   A.    I can't remember exactly what was in the notes, but, yes.

9   Q.    There was -- do you remember them discussing wear on the

10  edges of shingles?

11  A.    Right.  I remember asking, you know, "Do you -- do you

12  think this was wear?"  "Do you think this was hail?"

13        Yes.

14  Q.    Do you see where she is describing what she found in that

15  regard?

16  A.    Yes.

17  Q.    Okay.  Do you remember them -- do you remember Ms. Draper

18  asking, "What do your valleys and ridges look like?"

19  A.    Yes.

20  Q.    Okay.  Do you see where she's addressing what she saw on

21  the valleys and ridges?

22  A.    Yes.

23  Q.    Okay.  So my question is was, more or less, the content of

24  those messages included in what Ms. Jacome documented in the

25  file?

Sharon Arnold                                                    135
Cross-examination by Mr. Leffel

1   A.   The content was just, really, validating what she saw up

2   there on the roof.

3       And, you know, Jacqueline is asking her -- and -- and the

4   reason that she's asking her about the ridges and the valleys

5   is those are typically your softer parts of your roof, and so

6   you would definitely see damage from hail on those two areas;

7   and so, as -- as Jacqueline is asking her those, you know,

8   she's just verifying and making sure that what Tresa is showing

9   her is truly wear.

10  Q.   Okay.  Do you recall looking at one of the emails that

11  Mr. Bates sent where he wanted to speak to the supervisor of

12  supervisors or something like that?

13  A.   Yes.

14  Q.   Okay.  And I think you've testified you'd expected

15  somebody to respond to that; right?

16  A.   Yes.

17  Q.   Okay.  Is it required for -- for State Farm to honor its

18  duty to its policyholders, that every time someone says, "I

19  want to talk to the boss of bosses," that that has to be

20  escalated all the way to that level?

21  A.   No.

22  Q.   Have -- have you seen instances where someone is, maybe,

23  upset, and they want to talk to the president of the company?

24  Have you seen that?

25  A.   Yes.

Sharon Arnold                                                        136
Cross-examination by Mr. Leffel

1    Q.    Does that always get escalated to the president of

2    State Farm?

3    A.    No.

4    Q.    Would that be practical?

5    A.    No.

6    Q.    One of the things that Mr. Miller talked to you about was

7    the conversation that you had in your deposition about

8    fairness.  Do you remember that?

9    A.    Yes.

10   Q.    Okay.  And -- and do you recall:  Did that go on for

11   several pages of transcript?

12   A.    Yes.

13   Q.    Okay.  When he was asking you that initial question about

14   the role of fairness, what did you understand he was asking

15   you?

16   A.    I understood that he -- I thought he was asking about the

17   job description, I really did, because he said "in their

18   description;" and so that's where my mind went, was our job

19   descriptions, not to our commitment to our policyholders.

20   Q.    As you-all worked through, going back between fairness

21   and -- and what your expectations of --

22   A.    Uh-huh.

23   Q.    -- are of a -- of the adjusters, did you and Mr. Miller

24   eventually reach an accord where the question was basically

25   asked, "If -- if all the things I'm saying I expect for my

Sharon Arnold                                                    137
Cross-examination by Mr. Leffel

 1   people -- if that's -- means fair, then absolutely.  Fairness

 2   is what -- is -- is the description of the process"?

 3   A.   Yes.

 4   Q.   Okay.  When you're applying the policy, do you sometimes

 5   have claims that are not covered?

 6   A.   Yes.

 7   Q.   Okay.  And if the policy does not afford coverage based

 8   on -- on -- on your honest belief and your investigation, do

 9   you believe that is fair?

10   A.   Yes.

11   Q.   If you have a policyholder who wanted their damage to be

12   covered by their insurance policy, and they're being told that,

13   "As we apply it, it's not covered," do they always think that's

14   fair?

15   A.   No.

16   Q.   Is that why you were struggling with this concept of what

17   is fair to one person versus another?

18   A.   Yes.

19   Q.   Okay.  I don't think you were particularly asked this, but

20   I want to -- when did you first start working for State Farm?

21   A.   I started working for State Farm November 15th of 1993.

22   Q.   Okay.  What was your first position?

23   A.   I was a claims specialist.

24   Q.   Okay.  When you were a field representative, did you

25   handle roof claims?

Sharon Arnold                                                      138
Cross-examination by Mr. Leffel

1   A.   I did.

2   Q.   Okay.  Have you climbed on roofs and inspected for damage?

3   A.   I have.

4   Q.   Okay.  And I'm not going to go through your -- your -- you

5   know, you hit the team management level, and you've been a

6   section manager for a while; right?

7   A.   Yes.

8   Q.   Okay.  By my count, you've been with the company, I think

9   the testimony's been, 29.  I think I said 30.  You know, why --

10  why have you stayed with the company for so long?

11  A.   You know, I believe in State Farm.  When I first came to

12  State Farm, it was a -- a family.  I was straight out of

13  college.  I did have some friends that worked for them, and

14  they were like, "You need to come to State Farm.  It's such a

15  family, you know, feel," and I said okay.

16       Tried it out, and I loved it.  I loved everything that the

17  company stood for.

18       I have a -- a servant heart, and I knew that I wanted to

19  help people, and this is the way I could do it, although it

20  being financially, you know.  I did serve on some catastrophe

21  work through our company, and I was able to go and physically

22  see people, put my arms around them.

23       But the other thing too is I -- you know, at four -- as --

24  as he mentioned, at 4/12 years, I was promoted into management,

25  and that was another thing that caught my eye.  I always wanted

Sharon Arnold                                                    139
Cross-examination by Mr. Leffel

1   to be in a leadership role; and I saw, through State Farm, that

2   they, you know, promoted women; and quite honestly, that's what

3   I was looking for.

4       And I've been successful.  I mean, I know I spent 16 years

5   at that first-line level, but that was by some personal

6   choices; but, you know, I've spent the last eight years in an

7   elevated level that I really enjoy.

8   Q.   When you talk about personal choices, being a woman in a

9   professional world, is -- is one of those choices family?

10  A.   It is.

11  Q.   Okay.  Tell us about your family.

12  A.   So I am married to my husband, Todd.  We just celebrated

13  20 years.

14      And I have an 18-year-old son, who -- for the OU fans in

15  the room, his name is Jackson Arnold.  He is going to be --

16  he's a five-star quarterback recruit for OU.

17  Q.   When you're not working, what do you like to do?

18  A.   I'm watching him.

19  Q.   Okay.  Well, let's move on, and thank you for that.

20  A.   You're welcome.

21  Q.   Jacqueline Draper, that's a name we've heard a lot about

22  in this case, and -- and you've -- you've established you know

23  her; right?

24  A.   Yes.

25  Q.   Tell us:  How did you first get to know Ms. Draper?

Sharon Arnold                                                    140
Cross-examination by Mr. Leffel

1   A.    I first came across Jacqueline when we were, at that time,

2   still working in the offices, and she was in -- in our offices

3   working in a leadership development role, and she just happened

4   by my office.

5         We had a mutual interest in running, and I had a bunch of

6   medals in my office, and so we just struck up a conversation,

7   and she happened to be there, like I said, for this leadership

8   role, and she was also participating in one of our surveys.

9         And so we just started talking about claims, and, you

10  know, she talked about her interest in definitely becoming a

11  part of our leadership team, and so we just started developing

12  a relationship.

13        And that was, really, the only time that I really ever,

14  like, spoke to her, kind of learned a little bit about her,

15  until I had a opening.  Mr. Imhoff did retire, and Jacqueline

16  put in that for that position.

17  Q.    Do you recall about how long she was on your team?

18  A.    She would have started in 20- -- let's see, 2019.

19        And she has -- have been gone a year.  So she left in

20  2021.

21  Q.    Okay.  Well, a little bit like you, Ms. Draper was

22  promoted to a leadership position fairly early in her career.

23  Do you have any insight on why she was chosen for a leadership

24  position?

25  A.    I can speak to why I chose her for the leadership role.  I

Sharon Arnold                                                    141
Cross-examination by Mr. Leffel

1   mean, Jacqueline is just -- she's very good at what she does.

2   I mean, she's a good coach, she's a good trainer, she cares

3   about her people, and at the time, I needed someone with the

4   skill sets that she had.

5       She had worked on our catastrophe program.  As I

6   mentioned, wind and hail is predominant what we have, and so I

7   needed somebody that, you know, could be a trainer.  She had

8   a lot of new people on this team, so I needed somebody that

9   knew exactly what they were looking at.

10      I also needed somebody with a large loss skill set, and

11  there was a lot of large losses in this area that that team did

12  not possess, and Jacqueline had been working in California as a

13  team lead for those types of claims.

14      And so that, coupled with the fact that she was already

15  coming to me with about 16 months of leadership development

16  experience, it just was a win-win.

17  Q.   Okay.  In your assessment as her supervisor, when you were

18  supervising her, did you feel that she was technically

19  proficient in identifying hail on roofs?

20  A.   Yes.

21  Q.   Okay.  Now, Mr. Miller pointed out, I think, that -- that

22  you -- you've not been on a roof with her.  Is that -- did I

23  hear that right?

24  A.   That's correct.

25  Q.   So -- so I want to ask the question:  If -- if -- you

Sharon Arnold                                                          142
Cross-examination by Mr. Leffel

 1   know, how -- how are you so confident about that?

 2        How do you know if you've not been a roof with her?

 3   A.   Right.  I -- I think Mr. Miller had mentioned it before.

 4        So we do, do audits, and they're called "MCARs,"

 5   management closed assignment reviews.

 6              THE REPORTER:  Say that again slowly.

 7              THE WITNESS:  I'm sorry.  MCAR, management closed

 8   assignment review.

 9              THE REPORTER:  Thank you.

10              THE WITNESS:  Sorry.

11        If I -- I know, if I turn this way, you can't see me.

12   A.   And so what that process is, is I'm looking at their --

13   they've already looked at a file of their claims specialist,

14   and I'm -- I'm checking.  It's like the checker checking the

15   checker.  And so I'm looking at the same questions.  I'm

16   looking at the photos to make sure that they are calling, and

17   they're applying the policy provisions and making the accurate

18   coverage determination.

19   Q.   (By Mr. Leffel) Okay.  And I believe you also explained

20   in -- in a discussion with Mr. Miller that wear and tear is not

21   covered; right?

22   A.   That's correct.

23   Q.   And I think you-all talked a little bit what that means;

24   right?

25   A.   Yes.

Sharon Arnold                                                    143
Cross-examination by Mr. Leffel

1   Q.   Have you ever heard the term or heard people say,

2   "Insurance policies are not maintenance policies"?

3   A.   Yes.

4   Q.   Okay.  Tell us what you understand that to mean.

5   A.   A maintenance policy are just things that naturally happen

6   around natural maintenance.  Like, if you have paint peeling

7   off the side of your home, that would be a maintenance issue

8   that you would be responsible for; servicing your AC; just

9   normal things that happen on a home.

10       The homeowner's policy -- any homeowner's policy is not,

11  what we say, a maintenance policy.  It's really designed to --

12  to cover things that happen accidentally, such as a hailstorm

13  or a fire or a tornado or tree falling through, burst pipes,

14  things of that nature.

15       But everyday things that you do around your home, that's

16  not what insurance is for.

17  Q.   And there was a discussion about the fact that -- I mean,

18  I think my roof's been on my house since, like, 2009.  It's --

19  it's getting a little long in the tooth.

20            MR. MILLER:  Judge, I'm going to object to that.

21       Can we have a sidebar real quick?

22            THE COURT:  Yes.

23       (Bench conference on the record after headsets check.)

24            MR. MILLER:  Okay.  My objection, Judge, is, in my

25  view, Mr. -- Lance has made -- Lance has made several comments

Sharon Arnold                                                    144
Cross-examination by Mr. Leffel

1   that I think are personal references, but now he's worked into

2   his own roof and how long it's been on his house, and I

3   consider that to be to the heart of what we're here to decide:

4   about how long roofs last, what is wear and tear.

5        And I object to any further references that he makes to

6   his own personal life.

7                  THE COURT:  Mr. Leffel?

8                  MR. LEFFEL:  Well, I don't think I got my question

9   out before I was objected to, and so what I was going to try

10  to -- I was trying to give some context because what I wanted

11  to do is follow up and say, "Under Mr. Miller's example, you

12  can say that even a worn-out roof can have hail damage."

13       The point I'm trying to set her up to explain is that you

14  can also have a roof that's worn out that someone claims has

15  hail damage, and that's not covered if it's not hit by hail.

16       That's what I'm trying to do.

17                 THE COURT:  Okay.  You can -- you can ask that type

18  of question, but you can't make personal references to your own

19  home or your own roof.  So you need to -- I'm going to sustain

20  Mr. Miller's objection but allow you to reword the question.

21       Anything further, Counsel?

22                 MR. LEFFEL:  Not at all.

23                 MR. MILLER:  No, Judge.

24                 THE COURT:  Okay.  Thank you both.

25       (End of bench conference.)

Sharon Arnold                                                    145
Cross-examination by Mr. Leffel

1              THE COURT:  Thank you, Mr. Leffel.

2        For the record, that objection by Mr. Miller is sustained.

3        Mr. Leffel, you may proceed.

4              MR. LEFFEL:  Thank you.

5   Q.  (By Mr. Leffel) You remember talking about even a worn-out

6   roof can have hail damage?

7   A.   Yes.

8   Q.   Okay.  But conversely, if you've got a roof that is

9   getting older, that is showing loss of granulation from wear,

10  and that is claimed as hail damage, is that covered?

11  A.   No, it is not.

12  Q.   Okay.  So it works both ways?

13  A.   Yes.

14  Q.   There can be wear on a roof that would be excluded?

15  A.   That's correct.

16  Q.   Okay.  Now, you mentioned just a minute ago "MCARs,"

17  which, we have explained for the record, are management closed

18  assignment reviews.

19  A.   Yes.

20  Q.   Did you perform MCARs on claims handled by Jacqueline and

21  her team?

22  A.   Yes.

23  Q.   Okay.  In your review of Jacqueline and her team, did you

24  find that they were consistently making the correct call on

25  damaged roofs?

Sharon Arnold                                                    146
Cross-examination by Mr. Leffel

1   A.   Yes.

2   Q.   Okay.  Do you -- did you ever, you know, have -- did --

3   did the review of those files ever include sometimes sending

4   them out to third parties to check to see if they were

5   consistent?

6   A.   Yes, they -- we did.

7   Q.   Like -- like, what kind of third parties?

8   A.   So on occasion, if we had a roof where we -- we didn't

9   think it was hail damage and -- but we couldn't discern that it

10  was installation or footfall, we owed that to the policyholder,

11  to tell them what's going on with their roof.

12        And so we would send that out to an engineer; and

13  oftentimes, those came back where, you know, we were making the

14  right calls; and so the engineer could then educatedly tell us

15  what it was happening on that roof and, then, whether or not it

16  was covered.

17  Q.   Were those types of reviews with an engineer done outside

18  the context of a claim, like -- like a closed file was being

19  reviewed?

20  A.   No.

21  Q.   Okay.  Okay.  Let's talk a little bit about the

22  Oklahoma Insurance Department.  Okay?

23        What was your particular involvement in this file?

24  A.   My involvement was reviewing that letter, signing it, and

25  submitting it to the OID.

Sharon Arnold                                                        147
Cross-examination by Mr. Leffel

1  Q.   Okay.  And you-all have explained that process.  I won't

2  go back into it.

3        MR. LEFFEL:  If we could pull up Joint Exhibit 1-110,

4  and if we could go back to that last page that Mr. Miller

5  discussed.

6        Please, yeah, go to where she signed, and let's highlight

7  the attachments again.

8  Q.   (By Mr. Leffel) And -- and -- and I apologize, but I just

9  want to confirm.  These are things -- were these things that

10  were sent by you to the Department?

11  A.   Those should have been attachments sent to the

12  Department of Insurance, yes.

13  Q.   Policy form?

14  A.   Yes.

15  Q.   Estimate?

16  A.   Yes.

17  Q.   Photos?

18  A.   Yes.

19  Q.   And then the letter on the second inspection; right?

20  A.   That's correct.

21  Q.   So they had that at their disposal; is that correct?

22  A.   That is correct.

23        MR. LEFFEL:  Okay.  Can we please pull up

24  Defense Exhibit Number 1?

25  Q.   (By Mr. Leffel) Are you able to identify this, Ms. Arnold?

Sharon Arnold                                                         148
Cross-examination by Mr. Leffel

1   A.   Yes.   This is the letter that the Department of Insurance

2   would have sent to Mr. Bates probably along with our letter.

3   Q.   Okay.   And can you read for us what the OID said in the

4   third paragraph?

5   A.   (As read) The Oklahoma Insurance Code provides this office

6   with laws used to regulate the insurance industry.   Although we

7   appreciate your position, our review of this file does not

8   indicate the company violated any laws or regulations as

9   enforced by this office.   Your claim appears to have been

10  processed in accordance with the terms and provisions of your

11  policy."

12  Q.   Okay.   And to your knowledge, they had a copy of that

13  policy when they wrote that letter?

14  A.   Yes.

15  Q.   Okay.   Was this a perfect claim file?

16  A.   No.

17  Q.   Okay.   Have -- have you seen a perfect one yet?

18  A.   No.

19  Q.   Okay.   Do -- do people make mistakes?

20  A.   They do.

21  Q.   Okay.

22  A.   They do.

23  Q.   Understanding that there are mistakes in most files, do

24  you agree with the conclusion of the OID that, in your

25  assessment, this -- on -- on -- on the law of averages, this

Sharon Arnold                                                      149
Cross-examination by Mr. Leffel

1   was handled appropriately?

2   A.   I do.

3   Q.   Okay.  I want to talk to you a little bit specifically

4   about this file, and I think you feel like you've had an

5   opportunity to discuss with the jury what you would expect from

6   your team on a file like this.  Okay?

7        Well, let's keep things moving, then.

8        You did, in fact -- did you, in fact, review this file?

9   A.   I did.

10  Q.   Okay.  And I think you've told us that you don't have a

11  specific memory, but is it your general practice to review the

12  file when you're responding to an OID --

13  A.   Yes.

14  Q.   -- letter?

15       Okay.  And do you remember having an opportunity to look

16  at your response to the OID?

17  A.   Yes.

18  Q.   Okay.  I'm just going to be -- ask you:  Do you think you

19  know this file better even now than you may -- you know, you

20  just don't remember, but you know the file now; right?

21  A.   Yes.

22  Q.   Okay.

23  A.   Yes.

24  Q.   And do you feel like, getting ready for all this -- do you

25  stand by, you know, your documentation and that letter of what

Sharon Arnold                                                          150
Cross-examination by Mr. Leffel

1   had happened here?

2   A.    Yes, I do.

3   Q.    Is that what you're trying to tell the OID:  "This is what

4   we've done, and these are the decisions we've reached?"

5   A.    That -- yes.

6   Q.    Okay.  Can you tell me or -- or, maybe, elaborate for --

7   for these ladies and gentlemen:  As someone who does a review

8   of these, what was it that you saw in this file that makes you

9   think that the correct call was made?

10  A.    You know, Tresa did -- Ms. Jacome did exactly what I would

11  have expected her to do.  She did the elevation views.  She

12  took overviews of the roof.  She took close-ups.  She took

13  pictures of things that she found to be other than hail, all of

14  the things that I would want them to document in the claim

15  file.  She took all of the information.  She talked with the

16  policyholder.  You know, everything that I had said originally

17  of my expectation is what she did in this file.

18  Q.    Okay.  Did you find where she had met with the Bates's

19  contractor?

20  A.    Yes.

21  Q.    Okay.  What, if anything, do you know about that meeting?

22  A.    Other than what was put into the claim file notes, that

23  she just met with him and did -- completed the inspection of

24  the roof.

25  Q.    Okay.  Did you take a look at her photos and her scope

Sharon Arnold                                                        151
Cross-examination by Mr. Leffel

1  sheet?

2  A.    Yes.

3  Q.    Did it appear that she had looked -- did she look at all

4  the elevations?

5  A.    Yes.

6  Q.    Did she look at all the slopes?

7  A.    Yes.

8  Q.    Did she document all those things?

9  A.    Yes.

10  Q.    Okay.  Was there a second inspection request?

11  A.    There was.

12  Q.    Were there photos submitted to support it?

13  A.    There were photos submitted to State Farm to review for

14  consideration of that second inspection.

15  Q.    Did you find evidence that those photos were reviewed and

16  considered?

17  A.    Yes.

18  Q.    Okay.  Based on your review of this, do you believe it was

19  appropriate under these circumstances to decline the -- the

20  second inspection request?

21  A.    I do.

22  Q.    I was listening to you during your testimony with

23  Mr. Miller, talking about what your expectations are.  I'm

24  going to tell you what I was able to write down, and you just

25  tell me if I was right or wrong.

Sharon Arnold                                                              152
Cross-examination by Mr. Leffel

1      But number one was listen, all sides and information; is

2   that correct?

3   A.   That's correct.

4   Q.   Did you also say that they need to inspect the loss?

5   A.   Yes, I did.

6   Q.   Review the policy?

7   A.   Yes.

8   Q.   Be aware of the history, like the prior losses?

9   A.   Yes.

10  Q.   Okay.  Do they need to explanation their decisions to the

11  policyholder?

12  A.   Absolutely.

13  Q.   Okay.  And then you said something -- that they need to

14  get the entire story of the loss.  Is that what you said?

15  A.   That is what I said.

16  Q.   Okay.  Again, did you find that those things were

17  happening for Mr. Bates?

18  A.   I did.

19  Q.   Okay.  Now, Ms. Arnold, I think Ms. Jacome admitted that

20  there were photos that were submitted by Mr. Marks and his

21  second inspection submission that may have been taken of

22  different shingles or different areas --

23  A.   Uh-huh.

24  Q.   -- than what she included.

25  A.   Uh-huh.

Sharon Arnold                                                          153
Cross-examination by Mr. Leffel

1   Q.   Are you aware of that?

2   A.   Yes.

3   Q.   Would that, in and of itself, mean that we needed to do a

4   second inspection?

5   A.   No, because photos alone just of the different areas -- if

6   they exhibited the same damage that our photos had, then there

7   would be no reason for us to do another inspection if we had

8   already seen that type of damage.

9   Q.   Okay.

10           MR. LEFFEL:  Let's take a look at Joint Exhibit

11  1.257.  This is the Marks email that we've seen before.

12       And if we could highlight that paragraph.

13  Q.   (By Mr. Leffel) Mr. Marks states right there, about in the

14  middle of that -- I don't know what font that is, but it's

15  rough.

16       (As read) I realize there are differing opinions as to

17  what should be considered legitimate hail damage and what may

18  be just cosmetic in nature or a blemish, if you will.

19       Do you see that?

20  A.   I do.

21  Q.   Do you understand what he's trying to say there?

22  A.   He's just trying to say, as I can appreciate it, that it's

23  subjective.  It can be subjective.

24  Q.   Okay.  And would you agree with him on that point?

25  A.   I do.

Sharon Arnold                                                      154
Cross-examination by Mr. Leffel

1    Q.   Okay.

2              MR. LEFFEL:  Let's take a look, if we could, at

3    Joint Exhibit 3-3.

4    Q.   (By Mr. Leffel) This -- and -- and to make sure

5    everybody's on the same page, Joint Exhibit 3 is, I think,

6    eight photographs -- eight or nine photographs with the text

7    messages at the back.  I'm not going to make everybody look at

8    that again, but this is one of the photos.

9    A.   Uh-huh.

10   Q.   And looking at that, I'm going to -- well, before I ask,

11   let me ask this:  On your teams, you've got team managers that

12   have claims specialists that work under them; right?

13   A.   Yes.

14   Q.   Okay.  And your -- is it your expectation that there will

15   be interaction between the team manager and the claims

16   specialist on a file?

17   A.   Absolutely.  We work on a team environment, and we promote

18   that.  We promote collaboration.  And like I said, they can

19   call the team manager.  They can call a peer.  They can call me

20   if they felt like they needed to.

21   Q.   Is it inappropriate for Ms. Jacome to have been asking

22   questions like she did of Ms. Draper on this roof?

23   A.   No.

24   Q.   Okay.  What types of resources do you provide to your

25   claims teams so that they can speak with a supervisor or a

Sharon Arnold                                                          155
Cross-examination by Mr. Leffel

1  colleague if they've got questions when they're out on a claim?

2  A.    Resources -- you mean technical resources or...

3  Q.    Ways that they could make -- that they could

4  instantaneously, if the -- if the recipient of the call or the

5  text is available.

6  A.    Yeah.  So they -- they -- they have Facetime capabilities.

7  That's ultimately what I would prefer, because I think that way

8  it's -- you know, they can obviously see, and if there's other

9  questions, they can move the camera.

10      But they can -- they can do it that way.  They can use

11  virtual tools that we have.  They can certainly call.  They

12  can -- they can text.

13      I mean, all of those different modes of communication are

14  fine.

15  Q.    What's a first-contact settle?

16  A.    So a first-contact settlement is, really, what we strive

17  for.

18      When a policy -- when we go out -- we set the inspection;

19  and then we go out; and we see, if there's damage or even if

20  there's not damage, that we're able to tell you right then and

21  there, you know, how much -- write the estimate.

22      Let's just say, if it's a -- I'm sorry.

23      If it's a covered loss, we're going to go out, we're going

24  to write the estimate, and we're going to provide you with a

25  payment right then and there.  So by the time that we leave

Sharon Arnold                                                    156
Cross-examination by Mr. Leffel

1   your home, your -- your -- the claim is done, and you -- you --

2   your claim has been handled.

3   Q.    Is this instantaneous availability of a team manager to a

4   claims specialist a benefit to the policyholder?

5   A.    Absolutely, absolutely, because like I said, that's what

6   we're striving for as a first contact.

7         And so if a claim specialist might be unsure of what

8   they're seeing regardless of what the damage is, they -- they

9   have that ability to call the -- the team manager and say,

10  "Hey, you know, just let me know:  Am I handling this

11  correctly?" because we want to get it right, and we want to

12  make sure that we're paying what we owe.

13             MR. LEFFEL:  Let's go ahead and take a look, again,

14  at that JX3-3.

15  Q.    (By Mr. Leffel) You were receiving that text message from

16  one of your team managers.  What do you see?

17  A.    I see some discoloration on the -- well, the middle part

18  of that is what we -- I would call a "keyhole," what they call

19  a "keyhole."  It's where the two shingles meet.

20        And so I can see some wear starting at that -- like -- I

21  don't know if I can point but right where that -- right above

22  her line where she has written, and my understanding is, when

23  she puts that line underneath the thing she's trying to

24  articulate, it's other than hail.

25  Q.    Okay.

Sharon Arnold                                               157
Cross-examination by Mr. Leffel

1  A.    So to me, that looks more like that's where it's starting

2  to wear, because oftentimes -- that's right above where that

3  sealant strip is.  That's where we're going to start to see

4  those wear patterns form.

5  Q.    Let me play devil's advocate.  I'm looking at that thing,

6  and it's kind of round.

7        Hail can be round, can't it?

8  A.    It can be round, but it -- it's all -- it's various,

9  various sizes.  It can be jagged in nature.  It's not going to

10 give you a perfectly circular mark as -- you know, it's -- it

11 can be -- there's a lot of different facets that it can come

12 from.

13 Q.    Let's go ahead and look at the next one, Number 4.

14 What do you see there?

15 A.    That looks, maybe, like it's more of a close-up of the one

16 we just looked at --

17 Q.    Okay.

18 A.    -- but I really -- I mean, it's, like, in the same area,

19 again, where I would think that that wear pattern would start.

20 Q.    Do you see the edge?

21 A.    Yes.

22 Q.    Is there a difference in color between the edge and the

23 field?

24 A.    There's -- there's a little bit of difference in color

25 between that and the field but not -- like, in the middle of

Sharon Arnold                                                         158
Cross-examination by Mr. Leffel

1   that is the keyhole, and that is the same color.  That's the

2   underneath shingle.

3   Q.    What is the -- is the -- is the darkened area?  What is

4   that?

5   A.    That's the mat of the shingle.

6   Q.    Okay.  And -- and what has happened to the shingle so that

7   you can now see part of the mat at the edge?

8   A.    The -- the granules have come off.

9   Q.    Okay.  And are the -- if I look at this, and I see the

10  gray little -- looks almost like the tiny crushed stone, is

11  that what -- is that a granule?

12  A.    Yes.

13  Q.    Okay.  I want to show you -- let's go ahead and just take

14  one more, Number 5.

15        How about here?  What do you see?

16  A.    Oh, I'm sorry.

17  Q.    Yeah.  No.  I didn't ask a very good question.

18  A.    I'm sorry.

19        Yeah, I see -- actually, the fiberglass is exposed on

20  here, and, again, that's just something -- again, it's -- it's

21  from wear over time.  When the mat -- and there's no granules

22  there to protect it.  Then this fiberglass -- the gray part

23  that you see on there.

24  Q.    Are those fibers?

25  A.    Yes.

Sharon Arnold                                                        159
Cross-examination by Mr. Leffel

1   Q.   From the fiberglass?

2   A.   It -- it looks like -- yes --

3   Q.   Okay.

4   A.   -- from the fiberglass and the mat, uh-huh.

5   Q.   Well, I want to -- I want to show you some other pictures

6   because everyone seems to kind of have the pictures that they

7   like the most, but we're all looking at the same roof.  So

8   let's look at some of the ones Mr. Marks submitted.

9            MR. LEFFEL:  So if we could go to JX1 at 257.

10  Q.   (By Mr. Leffel) Okay.  This is his email, so this is just

11  showing us that this is the pictures.

12           MR. LEFFEL:  And let's go to JX1.263.  Okay?

13  Q.   (By Mr. Leffel) Can you -- can you describe for us --

14  describe for the jury what you see and why you do or don't

15  think that's hail.

16  A.   So he has clearly circled what he -- there's an

17  indentation.

18       What I see there is a very linear mark, kind of at an

19  angle.  That's not something -- it's not indicative of hail.

20  Hail is not going to make linear marks on a shingle.  So that's

21  what I see in that photo.

22  Q.   So let's look at JX1.265, another Mr. Marks photo.

23       Same question:  What do you see, and explain why it's hail

24  or not hail in your opinion.

25  A.   This looks like the photo that we saw originally to

Sharon Arnold                                                      160
Cross-examination by Mr. Leffel

1   show -- I mean, we had the same sort of photos in our file.

2        It looks -- just on the edge -- again, it's right in that

3   same area that we've seen a lot of these shingles where that

4   wear pattern starts, and you can see on that one side it's the

5   same color right as that shingle below it, but you can see the

6   fibers.

7   Q.   Okay.  Last one, JX1.266.

8        Same question:  What do you see, and explain why you

9   believe it is either hail or -- or other than hail.

10  A.   I don't really see anything in that photo.  I mean, it --

11  I can tell that it looks a little worn, maybe, on the edges,

12  but it's all the way up.

13  Q.   Okay.  Having seen photos submitted by State Farm and

14  photos taken by the contractor that were submitted in the

15  second inspection request, you stand by your -- your belief

16  that the right call was made here?

17  A.   Absolutely.

18  Q.   Okay.  Do you believe that the denial of the second

19  inspection was warranted?

20  A.   I do.

21  Q.   I want to go back to this idea of subjectivity.  Do you

22  understand that Mr. Marks and possibly the Bateses believe this

23  is hail damage just as strongly as State Farm believes this is

24  not hail damage?

25  A.   Yes.

Sharon Arnold                                                          161
Cross-examination by Mr. Leffel

1    Q.    Okay.  What would you say to the jurors that may be

2    skeptical, who think that State Farm is calling something

3    "wear" that -- that -- that -- or "blisters" that may be hail

4    damage?

5         What would you tell them about what you're seeing and how

6    you are satisfied that -- that the effort was made to get this

7    right?

8    A.    I would just say to you-all that, you know, although it's

9    very subjective, I mean, we do use the state-of-the-art

10   training.  Haag is the state of the art, right, in teaching us

11   how to look at hail-damaged shingles, and so there is a

12   scientific nature to it, and we, at State Farm, pride ourselves

13   on that training.  We want to make sure that we're equipping

14   our -- excuse me -- equipping our claims specialists with all

15   of the tools and resources to make the difficult decisions like

16   this.

17        At the end of the day, it is much easier for us to pay for

18   a claim that we -- it just is.  It's much harder for us to tell

19   somebody no, and we don't want to do that.  So if -- if we are

20   going to have to say no to someone, we want to make sure that

21   we are as educated as we can when we're going out here, making

22   these decisions.

23   Q.    Ms. Arnold, do you know Amy Lanier?

24   A.    I do.

25   Q.    Okay.  How did you know Amy Lanier?

Sharon Arnold                                                           162
Cross-examination by Mr. Leffel

1    A.   As I mentioned previous, I -- I don't know her personally.

2    I just knew her professionally, but she was a claims specialist

3    on -- in our section.

4    Q.   Okay.  And do you have any -- I think you talked a little

5    bit about this, and I don't 100 percent remember:  I think you

6    were asked if, like, she was on some kind of, like,

7    management -- I don't know -- I don't want to use the word

8    "probation."  I'm not remembering.

9         But what did you say about -- she was never under any type

10   of --

11   A.   I was just saying she was never under any sort of formal

12   performance management, because I'm involved in those, but she

13   was never involved in that.

14   Q.   Do you have any firsthand knowledge of her technical

15   capabilities as a claim handler?

16   A.   Just limitedly.  Like I said, Amy didn't work for us super

17   long -- well, under -- she did work for State Farm but not for

18   me directly.

19        I did have the opportunity to ride with her.  I -- I

20   got -- that was when we were still doing ride-alongs.  She was

21   not working for Jacqueline at the time.  She was working for

22   Steve Imhoff.  And it was actually on a water claim.

23        And I did have a little bit of concern.  She was not

24   asking the appropriate questions as far as some coverage issues

25   on the water claims.  So, you know, I just needed her to stop,

Sharon Arnold                                                                    163
Cross-examination by Mr. Leffel

1   pause a little bit, and ask some -- some more questions to

2   really get -- to make sure that we were making the appropriate

3   coverage decision.

4        But other than that -- I mean, it was nothing formal.  It

5   was nothing in writing.  It's part of what our role is, right,

6   when I'm out, and I'm observing the manager, and I'm observing

7   her; you know, just some coaching that would go along with

8   that; but, I mean, she -- she was -- she was a fine rep.

9   Q.   Okay.  And I think that you have already talked about --

10  you've told this jury what you know or don't know about her

11  departure?

12  A.   Yes.

13  Q.   Okay.

14  A.   Yeah.

15  Q.   I want to ask this, though:  If Ms. Lanier believed that

16  she was being asked to deny claims that she believed exhibited

17  covered damage for hail, is that something you would have

18  expected her to discuss with either you or another supervisor

19  at State Farm?

20  A.   Absolutely.

21  Q.   Okay.

22  A.   Absolutely.

23  Q.   Did Ms. Lanier ever express to you that she was

24  uncomfortable with the calls that were being made on her

25  claims?

Sharon Arnold                                          164
Cross-examination by Mr. Leffel

1   A.   No, and if she did, you know, I would have expected her --

2   we sign a code of conduct every year, and, you know, it's -- it

3   is our responsibility as employees, if we see something

4   unethical going on -- I mean, they -- they have many, many

5   opportunities to share that.  If -- if she didn't feel

6   comfortable going to Jacqueline, if she didn't feel comfortable

7   going to me -- we have an open-door policy.  She could have

8   gone to any leadership at State Farm.  And we also have a 1-800

9   anonymous line that they could call in.

10       But I -- to my knowledge, she never did any of that.

11  Q.   Okay.  Thank you.

12       There was testimony yesterday from Ms. Jacome, and just to

13  be honest, I -- I'm not sure that I -- that I completely

14  understood the context, but what I thought I understood her say

15  in some way -- I don't know if she was saying this was her or

16  if she was speaking for State Farm but that -- something about

17  engineers being discouraged.

18       And so let me just ask you this:  Is there some policy

19  that discourages the use of engineers at State Farm?

20  A.   No.

21  Q.   Okay.  Can a policyholder hire an engineer?

22  A.   Yes.

23  Q.   Okay.  And do you see evidence in this file that, maybe

24  even as early as the first inspection, that Mr. -- well, the

25  only inspection -- that Mr. Marks said that an engineer was

Sharon Arnold                                                165
Cross-examination by Mr. Leffel

1  going to be hired?

2  A.   I did see that he had said that in the file.  I also saw

3  an email from Mr. Bates to Ms. Bivins asking that question, and

4  I think Shari actually had shared with Mr. Bates that that was

5  his -- he could certainly go that route if he felt he needed

6  to.

7  Q.   And as Mr. Miller has kept reminding us, you know,

8  Ms. Bivins -- although they are independent contractors,

9  they're -- they're part of the family of State Farm --

10  A.   Yes.

11  Q.   -- right?

12  A.   Yes.

13  Q.   So she's telling him, "You have the option of hiring an

14  engineer," is what you saw.

15  A.   Yes.

16  Q.   Okay.  What does -- what does -- what does "authority"

17  mean in the context of claim handling?

18  A.   Authority in claim handling is a dollar threshold --

19  Q.   Okay.

20  A.   -- that each claims specialist, a team manager, section

21  manager, would have.

22  Q.   Do you -- well, I would guess a brand-new -- brand-new

23  person has less authority than, maybe, Sharon Arnold has.

24  A.   Yes, they do.

25  Q.   Okay.  If you, you know, show competency, might you be

Sharon Arnold                                                             166
Cross-examination by Mr. Leffel

1   given more authority?

2   A.    Yes.  That's --

3   Q.    Okay.

4   A.    -- that's why we do that.  We limit it.  We have it as an

5   oversight function that we have; and we just want to make sure

6   that our adjusters are making the right policy decisions, that

7   they are considering all the relevant facts before, you know,

8   we do start -- and as they feel -- as they get competent in

9   their claim handling, then we start to elevate that authority.

10  Q.    Is there ever situations that arise where someone's

11  authority might be lessened or decreased?

12  A.    Yes.

13  Q.    Okay.  What -- why might that happen?

14  A.    Well, if -- again, if -- if we're starting to see files

15  where, maybe, the -- the coverage decision was not appropriate

16  or estimatically they're not -- they're continuing to make the

17  same mistakes, then we will -- we would -- we can -- we have

18  the opportunity to reduce that authority.

19      We look at authority -- we -- we can -- we can increase

20  and decrease authority at any given time.  There is an annual

21  process that we go through that -- where we set it at the

22  beginning of January; but, you know, certainly, if, through the

23  course of the year -- if -- if things come up or if, you know,

24  they start handling a claim from a peril -- like, if they

25  haven't handled a lot of fires, they may have only limited

Sharon Arnold                                                              167
Cross-examination by Mr. Leffel

1    authority on those fires.

2    Q.    Is there ever instances where, maybe, authority's

3    completely taken away?

4    A.    Yes.

5    Q.    Okay.  Why might that happen?

6    A.    Again, if they -- if they are not following the policy

7    provisions, and they're not making the appropriate coverage

8    determinations, or they're not estimating appropriately, then

9    we can take their authority completely down.

10   Q.    When that happens, do they continue to work claims?

11   A.    They do.

12   Q.    Okay.  And how does that -- how does that work?

13         What's the expectation if you've got someone who's

14   temporarily had their authority removed?

15   A.    They -- they still would handle the claim, I

16   mean, because, again, we're trying to get them to where they do

17   have that authority, because they need to have the autonomy to

18   go and handle these claims; but they -- they would perform the

19   same functions that they would of somebody with full authority.

20   It's just, before they make a payment or they explain coverage,

21   they would have to run that by a team manager.

22   Q.    I want to take a quick run-through just a couple of

23   photographs here.

24         And we're getting close to concluding this, so...

25         I just want to give you some -- some photos.  Most of

Sharon Arnold                                                          168
Cross-examination by Mr. Leffel

1   them, I think, are overviews, which is the opposite of some of

2   the ones we just looked at that, that are close up, but let's

3   go to JX1.285.

4       Can you, on a severely damaged roof, often at least see

5   dark areas in an overview photo?

6   A.   Yes.

7   Q.   Okay.  What are you -- what are you -- this is the Bates

8   roof.  What do you think we're looking at here?

9   A.   This looks probably like this might be the front slope,

10  but that's the valley.

11  Q.   Okay.  JX1.304, what would you call that?

12  A.   That's going to be an overview of either the front or the

13  back slope.

14  Q.   Okay.  How about JX1.305?

15  A.   That -- she's got "B minus zero," so that would be the

16  back slope there.

17  Q.   Okay.  And does that appear to be part of a test square?

18  A.   It does.

19  Q.   That would --

20  A.   I can see her --

21  Q.   -- be a 10-by-10 area?

22  A.   Yes.

23  Q.   Okay.  How about JX1.307?

24  A.   Yep, same thing there.  That would be of the front slope,

25  and I can see the bottom of her test square right there.

Sharon Arnold                                                        169
Cross-examination by Mr. Leffel

1    Q.   Okay.  JX1.309.

2    A.   That -- that looks like the front.  That's probably, like,

3    the front gable extension --

4    Q.   Okay.

5    A.   -- on the roof.

6    Q.   JX1.322.

7    A.   That's the ridge cap, and this is where I was talking

8    about earlier where you should definitely see some damage on

9    that ridge cap because --

10   Q.   Okay.

11   A.   -- that's -- that's a very soft part of the roof.

12   Q.   Let me just show you briefly JX13, at page 3.  This is a

13   brochure that the -- the jury's familiar with --

14   A.   Okay.

15   Q.   -- that is -- is about composition shingles, and it's --

16   it's meant to instruct, I think, both policyholders and others

17   of -- of what hail looks like.

18        And, you know, I think there's been some testimony that

19   these are pretty prime examples of -- of hail damage.

20   A.   Uh-huh.

21   Q.   Looking at some of those photos, you know, what is the --

22   what's -- what do you see in the top photo?

23   A.   I see damage -- that's a ridge cap --

24   Q.   Okay.

25   A.   -- up there.

Sharon Arnold                                                           170
Cross-examination by Mr. Leffel

1        Yeah, that's a ridge cap.

2        And then there's a lot of damage --

3   Q.   Is that --

4   A.   -- you can see all over --

5   Q.   -- all large hail damage in your assessment?

6             THE REPORTER:  One at a time.

7             THE COURT:  Mr. -- Mr. Leffel, let the witness finish

8   her answer before you ask your next question.

9        Ms. Arnold, please, finish your answer, and then he can

10  ask the next question.

11            MR. LEFFEL:  Apologies, Your Honor.

12            THE WITNESS:  Yes, ma'am.

13  Q.   (By Mr. Leffel) Is that all large hail, if you can tell?

14  A.   It looks to be a mixture.

15       As -- as I have testified before, I mean, all hail is not

16  the same size that falls.  I mean, there's going to be some

17  smaller.  There could be some bigger.  So you would expect to

18  see different -- you know, different hits on the roof.

19  Q.   In a roof that is potentially going to be totaled, would

20  you expect, on a photo like this, to at least see some darkened

21  areas in the overview?

22  A.   Yes.

23  Q.   Okay.

24            MR. LEFFEL:  And let's go ahead and back out and look

25  at the next...

Sharon Arnold                                                        171
Cross-examination by Mr. Leffel

1   Q.   (By Mr. Leffel) is that kind of a -- is that a close-up

2   of -- of, like, a test square?

3   A.   Yes.

4   Q.   Okay.  And -- and -- and what's the annotation there?

5   A.   You've got damage all over, not necessarily just on the

6   edges, but you can see where it's damaged in the field of those

7   shingles as well.

8   Q.   And we've seen and the jury has seen, you know, some of

9   the -- the test square photos from -- from Ms. Jacome.

10      When you get to that proximity, would you start to see

11  more of these darkened areas if they're hail?

12  A.   Yes.

13  Q.   Okay.  Let me ask you this:  What if State Farm missed

14  some damage to a shingle?

15      Having reviewed the overview shots of this roof, do you

16  believe that there is damage to this roof warranting a full

17  roof replacement?

18  A.   No.

19  Q.   Okay.  You stand by the decision that was made in this

20  case?

21  A.   I do.

22  Q.   Okay.

23          MR. LEFFEL:  One moment.

24      (Discussion off the record between Mr. Leffel and

25  Ms. Williams.)

Sharon Arnold                                                          172
Redirect Examination by Mr. Miller

1           MR. LEFFEL:  I pass the witness, Your Honor.

2           THE COURT:  Thank you.

3           MR. LEFFEL:  Thank you.

4           THE COURT:  Mr. Miller?

5           MR. MILLER:  Thank you, Judge.

6                      REDIRECT EXAMINATION

7    BY MR. MILLER:

8    Q.   Now, being that you're the continuing ultimate supervisor,

9    at least to your level, of this claim that apparently is still

10   being paid, at least it was this summer -- you with me?

11   A.   Uh-huh.

12          THE COURT:  I'm sorry?

13          THE WITNESS:  Yes.

14          THE COURT:  Thank you.

15   Q.   (By Mr. Miller) Did anybody show you the VanDorn report?

16   A.   No.

17   Q.   Did they send you the transcript of Mr. VanDorn, the

18   former State Farm adjuster who now has been hired by State Farm

19   to act as the expert?

20   A.   No.

21   Q.   So surely you're aware that Mr. VanDorn said that the

22   spots like we saw in the texts, Picture 5, the one that had the

23   indention --

24   A.   Uh-huh.

25   Q.   -- that there's hundreds of those across the whole roof?

Sharon Arnold                                                          173
Redirect Examination by Mr. Miller

1    MR. LEFFEL:  Objection.  Facts not in evidence.

2    MR. MILLER:  Cross?

3    THE COURT:  I'm going to overrule.

4  Q.    (By Mr. Miller) You know about that?

5  A.    No, sir, I don't.  I've not seen his report.

6  Q.    Right.

7    I didn't say you'd seen it.  I just figured you must have

8  known because you're responsible for making the call on this

9  roof right along to the very end.  Fair?

10  A.   I have not seen his report.

11  Q.   All right.  How about this:  Did you know that Ms. Jacome

12  told us yesterday that, when she's deciding what pictures to

13  take, she's going to take things that support if she's denying,

14  and she's going to take pictures to support it if she's paying?

15  A.   She should, yes.

16  Q.   In other words, if she decides to pay it, she's going to

17  take -- find pictures of things that support that decision.

18    That's what she said.

19  A.   I --

20  Q.   You think --

21  A.   Again --

22  Q.   -- that's okay?

23  A.   I -- I -- no.  What I expect is they are going to take

24  photos to support the position that they are taking on the

25  claim.

Sharon Arnold                                                    174
Redirect Examination by Mr. Miller

1   Q.   Okay.

2   A.   So if she -- and then, clearly, as she's shown here, she

3   has shown things that she could pay for, and she showed things

4   that she couldn't pay for.

5   Q.   Okay.  So you agree, and State Farm apparently agrees,

6   that, if Ms. Jacome decides, when she gets up there, that she's

7   going to deny the shingles, she should take pictures to support

8   her denial.

9   A.   Correct.

10  Q.   All right.  Now, where in that text string --

11           MR. MILLER:  Could you put 3.9 back up there?

12  Q.   (By Mr. Miller) Where in that text string do you see that

13  Ms. Draper ever asked Ms. Jacome what the places that she sent

14  pictures of felt like on the shingles?

15  A.   I'm going to have to look at all of this.

16  Q.   Well, you've looked at it before, haven't you?

17  A.   I haven't read the entire thing, no.

18           MR. MILLER:  Could you help highlight the places that

19  matter?

20       Actually, anything where there's words, even where she

21  said, "I took some files off."  Can you --

22           MS. MCGUIRE:  (Inaudible.)

23           MR. MILLER:  Yeah.  Yeah.

24       Well, what I was hoping you'd do is just put some yellow

25  on the words --

Sharon Arnold                                                      175
Redirect Examination by Mr. Miller

 1          MS. MCGUIRE:  Oh.

 2          MR. MILLER:  -- you know, words that are actually

 3   textually involved?

 4       Yeah, I don't know if you can do it or not, Janna.  I was

 5   just trying to help her identify amongst all that stuff.

 6       Yeah, that's exactly what I meant.

 7   A.   Uh-huh.  Okay.

 8   Q.   (By Mr. Miller) Get through it all?

 9   A.   That she's highlighted, yes.

10   Q.   Oh, okay.

11          MR. MILLER:  Keep going Janna, please.

12   Q.   (By Mr. Miller) All right.  If we missed something, you

13   let us know, but I think that's about it.

14   A.   Okay.

15   Q.   Is there anyplace on there where Ms. Draper asks in these

16   texts about -- I think there's about five or six minutes of

17   texts back and forth -- "How does that damage -- whatever that

18   is that we're seeing, how does it feel?"

19   A.   There's no words to that, no.

20          MR. MILLER:  Okay.  You can take that down, Janna.

21       Now, if you would, though, put DX1 back up there.

22   Q.   (By Mr. Miller) In the second page of DX1, which is the

23   letter from the OID --

24          MR. MILLER:  I'm sorry.  Wrong one.

25       The letter to the OID from April 15.  That's what I was

Sharon Arnold                                                      176
Redirect Examination by Mr. Miller

1   trying to say.

2       And I'll need to say the number in the record.  I just

3   don't remember what it is right now.

4           MS. MCGUIRE:  Exhibit 1, page 10.

5   Q.   (By Mr. Miller) This is 1 --

6           THE COURT:  Mr. Miller, what number?

7           MR. MILLER:  JX1.110, but we're going to look at 111,

8   the second page, Judge.

9   Q.   (By Mr. Miller) All right.  I just want to clarify, if

10  you'd get that attachments thing Mr. Leffel asked you about.

11  A.   Uh-huh.

12  Q.   You'd already testified to this, and I think you confirmed

13  it with him.  I just want to make sure we're all square about

14  what was sent.

15      The -- the claim file's not mentioned here; right?

16  A.   Not the claim file.  There were --

17  Q.   So you-all did not send the claim file?

18  A.   No, we did not.

19  Q.   And you did not send the claim notes?

20  A.   No, we did not send the claim notes.

21  Q.   You did, however, send the photos Ms. Jacome took.

22  A.   We sent -- I'd have to see which photos, but it says

23  "photos," yes.

24  Q.   You told us earlier you figured that was Ms. Jacome's;

25  right?

Sharon Arnold                                                          177
Redirect Examination by Mr. Miller

1   A.   Oh, yeah, it would -- it would have been State Farm's

2   photos.

3   Q.   Okay.  Very good.

4        And, then, the second inspection denial.

5   A.   Uh-huh.

6   Q.   That's the letter that we've looked at a time or two;

7   right?

8   A.   Yes.

9   Q.   And then, of course, the estimate.  That's going to be the

10  estimate from 2-23 of '21 --

11  A.   Yes.

12  Q.   -- because nobody had corrected any of that yet --

13  A.   Yes.

14  Q.   -- correct?

15  A.   Yes.

16  Q.   And then, of course, the policy.  I think that's what you

17  told us.  That would be the whole policy.

18  A.   Correct.

19  Q.   What's -- what's not there, besides the claim file, is you

20  didn't send Mr. Marks's pictures, did you?

21  A.   No, because we're sending -- we're sending the information

22  from our file.

23  Q.   Right.

24       The whole point was they wanted a second inspection based

25  on what you required, which is, "Contractor, send us your

Sharon Arnold                                                        178
Redirect Examination by Mr. Miller

1  estimate and the pictures" --

2  A.    Uh-huh.

3  Q.    -- and you didn't send those to the OID, did you?

4  A.    We -- we didn't need to because they were very similar to

5  the photos that we had --

6  Q.    Were they?

7  A.    -- in the file.

8  Q.    You said that, if the pictures you saw -- that if the

9  pictures were being asked about had ridge or valley damage --

10  remember Ms. Draper asking that?

11  A.    Yes.

12  Q.    Now, if Mr. Marks's pictures have some ridge damage, that

13  would be new; right?

14  A.    If they had hail damage to the -- the ridges, yes, that

15  would -- that could potentially be new.

16  Q.    And if it had damage to the valleys that could be hail

17  damage, that could be new?

18  A.    It could be, yes.

19  Q.    Because that would be completely different than anything

20  that the adjuster took.  Fair?

21  A.    Well, I would say, as long as the photos that -- if he

22  sent in photos of the hail on the ridge, if it, again, was

23  similar damage to what we had exhibited before, it -- it still

24  wouldn't necessitate us doing a second inspection.

25  Q.    Well, now you're telling me you're not going to do one

Sharon Arnold                                                      179
Redirect Examination by Mr. Miller

1  before you even see the pictures.  Is that what you're saying?

2  A.    That's not what I'm saying.

3  Q.    All I'm asking you is, if you have got a picture of a --

4  of the ridge, and it showed some damage --

5  A.    Uh-huh.

6  Q.    -- that you thought could be consistent with hail, that

7  would be new evidence.

8  A.    That would be -- you're correct.

9  Q.    And if you saw some damage to a -- a valley -- shingles in

10  the valley -- sounds like should be a song -- shingles in the

11  valley, then, if -- if that could be hail damage, that also,

12  like the ridge, would be new?

13  A.    Yes.

14  Q.    And that would be enough, if anybody was looking at them

15  fairly, to consider a new inspection?

16  A.    Yes.

17  Q.    Fair enough.

18        All right.  Now, did anybody let the OID know that, six

19  days before you sent the letter responding for State Farm --

20  you remember that was 4-15, and Mr. -- maybe it's seven days,

21  but we know about the 4-8 email from your insured's son --

22  A.    Uh-huh.

23  Q.    -- right?

24        So seven days before you hit send on that letter --

25  A.    Uh-huh.

Sharon Arnold                                                    180
Redirect Examination by Mr. Miller

1    Q.    And by the way, Ms. Draper -- we looked up the note --

2    sent it to you for review one day after the email had been sent

3    to State Farm from Mr. Gary Bates --

4    A.    Okay.

5    Q.    -- right?

6          And that's the supervisor's supervisor letter; right?

7    A.    Okay.

8    Q.    Did you-all send that email to the OID?

9    A.    No.  Everything that we sent to the OID is what is listed

10   here in attachments.

11   Q.    Okay.  I just want to make sure it's not hidden in there

12   somewhere.

13   A.    No.

14   Q.    No.

15         All right.  Now, we -- we got -- have that comment about

16   cosmetic damage.  There is no cosmetic damage exclusion in the

17   State Farm policy, is there?

18   A.    There's not.

19   Q.    Right.

20         And -- and just -- just a very brief description of

21   that -- he asked you about it.  I want to make sure we're

22   square.

23         A cosmetic damage exclusion, depending on how it's

24   written, could say that, just because you've got scuffing from

25   hail on your roof, let's say, or maybe it's a metal roof, and

Sharon Arnold                                                    181
Redirect Examination by Mr. Miller

 1  it's got some discoloration or even a dent -- if it doesn't

 2  change the ability to shed water, then that cosmetic damage

 3  exclusion would prevent any need to pay for a new roof?

 4  A.    Correct.

 5  Q.    And those are getting more and more common, especially in

 6  the hail zone world or capital of the world; right?

 7  A.    Actually, ours is the opposite.  We -- we don't use the

 8  cosmetic exclusion anymore.  So our -- we're going more where

 9  we specifically define what is damaged, and so it's -- it's not

10  a cosmetic exclusion.

11  Q.    Well, I'm talking about commercial policies mostly, but I

12  suppose there can be a metal roof in a residential capacity

13  too.  That's true, yeah.

14        Well, in any event, it doesn't matter.

15        Bottom line is you don't have a cosmetic exclusion --

16  A.    No.

17  Q.    -- on this policy, so any -- any reference to cosmetic is

18  just because it happened to be in Mr. Marks's email.  Fair?

19  A.    Correct.

20  Q.    All right.  Now, what did Ms. Jacome tell Gary Bates,

21  according to Gary Bates, when she called him, after being told

22  to by the Mendoza folks and the hail reconciliation unit --

23  A.    Uh-huh.

24  Q.    -- what did she tell him when he said something about

25  hiring an engineer?

Sharon Arnold                                                          182
Redirect Examination by Mr. Miller

1   A.   I can't recall specifically what she said, but I think she

2   told him, you know, that was his choice if he wanted to.

3   Q.   Well, you're talking about what she wrote in her notes.

4   A.   Okay.

5   Q.   Right?

6        That's what you --

7   A.   Right.  That's -- because I wasn't privy to the

8   conversation.

9   Q.   Well, no.

10       But Ms. -- Ms. Jacome has testified about it twice now.

11  Do you know what she said under oath either time?

12  A.   No.

13  Q.   And -- and Mr. Bates has testified twice now.  Do you know

14  what he said under oath either time?

15  A.   No.

16  Q.   So you haven't even read what Mr. Gary Bates said in his

17  deposition?

18  A.   No, sir.

19  Q.   Well, would it surprise you to find out that Ms. Jacome,

20  at least according to the ears that Gary Bates owns, said,

21  "Well, if you hire an engineer, we're just going to hire one

22  too," as if it won't matter?

23  A.   Well, yeah.

24  Q.   She shouldn't have said that, should she?

25       If she did, if she did, she shouldn't have said it that

Sharon Arnold                                                      183
Redirect Examination by Mr. Miller

1  way, should she?

2  A.   I'm -- I can't -- I can't really answer that.  I wasn't

3  there, and I wasn't privy to that conversation.

4  Q.   Well, let's talk about you as the section manager.

5  A.   If you're asking me would I have said something, I -- I --

6  no, I would not say it.

7       And what I would say and what I would -- thought she would

8  mean is, if the insured -- anytime an insured wants to hire an

9  engineer, we welcome that, but we also are going to hire an

10 engineer as well.

11 Q.   Yeah.

12 A.   She was just trying to communicate the process.

13 Q.   Well, how -- now, wait.  You just got done telling me you

14 couldn't say what she said, but --

15 A.   I don't, but I --

16 Q.   -- now you're trying to tell us what she meant.

17          THE COURT:  Mr. Miller, let Ms. Arnold finish.

18 A.   I'm -- I'm -- Mr. Miller, I'm just trying to explain my

19 position and what I -- what I think.  I -- I wasn't there.  I

20 didn't hear the conversation, and I have not read the

21 transcripts.  I'm just -- I'm -- I'm just trying to say what I

22 think she might have meant by that because that would be my

23 expectation.

24 Q.   (By Mr. Miller) Look, all I'm asking you is real simple, I

25 hope.  If Ms. Jacome said what Mr. Bates heard --

Sharon Arnold                                                    184
Redirect Examination by Mr. Miller

1   A.   Uh-huh.

2   Q.   -- to the effect of, "If you hire an engineer, we're just

3   going to go hire one too" --

4   A.   Right.

5   Q.   -- would that be okay?

6   A.   I think it would be okay.  I would hope she would explain,

7   because that is what we would do.  I mean, she's explaining the

8   process.

9   Q.   Yeah.

10       So now we're going to elevate this to the paid engineers.

11  State Farm going to be -- are they going to use Haag?

12  A.   No.

13  Q.   They don't use Haag?

14  A.   We don't use Haag from an engineering standpoint.

15  Q.   Have you in the past?

16  A.   We have in the past.

17  Q.   Yeah.

18       All right.  That didn't go so well, did it?

19            MR. LEFFEL:  Objection, Your Honor.

20            THE COURT:  Sustained.

21            MR. MILLER:  I'm almost done, Judge.  I just need to

22  double-check one thing.

23  Q.   (By Mr. Miller) Ms. Arnold, is it fair to say that, for an

24  insurance company to do anything to force their insured into

25  litigation to try to resolve their dispute, that would be the

Sharon Arnold                                                         185
Redirect Examination by Mr. Miller

1    definition, one of them at least, of bad faith?

2    A.   We don't force anybody into litigation.

3    Q.   Well, if the only way an insured is going to get a proper

4    investigation or evaluation is by going to court, would you

5    agree that that is forcing them into litigation?

6    A.   Again, we properly investigated, and that is what our

7    expectation is.  We didn't force them into litigation.

8    Q.   Ma'am, is the -- what's the last thing that's put into the

9    letter sent to Mr. Bates when the second inspection was denied?

10   What's it talk about:  "suits against us"?

11   A.   That -- that is a requirement that the Department of

12   Insurance asks us to put into our letters, and it just -- it

13   communicates to them the "suit against us" provision.

14   Q.   Right.

15        The point is that's the last communication about the

16   inspection that was had -- about the inspection --

17   A.   Uh-huh.

18   Q.   -- that was had with the Bates --

19   A.   Right.

20   Q.   -- correct?

21   A.   Correct.

22            MR. MILLER:  That's all, Judge.

23            THE COURT:  Thank you, Mr. Miller.

24        Mr. Leffel?

25            MR. LEFFEL:  Very briefly, Your Honor.

Sharon Arnold                                                     186
Recross-examination by Mr. Leffel

1                      RECROSS-EXAMINATION

2     BY MR. LEFFEL:

3     Q.   Ms. Arnold, if you're responding to an OID complaint, is

4     it because somebody, the insured or someone on their behalf,

5     has made a complaint to the OID?

6     A.   Yes.

7     Q.   Can you control whether or not somebody makes a complaint

8     to the OID?

9     A.   No.

10    Q.   Can you control whether they make a complaint to the

11    Better Business Bureau?

12    A.   No.

13    Q.   Okay.  Do you get to dictate to them what they put in

14    there, what they want to show the OID?

15    A.   No.

16    Q.   Has anyone shown you the Bates, you know, complaint?

17    A.   The Bates -- what do you mean?

18    Q.   Like, the -- the -- the -- you know, the complaint that

19    you ultimately would have been responding to.

20    A.   Right.  We -- we see the inquiry that comes from whoever

21    put the complaint in, and we make -- that's one of my roles --

22    is I make sure that we've addressed all of those allegations.

23    Q.   Yeah, and I -- and I -- despite looking, I couldn't find

24    it, but the point is this:  They get to put whatever they want

25    in their letter; right?

Sharon Arnold                                                    187
Recross-examination by Mr. Leffel

1   A.   Absolutely.

2   Q.   Okay.  Similarly, you can't control who decides to engage

3   in litigation.  Fair?

4   A.   That's fair.

5   Q.   Okay.  Let's take a look at Joint Exhibit 1582; and if we

6   look at this, these are some text messages that the jury has

7   seen between Jonathan Marks and Mr. Gary Bates; and it looks

8   like on April 20th -- I believe this would have been in '21, so

9   claims being handled in the February to March time frame.

10      Can you -- do you see where he writes, "Jonathan, I have

11  the name of an attorney who specializes in suing an --

12  insurance companies, and I'm considering giving him a call and

13  suing the bastards.  Do you know when we might hear from the

14  engineer and have a report?"

15      Did I read that right?

16  A.   I -- you did.

17  Q.   So within, you know, 60 days of this claim being opened,

18  Mr. Gary Bates had already decided to sue the bastards, and you

19  can't control that, can you?

20  A.   No, I cannot.

21  Q.   Okay.  Have you seen any engineer reports that were

22  prepared in this case?

23  A.   No, I have not.

24  Q.   Okay.

25          MR. LEFFEL:  Nothing further.  Thank you.

Sharon Arnold
Further Redirect Examination by Mr. Miller

188

1        THE COURT:  Mr. Miller?

2        MR. MILLER:  May I?

3        THE COURT:  Yes.

4        MR. MILLER:  Oh.

5        THE COURT:  Limited.

6        MR. MILLER:  Yes.  Right.  Of course.

7                FURTHER REDIRECT EXAMINATION

8   BY MR. MILLER:

9   Q.   Ma'am, when you say you haven't seen any engineer

10  reports -- I want to make it clear -- that's from literally

11  your own company; right?

12  A.   Right.  I've not -- I've not seen any engineer reports

13  from -- from this, if there's an engineer report there, if

14  you-all have one, or ours.  I've not seen either one.

15  Q.   And one last thing:  Mr. Leffel mentions that that text,

16  which, by the way, is not about me just so you know -- but that

17  text is about two months, 60 days, after the inspection; right?

18  A.   I'd have to go back and look at the inspection --

19  Q.   Well, you agreed --

20  A.   -- but it was April 20th, right, and I think --

21  Q.   Yeah.

22  A.   -- we just read our Department of Insurance letter.

23       April 15th?

24  Q.   Yeah.

25       I said --

Sharon Arnold                                                    189
Further Redirect Examination by Mr. Miller

1   A.   Yeah.

2   Q.   -- it's about -- it's about 60 days -- I'm just going off

3   what -- you agreed with him --

4   A.   Yeah.

5   Q.   -- when he said "60 days."

6   A.   It -- yeah.  I -- I just --

7   Q.   Okay.

8   A.   -- I can't remember.

9   Q.   All right.  Well, anyway, the -- the -- the inspection at

10  the house is supposed to be February 23rd --

11  A.   Okay.

12  Q.   -- and the decision was February 23rd, and then the

13  reinspection decision was March 15th.

14  A.   Okay.

15  Q.   But that's -- that actually is just 35 days after the

16  decision to reinspect, when State Farm is telling Mr. Bates

17  about his need to sue within a certain time if he's going to;

18  correct?

19  A.   I have no idea what he means by that.

20  Q.   No.

21       Ma'am, I'm saying the letter that State Farm sent --

22  A.   Uh-huh.

23  Q.   -- denying the reinspection --

24  A.   Uh-huh.

25  Q.   -- that has the "suit against us" clause at the end --

Sharon Arnold                                                    190
Further Redirect Examination by Mr. Miller

1    A.   Yes.

2    Q.   -- the one that you said the insurance company said you

3    had to send them --

4    A.   We have --

5    Q.   -- right?

6    A.   -- to include that language, yes.

7    Q.   Right.

8         But you didn't include it on 2-23, the first time, when

9    Mr. -- Ms. Jacome effectively denied most -- the vast majority

10   of the claim.  They didn't get it then; right?

11   A.   Right, because we -- we -- we didn't deny the loss.  We

12   paid the covered damages.

13   Q.   And then they came back, and now you put it in the letter,

14   and you're supposed to put it in the letter, when you say,

15   "This is the end of it.  State Farm is done with you."

16        That's why you put that in the letter; correct?

17   A.   No, that's not correct.

18   Q.   Well, why didn't you put it in the first one?

19   A.   Because we didn't deny the first one.  The letter that

20   went out the first time was the payment letter.  We made a

21   payment on all of the soft metals.

22   Q.   All right.  So you're talking about the $200 is what you

23   consider to be a nondenial letter?

24   A.   Correct.

25   Q.   Okay.

Sharon Arnold                                                        191
Further Redirect Examination by Mr. Miller

1              MR. MILLER:  That's all, Judge.

2              THE COURT:  Mr. Leffel?

3              MR. LEFFEL:  Nothing further.  Thank you.

4              THE COURT:  Counsel, may we excuse Ms. Arnold, or is

5    she going to be re-called?

6              MR. MILLER:  No.

7              THE COURT:  I'm sorry.  Is that a -- we may excuse

8    her?

9              MR. MILLER:  Good point.

10          You may excuse her as far as we're concerned.

11             THE COURT:  Okay.  Mr. Leffel?

12             MR. LEFFEL:  Yes, Your Honor.

13             THE COURT:  Ms. Arnold, you may step down, and you

14   are excused.

15             THE WITNESS:  Thank you.

16          (End of trial transcript excerpt.)

17

18

19

20

21

22

23

24

25

Sharon Arnold                                                          192
Further Redirect Examination by Mr. Miller

1                          REPORTER'S CERTIFICATE

2          I, CASSY KERR, Federal Official Court Reporter in

3     and for the United States District Court for the Western

4     District of Oklahoma, do hereby certify that, pursuant to

5     Title 28, Section 753, United States Code, the foregoing is a

6     true and correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter, and the

8     transcript page format is in conformance with the regulations

9     of the Judicial Conference of the United States.

10         DATED THIS _____ day of September 11, 2023.

11         /s/Cassy Kerr
           Cassy Kerr, CSR, CCR, RPR, CRR, CRC, NP-OK
12         Oklahoma CSR License No. 1367
           Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25