1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THOMAS H. BATES,                     )
                                     )
                    Plaintiff,       )
                                     )
     vs.                             ) Case No. 21-CV-705
                                     )
STATE FARM FIRE AND CASUALTY,        )
                                     )
                    Defendant.       )

TRANSCRIPT OF

JACQUELINE DRAPER VIDEO TELECONFERENCE TRIAL TESTIMONY

NOVEMBER 2 and 3, 2022

BEFORE THE HONORABLE JODI W. DISHMAN, JUDGE PRESIDING

Recorded by mechanical stenography
Transcript produced by computer-aided transcription

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  StenoLogic@cox.net

1                           A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3         Mr. Robert Bradley Miller

4         bmiller@mjjaw.com

5         Ms. Shawna L. Landeros

6         slanderos@mjjaw.com

7         Miller, Johnson, Jones, Antonisse & White

8         500 Northwest Sixth

9         Suite 300

10        Oklahoma City, Oklahoma 73102

11        405-896-4388

12

13   FOR THE DEFENDANT:

14        Mr. Lance Leffel

15        lleffel@gable.com

16        Ms. Paula M. Williams

17        pwilliams@gablelaw.com

18        Ms. Taylor J. Freeman Peshehonoff

19        tpeshehonoff@gablelaw.com

20        GableGotwals

21        499 West Sheridan Avenue

22        Suite 200

23        Oklahoma City, Oklahoma 73102

24        405-235-5500

25

3

1                           EXAMINATION INDEX

2    PLAINTIFF'S WITNESS:

3    JACQUELINE DRAPER                               PAGE

4         DIRECT BY MR. MILLER                          4

5         CONTINUED DIRECT BY MR. MILLER               24

6         CROSS BY MR. LEFFEL                          149

7         REDIRECT BY MR. MILLER                       193

8         RECROSS BY MR. LEFFEL                        204

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacqueline Draper                                                    4
Direct Examination by Mr. Miller

1    (This transcript contains only the excerpted trial

2    testimony of Jacqueline Draper:)

3         THE COURT:  We are back on the record in *Bates v.*

4    *State Farm* in the presence of the jury.

5    Will the plaintiff please call his next witness?

6         MR. MILLER:  Jacqueline Draper.

7         THE COURT:  To the members of the jury, the parties

8    agreed and the Court allowed Ms. Draper to appear by video for

9    her live testimony.  The Court instructs the jury not to read

10   anything into Ms. Draper appearing by video.  I conveyed to you

11   with my preliminary instructions that the term "witness"

12   includes anyone who is testifying in person, by video, or by

13   deposition, including the parties.

14       For counsel, given that Ms. Draper is by video, you will

15   need to speak nice and slowly, make sure and give her time to

16   answer before you start your next question, and please

17   reference the exhibits slowly so that she can make sure she can

18   get to the exhibit.

19       Ms. Vasquez, will you administer the oath to the witness?

20       (The witness is sworn.)

21         THE COURT:  Mr. Miller, you may proceed.

22         MR. MILLER:  Thank you, Judge.

23                        DIRECT EXAMINATION

24   BY MR. MILLER:

25   Q.   All right.  Ms. Draper, I understand you're not actually

Jacqueline Draper                                                5
Direct Examination by Mr. Miller

1   going to be able to see us, but you'll be able to see the

2   exhibits.  Do I have that right?

3            THE CLERK:  Can you ask her again?

4            MR. MILLER:  Ask her again?

5   Q.   (By Mr. Miller) Ms. Draper, can you hear me?

6   A.   Yes.

7   Q.   I understand that you do not actually see me or anyone in

8   the courtroom; correct?

9   A.   Yes.  Correct.

10  Q.   But you can see apparently exhibits, if they're put up in

11  front of you?

12  A.   Yes.

13  Q.   Now, you have testified a couple of times in this case in

14  deposition; correct?

15  A.   Yes.

16  Q.   Have you had a chance to review your depositions?

17  A.   Yes.

18  Q.   I want to start with making clear that, at the time that

19  you were in Oklahoma City, which was a little over two years, I

20  think, you were the team manager of a proximity unit; is that

21  correct?

22  A.   Yes.

23  Q.   And you came to Oklahoma City with the proximity unit --

24  or -- or to -- to lead a proximity unit as a promotion?

25  A.   Yes.

Jacqueline Draper                                                      6
Direct Examination by Mr. Miller

1    Q.    And who was the person you reported to?

2    A.    Sharon Arnold.

3    Q.    What was her job?

4    A.    She's a proximity (technical problem) manager.

5    Q.    Did you say "section manager"?

6    A.    (Technical problem.)

7    Q.    Please answer again.

8    A.    Yes.

9    Q.    Now, that's currently the job that you hold in Georgia;

10   correct?

11   A.    Correct.

12   Q.    And when did you leave Oklahoma to take your new job in

13   Georgia?

14   A.    I (technical problem) role in October of 2021.

15   Q.    And tell us when you took the job in Oklahoma to be team

16   manager.

17   A.    In the summer of 2019.

18   Q.    So you had the job as team manager for roughly 27 months

19   or so?

20   A.    Yeah, just shy of 2 1/2 years.

21   Q.    All right.  Now, you currently are actually supervising

22   team managers in Georgia.

23   A.    Correct.

24   Q.    And at least at the time of your depositions, there were 8

25   team managers that you supervised.  Is that still the case?

Jacqueline Draper                                          7
Direct Examination by Mr. Miller

1  A.   I have 11 now.

2  Q.   And do you cover the whole state of Georgia?

3  A.   I split.  I have all of the state of Georgia, other than

4  the very metro of Atlanta.

5  Q.   And is that all that you take care of?

6       Not that it's not a lot but Georgia and no other states?

7  A.   Georgia.  Just Georgia.

8  Q.   Gotcha.

9       Now, with 11 team managers now, how many claims

10 adjusters -- is what we call them -- do you have under those

11 team managers?

12 A.   64 (technical problem).

13 Q.   All right.  Now, Ms. Draper, we've already spent a good

14 part of the day with another State Farm person, so I don't want

15 to ask you anything that -- if I can help it, that's

16 duplicative.  All right?

17 A.   Yes, sir.

18 Q.   But that doesn't mean you can't explain something if you

19 think you need to.  I'm just going to try to take you to the

20 points that affect what I believe to be important about your

21 testimony.  Does that make sense?

22 A.   Yes, sir.

23 Q.   All right.  Now, let's get -- let's go ahead and get this

24 out of the way:  Had you ever heard of a program roll-out in

25 Oklahoma by State Farm that was termed "hail focus"?

Jacqueline Draper                                                    8
Direct Examination by Mr. Miller

1    A.   (Technical problem).

2    Q.   Pardon?

3    A.   I have not.

4    Q.   And so while you were in Oklahoma as the team manager of

5    the proximity unit here, it was -- the whole time -- a team

6    that looked at hail damage; correct?

7    A.   It -- it -- can you say the last part of your question

8    again?

9         I'm sorry.  It just kind of cut out.

10   Q.   Yes.

11        And -- and -- and I -- and it would help me to know if my

12   question does not make sense because of me or because of

13   technology.  All right?

14   A.   It's just the technology.  It's -- sometimes it's going

15   out.

16   Q.   Yes.

17   A.   We might need to try it plug it (technical problem).

18   Q.   All right.

19             MR. MILLER:  It seems like it might not be a bad

20   idea, Judge, if she has a place to plug it in hard wire.  I

21   think that's what we just said.

22             THE COURT:  Okay.  Let's take a --

23   A.   I do have a JABRA, if that would help.  Could I try that?

24   Q.   (By Mr. Miller) Tell us what you just said.

25   A.   I could -- I have a JABRA in my -- it's right over here.

Jacqueline Draper                                                    9
Direct Examination by Mr. Miller

1   Could I plug that in --

2   Q.   Oh, it --

3   A.   -- to see if that helps with the sound?

4   Q.   For your --

5        THE COURT:  Yes.

6   Q.   (By Mr. Miller) -- head, yes.

7        THE COURT:  Yes.

8   Q.   (By Mr. Miller) Sure.

9        THE COURT:  We'll be off the record.

10       (Discussion off the record.)

11  A.   Can you hear me better now?

12  Q.   (By Mr. Miller) At the moment, yes.

13  A.   Okay.  That is much better.  Okay.

14       THE COURT:  Ms. Draper, we are back on the record and

15  as we take pauses for technology, I'm just going to remind you

16  that you remain under oath.

17       Mr. Miller, please proceed.

18       MR. MILLER:  Okay.

19  Q.   (By Mr. Miller) I think I heard you say that -- the words

20  put together -- "hail focus" was never a program of State Farm

21  that was rolled out across the country that you're aware of

22  while you were in Oklahoma; is that correct?

23  A.   I have never heard of -- of (technical problem) hail focus

24  used as a -- a program or a term at State Farm, no.

25  Q.   You do know Tresa Jacome, don't you?

Jacqueline Draper                                              10
Direct Examination by Mr. Miller

1   A.   Yes.

2   Q.   And, in fact, you did recruit her to come to your team

3   after working with her as a cat adjuster in a prior assignment

4   with State Farm that you had; correct?

5   A.   Yes, sir.

6   Q.   During the time that Ms. Jacome was on your team, Sharon

7   Arnold -- Arnold was the section manager the whole time?

8   A.   She was, yes.

9   Q.   All right.  Fair enough.

10       Do you agree that determining hail damage cannot be done

11  or at least confirmed by photographic evidence alone?

12  A.   Can you say the question again?

13  Q.   Do you agree that a person cannot tell for sure that

14  something is hail damage by looking at pictures?

15  A.   Yes.

16  Q.   And I think you've told me before that pictures are one

17  dimensional; correct?

18  A.   Yes.

19  Q.   And we can see things with depth, context, when we're

20  looking at -- at them in person with our eyes, if we have

21  normal vision.  Fair?

22  A.   I don't (technical problem) question.

23  Q.   I was trying to come up with the right word, but what I'm

24  saying is the reason that being present with the possible hail

25  damage on the roof -- one of the reasons -- is so you can see

Jacqueline Draper                                                    11
Direct Examination by Mr. Miller

1  the depth and the context of it against the rest of the
2  background.
3  A.    So that you can see it and feel the hail -- hail bruise,
4  yes.
5  Q.    Sure.
6        I was going to get to that.  Thank you.
7        But the point is that it's not only feeling it, but you
8  want to be able to see its contours and whether there's depth
9  to the impact area.  All that matters in making an assessment.
10 Is that fair?
11 A.    Yes, you're looking for the granules being crushed into
12 the mat and feeling for a hail bruise.
13 Q.    Now --
14           THE COURT:  Hold on just a second, Mr. -- Mr. Miller.
15      Ms. Draper, you said you're feeling for a hail bruise?
16           THE WITNESS:  Yes, ma'am.
17           THE COURT:  Okay.  Mr. Miller, please continue.
18 Q.    (By Mr. Miller) Now, part of -- even you as a section
19 manager, part of your role in training is to watch the same
20 videos that the team members do when it comes to hail
21 evaluation in training; is that right?
22      Excuse me.
23 A.    As a -- can you say the question again?
24      As a section manager (technical problem) say that again.
25 Q.    You watch the same videos -- the Haag videos, for

1  instance -- just like your team members do every year for State

2  Farm as a refresher; correct?

3  A.   Yes.

4  Q.   And we -- we've already heard some about the Haag group,

5  but I'd like to hear your spin on it.

6       What is Haag?

7  A.   Haag is an engineering firm.

8  Q.   And how is it involved in training State Farm adjusters in

9  storm and hail recognition?

10 A.   So Haag is an engineering firm, and they do

11 state-of-the-art testing (technical problem) various building

12 and -- and roofing materials and offer a certification for

13 individuals to go through to learn about hail damage and hail

14 (technical problem) to various building -- building and roofing

15 materials.

16 Q.   And State Farm has their adjusters watch those videos to

17 be certified in hail recognition -- I'm sure there's more to

18 it, but that as well; correct?

19 A.   Yes, annually, yes.

20 Q.   And I think you've told me that every year there's a

21 certain series of videos that you watch from Haag, and they are

22 the same every year; correct?

23 A.   I believe they are the same each year, yes.

24 Q.   Yeah.

25      Now, did it seem to you from your observations that Sharon

Jacqueline Draper                                              13
Direct Examination by Mr. Miller

1   Arnold was aware of State Farm's policies and procedures and

2   doing her part to enforce them when you were a team manager

3   under her?

4   A.   Yes, sir.

5   Q.   And if there was a policy or a program that was supposed

6   to be adopted by the claims people, not only the team managers

7   but the section managers are a part to play in making sure that

8   happens.  Is that fair?

9   A.   Yes.

10  Q.   And Sharon Arnold was competent at that in your view.

11  Fair?

12  A.   Yes.

13  Q.   Did she seem engaged in what the members of the different

14  teams were doing particularly in this case about being

15  adequately trained in hail recognition?

16  A.   Yes, she was.

17  Q.   All right.  Now, this particular claim, I believe, at

18  least the time of your deposition, you did not recall it

19  particularly.  You just had a vague memory of the claim; is

20  that right?

21  A.   Yes, I had a vague memory, and then I've obviously

22  reviewed it since then and -- and remember (technical problem).

23          THE COURT:  I'm sorry, Ms. Draper.  Repeat the last

24  part.  You remember what?

25          THE WITNESS:  I -- I do remember parts of it, yes.

Jacqueline Draper                                              14
Direct Examination by Mr. Miller

1  Q.   (By Mr. Miller) All right.  Now, I did ask you back in

2  your deposition if there was anything that you could

3  particularly describe for me that you remember about the claim,

4  and at least at that time, you could not; correct?

5  A.   I (technical problem) review the file, so I do remember

6  some of the things that were indicated in the file, vaguely,

7  yes.  It was 2 1/2 years ago, but, yes, I remember some of it.

8  Q.   Well, all right.  We -- we may come back to that.

9       Let me ask it this way:  Did you ever speak with Thomas

10 Bates?

11 A.   No, I (technical problem).

12 Q.   You say you did not?

13 A.   No, I don't believe I did.

14 Q.   Did you ever speak with Gary Bates?

15 A.   No, I don't believe I did.

16 Q.   And is there anyplace in the claim file or the claim notes

17 that indicate to the contrary?

18 A.   No, not that I'm aware of.

19 Q.   Did you ever email exchange or write any other sort of

20 correspondence with Gary Bates?

21 A.   No.

22 Q.   What about Thomas Bates?

23 A.   No.

24 Q.   And, again, to be clear, there is no such correspondence

25 where you were involved in it in the claim file; correct?

1    A.   No, not that I'm aware of.

2    Q.   By the way, is it fair to say that it is important for

3    claims people to document their files with the coverage

4    decisions that are made and the basis of those decisions per

5    State Farm policy?

6    A.   Yes.

7    Q.   And would you agree that that's something that you, as a

8    now section manager -- one of the, probably, many things that

9    you're in tune with:  to make sure that even the lowest-level

10   new adjuster understands their responsibility to document the

11   file with the material things in the claim?

12   A.   Yes.

13   Q.   And, of course, you don't work claims front line anymore;

14   correct?

15   A.   Correct.

16   Q.   What you know about claims is either what someone tells

17   you, like a -- a -- a team manager or a adjuster, or what you

18   can find in their file when it's your responsibility to examine

19   the file.  Fair?

20   A.   Can you restate the question?

21   Q.   Yes.  Let me break it down into two.

22        First of all, because you do not work claims front end as

23   a manager now, a lot of what you know about how people are

24   doing their jobs is based on review of files.  Fair?

25   A.   One element of how we review someone's work product, yes.

Jacqueline Draper                                          16
Direct Examination by Mr. Miller

1   Q.   Okay.  Fair enough.

2        And as well, you might have information based on verbal

3   communications with individuals as well.  True?

4   A.   Yes.

5   Q.   Okay.  Is it still part of State Farm's requirement that

6   section managers look at a certain number of files from each

7   team that they supervise on a regular basis in a random

8   accounted -- auditing kind of fashion to make sure that things

9   are being done and documented in the file like they're supposed

10  to be?

11  A.   I'm sorry.  Can you repeat the question?

12  Q.   Is there something going on there?

13       Are you...

14  A.   Yeah, I'm sorry.  I think (technical problem) plug in the

15  Ethernet cord.

16  Q.   Are they trying to --

17  A.   I'm sorry.  Please repeat the question.

18  Q.   Is someone there trying to help with the technical

19  problems?

20  A.   Yes.

21       MR. MILLER:  Judge, could we just wait till they do

22  that or have --

23       THE COURT:  Yes.

24       We'll go off --

25  A.   They left the room.

Jacqueline Draper                                                    17
Direct Examination by Mr. Miller

1           THE COURT:  Okay.  Mr. Miller, please proceed, and I

2      think, if you break down that question --

3           MR. MILLER:  Okay.

4      Q.   (By Mr. Miller) Ms. Draper, is it currently part of the

5      State Farm program for section managers to review files from

6      teams they supervise?

7      A.   Yes.

8      Q.   And are they supposed to be randomly selected so it can be

9      like an audit?

10     A.   We have various reviews of files that occur; so random,

11     and some we may intentionally review based on performance or

12     based on a complaint or -- there could be a host of different

13     reasons why we're reviewing claim (technical problem).

14     Q.   Makes sense.

15          So my point is that, for you to be able to determine in

16     your file reviews whether or not you need to take corrective

17     action, there must be some minimum basic standard that's

18     expected of what is in them; correct?

19     A.   Yes, we -- we want them to document the (technical

20     problem) document their investigation and how they ultimate

21     (technical problem) if the claim was covered, things like that,

22     of course.

23     Q.   And if the claim's denied.  Fair?

24     A.   Yes, if the claim is -- is covered or denied, what the

25     investigation (technical problem) facts, things like that, yes.

Jacqueline Draper                                          18
Direct Examination by Mr. Miller

1   Q.   Okay.  Now, Ms. Jacome texted you pictures of damage to

2   the roof at the Bates home on February 23rd, 2021; correct?

3   A.   Correct.

4   Q.   And she texted you those because it was your direction

5   that she was supposed to at that time of her maturation because

6   she was new.  Is that fair?

7            MR. LEFFEL:  Objection.  Facts not in evidence.

8            THE COURT:  Overruled.

9        Ms. Draper, you may answer.

10           THE WITNESS:  Thank you.

11  A.   I didn't have requirement for Tresa to text me photos of

12  (technical problem) time.

13  Q.   When you say "at the time," what does that mean?

14  A.   I -- I didn't have requirement for her to (technical

15  problem) text me.  She's -- I'm her -- I was her team manager

16  at the time.  She's more than welcome to reach (technical

17  problem) questions or wants an additional set of eyes to look

18  at something to make sure that she (technical problem) and

19  confident in the decision that she's made, absolutely.  She

20  could reach out to me as her team manager.  That was (technical

21  problem).

22  Q.   So are you giving us the testimony that Ms. Jacome was not

23  required at any time in her adjusting experience with your team

24  to text you or show you or email you pictures of roofs before

25  she made a decision about whether the roof was suffering hail

Jacqueline Draper                                              19
Direct Examination by Mr. Miller

1   damage?

2   A.   No.  If Tresa was confident of her decision, she

3   absolutely could make that -- that call.

4        If she wanted to reach out and (technical problem) thought

5   process, absolutely.  I encourage them to do that.

6        She was, you know, learning (technical problem) and -- and

7   wanted to (technical problem) after she had had some

8   conversations with the -- the contractor (technical problem,)

9   and she did just that.  So that's not uncommon.

10  Q.   Is it your testimony that you did not instruct your

11  adjusters, through the time you were in Oklahoma City for those

12  27 months, that they were not allowed to call a roof a total

13  loss for hail until they had your permission?

14  A.   A rule, no.  They have -- had authority to make those

15  calls, but it was not for me to ask them to step through their

16  thought process and -- and make sure that, you know, (technical

17  problem) of the claim file and -- and their investigation; and

18  as (technical problem), it's -- it's important that we help

19  them arrive at -- at the correct decision.  So (technical

20  problem) absolutely would reach out from time to time, and --

21  and we would review files together.  That's a (technical

22  problem) part and expectation of my role as a team manager.

23  Q.   Well, you -- you cut out a lot there, I'm afraid.  Let me

24  try again.

25       I just want a simple answer.  Did you have a rule while

Jacqueline Draper                                              20
Direct Examination by Mr. Miller

1   you were team manager that your adjusters were not allowed to

2   total a roof for hail damage without your permission at any

3   time you were at State Farm in Oklahoma City?

4   A.   I did not.

5              MR. MILLER:  If you could pull up JX3-9.

6              THE COURT:  Mr. Miller --

7              MR. MILLER:  Yes.

8              THE COURT:  -- please read that reference so that

9   Ms. Draper knows -- not just pulling up -- so that she can find

10  it in her book, if she needs it.

11             MR. MILLER:  Okay.

12  Q.   (By Mr. Miller) Are -- are you able -- are you able to see

13  it on the screen where you are?

14  A.   I -- I can't make out a single word of what that says,

15  unfortunately.

16  Q.   Okay.  Then in your --

17  A.   Can you tell me...

18  Q.   In your book, under JX3, you should find an exhibit that

19  are the texts that you and I have spent considerable time

20  talking about in your deposition.

21             THE COURT:  Mr. Miller, if we can go off the record

22  briefly.

23             MR. MILLER:  Yes, ma'am.

24        (Discussion off the record.)

25  A.   (Technical problem) X3 and then 009?  Is that what the

Jacqueline Draper                                                21
Direct Examination by Mr. Miller

1   bottom should say?

2   Q.   (By Mr. Miller) Ms. -- Ms. -- Ms. Draper, just a second.

3   We're off the record.

4          THE COURT:  Mr. Miller, my court reporter -- and I

5   trust what she says on these things because she's been doing

6   this a long time.

7          MR. MILLER:  Sure.

8          THE COURT:  She is wondering if the parties would

9   agree, if Ms. Draper has access to a telephone, if we can leave

10  her on video but have her mute her video line and try to call

11  in by phone and see if that is -- that would help us with not

12  having these inaudible responses.

13         MR. MILLER:  I mean, it's certainly okay with me.

14         THE COURT:  At least -- at least to try it?

15         MR. LEFFEL:  I'm in favor of anything that --

16         THE COURT:  Okay.

17         MR. LEFFEL:  -- makes this go better.

18         THE COURT:  So -- so let's go back on the record.

19     Ms. Draper, I have asked the lawyers for the parties, and

20  they have agreed -- that we would like to try something else

21  with your technology.  We can hear your responses, but at

22  times, some of the words, with the delay, are inaudible.

23     So what we would like to try to do is, in terms of your

24  video feed, if you could mute that and dial -- Ms. Vasquez, my

25  court reporter (verbatim), is going to give you a telephone

1    number and have you dial in; and we're going to try that, where

2    we can still see you by video but that, maybe, we can hear a

3    little bit more clearly.

4        Mr. Miller, is it correct that the plaintiff does not

5    object to that?

6            MR. MILLER:  Correct.

7            THE COURT:  And, Mr. Leffel, is it correct that the

8    defendant does not object to that?

9            MR. LEFFEL:  That is correct, Your Honor.

10            THE COURT:  Okay.  So we're going to go off the

11    record and see if we can try that.

12        And, jury, thank you for your patience.

13        (Discussion off the record.)

14            THE COURT:  We are back on the record.

15        Ms. Draper, what I have decided to do, with the

16    consultation and agreement of the attorneys for the parties,

17    is, given our technical difficulties, we are going to keep your

18    testimony open but come back to you once we have those

19    technical difficulties figured out, which, Mr. Miller, is that

20    a correct statement of the parties' agreement and the Court's

21    disposition of the -- the current state of things?

22            MR. MILLER:  Well, you're not going to be happy, but

23    I wasn't listening to everything you said.

24            THE COURT:  Okay.  That's okay.  I don't blame you.

25            MR. MILLER:  Well...

23

1          THE COURT:  What I said was, while we're having

2   technical difficulties, we're going to move on to another

3   witness.

4          MR. MILLER:  Yes, ma'am.

5          THE COURT:  We're going to leave Ms. Draper's

6   testimony open and figure out those technical difficulties and

7   come back to her.

8       Do I have agreement of both parties to proceed?

9          MR. LEFFEL:  Agreed, Your Honor.

10          MR. MILLER:  Agreed.

11          THE COURT:  Okay.  Thank you both.

12      And, again, my apologies to the jury, and thank you for

13   your patience.

14      We are going to go ahead and disconnect Ms. Draper and

15   leave her testimony open.

16      (Day 1 of Jacqueline Draper's testimony is adjourned, and

17   Day 2 begins hereafter:)

18          THE COURT:  Mr. Miller, please call your next

19   witness.

20          MR. MILLER:  Jacqueline Draper.

21          THE COURT:  Okay.  Mr. Miller, before you proceed,

22   members of the jury, I instructed you yesterday and will remind

23   you today, regarding Ms. Draper, that the parties and counsel

24   both agreed and the Court allowed her to appear for her live

25   testimony by video.

Jacqueline Draper                                                    24
Continued Direct Examination by Mr. Miller

1      We had some technical issues yesterday, and I instruct you

2  to put those out of your mind.  Today is a new day.

3      I'm going to have Nyssa swear in Ms. Draper again, and

4  I've told the lawyers I'm giving them leeway on questions that

5  were asked yesterday but may have been difficult to follow

6  given the technical issues.

7      I will also convey my further instruction that the jury is

8  not to read anything into Ms. Draper appearing by video and

9  that a witness in this trial is anyone who testifies in person,

10  by video, or by deposition, including the parties.

11      Ms. Vasquez, if you will swear the witness in.

12      (The witness is sworn.)

13          THE COURT:  Mr. Miller, please proceed.

14          MR. MILLER:  Thank you, Judge.

15              CONTINUED DIRECT EXAMINATION

16  BY MR. MILLER:

17  Q.   Ms. Draper, we're going to just hit a couple, three things

18  from yesterday to get everybody back on the same page.  Are you

19  ready to go?

20  A.   Yes, sir.

21  Q.   The first thing:  I think you testified that every year

22  you watch the same Haag videos to be -- I think you might have

23  called it "certified" again as is a requirement at State Farm;

24  is that right?

25  A.   We -- we do have the videos available to watch every year,

Jacqueline Draper                                         25
Continued Direct Examination by Mr. Miller

1   yes.

2   Q.   And did I understand that you watch them every year?

3   A.   I do, yes.

4   Q.   Okay.  And -- and did you say they were the same -- or at

5   least for many years now they've been the same -- these Haag

6   videos?

7   A.   That is, to the best of my knowledge, my understanding --

8   is that they are the same.

9   Q.   All right.  And can you -- I think you've been with

10  State Farm about 10 -- 10 or 11 years; is that right?

11  A.   Correct.

12  Q.   And so, as far as you can remember at least and as best of

13  your memory, for these 10 or 11 years since you've been

14  watching the Haag videos, they've been the same; is that right?

15  A.   Correct.

16  Q.   Okay.  And I think you also told us that you had a vague

17  recollection of this claim, but there was nothing in particular

18  that you actually had a visual memory of, other than what's

19  written in the file?

20  A.   I -- I do remember it vaguely.  I -- I don't remember the

21  exact piece of every single thing that happened in the file for

22  something, unfortunately, that happened 2 1/2 years ago; but

23  I -- I do have a rough, vague memory of it and obviously

24  refreshed my memory of it looking at the file and -- and going

25  through it with you on our -- our prior deposition and -- and

Jacqueline Draper                                          26
Continued Direct Examination by Mr. Miller

1   during my preparation.

2   Q.   Now, of course, I -- what I was trying to say is that,

3   clearly, there's things that are written down, and those things

4   would matter as something you believed to have happened if it's

5   in the claim file.  Is that fair?

6   A.   Yes, sir.

7   Q.   All right.  Outside of what's written down and what might

8   be a reminder to you on the -- on what's written down, can you

9   remember anything else you can tell us about that's not part of

10  the writing in the claim file?

11       That's what I'm trying to ask you but just not very well.

12  A.   Ask the question again for me, Mr. Miller, please.

13  Q.   Yes.

14       I -- I think I've reorganized it in my mind that -- I just

15  want to know -- the things that are written down in the claim

16  file, I get that.  You -- you're going to be able to either

17  recall them, or you're going to be comfortable that they

18  happened.  Fair?

19  A.   Yes, sir.

20  Q.   Okay.  I just wonder, before we move on, is there anything

21  that you remember that's not in the claim file that you can

22  specifically tell us about?

23  A.   Not that I -- not that I can recall.

24  Q.   Okay.  Is it accurate that you never spoke to Thomas or

25  Gary Bates?

Jacqueline Draper                                                    27
Continued Direct Examination by Mr. Miller

1   A.   That is accurate.

2   Q.   And is it accurate that you never had any exchange of

3   written correspondence, whether it be email or a letter or

4   text, with Thomas or Gary Bates?

5   A.   That is also correct.

6           MR. MILLER:  Now, if you could put up JX3.9.

7   Q.   (By Mr. Miller) Can -- can you see that of a size that you

8   can read it, or do you need to look at the actual exhibit?

9   A.   No.  I was going to get the book out --

10  Q.   Yeah, that's --

11  A.   -- if you could --

12  Q.   That's fine.

13  A.   -- (unintelligible).

14  Q.   That's fine.

15          So it'll be JX3, page 9.

16  A.   Give me just a minute.

17          So JX.009 at the bottom?

18  Q.   It should be.

19  A.   Yes, I have that.

20  Q.   Okay.  And, of course, there's a lot of numbers and things

21  that don't make a lot of sense there, but I think we had got

22  far enough along to know that this was back and forth -- maybe

23  we did -- back and forth between you and Tresa Jacome; correct?

24  A.   Yes, sir.

25  Q.   And it would have been on your State Farm-issued phones

Jacqueline Draper                                                        28
Continued Direct Examination by Mr. Miller

1    both of you would have had; correct?

2    A.    I know for sure it was on mine, and so I assume it was on

3    hers as well, but I don't know that with 100 percent certainty,

4    but I believe that it was.

5    Q.    Okay.  Fair enough.

6         And -- and when you go to pretty much the middle of the

7    page, there's a question that you ask.  It says, "Anything on

8    the ridge, valley, etc?"

9    A.    Yes, I'm there.

10   Q.    Found it?

11   A.    Yes.

12   Q.    And tell me, on that question, "Is there anything on the

13   ridge, valley, etc?" what did that mean to -- what did you mean

14   by that?

15   A.    So the -- Tresa had reached -- and thank you for blowing

16   it up.  I can -- I can definitely read that.  Thank you.

17        So, when Tresa had sent some pictures over and had asked

18   me to take a look at them -- and so -- which is not uncommon,

19   for my adjusters to reach out and -- and just ask questions or

20   ask for a second set of eyes to look at something.

21        And so, not being on the roof personally myself and being

22   able to touch and feel the shingles necessarily, part of what

23   I'm asking them is -- and her specifically in this situation is

24   about their investigation; and so the reason that I'm asking

25   about the ridges and the valleys -- and so, to explain, the

Jacqueline Draper                                           29
Continued Direct Examination by Mr. Miller

1  ridge is the highest point on the roof.  So, if you think of

2  the -- the highest peak, if you will, that's the ridge.

3       And, then, the valley is the -- the low point, if you

4  think, where two slopes meet.

5       And so those are the most susceptible places on a roof for

6  there to be hail damage because they are considered a softer

7  point.  The ridge has a shingle draped over it and is more

8  susceptible and more hail prone, and -- and valleys are met --

9  especially a close-cut valley is a softer place where hail is.

10      So I was just asking her about her investigation and

11  making sure that she was, you know, looking at and considering

12  those pieces of her investigation to help her --

13  Q.   Is that --

14  A.   -- make her.

15  Q.   -- is -- is that in part because you had not seen any

16  pictures in the texts that were of the ridge or the valleys?

17  A.   And are the pictures in this document?

18  Q.   Yes, if you look at page 1 through 8.

19  A.   Okay.  So it does look like there's one picture in here of

20  the ridge.

21  Q.   Is that the one that shows the street and the State Farm

22  van?

23  A.   Yes.

24  Q.   And, of course, it -- it shows the ridge at the furthest

25  point of the house and then, from a standing point, at a angle

Jacqueline Draper                                                30
Continued Direct Examination by Mr. Miller

1    toward the street.  So you can see the street and the van and

2    the house across the street; correct?

3    A.   Yes.

4    Q.   Okay.  So I take it that that picture of the ridge would

5    be difficult to discern hail if -- if you were trying to --

6    well, it'd be difficult to discern hail unless it was very bad

7    hail.  Would you agree -- very severe?

8    A.   You would still be able to see some dark bruising on -- on

9    the ridge, from the photo that she took, if there was some

10   damage there.

11        But more of my question was to help her get at her

12   investigation and to confirm that she -- and what she was

13   seeing while she was there versus -- little bit -- as her

14   leader, helping her -- teaching her how to fish versus, you

15   know, giving her those answers, making sure that she's doing

16   the investigation.

17   Q.   So are you saying that you wanted her to focus her

18   attention on the ridges and the valleys?

19   A.   It is certainly a part of her investigation.  It's a piece

20   of -- of her investigation to help arrive at the correct

21   coverage decision in her evaluation of the roof, yes.

22   Q.   All right.  Did you -- did you think from this picture of

23   the ridge that it showed there was no damage of any sort to the

24   ridge that could be hail?

25        Are you willing to say that from this picture?

Jacqueline Draper                                                31
Continued Direct Examination by Mr. Miller

1  A.   Looking at the photo, I don't see any hail, no.

2  Q.   Right.  You don't see any hail.

3       But I'm asking is it possible that something less than

4  severe damage -- hail damage that would be compensable,

5  right -- because any hail damage is compensable; right?

6       Agreed?

7       If there's hail damage to the -- a shingle -- we've been

8  hearing testimony about even a shingle -- then you would pay to

9  repair it; correct?

10 A.   So if it was, in fact, actual hail damage to the shingle,

11 yes.

12 Q.   Yes.

13      So what I'm saying is are you willing to say that this

14 picture would tell you there was no compensable hail damage to

15 the ridge all the way to the end?

16 A.    Mr. Miller, I didn't do the inspection.  Based on the

17 photo, I -- I'm telling you that I don't see any hail damage;

18 but, again, I was asking the claims adjuster who was up on

19 the -- the roof if they saw any, which is why I asked them that

20 question --

21 Q.   And --

22 A.   -- versus saying what I felt like I saw in the -- in the

23 photo.

24 Q.   All right.  Well, so what did she say about it, then?

25 A.   Let's look.

Jacqueline Draper                                                    32
Continued Direct Examination by Mr. Miller

1          So do I go up or down?

2     Q.   You would go up toward the top.

3     A.   Okay..

4     Q.   The very next one.

5          I think we're pulling it up for you, I hope.

6          Yeah.  It's right there on your screen now.

7     A.   Thank you so much.

8          Yes, that's very clear.

9          "Same things as those.  Lots of hail to soft metals."

10         Okay.

11    Q.   So does that mean, when she says, "Same things as those,"

12    that the pictures she sent, which showed some kind of damage,

13    whether it's hail or not -- that she saw those on the ridge and

14    the valleys too?  Is that what that means?

15    A.   The way I interpret her meaning to be is that she sees

16    additional wear to the -- to the ridges and the valleys.

17    Q.   Okay.  So whatever it is in the other pictures, right --

18    whatever you see in the other pictures, she's telling you

19    apparently that she found the same thing as those other

20    pictures in the ridges and the valleys.  Fair?

21    A.   Can you -- can you restate the question?

22         I apologize.  I was trying to look at the photos while you

23    were asking that question.  I apologize.

24    Q.   No.  That's fine.

25         And if you need a second to do that at any time, I know

Jacqueline Draper                                          33
Continued Direct Examination by Mr. Miller

1    you'll let me know; right?

2    A.    Absolutely.

3    Q.    Now, what I was trying to ask you is, when you interpret,

4    as you already have -- when you say that her comment, "Same

5    thing as those," is in response to your question, what did you

6    see on the -- well, I'll read it exactly.

7         "Same thing" -- I'm sorry.

8         "Anything on ridge, valleys, etc?"

9         She's telling you that, like the pictures she sent, she

10   sees the same thing as those on the ridge, valleys, and etc.;

11   right?

12   A.    Correct.

13   Q.    What -- what did "etc" mean?

14   A.    I took her text to mean that she felt that -- "I'm seeing

15   very obvious wear and granular loss, particularly around the

16   edges," so et cetera.  Wear, tear, deterioration, et cetera,

17   just similar, as it's written in the exclusion in the policy.

18   Q.    So let's just be square.  "Etc" -- what does "etc" mean in

19   this context?

20   A.    Well, "etc" means et cetera.

21   Q.    Right.

22        What does it mean in this context?

23        When a team manager at State Farm is talking to an

24   adjuster at State Farm about a hail damage -- possible hail

25   damage to an insured's roof, what's "etc"?

Jacqueline Draper                                              34
Continued Direct Examination by Mr. Miller

1  A.   "Etc" means et cetera?

2       Can you...

3  Q.   Well, I'm trying to figure out -- you say -- exactly, you

4  say (as read), Anything on the ridge, valley -- ridge, comma,

5  valley, comma, etc, question mark?"

6       What else are you referring to besides "the ridge,

7  valley"?

8  A.   So the -- so the ridge and the valley, again, are the most

9  susceptible places.  So I'm just asking her, you know,

10 "Collateral ridge.  Valley.  Spatter.

11      "Anything else in your investigation?

12      "What else are you seeing?

13      "Tell me about your investigation," ultimately, is what

14 I'm asking.

15 Q.   Okay.  So, just so we're square, there's not another term

16 of art for other parts of the shingled roof besides the

17 shingle, the edge, the ridge, the valley that might have

18 accounted for "etc" or et cetera.  Is that fair?

19 A.   Or the rake or the eve --

20 Q.   Well, did you --

21 A.   -- or the soft metals or --

22 Q.   When you --

23 A.   -- the valley metal.  So any other susceptible place on

24 the roof that may or may not have hail, et cetera, just means,

25 What are the other pieces of your investigation?

Jacqueline Draper                                              35
Continued Direct Examination by Mr. Miller

1  Q.   Okay.  So if -- if I take that "etc" to -- and accept that

2  she understood it like you meant it, as you've just described

3  it, then it sounds like she's saying not only the ridge and the

4  valleys but all the "etc"s, all of the et cetera possibilities,

5  have the same thing as the five pictures of the shingles that

6  made it to your phone; correct?

7  A.   You would have to ask Tresa.

8  Q.   Well, I -- I -- I have asked her questions like that, but

9  right now, as her supervisor who she was asking whether this

10  was hail or wear, I'm asking you.

11       Can you answer it, or can you not?

12  A.   Will you ask it again, please?

13  Q.   Of all the things that you've mentioned -- the rake, the

14  eave, the soft metals -- the other things that can be damaged

15  by hail besides eaves, shingles -- I'm sorry -- besides eaves,

16  valley -- besides ridges, valleys, edges, and shingles fields,

17  is there anything else that it could mean, other than she sees

18  what she sees -- or what you're seeing in the five pictures of

19  shingles that she sent you -- she is seeing it everywhere else?

20  A.   I took it to mean that -- that, "Hey, here's some pictures

21  of what I'm seeing and some granular loss, and -- and I'm

22  seeing that on other parts of the roof as well" --

23  Q.   Okay.

24  A.   -- yes.

25  Q.   All right.  Now, in your process of trying to help a new

Jacqueline Draper
Continued Direct Examination by Mr. Miller

1  adjuster to have an opportunity to learn here -- I'm not sure

2  exactly how you said that -- did you ask her in your texts

3  anything about how the places that she sent you pictures of

4  feels?

5  A.    It looks like the only question that I asked her when she

6  sent that was in regards to these areas, and then she had

7  responded back in regards to -- that she had told the roofer

8  that she felt that it was -- that she felt that it was wear and

9  that his name was Jonathan.

10 Q.    Yeah.  I didn't ask you to tell me all the things you did

11 say.

12      I'm just asking you to tell me if you asked any questions

13 about how the places on the roof that she sent you pictures of

14 in the shingles -- how they felt.

15      Is there some other place, maybe some code, in here that

16 you might tell us means -- "This means 'How does it feel?'" or

17 did you ask?

18 A.    Well, looking at the text messages, it -- it doesn't look

19 like I asked.  It looks like she responded in regards to what

20 she felt that -- that it was.  It -- I would have usually had,

21 you know, a couple more text messages and asking them about

22 their investigation; and I can't quite see the time frame, so I

23 don't know if I was in a meeting or was doing something else

24 and trying to text her.

25      But I -- but I didn't get the chance to obviously send her

1   any more texts to ask her about her investigation, and she had

2   responded that she felt that it was wear, and I didn't see that

3   she had asked any -- any other questions in that part.  So I

4   didn't necessarily go further down to ask her about her -- her

5   investigation.

6   Q.    So the answer's, no, it's not in there; right?

7   A.    I don't see it immediately, no.

8         I had asked her a couple of questions about her

9   investigation.

10        She -- you know, Tresa's been handling claims for -- for

11  several years and is a very capable adjuster; and while she was

12  new to being a staff adjuster at State Farm, she's more than

13  capable of -- of handling claim files; and -- and it was not

14  uncommon for me to ask her a couple of questions about -- about

15  her investigation; and -- and she shared what ultimately she --

16  she determined from what she saw.

17  Q.    Okay.  So the answer's, no, you didn't ask her how it

18  felt; right?

19  A.    I did -- it doesn't look like I -- I had a chance to ask

20  her how it felt --

21  Q.    Okay.

22  A.    -- no, Mr. Miller.

23  Q.    Okay.

24  A.    It doesn't.

25  Q.    Thank you.

Jacqueline Draper                                               38
Continued Direct Examination by Mr. Miller

1        Now, just so you know about the times, it looks like, so

2    it might help you, that her texts were sent around 1:28 p.m. on

3    this day, of February 23rd of '21; and the whole thing ended

4    with her, "Ok thanks," six minutes later -- five or six

5    minutes, depending on how you want to analyze the clock there.

6        We'll put it up on the screen so you can see it.

7    A.   Thank you.

8    Q.   First text with anything about this claim -- and I'm not

9    talking about when you had first texted her and told her that

10   you'd taken some claims off of her at the bottom.  I'm talking

11   about -- about the Bates claim.  So that was at 1:28 and 56

12   seconds, and the last one was at 1:34:37 seconds, so just under

13   six minutes.  Do you see that?

14   A.   Okay.

15   Q.   And to your knowledge, there are no other texts between

16   the two of you about this claim.  Is that fair?

17   A.   Not that I'm aware of, no.

18   Q.   And by the way, there is no reference in the claim file,

19   when she came back or whenever she did it -- I'm not -- I was a

20   little confused if she did some of it in her van while she was

21   there and some of it back in the office; but wherever she did

22   it, there's no reference in the claim file about when it was --

23   I'm sorry -- that she talked or texted with you.  Is that fair?

24   A.   I -- if you don't see it in there, then I -- I trust that

25   it's not in there.

Jacqueline Draper                                          39
Continued Direct Examination by Mr. Miller

1   Q.   You have prepared today for this trial testimony, haven't

2   you?

3   A.   Yes, Mr. Miller, I've prepared.  Thank you.

4   Q.   And you did read the claim file again, at least the parts

5   you thought were important?

6   A.   I did, Mr. Miller, and I'm doing the best that I can to

7   answer your questions.

8   Q.   No, I -- I'm not saying you're not.  I'm just wanting to

9   make sure everybody has context here, Ms. Draper.  I'm not

10  arguing with you.  Okay?

11       You ready?

12  A.   Yes.

13  Q.   And there was five or six pages in the claim notes --

14  can't remember if it's five or six, but there's, basically,

15  five or six pages from February 5th, when Ms. Jacome first gets

16  the claim, until the last entry where you don't see anything

17  else happening.

18       You've looked at all that, I'm sure, haven't you?

19  A.   I have, Mr. Miller.

20  Q.   Okay.  Good.

21       Now, is there anything in her note that mentions her

22  interaction with you about this claim?

23  A.   Is there anything in her note that mentions this claim?

24  Q.   That --

25  A.   Well, she has a file note about her investigation of the

Jacqueline Draper                                                    40
Continued Direct Examination by Mr. Miller

1    claim.

2    Q.    Well --

3    A.    That's an inspection file note.

4          And she's made notes in the files; so, yeah, she -- she

5    talks about the claim in the claim file notes.

6    Q.    Well, maybe you didn't hear me.  That's -- that's not what

7    I -- at least that's not what I thought I said.

8          What I was trying to say is, is there any mention in her

9    note on the day that these texts are sent that she had any

10   interaction with you about this claim?

11   A.    I don't think there is.

12   Q.    And you did not put any notes in the file on the day of

13   this decision or, as a matter of fact, any day until the

14   decision to deny a second inspection on March 15th was made.

15   Does that sound right?

16   A.    That sounds right.

17   Q.    Okay.  Now, you mentioned --

18             MR. MILLER:  You can take that down.  Thank you.

19   Q.    (By Mr. Miller) -- Mr. Marks.  Was Mr. Marks someone that

20   you knew personally?

21   A.    I don't recall ever meeting him.

22   Q.    And is it fair to say -- of course, you've been deposed,

23   so it -- I -- obviously, I want to establish that.

24         You've actually been deposed on this case twice; right?

25   A.    Yes, sir.

Jacqueline Draper                                          41
Continued Direct Examination by Mr. Miller

1   Q.   Okay.  And you've got your depo there; right -- both of

2   them?

3   A.   Yes.

4   Q.   Okay.  If you -- if you need to refer to it, you just let

5   me know.

6        But you knew nothing negative about Mr. Marks, at least as

7   of the time of your depositions; is that correct?

8   A.   I -- I knew of Mr. Marks as -- as a roofer in the area,

9   yes.

10  Q.   Right.

11       I said you didn't know anything negative about him; is

12  that correct?

13  A.   We can say "yes."  I -- I -- I was aware of Mr. Marks.  I

14  know he was a bit challenging; and I knew, kind of, of his

15  prior reputation; but I -- I don't know those things for -- for

16  meeting him; and I -- I can't make that assessment, you know,

17  myself from -- from those things.

18  Q.   Did Ms. Jacome say anything to you about Mr. Marks and her

19  interaction with him, other than what's in the texts:  that he

20  was there, and he said something about getting an engineer and

21  "no offense"?

22       I think that was the words he used.

23       "Nothing personal."  Excuse me.

24  A.   I think she had mentioned that he was aggressive and, you

25  know, that was another reason why she wanted another set of

Jacqueline Draper                                                    42
Continued Direct Examination by Mr. Miller

1    eyes to take a look and -- and anticipated there potentially

2    being an -- being an issue based on their interaction, so...

3    Q.    All right.  So is there anything in the claim file that

4    identifies any interaction with Mr. Marks?

5    A.    Not -- not that I can recall.

6    Q.    No.

7          And -- and just -- let's go ahead and -- and look at your

8    deposition testimony to see if you said then what you say now

9    about Mr. Marks.

10         If you could open up your deposition -- let me find the

11   page here.  One moment.

12              THE COURT:  Which one, Mr. Miller?

13              MR. MILLER:  Yeah, I -- I --

14              THE COURT:  Which date?

15              MR. MILLER:  Oh, it's going to be Volume I, Judge.

16   Q.    (By Mr. Miller) Volume I, page 109, and I'm -- I'm at

17   page -- I'm sorry -- 108, the very bottom, line 25.

18         Are you there?  108, line 25?

19   A.    I think I'm there.

20   Q.    Okay.  I ask the question:  "Again, I'm not suggesting

21   anything at all like it is, I'm just trying to -- I would just

22   like to try to -- you to try to answer my question.  I want to

23   know if you have any specific information -- let's start with

24   whether you have heard a negative thing about Mr. Marks as a

25   contractor?"

Jacqueline Draper                                        43
Continued Direct Examination by Mr. Miller

1      And you said what?

2  A.   I said, "I think it was -- I believe it was a mutual

3  decision when he left State Farm.  That is what I've heard."

4  Q.   Ma'am, that is not anywhere near where I was, and that's

5  not the thing I just read.

6      You need to find page 108, line 25.

7      Are you at page 108, line 25?

8  A.   I guess I'm not.

9  Q.   No, you're not, at least not by my -- what I've got here.

10 A.   I apologize, Mr. Miller.  I'm doing the best that I can.

11 I'm not trying to throw you off, so I will -- I will do my best

12 to find it.

13     So there's four pages on one page, so that may be why I'm

14 a bit thrown off here.

15 Q.   Okay.  Well, if you have a four-page-on-a-page copy --

16 A.   Okay.  So it's...

17 Q.   There'll be one -- there'll be page numbers in the corners

18 of each page of those four-page.

19 A.   I think I've got it.

20 Q.   Well, let's -- let's see.

21     "Again, I'm not suggesting anything at all like it is, I'm

22 just trying it to -- I would just like to -- you to answer my

23 question."

24     Do you see that part?

25 A.   Yes.

Jacqueline Draper                                           44
Continued Direct Examination by Mr. Miller

1  Q.    Okay.  I went on to say, "I want to know if you have any

2  specific information -- let's start with whether you have heard

3  a negative thing about Mr. Marks as a contractor?"

4        And you said what?

5        "I don't recall anything specific"; is that right?

6  A.    "Regarding his reputation (verbatim) in that regard."

7        I wrote (verbatim) (as read), We hear things all the time

8  in regards to roofers and opinions that are given to us by

9  others.  But again, it doesn't have any bearing on us handling

10 claim files.

11 Q.    Ms. Draper, you're still not in the right spot.

12       Start by making sure that the question I read is what

13 you -- you're seeing at the line.

14       Do you see on the left side there's a line with 25 numbers

15 on it of each of those four pages on the one you're looking at?

16 A.    Yes, and I'm at 108, 25.

17 Q.    And at that -- 25 will be at the bottom of the page.

18 A.    Correct.

19 Q.    Okay?

20       Then the next page should be 109.  Are you going to 109?

21 A.    I can see it here, yes.

22 Q.    And can you tell that the question's been completed on the

23 next several lines?

24 A.    Yes.

25 Q.    Okay.  So can you find the question, "Again, I'm not

Jacqueline Draper                                              45
Continued Direct Examination by Mr. Miller

1  suggesting anything at all"?

2      That's on the line 25 of page 108.  Okay?

3      And then the next page, 109, line 1, "Like it is, I am

4  just trying to -- I would just like."

5      You see that?

6  A.  Yes.  It looks like you asked the question multiple times,

7  and then I wrote (verbatim), "I don't recall anything

8  specific."

9  Q.  Okay.  So you found the right spot; right?

10  A.  Yes.

11  Q.  And -- and you're right.  I did ask it multiple times.  As

12  I said at the beginning of the question, I'm just trying to get

13  you to answer it; right?

14      That's what was going on there that day.

15      Now, let's try -- see if you can do this time.  Go back to

16  page 104.

17      Let's see if we can do that.

18      And I'm at line 23 and going to go to just line 25.  Are

19  you there?

20  A.  Yes.

21  Q.  Okay.  And do you see where I ask the question, "Do you

22  have an opinion about Mr. Marks' reputation as a contractor?"

23      You find that?

24  A.  Yes.

25  Q.  And did you say, "I do not personally have an opinion,

Jacqueline Draper                                                    46
Continued Direct Examination by Mr. Miller

1    no"?

2         Is that true still?

3    A.   I did say that, yes.

4    Q.   Is it still true?

5    A.   I -- I don't personally have an opinion of -- of

6    Mr. Marks, and that was part of what I tried to convey during

7    my initial deposition:  that roofers and -- and their

8    reputations and none of that has any bearing on us handling our

9    claim files.  We're -- we're going to go out and do our

10   investigation.  We're going to handle the claim file on our

11   merits.  So whatever Mr. Marks's reputation is, it -- it has no

12   bearing on -- on me or handling the claim.

13        So -- so I -- I said I do not personally have an opinion.

14   I -- I don't have an opinion about Mr. Marks.  I -- I don't

15   even know him.

16   Q.   Ms. -- Ms. Draper -- right.

17        Ms. Draper, look, all I need you to do is answer my

18   question.  Mr. Leffel or Ms. Williams -- they get to get up

19   here and ask you whatever they want to.  All right?

20        But we can get through this today if you'll just answer

21   the question so I can go to the next one.  Will you do that?

22             MR. LEFFEL:  Objection, Your Honor, to the narrative.

23             THE COURT:  Overruled.

24   Q.   (By Ms. Landeros) All right.  Are you ready?

25   A.   Yes.

Jacqueline Draper                                          47
Continued Direct Examination by Mr. Miller

1    Q.    Okay.  Now, is it fair to say that you were never at the

2    Bates's home?

3    A.    That is fair to say.

4    Q.    And even to this day; right?

5          Never on their roof.  True?

6    A.    True.

7    Q.    Has anybody at State Farm let you know about what Eric

8    VanDorn says -- the former State Farm adjuster who works at

9    Berryman that we talked about in your deposition.

10         Has anybody told you what he says about the roof?

11   A.    No.

12   Q.    Have you -- have you been given his report about the roof?

13   A.    No.

14   Q.    Did you ask after your deposition where I was inquiring,

15   "What is it about the roof that Mr. VanDorn says?"

16   A.    No, I did not ask.

17   Q.    Okay.  Now, you were still responsible for the team that

18   had this claim -- was it until -- did you tell us October of

19   '21; is that right?

20   A.    I stopped handling claims in Oklahoma in August of '21.

21   Q.    Oh.

22   A.    I did a project, and then I accepted this position in

23   October, yes.

24   Q.    Okay.  So you actually were -- okay.

25         That makes sense.

Jacqueline Draper                                              48
Continued Direct Examination by Mr. Miller

1      Thank you.

2      Now -- so it would have been just up until August of '21

3  that you would have been responsible for a team member assigned

4  to this claim?

5  A.   Yes.

6  Q.   And I think it was about a month after that, that

7  Ms. Jacome left, if I remember right.

8      September or so?  Does that sound right?

9  A.   I don't -- I don't remember specifically, but I -- I think

10  it was in the fall of -- fall of '21.

11  Q.   Would she have been responsible for this claim, if there

12  was anything new to do, up till the time she left on the front

13  line?

14  A.   Unless it was reassigned to in-office -- after a certain

15  period of time, if the claim was closed, it reopens to our

16  in-office units, which I -- I believe, from my recent review of

17  the file, that appears to be what happened.

18  Q.   Okay.  All right.  Now, is the decision to make a

19  reinspection -- to -- to deny one -- excuse me -- if someone

20  asks for one, if you're going to deny it, is that something

21  that the team manager's involved in?

22  A.   Yes, we ask that our claim handlers, on full denials and

23  denials of second inspections -- make sure that those are --

24  are ran through their -- their leadership, their management, to

25  make sure that --

Jacqueline Draper                                                      49
Continued Direct Examination by Mr. Miller

1  Q.   Okay.

2  A.   -- you know, we agree with that assessment.

3  Q.   Yeah.

4       So, at the time that that was done on March -- I think it

5  was March 15th of '21, you would have still been there, and it

6  would've had to have gone through you to get done.  Ms. Jacome

7  wouldn't have had the authority to do it; right?

8  A.   She would not have had the authority to -- to deny a

9  second, correct.

10 Q.   Okay.  Now, is it fair to say, when that request came in,

11 at least when you were deposed about it, you had no memory of

12 actually reviewing the file to decide whether or not a second

13 inspection should be allowed?

14 A.   I don't remember the exact moment and the exact file in

15 which I -- I reviewed it.  I -- I did have an opportunity to

16 review it during my prep for the deposition and take a look at

17 it.

18      But can I honestly say that I remember exactly that

19 particular request?

20      If I'm being honest, I -- I don't remember the -- every

21 detail or -- or that exact situation, no.

22 Q.   Sure, sure.

23      Well -- and we're going to get to it.

24      You said that you had a practice, and you would have --

25 you think you would have followed the practice, when the

Jacqueline Draper                                          50
Continued Direct Examination by Mr. Miller

1   reinspection request came in; right?

2   A.   Yes, I always had --

3   Q.   Yeah.

4   A.   -- a process of -- of how we review the claim file and the

5   things that we're -- we're looking for, absolutely, and that's

6   what --

7   Q.   Yeah.

8   A.   -- I would follow.

9   Q.   Yeah.  I understand.

10       I'm not saying that you didn't look at it or -- I just

11  want to know that -- for sure that, whatever you looked at, if

12  you followed your exact process, did more or did less, you

13  don't actually remember because you don't remember doing it.

14  Fair?

15  A.   Yes, Mr. Miller, I -- I don't remember it specifically.  I

16  think that's fair to say.

17  Q.   Okay.  Thank you.

18       Now -- but I do -- I am interested -- I think the jury

19  would be interested -- to know what your process normally was.

20  So if somebody asks for a reinspection, I believe you told us

21  that you would, of course, look at the claim file; right?

22  A.   Yes.

23  Q.   That'd be in the claim notes as well?

24  A.   Yes.

25  Q.   And you would look at whatever came in requesting the

Jacqueline Draper                                                51
Continued Direct Examination by Mr. Miller

1   reinspection?

2   A.   Yes, typically, in the form of photographs that we would

3   get from the contractor or the policyholder.  We'll look at

4   that.

5   Q.   Sure.

6        And would you also -- would you also read, if there was

7   anything that came in with it, like a -- a letter or a

8   description of what they said was worthy of looking at -- an

9   email in this case -- you would have looked at that too,

10  wouldn't you?

11  A.   Potentially would look at that.  Typically, we're looking

12  for photographic evidence or something indicating that there

13  was new evidence that there was damage that we missed, and

14  typically, that was in the form of -- of photographs.

15  Q.   All right.  So it's possible, if I'm hearing you right,

16  you wouldn't even have looked at the letter or the email that

17  Mr. Marks covered his pictures with.  Is that what I'm hearing?

18       That's not really --

19  A.   If it was included...

20  Q.   I -- I -- I interrupted you.  I'm sorry.  Go ahead.

21  A.   That's okay.

22       If it was included in with the pictures being submitted by

23  the contractor, like, with their package requesting for the

24  second inspection, then, you know, absolutely.  I would try to

25  look at anything that they're trying to present to show new

Jacqueline Draper                                                    52
Continued Direct Examination by Mr. Miller

1   information for coverage under the claim.

2   Q.   Okay.  Now -- one second here.

3           MR. MILLER:  If we could put up 257 -- JX1.257.

4   Q.   (By Mr. Miller) This is the email that we were just

5   talking about.  See that?

6   A.   Yes, I can -- it's -- it's blurry, but I can see it.

7   Q.   Okay.  Well, if you need to look at your book, it's in --

8   it's in Exhibit 1, if you decide you do.

9       Does this help you remember whether or not you read this

10  email?

11  A.   Hang on.  Let me move the little picture out of the way.

12      I don't necessarily recall reading this, but, again, if it

13  was attached in with the photos, it wasn't uncommon to look

14  through the -- the documents or emails that -- that may have

15  come in.

16      So I can't say with complete certainty that -- that I -- I

17  would have read this, but, again, if it was attached with

18  that -- I'm -- I'm looking at the information that they're

19  trying to present in regards to there being new information or

20  anything that they're claiming that we missed from a coverage

21  standpoint.

22  Q.   So would there have been a estimate from the contractor

23  with this?

24  A.   There could have been.  Sometimes we just see photos

25  submitted because, really, they're trying to submit and say,

Jacqueline Draper                                                53
Continued Direct Examination by Mr. Miller

1   you know, "Hey," you know, "State Farm," you know, "we're

2   trying to show you this is what we feel like you missed."

3        And so, typically, we just see photographs; don't always

4   see estimates.  They do come in from time to time.  It just

5   really depends.

6   Q.   Well, how about this:  Do you know from your review of the

7   claim file whether or not there's an estimate from Mr. Marks --

8   or from Aegis in the claim file?

9   A.   I don't remember that specifically to answer your

10  question.

11  Q.   All right.  Now, is there anything in your review of this

12  email that you believe would have involved you suggesting some

13  follow-up by Ms. Jacome?

14  A.   So -- so this -- okay.

15       So I think the above said it came in from Jonathan Marks,

16  so he -- looks like he submitted this in with, you know, his

17  photos or estimate or whatever that he was presenting.

18       So if we're receiving the request for a second

19  inspection -- anytime that, you know, we're reviewing that,

20  and -- and there's any type of denial, there would be a

21  follow-up letter that would go with this.

22  Q.   Okay.  But, before the letter's written, in other words,

23  when you're actually trying to determine whether there's going

24  to be a second inspection, I'm asking is there anything in this

25  email that would have caused you to direct Ms. Jacome to take

Jacqueline Draper                                                    54
Continued Direct Examination by Mr. Miller

1    some action?

2    A.    It appears the contractor disagrees with State Farm's

3    decision in regards to the roof shingles.

4        So I -- I don't see anything -- I think it was apparent

5    that he disagreed with -- with the decision, so she's going to

6    continue to handle the claim, along with the policyholder, and

7    explain our decision on a second inspection and follow that

8    decision up in writing.

9        So not necessarily that I would see something that stands

10   out to me that she would follow up with Jonathan, other than,

11   maybe, to advise him that the second inspection had been

12   denied; but, again, our communications go through our

13   policyholder.

14   Q.    Well, what about the place in here where it says that

15   there were not enough pipe jacks paid for?

16       Would you have wanted your adjuster to say something or do

17   something about that to see if it's right or wrong?

18   A.    Certainly.  If -- if we missed pipe jacks and -- and --

19   that would be something that we would want to catch on a

20   reconcile and make sure that we're paying for, absolutely.

21   Q.    Right.

22       And so was there anyplace in the claim file where anybody

23   actually did an analysis based on this particular comment that

24   not enough pipe jacks had been paid for even though identified

25   as damaged?

Jacqueline Draper                                    55
Continued Direct Examination by Mr. Miller

1  A.  Not that I'm aware of.

2  Q.  And so I assume Ms. Jacome would have also been involved

3  in looking at this email; right?

4  A.  As the adjuster on the claim file, yes.

5  Q.  Sure.

6      And you would have wanted her to also look at the pictures

7  and see what she thinks; right?

8  A.  Absolutely, and --

9  Q.  And --

10  A.  -- she's going to look at the photos and what's presented

11  and -- and make a determination of whether she feels there is a

12  second or not and make that recommendation to -- to leadership

13  if she felt like it was a denial.

14  Q.  Okay.  And -- and, of course, it would be important --

15  because all you have to compare the pictures Mr. Marks sent

16  in -- you just have those -- you can only compare those to the

17  pictures that Ms. Jacome brought in; right?

18      That's the world --

19  A.  The pictures (inaudible).

20  Q.  I'm sorry.  Go ahead.

21  A.  Sorry.  I thought you were done.

22  Q.  I should have --

23  A.  I -- I missed --

24  Q.  -- I should have been probably.

25      The -- the world of your review is going to be the

1  comparison of Jacome's photos with the Marks photos to see if

2  you see anything new, new evidence.  Fair?

3  A.   Right.  We're looking for -- for new information or if

4  there's, you know, additional damage.  So, if -- if there were

5  additional pipe jacks that were missed -- I mean, Tresa's

6  human; and so, if she missed a couple of pipe jacks; and that

7  didn't get caught on the reconciliation; and it's absolutely

8  reconcilable; that's something that -- that we would owe for,

9  we want to make sure we got Mr. Bates paid for that,

10  absolutely.

11  Q.   Well, I think what I'm really trying to understand,

12  Ms. Draper, and -- is just simply this:  If that didn't get

13  done -- in other words, here it is:  Two State Farm people,

14  including the team manager, saw, pointed out, directly that

15  this is something that requires reconciliation, that didn't get

16  done, how can anyone have confidence that there was a real

17  examination of the email or pictures?

18  A.   So, again, the fact that she missed a couple of pipe

19  jacks, absolutely, we owe Mr. Bates for that.  We -- we should

20  have caught that and included it on the estimate, and I think

21  that that's since been -- been rectified; and -- and, you know,

22  any additional amounts that we owe to Mr. Bates, we would want

23  to do that.

24      But -- but, absolutely, we -- we looked at the photos,

25  and -- and we looked at -- and did our investigation.

1      And Tresa was on the roof with the roofer, and he had an

2  opportunity to -- to point out any damages that he did see.  He

3  was present for that.  And it's our practice to go over our

4  scope with -- with the contractor when we're there, so he would

5  have had an opportunity as well to point out those same things.

6      And so you see in the photos that the contractor submitted

7  are much the same that -- that Tresa took on her -- on her

8  inspection and are of the same wear and tear and granular loss

9  that -- that we were seeing.  So his photos that he submitted

10  were -- were consistent with that, so we feel very confident

11  about -- about Tresa's decision there so...

12  Q.   Yeah.

13      Well, that's not answering my question, at least I don't

14  think it is.

15      I just want to know that, since nobody, out of the two

16  people that we know looked at the information that came in and

17  were responsible to look for it -- nobody did anything about

18  the very specific problem that's pointed out here, small as it

19  may be, but everyone seems to agree it needed to happen -- the

20  question is how can you -- when you don't even remember this,

21  how can you be sure that anybody paid any attention to it at

22  all?

23          MR. LEFFEL:  Objection.  Asked and answered.

24          THE COURT:  Overruled.

25  Q.   (By Mr. Miller) You can answer.

Jacqueline Draper                                              58
Continued Direct Examination by Mr. Miller

1  A.   Okay.  Can you ask it again, then?

2  Q.   I'll try.

3       What I'm trying to find out is how can anybody have any

4  confidence that you actually gave it a college try -- let's use

5  the right words -- a reasonable evaluation of the request if

6  something pointed out directly and obviously to you in the

7  email was ignored by you and by Ms. Jacome completely, and you

8  don't remember it?

9  A.   So -- so part of my evaluation is to look at the file

10 notes and to review what Tresa has looked at.  It's to review

11 the photos and the overall decision on the roof and the

12 shingles; and -- and she supported that investigation, looking

13 at all of the different parts of her investigation; and -- and

14 I don't know if we've gotten there so far but to the ridges,

15 to -- to the valleys, the spatter, the collateral, all of those

16 types of things.

17      And so, yes, absolutely, if -- if -- but she is human.  I

18 think I mentioned that.

19      And so, yes, absolutely, if we missed the pipe jacks,

20 we -- we do owe for that; but it doesn't mean that she

21 didn't do a thorough investigation or inspection, and it

22 doesn't mean that she missed the call on the roof.

23 Q.   Ms. Draper, let's -- let's try it a different way.

24      First, Ms. Jacome failed to include these items in her

25 original estimate; correct?

Jacqueline Draper                                            59
Continued Direct Examination by Mr. Miller

1    A.   Yes, sir.

2    Q.   Okay.  Second, Ms. Jacome failed to recognize and respond

3    to this issue when she got the email in.  Yes?

4    A.   I -- I don't know if Tresa had a -- a conversation with

5    Mr. Marks on -- in regards to the pipe jacks or how she felt --

6    if the pipe jacks were or weren't damaged from that standpoint.

7    I think, since then, we've confirmed that they were damaged

8    and -- and have been included.

9    Q.   Is there anyplace in the claim file that Ms. Marks -- I'm

10   sorry -- Ms. Jacome made any sort of note or any sort of

11   inclusion to indicate that she did anything about this sentence

12   in the email?

13   A.   I don't necessarily recall that from my review.

14   Q.   Right.

15        And what about you?

16        Is there anyplace in the claim file that indicates you

17   made any sort of note about this sentence that was missed on

18   the roof by Ms. Jacome, in the email by Ms. Jacome, and now

19   presented to you for decision?

20        Is there anyplace --

21   A.   Not --

22   Q.   -- in the file?

23        Go ahead.

24   A.   Sorry.

25        Not that I'm aware of.

Jacqueline Draper                                          60
Continued Direct Examination by Mr. Miller

1   Q.   I -- I recognize that, you know, you're -- I understand

2   what you're going to say and have always said about the Marks

3   pictures.

4        You do know that other people are going to decide --

5   they're here, and they're going to decide what they think about

6   them.  So you and I can just accept that I don't get to say,

7   and you don't get to say.  Fair enough?

8   A.   Fair enough.

9   Q.   So let me ask my other question again that I -- I think I

10  tried to ask.  I might not have.

11       Let's assume for a moment that there is new damage -- not

12  in a Jacome picture -- that is to ridge shingles in Mr. Marks's

13  pictures.  Okay?

14       You would be the one to decide if that was new because you

15  have to decide whether to deny the second inspection.  Is that

16  fair?

17  A.   So the adjuster can ultimately make a decision to do a

18  second inspection on that claim, so they only need support from

19  leadership if they feel that there is no new evidence that

20  warrants a second inspection.

21  Q.   Ma'am, that's -- that's what I was trying to ask you.

22       If -- you've got to decide if it's going to be a denial,

23  which is what you decided; right?

24  A.   Correct.

25  Q.   Okay.  And, for you to decide if there's a denial, all --

1  your whole world of information to make a comparison are those

2  pictures from Jacome and Marks.  We've agreed on that; right?

3  A.    And the file investigation and the file notes.

4  Q.    Well, that -- that's fine, but if you're going to -- I

5  mean, Mr. Marks doesn't get to see what's in the file notes,

6  does he?

7  A.    No.

8  Q.    No.

9        Ms. Jacome can write whatever she wants to.  They -- it

10  doesn't even have to be what Mr. Marks would consider to be

11  relevant or material, and he would never know.  Agreed?

12  A.    Can you restate the question?

13  Q.    Yeah.

14        It's like anybody that's taking notes.  You can write any

15  note you want to, if -- if you want, and you can decide what's

16  relevant.  You can decide what's material when you're taking

17  your own notes; correct?

18  A.    So Tresa's investigation and the way that she has her file

19  notes is speaking to her investigation of that claim file:

20  what she saw when she was out there, what she touched or she --

21  she felt.

22        Did she feel any hail bruising?

23        She's going to be able to speak to that.

24        If I had any questions when I reviewed her second

25  inspection photos, file notes, Mr. Marks's information, you

Jacqueline Draper                                              62
Continued Direct Examination by Mr. Miller

1   know, I would have had a conversation with her.

2         So I felt, based on the information that Mr. Marks had

3   presented -- the photos are very similar -- of the same

4   granular loss and wear and tear that we were seeing when we did

5   our initial inspection, and that second inspection was not

6   warranted.

7   Q.  All right.  Ma'am, you -- I'm asking a question about her

8   notes.  I just want to have a base level of understanding with

9   you.

10        A person can write, whatever they want to, down.  If it's

11  their notes, and they don't want to show them to anybody,

12  no one's going to know how accurate they are.  Is that fair?

13  A.  Her notes were supported by her photos --

14  Q.  Can you --

15  A.  -- and her --

16  Q.  -- answer my question?

17  A.  -- investigation --

18  Q.  Can you answer my question?

19              THE COURT:  Mr. Miller, Mr. Miller, let her finish --

20              MR. MILLER:  All right.

21              THE COURT:  -- and if you want to direct something --

22  make a motion about her testimony, you need to direct that to

23  me as the judge --

24              MR. MILLER:  All right.

25              THE COURT:  -- but don't cut her off, please.

1          MR. MILLER:  Yes, I understand.  Sorry, Judge.

2     Q.   (By Mr. Miller) I think she says you're going to finish.

3     Go ahead.

4     A.   I forgot what question I'm even answering at this point.

5     Can you ask it again?

6          MR. MILLER:  Judge, I -- I would ask that you ask the

7     witness to try to answer the question.

8          THE COURT:  Ms. Kerr, will you repeat the last

9     question -- substantive question that was asked for Ms. Draper?

10         (The question is read by the court reporter.)

11    A.   I don't think that's a fair statement, and so I was trying

12    to answer the question when I explained that her file notes are

13    a direct example of -- of what she took in the photos.  She's

14    speaking to and being able to back that up in the photos that

15    she has in the claim file as well as the scope notes.

16    Q.   (By Mr. Miller) How about this question, then:  Did you

17    know that Ms. Jacome told us yesterday that she was trained to

18    make a decision about whether she's going to deny or pay a

19    claim and then go find photos and take photos that support

20    whatever decision she made?

21         Did you know that?

22    A.   So I don't know in what context she was explaining, but,

23    you know, they are expected to do their investigation; and --

24    and, ultimately, if they feel that there are photos that

25    support that decision, then we absolutely need to be able to

Jacqueline Draper                                         64
Continued Direct Examination by Mr. Miller

1  see those in the claim file.

2      So I don't know in what context that -- that was asked to

3  Tresa to be able to speak upon that.

4  Q.   Well, how about this:  Is it State Farm's position that

5  they train their -- as far as you're concerned, they train

6  their adjusters that, if you're going to deny something, then

7  take pictures to support your denial; and if you're going to

8  pay it, take pictures to support paying it and not --

9  A.   We want --

10 Q.   -- anything else?

11 A.   Sorry.  I almost cut you off there.

12     So we want to take photos that tells the holistic picture

13 of the claim file, so we don't want to just take, you know,

14 pictures of -- of one particular thing.

15     So we ask our adjusters, in this particular situation,

16 types of cause of loss.  I mean, they're going to be looking at

17 every elevation.  They're going to be looking at every slope on

18 the roof.  They're going to be looking at every ridge, every

19 valley, every vent, things like that, that they want to include

20 in the claim file.

21     So we're -- we're not trying to paint a certain picture.

22 We want to take a -- a -- a holistic picture that tells the

23 story of what your investigation and your inspection looked

24 like when you were out there, you know, being the eyes out

25 there on -- on the inspection, so --

Jacqueline Draper                                                  65
Continued Direct Examination by Mr. Miller

1   Q.   So -- so if that was the impression she got from her time

2   on your team, that would be incorrect.  Is that fair?

3   A.   We train our adjusters, again, to tell the story of -- of

4   the investigation and inspection that they did --

5   Q.   And you say --

6   A.   -- and so --

7   Q.   -- a -- a "holistic story," all -- the whole story; right?

8            MR. LEFFEL:  Your Honor, question and answer.

9            MR. MILLER:  Sorry?

10           THE COURT:  Mr. Miller, do let her finish and then --

11   and then ask the question; but please continue, Mr. Miller.

12   Q.   (By Mr. Miller) I just want to make sure that we have what

13   you're going to say.

14       You -- you're saying that your view of your training is to

15   tell the adjuster to take pictures of the entire -- holistic

16   approach of the examination, the inspection, and that that will

17   take care of supporting whatever decision they make; is that

18   right?

19   A.   We want our adjusters to do a complete and thorough

20   investigation; so that includes documenting what's covered;

21   also includes documenting things that may not be covered as it

22   may speak to the actual story and the events that happened at

23   the home, you know.

24       An investigation and inspection of the home tells a story

25   of -- of the loss, and so there -- again, I don't know to what

1  context she was trying to explain; but, as I -- as I've

2  explained a couple of times, it's important for us to take a

3  thorough investigation and document that as such in our photos.

4  Q.   Now, just so we're square, the contractor, like Mr. Marks,

5  is not allowed to see anything inside the claim file.  Is that

6  true?

7  A.   The contractor is not a party to the contract, no; but the

8  policyholder would be able to -- be able to see the photos and

9  the estimate, any written communications, things like that.

10 We -- we share that with them, absolutely.

11 Q.   Well, now, you don't show -- share with the policyholder

12 any of that unless they know to ask; correct?

13 A.   It's shared on the online claims status.

14 Q.   So you're saying that the policyholder can go in and look

15 online, if they know how to do that, and see parts of the claim

16 file; or are you saying it's all of the claim file?

17 A.   It's not the -- the -- like, the work product; but, yes,

18 it would be the photos and -- and written communications and

19 estimates.  They can log on to StateFarm.com and online claim

20 status and be able to see those parts of their claim file,

21 whether they're going to do that online or through an app.

22 Q.   Okay.  If they know about it; right?

23      Correct?

24 A.   Yes, and -- and that's shared out in various forms when

25 you sign up for your policies --

Jacqueline Draper                                                    67
Continued Direct Examination by Mr. Miller

1   Q.   Did -- did --

2   A.   -- and communications that State Farm sends out.

3   Q.   Did Ms. Jacome tell, in anything you've seen written, or

4   did you tell anything you -- that you were involved in writing,

5   the policyholder that they could look online and see the

6   pictures that Ms. Jacome took?

7   A.   I would have to look at the system-generated documents

8   that were in the file that -- there's -- there's particular

9   information that goes out to all of our policyholders notifying

10  them -- info graphics, if you will -- in regards to the

11  handling of their claim and things that they can see online.

12       There's also -- when they get their declarations page each

13  year and communications from their agent letting them know

14  about the different technology and options that they have to

15  monitor their policies and claims and -- and -- and everything

16  that they have available to them.

17  Q.   Do you know if Mr. Thomas Bates or Mr. Gary Bates ever had

18  any information -- specifically those two people -- from

19  anybody in the claims department during this claim that they

20  could access the State Farm pictures or anything else that

21  State Farm allows on the Internet?

22       Yes or no?

23       Do you know?

24  A.   I personally don't know that, if they specifically had a

25  conversation or if someone from -- physically from the claims

1  department sent that, but that's kind of why I explained the

2  info graphic process that goes out.

3       And there's system-generated information that's sent to

4  our policyholders -- and, again, the same information that's

5  sent out to all of our policyholders on -- on the technology

6  options that they have, if they have a claim.

7       But I don't know specifically if Tresa sent an additional

8  communication to the policyholder, and I don't know if they

9  specifically had a conversation about that.

10 Q.   Did you see any --

11 A.   I would have to look at the file.

12 Q.   Did you -- did you see anything like that documented from

13 your review in the claim file?

14 A.   I don't recall looking for that specifically, so I can

15 honestly say I don't -- I don't specifically remember that from

16 the claim file --

17 Q.   Well, how --

18 A.   -- if it is there.

19 Q.   Well, how about this:  Is anybody going to get to see the

20 claims notes, who's a customer of State Farm's, without

21 bringing an action like this?

22 A.   The file notes, no, are not shared.  Those are internal

23 information in regards to the inspection and handling of the

24 claim file.

25 Q.   All right.  Now, again, back to what I was trying to ask

1    you.  When you're doing the final review before the denial of a

2    reinspection can happen -- like, we've -- we've established

3    that's your final decision -- now -- on the denial; right?

4        You with me?

5    A.    I think I'm following you, yes.

6    Q.    And when you're doing that, is it fair to say that what

7    you know to compare the Marks pictures to is the Jacome

8    pictures?

9        That -- that -- that's the only real things you can

10   compare -- Marks's pictures and Jacome pictures -- because he

11   doesn't know how to respond to the claim notes.  It's got to be

12   the pictures.  Is that fair?

13   A.    Again, I don't think that that's a fair statement, because

14   when I'm looking at the additional information that's

15   presented, and I'm looking at the claim file, I'm looking at

16   the holistic investigation.

17       So she is explaining, and the photos are able to -- to

18   back that up.  So I'm taking into consideration conversations

19   with Tresa, the review of the file notes, the photos that are

20   in there, as well as what Mr. Marks is presenting.  So it's not

21   just a comparison of side-by-side pictures.  It's taking into

22   account all of the -- all of the investigation, all of the

23   inspection.

24   Q.    Do you believe that this Haag training that you watch year

25   after year that's the same -- do you believe that there is

Jacqueline Draper                                                    70
Continued Direct Examination by Mr. Miller

1   instruction in that training that says that shingle edges are

2   more susceptible to hail damage than what's inside the -- some

3   people say "face," some people say "field."  Do you believe

4   that's part of the training?

5   A.    Can you restate the question?

6   Q.    I'll try.

7         I'm asking you do you know that the Haag training where

8   the president of Haag, the engineer, gets up -- that there's

9   one of the trainings that you watch every year that says the

10  edges of shingles are more susceptible to hail damage than the

11  body of the shingle, the inside portion of the shingle?

12        You remember seeing that in these year-after-year videos?

13  A.    That the shingle edges are more susceptible than the field

14  shingles?

15  Q.    If you mean, by "field shingle," the -- inside the edges,

16  yes.

17        You remember seeing that in the Haag training?

18  A.    I -- I don't recall seeing that.

19  Q.    Okay.  Well, do you think that the edges of single

20  shingles are more susceptible to hail damage than the inside of

21  the shingle away from the edges?

22  A.    I certainly think that it just depends necessarily.  So

23  there may be granular loss throughout the edges.  They may be

24  starting to wear, and -- and that may cause them to be

25  susceptible and -- and maybe not.  Maybe there's, you know,

Jacqueline Draper                                    71
Continued Direct Examination by Mr. Miller

1    other factors at play given how steep the roof was, given

2    how -- what kind of decking that they have, the density of the

3    hailstones.

4        So there's a lot of different factors at play.  It doesn't

5    necessarily just mean that -- that those are more susceptible.

6    Q.   All right.  So when you say, "It just depends," does that

7    mean the edges could be more susceptible to hail damage than

8    the internal parts of the shingle?

9        Is that your testimony now?

10   A.   They certainly could be, but, again, there's a lot of

11   other factors that -- that are at play.  It's not to say that

12   the edge of a shingle is never damaged by hail.  I don't think

13   anybody's saying that.  But it doesn't necessarily mean

14   that that edge of that shingle kind of explains in regards to

15   the granular loss.

16       So if there's some footfall that's on there, or there's

17   some granular loss on the edges, or the edges are really worn,

18   and just due to some manufacturing defect and the way that the

19   application of the tar can be, sometimes granulars can start to

20   wear off the shingles in those areas, and so the mat's already

21   exposed.

22       So there are a lot of different factors that could play

23   into the damage that's occurred from -- from hail.

24   Q.   All right.  Have you learned more since your deposition?

25       Has something happened in your life to help you understand

1    that the edges can be susceptible to -- more susceptible to

2    hail damage than what you told me in deposition?

3         Did -- did --

4    A.   Has there -- something happened -- did you ask if

5    there's -- something happened in my life?  Is that what you

6    said?

7    Q.   Yeah.

8         Did somebody train you, or did something else happen,

9    because of this case that caused you to decide now that the

10   edges of shingles can be more susceptible to hail damage?

11   A.   So, again, I think we're going to take every roof on its

12   merits; and so, if there's damage that's an actual hail bruise

13   to the edges of -- of the shingle, then -- then that's what

14   we're going to pay for, if it is, in fact, a hail bruise.

15   Q.   Ma'am --

16   A.   So I can't speak specifically if they are always going to

17   be more susceptible than the field of the shingles.  Depends on

18   the field of the shingles.  Maybe there's more granular loss to

19   the -- the field of the shingles, and -- and it would be

20   impacted by a hail bruise more.  Maybe that area is a softer

21   part in between 1-by-8 decking, and so that's why you'll see

22   sometimes that that's more susceptible.  Maybe they've got --

23   you know, not to get too technical with your question here, but

24   there's a lot more that -- that goes into it.

25   Q.   Well, that's why I'm asking if something's changed.

Jacqueline Draper                                                          73
Continued Direct Examination by Mr. Miller

1      When you were deposed on May 16th of 2022, you said very

2  clearly that the edges are not more susceptible to hail damage,

3  didn't you?

4  A.   And so, again, I -- I -- I explained I don't know that

5  they are more susceptible.  There's a lot more at play.

6  Q.   Well, I -- I know --

7  A.   I explained that --

8  Q.   -- what you said...

9           THE COURT:  Ms. Draper, let Mr. Miller finish his

10 question.

11 Q.   (By Mr. Miller) Let's --

12           THE WITNESS:  Okay.  I'm sorry.  I thought I was

13 still finishing my answer.

14 Q.   (By Mr. Miller) Go to page --

15 A.   Please go ahead.

16 Q.   Go to Volume II, page 242.

17 A.   I am there.

18 Q.   All right.  And line 14.

19      You there?

20      I want to --

21 A.   Yes.

22 Q.   -- I want to make sure we're on the same thing.

23      I'm going to read my question.  Hold your hand up, please,

24 if you're not following along so that we know you're in the

25 right spot.  Okay?

Jacqueline Draper                                            74
Continued Direct Examination by Mr. Miller

1    You ready?

2    A.    Yes.

3    Q.    Okay.  "So if a -- if hail hits this -- these edges of the

4    shingle, the same edges that you say for rain, even, and

5    walking across, can show damage, you do not think that the

6    edges are more susceptible when struck by hail?

7        "Is that the testimony of you as -- at this time, the team

8    manager for Mrs. -- or Ms. Jacome?"

9        And you answered what?

10   A.    I answered, "Correct."

11   Q.    There was no other explanation about the possibilities

12   based on all these varying factors that I was lost in many

13   times, was there?

14       It was a simple "correct"; right?

15   A.    I answered, "Correct."

16   Q.    Okay.  Do you remember seeing in the Haag videos support

17   for your answer then or support for your answer now, either

18   one?

19   A.    Support for my answer then or support for my answer now?

20       I mean, so -- so, again, I feel like I'm kind of

21   reanswering the same questions.

22       I -- I don't recall exactly that particular piece of the

23   six-hour training of exactly what -- what they talked about to

24   reiterate that for you.  I apologize.

25   Q.    That's okay.

1       Do -- do you think that it does talk about it, though?

2       Is that what you're saying?

3   A.   I -- I would have to watch them again if it does.

4   Q.   Well, let's just go and -- these have already been

5   admitted, so we don't have to bore everyone with the whole

6   thing, but we're going to just cue it right up on JX11.

7           MR. MILLER:  If you could pull up JX11, and I'd ask

8   you to go to...

9   Q.   (By Mr. Miller) Now, you recognize that fellow, don't you?

10  A.   I do.

11  Q.   And he -- he does a lot of these Haag trainings.  I think

12  they identify him as the president of Haag.  You remember that?

13  A.   Yes.

14  Q.   You know his name?

15  A.   I don't recall it right now.

16  Q.   Okay.  All right.

17          MR. MILLER:  Are you -- we at 725?

18          MS. MCGUIRE:  Yes.

19          MR. MILLER:  Okay.

20  Q.   (By Mr. Miller) Can you see it all right?

21       Hold your hand up if --

22  A.   I can see it.

23  Q.   Hold your hand up if you cannot hear it when we start it.

24  Okay?

25          MR. MILLER:  Okay.  Go ahead.

Jacqueline Draper                                                        76
Continued Direct Examination by Mr. Miller

1        (Video played.)

2              MR. MILLER:  Okay.  That's it.

3   Q.   (By Mr. Miller) Now, does that remind you --

4              THE COURT:  Mr. Miller, get to the microphone,

5   please.

6        Thank you, sir.

7              MR. MILLER:  Yes.

8   Q.   (By Mr. Miller) Ms. Draper, does that help your

9   recollection of the videos you watch every year what the

10  president of Haag says about the higher propensity and

11  susceptibility of the shingle edges to hail damage than the

12  rest of --

13  A.   Yes.

14  Q.   -- the shingle?

15       Okay.  And -- and do you have any reason to disagree with

16  the president of Haag when he says this?

17  A.   For actual hail damage and hail bruising, no, I don't -- I

18  don't disagree with him.

19  Q.   All right.  Now, by the way, Haag is -- as you understand

20  it, Haag is connected to State Farm how?

21  A.   Haag is an engineering firm that supplies some training

22  materials in regards to -- to hail and wind damage to various

23  roofing and building materials.

24  Q.   Okay.  And do you -- but do you know how it is that

25  State Farm is related to them in allowing Haag to do the

Jacqueline Draper                                                        77
Continued Direct Examination by Mr. Miller

1  training that you get certified in year after year as a

2  proximity, now, section manager?

3  A.   Do I know how we are related to them?

4       No.

5  Q.   I mean, do you know why it is that Haag is providing this

6  training, and State Farm's allowing it, for -- I guess it's for

7  all of their proximity adjusters; is that right?

8  A.   Correct.

9  Q.   Okay.  Do you have any idea -- maybe you don't know, but

10  do you have any idea why that is going on?

11  A.   Do I know why it's going on, that they're watching it,

12  to -- to upscale the adjusters on claim handling?

13  Q.   Well, I meant -- I didn't ask a very good question.  I'm

14  sorry.

15       Do -- do you know why it is that State Farm has selected

16  Haag to provide this information and this certification to its

17  proximity adjusters?

18  A.   I do not.

19  Q.   Hopefully not going to have to go all into this because

20  we've heard about it already, but I wanted to just ask from

21  your perspective -- and you might remember in the deposition we

22  talked about it quite a lot, but, just summarily, you did

23  become aware, didn't you, later -- much later, during your

24  deposition, that Ms. Jacome had incorrectly identified the age

25  on the soft metal vents, pipe jacks, and that sort of thing on

Jacqueline Draper                                              78
Continued Direct Examination by Mr. Miller

1    the roof.  You remember that?

2    A.    I do remember that.

3    Q.    And I just want to make sure the jury understands you

4    never knew that back in February or March of 2021, did you, or

5    at least there's no note of it.  Fair?

6    A.    Did I -- did I know that she had the wrong age for the

7    vents?

8    Q.    Yes.

9    A.    I -- I don't recall knowing that.

10   Q.    Right.

11         Because, again, if you would have known that, you would

12   have asked her, especially in a training mode, to go back and

13   make a reconciliation even if it was for a small amount of

14   money, wouldn't you?

15   A.    Correct.

16   Q.    Because, if she put 20 years on the metal, and it should

17   have been 9 years, then that would have been some amount of

18   money more paid (verbatim) to the insured under the ACV policy.

19   Is that fair?

20   A.    Correct.

21   Q.    Okay.  Did you ever come to understand why it is that she

22   knew it was a 9-year-old roof, but she put 20 years into the

23   estimate?

24         Did you ever learn?

25   A.    I have not.

Jacqueline Draper                                          79
Continued Direct Examination by Mr. Miller

1    Q.   And, certainly, at the depositions, you admitted that you

2    had no idea why she would do something like that.  Agreed?

3    A.   I -- I don't recall why she put that age, no.

4    Q.   Now, at the first deposition, you actually declared -- in

5    fact, the reason it got stopped is because you declared in that

6    deposition that those vents had never been replaced.  The pipe

7    jacks had never been replaced.  You remember that?

8    A.   I do.

9    Q.   And we asked more questions about it to try to find out

10   how you would come to believe that.  Remember that?

11   A.   Yes.

12   Q.   Okay.  Excuse me.

13        And you said that the -- by looking at the 2012 claim

14   file -- ultimately, you said, that's how you knew that the pipe

15   jacks had never been replaced.  Is that what you said?

16   A.   I think I did.

17   Q.   But first you told us, before we got there, that the 2012

18   pictures of the pipe jacks were in the actual 2021 claim file.

19   You remember saying that?

20   A.   I don't, but I believe you.

21   Q.   And, in fact, they are not and never have been, have they?

22        Let me --

23   A.   I believe there's photos of the roof in the prior claim,

24   yes.

25   Q.   Well, let me make -- clarify my question.

Jacqueline Draper                                              80
Continued Direct Examination by Mr. Miller

1    The 2021 claim file does not have any pictures of the 2012

2    pipe jacks or roof in it.  Is that true?

3    A.    They wouldn't.  That's correct.

4    Q.    Right.

5          You said they did, though, in the deposition, didn't you?

6    A.    I said the 2012 pictures are in the 2021 claim file?

7          I -- I don't know that I would say that.  I don't -- we

8    wouldn't cross claim files.  So I don't recall saying that.

9    Q.    Well, looks like at -- this is going to be in Volume I,

10   okay, page 142.

11   A.    Are you pulling it up, or do I need to --

12   Q.    No, you -- you --

13   A.    -- do something?

14   Q.    No, we don't -- unless the judge would let us.  I think --

15   I think we could, but I --

16         MR. MILLER:  Judge, do you want us to pull it up, or

17   would you prefer --

18         THE COURT:  Let's -- let's go on the headset.

19         MR. MILLER:  Okay.

20    (Bench conference on the record after headsets check.)

21         THE COURT:  Mr. Miller, I am confused.  What is going

22   on here?

23         MR. MILLER:  You mean about the specific question I

24   asked you or her?

25         THE COURT:  Her.

Jacqueline Draper                                              81
Continued Direct Examination by Mr. Miller

1          MR. MILLER:  It's my --

2          THE COURT:  You're -- you're basically setting up an

3    impeachment question by testifying to what -- or asking her

4    questions as to what she testified to?

5        I just -- I -- are you refreshing recollection?

6        Are you impeaching?

7        What are you doing with this?

8        And I -- I -- I did not know -- I was looking over at

9    defense counsel.  I did not know why you weren't objecting.

10         MR. MILLER:  Well, I -- I mean, I'm attempting to

11   impeach her, Judge.

12         THE COURT:  Okay.  But with what, because you've set

13   up the questions.  She hasn't yet testified to anything on

14   these things that you would impeach her on.

15         MR. MILLER:  Okay.  That -- I understand, Judge.

16         THE COURT:  I -- I'm being patient with you,

17   Mr. Miller, because she is going on and on and not giving you a

18   "yes" or "no" question (verbatim); and if -- in the future, if

19   she -- if you're asking her a question that is a "yes" or "no"

20   response, and she doesn't give you a "yes" or "no" response,

21   you can move to strike that testimony.  You can move me to

22   instruct the witness to give a "yes" or "no" response.

23       We need to move this along.  I know you're being patient

24   with her, and I'm trying to be patient with both of the

25   parties, but we're going to have to get through a lot today,

Jacqueline Draper                                              82
Continued Direct Examination by Mr. Miller

1  and so we need to tighten this up going forward.

2          MS. LANDEROS:  And -- and ,honestly, Judge, I was

3  trying to go faster with the way I was doing this.  I

4  understand what you're saying, though.  I thought I could jump

5  to the point quicker, but, obviously --

6          THE COURT:  Yeah.

7          MR. MILLER:  -- it didn't work.

8          THE COURT:  Yeah.  Ask her the question --

9          MR. MILLER:  Okay.

10          THE COURT:  -- and then, if she contradicts, then

11  I'll allow you --

12          MR. MILLER:  Okay.

13          THE COURT:  -- to impeach her with that testimony.

14      Anything further, Mr. Miller?

15          MR. MILLER:  No.

16          THE COURT:  Mr. Leffel?

17          MR. LEFFEL:  No, Your Honor.

18          THE COURT:  Okay.  Thank you.

19      (End of bench conference.)

20          MR. MILLER:  Okay.  All right.

21          THE COURT:  Mr. Miller, I'm going to ask you to start

22  over.

23          MR. MILLER:  Yes, I'll do it.

24  Q.   (By Mr. Miller) Now, Ms. Draper, what I was inartfully

25  trying to find out from you is if you attempted to tell us in

1   your deposition that the 2012 pipe jack information -- and, by

2   that, I mean the pictures -- were in the 2021 claim file in

3   support of your declaration that they had never been changed?

4   A.   So those 2012 photos, no, are not in the 2021 claim file.

5   Q.   Did you try to tell us they were under oath?

6   A.   Did I try to tell you that 2021 claim photos were in a

7   2021 claim file?

8   Q.   2012 --

9   A.   I --

10  Q.   2012 in 2021.

11  A.   You have access to them through the 2021 file, but,

12  holistically, in that claim file specifically, no, it's not in

13  there.

14  Q.   I know -- okay.

15       I understand.

16       I'm asking you, if, when you were under oath in the first

17  deposition, you tried to say that your support for the

18  position -- the declaration that they'd never changed the pipe

19  jacks was that the 2012 pipe jack photos were in the 2021 claim

20  file.  Did you say that?

21  A.   I don't believe those photos are in the 2021 claim file.

22              MR. MILLER:  I was asking for a "yes" or "no," Judge,

23  and I object.

24              THE COURT:  Ms. Draper, you need to answer the

25  question "yes" or "no."

Jacqueline Draper                                              84
Continued Direct Examination by Mr. Miller

1   A.   No.

2   Q.   (By Ms. Landeros) Okay.  Then let's -- let's look at

3   page -- first volume -- 142, line 15.

4   A.   Can you say it again?

5   Q.   Yes.

6        142; and I -- I said "15" but line 12.

7        142.  Line 12.

8   A.   Okay.  I'm there.

9   Q.   Okay.  And -- and I asked the question at line 12, "How do

10  you know that?"

11       And you answered what?

12  A.   "They are the same vents that were on the roof when we did

13  the inspection in 2012.

14       So your question was -- before that was in regards to the

15  photos, so --

16  Q.   Ma'am --

17  A.   -- this is a little bit of a different question.

18  Q.   Yeah.  I'm going to finish it if you'll just let me do the

19  questioning.  Okay?

20       You ready?

21       So your answer was, "They are the same vents that were on

22  the roof when we did the inspection in 2012."

23       And my question is, "Where is the proof of that?"

24       And what did you say?

25  A.   "The photos are in our file."

Jacqueline Draper                                                    85
Continued Direct Examination by Mr. Miller

1   Q.   No.

2        The next thing you said is, "You can look at the photos

3   and they indicate that they are the same vent."

4        That's what you said; right?

5   A.   Yes.

6   Q.   And then I said, "What photos are you looking at -- at

7   that -- at -- that indicate -- what photos are you looking at

8   that indicate that?"

9        And what'd you say?

10  A.   "The photos in our file."

11  Q.   And I said, "In this claim file?"

12       And you said what?

13  A.   "Yes."

14  Q.   And you were well aware that we only had the claim file

15  from 2021.  That's all you had said you'd prepared for.

16  Remember that?

17  A.   I didn't know at the time that you weren't provided the

18  2012 claim file, which is also our file.

19  Q.   Well, ma'am, what I'm saying is now you were asked two

20  different times in that deposition whether or not you'd looked

21  at anything else besides the 2021 claim file to prepare for

22  your deposition, and you said no.  That was all you looked at;

23  is that correct?

24            MR. LEFFEL:  Objection, Your Honor.  Relevance.

25            THE COURT:  Sustained.

Jacqueline Draper                                                    86
Continued Direct Examination by Mr. Miller

1   Q.   (By Mr. Miller) All right.  Ms. Draper, in fact, it was at

2   the end of that process that we stopped the deposition and got

3   the 20 -- 2012 -- 2012 claim file; correct?

4   A.   Yes.

5   Q.   And we came back a couple months later; and, in that time,

6   we established, and you even agreed and admitted, that, in

7   fact, the pipe jacks had been changed; correct?

8   A.   Correct.

9   Q.   All right.  So you -- you're actually the person that was

10  responsible, according to State Farm, for making sure the

11  discovery in this case -- the written discovery was properly

12  answered.  Isn't that true?

13  A.   That the discovery was properly...

14       I don't even know how to answer that question.

15       I am not responsible for the legal discovery on the file.

16  Q.   Well, the question that was asked at that time dealt with

17  who at State Farm is going to answer the questions that were

18  being posed.  You remember that?

19       Did you know that?

20  A.   I'm sorry.  I'm getting a little confused.

21            MR. LEFFEL:  Your Honor, may we --

22  A.   What do --

23            MR. LEFFEL:  -- have a sidebar?

24            THE COURT:  Yes, sidebar.

25       (Bench conference on the record after headsets check.)

Jacqueline Draper                                          87
Continued Direct Examination by Mr. Miller

1             THE COURT:  Okay.  Mr. Leffel?

2             MR. LEFFEL:  I'm just a little concerned with the

3    witness not knowing -- I mean, what -- what we're getting to

4    there is that Ms. Draper, I think, signed the verifications on

5    the discovery; but, of course, as you probably have seen a

6    hundred times, who answered this discovery is answered that it

7    was answered by, you know -- verified by Ms. Draper with

8    assistance of counsel.

9        That doesn't -- I want to -- I'm concerned about getting

10   into a potential privilege issue.

11       I'm also concerned about the relevance and cumulativeness

12   of -- of this.

13            THE COURT:  Mr. Miller, what -- what is the discovery

14   conduct -- what is that relevant to?

15            MR. MILLER:  Well, I'm actually about to move into

16   something else, Judge, but she is -- I want to be clear that --

17   I want the jury to understand that the admitted evidence, which

18   is JX18 and all the answers that came with JX18, were -- are

19   identified as being --

20            MR. LEFFEL:  Your Honor --

21            MR. MILLER:  -- provided by --

22            MR. LEFFEL:  I'm sorry.  I'm sorry, Mr. Miller.  Go

23   ahead.

24            MR. MILLER:  -- provided by Ms. Jacqueline Draper, as

25   can be seen at page -- JX18, page 6.

Jacqueline Draper                                              88
Continued Direct Examination by Mr. Miller

1              THE COURT:  Mr. Leffel?

2              MR. LEFFEL:  Well, now I have a greater concern,

3    because what Mr. Miller's trying to introduce is the answers to

4    the statistics, which, Your Court has ruled, is inadmissible.

5              MR. MILLER:  No.  No.  You have not ruled that.

6    They're already admitted.  Those --

7              THE COURT:  No.

8              MR. MILLER:  -- these answers are admitted.

9              THE COURT:  The discovery, you-all have identified as

10   a joint exhibit, but I have not ruled that the stipulated facts

11   are admissible.

12             MR. MILLER:  Right.

13        No, I'm not saying about the stipulation, but the

14   discovery and the answers in the discovery are admitted

15   evidence, JX18.

16             MR. LEFFEL:  Those statistics are directly derived

17   from interrogatory responses, and it was -- and that joint

18   exhibit was -- was made as part of the compromise when we went

19   to the Court while we were still maintaining our objection;

20   and, you know, again, the Court, after that -- joint exhibits

21   was made, ruled that the statistical evidence is not

22   admissible.

23             MR. MILLER:  Judge, you have not made that ruling,

24   first of all, unless I wasn't in here.  You made a preliminary

25   finding that we didn't respond to, but --

Jacqueline Draper                                                    89
Continued Direct Examination by Mr. Miller

1              THE COURT:  So -- so there's -- there's two issues

2    here.  The first issue is, number one, the parties jointly

3    moved for these exhibits -- or Plaintiffs had moved for the

4    joint exhibits without objection of the defendant, and those

5    have been admitted into evidence.  That's the first issue.

6         The second issue is there was a motion in limine made by

7    State Farm as to other claims litigation files.

8         I gave a detailed ruling either earlier today or yesterday

9    where I outlined -- it was yesterday -- where I outlined the

10   procedural history of how this had evolved:  that, initially,

11   it was to preclude reference to the 70-plus State Farm claims

12   files and that then, on Sunday, I got a final -- revised final

13   pretrial report that had Stipulation Numbers 9 through 12 and

14   that it was represented to me by lawyers on this case that

15   there no longer was a ruling needed on that motion in limine.

16        And then, when we came to trial on the first day, on

17   Tuesday, before the jury arrived, it was represented to me

18   that, no, in fact, State Farm maintained its objection to those

19   stipulated facts.

20        And I said, "I don't have enough context at this time to

21   reach a ruling"; and my preliminary ruling was, number one, I

22   didn't see how they were relevant.  Number two, I thought they

23   had 403 problems.

24        And so that's where we are.

25        But, Mr. Leffel, I have to tell you I'm -- I'm -- the --

Jacqueline Draper                                        90
Continued Direct Examination by Mr. Miller

1    you know, this is -- this is a joint exhibit.  Joint Exhibit 18

2    is admitted into evidence.

3          MR. LEFFEL:  Well, I mean, that's a true statement,

4    but, again, I think context matters.

5      We -- we were asked to, you know, create a solution so

6    that we didn't have to have 72 claim files, and so part of that

7    was going to be creating a stipulation to what the data showed,

8    and that was included and that was derived from interrogatory

9    response.  We needed that if the Court was going to rule that

10   that information was admitted.

11     We -- we have to show up here Tuesday with all of those

12   joint exhibits ready to go not knowing what the Court's ruling

13   would be.

14     And so, yes, once the Court ruled, we went to move the

15   exhibits, and, I mean -- I don't know.  I guess that's on me.

16     But -- but that's the circumstances -- is that, you know,

17   we had to be -- be ready to go either way, and it turned out

18   that the entirety of the interrogatory responses was included

19   that the specifics were derived from.  I don't think it takes

20   away the meaning and the rationale behind the Court's ruling.

21     And I think the way that they came together procedurally

22   means that that was a honest error, you know, on our part when

23   we were trying to, you know, streamline things to get all these

24   joint exhibits admitted.

25          MR. MILLER:  Judge, can I speak to that?

1              THE COURT:  Yes.

2              MR. MILLER:  I'm sure it's not intentional.  I don't

3    doubt it.  And Mr. Leffel and I have not handled all of the

4    exhibits exclusively, but I -- I believe he's missing a very

5    important fact.

6         The thing that we agreed would not be admitted were all of

7    those claim files -- that's what we agreed -- and they were not

8    admitted.  This does not bring them in.

9         The stipulation, Judge, we thought was going to be -- it

10   was all about when it was going to be read; and then they, at

11   3:03 on Sunday, which was after we were supposed to submit the

12   pretrial order, which we did at 3:00 o'clock or before -- at

13   3:03, we get for the first time a comment about how they're

14   withholding some kind of -- or withdrawing some kind of

15   objection earlier that very day.

16        We can show you the emails from Ms. Williams that said,

17   "We just don't want them admitted or the stipulation read at

18   the beginning of the trial."

19             THE COURT:  Okay.  Mr. Miller, let's pause that.  I'm

20   getting a note from Ms. Vasquez that the jurors need a break to

21   use the restroom.  So I'm going to --

22             MR. MILLER:  All right.

23             THE COURT:  -- give them the recess admonition, and

24   then we'll come back to this.

25             MR. MILLER:  Can I turn this off?

1        (End of bench conference.)

2            THE COURT:  I understand that we have a bathroom

3    request, and this is a good time to take an afternoon recess.

4        And so, members of the jury, I remind you of my admonition

5    and instruction on recess not to talk to any witness, any party

6    or persons seated at counsels' tables, with any of the lawyers

7    or their staff or anyone in their courtroom observing, or with

8    anyone else.

9        Do not talk about the trial with anyone else.  This

10   includes communicating by electronic means:  emails, texts,

11   social media postings, or any other means.

12       Do not attempt to gather any information relating to the

13   case on your own or visit any places mentioned in the case.

14       Do not attempt to do any research on the Internet.

15       Avoid reading or listening to reports of the case in the

16   media.

17       Do not discuss the case, even among yourselves, until the

18   end of the trial when I've instructed you on the law, and you

19   have gone into the jury room for your deliberations.

20       Keep your minds free and open, and do not form an opinion

21   one way or the other until the case is submitted to you, and

22   you retire to consider your verdict.

23       This instruction will apply during every recess throughout

24   the trial, and it applies to all of those in the courtroom, not

25   just the jurors, and my usual instructions continue to apply.

Jacqueline Draper                                                    93
Continued Direct Examination by Mr. Miller

1          We will take a 15-minute recess.

2          All rise for the jury.

3        (Jury exits.)

4              THE COURT:  Okay.  Please be seated.

5              MR. MILLER:  Judge, can we release the witness?

6              THE COURT:  Yes.

7        Can we get her back easily?

8              MR. MILLER:  I just didn't want her to hear all this.

9              THE COURT:  Right.

10       Yeah.  Let me wait for Nyssa.

11       (Discussion off the record between the Court and deputy

12   court clerk.)

13             THE COURT:  We're back on the record.

14       Ms. Draper, we are on a -- an afternoon recess, and I want

15   to give you an opportunity, ma'am, to use the restroom, to get

16   a drink of water.

17       We are going to -- Nyssa, what's the best way to proceed?

18       Mute her?

19             THE CLERK:  (Inaudible.)

20             THE COURT:  Okay.  So I need you back in the chair at

21   three -- 3:45 or three -- around 3:50 would probably be fine,

22   yes.

23             THE WITNESS:  Okay.

24             THE COURT:  And, Nyssa, are you going to disconnect

25   her?

Jacqueline Draper                                          94
Continued Direct Examination by Mr. Miller

1        Are we going to mute --

2              THE CLERK:  (Inaudible.)

3              THE COURT:  Okay.  So I want you to -- I'm going

4    to -- I guess she can't see me.

5        How do we know that she can't hear me?

6              THE CLERK:  She responded to you.

7              THE COURT:  I know, but if you're going to mute her

8    line, how do we know that she can't continue to hear?

9              THE CLERK:  Because I -- I mute (inaudible).

10             THE COURT:  Okay.  Okay.  Okay.

11       So, Ms. Draper, you can go ahead and be on recess.

12             THE WITNESS:  Okay.  Thank you.

13             THE CLERK:  Are you off the record now?

14             THE COURT:  We're off the record.

15        (Discussion off the record.)

16             THE COURT:  Okay.  Counsel, back to our issue that we

17   were discussing.

18       Mr. Miller, I believe you were presenting your argument to

19   the Court.

20             MR. MILLER:  Yes, and I'm actually pretty glad that

21   we got to take that break because I -- I said something that's

22   not accurate; and that is I thought Ms. Williams, at 3:03,

23   after the 3:00 o'clock PTO deadline, had sent an email about

24   the -- reserving this -- this argument about the stipulation;

25   and I don't think that's right.

1      We're looking for the email chain right now, but I want to

2   make it clear that I'm sorry about that.  I thought that's what

3   happened, but I wasn't really paying attention to the emails,

4   honestly.

5      But -- but there was some email exchange and traffic

6   exchange --

7           THE CLERK:  Sorry.  Give me just a second.

8      Okay.

9           MR. MILLER:  -- some email traffic exchange about all

10  of this; but, really, what -- the -- that's not even the big

11  point, Judge, that I think Mr. Leffel's not saying, and -- and

12  maybe he doesn't even realize.

13     But this whole thing was about not using the 71 or

14  whatever the number was of claim files; and we did talk about

15  all kinds of different possibilities, including not using any

16  of the discovery responses regarding a stipulation, which, by

17  the way, we thought we had an agreement on a stipulation; and

18  then they later say that they're reserving the right to ask the

19  Court to decide.

20     But in the meantime, in -- I thought, I believe, in

21  exchange for not trying to get all 71 claim files in, we were

22  going to use the exhibit PX18; and everybody agreed to it; and

23  I never -- I don't think it's trickery, and I don't think it's

24  a mistake.  We agreed to admit it.

25           THE COURT:  Mr. Leffel?

Jacqueline Draper                                                96
Continued Direct Examination by Mr. Miller

1            MR. LEFFEL:  Your Honor, I'm going to let

2   Ms. Williams, because she was directly involved with that,

3   respond, if that's okay with the Court.

4            THE COURT:  That's fine.

5            MR. LEFFEL:  Okay.

6            MS. WILLIAMS:  Your Honor, I do have the email

7   chains.  I have one printed out, which I'm happy to provide the

8   Court.

9            THE COURT:  Please do.

10           MS. WILLIAMS:  Can I read from it first?

11           THE COURT:  Yes.

12           MS. WILLIAMS:  Okay.  Your Honor, on Saturday at

13   2:23 p.m., Ms. Landeros and I were trying to come to an

14   agreement about proposed factual stipulations.

15       Included in the joint exhibit list was Joint Exhibit 18,

16   which are the discovery responses that are there.

17       What I said was, in lieu of this exhibit, we would agree

18   to stipulate to the following; however, would not stipulate to

19   these being included as facts that are read to the jury at the

20   beginning of the case.

21       Ms. Landeros and I continued to exchange revisions to the

22   stipulation.

23       And, at 10:24 a.m. on Sunday, again, hours before the

24   final pretrial report is filed, I said (as read), Shawna, we

25   will agree to the revised stipulation.  I want to be clear,

1    though, that, while we agree to those facts, those facts are

2    accurate, and we'll stipulate to them.  We are not agreeing

3    they're relevant to the case and reserve that objection,

4    depending on the context in which they're raised.

5         Keep in mind, Your Honor, the entire stipulation was in

6    lieu of Joint Exhibit 18.

7         On Sunday, at 11:01 a.m., so this is a half hour after

8    that exchange, Ms. Landeros and I are discussing whether the

9    Court should read Fact Stipulations Number 5 to 8 to the jury

10   at the beginning of the case.

11        Defendant had a concern about the phrase "at all material

12   times thereto that Plaintiff's policy was in effect" because I

13   raised that the parties disagreed about what the material times

14   were.

15        Ms. Shawna -- Ms. Landeros -- pardon me -- responded at

16   11:01, hours before the final pretrial -- a few hours before

17   (as read), Hi, Paula.

18        You want to change a stipulation that was already agreed

19   to and submitted to the Court.  I don't anticipate the Court

20   will like this.  State Farm wants to revise a previously agreed

21   to stipulation.  My understanding is that Judge Dishman wanted

22   us to confer to agree to more, not less.

23        Additionally, your revision also seems to be contrary to

24   the discovery responses, which admit that the policy ran from

25   2010 to the date of loss -- to the date the loss was reported.

1      It seems we may need to keep JX18.

2      I have a response asking if they're agreeable to leave the

3  stipulation as is but not having the Court read to the jury.

4      And -- and we discuss, you know, conferring more.

5      Said (as read), I don't think it's a secret that the

6  parties disagree about when the material time is for

7  Plaintiff's claim.

8      And -- and I'm going to stop the email there, but I agree

9  that perhaps the best course was to say, "Take the discovery

10  responses as a whole and put them as a separate exhibit."

11      I thought that they were using the discovery responses to

12  ask about the one thing that Ms. Landeros said was at issue,

13  was the material time that Plaintiff's policy was in effect.

14      In -- at no time did I think that we were talking about a

15  factual stipulation that would become moot when they

16  back-doored the exact same facts through a joint exhibit that I

17  had said would be withdrawn if we agreed to the very factual

18  stipulations that we've asked this Court to rule on.

19           MR. MILLER:  May I say something?

20           THE COURT:  Mr. Miller?

21           MR. MILLER:  I don't know how you could call it

22  back-dooring.  Ms. Landeros clearly said in the email chains

23  that -- something like, "Perhaps we'll need to leave JX18 in,"

24  which is what happened.

25      This was all done together.  We didn't do this any more

Jacqueline Draper                                                        99
Continued Direct Examination by Mr. Miller

1    than they did.

2         And, as you probably also heard at the beginning of the

3    reading of the emails, there was a -- a idea that we wouldn't

4    read the stipulation at the beginning of the trial, not

5    disclosing the use of the information.

6         I frankly think that we're the ones that kind of got

7    sandbagged because we thought we had a stipulation, and then

8    they're going to try to undo it, which the Court, of course,

9    did make your ruling on, but -- or your -- your preliminary

10   ruling, I think it was.

11        But, at the end of the day, Judge, we didn't sneak

12   anything on them.  They -- we actually literally said, "We need

13   to leave those in."

14             THE COURT:  So the rule that governs the Court, once

15   I have a final pretrial conference and order, which I have

16   here, is Rule 16(e), and that's Federal Rule of Civil Procedure

17   16(e).  It says, in pertinent part, "The court may modify the

18   order issued after a final pretrial conference only to prevent

19   manifest injustice."

20        So give me a minute here.  I want to look at the initial

21   pretrial report -- final pretrial report, which I rejected, and

22   look at Plaintiff's exhibit lists there so I can make sense of

23   the email that's been presented to me, so just give me a

24   minute.

25        Okay.  Counsel, I'm going to tell you-all the standard,

Jacqueline Draper                                                           100
Continued Direct Examination by Mr. Miller

1   and then I'm going to let you argue it.

2        So I'm looking at the email that has been presented by

3   Ms. Williams.

4        On Saturday, October 29th, Ms. Landeros sends to opposing

5   counsel a revised stipulation and then goes on to list, "Here

6   is the revised list," meaning the revised list of joint

7   exhibits.

8        What is now Joint Exhibit 18, which has been admitted into

9   evidence, was formerly Plaintiff's Exhibit 27; and that was

10  State Farm's responses and supplemental responses to

11  Plaintiff's interrogatories, requests for production, and

12  requests for admission; and I'm looking at Doc. Number 73-2 at

13  page -- ECF page 13.

14       As you-all know, I rejected that final pretrial report and

15  ordered the parties to submit a revised final pretrial report,

16  which they did on Sunday, October 30th, consistent with my

17  order.

18       And on October 31st, at Doc. Number -- sorry.

19       The revised final pretrial report is Doc. Number 103.

20       My order adopting -- approving the final pretrial report

21  is Doc. Number 105, and that order states -- I'm sorry.

22       That order states, "Order approving final pretrial report.

23       "Upon review of the revised Final Pretrial Report filed

24  jointly by the parties, the Court finds that it should be

25  approved.

1        "It is therefore ordered that the revised Final Pretrial

2   Report [Doc. Number 103] is approved.  Under Federal Rule of

3   Civil Procedure 16(e) and Local Civil Rule 16.1, Subsection

4   (c)(2), the revised Final Pretrial Report will constitute an

5   order of the Court as to all matters contained therein."

6        That brings me back to the standard.  "The court may

7   modify the order issued after a final pretrial conference only

8   to prevent manifest injustice."

9        The burden of establishing manifest injustice falls

10  squarely on the moving party.  This is *Smith v. Ford Motor

11  Company*, which is a 1980 Tenth Circuit case at page 795.

12       When a party fails to show any other circumstances than a

13  party's own neglect to warrant the amendment, it has failed to

14  meet Rule 16's manifest injustice standard.

15       The Tenth Circuit considers the following factors in a

16  challenge to the district court's denial of a motion to amend

17  the pretrial order and resulting exclusion of an issue:

18       Number one, prejudice or surprise to the party opposing

19  trial of the issue;

20       Number two, the ability of that party to cure any

21  prejudice;

22       Number three, disruption by inclusion of the new issue;

23       And number four, bad faith by the parties seeking to

24  modify the order, and that's from *Davey v. Lockheed Martin

25  Corporation*, which is a 2002 Tenth Circuit case at page 1210.

Jacqueline Draper                                                    102
Continued Direct Examination by Mr. Miller

1        Prejudice or surprise concerns the timing of the motion in

2    relation to commencement of trial.  That's an important element

3    in analyzing whether the amendment would cause prejudice or

4    surprise.

5        Number two, ability to cure prejudice or surprise, is

6    whether the opposing party had the ability to cure any

7    prejudice or surprise caused by the amendment.

8        Disruption is whether this would disrupt the orderly and

9    efficient trial of the case or other cases in the court, and

10   that's from *Smith v. Ford Motor*, a 1980 Tenth Circuit case at

11   page 797.

12       Finally, the Court must consider the bad faith or

13   willfulness in failing to comply with the Court's order.

14       The way I see things, given the joint exhibits were

15   outlined in the emails, including what they formerly

16   referenced -- so, here, Joint Exhibit 18 referenced former

17   Plaintiff's Exhibit Number 27.

18       Now that those exhibits have been admitted into court, and

19   I have an order approving your revised final pretrial report, I

20   see this as a manifest injustice standard case because it is

21   already before the jury.  So the stipulations, in my mind,

22   really no longer are relevant here.

23       What we're dealing with is this exhibit that's already

24   been admitted into evidence -- whether Mr. Miller gets to go

25   through this exhibit.  I think that's the issue that's

Jacqueline Draper                                              103
Continued Direct Examination by Mr. Miller

 1   presented.

 2              MR. LEFFEL:  May I, Your Honor?

 3              THE COURT:  You may.

 4              MR. LEFFEL:  Again, I -- I think that's where context

 5   matters, and I think that it's worth discussing that with

 6   respect to manifest injustice.

 7        So that's all happening on Sunday, Your Honor, as we're

 8   trying to work through some issues; but we've -- we've been

 9   here on Friday; and there's a motion in limine on -- on this

10   very issue pending before the Court that the Court has taken

11   under reservation.

12              THE COURT:  Well, not exactly, though, Mr. Leffel,

13   because the -- the issue before the Court was the other claims

14   files.  It wasn't discovery responses by Defendant.

15              MR. LEFFEL:  True, but -- but let -- but bear with

16   me.  Okay?

17        Part of the reason that we had that motion, and we were

18   coming to the stipulation, was so we could try to avoid the

19   problem that everyone seemed to recognize of having minitrials

20   on 72 different claims files.

21              THE COURT:  But, again, Plaintiffs have -- they have

22   not included that as an exhibit.  There's no way that those are

23   coming in.

24        Correct, Mr. Miller?

25              MR. MILLER:  Right, Judge.  Exactly.

Jacqueline Draper                                                    104
Continued Direct Examination by Mr. Miller

1          THE COURT:  Okay.

2          MR. LEFFEL:  Okay.  But the way to try to get there

3   was that we had to come up with something that they were asking

4   for, and that was the stipulation to the interrogatory response

5   that was derived from those claim files, that however many

6   claims had been handled that 19 had issues with wear and tear.

7   Okay?

8       The reason that we were -- we were, you know, creating

9   that stipulation was to avoid all the claim files, but we

10  may -- we may -- so we said, "Those are accurate, but we still

11  have problems with statistics without context.  If you're going

12  to come in here with a statistic, I've still got this prejudice

13  problem.  I've got this confusion problem.  I've got 401, 402,

14  403 problems, Your Honor," because then you're going to force

15  me into a position where I may need to have context to respond

16  to these -- these statistics without context.

17      So that's where we -- brought us here on Tuesday morning

18  where this Court said a lot more articulately than I have that

19  she still has problems under 401, 402, 403 with those

20  statistics being used in the case.

21          THE COURT:  At that time, though, let the record

22  reflect, Mr. Leffel, I did not know that the parties had -- had

23  entered this in as Joint Exhibit Number 18 with these same

24  statistics.  I was confining my remarks to the motion in limine

25  going to the claims files, which I had understood had evolved

Jacqueline Draper                                              105
Continued Direct Examination by Mr. Miller

1  into the stipulated facts.

2            MR. LEFFEL:  This is the last thing I'm going to say:

3       So we have to come over here prepared to go either way,

4  depending on rulings that are going to be -- literally be made

5  by this Court before this jury sits down and this case starts.

6       And so, yes, one of those contingencies was that we were

7  going to have the interrogatory responses, and -- and that --

8  that's where we get to the point that -- I -- I -- I had no

9  awareness, when -- when we -- when we said, yes, we -- we --

10 we've worked so hard to come up with these joint exhibits.  We

11 want to streamline this case so that we're not trying to get

12 these things into evidence.

13      I don't -- I don't -- can't speak for anyone else on my

14 team.  I did not make the realization that there was an

15 interrogatory response still included in those joints --

16 exhibits.

17      The right thing that would have -- should have happened is

18 the Court should have ruled, and then there should have been,

19 "Okay.  That affects our contingency joint exhibits."

20      And so I'll -- that's all I will say, but that's the

21 situation.

22            THE COURT:  I -- I know, and I think -- I mean, the

23 way I understand the issue, looking at the emails, the

24 exchanges, I mean, it is clearly laid out what Joint Exhibit

25 Number 18 is going to be; and that leads me to neglect, which

Jacqueline Draper                                                      106
Continued Direct Examination by Mr. Miller

1    is not enough to satisfy the manifest injustice standard.

2        Help me here.

3            MR. LEFFEL:  Well, that's what I'm struggling to

4    understand, and I guess the Court sees that that's now a new

5    issue.

6        We came over here with a contingency plan of exhibits that

7    would include a interrogatory that we were doubling down on and

8    saying, "Yes, those numbers are accurate," okay, pending the

9    ruling of the Court on the pending motion in limine.  Okay?

10           THE COURT:  But -- but, again, just so that the

11   record is clear, Mr. Leffel, the pending motion in limine went

12   to the 70-plus other claims files.  It did not go to State

13   Farm's discovery.  That was not part of the motion in limine.

14           MR. LEFFEL:  Fair.

15       But the way things evolved between the parties and the

16   communications with the Court where we were, again, trying to

17   work with -- everybody's trying to work together -- the Court

18   and the parties -- to come up with a way to solve this problem

19   and streamline that, and that's where we led into the

20   stipulated numbers.  Okay?

21       And then we got over here, but -- and we said, "Yes,

22   Judge, we did what you said.  We stipulated.  These are --

23   these -- we agree these numbers are accurate.  We still don't

24   think they're relevant."

25           It grew out of the same motion.  It was an evolution of

Jacqueline Draper                                                              107
Continued Direct Examination by Mr. Miller

1    that motion, Your Honor.

2             THE COURT:  Does -- does either side disagree that it

3    is the manifest injustice standard when we have a -- a joint

4    exhibit that's been admitted into evidence before the jury?

5             MR. LEFFEL:  I honestly have no idea, Your Honor, but

6    I trust the Court.

7             MR. MILLER:  Well, I mean, I -- I had to -- I have to

8    say, once again, I was quite surprised at how fast you had all

9    of that information.  I don't know what you have access to.

10       But, yeah, I mean, it sounds right.

11       But -- but, Judge, I -- I -- I do -- when you're ready, I

12   just want to say something for the record, to put our position

13   into the record, that I haven't quite said in response to what

14   Mr. Leffel said, not that I want to talk you out of what I

15   think you're seeing here.

16       Can I say it now?

17       It's just simply this -- and I -- and I don't -- I'm not

18   suggesting for one second that Mr. Leffel is -- is not candidly

19   referencing everything as he saw it, and he was not involved

20   very much; and I was not involved in very much either, but I

21   was involved in a couple of things, because when it boiled down

22   for me was I heard on -- I think it was Sunday that now they

23   don't want to do the stipulation that was 100 percent driven by

24   the agreement not to use the 71 files in our mind -- in my

25   mind, maybe not in Mr. Leffel's.

Jacqueline Draper                                                    108
Continued Direct Examination by Mr. Miller

1      And -- and that's -- and I'm thinking, Wait.

2      And now we -- I felt like we got sandbagged because we

3  couldn't use the 71 files because we'd already agreed to the

4  stipulation, and I still felt like we were going to get the

5  stipulation because the stipulation didn't -- doesn't usually

6  involve a decision by the Court about whether or not it's going

7  to be read until it came up that way on Tuesday.

8      So -- but, regardless, I think the Court has the emails.

9  There's actually another email that also amplifies on what

10  happened after that, as I understand it.

11      But the bottom line is nobody was caught unaware here from

12  what I know about the exhibits.

13          THE COURT:  Mr. Leffel, anything further?

14          MR. LEFFEL:  Again, I think we -- we've made our

15  record.  I don't know whether it's -- it's excusable neglect or

16  manifest injustice.  I trust the Court.

17      I -- I'm -- I'm struggling to -- you know, there are --

18  there are a lot of people in this room that are a whole lot

19  smarter than I am, but I'm struggling to, I guess, get my mind

20  around on if that is excusable negligence.

21      I don't know that that's a standard that anyone could --

22  could meet, to have literally the Court rule, this jury be

23  seated, then we're introducing those joint exhibits literally

24  so that people can use those in opening.

25      I -- you -- you have to be a pretty remarkable human being

Jacqueline Draper                                                          109
Continued Direct Examination by Mr. Miller

1   to have realized that our contingency exhibit that the Court

2   had now ruled on had not yet been -- had not been removed from

3   that list of joint exhibits.

4          THE COURT:  So I think the issues here have -- have

5   continued to evolve.  I mean, the motion in limine, as it was

6   presented to me -- State Farm's Motion in Limine Number 1 --

7   related to the testimony of Michael Joe Lewis.

8          Plaintiff agreed to take him off the witness list and take

9   his -- you know, reference to his claim off the exhibit list,

10  so that part of the issue became moot.

11         The second part of that first motion in limine by

12  State Farm related to the 70-plus other claims files, which

13  Plaintiff, at the time, had listed as a category of exhibits.

14         When we had our pretrial conference and our motions in

15  limine hearing, I asked the parties to look at that issue I

16  raised, concerns -- echoed concerns about getting into 70-plus

17  claim files that -- that State Farm had about minitrials,

18  wasting time, delay.  That was a significant concern.

19         And then what was presented to me was a revised final

20  pretrial report with joint exhibits, which now we have already

21  admitted into evidence.

22         Admittedly, I have not had this issue come up before; and

23  if you-all don't know a different standard than Rule 16(e),

24  that is the standard that I think applies here, which is the

25  manifest injustice standard; and the case law has made clear

1   that a party's own neglect does not warrant amendment.

2        The stipulations are not being -- I -- I have not ruled on

3   the stipulations.  Those have not been read.  There was no

4   agreement to the parties to read those; but, at this point, the

5   issue has evolved to where we have Joint Exhibit 18, which is

6   discovery responses by State Farm and supplemental discovery

7   responses, which were not part of the motion in limine.

8        And so, you know, in some ways, this is a new issue; but

9   I -- I -- I am going to allow Mr. Miller to inquire about a

10  joint exhibit that's been admitted into evidence unless and

11  until the parties can show me that there's a different

12  standard.

13              MR. MILLER:  All right, Judge.

14              MR. LEFFEL:  Okay.  The only other thing I'm going to

15  say just so that we're not having to interrupt the jury is --

16  is I don't believe Mrs. -- this witness verified the

17  supplemental response.

18              THE COURT:  Mr. Miller, is that correct?

19              MR. MILLER:  I don't -- Judge, I don't know.  I just

20  know her name is the one identified --

21              THE COURT:  Well --

22              MR. MILLER:  -- in the very opening.

23              THE COURT:  -- point -- point to me where her

24  verification is, because, if -- if there's not an indication in

25  Joint Exhibit 18 that she verified the response, then that's an

Jacqueline Draper                                            111
Continued Direct Examination by Mr. Miller

1    objection I'm -- I'm likely to sustain.

2            MR. MILLER:  Even -- are you talking about just to

3    use it with her?  Is that what you mean?

4            THE COURT:  I mean, if she didn't verify -- that was

5    your question, I think, before we got on our sidebar.

6        Did she verify it?  Can anyone answer that?

7            MR. MILLER:  I honestly --

8            MR. LEFFEL:  She verified the very opening set.

9        These statistics were provided in a supplemental response

10   to which I don't believe any verification was provided.

11           THE COURT:  Ms. Landeros?

12           MS. LANDEROS:  My recollection is that State Farm

13   never verified any of their discovery responses.

14       Part of the stipulation was --

15           THE COURT:  Come up to the microphone.

16           MS. LANDEROS:  My recollection is that State Farm

17   never verified any discovery response whatsoever in this case.

18       Part of the stipulation that we agreed to, as Mr. Miller

19   told the Court, was to remove these claim files and to admit

20   the facts that are contained in the discovery responses, which

21   were going to be introduced as a joint exhibit, were accurate.

22       That was the whole point of this -- was to not waste the

23   Court's time, not waste the jury's time, talking about -- and,

24   by the way, it's 156 claim files that were withdrawn.

25       If anyone was sandbagged, it was us, because the email

Jacqueline Draper                                          112
Continued Direct Examination by Mr. Miller

1  correspondence about the stipulations clearly says, in response

2  to Ms. Williams's email, which was not read (as read), It is my

3  understanding what you're referencing below is that we're not

4  reading these stipulations at the outset of the case.

5      The next response I got from Ms. Williams was (as read),

6  Thanks Shawna, and didn't reference at all anything about

7  timing of stipulations.

8          THE COURT:  But she says, Ms. Landeros -- this is

9  Ms. Williams's email (as read) -- I want to be clear, though,

10  that, while we agree those facts are accurate and will

11  stipulate to them, we are not agreeing they're relevant to the

12  case and reserve that objection, depending on the context in

13  which they are raised."

14          MS. LANDEROS:  Absolutely.

15      And my response to that email was, it's my understanding,

16  from what I'm reading and the whole history of the chain,

17  including other correspondence about reading stipulations at

18  the outset of the case -- that their objection was merely to

19  not reading them at the very beginning of the case, which is

20  why, when I came to the conference with your clerk -- me and

21  Taylor Peshehonoff -- I -- I'm sorry if I mispronounced your

22  name -- Ms. Peshehonoff represented that we had reached an

23  agreement as to the stipulations.

24      I -- we would not have advised the Court that we had

25  reached an agreement unless we actually felt that we had

Jacqueline Draper                                                       113
Continued Direct Examination by Mr. Miller

1   reached an agreement; and that agreement, as memorialized in

2   those emails, is, one, we stipulate to these facts; but, two,

3   we're not going to read them at the outset of the case, and we

4   were okay with that.  Plaintiff was okay with that.  We

5   could -- we could raise them at a later date when they became

6   relevant, and we represented to this Court when they became

7   relevant would be with Ms. Draper's testimony.

8        And so that is the entirety of the issue here.

9        (Discussion off the record between the Court and deputy

10  clerk.)

11         THE COURT:  Well, I think we are left with Joint

12  Exhibit 18 has been admitted into evidence.

13       And, Mr. Miller, you are allowed to ask questions on

14  exhibits that have been admitted into evidence.  If the witness

15  lacks personal knowledge, doesn't know what you're talking

16  about, I'm going to give you one of these to move on.

17         MR. MILLER:  All right, Judge.

18         THE COURT:  But that's where I'm at with how this

19  issue has evolved and how it's been presented to me.

20       I -- you know, I know you-all don't try to make messes of

21  trials.  I know that's not the nature of what you-all want to

22  do; but, given the way the issue's evolved and based on where

23  things stand right now, based on my understanding of these

24  exhibits being admitted, and what legal standard I think would

25  apply, which would be a very high bar -- the manifest injustice

Jacqueline Draper                                                114
Continued Direct Examination by Mr. Miller

1   standard -- I think you can reference the exhibit.

2           MR. MILLER:  Yes, ma'am.

3           THE COURT:  Okay?

4       Anything further, Counsel?

5           MR. MILLER:  Not on the record.

6           THE COURT:  Okay.

7           MR. LEFFEL:  We understand the ruling, and we reserve

8   our objection.

9           THE COURT:  Okay.  Thank you, Mr. Leffel.

10      Let's go ahead and get Ms. Draper back on the line.

11      And anything further before we get the jury?

12          MS. WILLIAMS:  Can we take a quick bathroom break?

13          THE COURT:  Yes, yes, of course.

14      (A recess is taken.)

15      (Jury enters.)

16          THE COURT:  Mr. Miller, you may proceed with your

17  examination.

18          MR. MILLER:  Thank you, Judge.

19  Q.  (By Mr. Miller) All right.  Ms. Draper, I was starting to

20  ask you about an exhibit that's been admitted:  JX18.

21          MR. MILLER:  Could you put JX18, page 1, up?

22  Q.  (By Mr. Miller) We've -- we've put the top of that up so

23  that you can see the title.

24      Can you see that, ma'am, and read it?

25  A.  Yes.

Jacqueline Draper                                                    115
Continued Direct Examination by Mr. Miller

1   Q.   All right.  This is the first of a series of discovery

2   responses that State Farm made in writing back in the beginning

3   of the case and then lasting all the way through, and it's

4   called "PX18."  Okay?

5   A.   Okay.

6   Q.   And you recognize that -- or do you recognize that

7   discovery responses are in writing?

8        They're questions asked in writing, and then the other

9   side has to answer them; correct?

10  A.   Okay.

11  Q.   Did you know that?

12  A.   I do now.

13  Q.   Okay.  Well, let's -- if we can go to page 6 of this,

14  please.

15       Page 6 is the first interrogatory.

16            MR. MILLER:  Maybe we should -- maybe we should put

17  it up, Janna.

18  Q.   (By Mr. Miller) The first interrogatory there at the top

19  says -- can you read it?

20       See that?

21       Interrogatory Number 1, you see that, Ms. Draper?

22  A.   Yes.  I have to move the stuff out of the way on the

23  screen.

24       Yes, Interrogatory Number 1.

25  Q.   Okay.  And -- and Interrogatory Number 1 is, in essence,

Jacqueline Draper                                                    116
Continued Direct Examination by Mr. Miller

1    without reading the whole thing, asking who is going to supply

2    the answers to these questions and then -- discovery questions

3    being posed by the plaintiff for the defendant.

4        You see that?

5    A.   Yes.

6    Q.   And the answers down below there has been -- the end of

7    the answer, where it's actually more than an objection; and it

8    says, "State Farm states that these interrogatories are being

9    answered by Jacqueline Draper, with the assistance of counsel."

10       You see that?

11   A.   Yes.

12   Q.   Now, were you involved in answering these interrogatories?

13   A.   I don't specifically recall that.

14   Q.   Well, do you generally recall that?

15   A.   I don't remember specifically being involved in the

16   response.  If it says that I -- I was -- and it's -- it's not

17   uncommon for us to, you know, assist if there's any questions

18   from the attorneys, absolutely.

19   Q.   Okay.  Well, I appreciate that answer and have reasons I

20   need to be a little more particular about it.

21       So that's why I was asking you do you generally recall

22   that you were the designated person for State Farm to answer

23   the written questions that would be coming to State Farm?

24   A.   Yes.

25   Q.   Okay.  Good.

Jacqueline Draper                                                 117
Continued Direct Examination by Mr. Miller

1        And, now, if we could -- give me one moment.

2        And, by the way, do you remember being given the

3   opportunity to read these things that, I'm sure, were put in

4   the proper format by State Farm's lawyers?

5        I'm not suggesting you typed them up, but were you given

6   the opportunity to be involved in making sure that, for what

7   you knew at least, they were accurate?

8   A.   I believe I was, yes.

9   Q.   Okay.

10             MR. MILLER:  If we could go to 27.031.

11             MS. MCGUIRE:  Which number?

12             MR. MILLER:  Oh, I'm sorry.  I'm -- I'm using the PX

13  number.

14        18.031.

15        Okay.  If you could open up Request for Admission No. 2 so

16  that Ms. Draper and the jury can see it.

17        Just the -- just the request for now.

18  Q.   (By Mr. Miller) All right.  Can you see that one of the --

19  this is kind of all, you know, legal stuff, but there was a

20  request for an admission from State Farm; and the question was,

21  "Admit that Plaintiff complied with all provisions of the

22  policy with -- with regard to filing a claim for a loss."

23        Do you see that?

24  A.   Yes.

25  Q.   And the answer from State Farm -- again, after some

Jacqueline Draper                                                    118
Continued Direct Examination by Mr. Miller

1  objections at the end, and it says, "State Farm has no present

2  knowledge of Plaintiff's failure to comply with provisions of

3  the policy with regard to the filing of a claim."

4      See that?

5  A.   Yes.

6  Q.   All right.  And if you'll just scroll down to page 34, on

7  page 34 there's a certificate of service.  Do you see where it

8  gives a date on that when that -- those answers were sent?

9  A.   Yes.

10 Q.   And so this would have happened -- your involvement would

11 have been before October 25th of '21, of course, but that's

12 when they were sent to us.  Do you see that?

13 A.   Yes.

14 Q.   Now, are you aware of -- in all of the supplemental

15 responses that are attached to this exhibit, did State Farm

16 ever change the position that they took when they said that,

17 "State Farm has no present knowledge of Plaintiff's failure to

18 comply with provisions of the policy with regard to filing a

19 claim?"

20 A.   Can you ask the question again?

21 Q.   Are you aware of any supplemental response, in other

22 words, changing any part of this response for Admission

23 Number 2, from what State Farm said originally on October 25th

24 of 2021:  that "State Farm has no present knowledge of

25 Plaintiff's failure to comply with provisions of the policy

Jacqueline Draper                                                    119
Continued Direct Examination by Mr. Miller

1   with regard to filing a claim"?

2        Did that ever change to your knowledge, ma'am?

3   A.   I -- I -- I don't know the answer to that.  I...

4   Q.   Well, do you remember ever being presented with any

5   information where a supplement had to be done of Request for

6   Admission No. 2 to change this answer?

7   A.   I -- I don't recall that.

8   Q.   Okay.  Fair enough.  Thank you for that.

9        MR. MILLER:  Now, if you could go to JX18, page 40,

10  and I'd ask you to blow up just the question on Interrogatory

11  Number 15 so that Ms. Draper can see it.

12  Q.   (By Mr. Miller) Here, the question --

13       MR. LEFFEL:  Objection based on lack of knowledge,

14  Your Honor.

15       THE COURT:  Overruled.  He hasn't asked a question

16  yet.

17  Q.   (By Mr. Miller) All right.  Here, the question is,

18  "Identify the number of hail claims under Oklahoma policies

19  handled by members of Jacqueline Draper's Team from July 2019

20  to present"; and, again, that would have been in that time

21  frame that we're talking about.

22       Do you see that?

23  A.   I see it.

24  Q.   And, then, the first answer, the one right below it, is

25  supplemented.  That's what I was talking about was

Jacqueline Draper                                          120
Continued Direct Examination by Mr. Miller

1    supplemental.

2            MR. MILLER:  So if you could just pull up the very

3    next title there, Janna.  It says, "Answer to Interrogatory No.

4    15."

5        And, then, right below it, in the next page, "Supplemental

6    answer to Interrogatory -- Interrogatory No. 14."

7    Q.   (By Mr. Miller) So another time after the first answer

8    State Farm revised their answer --

9            MR. LEFFEL:  Your Honor, may we sidebar?

10           THE COURT:  Sure.

11       (Bench conference on the record after headsets check.)

12           THE COURT:  Okay.  Mr. Leffel?

13           MR. LEFFEL:  So, yes.  First of all, could we ask to

14   take the evidence down that's being displayed on the screen?

15           THE COURT:  Yes.

16       Please remove that.

17           MR. LEFFEL:  So, first, my objection is -- and I --

18   the reason I objected based on lack of knowledge is that

19   Mr. Miller asked the witness if she had any knowledge about

20   whether she had received the supplemental discovery responses.

21       The supplemental responses start with Interrogatory Number

22   4, and -- and, you know -- so we don't have Number 1 where it

23   said that she was the person that was going to assist with

24   answering the discovery.

25       Furthermore, my -- second part of my objection is -- so

Jacqueline Draper                                                      121
Continued Direct Examination by Mr. Miller

1    just hang on.

2        We don't establish that she has any knowledge; but,

3    second, after I objected, you said, "Mr. Miller has not asked

4    his question yet," but, yet, his assistant is putting up the

5    answer to the interrogatory before he's even established

6    whether or not she knows or was involved in any way in

7    answering that interrogatory, which she was not.  There's no

8    verification, and we didn't repeat -- we didn't supplement

9    Interrogatory Number 1.

10            THE COURT:  Okay.  Mr. Miller?

11            MR. MILLER:  Well, Judge, number one, on that point,

12   they are admitted into evidence, so it's not something that I

13   have to offer, as I understand it.

14       Number two, so far, she hasn't said that she does not know

15   about these.  In fact, she said sometimes -- she didn't

16   remember exactly, but she's definitely said that she was

17   involved -- or at least my -- my hearing of it was that she was

18   involved in responding for State Farm, that they do that

19   sometimes, that she would have seen these before they were --

20   were approved.

21            THE COURT:  Okay.  So a couple of things.

22       The objection will be overruled.

23       On Interrogatory Number 1, the answer indicates that these

24   interrogatories are being answered by Jacqueline Draper with

25   the assistance of counsel.

Jacqueline Draper                                        122
Continued Direct Examination by Mr. Miller

1      Number two, the question seeks information about

2  Jacqueline Draper's team from 2019 to the present.  So there's

3  not an apparent basis to this Court that she would not have

4  knowledge of the number of hail claims under Oklahoma policies

5  handled by her own team from July 2019 to the present.

6      Mr. Miller, you are admonished to tell Ms. McGuire she is

7  not to put up evidence until the question has come out and we

8  have an opportunity to see if there's an objection.

9  Understood?

10             MR. MILLER:  Yes, ma'am.

11             THE COURT:  Okay.  Any further questions?

12             MR. MILLER:  One thing:  So what I should do is ask

13 Jacqueline to look at it in her book and then put it up if

14 it -- if it's appropriate?

15             THE COURT:  Yes.

16             MR. MILLER:  I gotcha.

17             THE COURT:  Yes.

18       Mr. Leffel?

19             MR. LEFFEL:  That's fine.

20             THE COURT:  Okay.  Thanks.

21       (End of bench conference.)

22             THE COURT:  Mr. Miller, you may proceed.

23             MR. MILLER:  All right.

24 Q.  (By Mr. Miller) All right.  So, Ms. -- Ms. Draper, we were

25 talking about Interrogatory Number 15.  Can you look in your

Jacqueline Draper                                                123
Continued Direct Examination by Mr. Miller

1  book and -- and see that particular interrogatory for me,

2  please?

3       It's -- it's -- it's going to be JX18 at page 40.

4  A.   Okay.  So which volume?

5  Q.   I really don't know how yours are put together, ma'am.

6            THE COURT:  It'll be Volume 2. --

7            MR. MILLER:  Thank you, Judge.

8            THE COURT:  -- of the --

9            THE WITNESS:  Okay.

10           THE COURT:  -- joint exhibits, and it's Tab 18.

11           THE WITNESS:  Thank you.

12  A.   Okay.  18.

13       And, then, what was the page at the bottom?

14  Q.   (By Mr. Miller) 40.

15  A.   Okay.  I'm on that page.

16  Q.   All right.  Here, the question, Interrogatory Number 15 --

17  that deals with you; correct?

18  A.   Yes.

19  Q.   And it -- the time frame of the beginning of that question

20  is around the time that you started as team manager for that

21  Oklahoma hail proximity -- or proximity team; correct?

22  A.   Yes.

23  Q.   Okay.  And, here, the number of hail claims are being

24  requested from State Farm; and they give an answer; and, if

25  you'll go down to the supplemental answer, which is on the next

Jacqueline Draper                                              124
Continued Direct Examination by Mr. Miller

1   page, 41...

2   A.   Okay.

3   Q.   If you'll read that just to yourself, please.

4        Make sure you're reading the right one.  It says

5   "Supplemental Answer to Interrogatory No. 15."

6        You got that one?

7   A.   Okay.  Uh-huh.

8   Q.   Okay.  Good.

9        Read that to yourself.

10  A.   Okay.

11  Q.   In this particular response, it gives a number of claims

12  that were involving hail handled by your team while you were

13  there.  All right?

14       Does that look like an accurate number to you?

15  A.   I wouldn't even be able to necessarily guess.

16  Q.   Well, I'm not asking you to guess.

17       I'm asking you to tell us if, when this answer was given

18  by State Farm to these questions that you were identified

19  originally as being the person to provide the information --

20  did you verify that was correct?

21  A.   Did I verify that it was correct?

22  Q.   Yes.

23  A.   No, I did not verify that it was correct.

24  Q.   Well, did you make up the number, or did you have

25  something to do with the number?

 1          MR. LEFFEL:  Objection.

 2          THE COURT:  Overruled.

 3  Q.   (By Mr. Miller) Where'd the number come from?

 4  A.   I -- I don't know.

 5  Q.   Do you believe that you can estimate, in your time in

 6  Oklahoma, the number of hail claims your team answered --

 7  responded to?

 8  A.   I -- I don't know how I would arrive at a correct answer

 9  for you --

10  Q.   And, if --

11  A.   -- in my head.

12  Q.   -- if I'm hearing you right, in spite of what these say

13  about your involvement, you do not recall being involved with

14  generating the specific answer?

15       Is that the answer?

16  A.   I wouldn't have access to be able to pull this data.

17  Q.   Well, whether you could pull it or not, you could

18  certainly look at it and verify in your mind, I -- I -- I would

19  assume, whether you think it's accurate.

20  A.   I don't know that I could verify in my mind if I don't

21  have the ability to pull this.  It would simply be a guess.

22  Q.   Okay.  All right.  So you -- you cannot tell us that the

23  Interrogatory Answer Number 15 in the supplement that deals

24  with you and your team while you were in Oklahoma -- if it's

25  right or not about hail claims.  Is that the bottom line?

Jacqueline Draper                                         126
Continued Direct Examination by Mr. Miller

1  A.    I don't -- again, I don't have access to this data for a

2  host of reasons, so I have no way of verifying that it is

3  correct.  I'm sure that this was pulled by someone who has

4  access to that data and is able to corroborate and -- and

5  verify that it's correct.

6  Q.    Okay.  All right.  In spite of what the things say, it

7  wasn't you, bottom line?

8  A.    I didn't pull the data.

9  Q.    If you'll look the next interrogatory, Number 16 -- I

10  think you're going to go to page 50.  It's going to be 8 -- 18,

11  page 50.

12  A.    Okay.  I'm there.

13  Q.    And -- and, here, in -- you can see that the

14  interrogatory, if we're on the same one together, says,

15  "Identify the number of hail claims under Oklahoma policies

16  handled by members of Jacqueline Draper's Team from July '19 to

17  present which were denied in whole or part."

18        You see that?

19  A.    Yes.

20  Q.    And there's another supplemental answer.  There was an

21  original one given, then a supplement; and it's on the same

22  page at the bottom; and after you get past the objections, you

23  see the response.

24  A.    Yes.

25  Q.    What -- was this your response?

1  A.   I did not write the response, no.

2  Q.   Are you aware that that's accurate information, ma'am?

3  A.   I also wouldn't have access to this information, not as a

4  team manager.

5  Q.   Ma'am, can you tell us who it would be that would provide

6  this information for State Farm?

7  A.   I don't -- I don't have any idea.

8  Q.   Okay.  How about this:  If State Farm provided this

9  information in the lawsuit, do you believe it to be accurate?

10  A.   I do.

11  Q.   Okay.  Fair enough.

12          MR. MILLER:  Judge, may we publish 16?

13          THE COURT:  You may.

14          MR. MILLER:  If you'll put up 18 and -- the top -- 50

15  so the jury can see the question that was asked.

16  Q.   (By Mr. Miller) And, as I said, Ms. Draper, is it accurate

17  to say that it says, "Identify the number of hail claims under

18  Oklahoma policies handled by number -- by members of Jacqueline

19  Draper's Team from July '19 to present which were denied in

20  whole or in part?"

21      And then -- that's accurate; correct?

22  A.   Yes.

23  Q.   And then the response in the supplemental said, in

24  pertinent part, where it starts at "State Farm," is that the

25  same response you saw?

Jacqueline Draper                                                    128
Continued Direct Examination by Mr. Miller

1    A.   Yes.

2    Q.   Okay.   Good.

3         And it says, "State Farm states that there were 156 claim

4    files for Plaintiff's dates of loss (July 3rd, 2020) handled by

5    Jacqueline Draper's Team.   Within the 156 claims, there were 71

6    claims in which either the loss investigation determined there

7    was no accidental direct physical loss or a part of the claim

8    was otherwise not covered."

9         That's the answer that you believe would be true if

10   State Farm said it was.   Fair?

11             MR. LEFFEL:   Objection.

12   A.   Correct.

13             MR. LEFFEL:   Lack of knowledge.

14             THE COURT:   Overruled.

15   Q.   (By Mr. Miller) All right.   If you'll go on to Number 17

16   for me --

17             MR. MILLER:   Don't show 17.

18   Q.   (By Mr. Miller) But look at 17, which is going to be on

19   page 51.

20        All right.   Here, this question is, "Identify the number

21   of hail claims under Oklahoma policies handled by members of

22   Jacqueline Draper's Team from July 2019 to present which were

23   denied in whole or in part due to deterioration and/or wear and

24   tear."

25        You see that?

Jacqueline Draper                                                129
Continued Direct Examination by Mr. Miller

1    A.   Yes.

2    Q.   Now, the answer, again, is a supplement; and it's on down

3    to the same page -- supplement to 8 -- to 17; and it does roll

4    over into the next page, but it starts with "State Farm."

5         Can you read that to yourself for me?

6    A.   Okay.

7    Q.   All right.  Can you tell us if this information is

8    something that you can verify personally?

9    A.   I -- I personally cannot -- would not be able to verify

10   the data.

11   Q.   Is it fair to say, though, that, if State Farm provided

12   that in this litigation, you would believe it to be true?

13            MR. LEFFEL:  Objection.

14   A.   If State Farm --

15            MR. LEFFEL:  Calls for speculation.

16            THE COURT:  Overruled.

17   Q.   (By Mr. Miller) Go ahead.

18        Did you understand my --

19   A.   Do I...

20   Q.   Did you understand --

21   A.   Yeah.

22   Q.   -- my question?

23   A.   Can you -- no.

24        Can you ask it again?

25   Q.   Yes.

Jacqueline Draper                                                          130
Continued Direct Examination by Mr. Miller

1        Ms. Draper, if State Farm provided that answer in this

2   litigation, do you believe it to be accurate?

3   A.   I -- I do.

4   Q.   All right.

5             MR. MILLER:  If you could -- Judge, if you'd allow us

6   to publish that.

7             THE COURT:  You may.

8             MR. MILLER:  If you'll just put up the supplemental

9   answer this time of 17, we'll try to move this along.

10       And if you'll start with "State Farm," all the way to the

11  end, please.

12  Q.   (By Mr. Miller) All right.  Ms. Draper, is this the same

13  one you were just -- the same response you were just looking at

14  in the book?

15  A.   Yes.

16  Q.   Says, "State Farm states that at -- of the 71 claims

17  identified in ROG -- Interrogatory 16" -- the one just above --

18  "State Farm has identified 18 claims in which the final denial

19  letter contained in the respective claim file referenced some

20  kind of wear, tear, and/or deterioration and which may have

21  been the basis of the claim decision.

22       "State Farm has identified 19 additional files where wear,

23  tear, and/or deterioration was mentioned or discussed in the

24  claim notes and which may have been considered as part of the

25  basis for the claim decision, but not expressly cited as a

Jacqueline Draper                                                      131
Continued Direct Examination by Mr. Miller

1   basis for the denial of the claim."

2       Do you have any reason at all to disagree with that,

3   ma'am?

4   A.   I don't.

5   Q.   All right.  If we can now look at Number 18 --

6           MR. MILLER:  Not on the jury's -- thank you.

7   Q.   (By Mr. Miller) -- Number 18, which is on the next page,

8   ma'am, 52; and it's Request for Production Number 18; says,

9   "Produce every claim file handled by members of Jacqueline

10  Draper's Team for hail damage with a date of loss from February

11  2020 to present which were -- was denied in whole or in part."

12      You see that?

13  A.   Yes.

14  Q.   And -- and do you see the partial answer, without reading

15  it out loud, on the supplement that was dealing with just 71 of

16  those claims?

17  A.   I've read it.

18  Q.   All right.  Do you know if that information personally --

19  can you verify that information personally?

20  A.   I personally would not be able to verify it.

21  Q.   Again, like the others, do you believe that, if State Farm

22  produced that information through this litigation, it would be

23  accurate?

24  A.   Yes.

25  Q.   All right.

Jacqueline Draper                                                    132
Continued Direct Examination by Mr. Miller

1          MR. MILLER:  If we could -- with the judge's

2     permission, can we put that up?

3          THE COURT:  You may.

4          MR. MILLER:  Just put up the answer, please,

5     Supplemental Response to Request for Production 18.  It's at

6     52, bottom.

7          If you'd just highlight the pertinent part.

8          Thank you.

9          It says here that -- in spite of the question that was

10    asked, State Farm answered in part.  It says, "State --

11    State Farm has produced claim notes and final denial letters

12    for 71 claims (including prior production of Plaintiff's claim

13    file)" -- that'd be this one -- "denied in whole or in part

14    which were handled by Jacqueline Draper's Team and have a date

15    of loss for July 3rd, 2020," the date of this date of loss;

16    correct?

17    A.   Correct.

18    Q.   Again, if State Farm provided that, you believe it to be

19    accurate.  Is that fair?

20    A.   I do.

21    Q.   Now, if you would turn to 27.60 --

22         MR. MILLER:  I'm sorry.  I keep doing that.

23    Apologize, Judge.

24    Q.   (By Mr. Miller) 18.60.

25    A.   Okay.

Jacqueline Draper                                              133
Continued Direct Examination by Mr. Miller

1  Q.   All right.  Here, we're seeing again the same

2  Interrogatory Number 16 that we have talked about already; but

3  there's a second supplemental answer to it, if you could just

4  read that portion, beyond the objection, to yourself so I can

5  ask you the same question I've been asking you.

6  A.   Okay.

7  Q.   All right.  Did -- can you verify this information?

8  A.   No.

9  Q.   Same question:  If State Farm produced it, do you believe

10  it to be accurate?

11  A.   I do.

12             MR. MILLER:  May I publish Second Supplemental 16?

13             THE COURT:  You may.

14  Q.   (By Mr. Miller) All right.  Here, the response State Farm,

15  on the second try, gives is, "State Farm states that" -- oh.

16      (Discussion off the record Mr. Miller and Ms. McGuire.)

17  Q.   (By Mr. Miller) All right.  It says, "State Farm states

18  that there were 156 claim files for Plaintiff's date of loss

19  (July 3rd of '20) handled by Jacqueline Draper's Team.  Within

20  the 156 claims, there were 72 claims in which either the loss

21  investigation determined there was no accidental direct

22  physical loss or a part of the claim was otherwise not

23  covered"; correct?

24      That's what it says.

25      Can you hear me?

Jacqueline Draper                                              134
Continued Direct Examination by Mr. Miller

1   A.   Yes.  I'm sorry.  I was looking at a different part of the

2   page.

3   Q.   Oh.  Well, if you're already --

4   A.   Yes.

5   Q.   Thank you.

6        If -- we -- we will summarily handle the last one, which,

7   I'm sure, everyone will be thankful to hear.

8        If you will just look at the one right below it, and we

9   can handle it real quickly.

10       They just changed, in this one, the number of claim files

11  again from -- I think it was 71 to 72; is that correct?

12       Everything else is the same.

13  A.   I'd have to look at them side by side.

14       What was the question?

15  Q.   I was just asking if, once again, they were just

16  correcting the number from 71 claim files that involved the

17  denial to 72.

18  A.   Yes.

19  Q.   Okay.  Thank you for going over that with me.

20            MR. MILLER:  You can take -- take that down.

21  Q.   (By Mr. Miller) Ma'am...

22       I forgot my question.

23       Sorry, Ms. Draper.  I forgot my question, honestly.

24       I'm going to move on to something else.  If I remember it,

25  maybe I'll come back and ask you.

Jacqueline Draper                                                    135
Continued Direct Examination by Mr. Miller

1      Now, Ms. Draper, did you ever tell the adjusters in
2  Oklahoma on your proximity team during those couple of years
3  that you were here -- did you ever tell them to keep coverage
4  decisions in the texts that were exchanged from the roofs or
5  the yards where they might be back and forth with you -- keep
6  them out of the claim file?
7  A.   No.  They can mention conversations that they have with
8  their leadership in the claim file.  There's nothing wrong with
9  that.
10 Q.   Well, no, there's nothing wrong with it.  In fact, they
11 should if it's -- goes to the coverage decision; right?
12     They absolutely should; correct?
13 A.   They certainly can.  They can.
14 Q.   And, certainly, in a case where the team leader's, for
15 instance -- is making the coverage decision for whatever
16 reason, that should be documented in the claim file.  Correct?
17 A.   I don't have a team leader, so I'm -- I'm not sure how to
18 answer that question.
19 Q.   Well, you...
20     Well, you were a team manager.  Maybe I used the wrong
21 words.
22     But if a team manager at State Farm in your position in
23 Oklahoma on a proximity team -- unit -- if that person decides
24 a -- makes a coverage decision, then the basis of that coverage
25 decision and the person who I -- made it -- their

1   identity should be included in the claim file.  Is that fair?

2   A.   I don't necessarily agree with that.  If it was omitted,

3   if they spoke to their investigation and their process and --

4   and their -- their photo documentation and -- it's not uncommon

5   for an adjuster to reach out and ask questions; and so I

6   wouldn't necessarily feel that every single time an adjuster

7   asks a question on a claim file, even if it's in regards to

8   coverage, that -- that that would be included in the claim

9   file.  I think that's unrealistic.

10  Q.   Sure is, and that's not my question.

11       My question was anytime a team manager makes a coverage

12  decision on a claim, should the basis for that coverage

13  decision and the identity of the manager who makes it be

14  included in the claim notes or the claim file so that it can be

15  documented how the adjuster got there?

16  A.   I mean, ultimately, the adjuster is going to make the

17  claims decision in the claim file, and the claim file should be

18  documented with the coverage decision.

19  Q.   Wait a minute.

20       Are you telling me that, if you decide to make a coverage

21  decision that's different than the adjuster, you do not have

22  the authority to do that?

23  A.   I'm confused by your questioning.  Can you --

24  Q.   You do have --

25  A.   -- restate your question?

Jacqueline Draper                                                    137
Continued Direct Examination by Mr. Miller

1  Q.   Yes.

2       You do have the authority to override a -- an adjuster's

3  decision about a coverage decision, don't you?

4  A.   Absolutely.

5  Q.   As a matter of fact, it's your job to make sure that those

6  decisions are correct; right?

7  A.   Correct.

8  Q.   And if it's a denial, the adjuster doesn't even have the

9  right to make it, unless he's got -- they've got your approval;

10 correct?

11 A.   Correct.

12 Q.   Okay.  So all I'm saying is, if that -- if it happens that

13 you, as the team manager, is making the coverage decision for

14 the adjuster, then that decision, whether you document it or

15 the adjuster does, should include your identity as the decision

16 maker and the basis of your decision.  Is that fair?

17 A.   So, again, if we've had discussions in regards to the

18 coverage decision and talked through it, and that wasn't

19 necessarily included in the claim file, but we've included the

20 investigation and the file notes and how they arrived at their

21 coverage decision, ultimately, the file reflects the coverage

22 decision that was appropriate on the claim file.

23 Q.   What I'm saying, ma'am, is, if you, as the team manager,

24 make the decision -- I didn't say anything about collaboration.

25 You make the decision -- do you then agree that that should be

1  reflected, including the basis of your decision, and your

2  identity as the maker of the decision in the claim file under

3  State Farm's OGs?

4  A.   And I'll try to answer your question.  I'm certainly

5  trying to get there.

6       So it's not uncommon for us to -- to put our opinions of

7  the coverage decision and why in the claim file as the

8  management.

9       If that didn't occur, and the -- the team manager had

10  conversations about coverage in the claim file, and it -- and

11  that team manager didn't put a file note in there, it's --

12  doesn't mean that the file wasn't still documented for that

13  coverage decision.

14       So if I had a conversation with them and reviewed

15  coverage, and, ultimately, we arrived at the coverage decision

16  during that time, they absolutely could document the claim file

17  from that; but it wasn't -- you're saying, like, is it a file

18  requirement that I immediately put a file note in there in

19  regards to my conversation with them or -- or that we, when we

20  discussed, arrived at that coverage decision.

21  Q.   Well, in fact, I never said anything about you putting a

22  note in red letters.

23       I just said should it be documented, under the rules in

24  the OGs, that, if a team manager makes a coverage decision,

25  their identity is disclosed and the basis -- basis of their

1   decision is disclosed?

2        Whether you write the note or your adjuster writes the

3   note, you're supposed to be identified in the decision.  Is

4   that true?

5   A.   I think they absolutely can include my information in the

6   claim file.

7   Q.   You don't think it's required?

8   A.   Do I not think it's required --

9   Q.   Yes.

10  A.   -- that -- that conversation be -- be documented?

11       Not necessarily.

12  Q.   All right.  Now, is it the case that you ever told your

13  adjusters on your team in Oklahoma that they were not to use

14  your name or your involvement in wanting to look at texts or

15  pictures of roofs before an adjuster could make a decision to

16  pay for a roof -- did you ever tell your adjusters not to

17  disclose your involvement in that decision?

18            MR. LEFFEL:  Asked and answered.

19            THE COURT:  I think he made it specific to roof.

20       It's a long question; if you can shorten the question.

21       The question -- the objection is overruled.

22            MR. MILLER:  So shorten it?

23  Q.   (By Mr. Miller) Okay.  Ma'am, I'm just trying to find out

24  if you ever told your adjusters not to tell the contractors up

25  on the roof or on the grass out -- before they leave that they

Jacqueline Draper                                                    140
Continued Direct Examination by Mr. Miller

1    had to wait to give them a decision about whether they were

2    going to pay for the roof until they heard back from Jacqueline

3    or their team manager being Jacqueline.

4         Did you ever tell them that?

5    A.   Did I ever tell them that they could not say that they had

6    to review it with their team manager?

7    Q.   Before it -- yes.  Exactly.

8    A.   I don't recall ever telling them that they couldn't say,

9    "Hey, I need to go back and review this with my leadership

10   before we settle."

11        I -- I don't ever recall saying that.

12   Q.   Do you remember being asked that question in the

13   deposition, the second volume?

14   A.   I don't recall being asked that question.

15   Q.   You might turn to the second volume for me.

16   A.   Where am I turning to?

17   Q.   Page 206, line four.

18        You're going to -- you're going to look at line four

19   through nine.

20   A.   "Did you ever tell any of your subordinates" --

21   Q.   You're not supposed --

22   A.   -- "while you were" --

23   Q.   -- you're not supposed to read it out loud, ma'am.  I'm

24   sorry.

25   A.   Okay.

Jacqueline Draper                                                    141
Continued Direct Examination by Mr. Miller

1   Q.   Just read it to yourself.

2   A.   I've read it.

3   Q.   Okay.  Do you remember being asked the question, "Did you

4   ever tell any of your subordinates, while you were in the

5   proximity unit in Oklahoma City as the team manager, not to use

6   your name or position in their discussions with contractors

7   about claim denials or claim decisions?"

8        And you said what?

9   A.   I said, "No."

10  Q.   Ma'am, did you ever tell people on your team, your

11  subordinates, not to use your name or your position in

12  discussions about coverage decisions on roofs with any of the

13  insureds that they were talking to or dealing with?

14            MR. LEFFEL:  Asked and answered, once again.

15            THE COURT:  Sustained.

16            MR. MILLER:  "The insureds"?

17       I'm sorry to stop the thing.  Could I have a quick

18  comment, Judge?

19            THE COURT:  As a sidebar?

20            MR. MILLER:  Yes.  I'm sorry.

21            THE COURT:  Sure.

22            MR. MILLER:  Okay.

23       (Bench conference on the record after headsets check.)

24            THE COURT:  Mr. Miller?

25            MR. MILLER:  Judge, the first question I just asked

Jacqueline Draper                                          142
Continued Direct Examination by Mr. Miller

1   was about contractors.  The second question that you sustained

2   was about insureds, at least that's what I meant to say.

3           THE COURT:  How do I go up on this?

4       Okay.  Mr. Miller, I believe, is correct, looking back at

5   the transcript, so that objection will be overruled.

6       Mr. Miller, how much longer do you need, sir?

7       I need you to move this along.  Shorten your questions,

8   condense your questions, and let's move along.

9       But I will allow -- allow you to ask that question.  If

10  you want Ms. Kerr to read it back to her, we can do that.

11          MR. MILLER:  That'd be fine.

12          THE COURT:  Okay.  Mr. Leffel, anything further?

13          MR. LEFFEL:  No, Your Honor.

14          THE COURT:  Okay.  Thank you.

15      (End of bench conference.)

16          THE COURT:  That objection is overruled.

17      Mr. Miller, do you want Ms. Kerr to read that question

18  back to the witness?

19          MR. MILLER:  That'd be fine, Judge.

20      (The question is read by the reporter.)

21  A.  No.

22  Q.  (By Mr. Miller) Okay.  All right.  Thank you, Ms. Draper.

23      Let me shift gears on us and move this along, I hope.

24      Speaking of Amy Lanier, she was one of the people that

25  worked for you; correct?

Jacqueline Draper                                                143
Continued Direct Examination by Mr. Miller

1   A.    Yes.

2   Q.    And I think about a year on your team before she left?

3   Does that sound right?

4   A.    I think it was something like that.

5   Q.    Okay.  And I'd asked you this before, and I just want to

6   make sure that -- is there anything at all about your

7   relationship with Ms. Lanier through that year -- that you ever

8   found her to be dishonest or deceitful in any way?

9   A.    Not that I can recall.

10  Q.    Okay.  Now, again shifting gears to roof decking, is it

11  fair to say that while this case -- this claim was active there

12  was never any involvement on the claims side, on the State Farm

13  side, in any kind of investigation or examination of whether or

14  not the roof decking met code for the Edmond community?

15  A.    It wouldn't have come into play in this claim file, no.

16  Q.    Right.

17        Because there was never going to be a -- State Farm was

18  not going to pay for the removal and replacement of the

19  shingles, so why would the decking matter?

20        Is that a fair way of saying it?

21  A.    Correct.  If there's no coverage for the -- the shingles,

22  then there would be no reason for us to take into account the

23  decking --

24  Q.    Right.  Exactly.

25  A.    -- or building ordinance and law.

Jacqueline Draper                                                    144
Continued Direct Examination by Mr. Miller

1   Q.   Exactly.

2        So decking never was a part of the claim decision.  Fair?

3   A.   Correct.

4   Q.   Thank you.

5            MR. MILLER:  All right.  If we could put up an email

6   that Mr. Bates wrote -- Gary Bates.  I think it is JX1.237.

7        Let's hope.

8        Yeah.  Good.  Did it.

9   Q.   (By Mr. Miller) All right.  Now, you remember talking

10  about this at your deposition at some length.

11       Can you see it?

12  A.   I can see it.

13  Q.   You -- do you remember that email, ma'am?

14  A.   I think I remember discussing it in the prior deposition.

15  Q.   Right.

16       And is that an email that you had ever seen in real time

17  at the time that the claim was being handled at State Farm?

18  A.   I don't think so.

19  Q.   And -- and so when you -- when you're first looking at it

20  would have been in preparation for your deposition; is that

21  right?

22  A.   Correct.

23  Q.   Okay.  You can tell, and would you agree, that's a

24  frustrated person writing that email?

25  A.   Yes.

Jacqueline Draper                                                    145
Continued Direct Examination by Mr. Miller

1  Q.   And the way you -- the way your team ran that email would

2  not have made its way to you, according to -- to what I

3  understand from you, unless a claims adjuster decided that they

4  could not handle the response, I guess.  Is that a fair way of

5  saying it?

6  A.   Correct.

7  Q.   Okay.  And so, on your team, you expected the -- the

8  claims handlers would have received it somehow in the -- I'm --

9  I'm not being critical.  I just don't exactly know how it

10 works.

11      But, somehow, it would pop to a claims handler, and they

12 would see it, and then it would be their job to take care of

13 it.  Fair?

14 A.   Yes.

15 Q.   Now, would it automatically and for sure go back to

16 Ms. Jacome, or could it be any number of the people, even in

17 the reconciliation unit?

18 A.   It could be any number of people.

19 Q.   All right.  And -- and the jury already knows this, but I

20 just want to make sure we're on the same page:  The hail

21 reconciliation unit means that, if that was handled by one of

22 them, it could be in one of three different places in the

23 country that has nothing to do with Oklahoma except handling

24 things like this remotely.  Fair?

25 A.   Correct.

Jacqueline Draper                                              146
Continued Direct Examination by Mr. Miller

1  Q.   Okay.  Now, do you know what Ms. Arnold would have

2  expected you to do with this email on your team?

3  A.   I didn't receive this email.

4  Q.   Well, sure.

5       But your -- well, you know what?

6       That's a good question.  Let me ask you that.

7       If -- if a hail reconciliation unit person did receive it,

8  what -- what are they supposed to do with it?

9  A.   First and foremost, reach out to the policyholder and

10 answer any questions that they had in regards to the -- the

11 email --

12 Q.   What --

13 A.   -- and try to resolve any concerns that the policyholder

14 had.

15 Q.   Even though the policyholder is really wanting to talk to

16 someone in management pretty clearly, does that matter in the

17 way State Farm does things?

18 A.   We would ask that the claims adjusters reach out and try

19 to resolve the issue before escalating to management, yes.

20 Q.   When an email like this comes into the hail claim -- hail

21 claims reconciliation unit, those are people that are not under

22 your control as a proximity manager.  True?

23 A.   Correct.

24 Q.   So how would -- how would they know how you would want it

25 handled?

Jacqueline Draper                                            147
Continued Direct Examination by Mr. Miller

1      Is that a -- is that a rule that's somewhere in the OGs,

2   or how does that work?

3   A.   It's a common procedure:  that, if, you know, we get an

4   email from a policyholder in regards to concerns or questions

5   that they have with their claim, that the claim handlers reach

6   out and try to resolve.  If they're unable to resolve, then,

7   you know, they can certainly escalate that to a first-line

8   leader.

9   Q.   Would it surprise you to know that Ms. Arnold testified

10  that -- especially in her deposition, that she would have

11  expected you to respond to this?

12  A.   I believe you said that this was reopened in HRU; right?

13  Q.   Well, I -- I didn't say.  I -- I didn't know.  I asked you

14  how that would work.

15      But what I'm saying right now is would that surprise you

16  to know, that Ms. Arnold, your section manager, testified in

17  her deposition that she would have expected you to respond to

18  this?

19  A.   It would, especially if it reopened in HRU, because we

20  would have no knowledge of the email, of the claim file.

21  Q.   Is it -- is it such that maybe it reopened in proximity?

22  Do you know?

23  A.   I don't know.

24  Q.   Okay.  Fair enough.

25      Have you done anything to try to find out if anybody ever

Jacqueline Draper                                              148
Continued Direct Examination by Mr. Miller

1   responded to the April 8th email?

2   A.   Have I done anything?

3   Q.   Yes.

4   A.   Recently, no, I -- I have not.

5   Q.   Well, I don't mean recently; I mean ever.

6        Did you ever look into seeing whether or not anybody ever

7   responded to that April 8th email that was up on the screen

8   right now?

9   A.   So, again, unless this was escalated to a supervisor, we

10  wouldn't have been aware of it.

11  Q.   That's fine.

12       You're -- you're using terms like "unless," and all I'm

13  trying to find out is did you do anything to sort it out and

14  figure out what happened after that email?

15       That's all I'm asking.

16           MR. LEFFEL:  Objection.  Cumulative, Your Honor.

17           THE COURT:  Sustained.

18       Mr. Miller, move this along.

19           MR. MILLER:  All right.

20           THE COURT:  It's 5:00 o'clock.

21           MR. MILLER:  All right, Judge.

22       (Discussion off the record between Mr. Miller and

23  Ms. Landeros.)

24           MR. MILLER:  I'll move it along to being done.

25           THE COURT:  Okay.  Thank you, Mr. Miller.

1        Mr. Leffel, you may proceed.

2        I do have a juror that needs to take a small break from

3   5:30 to 5:40; so, at that time, I will ask for our jurors to

4   get a -- a brief recess; but please proceed.

5                          CROSS-EXAMINATION

6   BY MR. LEFFEL:

7   Q.   Ms. Draper, good afternoon.

8   A.   Good afternoon.

9   Q.   So, being second in the batting order here, I am going to

10  go through some things that you have discussed with Mr. Miller,

11  and then we will work into some other questions that I have for

12  you as part of my examination for you.

13       Ms. Draper, you are appearing here today by video from

14  Georgia.  Can you tell us why you are appearing from Georgia?

15              MR. MILLER:  Objection, Judge.

16              THE COURT:  Overruled.

17  Q.   (By Mr. Leffel) Please proceed, Ms. Draper.

18  A.   I am having a -- a nonelective inpatient surgery next

19  week, so I had several preop appointments and things that I

20  needed to take care of this week and wasn't able to make it,

21  unfortunately.

22  Q.   Yesterday, I understood that you were asked if you ever

23  required the members of your team to contact you in some way to

24  discuss claims where they were going to total or partially

25  total a roof, and I understood your answer to be no.  Did I

Jacqueline Draper                                                    150
Cross-examination by Mr. Leffel

1    hear that correctly?

2    A.    Correct.

3    Q.    Okay.

4    A.    So I understood...

5    Q.    Yeah.

6          Tell us:  What did you understand the question to be

7    asking you?

8    A.    I understood Mr. Miller's question to be asking, "In

9    general, did you require all of your claims specialists, on all

10   of their claims, to reach out to you before they made a -- a

11   total roof decision?"

12         And as I explained yesterday, that was not the case.

13   Q.    Okay.  Well, I want to make sure that -- that it is clear.

14         Was there ever a time when any member of your team may not

15   have had full authority and needed to discuss their claims

16   decision before finalizing them?

17   A.    Yes.  Absolutely.  So we have new adjusters that, you

18   know, come on to State Farm and don't have any experience, and

19   they have a -- a probationary -- probationary time, if you

20   will.  They're -- they're certainly handling claims, but we ask

21   that they review their coverage decisions and their

22   investigation and -- and kind of show their work like a math

23   teacher would ask, that you show your work in a -- in a math

24   problem -- you know, "Tell me about your thought process" --

25   making sure that we're looking at everything and applying the

Jacqueline Draper                                                    151
Cross-examination by Mr. Leffel

1  policy correctly and consistently.

2      So it was not uncommon for my new-to-role claim handlers

3  to reach out and discuss their claim decisions.

4      Or if I identified even an experienced adjuster who was

5  struggling in a certain area or particular cause of loss that

6  they were handling, whether it be in their application of -- of

7  the contract, of the policy, or in -- in writing estimates; and

8  they ask that they reach out so we review those things prior to

9  them settling so that we can make sure that we're getting --

10 we're getting it correct.

11 Q.    Okay.  So it could -- it could be something that would

12 occur when needed from your management perspective for either

13 an experienced or a new adjuster?

14 A.    Correct.

15 Q.    Okay.

16 A.    Not uncommon.

17 Q.    Is that -- is that forever? long term?

18     I mean, how do -- how do they get their -- their -- their

19 stripes back?

20 A.    No.  I hope not.

21     Typically, when we are training them, the hope is that --

22 you know, we're reviewing the claim files to help teach them

23 the skill sets and coach them and upscale them right so that

24 they can eventually take the training wheels off and be able to

25 review the policy, review damages, write the estimates

Jacqueline Draper                                                    152
Cross-examination by Mr. Leffel

1    correctly, and then -- and then, you know, pay those claims.

2        And so it was not uncommon when they would text or call

3    or -- or FaceTime because, ultimately, they're out there at the

4    policyholder's home; and if they have an opportunity to issue

5    payment for -- for damages, they want to review their decision

6    and make sure that their estimates are accurate and then -- and

7    then pay the policyholder on-site for what it is that we owe.

8    Q.    Do you recall Mr. Miller asking you some questions about

9    how a -- a loss should be documented with respect to

10   photographs?

11   A.    Yes.

12   Q.    I think he was asking in the context -- to -- to -- to --

13   to streamline it, through Tresa's testimony, who you,

14   obviously, weren't present for, he suggested that she said

15   that, "If I needed to deny a claim, I would need to document my

16   file with the reasons for denial.  If I was going to pay a

17   claim, I would need to document that."

18       Do you remember that?

19   A.    Yes.

20   Q.    And I think that you said something to the effect of,

21   like, "Well, what we're looking for is a holistic approach.

22   You should be giving the whole story."

23       Did I hear that right?

24   A.    Correct.

25   Q.    Okay.

1              MR. LEFFEL:  If we could pull up operational guide --

2    it's at JX2.34?  Is that it?

3         If we could go to the -- the front page of that so that we

4    can identify the document under the rule of completeness.

5    Q.   (By Mr. Leffel) This is a operational guide that is

6    75-160.  It's a wind/hail roofing guideline.

7         So is this an operational guide that you use in the

8    regular course of business at State Farm?

9    A.   Yes, it is.

10   Q.   Okay.  Let's now go ahead and go to that section on

11   inspections, and do you see where it -- we're going to

12   highlight where it says "Photographs."

13        It states that "Photographs should give a clear indication

14   of the extent of damage involved or the lack of damage."

15        Do you agree with that?

16   A.   Yes.

17   Q.   So the -- the goal is to photo both what is damaged and

18   what is not damaged?

19   A.   Yes.

20   Q.   Okay.  Looking at the photographs that you have seen from

21   Ms. Jacome's inspection, did you find that she did both of

22   those things?

23   A.   Yes, she did.

24   Q.   She might have had a picture of a clean ridge.  Did you

25   see that?

Jacqueline Draper                                              154
Cross-examination by Mr. Leffel

1    A.   I did.

2    Q.   Or a really battered soft metal vent cap.  Did you see

3    that?

4    A.   She did --

5    Q.   So that's --

6    A.   -- yes.

7    Q.   -- an example of something that was not damaged and an

8    example of something that was damaged; right?

9    A.   Yes.

10   Q.   Okay.  It says you should take overview photos of the

11   entire slopes, which depict the number and type of vents on the

12   roof surface.

13        Do you agree with that?

14   A.   Yes.

15   Q.   Did you find photographs of Ms. Jacome's inspection that

16   did what this operational guide instructed her to do?

17   A.   Yes.

18   Q.   Okay.  "Overview and close up photos of every test square

19   when applicable."

20        Did you find -- well, first of all, do you agree that

21   that's required?

22   A.   Yes.

23   Q.   Did you find examples, when you looked at Ms. Jacome's

24   photos -- and -- and the jury has seen, you know, five, six,

25   seven, eight, nine slope photos.

Jacqueline Draper                                              155
Cross-examination by Mr. Leffel

1    But did you find that she documented her test squares?

2  A.   Yes.

3  Q.   Okay.  Says, "Close up photos clearly depicting damage or

4  lack of damage."

5    Did you find any photographs in your review of her file

6  documentation that demonstrated that?

7  A.   Yes.

8  Q.   Okay.  "Close-up photos to document and depict the type of

9  roofing materials and the condition of the roof."

10 A.   Yes.

11 Q.   Okay.  Is -- is this how you trained your adjusters, like

12 Ms. Jacome, to document a roof claim?

13 A.   It absolutely is, yes.

14 Q.   Now, you recall Mr. Miller also showed you some -- at

15 least a snippet of a Haag video.  Do you recall that?

16 A.   Yes.

17 Q.   And that's the training that, sounds like, most people get

18 a refresher on at least once a year.

19 A.   Yes.

20 Q.   And I think that you were trying to focus on some issues

21 regarding whether edges were more susceptible to damage.  Do

22 you recall that?

23 A.   Yes.

24 Q.   Are edges also more susceptible to wear?

25 A.   They are.

Jacqueline Draper                                                      156
Cross-examination by Mr. Leffel

1   Q.   Okay.  So it gets confusing because sometimes you're

2   talking about the -- the edges of a shingle or the face, and

3   we've heard that; but, in the broader sense, we also have sort

4   of edges of the roof, like eaves or ridges or even valleys

5   where two slopes come together.  Those can also be the edges;

6   right?

7   A.   Correct.

8   Q.   And then, in between, like, a valley and a ridge and

9   another valley, you're going to have a slope; right?

10  A.   Yes.

11  Q.   Okay.  And -- and is it also true that things like valleys

12  and ridges are more susceptible to damage?

13  A.   Yes.

14  Q.   Okay.

15          MR. LEFFEL:  If we could show her another portion of

16  that Haag video, which, I believe, is going to be Joint Exhibit

17  11; and it starts at 11:56 and runs through 13:30.

18      Do I have that right?

19      (Video played.)

20          MR. LEFFEL:  Yeah, that's enough.

21  Q.   (By Mr. Leffel) Ms. Draper, did that confirm for you

22  that -- that the edges can be both susceptible to wear and also

23  sometimes more susceptible to damage?

24  A.   Yes.

25  Q.   What did the instructor there tell us about a chipped edge

Jacqueline Draper                                          157
Cross-examination by Mr. Leffel

1   within a half inch of the -- of the -- of the end of the

2   shingle?  Do you remember?

3   A.   Yes.  It doesn't affect the water-shedding ability of the

4   roof.  It's not considered damaging the functional ability

5   of -- of that shingle, ultimately.

6   Q.   Okay.  Mr. Miller was asking you about, if you were

7   involved in making a decision in a claim, would you expect to

8   find a note explaining your rationale.  Do you recall that?

9   A.   Yes.

10  Q.   Okay.  Whoever is making decisions in a file needs to

11  document that in the file.  Is that -- is that accurate?

12  A.   Correct.

13  Q.   Okay.  Did you make the decision on what was and was not

14  covered on the Bates roof?

15  A.   No.

16  Q.   Okay.  Who made that decision?

17  A.   Tresa.

18  Q.   Have you seen notes from Ms. Jacome that document what she

19  saw and how she reached her conclusions?

20  A.   Yes.

21  Q.   Okay.  So would there have been any need in this claim --

22  the Bates claim, the one that this case is about, for you to

23  have documented the basis of any decision?

24  A.   No.

25  Q.   Because you -- did -- were you the one that made the

Jacqueline Draper                                                      158
Cross-examination by Mr. Leffel

1   decisions?

2   A.    No.

3   Q.    Okay.  Just want to make sure we're clear on that.

4         Now, the other thing that you were shown was some

5   interrogatory responses that -- that, I think, as I understand

6   it, you testified you -- you don't have any personal knowledge

7   about them; but, if that's what was produced on behalf of

8   State Farm, you -- you would trust them to be true; right?

9   A.    Absolutely.

10  Q.    Okay.  And what -- I think it was Interrogatory Number 18

11  or 15...

12          MR. LEFFEL:  "Rog" 16.  That's JX18 at 50.  Let's

13  take a look at that.

14        It's "Rog" 16.

15  A.    Okay.

16          MR. LEFFEL:  And let's look at the supplemental

17  response where we're -- well, first, show them what it says,

18  yeah.

19        So I apologize, everyone.

20        I can't remember.  You may not be able to remember either.

21  Q.    (By Mr. Leffel) So it's basically saying (as read)

22  Identify all of the hail claims under Oklahoma policies handled

23  by members of Jacqueline Draper's Team from July 2019 to the

24  present which were denied in whole or in part.

25        You got the question?

Jacqueline Draper                                                      159
Cross-examination by Mr. Leffel

1   A.   (Nods head yes.)

2   Q.   Okay.  So the first thing I want to ask you about is, if

3   you denied a claim in part, could that mean that you total

4   three slopes and paid for nine windows and paid for some siding

5   and paid for some gutters but didn't completely total the roof

6   when that was being requested?

7   A.   Yes, that would be considered a partial denial --

8   Q.   So, I mean --

9   A.   -- in part.

10  Q.   -- you know, a complete denial, which would be that, you

11  know, there's nothing going on at this property that was

12  covered by this policy; right?

13  A.   Would mean there was no damage.

14  Q.   Yeah.

15       Here, in the Bates claim, you were able to find covered

16  damage, and -- and -- and did you endeavor to pay for that

17  damage?

18  A.   Yes, we did.

19  Q.   So this would -- so this particular file is an example of

20  a partial denial; right?

21  A.   Yes.

22  Q.   Okay.  If we're looking at that interrogatory question,

23  he's asking for everything that could have been a complete

24  denial all the way up to -- you know, maybe you're paying for

25  almost every slope, but there's just parts of what they were

Jacqueline Draper                                                   160
Cross-examination by Mr. Leffel

1   claiming was damage that you didn't cover.

2       Do I understand that right?

3   A.   Yes.

4   Q.   Okay.  Now, let's go down and see the answer there, if we

5   could; and as I read that -- trying to get the glare away -- it

6   says that there were 156 claims for this date of loss, July 3rd

7   of 2020; and within those 156 claims, 71 claims in which either

8   the loss investigation determined there was no accidental

9   direct physical loss or the claim was otherwise not covered.

10  Okay?

11      So that could be a partial, or that could be a complete.

12  Do I understand that right?

13  A.   Yes.

14  Q.   Okay.  So, if that's correct, it would mean that there was

15  either a full or partial denial in only 45 percent of the

16  files, if I take -- and I can pull my calculator out and do

17  that; but, you know, if I -- if I divide 71 by 156, that's what

18  I get.  So 71 divided by 156 -- lawyers can check my math -- 45

19  percent.

20      You trust my math?

21  A.   Yes.

22  Q.   Okay.  45 percent of those would either have been a

23  complete denial or all the way up to paying for almost

24  everything but a few items that were disputed; is that right?

25  A.   Correct.

Jacqueline Draper                                                     161
Cross-examination by Mr. Leffel

1   Q.   So the -- the -- the inverse or the converse of that would

2   be that, in 55 percent of the claims that were submitted on

3   that day where there was 1 3/4-inch hail -- in 55 percent of

4   them, there was nothing denied.  Everything that was claimed

5   was paid.

6        Make -- are you tracking?

7   A.   Yes.

8   Q.   Okay.  So, then, I think that there was an interrogatory

9   that -- that said that, within those files that were either

10  partly or wholly denied, there were 19 that involved some kind

11  of wear and tear.  Do you remember that response?

12  A.   Yes.

13  Q.   Okay.  So, again, using my handy-dandy calculator because

14  I don't do math, I divided 70 -- or 19 by 72; and that tells me

15  that there -- of those that were denied that 24 percent of

16  those involved an issue where we were either discussing or in

17  part said, "We're not paying for something because it's wear."

18       You track?

19  A.   Yes.

20  Q.   Is that surprising at all to you given 1 3/4-inch hail on

21  that date of loss?

22  A.   No, not necessarily.

23       You know, the -- the basis of the hail swath and where the

24  hail actually fell -- I mean, so Accuweather data, without

25  getting too technical for everyone, is -- is really based off

Jacqueline Draper                                        162
Cross-examination by Mr. Leffel

1   of atmospheric.  It doesn't necessarily indicate what actually

2   fell at that home.

3        It also goes off of the largest hailstone that was in that

4   entire hail swath.  So, if there was one larger stone and a lot

5   of smaller stones, they're going to call it, you know, that

6   larger stone size; so not necessarily indicative of exactly

7   what fell at that home or -- and not every single home in that

8   hail swath necessarily had the same damage.

9   Q.   There was also a series of questions from Ms. --

10  Mr. Miller and -- I think three different questions that,

11  maybe, had one word that was changed; but the gist of them was

12  did you ever tell your people not to tell others, such as

13  contractors, that they were discussing their files with their

14  supervisor?

15       Let me just ask as a preliminary matter, is there anything

16  unusual or improper about having a subordinate employee talk to

17  their supervisor about the job that they're doing for that

18  supervisor?

19  A.   Is there anything improper about it?

20  Q.   Yeah.

21  A.   No, it's, I mean, highly encouraged.

22  Q.   But, then, let's take it again because what matters here

23  is this -- is this particular claim.  In this claim, did you

24  see evidence that Ms. Jacome, the -- on -- at the very

25  inspection of this roof, told Mr. Marks, "I understand you

Jacqueline Draper                                                              163
Cross-examination by Mr. Leffel

1   disagree with me, so I'm going to text some photos to my

2   supervisor"?

3        Did you see that?

4   A.   Yes.

5   Q.   So was it a secret that we were going to discuss this

6   claim with Jacqueline Draper?

7   A.   I don't think so, no.

8   Q.   Okay.  Fantastic.

9             MR. MILLER:  Judge, I'm going to object to sidebar

10  comments.

11       And, also, could we have a sidebar about his leading?

12            THE COURT:  Yes.

13       Would -- would now be okay to take our quick afternoon

14  recess for the -- I don't know who needed to -- who needed the

15  recess, but is it okay if we do it now?

16       (Discussion off the record between the Court and juror

17  followed by a bench conference on the record after headsets

18  check.)

19            THE COURT:  Mr. Miller, you asked for the sidebar?

20            MR. MILLER:  Yes.  The leading is getting...

21       I mean, I -- I -- I really don't even know how you feel

22  about the leading when it's, really, his witness, but we called

23  them.  He's -- she's clearly a -- a witness that is favorable

24  to him and -- and not favorable to us.  So it seems like he

25  shouldn't be allowed to lead in the way that he's literally

Jacqueline Draper                                                164
Cross-examination by Mr. Leffel

1   testifying.

2        And my -- second part of my objection is that that

3   "fantastic" at the end -- I don't believe that's appropriate no

4   matter what you say about leading.

5             THE COURT:  Mr. Leffel?

6             MR. LEFFEL:  Yeah.  I mean, similar to what I'm doing

7   is I got this witness at 5:00 o'clock; and we've been at this

8   all day; and I'm trying to get through some evidence; and I

9   understood that I was going to get some leeway, particularly

10  when I'm in the section where I'm going back over what was

11  already testified to.  So I'm trying to do that.

12       I shouldn't, you know --

13            THE COURT:  You are -- you are correct, Mr. Leffel.

14       And, Mr. Miller, I went over this at the outset of the --

15  of the case:  that if the defendant had its witness -- a

16  particular witness called by the plaintiff on its witness list,

17  I will relax somewhat the rules and give leeway so that we can

18  get through a witness.

19       I mean, it's 5:24.  We need to finish her today.  You went

20  all the way up until 5:00 p.m.  I think I was very patient with

21  your examination, and I'm going to give Mr. Leffel leeway.

22       Mr. Leffel, you are admonished not to comment on a

23  witness's testimony, so no use of words like "fantastic,"

24  et cetera.

25            Any other questions, Counsel?

Jacqueline Draper                                          165
Cross-examination by Mr. Leffel

1              MR. MILLER:  No.

2              MR. LEFFEL:  Nothing further.

3              THE COURT:  Okay.  Thank you.

4        (End of bench conference.)

5              THE COURT:  Mr. Leffel, if you'll just give the Court

6    a minute before we go back on with the witness.

7        We're off the record.

8        (Discussion off the record.)

9              THE COURT:  Mr. Leffel, you may proceed.

10             MR. LEFFEL:  Thank you.

11   Q.   (By Mr. Leffel) Ms. Draper, can you still hear me?

12   A.   Yes.

13   Q.   Were you in charge of any program in Oklahoma or anywhere

14   else by the name of "Hail Focus"?

15   A.   No, I was not.

16   Q.   Okay.  Do you recall seeing training videos in your

17   deposition that were titled "Hail Focus"?

18   A.   Yes.

19   Q.   Are there also other focuses that are sometimes used as

20   titles as training videos?

21   A.   Yes.

22   Q.   Okay.  Do you recall any teamwide initiative that involved

23   videos under the "Hail Focus" title?

24   A.   No.

25   Q.   Okay.  Where were you living when this claim arose,

Jacqueline Draper                                                166
Cross-examination by Mr. Leffel

1   Ms. Draper?

2   A.   In Edmond --

3   Q.   Okay.

4   A.   -- Oklahoma.

5   Q.   And I understand that your -- your section manager job has

6   taken you to Georgia; is that correct?

7   A.   Yes.

8   Q.   Okay.  Tell us very briefly what your educational

9   background is.

10  A.   I have a -- a bachelor's in criminal justice, and then I

11  have three insurance designations.

12  Q.   Okay.  And so your bachelor's -- is it -- did you -- did

13  you tell us what it was in -- is criminal justice?

14  A.   Yes.

15  Q.   Okay.  Was it your plan coming out of school to go

16  directly into the insurance business?

17  A.   No, not necessarily.

18  Q.   Okay.  What was your -- what were you planning to do?

19  A.   My bachelor's is in criminal justice, and I also had a

20  specialization in human trafficking, and so I was going through

21  the interview process to go into the Peace Corps.

22  Q.   Okay.  How did you find your way to working at State Farm?

23  A.   So, unfortunately, it didn't work out going into the Peace

24  Corps at that time in -- in my life; and I had been working

25  full-time to put myself through college and -- at a restaurant;

Jacqueline Draper                                                    167
Cross-examination by Mr. Leffel

1    and so I had some regular clients -- or customers that would

2    come in; and they recommended, knowing that I had studied and

3    taken some law classes and -- and criminal justice classes in

4    college, and indicated that there was a fire casualty opening

5    that would be similar to case law and things like that opened

6    at State Farm and recommended that I apply.

7    Q.   Okay.  You've been here -- or been with the company for a

8    little -- about a decade; is that right?

9    A.   Yes.

10   Q.   Okay.  And what has kept you with the company?

11   A.   The opportunity to help people.  I spent many years

12   traveling the country on the catastrophe team, helping people

13   after wildfires and hurricanes and -- sorry.  I just got an

14   echo.  Hopefully, you can still hear me.

15   Q.   We can hear you.

16   A.   Okay.  And then the continued opportunity that we have to

17   help people, especially when they've, you know, had a major

18   loss to their home and -- and, for -- for many, on -- on their

19   worst day; and we get to be there to -- to help them work

20   through it.

21   Q.   So I think we saw some statistics from your tenure in

22   Oklahoma, and -- and so I think we got a pretty good idea of

23   what you're going to say, but, you know, you handle claims in

24   Oklahoma or anywhere else.  From time to times (verbatim),

25   you're going to have claims that aren't covered by your policy.

Jacqueline Draper                                              168
Cross-examination by Mr. Leffel

1   Is that fair?

2   A.    Correct.

3   Q.    Okay.   In Oklahoma, did you ever encounter, you know,

4   expectations from certain insureds about when a roof should or

5   should not be -- be paid?

6   A.    Yes.

7   Q.    Okay.   Can -- can you tell us how you would, you know --

8   what you encountered and how you dealt with that issue?

9   A.    So there -- there's often an expectation (unintelligible)

10  policyholders that -- you know, especially in a -- in a -- in

11  an area like -- like Oklahoma that, after so many years of --

12  of having their policy, that it is time for the insurance to

13  pay for a new roof.  So, you know, that's certainly something

14  that can be difficult, and we have to really talk with our

15  policyholders and explain the -- the contract and the policy

16  and -- and what it is that we owe for under the contract and --

17  and that the contract is -- is not made to be a -- a

18  maintenance policy.

19  Q.    In your opinion, did you sometimes encounter those types

20  of expectations from roofing contractors?

21  A.    Yes.

22  Q.    If we could take a look at Joint Exhibit 6 at 9, and I

23  want to do this briefly because this is something that the

24  jury's seen; but the question is, is wear and tear covered?

25  A.    It is not.

Jacqueline Draper                                                    169
Cross-examination by Mr. Leffel

1   Q.    Okay.  Can you read for us, under the section of the

2   policy that's "Losses Not Insured" -- what does it say is not

3   covered?

4   A.    "Wear, tear, marring, scratching, deterioration, inherent

5   vice, latent defect and mechanical breakdown."

6   Q.    Okay.  And can you give us some examples of what some of

7   those things might look like or be on -- in the context of a

8   roof?

9   A.    Wear, tear, deterioration could look like granular loss.

10         You know, latent defect -- it's not uncommon for shingles

11  to wear earlier than -- than, maybe, expected or over time to

12  just, as a natural part of their life span, begin to lose their

13  granules; and so it's not uncommon for us to see, you know,

14  wearing on the edges like -- like we saw in this claim.

15         Blistering -- so that's something -- when there's gases

16  kind of trapped within the shingle, if you will, and warms up

17  in that hot Oklahoma sun and -- and bursts.  So we might see

18  blistering.

19         Might see, from hanging our Christmas lights -- you're

20  about to -- everyone's about to put their Christmas lights

21  on -- footfall, people on your roof, that causes some

22  additional damage and deterioration to -- just simply from

23  walking around on the roof.

24  Q.    I think you were asked a question about your text

25  messages, including one where you ended your text message with

Jacqueline Draper                                                    170
Cross-examination by Mr. Leffel

1   "etc," which you have --

2   A.    Uh-huh.

3   Q.    -- identified for the jury as meaning "et cetera"; right?

4   A.    Yes.

5   Q.    Okay.  I think one of the things you said that you would

6   be including in your "etc" or et cetera would be, you know,

7   basically asking her, "Did you look at the ridge?"  "Did you

8   look at the valley?"

9        But then you specifically mentioned, "What does your

10  spatter show?"

11       Did I hear that right?

12  A.    Yes.

13  Q.    What is spatter, and why are we looking for it in a hail

14  claim?

15  A.    So spatter or splatter pretty -- you know, the same term,

16  really; but -- but spatter is an indication on an oxidized

17  surface, so if we think of, like, a dirty fence.  It's, you

18  know, kind of grayed out over time; and it's, you know,

19  considered what we would call, you know, "oxidized over."

20       And so, if -- if there's been hail that's fallen, it will

21  clean off, so to speak; and you may see this -- clean dots all

22  over the kind of dirty, oxidized fence; and that's considered

23  spatter.

24  Q.    What does --

25  A.    It's an indication that hail was there --

Jacqueline Draper                                                    171
Cross-examination by Mr. Leffel

1  Q.   I apologize.

2  A.   -- recently.

3  Q.   What does the absence of spatter tell -- what story does

4  that tell to the examiner that's looking at a property for hail

5  damage?

6  A.   It indicates that there was no recent hail that occurred.

7  Q.   Okay.  When you took over a new team in Oklahoma of claims

8  specialists, did -- did you make an effort to make sure that

9  your team was properly trained in identifying hail on roofs?

10  A.   Absolutely.  I take pride in making sure that the folks

11  that I lead have the -- the training and the skill sets to

12  handle the claims and that they feel confident doing so; and so

13  we spend a lot of time training and spending time one on one

14  reviewing claim files and up on roofs so that they understood

15  not just what damage was, what hail damage was, what other

16  damages and other things that maybe -- others may confuse as

17  hail damage so that they understood the installation process of

18  the roofs, the damage of a roof, all of those types of things.

19          MR. LEFFEL:  Your Honor, are we still taking this

20  break at 5:50, or do I have this witness until we're --

21          THE COURT:  Yes.  Thank you.

22      I think at 5:50 we need to check a parking ticket --

23          MR. LEFFEL:  Okay.

24          THE COURT:  -- so you may proceed.  Thank you,

25  Mr. Leffel.

1          MR. LEFFEL:  I'm trying to kind of keep that timing

2   in mind, so --

3          THE COURT:  Yeah.

4          MR. LEFFEL:  -- thank you.

5          THE COURT:  Thank you.  I appreciate that.

6   Q.   (By Mr. Leffel) Well, what -- what -- what did you

7   personally do?

8       I mean, what resources did you provide them, or what did

9   you -- I mean, were you out there driving in ride-alongs?

10      I want to know what you personally did to make sure your

11  people knew what they were doing.

12  A.   Yeah.  Absolutely.

13      So -- and I think it's important that they have, you know,

14  the -- the state-of-the-art training, and there is -- much like

15  anything else, roofing is -- products are getting better.  They

16  want to improve the ability for roofs to be able to stand up to

17  weather, to hail, to wind; and so Haag often does testing on

18  roofs, and that's available to be looked at from what would

19  be -- cause damage.

20      In particular, we're talking about composition roofing,

21  and so it's not uncommon for them to do tests on that, so we

22  would review that.

23      They would take the Haag training.

24      We would look at, you know, claim files together.

25      We would get up on the roofs together and talk about the

1  installation of -- of roofs, and I would teach them about how

2  shingles are -- are manufactured and how, you know, shingles

3  are damaged, and so we would review all of those things

4  together.

5  Q.   Let me ask you this:  When you took your team over, did

6  you have a mix of both experienced claims handlers and

7  inexperienced claim handlers?

8  A.   I did.

9  Q.   Okay.  Why would it be necessary to take your experienced

10  claims handlers and provide them additional training on -- on

11  hail or hail identification?

12  A.   Yeah.  Absolutely.

13       And so, like -- kind of spoke to in my last question.  So

14  things are always evolving, you know, if you think about the

15  medical field and how, you know, that has evolved.

16       So -- so roofing and the knowledge that we have about how

17  hail damages roofing, how wind damages roofing -- that's all,

18  you know, evolved; and we know a lot more about, you know, the

19  damage to a roofing shingle; and so it's -- as those things

20  change, it's important for us to stay up to date on the

21  knowledge and the state-of-the-art technology and the testing

22  of these things.

23  Q.   Let's talk about Tresa Jacome.  She was the claims

24  specialist that inspected this home; right?

25  A.   Uh-huh --

Jacqueline Draper                                          174
Cross-examination by Mr. Leffel

1    Q.   How did --

2    A.   -- yes.

3    Q.   How did you first meet her?

4    A.   I originally met her when I was leading teams in Dallas,

5    working a lot of large-loss wildfire claims.

6    Q.   Okay.  And did you recruit her specifically to -- to join

7    your team at State Farm in Oklahoma?

8    A.   Yes.

9    Q.   Okay.  And what was it that -- that you saw in Ms. Jacome

10   that interested you and having her on your team?

11   A.   So Tresa was an external claim resource or an independent

12   adjuster, so a vendor that we were using at that time; and so I

13   was her first-line leader at -- at State Farm at the time; and

14   so knowing her abilities to handle very complex claims and her

15   extensive Estimatics knowledge that she had, including her

16   knowledge of -- of roofs and how roofs are constructed and

17   damaged, I thought that she would be a great resource for, you

18   know, my other claims specialists and, obviously, a great

19   adjuster to handle claims for our policyholders.

20   Q.   Is it your understanding -- well, let me just ask it this

21   way:  Did you have an understanding of what her level of

22   experience was on claims prior to joining your team?

23   A.   Yes.

24   Q.   Okay.  What was that?

25   A.   Her prior experience was as an external claim resource,

Jacqueline Draper                                                    175
Cross-examination by Mr. Leffel

1   and so she worked, to my knowledge, as an external claim

2   resource -- source solely for State Farm.

3   Q.   Okay.  Did she work in -- on big claims? small claims?

4        What type of claims was she handling?

5   A.   Very, very large claims.  Very large, complex, large

6   losses.

7   Q.   Okay.  And that's experience she had before she joined

8   your team?

9   A.   Yes.

10  Q.   Okay.  And -- and then, once she was brought into -- you

11  know, in-house, if you will, at State Farm, do you have

12  knowledge of the additional training on top of that, that she

13  received?

14  A.   Yes.  She -- in -- in addition to the training that she

15  received as an external claim resource, we trained her as a --

16  a staff adjuster when she came on, and it was extensive.

17  Q.   Okay.  And did you believe, once she was turned loose,

18  that she had the knowledge and experience that she needed to

19  make the right call on hail claims?

20  A.   Yes.

21  Q.   Okay.  Did she still make mistakes?

22  A.   She is human, so, yes.  We all make mistakes.

23  Q.   Okay.  But is she the person that made the call on the

24  Bates roof?

25  A.   Yes.

Jacqueline Draper                                              176
Cross-examination by Mr. Leffel

1    Q.   Okay.  And we went through this earlier, and I'm not going
2    to go back over it, but -- and -- you know, looking at the
3    operational guide and looking at the file, did you feel like
4    she did the things that you were training her to do to make the
5    best possible call?
6    A.   Yes.
7    Q.   Okay.  Let's take a look, if we could, at Joint Exhibit 1
8    at page 20; and I think, here, we're going to see your very
9    first note; and some of this has been translated for the jury;
10   and so I want to keep things moving, so what I want to ask you
11   about -- I'm not going to ask you about any acronyms, but --
12   they got them all memorized.
13        But there was an inspection scheduled for 2-23; so, if
14   this claim is coming in on 2-4, and we're getting the
15   information from the insurer -- this is my question:  Is that a
16   timely inspection for this insured?
17   A.   Yes.
18   Q.   Okay.  I want to take a look at JX1.20 now; and I want to
19   look at this inspection note; and, in the interest of
20   efficiency, I just want to direct your attention right to that
21   section that she wrote on the roof.
22        Do you see that?
23   A.   Yes.
24   Q.   Okay.  And -- and -- and forgive me because I can't
25   remember which questions I've asked which witnesses, but are

Jacqueline Draper                                                    177
Cross-examination by Mr. Leffel

1   you familiar with your text messages with Ms. Jacome?

2   A.    Yes.

3   Q.    Okay.  Do you recall asking her about what her ridges and

4   valleys look like?

5   A.    Yes.

6   Q.    Okay.  Do you remember asking her or -- or -- or having

7   a -- a conversation about what the edges look like?

8   A.    Yes.

9   Q.    Okay.  Looking at her note and what she's describing here

10  that she saw on this roof based on her examination -- and, just

11  to be clear, were you present for her inspection?

12  A.    No.

13  Q.    So -- so whatever she saw, whatever she's documenting,

14  that is her work?

15  A.    Correct.

16  Q.    Okay.  Is the discussion you had with her reflected in her

17  file note?

18  A.    Yes.

19  Q.    Okay.  When she talks about the fact that the field

20  shingles exhibit large areas of extensive granule loss, what --

21  and wear, what does that mean?

22  A.    It means that the shingles on the slopes -- the field

23  shingles are -- have -- are losing the granules.

24        So the granules are the area that's on top of the mat and

25  the tar.

Jacqueline Draper                                              178
Cross-examination by Mr. Leffel

1       And, again, as we've discussed previously, that would be

2   considered wear and tear.

3   Q.    Okay.  Did you see examples of that not just within the

4   file but specifically in the -- the eight or nine photos that

5   she texted to you?

6   A.    Yes.

7   Q.    Okay.  When she writes that the fiberglass mat was exposed

8   in most of the shingle edges, what does that refer to?

9   A.    The fiberglass mat is the base or the foundation of a

10  shingle; and so that is then covered with tar; and then

11  granules are on top of that; and so the -- the edges, as -- as

12  we saw on the video, begin to wear; and so the granules were

13  missing from the edges, and it exposed the underlying mat, and

14  that's what she's referring to in this sentence.

15  Q.    Let's take a look, if we could, at JX1.283.

16       Okay.  Keep in mind that we're asking questions about worn

17  edges and fiberglass mats.

18       Can you tell us whether 283 -- first of all, just tell us

19  what you see and -- and identify for us if either of those

20  things are present in this photograph.

21  A.    I see a long linear edge with the -- the mat being exposed

22  and the granules missing, as -- as she indicated.

23  Q.    Okay.  Is that consistent with what you saw in

24  Ms. Jacome's note?

25  A.    Yes.

Jacqueline Draper                                                    179
Cross-examination by Mr. Leffel

1    Q.    Let's take a look at 284.

2          What do you see here?

3    A.    I see granules missing from the edges and the mat being

4    exposed.

5    Q.    She goes on to say that hail damage was not observed to

6    the ridge or field shingles.

7          Let's take a look at JX1.322.

8          I recognize this is one photograph, and it's -- is this

9    considered an overview?

10   A.    Yes, an overview of the ridge, yeah.

11   Q.    Based on what you're seeing here and -- and just based on

12   what you've seen through the numerous pictures that are

13   documented in the file, would you agree with her assessment

14   that hail damage was not observed to the ridge or field

15   shingles?

16   A.    Correct, yes.

17   Q.    Okay.  This is something that the jury has seen several

18   times, and so I -- I'll hit it quickly, but let's take a look

19   at JX13.3.

20          MR. LEFFEL:  And pull up that first photo.

21   Q.    (By Mr. Leffel) What is that a photo of?

22   A.    It's a photo of hail damage to the ridge.

23   Q.    Okay.  Does it look similar or different than what was

24   seen on the Bates roof?

25   A.    Looks very different.

Jacqueline Draper                                                    180
Cross-examination by Mr. Leffel

 1          MR. LEFFEL:  And go ahead and pull that down.

 2   Q.   (By Mr. Leffel) Let's take a look at JX1.308.

 3        What is that?

 4   A.   It's a rain cap.

 5   Q.   Okay.  Is it damaged?

 6   A.   It is.

 7   Q.   Is it damaged by hail?

 8   A.   Yes.

 9   Q.   Is it something that was paid for by State Farm to your

10   knowledge?

11   A.   Yes.

12   Q.   Okay.

13        (Discussion off the record between Mr. Leffel and

14   Ms. Williams.)

15          THE COURT:  Mr. Leffel, while you do that, I'm going

16   to go off the record --

17          MR. LEFFEL:  Perfect.

18          THE COURT:  -- and see if we're able to get this

19   sorted out.

20        Does anyone need a longer break?

21        Are you-all good to keep going?

22        Okay.  Go ahead and see if you can get that.

23        (Discussion off the record.)

24          THE COURT:  Yes.  We're going to take just a very

25   quick recess.  We have a juror who needs to pay for -- for

Jacqueline Draper                                               181
Cross-examination by Mr. Leffel

1   additional parking time given the length we've been on the

2   record today, so we will take a very short break.

3        Jurors, I've -- I've gone over the instruction many times.

4        You're all nodding affirmatively.  You get the

5   instruction.

6        Follow my usual instructions:

7        Don't talk about the case.

8        Keep your minds free and open.

9        We are going to take a very quick recess, allow you-all to

10  use the restroom, and allow Ms. Northern to do what she needs

11  to do.

12        Counsel, anything further before I give the jury this

13  break?

14                MR. MILLER:  No.

15                MR. LEFFEL:  No, Your Honor.

16                THE COURT:  Okay.  Thank you.

17                THE CLERK:  Did we say what time?

18                THE COURT:  Five minutes.

19        (Jury exits.)

20        (A recess is taken.)

21        (Jury enters.)

22                THE COURT:  Thank you, Mr. Leffel.

23        We're ready to continue.

24                MR. LEFFEL:  Thank you, Your Honor.

25   Q.  (By Mr. Leffel) I think, right before we broke, we were

Jacqueline Draper                                                      182
Cross-examination by Mr. Leffel

1   looking at a picture of a HVAC ring cap; is that right?

2   A.   I think so, yes.

3        (Discussion off the record between Mr. Leffel and

4   Ms. Williams.)

5   Q.   (By Mr. Leffel) Confirming -- getting everybody back on

6   the same page -- that is a rain cap on an HVAC stack; right?

7   A.   Yes.

8   Q.   Okay.  And is that damaged?

9   A.   Yes.

10  Q.   Is it damaged by hail?

11  A.   Yes.

12  Q.   Was it paid for?

13  A.   Yes.

14  Q.   Okay.  I want to take a look real quick at JX17 at page --

15  well, it's just a one-page document, JX17; and the jury has

16  seen this, so let's be efficient here.

17       But I want you to look at the proposal section of this;

18  and this is from, Ms. Draper, so you know -- you've not seen

19  it -- this is Aegis's proposal, which effectively became the

20  invoice for what they did on this roof in 2013 as best we know

21  from the document.  Okay?

22       So I want you --

23  A.   Okay.

24  Q.   -- to look at that, and it says that they're installing

25  two large low-profile vents.  Do you know what those are?

Jacqueline Draper                                                    183
Cross-examination by Mr. Leffel

1   A.   Two large low-profile vents?

2   Q.   Yes.

3   A.   I don't know which vents they're referring to.

4   Q.   Okay.  Can we go back to -- well...

5        Do you see anywhere on this proposal where there is a

6   large HVAC vent cap that is included anywhere in this proposal?

7   A.   I don't see anything like that, no.

8   Q.   For example, they do have a replacement of plumbing vent

9   flashings; right?

10  A.   Yes.

11  Q.   And they have, I think, specifically...

12       I thought there was something about pipe jacks in there,

13  but now I'm not seeing it.

14       Okay.  Well, let me ask you this, Ms. Draper:  There has

15  been testimony and argument presented in this case that you

16  were not concerned with the experience of your adjusters

17  because you were really the one that was making the decisions

18  on files.

19       Would it have physically been possible for you to make the

20  decisions in every file being handled by every adjuster that

21  you supervised?

22  A.   No.

23  Q.   Okay.  Would there have been enough hours in a day for

24  that?

25  A.   No.

Jacqueline Draper                                               184
Cross-examination by Mr. Leffel

1    Q.    Okay.  What do you say to the notion that you didn't care

2    about the experience or the training of your adjusters because

3    you were just going to make all the decisions?

4    A.    I would disagree with that.  I very much valued the

5    experience that we have for the current adjusters and, you

6    know, those that are coming to us with outside experience that

7    are coming in.

8         But it's also important to make sure that we're all making

9    consistent coverage decisions, that we are applying the policy

10   correctly, that we are analyzing damage the same way, and that

11   we're looking for actual covered damage and then writing our

12   estimates consistently for the items that are damaged and then

13   paying for what we owe under the contract.

14        So it's important to focus our training not just on

15   potentially new-to-role that may need training but also

16   continue to upscaling.

17        We always want to continue to get better; and -- and, as I

18   discussed early -- earlier, those -- the -- the training and

19   the knowledge that we have of things that are ever growing,

20   like a -- I think I referenced the -- the medical field and how

21   it's -- how it's evolving.  It's important for us to evolve

22   with it and have the most up-to-date training and

23   state-of-the-art knowledge, and that's what I continue to -- to

24   focus on with -- with all of my adjusters.

25   Q.    Okay.  Let me ask you this very brief question:

Jacqueline Draper                                                    185
Cross-examination by Mr. Leffel

1        We've heard a lot about the Haag training, and I think,

2   you know, you've probably answered this in a couple of words,

3   but were there other trainings that you offered on roofing and

4   hail identification, other than what may have been contained in

5   the Haag -- in the Haag videos?

6   A.   Yes, there are -- there are other trainings on -- on hail

7   and wind, absolutely.

8   Q.   And -- and, for example, some of those that we've seen in

9   evidence and -- and your depositions were trainings that were

10  produced by State Farm as opposed to Haag; right?

11  A.   Yes.

12  Q.   So there are a variety of different trainings that are

13  offered.  Haag's just happens to be one of the leading ones.

14  Is that fair?

15  A.   Yes.

16  Q.   Okay.

17  A.   Fair.

18  Q.   Let's talk about Amy Lanier, Ms. Draper.

19       Do you know who Ms. Lanier is?

20  A.   I do.

21  Q.   Okay.  And how did you know Ms. Lanier?

22  A.   She was one of my employees.

23  Q.   Okay.  Do you know what types of claims that she was

24  handling prior to her joining your team?

25  A.   My understanding of what she was handling previously was

Jacqueline Draper                                                186
Cross-examination by Mr. Leffel

1  fire casualty claims, so it's -- it's like your slip-and-fall

2  liability-type claims.  It's a different section of the policy,

3  so not -- not property damage claims like we were handling

4  in -- in proximity.

5  Q.    She had experience as an adjuster but perhaps not on

6  weather catastrophe claims?

7  A.    Correct.

8  Q.    Okay.  Did you ever have any concerns about Ms. Lanier's

9  technical proficiency in handling hail claims?

10 A.    She did have some performance gaps, yes.

11 Q.    Okay.  Did you ever remove any of Amy's authority from

12 claims at any time?

13 A.    Yes, I did for a period of time; and we were reviewing all

14 of her files together and trying to build up her skill set and

15 her understanding of wind and hail claims; and she hadn't had

16 that experience before and -- or in her comfortability and --

17 and making sure that she was consistently applying the policy

18 and -- and writing those estimates.

19 Q.    Would she have been one of your more experienced adjusters

20 at that time, at least, you know, just general adjusting

21 experience if not specific to wind and hail?

22 A.    She had experience -- overall adjusting experience, sure.

23 Q.    Okay.  And did you have other experienced adjusters, even,

24 maybe, people who have done a lot of weather, that you did the

25 same thing with, where they may have had a period of time

Jacqueline Draper                                                    187
Cross-examination by Mr. Leffel

1   where, you know, you were reviewing their files?

2   A.   Yes.

3   Q.   Okay.  Did -- were -- were there -- were there people that

4   responded well to this upscaling?

5   A.   Yes, very well.

6        So when -- I can think of -- you know, without saying

7   names, I can think of, you know, particular other individuals

8   that -- just very receptive to the training, understood, had --

9   had kind of backgrounds of construction based or had handled

10  other claims before and were able to -- to understand and pick

11  up the damage and -- and the additional training and -- and did

12  well and -- and wasn't necessary to review their -- their --

13  their files.  They had taken off the training wheels, so to

14  speak, and -- and were doing a great job.

15  Q.   Okay.  Do you know why Ms. Lanier left State Farm?

16  A.   I don't know exactly, and I could speculate.

17  Q.   I -- I don't want you to speculate.  I don't want you to

18  speculate.

19  A.   Okay.  I don't know.

20  Q.   Okay.  Did you discuss her departure with her?

21  A.   I did briefly when she turned in her equipment.

22  Q.   Okay.  What, if anything, did you learn about why she was

23  leaving?

24  A.   She told me she was leaving to go to another insurance

25  company because she wanted some leadership opportunities and

Jacqueline Draper                                                      188
Cross-examination by Mr. Leffel

1    thought that she may be promotable over at another company; so,

2    that, I took to be, why she left.

3    Q.    Okay.  Well, in opening statement and -- and -- and during

4    examination during this case, Mr. Miller has told the jury that

5    Ms. Lanier felt like she was being asked to deny claims that

6    she thought were covered and that it bothered her and that she

7    left the job she loved for that reason.

8         Did you hear anything like that from Ms. Lanier in --

9    when -- when she was advising you that she was leaving?

10   A.    No, I did not.

11   Q.    Okay.  Does State Farm have a code of ethics?

12   A.    We do.

13   Q.    Okay.  Would you expect these types of concerns to have

14   been raised by an employee?

15   A.    Yes.

16   Q.    Okay.  Is there an open-door policy for voicing concerns

17   at State Farm?

18   A.    Yes.

19   Q.    Okay.  Is there a way to make anonymous complaints?

20   A.    There is.  There's an anonymous hotline that you can call

21   and report a completely anonymous ethical concern that you

22   have.

23        And -- and the open-door policy -- you -- means that you

24   could reach out -- if you didn't feel comfortable reaching out

25   to your leader or your leader's leader, you could reach out to

Jacqueline Draper
Cross-examination by Mr. Leffel

1   a different leader in a different area.

2   Q.   To your knowledge, using any of those sources -- well, let

3   me -- let me ask you this:  If -- if -- let's say that I don't

4   like my supervisor, and I have a complaint, but I'm afraid to

5   talk to my supervisor.  Am I allowed to go talk to somebody

6   else about it that's in -- in management?

7   A.   Yes.

8   Q.   Were you ever -- did any other managers ever come to you

9   and say, "Hey, Ms. Draper, these people are upset.  Amy's

10  upset.  She doesn't think that she's making the right calls"?

11       Did you ever hear anything like that?

12  A.   No.

13  Q.   Okay.  Through any of those sources, whether it's

14  open-door, anonymous tip line, are you aware of any complaint

15  that Amy Lanier made along the lines of what I've described:

16  that -- that she felt like she was having to make calls that

17  she didn't agree with?

18  A.   No.

19  Q.   Okay.  You mentioned earlier, when you were being asked

20  about how -- what the approach to doing an investigation of a

21  damaged property was, and you used the term "holistic."

22       Did I hear that right?

23  A.   Yes.

24  Q.   Okay.  And -- and tell us what you mean when you say that

25  "I would expect a holistic approach."

Jacqueline Draper                                            190
Cross-examination by Mr. Leffel

1   A.    Well, I think it's important, when I say "holistic," for

2   them to take into account their entire investigation; and so,

3   when they're going out to a home, you know, having the

4   conversations with -- with the policyholder on, you know, what

5   they saw, what they were claiming was damaged, you know;

6        Pulling the weather data;

7        Looking at all of the elevations around the home;

8        You know, the -- the mailbox, the fence -- looking for

9   spatter, which is, you know, indicative of the direction and

10  the size and, you know, if there was any recent hail;

11       Getting on the roof, looking at, you know, the places that

12  we would expect and know that -- that would be damaged far

13  before other parts of the roof, like the ridge and the valley

14  and the soft metals and things like that, and -- and truly

15  being able to analyze holistically what all of the damage was.

16  Q.    Ms. Draper, do you believe that the physical evidence that

17  presents at an inspection that must be identified and

18  documented at a home like the Bates rental property -- do you

19  believe that evidence tells a story of what's happened there?

20  A.    Yes, absolutely.

21  Q.    If you were going to write the final sentence of the

22  story -- in the interest of brevity, the final sentence of --

23  of what the evidence that you have reviewed told you about what

24  was happening with respect to hail damage, what would that

25  sentence say?

Jacqueline Draper                                                     191
Cross-examination by Mr. Leffel

1   A.    The -- the evidence is in support that there's no damage

2   to the asphalt composition roofing on Mr. Bates's roof.

3   Q.    Okay.  Do you believe that State Farm paid for all the

4   damage that was covered by the Bates policy?

5   A.    Yes, I do.

6   Q.    Recognizing and acknowledging that some of that money was

7   paid, I guess, this summer through -- through the process of

8   this litigation.  Is that accurate?

9   A.    Yes.

10  Q.    Okay.  What's easier for you:  paying a claim or denying

11  coverage?

12  A.    Most definitely paying a claim.

13  Q.    Okay.  And we've seen photos and heard testimony that hail

14  can be hard to identify -- we've heard that over and over

15  again -- and that there are things, like wear and blisters,

16  that can look like hail.

17        What can a adjuster do -- when you've got -- when you're

18  presented with these things that -- several different things

19  that look like hail, what tools are in their disposal that they

20  can use to try to make the best possible call?

21  A.    To analyze all of the evidence, right, and to look at --

22  at the investigation.

23        And we talked about building their story, right, and how

24  this story of the property, you know -- or -- or how the -- the

25  evidence in the property tells a story; and it absolutely does;

Jacqueline Draper                                               192
Cross-examination by Mr. Leffel

1    and so them being able to lean on the -- the tools and -- and

2    the technology that we have and the skill sets that -- that

3    they have and -- and what they've identified from a damage

4    perspective when they've done a complete investigation on the

5    home.

6         So they absolutely can lean on all of those things.

7    Q.   What examples did you see in your review of this file that

8    those skills were used for Mr. Bates?

9    A.   Tresa documented that there wasn't any spatter on the

10   fences.

11        She documented the collateral.

12        She documented the -- the ridges.

13        She documented the valleys.

14        She documented the areas of the roof that -- that were not

15   damaged.

16        She documented with overviews.

17        She documented with her test squares showing ultimately

18   what she found within those test squares.

19        So, you know, her photographic evidence and then also, you

20   know, her finalness speaking to her investigation.

21   Q.   Okay.

22             MR. LEFFEL:  Your Honor, I will pass the witness at

23   this time.

24             THE COURT:  Thank you.

25        Mr. Miller?

Jacqueline Draper                                                    193
Redirect Examination by Mr. Miller

1            MR. MILLER:  Yes, Judge.  I just have about four

2    areas, maybe five.

3                         REDIRECT EXAMINATION

4    BY MR. MILLER:

5    Q.   Ms. Draper, can you hear me all right?

6    A.   Yes.

7    Q.   Okay.  Let me kind of randomly cover these things.

8         In fact, isn't it true that you really had no idea if

9    Ms. Jacome had ever adjusted a -- a hail claim before coming to

10   State Farm?

11        Isn't that what you told us in your deposition?

12   A.   I don't know specifically if she handled a specific cause

13   of loss of hail prior to coming to State Farm, but she had

14   handled very large, complex claims and had plenty of knowledge

15   of roofs and damage and was more than capable of -- of handling

16   this cause of loss as well.

17   Q.   Ma'am, I -- I just want to know did you know whether

18   Ms. Draper had ever handled a hail claim before getting on the

19   Bates roof on February 23rd, 2021.

20   A.   I think you meant to say "Ms. Jacome."

21   Q.   What did I say?

22        Did I mess it up?

23        Thank you.  I'll -- let me try again.

24        Did you know whether Ms. Jacome had ever been involved in

25   identifying hail on a roof prior to getting on the Bates roof

Jacqueline Draper                                              194
Redirect Examination by Mr. Miller

1   on February 23rd, '21?

2   A.   I do not specifically believe that I knew that answer.

3   Q.   Okay.  And -- and, for that matter, do you know -- or did

4   you know whether Ms. Jacome had ever been shown by anyone with

5   experience what hail damage to a shingle looked like prior to

6   February 23rd, '21?

7   A.   Can you ask the question again?

8   Q.   Did you know whether Ms. Jacome had ever experienced being

9   shown what hail damage looks like in person by another person

10  who actually could say, "That's hail damage.  Feel it.  Touch

11  it.  There it is," on a roof prior to February 23rd, '21?

12  A.   I don't know that -- that she had it in person.  I don't

13  know that answer for sure.

14  Q.   All right.  Now, you mentioned earlier about those

15  denials.  I want to talk to you about that real quick.

16       The -- the Bates claim did not officially become a

17  State Farm denial until you wrote JX1 -- 1.113.

18            MR. MILLER:  Could you put that up?

19  Q.   (By Mr. Miller) Is that correct?

20       I'm -- I'm sorry.  I said you wrote it.  That's not true.

21       You approved it.

22       It's the Jacome denial letter of the second inspection.

23       That's the first time that her -- this case was considered

24  a denial; correct?

25  A.   No.  The roof was denied after her inspection.

Jacqueline Draper                                            195
Redirect Examination by Mr. Miller

1   Q.    Well, now, Ms. Arnold testified just a couple, three hours

2   before you; and she very vividly said that there was no denial

3   of this claim until March 15th of '21; and we were specifically

4   talking about what was on page 2.

5           MR. MILLER:  Could you put on page 2?

6   Q.    (By Mr. Miller) I was talking about the "Suit Against Us"

7   clause, and I said -- I was asking her questions about it, and

8   I asked why that wasn't on the February 23rd letter, and she

9   said, "That's because we made payment of the damage we found.

10  It wasn't a denial until this letter."

11        Now, does that help you understand the -- the context of

12  my question better?

13        You agree with Ms. Arnold?

14  A.    Not necessarily.

15        So I think Lance clarified earlier.  So the roof is a

16  partial denial.

17  Q.    Well, okay.  So you and Ms. Arnold have different opinions

18  then.

19        If she testified, as I've represented, you're saying she's

20  wrong, if it's as I represented; correct?

21  A.    I don't know what questions that you asked Sharon Arnold.

22        The -- the roof would be considered a partial denial.

23  Q.    Well, you did not --

24  A.    This is a --

25  Q.    Oh, I'm sorry.

Jacqueline Draper                                              196
Redirect Examination by Mr. Miller

1  A.   This is a denial --

2  Q.   I'm sorry.  I apologize.  Go ahead.

3  A.   This letter is a denial of a second inspection.

4  Q.   Ms. -- Ms. -- gosh.

5       Ms. Arnold said that the reason that there was no "Suit

6  Against Us" clause in the first letter was because it was not a

7  denial.  It was a partial payment.  It was a payment.

8       Do you disagree with that?

9  A.   I don't disagree with that.

10 Q.   Okay.  So let's be clear.  The first letter on 2-23 that

11 sent a check for a couple hundred dollars, all right -- do you

12 agree that was not a denial?

13 A.   The -- the damage to the shingles would be considered a

14 partial denial.

15 Q.   All right.  According to --

16 A.   They're...

17 Q.   Go ahead.

18 A.   They're claiming damage to the roof, and so, if we're not

19 paying for that, then that would be considered a partial

20 denial.

21 Q.   Well, apparently, Ms. Arnold says different.

22      So can you explain and reconcile the two different things

23 that are being said today in this courtroom?

24 A.   I -- I -- I don't.

25      So she is right, that this is a -- an actual letter for a

Jacqueline Draper                                                      197
Redirect Examination by Mr. Miller

1   denial -- a denial of a second inspection.  So the -- the

2   verbiage cited is correct, but it doesn't mean that the roof

3   wasn't denied.

4   Q.    Well, actually, it's still a partial denial even on the

5   15th of March, right, because you had already paid some of the

6   claim.  Fair?

7   A.    Correct.

8   Q.    All right.  Now, in any event, when we're looking at the

9   numbers, Mr. Leffel talked about 55 percent where there were

10  payments.

11       If a insured like Mr. Bates would have just taken his

12  couple hundred dollars and never asked for a reinspection --

13  just assume that State Farm knew what they were talking about,

14  and there was no damage to the shingles of his roof -- then he

15  would not be considered a denial, would he?

16       Is that fair?

17  A.    The overall file was not denied, but -- but the roof

18  shingles would be considered a partial denial.

19  Q.    That -- that's fine.

20       But, as far as State Farm considering it a denial, is

21  Ms. Arnold right?

22       Until you send the denial letter, it's not a denial.  Is

23  that fair?

24       Are -- if you don't know, it's fine.

25  A.    It -- it seems very much like you're confusing two very

Jacqueline Draper                                                      198
Redirect Examination by Mr. Miller

1  different things, so I'm doing my best to answer your question,

2  but it's -- the -- the -- the roof is a partial denial.  The --

3  the roof is -- is not covered, so it's still a partial denial

4  whether there was a letter sent or not on it.

5           MR. MILLER:  Let's put up the -- let's do --

6  this'll -- this'll be real helpful, Judge.

7       I'm sorry.  I got to find this exhibit.

8       (Discussion off the record between Mr. Miller and

9  Ms. McGuire.)

10          THE COURT:  Mr. Miller, what exhibit?

11          MR. MILLER:  It's JX1.

12      Just enlisting some help here.

13      Let me look at it.

14      Perfect, yes.

15      Would you please put up JX1.82?

16  Q.   (By Mr. Miller) This is a one-page letter --

17          MR. LEFFEL:  I object as outside the scope of my

18  redirect.

19          MR. MILLER:  Judge, it's all along the lines of the

20  partial denial claim she's making.

21          THE COURT:  I think it goes -- I agree with

22  Mr. Miller.  That objection's overruled.

23  Q.   (By Mr. Miller) If you would just quickly read this letter

24  to yourself, and, as you're reading it, I want you to look for

25  the word "denial."

Jacqueline Draper                                                    199
Redirect Examination by Mr. Miller

1       Tell me where it says in this letter that State Farm is

2   denying anything.

3   A.   I don't see it in that letter.  I would have expected to

4   see some -- some language indicating that we were denying the

5   roof shingles.

6   Q.   You would have expected it, but it's not there.  Fair

7   enough?

8   A.   I don't see that, and I believe I made a note of that in

9   the claim file.

10  Q.   Made a note of what?

11  A.   The -- the language in the denial.

12  Q.   I'm sorry.  I want to know exactly what you're claiming to

13  have made a note about, please.

14  A.   What's your question, Mr. Miller?

15  Q.   Well, it's a follow-up to what you said.

16      You offered up this idea that you made some note about

17  this letter as being a denial.  Please tell me where that is.

18      Is that what you're saying?

19  A.   I -- I don't see that they mentioned the denial in the

20  letter, and so I believe what I previously had indicated --

21  that the roof damages that were partially denied by

22  State Farm -- I don't see that indicated in the letter.  It

23  doesn't mean that those damages to the roof are not a partial

24  denial.

25  Q.   All right.  Ma'am, you said you made a note --

Jacqueline Draper                                                    200
Redirect Examination by Mr. Miller

1          MR. MILLER:  If you'd put up JX1, page 20.

2    Q.   (By Mr. Miller) You said you made a note about this letter

3    in the denial (verbatim) -- or at least that's what I thought

4    you said.

5          Now, here's -- we can see here.  This is the note of

6    Ms. Jacome on 2-23 that corresponds with the letter we just

7    looked at.  Agreed?

8          Is that agreed?

9    A.   Okay.

10   Q.   All right.

11         MR. MILLER:  And then, if we go to 19, so Ms. Draper

12   can see, all the way to the first note in red that I found.

13   Q.   (By Mr. Miller) And the first note in red that you make is

14   March 15th of '21, and that's when you're denying the second

15   inspection and approving the -- the denial letter of the second

16   inspection and actually say make sure to add the "Suit Against

17   Us" clause.  Fair?

18   A.   Yes.

19   Q.   That's your first note about anything that happened on

20   2-23 or thereafter.  It was on 3-15.  Fair enough?

21   A.   And so the -- and so my note, if I could clarify -- in the

22   second inspection, it should include that language for the wear

23   and tear if it was not previously already included in a letter.

24   Q.   What -- it doesn't say that.

25         Where does it say that?

Jacqueline Draper                                           201
Redirect Examination by Mr. Miller

1   A.    The adjusters know, if they have not previously -- already
2   included the policy language in writing to the policyholder,
3   they include it in this letter.
4   Q.    No.
5         Answer my --
6   A.    It's not -- it's not --
7   Q.    Answer my question, okay, so we can all go home.
8   A.    Oh, wow.
9   Q.    Where does -- where does it say in these red letters that
10  you're telling the adjuster that they made a mistake by not
11  putting this "Suit Against Us" clause information in the first
12  letter?
13        Where's it say that?
14  A.    It -- it doesn't say it specifically in the file, but I
15  sent her back the corrected letter with the language --
16  Q.    This letter.
17  A.    -- and she sent it out.
18  Q.    This letter.  The second -- the second denial letter.  The
19  March 15th letter.  That's all you're talking about right here.
20  Agreed?
21        That's when this became a denial -- is when you denied the
22  second inspection just like Ms. Arnold said; correct?
23  A.    Okay.  I feel like we're splitting hairs and talking about
24  two different things, but okay.
25        I'm trying to -- I'm trying to track where you're going

Jacqueline Draper                                        202
Redirect Examination by Mr. Miller

1   and answer your questions so...

2   Q.   So I -- I'm not asking you to acquiesce.  I'm asking you

3   to answer the question, if you can.

4       Does this note of 3-15 of '21 have anything to do with the

5   letter that went out paying the claim as State Farm claimed it

6   to be on 2-23 of '21?

7   A.   The original letter did not have the policy language,

8   as -- as it should have, included in there in regards to the

9   specific policy language that excludes the damage.

10       So, when I receive the letter for review, it's not

11  uncommon for me to correct that and make sure that we're

12  speaking to the policyholders -- that they understand

13  specifically where in the policy that the damage is excluded;

14  and so, when I correct the letter, I send it back to the claims

15  specialist, and they send it out.

16  Q.   Yeah.  That's fine.

17  A.   So, in this case -- in this case, I included that, also

18  included the additional endorsement; and the letter was sent

19  out.

20  Q.   Right.

21       But we're still talking about the "March 15th denial of

22  the second inspection" letter; right?

23       That's what this note's about.  Fair?

24  A.   But, if you read the letter, it speaks to why the damage

25  on the roof was not covered.

Jacqueline Draper                                                      203
Redirect Examination by Mr. Miller

1   Q.   On March 15th of 2021.  Fair?

2        Correct?

3   A.   That is the date of the letter to my --

4   Q.   Okay.

5   A.   -- knowledge.

6   Q.   All right.  That's all -- okay.

7        I want to make sure that everybody's square about hail --

8   the "Hail Focus" testimony you gave in the deposition.

9        Mr. Leffel indicated that somehow you knew about the "Hail

10  Focus" video in your deposition; but, actually, you did -- had

11  never seen that video until State Farm lawyers showed it to you

12  just in advance of the deposition, and you watched the first

13  two minutes of it to watch -- so you could see the title page.

14       Do you remember that?

15  A.   Correct.

16  Q.   Okay.  And -- and your testimony was that the title page

17  that the jury's all seen now that says "Hail Focus" -- you had

18  never seen a video like that -- was your testimony; correct?

19  A.   I had never seen that video.  You are correct.

20  Q.   Or any other video that had the words "Hail Focus" in it,

21  as -- as if it was a title page; right?

22  A.   No.  Not that I'm aware.

23  Q.   And then that led us to talking about the phrase "hail

24  focus," and that's when you denied ever knowing anything about

25  the "Hail Focus" program or a rollout in State Farm or anything

Jacqueline Draper                                                      204
Recross-examination by Mr. Leffel

1  that might involve big Zoom meetings on hail focus; right?

2  A.   I'm not aware of a hail focus.

3  Q.   All right.

4          MR. MILLER:  One second, Judge.

5       That's it, Judge.

6       Okay.  Mr. Leffel?

7          MR. LEFFEL:  One question, Your Honor.

8                      RECROSS-EXAMINATION

9  BY MR. LEFFEL:

10  Q.   Ms. Draper, that -- when you had the file note that said

11  that they needed to include the FE 5676 -- I'm not going to

12  need an exhibit -- and we looked at this March 15th letter, is

13  it your understanding that the Oklahoma, you know, Insurance

14  Department requires you to inform an insured of, you know,

15  significant timelines, including the one-year "Suits Against

16  Us," you know -- is that required by the -- by the Department?

17  A.   Yes.

18  Q.   So is that why, when you see that that's not in a letter,

19  that you're telling your adjusters, "You better put the FE 76

20  language, the 'Suits Against Us' language, in your letter,"

21  because it's required by the Insurance Department?

22  A.   Yes.

23          MR. LEFFEL:  Nothing further.

24          THE COURT:  Thank you.

25       May I excuse this witness?

Jacqueline Draper                                                          205
Recross-examination by Mr. Leffel

1          MR. MILLER:  Yes, for me.

2          MR. LEFFEL:  Yes, but for potential rebuttal.

3          THE COURT:  Okay.  So, Ms. Draper, you are reserved

4     by State Farm; but, at this time, we have concluded with you

5     for the evening; so you are dismissed from court for today.

6          (End of Jacqueline Draper testimony excerpt.)

7                      REPORTER'S CERTIFICATE

8          I, CASSY KERR, Federal Official Court Reporter in and for

9     the United States District Court for the Western District of

10    Oklahoma, do hereby certify that, pursuant to Title 28, Section

11    753, United States Code, the foregoing is a true and correct

12    transcript of the stenographically reported proceedings held in

13    the above-entitled matter, and the transcript page format is in

14    conformance with the regulations of the Judicial Conference of

15    the United States.

16         DATED THIS 16th day of October, 2023.

17         /s/Cassy Kerr
           Cassy Kerr, CSR, CCR, RPR, CRR, CRC, NP-OK
18         Oklahoma CSR License No. 1367
           Federal Official Court Reporter

19

20

21

22

23

24

25