1

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF OKLAHOMA

2

THOMAS H. BATES,             )

3                       )
              Plaintiff,  )

4                       )
   vs.                 ) Case No. 21-CV-705

5                       )
STATE FARM FIRE AND CASUALTY,  )

6                       )
             Defendant.  )

7

8

9

10

11          TRANSCRIPT OF TRIAL OPENING STATEMENTS

12            NOVEMBER 1, 2022, at 1:38 P.M.

13   BEFORE THE HONORABLE JODI W. DISHMAN, JUDGE PRESIDING

14

15

16

17

18

19

20

21

22

23

24              Recorded by mechanical stenography

25      Transcript produced by computer-aided transcription

```
1                      A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3         Mr. Robert Bradley Miller

4         bmiller@mjjaw.com

5         Ms. Shawna L. Landeros

6         slanderos@mjjaw.com

7         Miller, Johnson, Jones, Antonisse & White

8         500 Northwest Sixth

9         Suite 300

10        Oklahoma City, Oklahoma 73102

11        405-896-4388

12

13   FOR THE DEFENDANT:

14        Mr. Lance Leffel

15        lleffel@gable.com

16        Ms. Paula M. Williams

17        pwilliams@gablelaw.com

18        Ms. Taylor J. Freeman Peshehonoff

19        tpeshehonoff@gablelaw.com

20        GableGotwals

21        499 West Sheridan Avenue

22        Suite 200

23        Oklahoma City, Oklahoma 73102

24        405-235-5500

25
```

3

1                           I N D E X

2   OPENING STATEMENTS:                                     PAGE

3        BY MR. MILLER . . . . . . . . . . . . . . . . .   3

4        BY MR. LEFFEL . . . . . . . . . . . . . . . . .  19

5   REPORTER'S CERTIFICATE . . . . . . . . . . . . . . .  37

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (This transcript contains only the excerpted trial opening

2    statements:)

3              THE COURT:  At this time, the parties will give

4    opening statements through their lawyers.

5          Opening statements are not evidence.  The purpose of

6    opening statement is to help you understand what the evidence

7    will be.  It is a road map to show you what is ahead.

8          With that, I recognize Mr. Miller for Plaintiff Thomas

9    Bates's opening statement.

10             MR. MILLER:  Thank you, Judge.

11         Well, good afternoon.  Thank you for putting up with us so

12   far.

13         As you know, I represent Thomas Bates, and now it's my

14   responsibility to tell you the -- kind of an outline of the

15   case.

16         What you're going to hear in the next few days is the --

17   kind of the evolved insider information that comes out of State

18   Farm, maybe things that you've not necessarily thought about or

19   cared to know, but you're going to hear about it as it relates

20   to hail claims in Oklahoma at least.

21         But it all started with a single claim:  hail damage on

22   the roof in Edmond at Mr. Bates's house.  He'd insured that

23   house with State Farm for over a decade.

24         We happen to live -- although some of you have dodged the

25   bullet somehow, but we happen to live in what the insurance

1   industry, as you'll hear, considers to be the most severe hail

2   zone in the country.  Oklahoma's right in the middle of it, and

3   it's not at all uncommon that people have several new roofs put

4   on their house over a lifetime.

5       Year in and year out, hailstorms cycle through regularly,

6   according to the insurance industry; and so the terms on

7   shingle life, things like 25-year, 30-, 35-, 40-, 50-year

8   shingles, really, in our state, don't have a lot of meaning

9   because it's not at all uncommon in certain swaths through the

10  city that a hailstorm will take them out long before they wear

11  out.

12      But, just because it's important to keep in mind in the

13  insurance business, generally, and, certainly, with State Farm,

14  a worn-out shingle, something that lasts 20, 30, 40 years, if

15  it's worn out, well, that's not covered by insurance in the

16  sense that they're going to replace it, unless, of course, it's

17  hail-damaged.  So you -- you can't just get a new roof because

18  you have a worn-out shingle, of course.  That's the

19  wear-and-tear exception to the coverage that you will hear

20  a lot about here.

21      As I said, Mr. Bates had owned that house for several

22  years.  Originally, it was in the family when his son Gary, who

23  you're going to see as soon as we lawyers sit down -- he's

24  going to be the first witness -- Gary and his family lived

25  there until about, I think, 40 years ago or something like

1  that.  He'll correct me.  But he was moving out, and his

2  father, Mr. Bates, decided to keep that house in the family.

3  He didn't live there.  He bought it to rent it and did, in

4  fact, rent it and was very actively involved in collecting the

5  rent and making sure the renters did what they were supposed to

6  do.

7      In -- soon after he got the house, at some point -- I'm

8  not exactly sure when, but he turned to State Farm to cover it.

9  Mr. Bates had been a State Farm customer on all his properties

10  since the mid-'50s, longtime customer.  He put that house under

11  the same umbrella of coverage through the same agent; and,

12  around 2012, a hailstorm came through the neighborhood and

13  destroyed the roof; a typical claim was submitted; and the

14  Bates family decided to call a roofer that was a family friend,

15  who had, not that long ago, opened his own roofing company, to

16  help them.

17      This man, who you'll hear from -- hear from, is Jonathan

18  Marks, Jonathan Marks.  He had been a longtime State Farm

19  adjuster himself working on units that inspect and investigate

20  general residential claims of every kind and character and,

21  particularly, hail.

22      Mr. Marks worked his way up to being a supervisor at State

23  Farm.  I think he worked there nearly 20 years when State Farm

24  was doing a reorganization, and several people -- in fact, it's

25  likely you're going to hear from a couple of them that had been

7

1   at State Farm in this case -- decided that, instead of moving

2   their family away from Oklahoma as a part of the

3   reorganization, they would do something else.

4       In Mr. Marks's case, he decided to go into business with

5   one of his coworkers at State Farm, another longtime adjuster,

6   and they opened a company called Aegis Roofing.  That's

7   A-E-G-I-S, but they say it "e-jhus."  And that's been, again,

8   getting close to, I think, 20 years ago.

9       They employ a lot of State Farm former adjusters, as a

10  matter of fact.  I think his estimate is somewhere around 100

11  years of claims experience in the insurance business, they have

12  with Aegis Roofing, from all these people that he knew while he

13  worked there.

14      75 percent of his business comes from State Farm

15  customers.  Referrals are frequent from State Farm agents, even

16  claims people.  They know Mr. Marks, but they also know that --

17  about him that he doesn't take time or waste time with any sort

18  of claims that are not legitimate.  There's plenty of work for

19  him to do without ever having to do that.

20      So he took them up on the opportunity to replace this roof

21  in 20, actually, '13, by the time he got to it, and everything

22  went just fine.  State Farm, at the time, paid the roof; they

23  went on down the road; and it was handled.

24      Now, years pass.  Around 2019, another pretty significant

25  hailstorm -- you're going to get to see information about these

in the case, but another significant hailstorm went right over

the top of that house; and, again, Mr. Marks was called out to

check on it.

He, up on the roof, did not think it was bad enough to

even make a claim.  He documented it in his file.

One thing about an adjuster:  They keep a -- a -- a file;

and he was used to doing things that way; and so, even in his

roofing business, he does things that are very close to what

a -- you're going to see in the State Farm file.  You're going

to see both files, I think.

Anyway, he told them, the Bateses, that it -- it wasn't to

the point of needing to be replaced, and it'd be better to just

put that off, because, again, in a claims business -- in the

insurance business, it's not good to have too many claims.  It

can affect your coverage.  Again, why he gets so much business

from these agents.

Several hailstorms roll through the neighborhood, four or

five a year; but a big one came again on July 3rd of 2020; and

Mr. Bates -- Gary Bates was through that area a lot; and he

noticed all kinds of roofing signs in the yards of that

neighborhood, so he called Mr. Marks again and said, "I think

you better go check the roof."

By the time Mr. Marks got around to it, which was around

January of 2021, he got up on the roof; and, sure enough, now

the roof is totaled.

1     He tells Mr. Bates -- Gary Bates about it, and he calls

2  his dad.

3          Now, one thing that's --

4          (Cell phone interruption.)

5              MR. MILLER:  I don't know what that was.  Excuse me.

6          Mr. Bates -- Gary Bates was called by Mr. Marks, and, of

7  course, Mr. Gary Bates called his dad, Thomas.  They talked

8  about it.

9          And -- and the thing about, at the time, a 95-year-old

10  man, in spite of how he had taken care of all his own business

11  most of his life -- he was a petroleum engineer -- excuse me --

12  a geologist in the petroleum business -- geologist into his 80s

13  and had always handled all kinds of up -- ups and downs in the

14  business.  As you can imagine, in that particular industry,

15  they come, and they go.  Conflict, especially with any kind of

16  business, has never been a problem for him but, certainly, any

17  kind of conflict.

18          You're going to hear about Mr. Thomas Bates.  At that age,

19  of course, you can imagine what he lived through.  The second

20  he gets out of high school, Mr. Thomas Bates goes to the

21  recruiter's office because World War II was fully raging at the

22  time, and he joined the service; went into the military as a

23  infantryman in the Army; was sent to the Philippines where

24  fighting was heavy; took shrapnel in -- in a war zone, combat

25  zone; got the Purple Heart; and survived all of it.

10

1          Now, again, I want to tell you that because it's important

2     to recognize he's not one to shy away from what he thinks is

3     right; but he got less patient with matters and affairs like

4     this; and he started slowly, especially in his 90s, asking Gary

5     to help him with these things; and that's exactly what

6     happened.  Mr. Gary Bates submitted the claim and dealt with

7     State Farm for his father.

8          It probably will help to understand a few things about

9     investigating hail and understanding what hail looks like.

10    We've heard from a couple of people that said that, until they

11    were shown what it was, it's not so obvious; and, sometimes,

12    that's the case.  In fact, that's the State Farm training, as

13    you'll find out, I think.

14         But it's important, number one -- and everyone agrees with

15    this -- that you got to get up on the roof.  You got to be able

16    to see it up close.

17         You got to be able to feel it.  It -- they actually call

18    it "bruising," a -- a hail damage, because it's like bruising

19    an apple.  You can kind of push on it.

20         And it's typically like you might imagine.  It's kind of

21    circular or semicircular.  Typically, you can see to the mat a

22    little bit if you're close enough because some of the granules

23    that are on top of the mat have either pushed into the mat, or

24    they've wasted away and fallen away.

25         Experience is very important in this regard.  It's not

1  just obvious until you do it a while, and that, it seems like,

2  was problem number one here.

3      A lady named Tresa Jacome, who you may well hear today --

4  I think you will -- had no experience in looking at hail before

5  she took the job at State Farm several weeks before she worked

6  this claim.  She did watch several weeks of videos that State

7  Farm had her to and all kinds of different training policies

8  and procedures, including recognition and identifying hail and

9  how to handle it when you see it.

10     She also went out with a couple of three trainers for a

11  few days apiece, but, somehow -- and keep in mind:  They don't

12  just do hail.  They do all manners of claims in a house:

13  broken pipe, you know, lightning strike.  You name it.  A

14  theft.  But, somehow, she managed to get through all that

15  time -- and she'll tell you that, in all those experiences, she

16  never saw hail that the trainer said, "That's hail damage to a

17  shingle."

18     Now, you're going to find out that this has to be one of

19  the very first hail claims she got.  She estimates that, when

20  she finally started working hail claims, it was around the end

21  of January of '21.

22     Well, we can see from the records that she is looking at

23  this file on February 5th for the first time and working on it.

24     She scheduled a time to go out and look at the roof,

25  Mr. Marks was intent on meeting her there, and -- and that's

12

1    what had been set up for those days.

2        The -- the reason, though, that I think you're going to

3    find out -- or I submit to you what you'll consider is that --

4    that Ms. Jacome's lack of experience was really immaterial to

5    State Farm, was -- she was coming in at a time when the company

6    had gone to what the adjusters who'd been there a long time

7    knew as the "Hail Focus."

8        Now, they're going to run from this term, but you're going

9    to hear plenty about the Hail Focus; and the Hail Focus came in

10   with a new claims supervisor -- a "team manager" is what they

11   call her -- and her name was Draper, Jacqueline Draper.

12   Ms. Draper had been promoted to the worst hail zone in the

13   state, right here in -- or in the country, right here in

14   Oklahoma City, to run a team of six adjusters in the summer of

15   2019.  She brought just one real different rule with her.

16       Adjusters generally have authority for dollar amounts that

17   they can use to settle all kinds of claims.  Don't even have to

18   talk to their manager as long as the claim is within their

19   dollar figure.  Those didn't change.

20       The State Farm insurance policies that the customers had,

21   they didn't change.

22       The State Farm policies and training on hail recognition,

23   that didn't change.

24       The only thing that changed was, when Ms. Draper came in,

25   she told the very experienced adjusters that worked on that

1    team that, "You will no longer have authority to approve the

2    replacement of the shingles on a roof.  You have to send me

3    pictures of it and ask me my permission."

4         By the way, did not require that they call her before they

5    denied a hail claim.  That was fine.  But, if you wanted to pay

6    for a new roof, you had to send pictures by your cell phone to

7    Ms. Draper.

8         That was a real problem for several people because, as you

9    can imagine, they're seeing the same roofers all the time.

10   They're up on the roofs and dealing with people, deciding

11   what's hail and what's not, writing a check right out there on

12   the roof; and now they were supposed to sit around, tapping

13   their fingers, until they could hopefully get ahold of this new

14   supervisor; and they were grousing about it; and they groused

15   to each other.  They worried that they were going to get sued,

16   that State Farm was going to get sued, all kinds of internal

17   concern but also external.

18        When they're on a roof with people that -- that knew they

19   had authority, and now they wouldn't even make a decision about

20   what was hail, well, they grumbled until the new team manager

21   told them, "You can no longer use my name or the fact that

22   you're sending these pictures to me or awaiting my decision to

23   any of the people you're dealing with, the contractors, the

24   insureds."

25        As a matter of fact, she forbid them from putting the

14

1   information about the interaction and her involvement in the

2   coverage decision in the claim file.

3        As a matter of fact, the texts back and forth and the

4   things that were said, never in the claim file.  That violates

5   State Farm's own rules about completeness of the file and what

6   you're supposed to do to build a proper claim file.

7        As I said, some of the adjusters just couldn't take it.

8   One, in particular, had been there 20 years, good evaluations,

9   good adjuster, knew exactly what she was doing on a roof and

10  around a roof; and she -- her conscience started getting the

11  better of her because she was being forced to deny claims that

12  she knew were hail claims.  She was forced by Ms. Draper to

13  say, "They're wear and tear."

14       There's that phrase again:  wear and tear.

15       Because why?

16       It's not covered.

17       Eventually, she decided to leave that job that she loved,

18  that had great benefits because she could go nowhere.  She

19  talked to bosses about it, bosses' bosses.  No one seemed to

20  have anything to offer to help, and so she took a job for less

21  money in another place, and she's going to come talk to you

22  about it too.

23       As I said, it didn't matter about Ms. Jacome's experience

24  because all she had to do was follow the plan.  She just had to

25  get on that roof, take some pictures, and send them to

1  Jacqueline Draper.

2      As she was getting down off the roof at his house,

3  Mr. Marks rolled up -- he knew she was supposed to be there --

4  and -- and asked, you know, "How did it go?"

5      And, after some discussion, they got back up on the roof

6  at his request because she wasn't going to pay for the roof.

7      He knew it was hail-damaged badly.

8      As he was getting up on the roof with her, he said, "What

9  do you need to see?

10      "I mean, it's all over.  What -- what can I show you?"

11      She said, "Well, maybe if you could show me a broken mat."

12      Underneath the -- the shingle mat -- when the hail hits on

13  top, it often cracks the fiberglass underneath its portion.  If

14  it can be lifted up, which is not easy to do because, think

15  about it, the roof's on an angle.  You got to lift it up and

16  get down there to see it, or you break the -- the seal -- I

17  mean, break the shingle.

18      So he turns, pulls one up, first one they look at, and

19  there it is.

20      He'll tell you he thought he really turned her.  He could

21  tell she wasn't very experienced because she did a pretty poor

22  job on the ground explaining why this wasn't hail when there

23  was hundreds of the semicircular and circular indentions in the

24  roof, all over it, all slopes, but it seemed like she got it

25  when he showed her the broken mat on the very first shingle he

16

1    took her to.

2         Then she said something real curious.  She said, "I think

3    that could be hail, but my supervisor, Jacqueline, will never

4    pay for it."

5         Sure enough, not long after, he gets a call back from her

6    and said, "I sent the pictures to Jacqueline, and she said,

7    'It's not hail.  It's wear and tear.'"

8         Mr. Marks documented that in his file.  He knew that he'd

9    probably still have a chance, though.  She -- he knew she was

10   inexperienced.  He just needed a second inspection.  He needed

11   somebody out there with more background in it.

12        So he goes to the roof, he marks it himself, he takes the

13   pictures, and he submits -- now, understand, he doesn't know

14   what pictures they have.  He doesn't know what she did.  He

15   just sends his own, and he asks in a very nice email that

16   you're going to get to read, "Please send somebody else out

17   here to look at it because it is hail, and, by the way, I was

18   with this company for a long time."

19        Well, guess what?

20        Those texts between Jacome and Draper, nowhere in the

21   claim file.

22        The pictures that she told Jonathan Marks she sent to her,

23   nowhere in the claim file, not from the texts.

24        The notes, which you'll see in State Farm's own words,

25   "You're supposed to document your file with what happens on

17

1    coverage decisions," not a single mention of Jacqueline Draper.

2    Even though Jacome had no authority to make a decision, not a

3    mention.

4        And, by the way,  Ms. Draper, she writes no note about her

5    involvement in the original decision to deny it.

6        But the inexperienced adjuster made one big mistake.  She

7    told the contractor about the texts.  So, after we saw that

8    they were not in there, we dug them out of the records from

9    State Farm, and you're going to get to see them.

10       Mr. Marks's email and pictures demonstrate mistake after

11   mistake after mistake.  Some are very obvious, and some, you

12   will see, would be extremely obvious to someone that was in the

13   business.

14       And they summarily, in three words in the claim file --

15   reinspection denied, because, by that time, 18 months in,

16   Ms. Draper was so confident in her ability to do whatever she

17   want, you're going to see a file that makes it clear they had

18   long since quit worrying about their customers.

19       Gary Bates, doing this for his dad, did all he could, all

20   he knew to do, to try to get help.  He wrote email after email.

21   He asked to talk to a supervisor, new adjuster, anything,

22   supervisor's supervisor.

23       Not a single one ever called him.  A supervisor never

24   called him.  They never emailed him back.  They never did

25   anything to try to help him understand their position or listen

1  to his.

2       So then he went to the Better Business Bureau.

3       Jacqueline Draper submitted a -- a response to the Better

4  Business Bureau that they had reached a satisfactory

5  conclusion -- resolution.

6       Nothing, as you'll see from the emails, could be further

7  from the truth.

8       He went to the insurance department, tried to get help

9  there.

10      Their response was, "You're going to have to take it to a

11  courtroom."

12      Mr. Bates ended -- Thomas Bates ended his 65-year

13  relationship with State Farm over this because he was not very

14  happy.

15      And Ms. Draper, she got promoted.  She now runs eight

16  teams like the one she had in Georgia doing, by her own

17  account, the job and enforcing the job with those 60 people

18  that work for her in Georgia, the whole state, the same way she

19  did it here.  Nothing's changed, not a thing.

20      So it is the failure to properly investigate, which is the

21  insurer's duty; to evaluate, which is the insurer's duty; and

22  to pay properly the insurance claim, the insurer's duty, that

23  we're left nowhere to go except right here to you.

24      Thank you.

25          THE COURT:  I recognize Mr. Leffel for Defendant

```
 1   State Farm Fire and Casualty Company's opening statement.
 2             MR. LEFFEL:  Thank you, Your Honor.
 3             THE COURTROOM DEPUTY:  Give me just a second, Lance.
 4             MR. LEFFEL:  May it please the Court, Counsel, ladies
 5   and gentlemen of the jury, this case presents a disagreement
 6   about what is and is not covered by Mr. Thomas Bates's
 7   insurance policy with State Farm.
 8        As I listened to Mr. Miller, there are a number of things
 9   that you're going to notice that the parties agree about; there
10   are a number of things that we see very, very differently; and,
11   as I listened to Mr. Miller speak, there were a number of
12   things that he told you that, I believe, are not supported by
13   the evidence in this case.  All of this information about how
14   Mrs. Draper's team operated and Mrs. Jacome's experience are
15   rebutted.
16        Ms. Jacome had worked for several independent adjusting
17   companies, working on some of the most complex claims that any
18   claims adjuster ever handles, things like wildfire, hurricane,
19   natural disasters, dealing with all aspects of claims, and
20   that's the experience that she brought when she was invited to
21   join Ms. Draper's team.
22        Ms. Drapers (verbatim) went to great lengths to train not
23   only the people that were new but the people that were older to
24   make sure that everybody had the state-of-the-art training on
25   how to recognize what is and is not hail damage.
```

1      This Ms. Lanier, this former employee, secured a job

2   before she left State Farm; and the evidence from everyone at

3   State Farm, including her supervisor's supervisor, Ms. Sharon

4   Arnold, who you'll hear from, say that she said nothing.  In

5   fact, we put Ms. Lanier under oath, and she -- we asked, "Did

6   you tell anybody at State Farm that you were feeling this way?"

7      She said, "No.  I dropped my stuff off at Jacqueline's

8   house, and I just -- it would have been uncomfortable to talk

9   about these feelings."

10      There's a lot of things that we see differently, like that

11   conversation between Ms. Jacome and the roofer, Mr. Marks.

12      You're going to hear from Ms. Jacome.  She's got a unique

13   story to tell.  She's a neat lady, and she disputes the

14   narrative that she was shown a broken mat.

15      You know, interestingly, Mr. Marks sent that email asking

16   for a second inspection.

17      You know what's not in any of his photographs?

18      A picture of that alleged broken mat.

19      The photographs that were texted to Ms. Draper, who, you

20   were just told, are not in the claim file, every one of those

21   photographs are part of her investigation as documented in the

22   file.

23      I would agree the actual text messages were not in the

24   file.  They were maintained by State Farm, and they were

25   produced, so I just want to touch on a few of those things.

1    But Plaintiff, Thomas Bates, owned a rental property, as
2  we've said, at 2605 Elwood Drive in Edmond.  We got a picture
3  of it.  It's Joint Exhibit 1.317.  That's the house that's at
4  issue.
5    Now, the evidence will show that this is one of eight
6  rental properties that are owned by Mr. Bates and his son Gary
7  Bates.  They're -- I -- like we said, they're in the
8  landlord-tenant business.  This is one of their income-deriving
9  properties.
10    You'll hear testimony in the case that, when you get to
11  the scene of a loss, the physical evidence tells a story, and
12  this building told a story.
13    And, while every property has history, as Mr. Miller
14  alluded to, the story of this property really begins in 2012.
15  That's when Mr. Bates made a claim for this particular rental
16  property; and State Farm insured it then, as it did when this
17  claim arose; and, as you've been told, they paid that claim
18  with no issue.
19    Mr. Marks of Aegis, who we've heard about, the former
20  State Farm adjuster, charged the Bateses $6,300 to replace that
21  roof in 2013, after the 2012 claim.
22    Let's take a look at Joint Exhibit 17.  That's the
23  contract that he entered.  It says "proposal," but that
24  ultimately ends up being the final invoice.
25    And a couple of things you'll notice is the price; the

1   date, January; but the other thing that you're going to notice

2   is that he put a Malarkey Dura-Seal Class A shingle on that

3   roof in 2013; and he testified the Malarkey Dura-Seal has

4   obtained a Class 4 impact-resistant rating.  That's the highest

5   classification you can give to a shingle, and only the ones

6   that are Class 4 are marketed as being the most durable on the

7   market.

8       Now, I want to show you another photograph, and it's

9   Plaintiff's -- I'm sorry -- Joint Exhibit 14.117.  This

10   photograph that we're going to see is a photograph from that

11   2012 claim, and, if you look at that, you'll see what's called

12   a "test square."  That's what you're looking at.  That's a test

13   square.

14       So the adjuster has marked that up.  Those parentheticals

15   indicate where there has been hail strikes, and this particular

16   test square shows that there were more than five hail hits in

17   that test square.

18       Now, I can't tell how it looks on your screen.  I'm

19   looking at that.  I can see the dark marks inside of the

20   parentheticals, but that's part of the evidence that supported

21   this being paid in 2012.

22       Now, I want to show you another photograph.  Joint Exhibit

23   1, Number 330, is a test square taken from this same roof from

24   the 2021 claim.  Right up there in the upper right corner, you

25   can see part of where she has chalked her test square, and

1    you're going to hear from Ms. Jacome, and you can look at it

2    with your own eyes and form your own opinions, but she's going

3    to tell you she found no hail within that test square or the

4    other test squares on the field shingles of this home.  Okay?

5         Compare and contrast what you saw from 2012.

6         Now, State Farm has a number of training materials, and

7    we're going to hear a lot about those today, but they also have

8    things like brochures that are meant to inform not only claims

9    people but also people like you and me, consumers, of what hail

10    really looks like on a roof.  One of those is marked as Joint

11    Exhibit 13.  Okay?

12         We can see that this is titled "Evaluating Composition

13    Shingles."  That's the kind of shingle that was on Mr. Bates's

14    home.  And, if we go to the second -- or third page of this

15    brochure, we get a series of photographs.  I want to take a

16    look at that top one.

17         What you are seeing there, ladies and gentlemen, is called

18    a "ridge"; and you're going to hear a lot about ridges and

19    valleys during this case; but, on this particular ridge, you

20    can see what's called a "slope" or a "field" on either side.

21         You'll notice that on the right side of the ridge you see

22    all those dark marks.  That is hail damage.  And you can see it

23    even in this overview photograph.  You don't need to get up

24    there and magnify it times 10 with your iPhone.  You can see it

25    walking up when there's significant hail damage that would

24

1    cause a roof to be totaled.  Okay?

2        If we go back, you may be wondering, Why is that hail

3    damage all on one side of that ridge?

4        And there's a reason for that, and it's shown in this

5    brochure at page 2, I think.  There's that graphic at the

6    bottom that talks about the directionality of hail.

7        Storms come in from a certain direction.  There's wind at

8    a certain direction, which is why you may see damage on certain

9    slopes but maybe not the back side of that slope.  I like the

10   one on the -- on the left because it shows, maybe, a couple of

11   them would hit over the top, but, primarily, it's going to be

12   those storm-facing slopes that may get damaged.

13       I want to show you, now that you had a chance to look at

14   that ridge, a photo, which, I believe, is JX1.322.  This is a

15   photograph that was taken by Ms. Jacome during her inspection.

16       Remember what that brochure looked like, and this is what

17   Ms. Jacome found.

18       You're going to hear her testify.  Those text messages

19   that -- is that -- she shared with Ms. Draper -- she -- she's

20   asked, "What do your ridges look like?

21       "What do your valleys look like?"

22       This is what she saw, and she's saying, "I don't see

23   obvious hail damage on this clean ridge."

24       Everything that's discussed in those text messages, while

25   the text messages themselves are not in the file, are part of

1  her inspection note from this inspection.  Same information.

2      I want to show you one more picture from the brochure, if

3  we could, and that's JX13 at 3.  It's that middle photograph.

4  Okay?

5      So -- so you've got right there on the left -- that was

6  perfect, Ms. Wright.

7      On the left, you've got the test square that Ms. Jacome

8  made.

9      That middle photograph on the right is a test square

10 that's labeled "random hail hits," and you're going to notice

11 how there are hail hits distributed all throughout those

12 shingles.  Some are at the top.  Some are at the bottom.  Some

13 are in the middle.  They're obvious to the eye in the test

14 square.

15     Juxtapose that to the test square that Ms. Jacome took.

16     Now, based on the evidence, and you heard this similar

17 thing from Mr. Miller, the story of this roof picks back up in

18 March of 2019 when there was a hail event; and, as you've been

19 told, Mr. Marks went out there; he noted in his file, "I

20 inspected this roof on Saturday.  It has some hail damage, but

21 I'm not sure it's enough"; and he tells them, after inspecting

22 this after this hailstorm, not to make a claim.

23     And the evidence is going to show that nobody at State

24 Farm was ever informed of alleged damage to this roof in 2019.

25     No claim was ever made.

26

1        They didn't even find it necessary to make any repairs

2   after this hailstorm in 2019.

3        20 months go by, okay, and the next contact -- and I don't

4   know if there'd been conversations between Gary Bates -- we

5   haven't seen those in the evidence, but 20 months go by, and we

6   know because we have the text messages, and Mr. Marks reach

7   out -- reaches out to Mr. Bates in January of '21.

8        And the evidence is going to show that in that 20-month

9   period there was no contact made with State Farm.  There was no

10  repairs made to this allegedly damaged roof.  There's not

11  really any evidence of anybody complaining, like the tenant,

12  saying, "Hey, the roof is leaking," or anything like that.

13  Nothing is going on with this deal.

14       And you're going to hear Mr. Marks say that January can be

15  a pretty slow month in the roofing business, good time to start

16  looking at your files, seeing who might need to be followed up

17  with.  That's what he did.

18       Unsolicited, he reached out to the Bateses and sends a

19  text message, and it's at JX1.575, and he says this (as read):

20  "Hey, Gary, your dad's house on Elwood pops up on my calendar.

21  Are you still wanting to get that roof replaced?

22       "We can use a hailstorm we had in July for a claim, or we

23  can just wait on the next storm.  Your call."

24       There's no evidence of any urgency.

25       There's no evidence he was saying, "Hey, this thing has

27

1   been damaged again.  Get back out here."

2        The evidence we have is that he called them during a slow

3   month and said, "Hey, we got some storms we can use.  We can

4   make another run at this deal," and that's okay, but that's

5   what he was doing.

6        And you -- the evidence is also going to show that

7   Mr. Marks is making that suggestion without having ever gone

8   back to the property to see if it, in fact, was damaged.

9        After he goes out and inspects, he tells them, "I think

10  there's -- there's damage.  Make a claim."  He does that.

11       And you'll see there on a text message what Mr. Gary

12  Bates's response was.  He says (as read), "Well, probably, but

13  I would need to talk to him," meaning his father, Thomas Bates.

14  "What would be his out-of-pocket?"

15       It goes on in the same text message chain to say, "Will

16  you absorb our deductible if we go forward with the claim?"

17       And Mr. Marks says, "Sure."

18       I think he does text later and say, "I better make sure

19  how much the deductible is," which is wise, but he says he'll

20  do it.

21       And I told you this is a disagreement about what is and is

22  not covered by the policy.

23       Let's take a quick look at what this policy covers, and

24  we'll start by looking at JX6.30.

25       This is the policy.  JX6.30 is what we call the

1   "declarations."  I just want to draw your attention to the fact

2   that it does identify Mr. Thomas Bates as the insured.  It

3   identifies the property that's at issue.  It tells you that

4   this was in place from October of 2019 to October of '20, so

5   our July 3rd, 2020, claim date would fail within the terms of

6   this particular policy.

7       If we could go into the body there -- it's okay,

8   Ms. Wright.

9       If we'll go into the body, we're going to go into the

10  coverage language at JX6, page 8; and, at JX6.8, we're going to

11  see very simple language:  Section 1, "Losses Insured"; and it

12  tells us that this policy insures for accidental direct

13  physical loss to property described in Coverage A and B except

14  as provided in Section 1, "Losses Not Insured."

15      And you guys sound like you're all consumers of insurance.

16  You know that there's this broad coverage language, but then

17  there's some exceptions to coverage.  So we see, if we back

18  that out, the next section is those losses not insured.

19      Okay.  And, if we turn -- and I'm being mean to Ms. Wright

20  because I'm talking faster than she can post.  She's -- she's

21  very good.

22      But, at Subpart I is that exclusion that we have heard

23  about already for wear, tear, deterioration, marring,

24  scratching, inherent vice, latent defect, and mechanical

25  breakdown; and you're going to hear a lot about that language

29

1    over the course; and -- and the language of the policy that you

2    can read with your own eyes and the testimony you're going to

3    hear is that that is just ordinary wear and tear.  Roofs and

4    other things wear out over time.

5        If you've got three children and a dog -- I don't have

6    three children; I have two, but I do have two dogs, and your

7    carpet wears out.  That's not the type of thing that you can

8    make an insurance claim for.

9        Roofs wear out too.  Siding wears out.  Houses need to be

10   painted.  It's not a maintenance policy, you will hear the

11   witnesses say, okay, as much as we would like for it to be

12   sometimes, including myself, as a consumer of insurance.

13       There's also a section of the policy that's called "Your

14   Duties After Loss," and that section is meant to tell you as

15   the policyholder what your duties are.  One of those things is,

16   when you think there's been damage to the property -- if you

17   want to look at it, it's JX6, page 10.

18       One of the things it tells us is that, "If you are going

19   to -- if you think there's been a loss that this -- is covered

20   by this policy, you got to tell us."

21       Next thing says you need to make sure that you're making

22   necessary repairs so that -- that things that may be a small

23   problem now don't get to be a bigger problem later.

24       Those are your obligations as the homeowner and the

25   policyholder.

1        As we've said, after that 2019 storm, those things didn't

2    happen.

3        Now, ultimately, after Mr. Marks inspected in January of

4    '21, a claim was made.  The claim was made on February 4th of

5    2021.  The date of loss they gave was July 3rd of 2020.  So

6    this loss that they're claiming was so bad that the entire roof

7    needed to be replaced again after being replaced in '13, they

8    waited 217 days after they claim a storm damaged this property

9    to make that claim and said it was totaled and had to be

10   replaced entirely again.

11       Evidence is going to show, as soon as they made the claim,

12   Mr. Bates was contacted the same day.

13       Mrs. Jacome, who you've heard about and you'll hear from,

14   maybe, today, was out there on February 23rd to do her

15   inspection; and she's going to be able to tell you about all

16   the things she did, about how she walked every slope and every

17   valley, how she walked all the elevations.

18       When you hear that, those are the sides of the house:  the

19   front, left, back, and right.

20       She noted all the damage that she saw, including where she

21   saw a lot of damage to a lot of the soft roofing metal, to some

22   windows, to a mailbox, to the garage door in the front, but

23   what she did not find was significant hail damage that totaled

24   the fields or the shingles of the roof.

25       The evidence is going to show that -- that most of the

31

1    damage was on the front and the back elevations, consistent

2    with what we were talking about, the directional nature of

3    hail.

4        She was asked about the ridges.  You saw that photograph

5    of that clean ridge.

6        But the other thing that you do when you're taking a

7    insurance adjustment is you take various overview shots, and I

8    just want to give you guys a little preview of what some of

9    those overview photos are going to show, starting with JX1.285.

10       Okay.  We're looking at a valley there.  You got fields on

11   either sides.

12       That's one of the overview photos that she was looking at,

13   and she's going to tell you, "I didn't see major damage in that

14   valley," which is one of -- again, one of the first places that

15   gets damaged.  They're more exposed on the ridge.

16       Let's go to 305, if we could.

17       Another overview of a slope.  You can see that power vent.

18   We're going to talk about that in a minute.

19       In the background, you can see part of a ridge there and

20   part of another ridge with another valley and another partial

21   slope.

22       You're looking for -- yourself to look and see if you see

23   some of those obvious hail marks that we've seen in some of the

24   examples.

25       Let's take a look at 307.

32

1        Okay.  Another field.

2        And, finally, 309.

3        Those are some of the overviews that were relied upon in

4   making the decision here.

5        And, as you've been told, after Ms. Jacome finished her

6   inspection, Mr. Marks showed up; and he -- and she tells him

7   down on the ground, "I -- I've been up there already."

8        She was putting her ladder up.

9        She said, "I didn't see hail to the shingles."

10       And he said, "Will you mind getting up there and looking

11  with me?"

12       And he's going to testify she was very gracious about it.

13  She was professional and courteous.

14       They got up there together -- put another ladder back

15  up -- and they went through all the damage.

16       And she has a real different story to tell about the

17  conversations that happened on that roof that are different

18  than what Mr. Marks remembers, and that happens.  That happens,

19  but it's really drastically different, and there was no picture

20  that he sent when he asked for the second inspection that

21  included this allegedly broken mat.

22        She's also going to tell you that she told him again on

23  the roof, "What I'm seeing is wear."

24       When you look at those text messages that she sent with

25  Ms. Draper, she's consistent.  She says, "I'm seeing wear.

1    This is where I found damage.  This is where I didn't find

2    damage."

3        She -- her note tracks exactly what she's been

4    consistently saying all along, and it contradicts what

5    Mr. Marks has to say.

6        Now, I want to see if I could show you something I alluded

7    to a minute ago, and let's look at JX3.8.

8        Okay.  That's one of those power vents.  You're going to

9    look at that, and you're going to see all kinds of tiny little

10   indentations all over that soft metal power vent.  That was

11   called as hail.  Okay?

12       So, now, you might ask yourself, Why might there be hail

13   right on top of itself, you know, very little distance between

14   the spaces on this item, but, then, that wasn't found on the

15   composition shingle roof?

16       Well, there's science behind that, and you're going to

17   hear from a number of witnesses.  This is an impact-resistant

18   shingle.

19       Soft metal can be damaged, according to some people, by

20   just pressing it down, and we're going to show you some

21   examples of how easily that metal damages.

22       What you're not going to find and what they're not going

23   to produce in evidence is anyplace on any shingle where you see

24   a similar pattern of hail hits, random and indiscriminate, like

25   you see on the soft metals, which were paid for in this claim

34

by State Farm.  The things that they confirm, the things that

they knew were covered, they paid those things, no question.

Ms. Jacome estimated the damages the same day she did her

inspection.  Came out to about $2,000.  She applied the

deductible and depreciation and issued payment the same day.

As I mentioned, Mr. Marks asked for a second inspection.

We'll get to see what he presented.

But both Ms. Jacome and Ms. Draper, who allegedly didn't

appear in the file -- she's got several notes in the file,

several references to her in the file -- they reviewed those

photographs together, and they decided that there was nothing

that they had not already seen that warranted going back out

and giving a second inspection.

In fact, Mr. Marks, the roofer, testified that there was

nothing new in his photographs, that everything he wanted to

show Ms. Jacome he had the opportunity to show her when he was

on that roof with her.

Now, one of the people that's going to talk about the soft

metal damage, in addition to some of the State Farm people like

Ms. Jacome; Ms. Draper, who you'll have an opportunity to hear

from; Ms. Arnold -- Sharon Arnold, the section manager, who was

Ms. Draper's supervisor -- you'll have an opportunity to hear

from all of them, tell you what they understand about how these

roofs work and what was seen and done in this file, but you're

also going to have an opportunity to hear from Mr. Derek

1    VanDorn.

2        Mr. VanDorn, like Mr. Marks -- they actually worked

3    together at State Farm.  He's a former State Farm guy, but he's

4    got 24 years of experience in construction and insurance, and

5    he currently works for a company that does general contracting

6    and also does consulting services.  They get hired.  He's a

7    paid witness.  So he is paid to be an expert and come and talk

8    about his expertise.

9        But what he's going to essentially tell you is that he has

10   looked at his own inspection.  He personally inspected this

11   property; he has looked at the photographs from Mr. Marks and

12   from people representing the plaintiff and also the State Farm

13   photos; and he did a statistical analysis; and he found over

14   and over again, just as was noted in the file, that the

15   majority of the blemishes on this roof fall within about a half

16   inch of the shingle's edge; and we're going to see numerous

17   examples throughout this case of where you're going to see the

18   dark loss of granulation; and he's going to say, "That's not

19   what you'd expect to see with random, discriminate hail fall."

20       You're going to hear from Gary Bates.  You're going to see

21   some of the correspondence that Mr. Bates sent in this claim.

22   Some are not very kind.  He starts threatening lawsuits and

23   lawyers and engineers.

24       He refers -- he constantly reminds us that Mr. Thomas

25   Bates is a war veteran, which he is, but he -- but he uses that

36

1    as a sword.

2        And he calls Ms. Jacome a "rookie cookie-cutter adjuster."

3        He sends a text message to Mr. Marks about 60 days after

4    this claim was filed saying he -- and I quote:  "He's ready to

5    sue the bastards, and he's threatening to call News 4 In Your

6    Corner throughout this whole process."

7        You'll have an opportunity to hear from him, but it's on

8    these facts that they're alleging that State Farm acted in bad

9    faith.

10        I want you to remember that the plaintiff bears the burden

11    of proof in this case, not State Farm, to prove these claims of

12    breach of contract and bad faith.

13        I want you to remember the photographs that you've seen

14    and that you will see throughout the case, the comparisons of

15    what was on this roof versus what's depicted in some of the

16    examples because it's on these facts that they allege bad

17    faith.  It's on these facts that they allege we did not pay

18    what we owed under the policy.

19        We're going to ask you to find, when the evidence is

20    heard, that State Farm didn't breach the policy.  It honored

21    it; and we're going to ask you to find that this is a case

22    where reasonable minds can differ on what is and is not covered

23    and that, on those facts, when there's that reasonable dispute,

24    that's not bad faith.  That's just the kind of disagreement

25    that we have in life.

37

1          Thank you.

2          (End of excerpt.)

3                    REPORTER'S CERTIFICATE

4          I, CASSY KERR, Federal Official Court Reporter in and for

5     the United States District Court for the Western District of

6     Oklahoma, do hereby certify that, pursuant to Title 28, Section

7     753, United States Code, the foregoing is a true and correct

8     transcript of the stenographically reported proceedings held in

9     the above-entitled matter, and the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12         DATED THIS 5th day of November, 2024.

13         /s/Cassy Kerr
           Cassy Kerr, CSR, CCR, RPR, CRR, CRC
14         Oklahoma CSR License No. 1367
           Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25