1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
    THOMAS H. BATES,                 )
 3                                   )
                       Plaintiff,    )
 4                                   )
       vs.                           ) Case No. 21-CV-705
 5                                   )
    STATE FARM FIRE AND CASUALTY,    )
 6                                   )
                       Defendant.    )
 7

 8

 9

10

11              TRANSCRIPT OF TRIAL CLOSING ARGUMENTS

12                 NOVEMBER 7, 2022, at 2:55 P.M.

13      BEFORE THE HONORABLE JODI W. DISHMAN, JUDGE PRESIDING

14

15

16

17

18

19

20

21

22

23

24
                    Recorded by mechanical stenography
25      Transcript produced by computer-aided transcription
```

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  StenoLogic@cox.net

1                          A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3         Mr. Robert Bradley Miller

4         bmiller@mjjaw.com

5         Ms. Shawna L. Landeros

6         slanderos@mjjaw.com

7         Miller, Johnson, Jones, Antonisse & White

8         500 Northwest Sixth

9         Suite 300

10        Oklahoma City, Oklahoma 73102

11        405-896-4388

12

13   FOR THE DEFENDANT:

14        Mr. Lance Leffel

15        lleffel@gable.com

16        Ms. Paula M. Williams

17        pwilliams@gablelaw.com

18        Ms. Taylor J. Freeman Peshehonoff

19        tpeshehonoff@gablelaw.com

20        GableGotwals

21        499 West Sheridan Avenue

22        Suite 200

23        Oklahoma City, Oklahoma 73102

24        405-235-5500

25

3

1                          I N D E X

2   CLOSING ARGUMENTS:                                      PAGE

3        BY MR. MILLER . . . . . . . . . . . . . . . . . .    4

4        BY MR. LEFFEL . . . . . . . . . . . . . . . . . .   18

5        BY MR. MILLER . . . . . . . . . . . . . . . . . .   44

6        REPORTER'S CERTIFICATE. . . . . . . . . . . . . .   48

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1       (This transcript contains only the excerpted trial closing

2   arguments:)

3           THE COURT:  At this time, I recognize Mr. Miller for

4   the plaintiff's closing argument.

5           MR. MILLER:  You-all have heard a lot of evidence in

6   a very short time.  I -- I got to tell you it's been a very

7   fast trial and a -- a lot of witnesses and a pretty dense,

8   really, trial in a lot of ways, and your attention to the

9   details and the evidence have been obvious to all of us.

10      I've been doing this a great long while.  Actually, 38

11  years is when I tried my first case to a jury.  And we, in the

12  outside world, hear a lot about the faults of our system; but,

13  from the insider's perspective, I can tell you that it is by

14  far the greatest system in the world; and the real reason it

15  is, is just the one difference between us and everyone else,

16  and that's you.

17      We have members of the community that come and tell us,

18  after listening to the facts, listening to the law -- they tell

19  us what they think about the facts, as we present them, and it

20  helps everyone.  It informs all of us:  State Farm, everyone in

21  here.  It will let them know what they should think about the

22  conduct of this case.

23      So, on behalf of all of us but certainly my client,

24  Ms. Landeros, we want to thank you for your time and your

25  attention.

1      Now, I only have a very short time to talk to you.  I do

2   get the last word, though, because we have the burden of proof,

3   as you've heard.  I get to go first; and then Mr. Leffel, I

4   assume, will go; and then I will go last for a few more

5   moments.  So I want to visit with you about the things that I

6   really think need to be said.  Even though, I'm sure, there's

7   a lot of little details that, maybe, ought to be talked about,

8   we just don't have time.

9      The first thing are the instructions that deal with how

10   you decide whether or not the case has been proven.  First one

11   would be Instruction 12, and the judge has read it to you, but

12   you'll have these back -- to go back to you, and there's

13   absolutely nothing wrong with us putting them up here, but it's

14   three elements we have to prove for breach of contract -- these

15   three elements, as the judge already read.

16      The first one is, is -- was there a contract formed?

17      I don't believe that there's any dispute about it.  I

18   won't put it up, but just the stipulation that the judge read,

19   I believe, takes care of it.  A stipulated fact, which is one

20   of your instructions, is going to say that (as read), "All

21   times material hereto, the Property was insured through a State

22   Farm policy."  So number one's proven.

23      There's even more proof than that -- that policy.  As you

24   can find, if you look at -- let's start with JX18.33.

25      You heard a lot about written discovery, and we're allowed

6

1   to ask certain questions, and the other side has to answer them
2   and -- and keep updating them until they -- everyone's
3   satisfied that they're correct.
4       Well, here -- this is called a "request for admission" --
5   we asked to admit that Plaintiff had a policy with State Farm
6   that was in full force continuously from the original policy
7   inception date all the way through February 4th when he made
8   the claim in '21.
9       We were refused -- I'm sorry.
10      We were referred also -- this says it was admitted -- to
11  another interrogatory, if you'll look at JX18.40, and this is
12  kind of important.
13      18.40.
14      We wanted further information; and, on the supplemental
15  answer, it's been told to us and to you that State Farm
16  maintains its objection; but, without waiving it, the original
17  policy issue date of Plaintiff's policy with State Farm is
18  October 10 of '10.
19      So the policy has been inception (verbatim) and full force
20  and effect since 2010 all the way through the day and beyond
21  that it was reported -- this hail loss was reported.
22      That's the first element.
23      They sort of -- I don't know -- indicated, maybe, that
24  they're going to challenge this, but -- and whether or not
25  Mr. Bates has to actually prove the for-sure date that the hail

1    damage happened and when that was and what policy.  I'm not

2    sure if Mr. Leffel will address that again, but I've heard a

3    few little hints of it.

4        The bottom line is that's why I asked Ms. Jacome to slowly

5    and carefully explain right up there in the first day that --

6    the day she testified; and, if you'll remember, she very

7    clearly said, "If we have a longtime insured like this, and

8    they have a -- a hail claim, doesn't matter if they know when

9    it happened.  As long as we haven't already paid for it, then

10   we're going to pay them."

11       There's also an OG, the original -- I mean, the

12   operational guides, and you've got those, and you've got the

13   one that matters.  I won't go to it right now, but it's -- it's

14   Number 88 and Number 91, if anybody wants to see it.

15       But State Farm literally gives a written version of what

16   you're supposed to do in case of a situation where a deductible

17   wasn't met originally, or there was damage that hadn't been

18   turned in for something like hail -- in fact, specifically like

19   hail and tells the adjusters, "You will pay for the loss on the

20   day of the claim that's made and not in any way punish the

21   insured because of the fact they don't exactly know when the

22   hail hit."

23       Again, that's conforming completely with what Amy Lanier

24   said and what Jonathan Marks said, as well as what Ms. Jacome

25   said.

1         Furthermore, anybody that stands up here and says that

2    they don't believe this was a covered loss -- ask yourselves,

3    well, why did they pay for all the metals?

4         If this was not a covered loss, and they were challenging

5    when it actually happened, and it mattered, why did they ever

6    pay any metals and then pay again a little more in August of

7    this year?

8         Doesn't make sense but just in case they bring it up.

9         Number 2 -- Element Number 2 on the contract claim, you

10   have to show that the contract has been breached.

11        The -- I think at the end of the testimony today we were

12   left with -- I'll challenge you to tell me if I've got this

13   wrong, but there are hundreds of circular spots of damage on

14   the roof, spread out across the whole roof sporadically,

15   randomly; and the hundreds of circular spots of damage across

16   the roof, he can't tell us what they are.  State Farm could

17   never tell us what they were.

18        You'll see in their brochure in Exhibit JX13 that they

19   have all kinds of different possibilities of what they call

20   "wear," but, when you look at those pictures, none of them have

21   anything to do with what you can see on this roof.

22        I submit to you that the only credible person that's

23   testified, who has no concern about the outcome, is Mr. Marks;

24   and he said, "It's obviously hail.  There's no doubt about it."

25   In all of his nearly 40 years, I think it was, of looking at

1    these claims, that's hail.

2        The third element is we have to show there's some damage.

3        Well, of course, again, obviously, we've not been paid for

4    the roof; right?

5        But there's a further instruction on that.  It's

6    Number 14.

7        In Number 14, the judge will -- or Judge will give you

8    this instruction when you go back, but, at the end of that

9    instruction, it said you should award damages -- if you approve

10   it, you should award damages even if you are uncertain as to

11   the exact amount.  The amount of damages does not have to be

12   proved with mathematical certainty, but there must be

13   reasonable basis for the award.

14       Again, we have submitted to you in evidence the Aegis

15   estimate for doing the job.  He didn't submit the estimate for

16   what the insurance coverage was; he submitted it for what he

17   felt was going to be necessary to do the job.

18       It is an ACV policy.  It is supposed to be depreciated.

19   There is no doubt about it.  But no one at State Farm,

20   including the paid expert, never, to this day, has ever

21   calculated what the AT -- CV value would be in their opinion.

22   That's why this instruction says that we don't have to, and

23   they don't have to.  You can resolve it based on the evidence

24   that's submitted.  That is up to you.

25       Could we look at the verdict form right fast, please, on

1    Stage 1?

2         Here, we're dealing now with the first cause of action,

3    breach of contract; and I suggest to you that, if you agree

4    that the plaintiff has proven the breach of contract as I've

5    just outlined, then you would check A; and that would be, of

6    course, in favor of Thomas Bates; and then you would go to the

7    line and decide, based on the information you have, what is the

8    value of the breach of the contract?

9         Again, up to your discernment.

10        All right.  The next part that the judge read to you is

11   the insurance company, all of them, have a duty to deal fairly

12   and in good faith.  That obligation of -- of insurers, that

13   obligation of good faith and fair dealing, is termed as a

14   "duty."  It's not a choice.  It's not if you want to.  If

15   you're going to take people's premium, then you must

16   investigate and evaluate claims fairly and reasonably and in

17   good faith.

18        You might remember Mr. Mendoza telling us in good faith,

19   fairly, reasonably, like you'd want to be treated.  That's what

20   Mr. Mendoza said.

21        Not supposed to climb on the backs of insureds to get a

22   promotion.  You're not supposed to want to save money by

23   saying, "Too many hail claims are being paid," and decide to

24   start denying them just to save money.

25        Businesses can make decisions all the time to cut costs,

1  even insurance companies, but not when it comes to the valid

2  claim covered by the policy that you took premium for.  That's

3  the difference.  That's why you have specific instructions in

4  the law about insurance company's duty, and you're seeing them

5  today.

6       How do you decide if they -- elementally, how do you

7  decide if they committed bad faith?

8       Well, under Instruction 18, the judge gives you the five

9  parts of -- or four parts of the decision, but the one that I

10 think is the place that matters, really, is the subparts of

11 number two.  The rest are pretty obvious.

12      The subparts of number two:  "State Farm's refusal to pay

13 a claim in full was unreasonable under the circumstances,

14 because" -- either -- this is all -- either one of these works.

15 You don't have to have all of them.  You don't have to have two

16 of them -- "it did not perform a proper investigation, it did

17 not evaluate the results of the investigation properly, or it

18 had no reasonable basis for the refusal to pay the claim."

19      There is no dispute in this case and has not been from the

20 opening bell, if you are going to properly investigate a hail

21 claim, you must get on the roof.

22      Number two, you must have the ability to see the damage,

23 feel the damage, inspect the damage that only an in-person

24 inspection allows.

25      And, number three, you have to know what you're looking

12

1  at.  You must be trained to know what hail damage is because --

2  just from the fact that you've heard so many different opinions

3  about this case ought to be enough to show that you can say

4  anything about damage to a roof if you want to.

5      State Farm only had one person that ever got up on that

6  roof.  So, first of all, we can focus completely on Ms. Jacome,

7  and she admitted in deposition and in court and never changed

8  it that, prior to that climb of the ladder, she had never been

9  shown by a single human not just at State Farm but anywhere

10  what hail damage looks like or feels like.  In all the claims

11  that he -- she went out on, all the trainers -- they said

12  nothing she was seeing was hail damage, and then they turn her

13  loose to do it on her own.

14      The second thing I'd like to say really approaches both

15  the number one and two, improper investigation and improper

16  evaluation.

17      The mistakes that we talked about, I wondered sometimes if

18  you-all would think, Those are pretty picayune mistakes you're

19  showing us there.

20      It wasn't the point.  The point is not whether or not they

21  cost a lot of money or saved a lot of money.  The point was how

22  many, as a supervisor, do you see before you realize that the

23  person making them doesn't have the first clue what they're

24  doing, and it's time to send somebody else out there?

25      It's not -- shouldn't be lost on anyone that we have a

1   good example of the final word on the problem, and that is,

2   when Ms. Draper, two weeks or so after this inspection, got

3   texts from Jacome, where she's on another roof sending pictures

4   of one slope of a roof that are so bad that it must be

5   something else -- it can't be hail.  "May be mechanical

6   damage," is what she tells us -- somehow, they managed to

7   secure a second inspection there.

8        Maybe it's because they paid for two slopes and not one.

9   I don't know.

10        But, when they -- when they went out there again, this

11   time they sent Kelly Wienstroer, one of the people that knew

12   what she was doing.  Before she even got up on the roof, she

13   said, "That's the worst hail damage I've ever seen on the slope

14   you've denied."

15        Keep in mind it wasn't just Jacome that denied it.  She

16   sent the text dutifully like she had to, to Ms. Draper, and she

17   denied it.

18        And, of course, after Kelly Wienstroer went out there,

19   they paid the whole thing.

20        How in the world at that moment does somebody not say,

21   "Let's go back and look at the other inspections"?

22        There wasn't that many that Jacome did.

23        At the same time, they're getting things from Jonathan

24   Marks and Gary Bates, screaming, "Help" -- especially him,

25   "Somebody, pay attention.  Is anybody paying attention?"

1    No one responded.

2    How can that be explained by anything other than a

3 straight corporate scheme to put saving money ahead of making

4 decisions legitimately about a claim?

5    The third prong of those elements -- well, the subprong

6 there, the highlighted one, it had -- the insurer had no

7 reasonable basis for the refusal to pay the claim.  Very

8 important here:  no reasonable basis.

9    They've admitted -- I'm sorry.

10    Amy Lanier testified that it all jumped off with

11 Jacqueline Draper declaring bad faith.  "We're paying too many

12 hail claims," and then she proceeded to stop it.

13    Put up 19, please.

14    "Bad Faith - Damages," here's the things that can be paid

15 for:  all financial losses -- that's up to you -- and mental

16 pain and suffering.

17    All financial losses literally means just that:  whatever

18 you say it is.  No mathematical formula required.

19    And no matter how you define suffering, that's up to you

20 as well.

21    In the 602 days, since the claim was not paid on

22 February -- I'm sorry -- March 15th and denied on March 15th,

23 602 days to today, just by VanDorn's hourly rate, that'd be

24 $4 million.

25    Whose time ought to be worth more to State Farm:  VanDorn

15

1 | or their insured of about 55 years?

2 | They pay some pretty valuable people on TV, and that's

3 | another thing.  These celebrity athletes, we call heroes

4 | sometimes.  I've heard that:  hero.

5 | They may be able to do something really neat in football

6 | or baseball, but hero?

7 | You-all had the opportunity to sit with a hero all week, I

8 | suggest a humble man, who was a hero for his time, one of the

9 | few left from his time.  You could barely drag out of him the

10 | matters of valor and heroism that he performed.  He missed a

11 | whole day's work in the foxhole when he got knocked to the

12 | ground with shrapnel in the back of the head.

13 | Gary Bates just trying to tell them, "You don't know what

14 | he's been through already.  He's not going to be bullied," nor

15 | is his son that he raised.

16 | And they really knew about Jonathan Marks, I submit to you

17 | another man of honor, because they had him on the payroll for

18 | almost 20 years.  They knew him.

19 | If you could put up the verdict form.  I'm running out of

20 | time.

21 | In this particular case, if you agree that State Farm

22 | violated any or each or all of those elements on subpart 3 and

23 | the rest, then you would check the first box, A; and you would

24 | decide completely, based on your own analysis, what you should

25 | fill in that blank.

16

1        The next one, 20, here, we have another disjunctive for

2    you to consider.  You can decide -- if you decide that there

3    was bad faith -- that has to be first, but, if you decide that,

4    then you can go right to this one and decide whether or not

5    there are punitive damages worthy of award in this case.

6    There's two different ways you get there.

7        If you could put up that verdict form on the second page.

8        There are two ways to get there:  either find that there's

9    been a reckless disregard by State Farm of its duty to deal

10   fairly and in good faith with their insured, or/and, either way

11   or both, you can find that intentionally they did this, with

12   malice.

13       Malice is further designed (verbatim) -- can be hatred,

14   can be spite, can be ill will.  I suggest to you that has

15   nothing to do with this case.  They don't know Mr. Bates.  They

16   don't care to know him.

17       Doing a wrongful act intentionally without just cause.

18       Of course, I'm partial.  We know that.  I've been living

19   this for 18 months, but I suggest to you that we have satisfied

20   that burden on both regards.

21       Amy Lanier made it very clear -- and she didn't want to be

22   here, I'm quite certain.  She'd been handling these kind of

23   claims for 14 years.

24       Sharon Arnold said she was a fine rep.

25       As soon as Ms. Draper comes in, she takes away the

1  authority to pay roofs only.

2      Had to wait around for permission to do her job.  She'd be

3  up on a roof with a contractor and literally have to get

4  permission from her texted photos before she could decide

5  whether she's going to mark the roof like she wants to or

6  should, take the pictures, go fill out the paperwork, and make

7  a payment.

8      If she had to write up a denial because Ms. Draper said it

9  was going to be denied, and she said she estimated 40 times out

10  of 100 that she submitted in her year for her one place on

11  one -- on the team of six people.

12      She would have to write things in the computer that she

13  did not agree with, and a lady of conscience, I submit, finally

14  couldn't take it.

15      There are some things, even in a 20-year job, where you

16  have seniority, you're making a good living, you like your

17  job -- I think she said she loved her job -- and she turned her

18  back on that job because -- and it crawled all over me to

19  listen to them talk about how she never tried to tell anybody.

20      She confronted Jacqueline Draper.  She told a supervisor.

21  Nobody wanted to hear it.

22      Actually, I don't think there's a lot of difference

23  between her and Jacome in this regard.  If you really want to

24  know what I think, I submit to you that the only difference

25  between Jacome and Lanier is Jacome didn't know what she was

1   denying should have been approved because she didn't get any

2   training on it, but even she knew something was wrong.  She

3   didn't even stay but a few months.  She didn't like the feeling

4   that she had for doing the -- this job the way she was supposed

5   to for Ms. Draper.

6           MR. THOMAS BATES:  (Unintelligible.)

7           MR. MILLER:  You okay?

8       Been a long couple of years for Mr. Bates.

9       Again, if -- and the judge tells you this, but I'll tell

10  you again:  If you agree that this is worthy of consideration

11  of punitive damages, you check those boxes that you do find,

12  that you do find; and then we'll come back; and you won't be

13  here a long time.  The next part's very, very short.  There's

14  just a few things to show you and talk about, and then you'll

15  be allowed to go back out and make a final decision about what

16  you want State Farm to hear from this courtroom.

17      Thank you.

18          THE COURT:  Thank you, Mr. Miller.

19      Mr. Leffel?

20          MR. LEFFEL:  Thank you, Your Honor.

21      Ladies and gentlemen of the jury, I too, on behalf of

22  State Farm, want to thank you for your service.  Not only, as

23  Mr. Miller said, did we present you with a lot of information,

24  although this is very important to -- to both parties, a lot of

25  this is pretty mundane and dry.  You probably learned more

1    about roofs and what a hail bruise is than you ever thought you
2    might learn, but you-all have been incredibly attentive.
3        And, you know, we're -- we're going to go vote tomorrow,
4    some of us; right?
5        And there's two ways we get to participate in democracy:
6    at the ballot box and in the jury box.
7        And I know this is an imposition, but, when I -- when I
8    get the opportunity to talk to jurors after a case, I find that
9    they take this charge very seriously, and a lot of them have a
10   really positive experience participating in our democracy this
11   way.  So thank you for that.
12       The Court has instructed you that what the lawyers say is
13   not evidence, and that's true.  We're advocates.  But you're
14   entitled to consider who kept the promises they made on opening
15   statement.  I'm going to talk just real briefly about a few
16   things that Mr. Miller raised in his first opening.
17       No one has ever said that this loss is not covered.  There
18   was covered damage to this roof, and it was paid for, and you
19   have seen the evidence of that.
20       What they disagree with is -- is the scope of how much was
21   covered under the policy.  That's where there is a
22   disagreement, and you've heard so much evidence from both sides
23   on that.
24       Each side says, "I think this damage is covered, and
25   here's why.  Here's my photographs to support that."

1    The other side says, "We don't believe that's covered

2  damage based on our training and our understanding, and here's

3  our photographs and our evidence."

4    And, when you think about that in the context of bad

5  faith, that's what we call a "bona fide dispute."  Each side is

6  looking at the same evidence and reaching different

7  conclusions.

8    You know, Mr. Miller mentioned that Joint Exhibit 13 and

9  said that there's all these "other than hail" items that he

10  says were nothing like anything that was found on this roof.

11    You know what else was not on this roof?

12    Any of the really bona fide examples of significant hail

13  damage that you saw on Exhibit 13.  You remember the

14  juxtaposition of those pictures.

15    I heard him say, when you got to the part of the bad faith

16  jury instruction, that you got to conduct a proper

17  investigation, that you got to get on the roof.

18    State Farm got on this roof.  Ms. Jacome inspected it.

19    You got to feel the damage.

20    Ms. Jacome said, every time she put a line on her test

21  square, that she felt that for a bruise, like an apple.  Not

22  rocket science.

23    And then he says you got to know what you're looking at;

24  and this big evidence, this big tell there is that, apparently,

25  when she was training in January, there weren't any hailstorms

1    for her to go out on; but that doesn't mean that, in the months

2    before that, while she's training in a classroom, that she

3    wasn't getting experience on identifying hail.

4       Think about just the videos you've seen in this case that

5    demonstrate the efforts that State Farm has gone to, to help

6    people identify hail; operational guides that describe things

7    like bruising; and even acknowledge, as so many witnesses have,

8    that it can be difficult to ascertain.

9       He wants to talk to you about a claim that, apparently,

10    there was text messages about that -- that have nothing to do

11    with this case as evidence that -- that -- that Ms. Jacome

12    wasn't trained.

13       You weren't presented any evidence on any other claim that

14    Ms. Jacome handled.

15       You weren't shown what was going on, what happened, what

16    she was looking at, and why she may have been confused about

17    why a final slope, when she had covered several others, may

18    have been damaged, and you're supposed to base your verdict on

19    the evidence you were actually presented.

20       You weren't presented with any evidence on that.

21       And it kind of cuts against this whole theory that we're

22    denying claims when there are examples of a case where, at

23    first, we were totaling three slopes, because, again, there was

24    obvious hail damage, and then we totaled the fourth slope.

25       Talked about Amy Lanier, and Amy Lanier admits that she

does not know anything about the Bates claim.  She left State

Farm months before it even arose.

She was able to provide no specifics on cross-examination

when asked, "Tell us about these claims that you felt like you

disagreed with."  Couldn't provide one specific example as --

even as specific as the example that Mr. Miller just gave you

on this alleged second Jacome roof.

He told you Ms. Jacome -- he told you Ms. Jacome left

State Farm because she was uncomfortable working for Jacqueline

Draper.

Did Ms. Jacome ever say that?

She did not.

You remember what she said?

"I left because I could make more money as an independent,

and I needed money to take care of the little girl that I

adopted from Russia, who had a missing eye," and she had to

raise $35,000.

That's why she left.

Is Mr. Miller being fair with you about the facts?

Let's take a look at Instruction Number 6.  You've been

read this.  This is that "burden of proof by preponderance of

the evidence"; and, if we look at that, we can see that it

tells you, you must be persuaded, considering all the evidence

in the case, that the proposition on which the party that bears

the burden is more probably true than not true; and that

1    doesn't mean more witnesses that testified to a fact.  It means

2    what seem to you more convincing and more probably true than

3    not true.

4         Mr. Bates is a hero, and, when he started telling his

5    story about his time in the war, I was just as riveted as you

6    were.

7         Why?

8         Because we all know people that serve, people like my

9    grandfathers, each who served in the war; and I wanted to hear

10   what he had to say because I've lost them; and I don't get to

11   hear their stories anymore.

12        But, as you heard Mr. Gary Bates say, the fact that we

13   honor their service has nothing to do with whether there was

14   hail damage that didn't get paid on this claim; and this Court

15   has told you that your verdict needs to be based on the

16   evidence and that you should not let sympathy, sentiment, or

17   prejudice enter in your deliberations.  That's all I'm going to

18   say about that.

19        Told you this case presents a question of what is and is

20   not covered under the policy, and that's what it is, nothing

21   more.

22        You had an opportunity to see a lot of information from

23   State Farm, but I want to draw your attention to Joint

24   Exhibit 2 at 7.  That's that commitment to policyholders, and I

25   think, in two succinct statements, it states -- sums up the

1   philosophy:  "In addition to your obligation to deal fairly

2   with each policyholder, we have an obligation to pay -- to pay

3   only covered claims in the proper amount.  Payment of those

4   claims not covered unnecessarily increases insurance costs for

5   all policyholders."

6        State Farm is a mutual company owned by its policyholders,

7   people like me and others, who have their policies.

8        The evidence, again, shows that each party looked at the

9   same evidence and saw something different.

10        Let's take a look at Instruction Number 12.  You saw it

11   with Mr. Miller.  These are the elements of a breach of

12   contract claim.

13        There is no dispute.  I agree.  There was a contract.

14        So you just need to start with Number 2 and then go to

15   Number 3 and determine whether -- if -- first, if there was a

16   breach and, second, if you find a breach, whether there was

17   damages caused by that breach, but I want you to think about a

18   couple of things when you're considering that.

19        You heard Mr. Marks testify that a hail loss must have

20   occurred during the policy period.

21        Now, they're trying to suggest that, if you had a policy

22   for 10 years, it's just like one big policy.

23        You're consumers of insurance, and you know that's not how

24   it works.

25        You pay a premium.  There's a policy term.  It runs from

one year to the next year.  When it ends, you got to pay a new

premium.  There may be changes.  The insurance company sends

you that little mailer that says, "Hey, you need to read this.

We made changes to your policy."

Each successive year is a new term, and even their own

expert, who was a State Farm guy, said, "I get that.  When I'm

looking for hail, I had to prove that it occurred under the

policy period."

You heard no evidence from Mr. Marks or anyone else

establishing that this hail that they allege that damaged

probably -- when that, in fact, occurred, because we know about

that May of 2019 hailstorm -- or, I guess, it was March of '19

that was inspected by Marks in '19, 2-and-a-quarter-inch hail;

and that's the same one that Mr. Marks went out and looked at

and said, "This is not enough hail to make a claim."

There's evidence that 20 months pass after that May

inspection there's no real conversation about this roof until

Mr. Marks texts Mr. Gary Bates and says, "Hey, I'm looking for

some work.  You still want to replace the roof on that rental

property?

"If so, I can find you a hailstorm that you can use to

make a claim."

He hadn't even been back out to the property to confirm

any damage, told you January's a slow month when he's drumming

up business.

26

1    There was no urgency.  The tenant wasn't complaining.  The

2    roof never leaked.  So two years after 2-and-a-quarter-inch

3    hail, the roof never leaked.

4    Mr. Marks and Mr. Gary Bates were biding their time,

5    waiting for the right storm, to get the insurance company to

6    pay for the roof on their investment property.  It's on these

7    facts that they allege breach of contract.

8    Mr. Marks admits he doesn't even know if the decking he

9    put in his estimate should be paid.

10    You've seen dozens and dozens of pictures of this roof.

11    You saw examples of the very thing that State Farm

12    identified as being wear and tear:  extensive granular loss at

13    the edges, things like JX3, Number 3, and JX3.4.

14    Nobody's coming in here and telling you that that worn

15    edge is hail damage.

16    You got to see Mr. VanDorn's test square, and he went

17    through each one of the photos in his test square and explained

18    to you that he felt it and that it didn't have the trademark

19    bruising to make it hail damage.

20    Ms. Jacome told you that she did the same thing.

21    You've heard that the physical evidence tells a story, and

22    that includes not what's on the roof but also what's around on

23    the collateral items.  That's an important part of the story:

24    the lack of collateral damage supporting that there had been

25    recent hail.

1    That evidence, ladies and gentlemen, was unrebutted.

2    There were some items that needed to be supplemented.

3    Mr. Miller admits they were not expensive.  Doesn't matter.

4    They needed to be paid; and, when it was brought up, what was

5    done, State Farm paid it, even after they were sued for bad

6    faith.

7    Heard Mr. VanDorn's testimony about how you would expect,

8    when you had a shingle tab, that, if hail really is randomly

9    falling like we saw on that 2012 claim -- you'd expect there to

10   be a lot more hits on the field than everything being at the

11   edge.  I mean, he found the exact converse.  Something to the

12   tune of 70 to 80 percent of all the damage was on the edges?

13   There has been more than adequate evidence for you to make

14   the finding that all the damage that State Farm owed for was

15   paid.

16   There's even evidence that State Farm paid for things that

17   they didn't owe, like that HVAC -- that's at JX3, I think,

18   maybe 7 or 9 -- that HVAC vent cover, you know?

19   State Farm paid for that in 2012.  They paid for it again

20   in '21.

21   Mr. Marks admits that he can't produce the evidence that

22   that was replaced.

23   Things like the garage door.  Remember Mr. VanDorn telling

24   you how he looked at all those marks that were in the same

25   location on every panel, and he didn't think that was hail

1  damage?

2      That was like a $1,116 item paid -- paid for by State

3  Farm.

4      If you agree -- let's take a look at the verdict form, if

5  we could.

6      That first item is breach of contract; and, if you

7  agree -- ask yourself whether they've met their burden of truly

8  proving to you by a preponderance of the evidence that, in

9  fact, there were more things that were owed, because all I

10  could hear -- or all I saw were there was an agreement that

11  there was something else that was owed here that hadn't been

12  paid -- was one Corbin Swain photo that showed an indentation

13  down to the mat; and you know because you've been told that

14  that was not part of the evidence that was ever sent to State

15  Farm, not part of what they had in their disposal to -- to --

16  to consider when they were paying.  Mr. Marks never included a

17  photo like that.

18      That's the only thing that everyone admits was a hail hit.

19      Mr. Miller talks about the fact you can call it whatever

20  you want, you know.

21      I don't agree.  You got to be able to back it up with the

22  science, but, if -- if he's right, and State Farm can call it

23  whatever they want, so can their roofer.

24      Everybody looked at the same evidence and reached a

25  different conclusion.  You have had those experiences in your

1  life.

2      But I understand you may not agree, and, if you don't

3  agree, and you think there is more damage that you know has not

4  been paid, listen to this:  State Farm wants you to make

5  Mr. Bates whole under this policy if you think more money's

6  owed.

7      Evidence is there to reach the conclusion that it's not,

8  and, if you agree, check B; but, if you don't, check A and fill

9  in that blank and give them the number that you think was left

10  out; but, when you're considering that, consider some things:

11      Consider the fact that the only evidence that you've got

12  is that Mr. Gary Bates said he's relying on the $18,000

13  estimate.  $6,600 of that is decking that Mr. Marks admits he

14  doesn't know needs to be replaced.  $1,116 was the garage door

15  that Mr. VanDorn says probably shouldn't have been paid.  They

16  owe their deductible, and, plus, there's been $641 in prior

17  payments.

18      And so the point is, if you add all that up -- and,

19  remember, the $18,000 is not ACV.  That's replacement cost

20  value.

21      So, again, it still has to be depreciated; but, if you

22  take all those things out that are questionable, it takes that

23  $18,000 estimate down to $9,300 before depreciation.

24      So, if you award damages, I'm just asking you to consider

25  some of the other evidence that you heard.

30

1       Now, before I move on, I want to talk about one more

2  thing, and I mentioned it a minute ago.

3       Corbin Swain, the engineer -- you heard the evidence

4  that -- that -- that, at the inspection, Ms. Jacome was told by

5  Mr. Marks at the very first meeting that they were going to

6  hire an engineer.

7       You heard evidence that they, in fact, hired that

8  engineer.

9       You heard evidence that he got on the roof with Mr. Marks.

10       Ladies and gentlemen, where is that engineer?

11       I'm sure Mr. Miller will give you a reason when he gets

12  back up here.

13       Mrs. Bivins from the agent's office, Shari -- that's the

14  email we saw -- saw 25 times that had the 25 pictures -- she --

15  she said in later correspondence that you saw, "If you want to

16  get a second inspection, one option you have is to hire an

17  engineer."

18       You heard Mr. Gary Bates say, "If we had just gotten a

19  second inspection, we wouldn't even be here."

20       If the agent's office is telling them that, "If you hire

21  the engineer, that could be a pathway to a second inspection,"

22  why wouldn't they have done that if he could support what they

23  were saying?

24       If Mr. Marks is to be believed that every single blemish

25  on that roof, every single one -- that was his testimony -- is

1    not hail, ask yourself how credible he is, and couldn't he

2    certainly have been corroborated by that engineer?

3        Where's that engineer?

4        Let's take a look at the bad faith jury instruction, if we

5    could, and that is going to -- you're on top of it.

6        Go ahead and pull that up where, maybe, even blind people

7    like me can read it.

8        Now, here's the deal:  If you find in favor of State Farm

9    on the breach of contract, if you agree, your work gets really

10   easy, because what is the first element that must be proven?

11       And -- and -- and each one of those things has to be

12   proven.  He's got to prove that there -- that State Farm was

13   required under the insurance policy to pay Mr. Bates's claims.

14   That's basically that more money was owed, that the policy was

15   breached.

16       So, if you find that the policy was not breached, that

17   they didn't prove more money was owed, you don't have to go any

18   further.  Okay?

19       But, assuming you awarded that, let's go on and talk a

20   little bit more about what else it says; and, although each

21   element must be proven -- I agree with Mr. Miller -- when you

22   get to number two, it's either/or on the -- on the subparts;

23   and -- and he read them for you.  It says (as read), "The

24   refusal to pay was unreasonable under the circumstances,

25   because State Farm did not perform a proper investigation, it

did not evaluate the results of the investigation properly, or
it had no reasonable basis for its refusal to pay the claim,"
and that's -- I mean, focus on any one of these, and we're
going to talk about them, but let's start there.

Can you sit around, based on all the evidence you've
heard, and look your fellow jurors in the eye and say, "State
Farm had no reasonable basis for its decision, none at all"?

Consider the undisputed evidence that you heard from State
Farm and even Mr. Marks that hail can be subjective.  It can be
hard to determine.

Consider the words that you saw Mr. Marks write in his
email to Ms. Bivins at the agent's office.  "I realize there
are differing opinions on what should be considered legitimate
hail damage or what may be a -- cosmetic in nature or a
blemish."

He -- he gets it.  He understands that this can -- these
can be tough calls.

Let's talk a little bit about the fact that, in that email
to Ms. Bivins, it's been established he didn't send a picture
of any dented mats for State Farm to consider.  On these facts,
can you say that it's more likely true than not true that State
Farm did not conduct a reasonable investigation?

What did they do?

As many witnesses have said, the physical evidence tells a
story.

1          Ms. Jacome followed established procedures for inspecting,

2    procedures that were carefully constructed in State Farm's

3    guidelines that are designed to ensure a good faith claim

4    handling:  She walked the elevations, noting what damage she

5    could find.  She noted a lack of spatter where spatter should

6    have been found from recent hail.  She got on the roof.  She

7    performed her test square.  She felt the blemishes.  She found

8    none.

9          Ms. Jacome, on her own, determined that she didn't think

10   that this was damage by hail beyond the metals and things that

11   she was covering.

12         Let's look at that instruction one more time.  Okay?

13         Third element is -- is -- is, once you've gone through

14   that analysis, you've got to decide whether you, in fact, think

15   that State Farm had breached that duty of good faith and fair

16   dealing; and then you got to establish that any violation by

17   State Farm in this duty and fair dealing was the direct cause

18   of an injury to Mr. Thomas Bates.  Okay?

19         And you heard Mr. Thomas Bates say he didn't have much or

20   any involvement in this claim.

21         So there's a number of theories that have been advanced

22   where Plaintiff has grasped for something to try to make this

23   case about more than just a dispute of what is or is not

24   covered, and all those theories center on Ms. Jacqueline

25   Draper.  The way they describe her, I was surprised that she

34

1    didn't have horns coming out of her head when she appeared on

2    the video from Georgia.

3        Let me tell you a little bit about what we've got with

4    Jacqueline Draper:

5        She's 33 years old.

6        When people like Mr. VanDorn and their expert, Mr. Marks,

7    were transitioning out of careers at State Farm, you know what

8    Jacqueline Draper was doing in 2008?

9        She was graduating from high school.

10        She graduated from college in 2012, tried to get into the

11    Peace Corps; and, when that didn't work out, the restaurant

12    where she was working to pay her way through school had some

13    customers from State Farm; and they said, "You know what,

14    Jacqueline?

15        "You ought to apply and start your career at State Farm."

16        That's who they're trying to tell you was the mastermind

17    of a Hail Focus initiative, the woman that had her very first

18    leadership position in Oklahoma after being with the company

19    for about nine years, the 33-year-old mastermind of Hail Focus.

20        Now, if you believe them, not only was she the mastermind,

21    but she was given a production staff to make videos called

22    "Hail Focus."  She got to borrow team managers from

23    Bloomington.  She got production for music and fancy graphics.

24        Does that seem plausible to you?

25        I know they're not saying she made the videos, but that's

1    all the evidence was of Hail Focus.  They had videos that said

2    "Hail Focus."  They also had ones that said "Water Focus" or

3    "Vandalism Focus."  It's training, the very thing that they're

4    saying we didn't do for our people.

5         And what was in those videos?

6         Information on how to identify hail and how to pay valid

7    claims.

8         That's a bad thing?

9         There's no prohibition against you using your common

10   sense.

11        Mr. Miller told you about some other theories they've got

12   in opening statement like State Farm did not care about the

13   training that -- of Mrs. Draper's team because it was really

14   Ms. Draper that made the decisions.

15        Think about all the information.  You heard from every

16   witness extensively about the training, even Mr. Mendoza, who

17   sits at a desk, you know, and is trying to resolve issues.  He

18   talked about going and getting hail training, watching the

19   videos.  He spoke articulately about how to identify hail

20   damage.

21        The training is not a problem here.  State Farm has

22   endeavored and made guidelines to make sure people are trained.

23        You can be inexperienced, sure.  You got to start

24   somewhere.  But that's why this next part of their theory

25   doesn't make sense.  If you got someone who's inexperienced --

1  and -- and everyone here in this room has -- has started a job.

2  I've got young attorneys that are working with me, and they are

3  going to be fantastic, but are they -- are they as fantastic

4  today as they may be 20 years from now?

5      In those situations, you want to have someone who is a

6  good leader, who's willing to coach and mentor people.  That's

7  not conduct that should be punished.  It's conduct that should

8  be lauded.

9      Keep in mind that Ms. Draper testified she had never even

10  seen those Hail Focus videos.

11      The other theory they advance is that Mrs. Draper was

12  stripping her team of authority, and she's the one that was

13  making those decisions, and I want you to ask yourself if that

14  theory fits the facts of this case, because here's what the

15  evidence showed on that:

16      It is undisputed that Ms. Jacome inspected that roof and

17  made her call and said she thought it was wear.

18      Mr. Marks corroborated that, when he arrived at that

19  inspection, Ms. Jacome said, "I looked, and I think you got

20  wear on this roof."

21      He said, "Well, will you look at it with me again?"

22      She said, "Sure."

23      So they get back up on the roof together.  They start

24  looking at things.  He says he got to show her everything he

25  wanted her to see, and she again told him it was wear, but he

1  disagreed, and so she said, "You know what?

2      "Because you disagree, I'm going to check in with my

3  manager."

4      It was not secret.  She told him that's what she's going

5  to do.

6      And then, as Mr. Marks says, she said that she would

7  follow up.

8      Well, she did just what she promised to do.  She contacted

9  Ms. Draper, she talked about what she was seeing, and then she

10  calls Marks back and says, "I did, in fact, talk to my manager,

11  and she agrees with me that this is wear."

12      So does it fit their theory that this top secret plan --

13  and -- and, by the way, the other part of the theory was that

14  you had to contact Jacqueline Draper if you were going to

15  deny -- I'm sorry -- if you were to pay a total or partial

16  roof.

17      Here, she didn't -- she wasn't paying a total or partial

18  roof.  She was paying for soft metals, and she didn't think

19  that the shingles were -- so -- so, even if their theory was

20  true, it doesn't fit.

21      The undisputed evidence was that Mr. Marks was being

22  contentious, and so, being a new person, she reached out to her

23  supervisor again.  That should be encouraged.

24      Let's talk about Ms. Jacome.  They've described her as

25  being green.  She was new as a staff adjuster, but, before

1 coming to State Farm, she had been working for three years,

2 working some of the most complex total losses out in California

3 and the wildfires.  She had a lot of experience, and that's

4 what Jacqueline said she brought to the team.  She identified

5 that experience and brought her on.  So this idea that she was

6 not trained, that she was not experienced, it doesn't add up.

7      Use your common sense.

8      She underwent more training when she became a staff

9 adjuster.

10      But, when you're considering this issue of bad faith, of

11 whether the evidence demonstrated bad faith as opposed to a

12 legitimate disagreement, I want you to ask yourself this:  Ask

13 yourself whether, in today's world, any of us any longer has a

14 right to be wrong.  Do we have the right today to make even

15 honest mistakes without someone coming in and assigning some

16 kind of nefarious motive?

17      Let's talk about Amy Lanier.  She left State Farm only

18 after she had found a new job, and she stood right up in that

19 chair and told you that the only reason she gave for leaving is

20 that she wanted to get into leadership and that she didn't

21 think those opportunities existed for her at State Farm.

22      Maybe she didn't like having a young up-and-comer like

23 Jacqueline Draper, 33 years old, being her boss after she had

24 been there for 20 years and had never gotten the promotion.

25      I'm not -- I'm not suggesting -- I'm not -- I'm not

39

1  suggesting I do know, but something was off between the two of

2  them.

3      Asked for details about claim decisions that she disagreed

4  with.  She could not provide you with one single example.

5      Asked, if upon leaving, whether she told anybody the

6  reasons that -- she said she told Jacqueline Draper, and

7  nothing was done, but she admitted -- we said, "Well, when you

8  left, did you tell Ms. Draper it was because you didn't agree

9  with her leadership?"

10      And she said, "No.  I just thought that that would -- that

11  would be uncomfortable," because she said she really liked

12  Jacqueline and that she thought Jacqueline meant well.

13      If you really like someone, and you think that they mean

14  well, wouldn't you have the honesty to tell them why you were

15  leaving?

16      Sharon Arnold said the same thing.  No one said anything

17  to her.

18      There's no evidence that she called the anonymous tip

19  line.  There's no evidence she went to some other manager to

20  raise her concerns.  There's simply no evidence that she told

21  them why she was leaving.

22      She wants you to believe that she left the job she loved

23  due to her concerns but didn't tell a single person at her exit

24  from the company.

25      There is a term of art in this industry, and it's called a

1  "legitimate dispute."  It describes disputes like we have every

2  single day, and you only need your common sense.  It's the type

3  of a disagreement that is typical or people look at the same

4  things and see things differently.  Those are bona fide

5  disputes.

6      You heard from Mr. Bates and even Mr. Marks that there can

7  be disagreements without bad faith.

8      The critical question on a bad faith claim is whether you

9  can find that State Farm had no reasonable basis for its

10  decision.  Even if you disagree -- let's say you decide to

11  award more money.  That's not enough for bad faith.

12      Again, you can just say, "I just think they got it wrong.

13  We're going to give them more money, but I understand how they

14  got to their conclusion.  We just disagreed with it."  That --

15  that -- that -- that right there is the recognition that all of

16  you understand that can evidence the fact that you can disagree

17  with someone but understand how they got to their conclusion

18  and just not think -- not agree.  You see it differently.

19      An insurer can be wrong in their decision without being in

20  bad faith, again, as long as they had a reasonable basis.

21  State Farm's claim handling need not be perfect in order for

22  you to find that they were in bad faith.  It just had to be

23  reasonable.  There's perfect -- perfection's nowhere in the

24  word.

25      Let's take a look at that verdict form on bad faith, and,

1    if you agree, if they have not proven, if you are unable to

2    look your fellow juror in the eye and say that they had no

3    reasonable basis for doing what they did, we're asking you to

4    check B, that there was no bad faith.

5        Again, not so arrogant to think that you might not

6    disagree; but, if you do, you got to look at the instruction on

7    bad faith damages; and, as Mr. Miller showed you, you've got

8    two things you can consider:

9        The financial loss, primarily, that's going to be what

10   you -- what, if anything, if you found for them on the breach

11   of contract, that you thought was still owed under this policy.

12   That's the financial loss.

13       The second part is mental pain and suffering, and, on that

14   one, you really should consider the evidence or the lack of

15   evidence -- of any evidence that there was any actual mental

16   pain and suffering experienced by Mr. Bates who said he wasn't

17   very involved, said he was glad Gary was there.

18       The only real evidence, if you can call it that and you

19   heard, was that Mr. Gary Bates said that he got fidgety and

20   sometimes, I think, became agitated when they were talking

21   about this insurance claim; but, again, there, that's simply --

22   all you've got is what Mr. Gary Bates is perceiving in somebody

23   else's mannerisms.

24       I could be trying to read the jury, and I could be

25   completely misreading your mannerisms if I don't know what you

42

1    had to say on that issue, and you didn't hear anything because

2    he wasn't involved, and that's okay.  It's okay for Gary to

3    help him out, but Gary's not a plaintiff, and any frustration

4    he felt is not compensable.

5         The last thing that you're going to have to decide is that

6    issue of punitive damages, and that's the one where that clear

7    and convincing standard, that "highly probable and free from

8    doubt" standard applies.

9         The reckless disregard, State Farm submits that the

10   evidence here does not even support a finding that there was

11   bad faith; and, even if you disagree, you still don't have to

12   award damages to punish.  You've got to consider all the

13   evidence of what was done well, what could have been done

14   better, and what may have been done wrong.

15        The second and last part -- which, again, you don't have

16   to check any of those boxes.  In fact, if you found in favor of

17   State Farm, your -- your work is done.  You don't have to check

18   any of these boxes.

19        But there's that second one that talks about malice, which

20   involves hatred, spite, and ill will.  There is no evidence of

21   that in this case, not from Ms. Jacome, the former foster child

22   who was trying to get this right, who said she would have paid

23   the claim if she -- there's simply no evidence of malice,

24   unless you're looking at some of the nasty emails that were

25   sent to State Farm.

43

1      "Considering all of the evidence" means considering
2    Ms. Jacome's complete inspection.
3      It means considering State Farm's timely handling of this
4    claim and the timely payment of the amounts that they knew that
5    they owed.
6      It means considering the claim, and the photos were
7    considered not just by Ms. Jacome but by her supervisor.
8      It's considering that having someone available to an
9    inexperienced person to help them and coach them should be
10   encouraged in this world, not punished.
11     That's what it means to consider all of the evidence.
12     We're asking you to find in favor of State Farm and say
13   that there was no conduct here that is in need of punishment.
14     Further, as that instruction says, if you check "yes" on
15   punitive damages, we will continue to the next phase of the
16   case where you will have an opportunity to hear additional
17   evidence and testimony.
18     The physical evidence in this case tells a story, and it
19   does not support the claims made by the plaintiffs.
20     This case presents a question of what is or what is not
21   covered, nothing more.
22     Ladies and gentlemen, thank you for your time and
23   attention.
24         THE COURT:  Thank you, Mr. Leffel.
25     Mr. Miller, you have 10 minutes in rebuttal.

44

1          MR. MILLER:  Well, don't have much time to talk about

2    all that, but there is a big difference between trying to read

3    a jury of people you don't know and reading your daddy for --

4    of 67 years, and Mr. Gary Bates -- he didn't oversell it.  He

5    didn't overstate it.  He just said the things that he saw when

6    they would talk about this.

7          And you noticed that his dad said, "I'd have to ask him."

8          He didn't -- he wasn't trying to talk to anybody.  He

9    wasn't trying to upset him.

10          Mr. Bates made it clear in his emails several times, but,

11    for example -- if you could put up the one right there.

12          You know, he -- he's trying to tell them in real time that

13    his 96-year-old dad is confused and upset over this matter.

14          They knew what they were dealing with the entire time that

15    we were involved in this.

16          And this whole "right to be wrong" thing?

17          I don't know where he read that.  All they got to do is

18    admit it.  If they would have admitted this, they would have

19    never got sued.

20          "We'll go back out.  Let us look again."

21          They had every reason to know that that was necessary.

22          You know, they said something about Swain being hired --

23    or not -- Corbin Swain was never hired.  That's what Marks told

24    you, and it's absolutely the facts, and the reason is -- and

25    you heard it.

45

1      When Gary talked to Jacome on the phone, she said, "If you
2  hire an engineer, we'll hire an engineer," more like a threat;
3  and if you don't think it was a threat, don't forget that long
4  15 -- I don't know -- 10 minutes -- seemed like forever --
5  where she's talking about she doesn't want to look bad.  She
6  doesn't want another inspection.  That will make her look bad.
7  State Farm's going to care about that.
8      I can't even remember all the things she said, but the
9  bottom line is does anybody care about the insured?
10     It feels like all they care about is themselves at that
11 place.
12     They've had the Corbin Swain photos for months and months
13 and months.  They had them at the time of the depo of
14 Mr. VanDorn.  They had them before he wrote his report.
15 They've had those.  They're paying parts of things and not all
16 the things.
17     All they had to do was stand up and admit they'd made a
18 mistake.  They still haven't done that.  Right now they haven't
19 done that.  What's it going to take to get them to do that?
20     And, yeah, I will say it for sure ahead of all the rest of
21 the people that testified from their side:  I don't think the
22 truth is in Ms. Draper.
23     I don't know what her life was.  I don't care.  I know
24 what it is now.  I'm not sure she has the capacity to recognize
25 it.

46

1         The most expedient testifier I've ever seen.  She says

2    whatever helps her at the moment.  We had to stop the whole

3    first depo because she claimed that the 2012 claim pictures

4    showed that they never replaced any of the metal up there and

5    then realized that we didn't have any of that.  She'd been

6    looking, doing her own little research; and then, when we get

7    it all, she has to admit that she was completely wrong.  I

8    doubt that she ever looked in the first place.

9         Never said she was the mastermind.  Never said that.  She

10   was running out front because she was willing.

11        We never could dig out of them who the mastermind was.  No

12   telling how many layers up that is.

13        There's a few things that I suggest to you that tell you

14   the story about inside of that place.  You've seen every one of

15   them:

16        First, look what they said to the OID.  They sent to the

17   OID, the insurance department -- they sent to them only what

18   they wanted them to see.

19        The thing they didn't send was Marks's pictures, and what

20   result of that?

21        The OID said, "You may have to go to court."

22        Lookee what they said to the Better Business Bureau.

23   Jacqueline Draper wrote this one.  She literally said to the

24   Better Business Bureau, "We have reached a satisfactory

25   resolution."

47

1          That was sent when Mr. Bates is sending all the emails

2    before and after.

3          Is anybody listening?

4          Does anybody care?

5          Is anybody concerned?

6          Nobody got back with him about that.

7          He wanted to talk to management, supervisor's super- --

8    nobody.

9          Arnold said Draper should have called.

10         Draper said somebody in -- below her should have called.

11         It's the biggest "pass the buck" deal I ever saw, but you

12    saw the biggest part of that today, I suggest:  the 2012 claim

13    file right slope dodge.  They were real proud of that one

14    because it proved the theory.  Little problem was -- and I

15    guess they didn't think we'd look -- the rest of the roof

16    showed exactly what happened in our case.  You know why?

17         Because edges are more susceptible to hail damage.  Their

18    own training folks tell them that.  Their captive training

19    company, HAAG, tells them that.

20         I don't reckon there's really anything else to say,

21    truthfully.  You either see it our way, or you don't.  I get

22    it.  That's why you're here.  We had to have you.  We couldn't

23    resolve it otherwise.

24         But, if you do see it our way, I'd just ask you to fully

25    explore -- and I don't even have to ask you because you will --

48

1   what is Mr. Gary -- excuse me -- Thomas Bates's time, his peace

2   of mind, his right to not be confused and upset -- what is the

3   real value of that after all he's done and been through?

4       I appreciate you, at the end, very much and for your

5   attention and your time.  Thank you.

6           THE COURT:  Thank you, Mr. Miller.

7       (End of excerpt.)

8                   REPORTER'S CERTIFICATE

9       I, CASSY KERR, Federal Official Court Reporter in and for

10  the United States District Court for the Western District of

11  Oklahoma, do hereby certify that, pursuant to Title 28, Section

12  753, United States Code, the foregoing is a true and correct

13  transcript of the stenographically reported proceedings held in

14  the above-entitled matter, and the transcript page format is in

15  conformance with the regulations of the Judicial Conference of

16  the United States.

17      DATED THIS 5th day of November, 2024.

18      /s/Cassy Kerr
        Cassy Kerr, CSR, CCR, RPR, CRR, CRC
19      Oklahoma CSR License No. 1367
        Federal Official Court Reporter

20

21

22

23

24

25