1

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
    THOMAS H. BATES,                )
 3                                  )
                     Plaintiff,     )
 4                                  )
       vs.                          ) Case No. 21-CV-705
 5                                  )
    STATE FARM FIRE AND CASUALTY,   )
 6                                  )
                     Defendant.     )
 7

 8

 9

10

11                       TRANSCRIPT OF

12           JON DEREK VANDORN TRIAL TESTIMONY

13               NOVEMBER 4 AND 7, 2022

14    BEFORE THE HONORABLE JODI W. DISHMAN, JUDGE PRESIDING

15

16

17

18

19

20

21

22

23

24
                   Recorded by mechanical stenography
25        Transcript produced by computer-aided transcription
```

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  StenoLogic@cox.net

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3        Mr. Robert Bradley Miller
 4        bmiller@mjjaw.com
 5        Ms. Shawna L. Landeros
 6        slanderos@mjjaw.com
 7        Miller, Johnson, Jones, Antonisse & White
 8        500 Northwest Sixth
 9        Suite 300
10        Oklahoma City, Oklahoma 73102
11        405-896-4388
12
13   FOR THE DEFENDANT:
14        Mr. Lance Leffel
15        lleffel@gable.com
16        Ms. Paula M. Williams
17        pwilliams@gablelaw.com
18        Ms. Taylor J. Freeman Peshehonoff
19        tpeshehonoff@gablelaw.com
20        GableGotwals
21        499 West Sheridan Avenue
22        Suite 200
23        Oklahoma City, Oklahoma 73102
24        405-235-5500
25
```

3

1                          EXAMINATION INDEX

2   DEFENDANT'S WITNESS:                                    PAGE

3   JON DEREK VANDORN

4   NOVEMBER 4, 2022

5       DIRECT BY MR. LEFFEL . . . . . . . . . . . . . . .   4

6   NOVEMBER 7, 2022

7       CONTINUED DIRECT BY MR. LEFFEL . . . . . . . . . .  17

8       CROSS BY MR. MILLER. . . . . . . . . . . . . . . .  86

9       REDIRECT BY MR. LEFFEL . . . . . . . . . . . . . . 187

10      RECROSS BY MR. MILLER. . . . . . . . . . . . . . . 203

11  REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . 206

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jon Derek VanDorn                                            4
Direct Examination by Mr. Leffel

1          (This transcript contains only the trial testimony of Jon

2     Derek VanDorn in the presence of the jury on November 4 and 7,

3     2022.)

4               THE COURT:  Mr. Leffel, will the defendant please

5     call its witness?

6               MR. LEFFEL:  The defense calls Mr. Derek VanDorn.

7          (The witness is sworn.)

8                          DIRECT EXAMINATION

9     BY MR. LEFFEL:

10    Q.   Good afternoon, Mr. VanDorn.

11         Will you please introduce yourself to the ladies and

12    gentlemen of the jury?

13    A.   My name's Jon Derek VanDorn, but I go my -- by my middle

14    name Derek.

15    Q.   Okay.  Mr. VanDorn, what do you do for a living?

16    A.   I am a construction consultant or building consultant

17    employed by Berryman Enterprises.

18    Q.   Okay.  And what does Berryman Enterprises do?

19    A.   Berryman Enterprises has been a general contractor and

20    building consultant firm here in Oklahoma City -- in the

21    Oklahoma City -- or the Oklahoma area.

22    Q.   And, as a general contractor, have you been involved in

23    restoration projects for property owners?

24    A.   Yes.  Beginning about 15 years ago, I went into that

25    industry as a general contractor, specializing in restoration

Jon Derek VanDorn                                              5
Direct Examination by Mr. Leffel

1   construction.

2   Q.   Have you been involved in restoration products -- projects

3   that involve storm damage to residential properties?

4   A.   Yes.  On many occasions.

5   Q.   Okay.  Do you write construction estimates?

6   A.   Regularly, yes.

7   Q.   Okay.  Are you familiar with Xactimate?

8   A.   Yes.  I've used Xactimate for the last 24 years.

9   Q.   Okay.  And what is Xactimate?

10  A.   Xactimate is a estimating software that is used by

11  restoration contractors and insurance carriers across the

12  country.  It provides a -- kind of a common language of

13  in-estimate preparation.  It provides thousands of specific

14  line items that can apply to about any type of repair to a

15  home.

16  Q.   In your job, do you regularly work with insurance

17  professionals?

18  A.   Yes.  I do.

19  Q.   Okay.  Give us an idea -- like, why would you be working

20  with insurance professionals in your job at Berryman

21  Enterprises?

22  A.   Well, as a general contractor, in my experience, I've --

23  my clients have -- have generally been homeowners or business

24  owners, owners of structures; and, many times, the repairs that

25  we do or the work that we do at their businesses or homes is

Jon Derek VanDorn                                                    6
Direct Examination by Mr. Leffel

1    the result of an insurance loss; and so I regularly have met

2    with insurance professionals to set a scope of work and

3    determine a price for the repairs.

4    Q.    In your work as a -- as a contractor or as a consultant,

5    do you regularly engage in determining things like the extent

6    of damage to property?

7    A.    Yes.  I regularly inspect and investigate causes for

8    damages and determine what it'll cost to fix them.

9    Q.    Do you also engage to determine the proper scope of

10   repairs for things like storm damage?

11   A.    Sure.  There's a process for not only identifying the

12   damage but repairing it appropriately.  So that goes into

13   setting the scope.

14   Q.    How long have you been with Berryman Enterprises?

15   A.    5 1/2 years.

16   Q.    5 1/2 years for Berryman.

17         How often do you think you have been called upon -- or,

18   you know, what's your best guess with respect to how often you

19   have been engaged in evaluating the scope of damage or the

20   scope of needed repairs?

21   A.    Well, in -- in some form or fashion, you know, I guess 5

22   to 10 times a month for those 5 1/2 years, so several hundred

23   by this point.

24   Q.    Okay.  And, if I were to ask for you to include all of the

25   experience that you have doing that type of work, evaluating

Jon Derek VanDorn                                                    7
Direct Examination by Mr. Leffel

 1  damages, scoping repairs -- if I ask you to include your

 2  lifetime experience, how long have you been engaged in doing

 3  that type of work?

 4  A.   Well, I've evaluated and estimated damage for the last

 5  24 years, and so that would amount to thousands of projects.

 6  Q.   Okay.  Mr. VanDorn, tell us briefly, if you could, about

 7  your educational background after high school.

 8  A.   Okay.  I went -- I attended a couple of small colleges

 9  here in Oklahoma -- I'm sorry -- one in Kansas and then

10  eventually ended up at Oklahoma State where I got my bachelor's

11  degree; and then, after beginning full-time work, I became a

12  part-time student and achieved a master's degree from Cameron

13  University.

14  Q.   All right.  And tell me what your undergraduate degree was

15  in.

16  A.   It was in finance.

17  Q.   And that was from OSU?

18  A.   Yes, sir.

19  Q.   Okay.  And tell me what your masters's was in.

20  A.   Business administration.

21  Q.   And where'd you obtain that?

22  A.   Cameron University.

23  Q.   Okay.  Prior to working for Berryman Enterprises, what did

24  you do?

25  A.   I worked for a restoration contractor called Phoenix

Jon Derek VanDorn                                                              8
Direct Examination by Mr. Leffel

1   Construction that offices here in Oklahoma City/Edmond area.

2   Q.   Okay.  What type of work -- or let me just ask you this

3   way:  What does Phoenix Construction do?

4   A.   A lot of what I've described earlier.  They are typically

5   hired for projects that have -- buildings have sustained

6   damage, and they make those repairs.

7   Q.   What was your job at Phoenix?

8   A.   I did a lot of things.  I was an estimator and salesman,

9   project manager and supervisor and worked in billing and

10  collections.

11  Q.   Prior to working at Phoenix, what did you do?

12  A.   Work for another restoration company called Steve Breed

13  Construction.

14  Q.   Okay.  And -- and what does Steve Breed Construction do?

15  A.   Very similar.  Steve Breed probably -- they took on more

16  work on an annual basis, but a lot of those jobs were smaller

17  and -- and really did a lot of storm restoration work.

18  Q.   What was your role there at Steve Breed?

19  A.   Same as with -- with Phoenix Construction except I was

20  eventually the general manager.  So I was involved with a lot

21  of the financials and office decisions.

22  Q.   At -- at Steve Breed, are you also taking on clients such

23  as homeowners or building owners?

24  A.   Yes.

25  Q.   Okay.  Are you working with insurance professionals?

Jon Derek VanDorn                                                    9
Direct Examination by Mr. Leffel

1  A.   Regularly.

2  Q.   Okay.  And help the -- help them understand.  When

3  you're -- when you're working for a contractor like Steve

4  Breed, why would you be working with insurance professionals?

5  A.   The same thing:  They've had a loss, and there's an

6  adjuster that's working with the policyholder, and the

7  contractor can provide on occasion needed input or -- or a

8  second set of eyes for consideration.

9  Q.   In all of those situations where you would be working on

10  behalf of a client with a carrier, your client is the

11  individual property owner; is that right?

12  A.   Yes.

13  Q.   Okay.  Prior to working for Steve Breed, what did you do?

14  A.   I was a claim representative for State Farm Insurance.

15  Q.   Okay.  And what types of claims did you handle at

16  State Farm?

17  A.   Well, they were called "first-party claims."  So it was

18  still involving structures, typically, so homeowner's,

19  business, church policies, rental dwelling policies.

20  Q.   How long were you employed by State Farm?

21  A.   Just under 10 years.

22  Q.   Okay.  And so what was your -- what was the last year you

23  were there?

24  A.   December -- yeah.  December 2007, approximately.

25  Q.   Okay.  And that sounds about -- or our last witness was

Jon Derek VanDorn                                              10
Direct Examination by Mr. Leffel

1   Mr. Jonathan Marks, and I think he also left in '07.

2        Did you know Mr. Marks?

3   A.   I did.  I knew him well.

4   Q.   Okay.  And were you a licensed insurance adjuster?

5        Did I just ask that?

6   A.   No.  Not --

7   Q.   Okay.

8   A.   -- the licensed part.

9        So, yes.  I was licensed.

10  Q.   Okay.  Why'd you decide to leave State Farm?

11  A.   Similar to Mr. Marks and Mr. Ingram, there was a -- a

12  reorganization that involved mainly moving employees around to

13  different areas, and so I'd been in the Stillwater office up

14  till 2005, and that's when they closed that office, and I moved

15  to Edmond -- or the Edmond office, and I was faced with the

16  real possibility of moving my family again.  So I elected to

17  leave the company at that time.

18  Q.   So you've now referenced your family.  Tell us about your

19  family.

20  A.   I have a wife and -- and two children.  My children are

21  almost grown:  senior in college and senior in high school.

22  Q.   It's -- it's been kind of a long week, and my witnesses

23  are running together, but do I have a correct memory:  Do you

24  have twins?

25  A.   No.

Jon Derek VanDorn                                              11
Direct Examination by Mr. Leffel

1    Q.    No.

2          Okay.  That was another witness.

3          Tell me -- tell me about who -- you have two children?

4    A.    Yes.

5    Q.    Both girls?

6    A.    Both girls.

7    Q.    Okay.  Tell us about your girls.

8    A.    My senior in college is at Oklahoma State, about to

9    graduate in wildlife ecology; and I have a -- a senior at Deer

10   Creek High School.

11   Q.    Okay.  How old would they have been, if they were born

12   yet, in 2007 when -- when you were faced with this prospect

13   of -- of possibly moving?

14   A.    Sure.  Approximately seven and four.

15   Q.    Okay.  So you -- you've got one in grade school, one

16   almost to pre-K; right?

17   A.    Correct.

18   Q.    Okay.  And so was that a factor in your deciding to leave?

19   A.    Very much, and my wife's job also.  I think she'd found

20   a -- a -- a job that she really enjoyed, and we wanted to give

21   her opportunity to keep that.

22   Q.    Okay.  Well, other than not wanting to relocate, did you

23   have a positive experience when you worked at State Farm?

24   A.    Yes.  It was a good company, and I felt like I had great

25   coworkers.

Jon Derek VanDorn                                          12
Direct Examination by Mr. Leffel

1   Q.   Now, I want to ask you this:  Part of what you do -- and

2   maybe you should probably tell the jury first.

3        We've talked a little bit about the general contracting

4   side of what you do at your current job at Berryman.  You with

5   me?

6   A.   Yes.

7   Q.   I want you to talk about sort of what you do as a

8   consultant, and I guess I should probably start by saying do

9   you do consulting work?

10       I'm going to get these direct questions finished out

11  before this -- figured out before the case is over.

12       Do you do consulting work?

13  A.   I do, yes.  I --

14  Q.   Okay.  Will you please explain to the jury what type of

15  consulting work you do?

16  A.   Well, there's a lot of different matters, but they all

17  center around construction, of course; so this case, being an

18  insurance loss, is -- is just one example.

19       Also, I am also involved in construction defect cases,

20  where there's been a dispute as to the quality of work and some

21  of the contractual disagreements that come up between a client

22  and a builder.

23       And then, also, I'm involved in some other types of

24  insurance work, such as subrogation and some premise liability

25  cases as well.

Jon Derek VanDorn                                          13
Direct Examination by Mr. Leffel

1    Q.    What would your role be in a premise -- premises liability

2    case?

3    A.    Occasionally, someone will have a trip-and-fall-type loss,

4    and there is a question as to the cause and whether some part

5    of the structure or the environment around the building

6    contributed, and so it's a matter of applying building code

7    typically and determine if -- if there was a safe environment.

8    Q.    I want to make sure I understand something.  When you are

9    doing general contracting work, and you're describing working

10   with owners, whether they're commercial or residential property

11   owners, that work is always for the owner of the property, and

12   you may -- if you're working with a carrier, it's because they

13   have a claim with the carrier.  Am I -- do I understand?

14   A.    Sorry.  I might need you --

15   Q.    Yeah.

16   A.    -- to restate that.

17   Q.    So -- well, for example, on a premises liability matter

18   where you may be a consultant, who might be your client?

19   A.    Correct.  It could be either.  So I've worked Plaintiff

20   and Defendant cases in that -- in that type of situation.  So

21   I'm working for the injured and for the building or property

22   owner.

23   Q.    Did you -- you represent both the injured party sometime

24   and also the property owner?

25   A.    Correct.

Jon Derek VanDorn
Direct Examination by Mr. Leffel

14

1  Q.   Okay.  So what I was trying to ask, with respect to

2  contracting -- general contracting, in those instances, have

3  you ever been hired by an insurance carrier to do general

4  contracting work?

5  A.   I have not --

6  Q.   Okay.

7  A.   -- no.

8  Q.   Okay.  So you also mentioned construction defect cases.

9  Can you explain to us who your clients might be in construction

10  defect cases?

11  A.   Sure.  So about half of my work is -- in construction

12  defect cases are for Plaintiffs and about half are Defendants,

13  so I have pretty even distribution in those cases.

14  Q.   Okay.  Have you done other consulting work for State Farm

15  on prior cases?

16  A.   I have, yes.

17  Q.   Okay.  Do you work for other insurance companies?

18  A.   I do.

19  Q.   Okay.  You mentioned products liability cases.  What type

20  of -- what is your role in a products case?

21  A.   Typically, those cases are determining the extent of

22  damages.  So I'll be involved in writing an estimate and

23  determining the fair amount for the cost of repairs.

24  Q.   Mr. VanDorn, are you a witness that is provided

25  compensation for providing this type of service?

Jon Derek VanDorn                                           15
Direct Examination by Mr. Leffel

1   A.    Our firm is compensated, yes.

2   Q.    Okay.  Are you being compensated by State Farm in this

3   case?

4   A.    Yes.

5   Q.    Okay.  What is your hourly rate?

6   A.    20- -- or $295 for file review-type work, inspections,

7   estimate writing, and $445 for testimony.

8   Q.    So I got to do 445 to get you here to -- to court today?

9   A.    That -- that's right.

10  Q.    Should have read the contract.

11        All right.  So the plaintiff's roofing contractor, I think

12  you said -- you knew Mr. Marks; right?

13  A.    Correct.

14  Q.    Did -- did you-all actually work together?

15  A.    Yes.  We were on the same team when he was a team manager.

16  Q.    Okay.  And sounds like you guys -- did you guys have a

17  good relationship?

18  A.    We did.

19  Q.    Okay.  And still today?

20  A.    I believe so, yes.

21  Q.    Okay.  Well, do you recall when you were retained in this

22  particular case?

23  A.    Yeah.  Earlier this year.  Probably January of 2022.

24  Q.    Who retained you?

25  A.    GableGotwals.

Jon Derek VanDorn                                          16
Direct Examination by Mr. Leffel

1  Q.   Okay.  What were you asked to do?

2  A.   To make an inspection and provide a report on my

3  observations and opinions and provide testimony through to this

4  point.

5  Q.   Okay.

6           THE COURT:  Yeah.  I think we're good.

7           MR. LEFFEL:  Okay.

8           THE COURT:  I mean, I know we're not good, but I

9  think we're going to have to cut it off there.

10          MR. LEFFEL:  Okay.  I was watching the clock.

11          THE COURT:  I appreciate that, Mr. Leffel.

12      And I violated my word to the members of the jury earlier

13  when I miscalculated how long we needed on our afternoon

14  recess, and so my apologies for that, and I'm going to try to

15  keep my word to you that we are ending on this Friday at 5:00.

16      Mr. VanDorn, you may stay seated until I excuse the jury,

17  and you will be on the stand on Monday morning when we return.

18      (End of the trial testimony of Jon Derek VanDorn on

19  November 4, 2022.)

20      (Proceedings adjourn on November 4, 2022, and resume on

21  November 7, 2022.)

22      (Beginning of the trial testimony of Jon Derek VanDorn in

23  the presence of the jury on November 7, 2022:)

24          THE COURT:  We are on the record in *Bates v. State*

25  *Farm*, Case Number 21-CV-705, and we have been joined by the

1  members of our jury for Day 5 of this case.

2       Good morning and welcome back.

3       Mr. Leffel, you may resume your direct examination of

4  Mr. VanDorn.

5            MR. LEFFEL:  Thank you, Your Honor.

6                 CONTINUED DIRECT EXAMINATION

7  BY MR. LEFFEL:

8  Q.   Good morning, Mr. VanDorn.

9  A.   Good morning.

10  Q.   So the last question that I noted you had answered on

11  Friday was the question of who had retained you in this case,

12  and I think you said that my law firm had retained you;

13  correct?

14  A.   Correct.

15  Q.   Okay.  So let's pick it up from there.

16       Tell the jury what you were asked to do in this case.

17  A.   I was asked to review documents that were provided to me,

18  make a site inspection of the property, and repair -- or

19  sorry -- prepare a report with opinions and observations.

20  Q.   Okay.  And I think you said -- did you prepare a written

21  report?

22  A.   I did.

23  Q.   Okay.  What did you review or rely upon in forming your

24  opinions in writing that report?

25  A.   I was provided the State Farm claim file; a couple hundred

Jon Derek VanDorn                                    18
Continued Direct Examination by Mr. Leffel

1  documents produced by the plaintiff, Bates, in this case;

2  documents produced by the roofing contractor, Aegis, and a

3  consulting engineer and -- as well as some of the literature

4  produced by the shingle manufacturer, Malarkey.

5  Q.   That include all the photos that were taken by State Farm?

6  A.   Yes.  It did.

7  Q.   Include all the photos that were taken by Plaintiff's

8  representatives?

9  A.   As far as I know, yes.

10  Q.   Okay.  Let's talk a little bit about your reports.

11       There's -- were there two reports?

12  A.   There were, yes.

13  Q.   I think the first one was written in March of '22, and

14  then there was a second one in June of '22.

15       Why did you write a second report?

16  A.   Some of the documents that I just mentioned were produced

17  between those two dates, and those documents changed my

18  positions to some degree and my opinions, so I -- I revised my

19  estimate just prior to providing my deposition.

20  Q.   Prior to writing even the initial reports, did you go out

21  and inspect this property?

22  A.   I did.

23  Q.   Okay.  When did that occur?

24  A.   In March of 2022.

25  Q.   Okay.  So this would -- that have been roughly, you know,

1  a year or a little more than a year than when Mr. Marks and

2  Ms. Jacome are there in February of '21.

3  A.    Yes.

4  Q.    Okay.  Tell us what you did during your inspection.

5  A.    Well, I began by inspecting the elevations from the

6  ground, so I started at the -- the front slope -- or I'm

7  sorry -- the front elevation, worked my way to the right

8  elevation, the rear, and to the left.

9         And, while inspecting each elevation, I looked at

10  components of the building that are typically known to be

11  damaged by hail or could be damaged by hail and made

12  documentation of those items, whether they had damage or lacked

13  damage; and that would include items like the overhead door;

14  paint on trims, including overhead door, siding, and fascia;

15  air-conditioning units; exterior doors; window screens,

16  et cetera.

17  Q.    Okay.  Did you get on the roof?

18  A.    I did.  So, following my elevations review, I did get on

19  the roof and inspected the soft metals that are attached to the

20  roof, as well as the shingles.

21  Q.    Okay.  Did you examine every slope of the roof?

22  A.    I did.  I -- I inspected largely the entire slope but

23  conducted test squares on all four slopes.

24  Q.    Okay.  In -- well, let me ask you this:  Did -- I mean,

25  did you look at the entire exterior?

Jon Derek VanDorn                                                    20
Continued Direct Examination by Mr. Leffel

1    A.   Yes.  I did.

2    Q.   And is that -- that all documented with photographs?

3    A.   Correct, yes.

4    Q.   Okay.  Did you make calculations or measurements?

5    A.   Yeah.  In most cases, I do.  If I find a -- a damaged

6    item, I'll -- I'll measure it if it's a -- a calculation I have

7    to make to enter a quantity to an estimate; but, in this case,

8    my measurements -- or documented measurements pertain mostly to

9    the size of hail spatter, which was also an item I was looking

10   for when I inspected both the roof and elevations, as well as

11   dents in metals.

12   Q.   I think on Friday you told us you -- you had been an

13   adjuster for about a decade at State Farm.

14   A.   That's correct.

15   Q.   And -- and were you -- did you start learning how to

16   examine a property like this when you were being trained at

17   State Farm?

18   A.   Sure.  It's one of the first things that I learned.

19   Q.   Okay.  Looking -- and -- and -- and I'm not -- I'm not

20   sure we mentioned this, but did you also review the claim file

21   for this claim?

22   A.   I did.  That was one of the first documents I reviewed.

23   Q.   Were you able to satisfy yourself -- and -- and -- and

24   give us as many specifics as you can -- that Ms. Jacome, when

25   she was out there doing her inspection, based on what she

1   wrote, what she photographed, what she documented -- were you

2   able to satisfy yourself that -- that she used the same process

3   that you did when you inspected this property?

4   A.    I believe so.  She took pictures that documented her

5   exterior elevations inspection, including several of those

6   items; she noted that she did not see spatter on some of those

7   elevations where we would typically expect to see spatter from

8   recent hail; and, then, her photos show that she did a test

9   square evaluation of the roof.

10  Q.    So I think a minute ago you told us that you had looked at

11  the State Farm photos that Ms. Jacome took.

12  A.    Correct.

13  Q.    And you -- have you seen Mr. Marks's photos?

14  A.    I have.

15  Q.    Okay.  Were you -- were you aware, and have you seen

16  evidence that the jury has seen, that there was an email that

17  Mr. Marks sent to Ms. Bivins at the agent's office that

18  contained, I think, roughly 20 photographs?

19  A.    I have seen that, yes.

20  Q.    Okay.  And -- and did -- what did you under- -- why'd --

21  what did you understand was the reason he's sending those

22  photographs to the agent's office?

23  A.    Well, it's a -- it's a common request for restoration

24  contractors, from an insurance carrier, to send additional

25  information for their consideration, and I understood Mr. Marks

1   to be sending photos that he felt like represented additional

2   damage for State Farm to consider.

3   Q.   In your review, did Mr. Marks take more than 20

4   photographs of this roof?

5   A.   He did.

6   Q.   Okay.  So he only selected, you know, some of those photos

7   to send to the agent.  Is that your understanding?

8   A.   Yes.

9   Q.   Okay.  And do you understand that, if Marks held on to the

10  photos, State Farm only has what would have been in the email?

11  A.   Correct.

12  Q.   Okay.  Is that -- is that consistent how -- with how it

13  was when you were an adjuster?

14  A.   Sure, yes.

15  Q.   Okay.  Well, this is what I want to know, then, based on

16  that:  In the photos that were available to State Farm, when it

17  was making its claims-handling decisions, did you find any that

18  you believe definitively showed hail damage?

19  A.   No.  I didn't, other than to the soft metals, which were

20  already known to be hail-damaged.  So the photos really look

21  consistent with the damages already documented by State Farm

22  during their inspection.

23  Q.   Okay.  Did you see any photos from either State Farm or

24  from those that were submitted by Mr. Marks that you believe

25  show hail impact to the back of the mat of a shingle?

Jon Derek VanDorn                                                23
Continued Direct Examination by Mr. Leffel

1   A.   No.  There were none that showed that.

2   Q.   I recall from Friday that you testified you've been

3   evaluating storm damage and preparing recommended scopes of

4   repair for 24 years.  Do I recall that correctly?

5   A.   You do, yes.

6   Q.   Okay.  If there, in fact, was demonstrate- -- if it was

7   demonstrated that there was some shingles on the roof that had

8   hail damage, there was, you know -- let's say there was one per

9   slope that -- that the evidence bore out, what would be the

10  remedy if you had a shingle or two on each slope that actually

11  had hail damage?

12  A.   Well, the standard would be to replace that individual

13  shingle.  A qualified roofer can remove or extract a shingle

14  that's been damaged and -- and tie in a new one in its place.

15  Q.   If you've got -- let's say you -- you've got two

16  shingles -- two shingles on every slope.  Is that going to

17  require you to entirely replace a eight- or nine-year-old roof?

18  A.   No.  It'd just require the replacement of those shingles.

19  Q.   You have any idea -- or -- or could you tell us:  Do you

20  sometimes calculate in your estimates the cost to repair even a

21  single shingle?

22  A.   I do, yes.

23  Q.   Okay.  Can -- can you explain to the jury what that would

24  cost?

25  A.   Sure.  So, on a individual-shingle basis, it's around 22

Jon Derek VanDorn                                                24
Continued Direct Examination by Mr. Leffel

1   to $25 per shingle, depending on the -- the type of shingle;

2   and something to consider is -- is a roofing labor minimum that

3   would be, you know, required to -- to meet a minimum cost to

4   get the roofer out to do the job.  So, you know, to repair one

5   shingle, it'd roughly cost $500.

6   Q.   Okay.  Well, Mr. VanDorn, I want to look at some of the

7   photos that you took.  Those were admitted on Friday.  They're

8   Defense Exhibit 2, and let's start by looking at DX2_99.

9        I'm going to move so I can -- I can -- I can actually see

10  this pretty well but just to make sure I can see.

11            (Discussion off the record between the courtroom

12  deputy and Mr. Leffel.)

13  Q.   (By Mr. Leffel) Okay.  Tell us why you took this

14  photograph.

15  A.   Well, I typically take overshots of all elevations, and so

16  this is the front elevation.

17  Q.   Okay.  Well, let's take a look at DX2_144.

18       Same?

19       Are you getting elevations here?

20  A.   Yes.  So this is the gable extension off the back

21  elevation.

22  Q.   Okay.  DX2_156, what are we looking at here?

23  A.   That's farther down the back elevation again.

24  Q.   Okay.  And how about DX2_164?

25       What are you showing us in that photograph?

1   A.   That would be the left elevation, left being as if you

2   were looking at it from the street.

3   Q.   Just, you know, in general terms, why are you -- why are

4   you -- why is that an important part of the inspection?

5   A.   Well, just to show that -- first, that the entire

6   exterior's being inspected; but, when you come back to write an

7   estimate for needed repairs, it's easy to refer to photos

8   sometimes and to go back and look at some really detailed notes

9   that you would have to take otherwise to prepare your estimate.

10  Q.   Tell us what an overview photo is in general, whether it's

11  an overview of a -- a roof slope or an elevation.

12  A.   Well, it's -- it's just meant to show the -- the overall

13  design and -- and components of a home or -- or to set up and

14  document a focused area because you're about to take more

15  close-up photos.

16  Q.   Okay.  I'm going to run you through some photographs that

17  I think -- a reason I want you to confirm.  Okay?

18       So let's start with 194 and just go ahead -- when we get

19  to the photo, tell us what -- what -- what we're looking at.

20  A.   This is a overview of the front extension gable above the

21  garage.

22  Q.   Okay.  195.

23  A.   Just tilted a little bit to get both sides of -- or -- or

24  both slopes into these two photos.

25  Q.   Okay.  196.

Jon Derek VanDorn                                          26
Continued Direct Examination by Mr. Leffel

1   A.   That's the remainder of the front slope of the residence.

2   Q.   Okay.  Is that Mr. Marks there in the photograph?

3   A.   Yes.

4   Q.   So he -- he was there when you inspected it.

5   A.   Correct.

6   Q.   Okay.  How about 197?

7   A.   So that's the back extension of the rear slope.

8   Q.   And 198?

9   A.   And the remainder of the back slope.  That's west facing.

10  Q.   And are those overview photos?

11  A.   Yes, sir.

12  Q.   Okay.  Did you find any overview photos included in the

13  photos that Mr. Marks submitted to State Farm in the email?

14  A.   None that I recall.

15  Q.   Okay.  Why would it be important to include those types of

16  overview photos in -- in a submission like that to State Farm?

17  A.   Just to document that it is the roof and that -- where

18  that close-up photo was taken on the roof.

19  Q.   Let's take a look at DX2.225, and can you tell us what

20  we're looking at in this particular photograph?

21       And -- and -- and I -- and I want you to talk about why

22  this -- this photo has chalk marks in it.

23  A.   Okay.  That's an overview of my south-facing test square

24  or my south slope test square.  You might see four corners,

25  four L-shaped-type chalk marks.  That's designating the

Jon Derek VanDorn                                          27
Continued Direct Examination by Mr. Leffel

1  boundaries of the test square.

2       And a test square -- it's, maybe, been discussed already,

3  but a test square's a 100-square-foot area of the roof that's

4  being evaluated for storm damage.

5       And this shoto -- photo shows S for -- for "south slope,"

6  and it has some underlining -- or some chalk marks/unlined

7  blemishes in that test square.

8  Q.   So, when you use the term "blemish," what does that mean?

9  A.   Well, I -- I wanted to show that I was looking at

10 everything that may be discussed or construed as hail damage,

11 and so I was documenting that I -- I was -- these are the spots

12 that I'm looking at.

13 Q.   Does "blemish" mean hail?

14 A.   No.  There's -- there's different causes for granular

15 loss.  So a blemish could be described as concentrated granular

16 loss.

17 Q.   Okay.  And so the white underlining on this is where you

18 were examining a blemish.

19 A.   Correct.

20 Q.   Okay.  I want to go to the next photo, which is DX2_227,

21 and I want to ask if this is a close-up of one of those

22 blemishes.

23 A.   It is.

24 Q.   And so, because -- and -- and help the jury understand.

25      You take an overview shot of your square; right?

Jon Derek VanDorn                                                    28
Continued Direct Examination by Mr. Leffel

1  A.   Correct.

2  Q.   Then do you -- if I'm going through your photographs,

3  would the -- would the next close-up be within the test square

4  that was demonstrated in the overview?

5  A.   Sure.  There's the intent.

6  Q.   Okay.  And -- and so that would help the reviewer know

7  where you are.

8  A.   Correct.

9  Q.   Okay.  So we're now inside that test square that they just

10 saw, and you're underlining a blemish; is that correct?

11 A.   That's right.

12 Q.   Okay.  And what are you seeing in this particular

13 photograph?

14 A.   Well, we see granular loss at the edge of the shingle.

15 Q.   Okay.  When you underline one of these blemishes and

16 photograph it, was there anything else you would do each time

17 you examine these blemishes, other than take a photograph and

18 underline it with your chalk?

19 A.   Sure.  Well, you first look at the visual characteristics

20 of the blemish; and then you -- you inspect for embedded

21 granules because hail oftentimes -- or it's expected that they

22 will -- they'll force the granules in deeper into the asphalt

23 protection of the matting; and -- and then, if -- if it still

24 looks like it's a hail hit, then you feel that and feel for a

25 bruise in the -- the matting of the shingle.

Jon Derek VanDorn                                              29
Continued Direct Examination by Mr. Leffel

1  Q.   And did you do that on every single blemish that you

2  underlined on the Bates rental property?

3  A.   I definitely did it on every shingle that had a blemish

4  within the face of the shingle.  So, if the -- and we'll

5  probably discuss it later, but --

6  Q.   Well, go -- tell us -- I -- I think these are terms the

7  jury's heard, but tell them what you mean when you say "the

8  face of the shingle."

9  A.   Sure.  As an evaluator of hail damage, I learned a long

10  time ago that it's best to first evaluate blemishes within the

11  face of the shingle because issues happen at the edges that

12  relate to weathering, installation, mechanical damages.  Those

13  things happen more often at the edges.  So, first, try and --

14  and evaluate and find damages within the face of the shingle

15  because those will be more consistently known to be hail.

16      So I really wanted to put emphasis on you feeling those

17  bruises or feeling for those bruises when they were in the face

18  of the shingle.

19  Q.   Well, here, at DX_227, is that hail?

20  A.   No.  I don't believe it is.

21  Q.   Okay.  Why not?

22  A.   Well, again, it's at the edge of the shingle; and I'm --

23  rather than evaluating a roof for hail damage by a

24  blemish-by-blemish basis, it's really about the totality of the

25  evidence; and so it's the locations of those blemishes and the

Jon Derek VanDorn                                          30
Continued Direct Examination by Mr. Leffel

1  collateral damage around the property that I've briefly touched

2  on so far that indicate the presence of hail.

3  Q.   So we heard testimony from -- I think it may have been

4  Mr. Marks or others, but the testimony was this, if I remember

5  it right:  The edges of a shingle cannot -- can be more

6  susceptible to wear.

7       Would you agree with that?

8  A.   Yes.

9  Q.   But they also said that the edge of a shingle can also be

10  more susceptible to hail damage.

11      You agree with that?

12  A.   I've heard that before, yes.

13  Q.   Okay.  So help us understand why it would still be

14  significant if you're mostly finding granule loss at the edge

15  of a shingle.

16  A.   Well, if it's predominantly at the edge of the shingle,

17  then that's an indication that there's something else going on.

18  If it's not in the face of the shingle as well or not

19  predominantly in the face of the shingle, then it's likely a

20  cause of something other than hail.

21  Q.   Let's keep moving through this test square, and let's go

22  to DX2_229.

23      Tell us what you are identifying for us in this

24  photograph.

25  A.   That's another blemish at a right edge of a tab.

Jon Derek VanDorn                                          31
Continued Direct Examination by Mr. Leffel

1    Q.    Okay.  And that would have been -- would you have felt

2    that?

3    A.    Likely, yes.

4    Q.    Okay.  Tell us what you believe -- well, let's -- do you

5    believe that to be hail damage?

6    A.    Most likely not.

7    Q.    Okay.  Let's go ahead and look at DX2_230.

8          Is that the -- is that the same mark, or is that a

9    different one?

10   A.    Well, it looks very same.

11   Q.    Okay.  Let's go ahead and move on to DX2_236.

12         Okay.  What are you trying to show us in this photo?

13   A.    Again, a -- a blemish at the left edge of a tab.

14   Q.    Do you believe that's hail?

15   A.    I do not believe so.

16   Q.    Why not?

17   A.    Well, it's, again, at the edge.  I'm still considering all

18   the -- the entire group of evidence, and it's -- it's not

19   exactly a round blemish.

20   Q.    What is bridging?

21   A.    Bridging is where you have blemishes on two sides of a tab

22   or joints within tabs, and they -- they sometimes indicate the

23   presence of hail.

24   Q.    And, just using this as an example, would it be because,

25   if a hailstone perfectly hit, you know, kind of on the seam

Jon Derek VanDorn                                              32
Continued Direct Examination by Mr. Leffel

1   between those edges, you would expect to see the crater on both

2   sides?

3   A.   Yes.  If you have a -- a large rounded area on one side

4   of -- on one tab, you would expect something similar, or, you

5   know, you would expect to be able to complete the circle.

6   Q.   Okay.  Let's take a look at DX2_238.

7        What do you observe on this mark in your test square?

8   A.   A blemish on the left tab.

9   Q.   Okay.  About -- almost -- almost in the middle of the tab

10  there?

11  A.   Right.

12  Q.   Okay.  And what do you believe that blemish is?

13  A.   I don't know.  I don't believe it's hail.

14  Q.   Okay.  Let's go ahead and move to DX2_234.

15  A.   That's a blemish at the bottom or lower edge of the tab.

16  Q.   Okay.  Do you believe that's hail damage?

17  A.   I do not.

18  Q.   Let's look at DX2_235.

19       What are you showing us here?

20  A.   There's a blemish somewhere in there.

21       I'm sorry.  With the glare on here...

22  Q.   Okay.

23  A.   Sorry.  It's mostly on the right tab.

24  Q.   Yeah.  Right -- again, kind of towards the middle?

25  A.   Yes.

Jon Derek VanDorn                                              33
Continued Direct Examination by Mr. Leffel

1  Q.   Okay.  And do you believe that's hail?

2  A.   No.  I do not believe that's hail.

3  Q.   Okay.  And let's look at DX2_236.

4       What are we seeing there?

5  A.   Similar photo with a blemish on the right tab.

6  Q.   Okay.  Now, do you -- do you typically do a test square

7  that includes -- well, let me just ask you this:  Where --

8  where is the appropriate spot to do a test square within a

9  slope of the roof?

10 A.   Well, typically, up a safe distance from the edge of the

11 roof and -- and somewhere below so you're not incorporating

12 the -- the ridge or any valleys.  So, ideally, a perfect

13 10-by-10 area.

14 Q.   Okay.  Well, by my count, I think we've looked at about

15 nine different photographs that were specifically things that

16 you had examined within that test square.  Does that track with

17 your memory so far?

18 A.   Yes, sir.

19 Q.   Okay.  And did you perform similar test scope -- or test

20 squares on every other slope of this roof?

21 A.   Yes, sir.  I did a test square on all four directional

22 slopes.

23 Q.   Did you feel all of the blemishes that you marked in your

24 squares?

25 A.   I can't say that I felt all of the blemishes, but I

Jon Derek VanDorn                                        34
Continued Direct Examination by Mr. Leffel

1   certainly felt all of the blemishes that were in the face of

2   the shingles.

3   Q.   Did you find any in your test squares that were soft,

4   exhibiting what we've -- we -- we -- talking about as being a

5   hail bruise?

6   A.   I did not, no.

7   Q.   Okay.  What does that suggest to you?

8   A.   That they were not caused by hail.

9   Q.   Let's take a look at DX2_258, and I wanted to bring this

10  one up because, as I look at this -- we've got several

11  shingles, but I -- I see these little -- and I've seen this in

12  many, many photographs -- of these little dark spots kind of in

13  the space between the -- the shingles.

14       Can you tell the jury what that is?

15  A.   Sure.  So that's a part of the sealant strip.

16       So the shingle on the bottom of that photo actually is

17  13 inches tall.  5 5/8 shows -- of it is -- is exposed.  So

18  what's not exposed has a strip running through that -- that

19  horizontal level, and that's what activates and -- and causes

20  the -- the shingles that are installed upon each other to seal

21  together, and so that sealant strip is continuous across the

22  entire shingle.  So that's just a little bit of it that is

23  exposed.

24  Q.   Okay.  Thank you.

25       Let's look at DX2_261.

Jon Derek VanDorn                                          35
Continued Direct Examination by Mr. Leffel

1      Well, actually, let's go to 259 first.  I want to ask you

2   about this because this is marked a little bit differently than

3   some of your other photographs.

4      Can you tell us what you were trying to indicate with that

5   arrow pointing to the underline?

6   A.   Sure.  So, you know, within any roof, it's expected that

7   there'll be some angulations or unevenness in the shingles that

8   impact how water sheds from the roof and how it flows, and so

9   you oftentimes see weathering -- or weathering and aging at an

10  accelerated rate in some of the peaks and valleys of an uneven

11  roof.

12  Q.   So I -- I will confess.  I can't -- I can't see any ridge

13  there.

14     Is that something that was difficult to capture with

15  the -- with the camera?

16  A.   Sure.  That's why I use the arrow to -- because it doesn't

17  show up in a two-dimensional photo.

18  Q.   Do you tactilely confirm the presence of that with your

19  hand?

20  A.   Sure.  I lower my eye level and -- and look upwards a lot

21  of times.

22  Q.   And -- and -- and I've had this experience doing, you

23  know, inspections at houses, but are -- you know, are there

24  things that are very obvious to the -- to the human eye that

25  may be -- not get picked up by the camera?

Jon Derek VanDorn                                                    36
Continued Direct Examination by Mr. Leffel

1    A.    That's true, yes.

2    Q.    Okay.  Let's take a look at DX2_261.

3          What are you showing us in that photograph?

4    A.    Another blemish at the bottom edge.

5    Q.    Okay.  Is that a chipped edge?

6    A.    Could be called that.  Oftentimes, footfall looks like

7    that.

8    Q.    Okay.  Consistent with hail damage?

9    A.    No.

10   Q.    Okay.  Let's take a look at DX2_266.

11         What are -- if anything, are you showing us in this

12   shingle that's got lines on the top and the bottom?

13   A.    Well, the -- the bottom line is showing a noncircular

14   chipped area from the tab on the left.

15         I suspect the top line's showing a blemish that's not in

16   the view of the photo.

17   Q.    Okay.  So -- it's for the tab above it.

18   A.    Correct.

19   Q.    Gotcha.  Gotcha.

20         Okay.  Is that hail damage?

21   A.    No.

22   Q.    Okay.  Let's take a look at DX2_291.

23         What are you showing us on that particular photograph?

24   A.    There's some sort of defect in the shingle that was caused

25   either during the manufacturing process or the shipping -- or

Jon Derek VanDorn                                              37
Continued Direct Examination by Mr. Leffel

1  the shipping of the shingles or during the installation of the

2  shingles.  So that -- that crease or fold or line's been there

3  likely since the day the roof was installed.

4  Q.    Okay.  And, again, is that consistent at all with hail

5  damage?

6  A.    It is not.

7  Q.    Let's take a look at DX2_293.

8        So what is the chalk -- the significance of the chalk mark

9  there?

10 A.    Well, I've labeled that as "mechanical damage."  So, to

11 the bottom left of that M in chalk, there's a pyramid- or

12 triangular-shaped blemish on the shingle that was likely caused

13 by -- it could be footfall but most likely a tool or -- or

14 something during installation of the shingle.

15 Q.    Are you able to direct us at all to, like, where you're

16 seeing that damage on that shingle?

17 A.    As -- what location on the roof?

18 Q.    Well, no.

19       Just, like, I'm looking at it, and I'm kind of focused on

20 the edge.  I'm just trying to --

21 A.    Oh.

22 Q.    -- understand where are you pointing to?

23 A.    Well, it is at the bottom edge of the shingle.

24 Q.    That little triangle at the very bottom of the left of the

25 tab?

Jon Derek VanDorn                                        38
Continued Direct Examination by Mr. Leffel

1   A.   Yes, sir.

2   Q.   Okay.  Gotcha.

3        And -- and -- and you're telling us that could be

4   mechanical or footfall.

5   A.   Yes.

6   Q.   Okay.  And is the M there for "mechanical"?

7   A.   Yes, sir.

8   Q.   Okay.  Well, Mr. VanDorn, let's take a look at DX2_294.

9        What are you showing us in that particular photograph?

10  A.   This is another unevenness in the roof that -- for some

11  reason, there's like a bulge right there perhaps from some

12  underlayment bulked up or the decking, and so that has caused

13  some premature aging of the shingle at that location.

14  Q.   So are we seeing some granulation loss at the corner of

15  that -- that right tab?

16  A.   Right, and a little bit to the left too.

17  Q.   Okay.  Mr. VanDorn, this roof was nine years old when this

18  loss was reported.  Is a nine-year-old roof still in perfect

19  condition?

20  A.   It was nine years old when I inspected it, but, no.  I

21  would expect some issues with the roof relating to wear and

22  tear and aging of the roof.

23  Q.   And I think you used these terms a minute ago, so let's

24  make sure that everyone understands what you mean.

25       What is footfall?

Jon Derek VanDorn                                                    39
Continued Direct Examination by Mr. Leffel

1   A.   So footfall is damage caused when someone walks across the

2   roof, especially when you walk horizontal -- or with the lower

3   edge of the roof.  So your -- your foot's partially on the

4   upper shingle that's raised above the lower shingle; and it

5   occurs especially when it's hot, but it can occur anytime; and

6   it just causes some of the shingle to slough off, if you will.

7   Q.   Okay.  What is -- what do -- what -- what do you mean when

8   you say "mechanical damage"?

9   A.   Well, mechanical is something that may be sudden -- you

10  know, damage that's sudden to the roof but is not caused by

11  storm related.  So it could encompass a lot of different causes

12  but, for example, dropping a tool on the roof or cutting --

13  cutting a shingle when installing another shingle in the valley

14  or something along those lines.

15  Q.   Can footfall and mechanical damage happen even while the

16  roof is being installed?

17  A.   Yes.  I mean, it's expected that on day one that, if you

18  look at and inspect a roof closely, you'll find some issues or

19  some blemishes on the roof even the day it's installed.

20  Q.   Can footfall occur anytime that someone is on a roof?

21  A.   Yes.

22  Q.   Is it more -- is the roof more susceptible to footfall at

23  certain times rather than others?

24  A.   Yeah.  I mean, any of these issues are more common

25  whenever the roof's hot, so it's more pliable.  The asphalts

Jon Derek VanDorn                                                40
Continued Direct Examination by Mr. Leffel

1  are soft, and so it is more common when it's hot.

2  Q.   Well, we know from the evidence in this case that

3  Mr. Marks's company, Aegis, installed this roof in 2013.  Did

4  you -- did you -- were you able to determine that in your

5  review?

6  A.   The documentation shows that, yes.

7  Q.   Could there have been footfall and mechanical damage when

8  the roof was installed in 2013?

9  A.   It's expected, to some degree, there would be, yes.

10  Q.   Were you aware that Mr. Marks inspected this roof in May

11  of 2019 following a March '19 hailstorm?

12  A.   I understand that, yes.

13  Q.   Okay.  Were you aware that he inspected it again in

14  January of 2021?

15  A.   Yes.

16  Q.   Okay.  But prior to this claim being made; right?

17  A.   Correct.

18  Q.   Okay.  From reviewing the claim file, did you find that

19  Ms. Jacome inspected this roof?

20  A.   She did.

21  Q.   Did you see that, after she completed her inspection, she

22  went back up on the roof and inspected again with Mr. Marks?

23  A.   I did.

24  Q.   Okay.  Were you aware that Mr. Marks inspected an

25  additional time with an engineer that he was -- was engaging

1   with?

2   A.   Yes.  I understood he inspected it after the inspection

3   with Ms. Jacome to take the additional photos to submit to

4   State Farm and then additional time that you mentioned.

5   Q.   What I'm getting at is there's at least -- by my count, at

6   least six different times, more or less, between the

7   installation, the May 19th inspection, and then this claim

8   where there were people on this roof; and my question is could

9   there be footfall from each one of those inspections?

10  A.   There could be, yes.

11  Q.   Now, did you go inside the home at all during your

12  inspection?

13  A.   I did not.

14  Q.   Why not?

15  A.   It was reported that there was not any interior leaking of

16  the roof.

17  Q.   Okay.  During your inspection, did you do anything to

18  attempt to analyze the type of decking -- and, I guess, just to

19  refresh everybody's memory, tell us what decking is.

20  A.   Decking is the wood surface that the shingles are

21  installed into or nailed into.

22  Q.   Okay.  And -- and did you examine that to try to determine

23  what type of decking was on the roof?

24  A.   I did.  I looked at it from the roof's edge.

25  Q.   Okay.  Did you have any reason to investigate that type of

Jon Derek VanDorn                                             42
Continued Direct Examination by Mr. Leffel

1   decking any further than you did?

2   A.   No.  I was satisfied with what I knew it to be.

3   Q.   Well, I want to get into your report here, and -- and,

4   just so I understand, is the March report identical to the June

5   report except for what you added?

6   A.   Yes.

7   Q.   Okay.  So I'm going to work from your June 26 report, and

8   that should cover everything, so let's -- do you have a copy of

9   it there?

10  A.   I do.

11  Q.   Why don't you go ahead and turn to page 3 of that report

12  where you start with a proper- -- "PROPERTY DESCRIPTION."  Do

13  you see that?

14  A.   Yes.

15  Q.   Okay.  I note that you write that the current shingles

16  were reportedly installed in '13.  Is that where you -- we

17  talked about that a minute ago.  Did you -- did you find that

18  in the documentation?

19  A.   I did.

20  Q.   Is that -- is that -- is that fact significant to your

21  opinions?

22  A.   It is.  It's -- it's good to know the age of the roof

23  so -- when it was installed, so you can use that as part of

24  your investigation and, in this case, was also able to -- it

25  helped us identify the manufacturer of the shingle.

1    Q.    Let's take a look at JX17, which is the Aegis Roofing

2    proposal.

3          Have you seen this before?

4    A.    Yes.

5    Q.    Okay.  Looks like it's dated January of '13.

6              MR. LEFFEL:  Let's -- thank you, Ms. Wright.

7          Let's go ahead and pull up the proposal.

8    Q.    (By Mr. Leffel) And do you find anywhere in the items that

9    were being done here that there was any decking -- or whether

10   the decking was replaced?

11   A.    It's not itemized in this proposal.

12   Q.    Okay.  Do you see what type of shingle was installed or

13   what brand?

14   A.    A Malarkey Dura-Seal.

15   Q.    Okay.  Do you see anywhere on there where there is a --

16   what we sometimes refer to as like an -- an "HVAC exhaust vent

17   cover"?

18   A.    I do not see it in this list.

19   Q.    Okay.  What is the International Residential Code?

20   A.    It is the building code that the state has adopted as a

21   minimum for the entire state.  It -- and it applies to all

22   residential construction.

23   Q.    Okay.  Has Oklahoma adopted the IRC?

24   A.    Oklahoma did adopt -- first -- the first time they adopted

25   the IRC was in the summer of 2011, and it was -- the -- the

Jon Derek VanDorn                                                    44
Continued Direct Examination by Mr. Leffel

1   actual form of the -- the code was 2009 I -- IRC.

2   Q.   Do you have an understanding of -- of -- of -- we -- we've

3   heard some testimony about there being -- you know, the City of

4   Moore having certain, you know, code requirements or the City

5   of Edmond or the City of Bartlesville.

6        Do you have any understanding of -- of why the state

7   adopted this International Residential Code?

8   A.   Sure.  It was a -- a common code that everybody in --

9   involved in the construction industry in Oklahoma should be

10  aware of, and it sets a standard for building homes in a safe

11  manner.

12  Q.   Now, is the IRC updated from time to time?

13  A.   It is.  The IRC -- or the International Code Council that

14  prints the IRC, develops the IRC, issues a new one every three

15  years.

16  Q.   Okay.  And -- and do you know what the current version --

17  well, let me ask you:  Do you know what version of the IRC

18  would have been in place when the Bateses made this claim in

19  2021?

20  A.   The 2009 IRC.

21  Q.   Well, okay.

22       The 2009 would have been in effect in 2021?

23  A.   Oh, I'm sorry.

24  Q.   So let's -- let me -- I --

25  A.   Okay.

1   Q.    -- let me back up.

2         Do you know which version of the code would have been in

3   place when the roof was installed in 2013?

4   A.    That would have been 2009.  That claim would have been.

5   Q.    Now fast-forward to '21.  What version of the code?

6   A.    That would be 2015 IRC.

7   Q.    Okay.  Here's what I want to know:  Between the -- the

8   2009 version and the 2015 version, was there any change to what

9   the code said with respect to decking?

10  A.    Well, as -- no.  Not in the sense of what was required,

11  what the State of Oklahoma did.

12        So the -- the ICC made no changes to the building code

13  language.

14        What -- the O -- the Oklahoma Uniform Building Code

15  Commission, which is responsible for any amendments and code

16  adoptions for Oklahoma, made some language changes because

17  there was this confusion that was addressed to some degree by

18  Mr. Marks about whether lumber decking is required, because the

19  code uses "solidly sheathed decking" -- is its terminology;

20  and, looking closely within Chapter 8 of the code, which is

21  roof framing, it does allow lumber decking to be used for the

22  rooves.

23        And then they also added some -- or pulled some language

24  into the roofing chapter from, you know, a preamble at the

25  front of the -- of the code book that says that the code --

Jon Derek VanDorn                                          46
Continued Direct Examination by Mr. Leffel

1    most restrictive code is whatever the code book says, or any

2    inner- -- inner- -- installation instructions that are more

3    restrictive then becomes the code.

4    Q.    If you're -- if you're needing to do some repairs on a

5    roof, like, you know, spot shingles on -- on various slopes,

6    or you're -- or you're not -- there's -- there's no cause to

7    total an entire slope anywhere on a entire roof -- are you with

8    me?

9    A.    Yes.

10   Q.    Is that a situation where you would need to redeck, if

11   that was required under the code?

12   A.    No.  Just a repair of a few shingles does not cause

13   changes for the decking.

14   Q.    Okay.  Let's assume this roof, in fact, needed to be

15   totaled.  Would -- in that situation, do you believe, based on

16   what you've seen, that decking would be needed on this roof to

17   comply with code?

18   A.    In this particular case, it would not; and -- and the

19   reason is we know from the code language that lumber decking is

20   permitted; and then we -- we refer to the installation

21   instructions, which are produced by Malarkey, and find that

22   they do permit nominal 1-inch decking.  So any -- any 1-by

23   decking is permitted.

24   Q.    Okay.  Well, let me ask you this:  Let's assume that the

25   facts were different than you see them.  Let's assume that to

Jon Derek VanDorn                                           47
Continued Direct Examination by Mr. Leffel

1  meet code this decking would have had to have been replaced.

2  Okay?

3      Based on what you're telling us about the 2009 to 2015, if

4  code required that decking on this home to be replaced, would

5  it have been necessary when Mr. Marks replaced the roof in

6  2013?

7  A.   Yes.  The same code would have been in force then, so

8  it -- it should -- if it were required, which it's not, it

9  should have been replaced in 2013.

10 Q.   Are you aware of whether this policy from State Farm talks

11 about whether or not that type of situation's covered, where --

12 when -- when something wasn't done that should have been done

13 under my hypothetical, does the policy address, you know, any

14 type of exclusion that might apply to that situation?

15         MR. MILLER:  Judge, I'm going to object to him

16 talking about the policy based on his limitation as a witness.

17         THE COURT:  Let's go on our headsets.

18      (Bench conference on the record.)

19         THE COURT:  Mr. Miller, your objection is that this

20 question elicited testimony outside the scope of the

21 designation; is that correct?

22         MR. MILLER:  Yes, Judge.

23         THE COURT:  Okay.  And, Mr. Leffel, what's your

24 response?

25         MR. LEFFEL:  Yeah.  I think he's been called to

Jon Derek VanDorn                                                48
Continued Direct Examination by Mr. Leffel

1   testify about what happened in this claim and how coverage was

2   applied, what the scope of the damages were.

3       We've established he's a former State Farm employee, we've

4   established that he works with insurance professionals every

5   day in his job, and I think this is something that's within the

6   scope of his knowledge.

7               MR. MILLER:  Can I say something?

8               THE COURT:  You may.

9               MR. MILLER:  It's been specifically denied that he's

10  been involved in any way --

11              THE COURTROOM DEPUTY:  I'm sorry.  Cassy can't hear

12  you.

13              THE COURT:  Yeah.  Someone, maybe, is touching their

14  microphone.

15      Okay.  Go ahead, Mr. Miller.

16              MR. MILLER:  Can you hear me now?

17              THE COURT:  Yes.

18              MR. MILLER:  He testified specifically under oath

19  that he was not going to offer any opinions that had to do with

20  insurance matters, including how the claim was handled in the

21  sense of the duties, and exclude himself from that sort of

22  testimony, and so we didn't question him on it.

23              THE COURT:  So I'm looking at the final expert

24  witness list designation, Doc. Number 22.  It says, "As per

25  report; expert opinions pertaining to various issues in

Jon Derek VanDorn                                              49
Continued Direct Examination by Mr. Leffel

1   connection with Plaintiff's roof, decking, and State Farm's

2   evaluation thereof in light of common practice, common industry

3   standards generally, and all applicable codes and regulations

4   governing same."

5       Mr. Leffel, is there something in his report where he's

6   talked about policy provisions?

7              MR. LEFFEL:  Specifically, Your Honor, you know, I

8   don't recall; but he's -- but what he's talking about is

9   decking; and, as a guy who's a contractor, who deals with these

10  things every day, has to know the code, and works with

11  insurance professionals, it is within his knowledge and

12  experience to know whether -- in a situation where -- where

13  something should have been done by a contractor, whether that's

14  typically covered by insurance policies.

15             THE COURT:  So I -- you know, I think you can ask him

16  certainly about the code and about his experience and industry

17  standards, but my understanding -- I don't have your question

18  right in front of me, but it went to policy language, and I

19  think that that is outside the scope.

20      So I'm going to sustain the objection.

21             MR. LEFFEL:  Understood.

22             THE COURT:  Okay.  Thank you-all.

23             MR. LEFFEL:  Yeah.

24      (Bench conference off the record.)

25             THE COURT:  That objection is sustained.

1        Mr. Leffel, please proceed.

2   Q.   (By Mr. Leffel) Just to confirm, if the decking on the

3   Bates rental property is not code compliant now, would it have

4   been code compliant in 2013?

5   A.   No.

6   Q.   Okay.  Let's take a look...

7        Let's turn to page 4 of your report, if we could, and

8   there is a section there that has the heading "BACKGROUND."

9   Tell us what the purpose of that is and why you include that in

10  your report.

11  A.   Well, it's just to provide the reader some essential

12  information to understanding some of the pertinent details that

13  will affect my opinion at the end of the -- at the end of the

14  report and, really, set up what has happened to this point.

15  Q.   So, in the second item, you discuss the Aegis 2013

16  replacement; is that correct?

17  A.   Yes, sir.

18  Q.   Okay.  Can you tell us what you found was the -- the

19  shingle that was used in that roof replacement?

20  A.   Well, the -- the contract or proposal that we just looked

21  at was a -- a Malarkey Dura-Seal three-tab shingle.

22  Q.   Okay.  Can you tell the jury how much it cost to replace

23  this roof, including two new power attic vents, in 2013?

24  A.   Yes.  It cost $6,300.

25  Q.   Okay.  And can you tell us -- do you know whether that

Jon Derek VanDorn                                           51
Continued Direct Examination by Mr. Leffel

1  Malarkey shingle has any special classifications associated

2  with it?

3  A.   Well, this particular Malarkey shingle is considered a

4  Class 3 impact-resistant shingle.

5  Q.   Were you aware that Mr. Marks testified that the Malarkey

6  Dura-Seal subsequently got a Class 4 rating?

7  A.   I am aware of that, yes.

8  Q.   Okay.  Well, tell me this:  What are the classes of

9  compositions of shingles that are available on the market?

10  A.   Well, there's four levels.  All shingles that are

11  installed on our rooves have some level of impact resistance,

12  and it begins with Class 1, which is resistant up to 1.25-inch

13  hail; and then it increases by class by quarter-inch

14  increments, so 1.5; the Class 3's 1.75 resistant; and then

15  the -- the top level's 2.0 resistant or Class 4.

16  Q.   So, when you say "2.0," you mean hail that's 2 inches or

17  greater in diameter.

18  A.   Correct.  A -- a -- a diameter of 2 inches or more.

19  Q.   Okay.  Were you present when I was examining Mr. Marks on

20  Friday?

21  A.   Yes.

22  Q.   Okay.  Do you recall me asking him whether he was aware

23  whether there are studies or analysis establishing the

24  thresholds for the size of hail that would be necessary to

25  damage an impact-resistant shingle?

Jon Derek VanDorn                                                    52
Continued Direct Examination by Mr. Leffel

1  A.   I recall he had some limited knowledge, yes.

2  Q.   Okay.  You remember what he had to say about that?

3  A.   That there were -- there were different classifications,

4  that -- he had some of it right but not -- not quite all of it.

5  I think he mentioned there was a 3 and 4, maybe a 1, and then a

6  Class A.

7       Class A applies to something different.  That's wind

8  resistance.

9  Q.   So, just so we've got it down, let me ask -- I mean, are

10 you aware of -- of the testing or analysis process that goes

11 into creating these -- these ratings and kind of what they mean

12 as far as hail resistance?

13 A.   Yes.  So laboratories with -- using scientists and

14 engineers have established a couple different tests.  One

15 involves ice spheres being launched or projected at the shingle

16 that are meant to mimic hail, and the other that has been

17 around longer and which Malarkey markets as the test that their

18 shingle's been through is a UL 2218 that's conducted by

19 Underwriters Laboratories, and it involves dropping steel ball

20 bearings from prescribed heights to mimic the kinetic energy of

21 hail impacting a shingle.

22 Q.   Okay.  Was the first one, you say, that somebody, like,

23 projectiles ice balls at the -- at the shingles?

24 A.   Sure.  They've invented a couple of different launchers to

25 launch ice balls that they've made in the freezer at shingles.

Jon Derek VanDorn                                                     53
Continued Direct Examination by Mr. Leffel

1   Q.   Have you ever seen that?

2   A.   In video.

3   Q.   Okay.  I want that job.

4        Well, just to make sure we know, what does Class 4 mean?

5   A.   Means it's impact resistant to hail up to 2 inches.

6   Q.   And Class 3?

7   A.   1.75.

8   Q.   Okay.  Do you have any knowledge of the -- the largest

9   hail that allegedly fell on this property on the date of loss?

10  A.   Well, I know there's weather reports that have been

11  referred to.

12  Q.   Okay.  And what was the largest hail that was reported for

13  that loss?

14  A.   Well, according to the AccuWeather report, the largest

15  potential hail was 2.25 inches.

16  Q.   On -- on July 3rd of '21?

17  A.   No.  That would have been sometime in 2019.

18  Q.   Okay.  So what I'm asking is, for the loss that they're

19  claiming here --

20  A.   I see.

21  Q.   -- what was the largest hail that the weather data showed?

22  A.   I see.

23       So, yeah.  For the date of loss, which, I believe, was

24  July 2020, it was 1.75.

25  Q.   Is the class -- I mean -- or the fact that this Malarkey

Jon Derek VanDorn                                                    54
Continued Direct Examination by Mr. Leffel

1   shingle was at -- was at least either a Class 3 or Class 4,

2   depending on who you listen to, at the -- at the time of this

3   loss, significant in any way to your opinions?

4   A.   Sure.  So it would mean that this shingle would be impact

5   resistant to most of the hail, if not all of the hail, that

6   fell based on the AccuWeather report, which showed the -- the

7   potential hail of being a maximum size of 1.75.

8   Q.   Okay.  Do you understand from your review that State Farm

9   made the finding that the -- the granulation loss that they

10  observed on these shingles was caused by wear?

11  A.   I understand that, yes.

12  Q.   Okay.  Did you also find wear on the shingles during your

13  inspection?

14  A.   In my opinion, yes.  There is wear to these shingles.

15  Q.   Okay.  So, if the Malarkey shingle is marketed as an

16  impact-resistant shingle, is there any correlation that you

17  know of between the impact-resistance rating on a shingle and

18  the -- the shingle's susceptibility to granular loss on the

19  surface or ordinary wear?

20  A.   No.  There's no connection between those two items.

21       The shingles are put through a test to evaluate how they

22  lose granules.  It is only tested at the point of manufacturing

23  so that the consumer knows that they're buying a -- a shingle

24  with good granular coverage at the point that it's installed.

25       As far as I know, there are no tests to evaluate the

1   long-term loss of granules from a roof.

2   Q.   So, if I'm hearing you right, can a impact-resistant

3   shingle lose granules just as easily as a regular shingle?

4   A.   I believe so, yes.

5   Q.   Okay.  And, when -- and, when they -- when they talk about

6   impact resistance, is that, really, impact resistance to the

7   mat?

8   A.   Correct.  So it's determining whether the -- the mat is

9   damaged by that hail-size threshold.

10        Mr. Marks talked about it a little bit, but the four main

11  components of a -- of a shingle is the -- and the -- the real

12  structural integrity of the shingle is provided by a fiberglass

13  mat; and then it's -- it is coated by asphalt, top and bottom,

14  for Components 2 and 3; and then that is protected by granules

15  that are -- are installed across the top of the asphalt.

16  Q.   So there's almost like three parts of the shingle.

17  A.   Correct.

18  Q.   Okay.  Would you expect to see some -- some natural

19  granulation loss and wear on even an impact-resistant shingle

20  that's -- that's nine years old?

21  A.   Yes.

22  Q.   Okay.  Well, continuing with your report and your

23  "BACKGROUND" section, you note that in May of '19 Mr. Gary

24  Bates asked Mr. Marks to inspect the roof for hail damage.

25        What do you note about that inspection in your report

Jon Derek VanDorn                                          56
Continued Direct Examination by Mr. Leffel

1  under Item 3?

2  A.   Well, Mr. Marks states that he believed there may be some

3  hail damage but not enough to submit a claim at that time.

4  Q.   Okay.  And -- and what kind of hail had they had in -- in

5  March of 2019?

6  A.   So the Accu- -- AccuWeather report states that there was a

7  potential for 2.25-inch hail in March of 2019.

8  Q.   And I think you said you found there was no claim made

9  then.

10  A.   Correct.

11  Q.   Okay.  Is that significant at all to the opinions that you

12  hold in this case?

13  A.   Sure, because I -- I think that the older hail would

14  present itself differently several years later when inspected.

15  Q.   I'm -- I'm -- I'm really confident that the jury probably

16  has heard this and has got it nailed, but I just -- to make

17  sure, you know, can you kind of just explain to us kind of

18  how -- what AccuWeather is and -- and how that works and -- and

19  kind of what -- the caveats you need to know about that?

20  A.   Sure.  So it's one of several historical weather-reporting

21  sites or companies that provide us data mostly used on

22  algorithms that radar detect -- or use radar detection at

23  the -- at the upper levels of the cloud where hail is expected

24  to form, and it provides a -- a estimate at the largest

25  potential hail that may fall at that property, but it does not

Jon Derek VanDorn                                          57
Continued Direct Examination by Mr. Leffel

1    guarantee that hail that size or -- or hail of any sort fell at

2    that property.  It just says that hail of that size may be in

3    the clouds over that property.

4    Q.    Have you gone out to inspect a loss or a roof where

5    AccuWeather said, "Hey, on the date they're claiming, there

6    was -- there was two-and-two-quarter-inch hail gotten out to

7    that particular house that was within the area that was

8    included in the report," and found no hail damage to the roof?

9    A.    Yes.

10         And it's not just true for AccuWeather.  There's other

11   companies that offer a similar product, and so those reports

12   are just one piece of the overall book of evidence that we use.

13   Q.    Irrespective of what the weather data may show, what must

14   you do to confirm damage to a roof?

15   A.    Go through the thorough and complete inspection and

16   consider all of -- not just the blemishes on the shingles but

17   the collateral damage or absence of at the subject property.

18   Q.    Let's get back to your report here, and, looking at

19   Item 5, you're talking about Ms. Jacome's inspections.

20         Tell us what you found significant from your review of her

21   inspection.

22   A.    Well, she noted damage to some items, including the

23   overhead door, three screens, and then the soft metal

24   impertinences [verbatim] or flashings and vent caps attached to

25   the roof, and then she noted extensive areas of granular loss

Jon Derek VanDorn                                                    58
Continued Direct Examination by Mr. Leffel

1   that she attributed to wear.

2   Q.   Okay.  In your inspection, did -- did you confirm those

3   items, in fact, were damaged in your opinion?

4   A.   To complete the answer before, it's probably worth noting

5   that the wear that she notices is at the shingles' edges, and

6   that's important to the matter.

7        But, in terms of the items that she did note were damaged,

8   mostly, I agreed.  I did inspect the overhead door and could

9   not confirm a hail dent to it.

10  Q.   Okay.  Did -- were you able to find, in looking at State

11  Farm's estimate that paid for the items, that you were able to

12  confirm were damaged or that she had confirmed were damaged?

13  A.   Well, yes.  They had paid for the screens and overhead

14  door; it paid for vent caps that we ultimately know were not

15  replaced from the prior claim, so it paid for those again; and

16  it paid for pipe flashings.

17       There was some confusion in the quantities really kind of

18  throughout the claim process, it seemed, that caused that

19  number to be different than what I observed.

20  Q.   Okay.  You note, if we turn to page 5 -- can you tell us

21  what the -- the estimate total was based on State Farm's

22  estimate of the damage?

23  A.   $2,020.18.

24  Q.   Okay.  So we move on here to the next section of your

25  report at page 5, and it is the "DISCUSSION" section.  What

 1  are -- what is the -- what is the purpose of this part of your

 2  report?

 3  A.   It's more background information for the reader so they

 4  can understand the issues that may be presented in this case

 5  and some of the real important factors for evaluating a roof

 6  and determining if it has hail damage or wind damage or some of

 7  the other issues that you may see.

 8  Q.   The first thing you tell us in the "DISCUSSION" is,

 9  "Roofing materials, exposed to weather elements as they perform

10  their intended purpose, suffer cumulative wear and tear as they

11  age.  Even in the absence of hail and wind, it is understood

12  that roof materials naturally wear out over time and must be

13  eventually repaired and/or replaced."

14       Tell us why you thought it was important for your reader

15  to know that.

16  A.   Well, everyone should understand that roofs do age, and --

17  and the predominant indicator of the aging is granule loss.

18  Q.   And can they wear out irrespective of wind and hail

19  events?

20  A.   Yes.  It's expected eventually, if it's not first damaged

21  by wind or hail, that the roof will meet its expected life and

22  need to be replaced.

23  Q.   The next item that you discuss in your report has a

24  heading, "Hail," and I think one of the things you first state

25  in your first bullet there -- that, "Hail fall is almost always

Jon Derek VanDorn                                            60
Continued Direct Examination by Mr. Leffel

1    directional."

2        What does that mean, and why was that important to you?

3            MR. LEFFEL:  Let's go ahead and pull up JX13.2, if we

4    could.

5    Q.   (By Mr. Leffel) And, if it's helpful to you, the jury has

6    seen this brochure that has a little bit of a discussion about

7    directionality of hail.

8    A.   So, typically, hail is influenced by wind, and so it's --

9    it's blown and does not fall perfectly vertically or straight

10   down, and so it will impact certain slopes more than others.

11   Q.   You also make a comment that, "All hail does not cause

12   damage to residential asphalt composition roofs."

13        What are you trying to tell us with that statement?

14   A.   Well, that goes back to the hail thresholds that have been

15   established for these shingles at the time that they're

16   developed and sold.  So smaller hail will not damage all types

17   of shingles.

18   Q.   Now, is damage that's other than hail typically

19   directional in nature?

20   A.   I guess wind would be too as well, yes.

21   Q.   Okay.  What about things that -- like, footfalls and

22   blisters and other types of things that we see on a roof that

23   we believe -- or -- or just wear and tear?  Is that typically

24   directional?

25   A.   No.  In the presence of good roof ventilation, which --

1  with the addition of these two power vents, this roof, I

2  believe, was adequately vented.  So we should see wear and tear

3  equally on -- on all the slopes, especially on a -- a flatter

4  roof like this.

5  Q.   Okay.  Do you recall, when you were looking at

6  Ms. Jacome's findings, that, when she did her elevation walk,

7  she found damages to the -- to the front of the house, like

8  the -- the garage door we've talked a little bit about, and

9  then also on the rear of the home, okay, but she didn't find

10  anything on the right and left.

11      Do you recall that?

12  A.   Yes.

13  Q.   Okay.  What does that suggest to you about the

14  directionality of any hail that may have affected this property

15  at any time?

16  A.   Well, likely, there -- there were two dates involved

17  that -- that caused those damage.  It'd be unlikely that you

18  would have hail damage on the front and the back on the same

19  date of loss.

20  Q.   Go ahead.

21      We're looking at our --

22          MR. LEFFEL:  Pull up that directionality deal.

23  Q.   (By Mr. Leffel) So, if -- if -- if -- if hail is

24  approaching a home and comes in, in a way that could affect the

25  garage door or could affect the -- the front slope, am I -- is

Jon Derek VanDorn                                                    62
Continued Direct Examination by Mr. Leffel

1    that where you would expect to see damage if hail came in that

2    direction?

3    A.    Sure, and at the exterior elevations as well as the

4    shingles.

5    Q.    And could it -- could it be the case, based on our

6    understanding of directionality, that you might not find much

7    damage, for example, on the -- on the left slope or on the left

8    or right elevations?

9    A.    That's right.

10   Q.    Okay.  So, when you looked at this roof and -- and

11   inspected every slope, did you find that there were, you know,

12   consistent blemishes and consistent wear patterns on every

13   shingle directional slope?

14   A.    Yes.  They were consistent across the entire roof.

15   Q.    You go on to say, "It is expected that hail will damage

16   the roof's shingles indiscriminately across the entire surface

17   of the shingles."

18          And, again, you know, you can --

19              MR. LEFFEL:  Let's pull up JX13.3.

20   Q.    (By Mr. Leffel) First of all, tell us:  What is -- what

21   are you meaning when you say it is expected that hail will

22   damage the roof's shingle indiscriminately across the entire

23   face?

24   A.    We would see random evidence or evidence of random hail

25   fall, so the shingles would be -- would show hail bruising

1  across the entire shingle, on the faces and the edges.

2  Q.   When you look at that second photograph from the brochure,

3  is that -- does that provide an example of what you're

4  describing?

5  A.   Yes.  The -- the larger hail hits -- it seems the -- the

6  predominant location of the hail hits is in the face of the

7  shingle rather than at the edges.

8  Q.   I think we're going to talk about it in a minute, but do

9  you remember seeing a -- a test square that was taken from the

10 2012 hail claim?

11 A.   Yes.

12 Q.   What, if anything, did you find in that photograph

13 regarding the randomness of hail?

14 A.   Well, the -- the seven identified hail hits were -- six of

15 them were located in the face, and only one was at the

16 shingle's edge.

17 Q.   Well, help the jury understand.  You know, when you're

18 talking about this indiscriminate pattern of hail, explain to

19 them why that's significant to your opinions in this case.

20 A.   Well, it's been discussed, I'm sure, that almost all the

21 blemishes or the great majority of the blemishes were -- were

22 found at the shingles' edges rather than in the shingles'

23 faces, and that's important to know.

24 Q.   Okay.  I think that's the next thing you write in your

25 report.  "The observance of blemishes almost exclusively within

Jon Derek VanDorn                                          64
Continued Direct Examination by Mr. Leffel

1   the face of the shingles or only at the edges would be

2   unexpected."

3        Did I read that right?

4   A.   Yes.

5   Q.   And why would that be unexpected?

6   A.   Because hail fails random, and so it'll impact the entire

7   face of the shingle evenly.

8   Q.   You go on here to state, "If either of those situations

9   occur, the storm damage evaluator must question other causes,

10  such as manufacturer defect, mechanical damage, and patterns of

11  wear and tear."

12       What are the two -- if either of those situations -- what

13  are those two situations you're saying that would cause the --

14  the claims examiner to question whether you're seeing hail?

15  A.   Well, if the -- if the -- if the majority of the hail hits

16  are either at the face or at the -- the edge, then it's not

17  random.

18  Q.   Okay.  What is a manufacturer defect?

19       Is that -- I -- and -- and I think -- did you show us a --

20  an example of that in the photos?

21  A.   Possibly.

22       The -- the long skinny crease at the bottom of the

23  shingle, it may have come from the manufacturer that way.

24       Another manufacturer defect doesn't present itself until

25  the roof's already been installed:  where, for different

Jon Derek VanDorn                                          65
Continued Direct Examination by Mr. Leffel

1   reasons, the granular doesn't adhere to the asphalt well;

2   and -- and so it -- it -- it sheds, sometimes blisters.

3   Q.    Okay.  And I think you already told us what mechanical

4   damage is, but what might mechanical damage look like on an

5   asphalt roof?

6   A.    Dropped tools.  Impact of a tool.

7   Q.    And what did you mean in that portion of your report when

8   you talked about patterns of wear and tear?

9         What does that mean?

10  A.    Well, if you see consistent issues with the shingle that

11  you see over and over, so these blemishes at the shingle's

12  edge, that's a pattern, and it's worth considering.

13  Q.    Well, when you looked at this particular roof, what story

14  did it tell regarding any patterns of wear?

15  A.    Well, the -- the shingles lost their granules

16  predominantly at the shingles' edges and these blemishes, many

17  of which we looked at photos early -- earlier.

18  Q.    Broadening that question, did you see any of these other

19  causes -- "other than hail" causes, as you call them -- on the

20  roof of this rental home?

21  A.    Yes.  Yeah.  We -- we saw the mechanical damage and the

22  marring and the manufacturer's defect.

23  Q.    Did you hear Mr. Marks testify on Friday that every

24  shingle blemish on this roof was caused by hail?

25  A.    I did.

Jon Derek VanDorn                                          66
Continued Direct Examination by Mr. Leffel

1    Q.   Do you find that -- is that consistent -- I mean, do you

2    find support for that statement at all based on your review?

3    A.   No.  You -- based on the inspection of this -- this

4    property, I don't find that to be true; but it's really not

5    true to expect to see that on any property, that -- that -- any

6    roof, when we inspect it, we're going to find blemishes, and

7    we're going to have to find -- we're going to have to consider

8    issues with the roof when evaluating it for hail.

9    Q.   Well, if we turn to page 6 of your report, the third

10   bullet on that page states that, "It is common when evaluating

11   a roof for hail damage to inspect other collateral building

12   components for indices of hail impact and size."

13        Tell us why that's common and important.

14   A.   Well, it goes again to the full body of the evidence.  So

15   it's finding evidence that hail's been present, first; and,

16   second, that -- what the size of the hail is.  So the sizes of

17   dents, sizes of spatter will indicate the size of the hail.

18   Q.   Okay.  You then write, "Hail often leaves spatter," which

19   is something you just mentioned there, "and/or dents on metal

20   that can offer historical evidence of the size of hail fall."

21        Tell us what spatter is.

22   A.   So spatter is the removal of built-up oxidation on

23   building components.  So, when the hail impacts it, it removes

24   that oxidation and gets it down at least to closer to its

25   original finish.

Jon Derek VanDorn                                              67
Continued Direct Examination by Mr. Leffel

1      And that's commonly found on a lot of the metal

2   surfaces -- air-conditioning cases, exterior doors, electrical

3   meters on the side of the house -- and it's also found on wood

4   surfaces, especially picket fences where they -- oxidation --

5   originally, it was a yellow or brown, nice clean new-wood

6   color, and it becomes dark tan.  That's because of oxidation

7   buildup.

8   Q.   What are the -- what are the -- the big-ticket items --

9   or -- well, big ticket's not the right word.

10      What are the things that -- if you're doing an inspection,

11   what are some of these other items that you see typically at a

12   home that you're going to want to look at to see if they got

13   spatter?

14   A.   The fence.  The electrical meter -- electrical casing.

15   Metal doors are a good indicator.

16   Q.   Okay.  Let's take a look at some fence photos that you

17   took, starting with DX2.174.

18      Tell us what you see, if anything, on -- on these panels.

19   A.   This is the wood fence that surrounds the backyard, and

20   there is no hail spatter on this wood fence.

21   Q.   Okay.  How about 175?

22   A.   Again, a little -- a little closer view of it, and there

23   is no hail spatter.

24   Q.   Okay.  How about 176?

25   A.   I believe this is the back or east-facing elevation, so,

1    again, no hail spatter.

2    Q.    Okay.   177.

3    A.    Looks like that's still the back fence, and there is no

4    hail spatter.

5    Q.    And 179?

6    A.    Now it's moved around to the south-facing or the north

7    side of the backyard, and, in that area -- from that distance,

8    the spatter's not visible.

9    Q.    I want to direct your attention to DX2.190.

10        So can you tell us why you -- you included that

11   photograph?

12   A.    Yes.   So this is some spatter that's found on that

13   south-facing side of the fence, and it's the largest hail

14   spatter that I could find, and it measured at three-eighths of

15   an inch.

16   Q.    Okay.   Why is that significant with respect to whether

17   evidence of this spatter might support hail damage on the roof?

18   A.    Well, scientific research has shown that hail spatter is

19   equal to the hail size that caused it, and so that indicates

20   that the largest hail -- the largest evidence of hail is

21   three-eighths of an inch.

22   Q.    Okay.   What does the --

23            MR. LEFFEL:   We can go ahead and pull that down.

24   Q.    (By Mr. Leffel) What does the overall presence or lack of

25   presence of spatter tell you about the recency of any hail of

Jon Derek VanDorn                                          69
Continued Direct Examination by Mr. Leffel

1   this property?

2   A.   Sure.  So a little bit more on that last picture, that

3   three-eighths inch, it's important to know it means that it's

4   too far too small to damage the shingle because it's -- excuse

5   me -- we talked about earlier that the threshold for that

6   shingle's 1.75 inches.

7        But the lack of spatter indicates that at least recently

8   there has not been any hail fall at least of the -- the size

9   threshold that's required to damage the shingles.

10  Q.   What do the authorities in the industry say about how

11  long -- or what does the science tell us about how long spatter

12  can stay at a property after a -- a hailstorm?

13  A.   Right.  The scientific research shows it'll last from a

14  year to two years.

15  Q.   Okay.  Okay.  And, I imagine, it depends on conditions,

16  weather, things of that nature.

17  A.   Yeah.  Probably mostly the extent of the buildup at the

18  time it occurred.

19  Q.   And, just to -- to drive home the point, and -- and it may

20  be unnecessary, but, you know, if I had a -- you know, a wall

21  that was covered in, like, algae or moss or some type of

22  fungus, and I walked up to it, you know, with my finger and

23  kind of pulled some of that off, is that similar to the concept

24  of what's happening when that oxidation is removed from a

25  surface like a fence?

Jon Derek VanDorn                                                70
Continued Direct Examination by Mr. Leffel

1   A.   Sure.  Yeah.  That'd be a good analogy; and then,

2   eventually, it would be expected that that algae or, in this

3   case, oxidation would fill back in; and it would no longer

4   be -- the spatter no longer visible.

5   Q.   Okay.  If I have a -- a roof panel that has been weathered

6   by the sun and the weather, and I have a hail impact to my

7   fence, does it typically go back to sort of the fresher, raw

8   color of the original lumber?

9   A.   Yeah.  The spatter is a little cleaner than what the aged

10  wood is.

11  Q.   Okay.  But, over time, that -- that fades --

12  A.   Yeah.  It --

13  Q.   -- due to the same weathering process.  Is that accurate?

14  A.   Sorry.

15  Q.   Okay.

16  A.   Yes.

17  Q.   Well, the next section of your report, under

18  "OBSERVATIONS," is -- but, before we go there, I think you got

19  a discussion about wind.  I'm just going to ask you, to

20  streamline this, did you find any wind damage to the property?

21  A.   I did not.  I did not find any creased, torn, or missing

22  shingles, nor, really, any unsealed shingles.

23  Q.   But you included that in your inspection.

24  A.   I did, yes --

25  Q.   Okay.

1  A.   -- as part of the inspection.

2  Q.   Well, we now turn to your observations that begin at

3  page 7 of your report, and you start that with Item Number 1,

4  which is part of your exterior.

5       Tell us what you are telling us in Item Number 1 there,

6  and, while you're doing that, I'm going to pull up for you

7  DX2.130, which is the photo that you included in that section

8  of your report.

9       So what are you telling us here?

10  A.   Well, I could see from -- well, first, I inspected the --

11  the overhead door, the garage door, and -- and found several

12  oblong or -- or long, narrow dents; but I -- I knew by the

13  photo documentation that State Farm's claim representative had

14  identified one particular one; and I could tell from the photo

15  that it was in that second panel, you know, somewhere in the

16  right side of those raised panels that you see.

17      So I chalked all those areas, trying to find the dent, so

18  I could observe it and confirm it for myself; and what I found

19  was that long, oblong dent that you can kind of see where the

20  arrow is pointing to that is not consistent with hail, more

21  likely caused by some hard object that was accidentally banged

22  into the door.

23  Q.   Okay.  Now, did you find that Ms. Jacome had included this

24  garage door in her payment?

25  A.   She did, yes.

Jon Derek VanDorn                                          72
Continued Direct Examination by Mr. Leffel

1   Q.   Okay.  So you agree with her that this was hail-damaged?

2   A.   No.  I don't.

3   Q.   Okay.  Let's turn over to page 8 where you have an Item 4,

4   and, while you are explaining what you are talking to us about

5   in Item 4, let's go ahead and pull up DX2.116.

6        Okay.  Why did you include this photograph in your report,

7   and what are you -- what are you wanting to tell us about it?

8   A.   Well, this is one of the photos that I took of the area

9   above the garage door on that east-facing gable, and it, you

10  know, shows that there's not any damage to the siding or the

11  paint to it.

12       And -- and, although this photo's far away, I -- I got a

13  ladder and looked up at the light fixture too where I would

14  expect to see denting if large hail had hit it, and it was free

15  of dents.

16  Q.   Okay.  And what did you observe?

17  A.   No hail damage.

18  Q.   And is that an item -- again, are you looking for spatter

19  there?

20  A.   Yes.

21  Q.   Okay.  At page 9 of your report, we've got a -- a

22  close-up, I think, and let's go to DX2.122.

23       What are you showing us there?

24  A.   This is the light fixture that I just mentioned where

25  I'm -- I got on my ladder and looked at it and found that there

Jon Derek VanDorn                                                73
Continued Direct Examination by Mr. Leffel

1  was not any hail denting, nor any spatter to it, because you

2  can see that it's discolored and -- likely from oxidation

3  buildup.

4  Q.    Okay.  Let's take a look at the next photo, which, I

5  believe, is going to be DX2.142.

6      Why do you include a discussion -- well, tell us what this

7  is and why you include it.

8  A.    Sure.  Air-conditioning condensers are always great

9  resources for determining hail.

10     This particular unit was fully encased; so there were not

11 any exposed fins that oftentimes are dented by hail; but,

12 still, it's got value to inspect because it's been shown that

13 2-inch hail will dent these units, and there was no dentings

14 found in this unit.

15 Q.    Okay.  Let's skip over to page 11 of your report, and I

16 think at page 11 we're going to see the photo that we -- we saw

17 previously of the -- of the fence spatter, and that's DX2.190.

18     I got a little ahead of myself.

19     Tell us, again -- well, I mean, again, to confirm, you're

20 just showing that there's -- there's spatter.

21     And did you find that the spatter was of a size that you

22 wouldn't expect to -- to damage the roof?

23 A.    That's correct.

24 Q.    Okay.

25              MR. LEFFEL:  Go ahead and pull that down.

Jon Derek VanDorn                                                74
Continued Direct Examination by Mr. Leffel

1   Q.   (By Mr. Leffel) Let me ask you this:  In your experience,

2   what size hail is necessary to damage a composition shingle?

3   A.   Well, depends on the shingle and the manufacturer.

4   Generally, you would expect this type of shingle to be

5   1.25-inch hail or larger, but we know that the manufacturer

6   made a -- a better, more durable shingle in this case.

7   Q.   Let's say I've got the -- the -- a -- a -- a regular comp

8   shingle.  No -- no impact resistance.  What's the smallest size

9   hail you'd expect that could damage that?

10  A.   Well, for the three-tabs, like this one, it's 1.25-inch.

11  For a laminated shingle, which is not in this matter, it's

12  1.5 inches.

13  Q.   What about roofing metals, like things on vent caps that

14  you see on roofs?

15       What is the -- the smallest diameter of hail that you --

16  where you would start to expect to see damage to those metals?

17  A.   Well, with the vent caps -- like, I know you -- you saw a

18  photo or two of those on Friday.  Those are very soft metals;

19  and, you know, I'm not sure how small the -- the hail is that

20  can dent that, but it's very small, you know, less than half a

21  inch; and so it's easy for those vent caps to accumulate damage

22  that look significant.

23  Q.   Let me ask you this:  If hail, large enough to damage this

24  Class 3 Malarkey shingle, fell on this roof within a year of

25  July 3rd of 2020, what would you have expected to have found on

1   collateral items, such as the wood siding, the light fixtures,

2   and that air-conditioning unit?

3   A.   I would have expected to find dents in some of those items

4   and, certainly, spatter somewhere on the property, more than

5   what I did, which was just the south-facing fence.

6   Q.   Okay.  Let's go ahead and turn to page 13 of your report,

7   and I think, when we get to page 13, not only are we getting

8   near the end of your report, but we're -- we -- we find your

9   conclusions and your opinions.  Am I -- is that what I'm

10  seeing?

11  A.   Yes.

12  Q.   Okay.  Tell us what your first opinion was with respect to

13  this evaluation.

14  A.   Well, it's a pretty short opinion that offers some

15  thoughts on the Aegis Roofing estimate that they produced on

16  March 10th, 2021, in the amount of $18,776; and the majority of

17  that opinion centers on the -- the unnecessary inclusion in

18  their estimate to replace the roof decking, and we've talked

19  about that quite a bit.

20  Q.   Okay.  Let's go ahead and turn to page 15.

21       Do I -- at page 15, do I find your second opinion?

22  A.   Yes.  That's the beginning of my second opinion.

23  Q.   Okay.  You start that one by saying, "State Farm appears

24  to have followed industry standard methods when evaluating the

25  subject property for storm-related damages."

Jon Derek VanDorn                                          76
Continued Direct Examination by Mr. Leffel

1      Tell the jury what you mean when you're talking about

2   industry standard methods.

3   A.   It goes back to what I talked about very early this

4   morning where they inspected all elevations, including the

5   components of those elevations, trying to find the spatter that

6   would be present if the hail was recent, and then inspecting

7   the roof and the soft metals and conducting test squares on all

8   four directional slopes.

9   Q.   Okay.  You then state that, "Based on the inspection's

10  conclusions" -- and -- and just to make sure, you're talking

11  about Ms. Jacome's inspection --

12  A.   Correct.

13  Q.   -- "the estimate reasonably represents the cost to repair

14  the noted damages."

15      And are you referring to Ms. Jacome's estimate?

16  A.   I am, yes.

17  Q.   Okay.  Tell us what you rely upon to support that opinion.

18  A.   Well, the observations I made during my inspection, and so

19  that would include the -- in my opinion, the overpayment of

20  paying for the overhead doors -- or overhead door and the three

21  vent caps that were included in her estimate but, we know, were

22  not replaced from the 2013 roof replacement.

23      And then, you know, like a lot of estimates, there's --

24  these inclusions are overstatements, but an understatement

25  would include the two vent pipe flashings that were not in the

Jon Derek VanDorn                                                    77
Continued Direct Examination by Mr. Leffel

1    original estimate.

2    Q.   I think there was also a mailbox that she identified that

3    was damaged that was -- that was caught later.

4    A.   That's correct.

5    Q.   Okay.  Let's turn to page 16 of your report, and, if you

6    would, I think that --

7            MR. LEFFEL:  If we could put up the DV-1.

8    Q.   (By Mr. Leffel) At page 16 of your report, you have

9    included this photograph.  Please tell the jury -- first of

10   all, there -- there -- there are shingles on this -- on this

11   image, and where did you get the image of those shingles?

12   A.   So this is -- you might -- might be called a "stock photo"

13   from Malarkey's website where they're giving a -- a visual

14   example of what the shingle looks like, including its color.

15   Q.   Okay.  And why did you choose that stock photo?

16   A.   Because it is of the Malarkey Dura-Seal.

17   Q.   Okay.  So then we've got some graphics interposed on that

18   image.  Can you tell us what you're trying to explain to us

19   there?

20   A.   Sure.  So I wanted to discuss -- or to set up for later

21   discussion the dimensions of each tab.

22       So it's probably understood by now there's three tabs per

23   shingle; so this is one of the tabs; and so the -- the

24   horizontal or lower edge of that shingle's 12 inches wide; and

25   the height of that shingle -- or at least its exposure is

Jon Derek VanDorn                                          78
Continued Direct Examination by Mr. Leffel

1   5 5/8 inch; and so, by multiplying those two variables, we find

2   that the total area of the -- of the tab is 66.84 square

3   inches.

4   Q.   Okay.  Looking at your report at page 17 --

5            MR. LEFFEL:  Well, let's -- let's actually go to the

6   DV-2.

7   Q.   (By Mr. Leffel) Okay.  So now we've moved over to the next

8   image that you include in your report.  Tell us what you are

9   doing with your graphics in this photograph.

10  A.   Well, I wanted to establish what the edge of the shingles

11  were and -- and what the surface area of the edge was; and the

12  reason being is because it's been noted that the observations

13  made by Ms. Jacome, my observations, and the documented

14  observations by others that -- representing the Bateses in this

15  case show that the majority of the issues are at the edge of

16  the shingle and that those observations included that as the

17  first half-inch edge of the shingle.

18  Q.   Okay.  Go ahead

19  A.   And so it's establishing the square area or the -- the --

20  the surface area of those edges so that we can discuss the

21  likelihood of hail impacts only at one area of the shingle

22  between these two.

23       So the square area of these edges comes to 11.08 of our

24  previously determined 66 square inches, and then, in turn, the

25  square inches or the surface area of the face of the shingle's

Jon Derek VanDorn                                             79
Continued Direct Examination by Mr. Leffel

1   55.76 square inches.

2   Q.   Okay.  So, right underneath that -- that -- that graphic

3   in your report, you address Item 7 of your second opinion.  I

4   want you to explain to the jury what you -- what you're telling

5   us in Item 7.

6   A.   Okay.  Well, we -- we find, by having those two

7   calculations and the overall surface area, that we can find

8   the -- the percentage of surface area for either the edge or

9   the face; and so, if we divide those numbers, we find that the

10  edge represents 17 percent of the square area of the shingle

11  tab, and the face equals 55.76 square inches or 83 percent of

12  the shingle's face.  So it's a ratio of 83 percent to

13  17 percent.

14  Q.   So that would be your expectation given the randomness of

15  hail.

16  A.   Sure.  Over the documented areas, that -- that should be

17  our breakdown of hail impacts at the faces versus the edges.

18  Q.   Okay.  The next image at page 18 of your report, after

19  those graphics you prepared, is a photo from that 2012 claim.

20          MR. LEFFEL:  And so if we could pull up Defense --

21  I'm sorry -- Joint Exhibit 14.112.

22          How about JX14.112?

23          I apologize if I said that wrong, so...

24          Okay.  Perfect.  Thank you, Ms. Wright.

25  Q.   (By Mr. Leffel) So what are we looking at here in this

Jon Derek VanDorn                                          80
Continued Direct Examination by Mr. Leffel

1    image that was included in your report after that discussion of
2    random hail fall?
3    A.    So this is a photo of -- excuse me -- one of the test
4    squares taken by the adjuster in 2012, and it shows seven
5    identified hail impacts.  Six of those hail impacts are in the
6    face of the shingle while one is at the edge.  So that -- that
7    represents a -- a ratio of 87 -- or I'm sorry -- 80- -- 86 to
8    14, which is really close to our expected result of 87 to 13.
9    Q.    So I think, when you were just doing this without any
10   actual hail data, you said you would expect to see about
11   17 percent at the edges and -- and 87 percent in the field;
12   right?
13   A.    Yeah.  I mixed up some numbers there.
14         So, to be exact, our expected result:  83 to 17.  In this
15   case, it was 86 to 14.
16   Q.    Okay.  And now you've moved on to an actual example of
17   hail fall from this roof, and was that consistent with your
18   expectation?
19   A.    Right.  That's the expected result of random hail fall.
20   Q.    Okay.  Well, when you did that same analysis based on your
21   confirmation of where the blemishes were from the '21 claim,
22   what did it bear out?
23   A.    Well, I evaluated the photos produced by Mr. Marks and --
24   and the consulting engineer that were retained by the Bateses
25   and evaluated only their photos, and they -- they identified

1  62 blemishes within their photography of -- of the -- on these

2  tabs; and, if you evaluate those for whether the blemish was in

3  the face of the shingle or at the edge, you find that

4  26 percent or 16 of those blemishes are at the shingle's face

5  while 74 percent or 46 of the blemishes are at the edge.

6       So it's almost the inverse of what we would expect; so,

7  instead of having a -- a ratio of 83 to 17, we have a ratio of

8  26 to 74, so it's not consistent with the expected results of

9  random hail fall.

10 Q.   So that's 26 percent in the larger area of the -- of

11 the -- of the shingle, the face; and then the remaining, you

12 know, 70 or 80 percent was at the edge?

13 A.   Correct.

14 Q.   I just proved to the jury I can't do math in my head,

15 so...

16      Item Number 10 in your report goes on to say -- talk a

17 little bit about Ms. Jacome's file note from her inspection.

18 Am I reading that correctly?

19 A.   Yes.

20 Q.   And you -- you make a note in here that spatter was not

21 observed to any surfaces, fencing, electrical panel, exterior

22 door.

23      Tell us why, at that point, after the discussion of the

24 hail randomness, you are drawing our attention back to the

25 spatter.

Jon Derek VanDorn                                                82
Continued Direct Examination by Mr. Leffel

1   A.   Well, it's first -- first, it confirms she's aware of the

2   issues to inspect for with a hail inspection.  She looked at

3   these areas at the elevation of the home and found no spatter,

4   which indicates there was no hail present -- or recently

5   present at the subject property.

6   Q.   Okay.  Last page of your report.

7        Everybody gets excited when I say that.

8        So Item Number 11, I think you're telling us a little bit

9   about your review of the process that happened here on

10  Mr. Bates's second inspection request.  Am I -- am I reading

11  that correctly?

12  A.   Yes.

13  Q.   Tell us what your analysis of this found with respect to

14  that second inspection request.

15  A.   Well, reviewing the photos that were -- well, first, State

16  Farm requested that Mr. Marks submit evidence or some sort of

17  documentation that there was additional damage; and Mr. Marks

18  did submit some photos that showed dents to the

19  already-documented soft metals, as well as more photos at the

20  shingles' edges predominantly; and so it really didn't give

21  State Farm anything new that they had not already considered.

22  Q.   Okay.   Item --

23             THE COURT:  Mr. Leffel, how close are you?

24             MR. LEFFEL:  Very close.

25             THE COURT:  Okay.

1          MR. LEFFEL:  Okay?

2   Q.   (By Mr. Leffel) Item 12 in your report is -- is the last

3   point you make on this second opinion that we've been

4   discussing regarding the reasonableness of the evaluation.

5   Tell us what you conclude in your last item.

6   A.   Sure.  So, considering the totality of the evidence,

7   the -- the lack of spatter, the lack of some of the expected

8   collateral damage, and then the -- the unusual presentation of

9   the granular loss, I felt like State Farm thoroughly evaluated

10  and their evaluation was reasonable and even expected for the

11  totality of the evidence.

12  Q.   Okay.  You heard Mr. Marks -- and I think I asked you this

13  briefly earlier, but you remember him saying -- Mr. Marks

14  testified that every blemish on this roof was hail.

15  A.   I do.

16  Q.   Do you agree?

17  A.   I do not.

18  Q.   He went on to say that no person looking at this roof

19  could reasonably conclude that the damage to this roof was

20  caused by wear.

21          Do you agree with that opinion?

22  A.   I do not.

23  Q.   Okay.  When you look at this roof and this property, all

24  the collateral, all the things that go into doing a thorough

25  investigation, what story does this property tell you about

1   what has occurred at that property?

2   A.   Well, that there hasn't -- not been very large hail there,

3   at least recently, and that there is a condition on the roof

4   that is not consistent with hail damage.  That's more likely

5   and -- related to wear and tear and the aging of the roof.

6   Q.   Okay.

7            MR. LEFFEL:  Just a quick moment.

8        Your Honor, I will pass the witness at this time.

9            THE COURT:  Okay.  We are going to go ahead and take

10  our morning recess.  I understand that at least one juror needs

11  to use the restroom, and I am right there with you, so I'd

12  imagine that there are others here in the courtroom as well.

13       During this morning recess, do not talk with any witness,

14  with any person or party seated at counsel tables, with any of

15  the lawyers or their staff, with anyone in the courtroom

16  observing, or with anyone else.

17       Also, do not talk about the trial with anyone else.  This

18  includes communicating by electronic means, such as emails,

19  texts, and social media postings, or any other means.

20       Do not attempt to gather any information relating to the

21  case on your own or visit any places mentioned in the case.

22       Do not attempt to do any research on the Internet.

23       Avoid reading or listening to any reports about the case

24  that may be in the media.

25       Do not discuss the case, even among yourselves, until the

Jon Derek VanDorn                                                    85
Continued Direct Examination by Mr. Leffel

1    end of the trial when I have instructed you on the law, and you

2    have gone into the jury room for your deliberations.

3        Keep your minds free and open and do not form an opinion

4    one way or the other until the case is submitted to you, and

5    you retire to consider your verdict.

6        This instruction will apply during every recess throughout

7    the trial.

8        This also governs those in the courtroom whether

9    participating in the trial or observing.  You are not to speak

10   to the jurors.

11       Let's take a -- actually, let's go off the record.

12               (Discussion off the record.)

13               THE COURT:  We will take a 15-minute recess, and

14   Nyssa will take you to our room up here on the fifth floor.

15       Counsel, anything before we recess the jurors?

16               MR. MILLER:  No.

17               MR. LEFFEL:  No, Your Honor.

18               THE COURT:  Okay.  The court is in recess.

19       (Jury exits.)

20               THE COURT:  Mr. VanDorn, you may step down and then

21   just -- when we start back with the jury in 15 minutes, just

22   please retake your seat.

23               THE WITNESS:  Okay.

24               THE COURT:  Counsel, anything before we take our

25   morning recess?

Jon Derek VanDorn                                         86
Cross-examination by Mr. Miller

1          MR. MILLER:  No.

2          MR. LEFFEL:  No, Your Honor.

3          THE COURT:  Okay.  Thank you.

4      We are on recess.

5      (A recess is taken.)

6      (Jury enters.)

7          THE COURT:  Mr. Miller, you may proceed with your

8  cross-examination.

9          MR. MILLER:  Thank you, Judge.

10                      CROSS-EXAMINATION

11  BY MR. MILLER:

12  Q.  You ready to go, Mr. VanDorn?

13  A.  Yes, sir.

14  Q.  Now, I think I heard you -- maybe the last thing I wrote

15  down that you said earlier:  that State Farm asked Mr. Marks to

16  send them something?

17      Did you mean to say that?

18  A.  I believe so, yes.

19  Q.  Well, now, where is it that -- in the claim file that

20  you've seen -- or anywhere -- that Mr. Marks was asked to send

21  something?

22  A.  I just recall it being the activity log -- is where I

23  would estimate it is.

24  Q.  So you think in the -- which is like a six-page -- claim

25  notes; right?

Jon Derek VanDorn                                          87
Cross-examination by Mr. Miller

1   A.   Yes.

2   Q.   In other words, it's the -- we've seen it a lot.  The

3   supervisors, they write in red, and the -- everybody else

4   writes in black letters.

5        That thing?

6   A.   Yes.

7   Q.   And it'll have, at the top, the -- the -- the last thing

8   done on the claim, and then it works it's way down to the first

9   thing done in the claim; right?

10  A.   Yes.

11  Q.   And, if I hear you right, you're telling us that your

12  review of those claim notes -- some adjuster or somebody at

13  State Farm who had access to make the notes -- you're telling

14  us that they asked Mr. Marks specifically for some information.

15  A.   Well, from my recollection, that, at some point, it was

16  asked of him, which is -- is common for this type of

17  involvement.

18  Q.   I'm not asking about common; I'm asking in this case.

19       What is it he was asked to do in those claim notes?

20  A.   Well, I recall that he was asked to submit additional

21  documentation that would support the need for a second

22  inspection.

23  Q.   Now, who was it that was asking him that?

24  A.   I don't recall.

25  Q.   Well, when was it?

Jon Derek VanDorn                                                88
Cross-examination by Mr. Miller

1   A.   I don't recall.

2   Q.   Well, how many times did someone at State Farm talk to

3   Mr. Marks?

4   A.   I don't know.

5   Q.   Well, would this have been at the same time that he was up

6   on the roof the very first time with Jacome or some other time?

7   A.   I can't tell you.  I'm sorry.

8   Q.   Well, if the claim notes don't show that, you'll stand

9   corrected.

10   A.   Yes, sir.

11   Q.   So, if the only time the claim notes show that anybody

12   ever had anything to do with Mr. Marks was when he met

13   Ms. Jacome out at the roof on 2-23, February 23, of '21 -- if

14   that's what they show, that's what they mean.  Fair enough?

15   A.   I believe so, yes.

16   Q.   And -- and, specifically, after he sent his March 15th,

17   2021, request for a reinspection to the agent -- that.  Yeah.

18   That one -- that got into the claim file, didn't it?

19   A.   Yes, sir.

20   Q.   Now, you -- you mention -- or you -- you kind of adopted

21   what counsel said several times about there being 20 pictures.

22        How many pictures did Mr. Marks send to the agent?

23   A.   I believe 20 were sent to the agent.

24   Q.   Did you ever count the JPEGs that were attached on the --

25   in the attachment line on the email?

Jon Derek VanDorn                                                89
Cross-examination by Mr. Miller

1   A.   No, sir.

2   Q.   You didn't?

3   A.   Not that I recall.

4   Q.   Did you ever compare the pictures that are an exhibit in

5   this case that were sent to Shari Bivins, the agent, with the

6   pictures that ended up in the State Farm claim file?

7   A.   I -- I reviewed the pictures that were in the State Farm

8   claim file, and I reviewed all of Jonathan Marks's photos.

9   Q.   Sir, sir, I'm asking a different question.

10  A.   Sure.

11  Q.   We have an email that's printed off from Shari Bivins's

12  computer -- I believe -- one moment.

13       Hopefully, I'll be able to show you this quickly.

14       We're calling it "JX" -- it's a joint exhibit; and it's

15  Joint Exhibit 26; and you can see there, can't you, that this

16  is printed from Ms. Bivins's computer because it's got her name

17  in the upper left-hand corner; right?

18  A.   Yes, sir.

19  Q.   Okay.  Now, you see all those attachments that are called

20  "JPEGs"?

21  A.   Yes.

22  Q.   You know enough about all this to know that means that's a

23  picture, don't you?

24  A.   I do, yes, sir.

25  Q.   All right.  Now, I want to make sure we're square.

Jon Derek VanDorn                                    90
Cross-examination by Mr. Miller

1        You've never actually counted that and looked at this

2   particular email about how many pictures were sent to

3   Ms. Bivins, or have you?

4   A.   No.  You're right.  I have not.

5   Q.   So you've never seen this?

6   A.   I've seen this email, yes, but I didn't count the number

7   of JPEGs attachments.

8   Q.   Oh, I'm sorry.  I asked you a compound question.

9   A.   I'm sorry.

10  Q.   Did you ever see the email that Shari Bivins printed off?

11  A.   Yes.  I've seen this email.

12  Q.   Don't -- now, answer my question.

13  A.   Okay.

14  Q.   This is the one that Shari Bivins printed off and gave all

15  of us in discovery.

16       Did you ever see this particular email that Mr. Marks sent

17  to her before she forwarded it to State Farm's claims

18  department?

19  A.   Well, I've seen an email with blue font that Mr. Marks had

20  typed in.  That's the email I'm referring to.

21  Q.   You bet.

22       And that's -- this -- this one has that --

23  A.   Okay.

24  Q.   -- doesn't it?

25       We can see the whole email there.

1          It's got blue font; right?

2     A.    Yes.

3     Q.    Because that's what he sent to Shari Bivins; right?

4     A.    Okay.

5     Q.    Did you recognize or ever even ask a question about why it

6     was that there were more pictures sent to Shari Bivins than

7     sent -- than received or at least in the State Farm claim file?

8     A.    No, sir.

9     Q.    So there's 25 -- I'll let the jury confirm this, but we've

10    already got evidence there's actually 25 pictures attached to

11    the Shari Bivins printed-off email that she was supposed to

12    forward to State Farm.  Did you know that?

13    A.    I did not.

14    Q.    Well, he keeps talking about 20.  You're talking about the

15    ones in the claim file.

16    A.    Yes, sir.

17    Q.    So, as we sit here right now, you're flat-footed on

18    knowing what in the world the other 5 pictures are, aren't you?

19    A.    Well, I've reviewed the other 5 pictures, if they were all

20    produced; but, as -- as to what was attached to this email,

21    I -- if there are additionals, I'm not aware of what they are.

22    Q.    When you say you've reviewed the other pictures, the 5, if

23    they were produced...

24    A.    Well, I've reviewed every photo produced by Mr. Marks.

25    Q.    Well, how do you know that you've got the 5 that were sent

Jon Derek VanDorn                                               92
Cross-examination by Mr. Miller

1    to Ms. Bivins if all you looked at was the claim file?

2    A.   Well, I didn't only look at the claim file.  I -- I looked

3    at the photos produced by Mr. Marks under subpoena.

4    Q.   Okay.  So can you sort out which 5 didn't make it to the

5    claim file --

6    A.   No, sir.

7    Q.   -- since you

8    A.   I'm sorry.  I cannot.

9    Q.   You reviewed them all.

10        Did you ever make a comparison of what was in the claim

11   file versus what Mr. Marks had to give up because State Farm

12   subpoenaed him?

13   A.   No.  I didn't cross-reference those.

14   Q.   All right.  Now, you do recognize that it's not

15   Mr. Marks's duty to help State Farm make -- fulfill their duty

16   to the insured.  Fair?

17   A.   Well, I understand there's a process, and it -- and it

18   requires exchange of information, and it's common to

19   restoration contractors because I've participated in that

20   process.

21   Q.   You bet.

22        But State Farm has their own duty to the insured.  Fair?

23   A.   I think to a degree, yes.  That's fair.  I'm --

24   Q.   Okay.  Did -- did State Farm ever pay to repair even a

25   single shingle on this roof?

Jon Derek VanDorn                                          93
Cross-examination by Mr. Miller

1  A.   No.  They did not.

2  Q.   And this $500 minimum charge that you're mentioning --

3  I -- I'm kind of curious -- why would you bring that up if none

4  of the damage that you've shown us and talked about today was

5  hail damage?

6  A.   Well, I'm aware of at least one shingle that I believe is

7  hail-damaged.

8  Q.   Oh, I didn't hear you say that.

9       Did you cover that in your direct examination?

10  A.   No.  It was not asked of me.

11  Q.   I see.

12       Now, also, you -- you commented on the resistance capacity

13  or capability of a shingle based on its class rating.  Remember

14  talking about that some?

15  A.   Yes, sir.

16  Q.   And you explained to us that the size of the shingle --

17  I'm sorry -- the size of the hail kind of goes up with the

18  class.  I mean, it's a direct correlation.  Class 4's supposed

19  to be resistant to the biggest shingle -- hail.

20  A.   Or to at least 2.0, correct.

21  Q.   Yeah.  Yeah.

22       And -- and, by "resistant" -- I think you even one time

23  kind of said that it will be resistant to most, if not all;

24  right?

25  A.   Right.  At 2.0, yes.

Jon Derek VanDorn                                              94
Cross-examination by Mr. Miller

1   Q.   Well -- or even -- any of them.

2        Whatever the resistance capacity is according to the

3   shingle manufacturer -- manufacturer, their resistance capacity

4   is not absolute; right?

5   A.   Right.  They achieve a level under testing that it is.

6   Q.   It is absolute?

7        Is that on the day that the shingle's brand new?

8   A.   It's the day it's tested, yes.

9   Q.   The day it's brand new?

10  A.   Well, the day it's presented for a testing.  I don't -- I

11  don't know if it came off a roof or if it came off a assembly

12  line, but --

13  Q.   Whoa.  Whoa.  Whoa.

14       You -- are you saying that an eight-year-old shingle

15  that's been on a roof for all that time is going to have the

16  same resistance capacity for the same size hail as a brand-new

17  shingle?

18  A.   Yes.  I expect it to, yes.

19  Q.   So a 25-year-old shingle that's reached the end of its

20  25-year life, you believe it'll have the same resistance

21  capacity as a brand-new one.

22  A.   If the granular loss is extensive, then, no.  It won't

23  have that protection.

24  Q.   I see.

25       So the more granular loss -- I'm not going to say that

Jon Derek VanDorn                                                    95
Cross-examination by Mr. Miller

1  right all day --

2  A.   Yeah.

3  Q.   -- but the more the -- the granules are gone over time,

4  the -- the reduction correspondingly in the shingle's ability

5  to withstand whatever its resistant capacity is.   Fair?

6  A.   I believe at some point well beyond eight years a shingle

7  becomes more susceptible to hail damage.

8  Q.   Well, now, where are you relying on the information that

9  you just spoke of when it comes to the Malarkey shingle?

10  A.   Well, I'm aware of scientific studies that have been

11  conducted that -- that address a large volume of -- of rooves.

12  Q.   Sir, where have you ever studied the Malarkey shingle --

13  about its resistance capacity after eight years?

14  A.   I'm not aware that that's been tested, but we know that

15  Malarkey is a -- a durable shingle compared to others, so I

16  don't doubt its resistance.

17  Q.   I see.

18      All right.  Let's -- now, once and for all, let's --

19  because, obviously, some of this is common sense.

20      So you are agreeing that a 25-year shingle that's now in

21  its 25th year, if it's wore and tore like a normal 25-year

22  process, it's going to lose granules.  Fair?

23  A.   Yes.

24  Q.   And, with all the loss of granules, whatever that is on

25  the given day that the hail comes down, it's going to affect

Jon Derek VanDorn                                          96
Cross-examination by Mr. Miller

1   its resistance capacity as it was rated when it was brand new.

2   Fair?

3   A.    If it has significant granular loss -- granule loss that's

4   been -- caused exposure to the roof mat.

5   Q.    Okay.  Now, I notice that you did not write an estimate on

6   this roof, did you?

7   A.    I did not.

8   Q.    And -- and, specifically, you never wrote an estimate

9   about what the depreciation would be on this roof, did you?

10  A.    I did not.

11  Q.    You also did not ever give us a replacement cost value for

12  this roof; right?

13  A.    Right.  I believe the Aegis estimate is reasonable, absent

14  the decking and the overhead door.

15  Q.    Now, does that mean that you did not do one because you

16  had the Aegis estimate, or were you not asked to do one?

17  A.    Well, I don't specifically recall being asked for one, but

18  I believe my conclusion would be to discuss the Aegis Roofing

19  in that way.

20  Q.    And the Aegis Roofing estimate that you talked about in

21  your direct was the one from 2021, I believe.

22        Did you look at the one from 2022 that took into account

23  the additional expenses with passage of time?

24  A.    No.  I don't recall seeing that.

25  Q.    You've not seen that?

1  A.   No, sir.

2  Q.   Oh.

3       Now, what I want to know at the end of the day is did you,

4  at any time, make any effort under Xactimate -- I believe you

5  consider yourself well versed in Xactimate -- to run an

6  Xactimate to determine what the expense would be at any given

7  day to replace this roof?

8  A.   I did not, no.

9  Q.   Did you insert the years -- the value in years for

10 depreciation that Xactimate includes in their program to see

11 what the depreciation percentage would be for this roof?

12 A.   No.  I did not run an estimate and add depreciation to it.

13 Q.   All right.  Back in March -- May -- let's see -- March and

14 April -- March and April of 2021, did you know this matter

15 existed?

16 A.   No.

17 Q.   March and April of 2021, I take it, that you hadn't got

18 any messages from State Farm to go out and take a look at this

19 roof or anything like that.

20 A.   No.

21 Q.   Your involvement is a year later; right?

22 A.   Approximately January '22, yes.

23 Q.   Well, your inspection was in March, I think you told us;

24 correct?

25 A.   Correct.

Jon Derek VanDorn                                                    98
Cross-examination by Mr. Miller

1   Q.   So the inspection was a full year and a few days after

2   Ms. Jacome was on the roof.  Fair?

3   A.   Yes, sir.

4   Q.   Now, you also talked about manufacturing defect.  You

5   remember talking about that as something that might have

6   something to do with at least one of the blemishes that you

7   pointed out in the -- in the pictures --

8   A.   Yes.

9   Q.   -- your pictures?

10          MR. MILLER:  If we could put up JX13.6, please.

11  Q.   (By Mr. Miller) Now, here, State Farm, in their

12  brochure -- you know this brochure, don't you?

13  A.   Well, I've seen pictures of it during this matter.

14  Q.   Okay.  But State Farm gives one example of a photograph of

15  what they call "manufacturing defects."  You know that to be

16  true, don't you?

17  A.   Well, I read this picture -- that it says that, yes.

18  Q.   Well, I'm saying, in the -- in the whole brochure, there's

19  just one picture that they call an example of manufacturing

20  defects.

21  A.   I see.

22  Q.   Is that true?

23  A.   I don't know.

24  Q.   You're not sure.

25          Well, we'll have the -- they'll have the brochure for

Jon Derek VanDorn                                              99
Cross-examination by Mr. Miller

1    sure.

2         But, here, we have a manufacturing defect that's

3    identified by State Farm; and -- and, from your review of this

4    picture and your expertise in the field, tell us:  What is the

5    manifestation of the manufacturing defect here?

6    A.   Seems to be a long narrow line from top to bottom that has

7    showed concentration granular loss.

8    Q.   So you're talking about the black areas on the shingles;

9    right?

10   A.   Yes.

11   Q.   Consistently across these shingles, at least some of them;

12   right?

13   A.   Right.

14   Q.   And it seems to be, at least in the two we can see, the

15   ones that have the red marks on the -- on the -- kind of

16   running parallel with the defect at the top.

17   A.   Okay.  Yes.

18   Q.   Agree?

19        Now, in other words, this is a place where, because the

20   manufacturer had a problem in their production, over time, the

21   wear patterns are similar, and they are in the same place on

22   the same tabs.

23   A.   Yes.

24   Q.   And that would be consistent with a manufacturing defect.

25   A.   Sure.  That's one type of manufacturing defect.

Jon Derek VanDorn                                                      100
Cross-examination by Mr. Miller

1    Q.   Okay.  Very good.

2         Now, you talked a lot about spatter, but I -- one of the

3    things I remember you saying about spatter was that somewhere

4    around a year or two is when you can expect spatter to fade

5    away --

6    A.   Right.

7    Q.   -- right?

8         And, of course, I'm assuming that doesn't just happen

9    overnight, does it?

10   A.   Sure.  It would fade.

11   Q.   Yeah.

12        So the spatter's not going to drop off at a year or two

13   years and say, "I'm gone now.  Turn the light off."

14   A.   Correct.

15   Q.   All right.  So, instead, what we know is that, depending

16   on the circumstances, right, and the material, the spatter's

17   going to change in its longevity.  Would you agree with that?

18   A.   Yes.

19   Q.   Spatter to wood, a fence, might look differently over time

20   than spatter to metal.  Fair?

21   A.   It's possible.  Yes.

22   Q.   Sure.

23        And -- and, in this particular case, you were not on the

24   roof until a full year after Jacome; right?

25   A.   Correct.

Jon Derek VanDorn                                                101
Cross-examination by Mr. Miller

1    Q.   And the date of loss that has been identified, did you

2    know that was identified by Jacome?

3    A.   I don't recall that specifically, no.

4    Q.   Okay.  Well, did you read her deposition?

5    A.   I did.

6    Q.   I mean, you've got to read all the depositions, haven't

7    you?

8    A.   I don't know about all, but I've read a few, yes.

9    Q.   Well, in any event, Ms. Jacome apparently went through the

10   same process as Mr. Marks -- both did correlatively together,

11   unknowing -- unknowing it, that one did -- that one did it, and

12   the other did it, but -- to identify this July 3rd, 2020, as

13   the most likely day of loss for this roof; correct?

14   A.   Yes.

15   Q.   And that process is not unusual in the business.  People

16   don't always know when their roof gets hurt by hail; right?

17   A.   I believe that's true, that it's common to refer to the

18   weather report to determine when it might have happened.

19   Q.   Sure.

20        And the point I'm making, though, is that it's often the

21   case that the homeowner, especially in a rental property, may

22   have no idea when the hail fell that has caused the concern.

23   A.   Especially of a rental property.

24   Q.   You bet.

25        Because they don't live there; right?

Jon Derek VanDorn                                          102
Cross-examination by Mr. Miller

1   A.   Yes.

2   Q.   Okay.  But we know that -- because you have looked at

3   AccuWeather since your deposition.  You told us you did; right?

4   A.   Right.

5   Q.   You hadn't looked at it before; right?

6   A.   I don't recall.

7   Q.   You didn't consider it at all.

8   A.   I don't recall.  Sorry.

9   Q.   You don't remember.

10       Well, we'll come back around to that in a minute.

11       But what -- what I -- what I heard you say was there's --

12   there was a 1.75-inch hailstorm attributed to the date of loss

13   in this case; right?

14   A.   Well, I understand there was the potential for 1.75-inch

15   hail in July of 2020.

16   Q.   Right.

17       In other words -- and you made it clear that that's

18   atmospheric measurements.

19       I mean, no one's actually looking at one in their hand,

20   are they?

21   A.   Right.

22   Q.   This is all based on weather data that State Farm, by the

23   way, completely ascribes to because it -- they have adopted

24   AccuWeather as their go-to weather service; right?

25   A.   I understand they refer to it as -- as possible evidence

Jon Derek VanDorn                                              103
Cross-examination by Mr. Miller

1  in their investigations.

2  Q.   Well, do you know, in their -- from what you've seen in

3  this case, that State Farm literally selected AccuWeather to be

4  the one that adjusters are to use when they want to see

5  something regards hail size?

6  A.   I'm not aware of their business decisions as I -- but I --

7  I've seen the AccuWeather report in this case.

8  Q.   It was in the claim file; right?

9  A.   Right.

10  Q.   Mr. Marks didn't send it, did he?

11  A.   I don't recall.

12  Q.   Well, all right.  In any event, the one thing about the

13  AccuWeather, I think everyone seems to agree, is it shows

14  the -- the size of hail in the atmosphere in its given area.

15  That's it; right?

16  A.   Right.

17  Q.   That doesn't mean that -- that's all the hail that was

18  there; right?

19  A.   Doesn't mean there's all or any hail there, yes.

20  Q.   Fair enough.

21       And it doesn't mean that it was that size particularly, if

22  there was some there.  Fair?

23  A.   The maximum size would have been that and smaller.

24  Q.   Well, except that AccuWeather involves weather radar

25  measurements.  It has nothing to do with human beings with tape

Jon Derek VanDorn                                                    104
Cross-examination by Mr. Miller

1    measures, does it?

2    A.    Right.  Spatter on the ground.

3    Q.    Right.

4          In any event, the spatter that you were trying to tell us

5    about, if you could have observed any, would have had to have

6    been 20 months after the July -- more or less, after the

7    July 2020 date of loss that Ms. Jacome attributed to this

8    incident; right?

9    A.    Sure, from my -- from my inspection, but I also considered

10   the file documentation.

11   Q.    You bet.

12         Do you have any idea what experience on February 23rd of

13   2021 that Ms. Jacome had in investigating a hail claim?

14   A.    Not specifically, no.

15   Q.    Well, generally?

16         Do you have any general idea about that?

17   A.    I don't remember the numbers, but I understood from her

18   deposition that she was fairly new.

19   Q.    Fairly new?

20         Did she not admit in her deposition that you read that she

21   had never been shown what it felt like or looked like to see

22   hail damage on a roof?

23   A.    Sir, I don't recall reading that.

24   Q.    Well, you skipped over that.

25         Well, did you talk about it with counsel?

1    A.    No.

2    Q.    You mean in all your run-up to preparing for this, in all

3    the time that you've charged this company at your 295 rate,

4    y'all never visited about the inexperience of Tresa Jacome?

5    A.    Well, that's less relevant than the observations I made

6    during my inspection and what the actual collateral damage and

7    body of evidence says.

8    Q.    Well, unless -- unless it would help to know what you're

9    looking for so that you could identify what to take pictures

10   of; right?

11   A.    No.

12   Q.    Do you think it's -- no?

13        Okay.   How about this:   Do you think it's ever okay for a

14   claims investigator or a inspector who's been hired by a claims

15   company, insurance company, to show up and just take pictures

16   of the things that support their version or defense?

17   A.    Well, I can say, in reviewing my documentation, including

18   my photographs, that they're consistent with the photographs

19   taken by the consulting engineer for -- representing Mr. Bates

20   and Jonathan Marks, so -- and for State Farm.   So they're all

21   consistent, and so there -- there wasn't any prejudice or a

22   direction to look for only a certain type of -- of blemish on

23   the roof, and I think that's exhibited in my report, when we

24   discussed it earlier.

25   Q.    Yeah.

Jon Derek VanDorn                                                    106
Cross-examination by Mr. Miller

1       That's not what I asked you, is it?

2       You remember what I asked you?

3   A.   Please repeat it.

4   Q.   Okay.  Do you think it would be appropriate for any of --

5   investigator of hail damage -- I don't care who hired them --

6   but particularly an insurance company to decide that they're

7   going to take pictures of just what supports their conclusion?

8   A.   No.  I don't think that would be appropriate.

9   Q.   When Mr. Marks and Mr. Swain were out there taking their

10  pictures, according to what you saw in the claim file, was

11  there anything to indicate that they had a clue that State Farm

12  was going to try to deny this with someone like you at this

13  late date, saying that the hail is all at the edges or the

14  marks are all at the edges and nowhere else?

15      Would they have had any way to know that that was being

16  done?

17           MR. LEFFEL:  Objection.  Calls for speculation.

18  A.   Yeah.  I don't know what --

19           THE COURT:  Hold on -- hold on, Mr. VanDorn.

20           THE WITNESS:  Oh, I'm sorry.

21           THE COURT:  It was cumulative.  You may reask that

22  question.

23           MR. MILLER:  All right, Judge.

24           THE COURT:  So I'm overruling the objection, but it

25  was cumulative, and so I'm -- I'm clear on the question.

1           MR. MILLER:  Gotcha.

2    Q.   (By Mr. Miller) Mr. Marks was out there taking the

3    pictures I think the day before he sent them by email to

4    Ms. Bivins.  Do you remember that?

5    A.   I remember him being out --

6    Q.   Yeah --

7           And you --

8    A.   -- to take pictures.

9    Q.   You saw the -- the pictures that he had in his -- in the

10   documents that he was subpoenaed to produce.

11          I think it was around March 9th that he was out there

12   marking up the roof and taking the pictures.  Does that sound

13   right?

14   A.   Yes.

15   Q.   At the time that he was out there on March 9th of 2021,

16   did he have any information from anything you can see in the

17   claim file that the people at State Farm were going to try to

18   call this another example of edge blemishes?

19   A.   Well, I think that Mr. Marks has similar training to -- to

20   what I would do; and I would expect him to evaluate the roof in

21   the same way that I did; and that's to document any type of

22   damage, whether it's at the edge and the face; and that's not

23   what he -- well, he took photos of what he thought were

24   blemishes, and they were predominantly at the edge.

25   Q.   Well, he took plenty of pictures of things in what you

Jon Derek VanDorn                                                    108
Cross-examination by Mr. Miller

1    call "the face," didn't he?

2    A.    Well, the -- between he and Mr. Swain, it was 74/26, ratio

3    something like that.

4    Q.    Well, yeah.  That's what you say, but let's talk about

5    what my question was --

6    A.    Okay.

7    Q.    -- right?

8          Back to my question.  Would Mr. Marks have had any idea on

9    March the 9th of 2021 that he needed to go find a bunch of

10   blemishes on the face of the shingles so that he could send

11   them to State Farm and counter this whole -- this hail

12   damage -- I'm sorry -- these blemish -- so-called "blemishes

13   are on the edge only"?

14              MR. LEFFEL:  Objection.  Cumulative.  Speculation.

15              THE COURT:  Overruled.

16   A.    I don't know what he would know.

17   Q.    (By Mr. Miller) Well, you looked at the claim file.

18         Did you see anything outside the claim file that would

19   have told you what was in the mind of these people at State

20   Farm, like Jacqueline Draper, in denying this claim?

21   A.    Well, I know they mentioned wear and tear to the roof,

22   yes.

23   Q.    Well, they mentioned wear and tear to the roof on March

24   15th, after he submitted his pictures; right?

25         Is that right?

Jon Derek VanDorn                                                    109
Cross-examination by Mr. Miller

1   A.   I seem to recall, from Ms. Jacome's original inspection

2   notes --

3   Q.   Oh, no.  I know that.  I'm talking about what Mr. Marks

4   can see.

5   A.   Okay.

6   Q.   Oh, yeah.  Inside the bowels and the -- the cloistered

7   area of State Farm, you would have known that this is another

8   one of those, "We're going to call this 'edge wear and tear'";

9   but I'm talking about, outside in the world, how would

10  Mr. Marks know that, from anything you saw, when he was on the

11  roof on March 9th, taking pictures of what he said was obvious

12  hail from stem to stern?

13  A.   I just think he would document the damage that existed,

14  and he would document random damage that was -- that was

15  distributed across the entire shingle, and that's not what he

16  did.

17  Q.   Well, that's what -- that's what you say.

18       But, yeah.  He would do what you're supposed to do.  He

19  would look across the roof and find random examples of the

20  hail; right?

21  A.   That's what I would expect.

22  Q.   Yeah.

23       What I'm asking you specifically -- and I don't know why

24  you're having trouble with it.  Maybe it's my question.

25       I just want to know do you know of any information that

Jon Derek VanDorn                                          110
Cross-examination by Mr. Miller

1   Mr. Marks would have known that State Farm was going to target

2   this as another example of what they call "edge wear and tear"

3   on March the 9th, 2021?

4   A.   I don't know of any information he would know.

5   Q.   All right.  Thank you.

6        Now, you kind of mentioned that you used to know Jonathan

7   Marks at State Farm; right?

8   A.   Yes, sir.

9   Q.   And, actually, you were on his team, right, for a while?

10  A.   That's right.

11  Q.   And he was your team manager, I think you said, for about

12  a year.

13  A.   Right.

14  Q.   But you knew him in other contexts around because it was

15  a -- more of a -- oh, it was just a little bit closer-knit

16  deal.  Not everybody was working out of their houses back then,

17  were they?

18  A.   Sure.  It would -- everybody was officed, and, even if we

19  were in different offices, we -- we knew each other.

20  Q.   Yeah.  Yeah.

21       And -- and that is where you got your experience, from the

22  adjusting side at least, on hail investigation, and that's all

23  at State Farm; correct?

24  A.   Yes, sir.

25  Q.   Now, that -- that team that you were on that Mr. Marks was

Jon Derek VanDorn                                                    111
Cross-examination by Mr. Miller

1   the manager of, it was a -- it was just like these proximity

2   teams now in the sense that part of their -- big part of their

3   job -- biggest part was investigating storm damage; right?

4   A.   Well, I don't know about the biggest part, but, yeah.

5   Storm damage is a big part of first-party insurance claims.

6   Q.   Sure.

7        Okay.  But that's what you did a lot with -- under his

8   management, was look at hailstorm claims; right?

9   A.   I can't say that for certain because it -- at some point,

10  I was a large-and-complex-loss adjuster, and I don't know if

11  that was under the supervision of Jonathan Marks or not.

12  Q.   Well, I was trying to ask you if, when you were under his

13  supervision, you were doing storm claims.

14  A.   At some point in my career with State Farm, yes.  I

15  handled storm claims.

16  Q.   And under his supervision.  "Yes" or "no."

17  A.   I don't know.

18  Q.   Okay.  In any event, it was kind of a family-size unit, I

19  think.  He was the team manager, but there'd be five or six

20  adjusters like yourself working with each other on these

21  claims.  Fair?

22  A.   Yes, sir.

23  Q.   And you got along well with Jonathan Marks and his partner

24  in the -- Aegis, Eric Ingram.  True?

25  A.   True.

Jon Derek VanDorn                                              112
Cross-examination by Mr. Miller

 1  Q.   As a matter of fact, you know nothing -- never have.  Not

 2  now; not then -- that would indicate in any way a question of

 3  Mr. Marks's character; right?

 4  A.   That's correct.

 5  Q.   And absolutely nothing to indicate he would ever have a --

 6  tell an untruth.

 7  A.   Right.  I think the issue in this case is we just have

 8  differing opinions.

 9  Q.   So I wish you'd just answer my questions, but I -- if you

10  keep doing it, I'll just keep the -- the question, and -- and

11  I'm sure everybody will be real pleased with that.  Okay?

12       Now, in other words, you have no indication from anything

13  you've ever known, including to this day, that he has any --

14  there's any question about his veracity or truthfulness.  True?

15  A.   True.

16  Q.   Now, you had, on the other hand, no experience and have no

17  knowledge of Tresa Jacome, do you?

18  A.   That's correct.

19  Q.   Or Sharon Arnold; correct?

20  A.   Correct.

21  Q.   Or Jacqueline Draper.

22  A.   Right.

23  Q.   Now, you had mentioned -- actually, this might help you --

24  I don't know -- but you had worked hundreds of hail claims with

25  State Farm, generally; right?

Jon Derek VanDorn                                                    113
Cross-examination by Mr. Miller

1  A.   I think that's fair.

2  Q.   And now you work with Mike Berryman's outfit; right?

3  A.   Correct.

4  Q.   And I want to be sure everyone knows what that is.  That's

5  a -- when you say "a consulting firm," that's, basically,

6  people who are either in litigation or contemplating some sort

7  of litigation; correct?

8  A.   For the most part, yes.

9  Q.   You bet.

10      And, I mean, there's not a general-contracting thing

11  happening there, at least not that involves you.

12  A.   Not that I'm involved in.  You're right.

13  Q.   And has it generally been, your five years there -- you've

14  been working in getting yourself ready to be, like you are

15  today, this litigation consultant?

16      True?

17  A.   Generally, yes.  That's true.

18  Q.   All right.  So, in a -- in essence, your living,

19  completely and totally, is earned by being a paid witness;

20  correct?

21  A.   And consultant, yes.

22  Q.   Sure.

23      Okay.  Now, at the time of the deposition that you and I

24  sat for on June 28th of 2022 -- that sound right?

25  A.   Yes, sir.

Jon Derek VanDorn                                              114
Cross-examination by Mr. Miller

1  Q.   And you got it right there in front of you, if you need

2  it.  Okay?

3  A.   Okay.  Thanks.

4  Q.   But, at that time, you had estimated that, before the

5  month of June, you had put in about 20 hours on this case.

6       That was a estimate; right?

7  A.   Right.

8  Q.   Which would put you at around six grand before you get to

9  June.

10 A.   Okay.

11 Q.   Is that --

12 A.   Yeah.  That sounds right --

13 Q.   Yeah.

14 A.   -- yes, sir.

15 Q.   And I'm just doing 295 -- I rounded up --

16 A.   Sure.

17 Q.   -- okay, to 300 -- times 20 hours.  Six grand; right?

18 A.   Yes.

19 Q.   And then I asked you how much time you had in the month of

20 June, because you'd rewritten your report; right?

21 A.   Right.

22 Q.   In fact, you -- you signed off on your new amended report

23 on Sunday, June the 26th, two days before I was deposing you;

24 right?

25 A.   Yes.

Jon Derek VanDorn                                        115
Cross-examination by Mr. Miller

1   Q.   And so -- by the way, is there overtime pay for weekends?

2   A.   There is not.

3   Q.   But your estimate was around another 15 to 20 more hours

4   in June of 2022; right?

5   A.   Yes.

6   Q.   Now, by the way, did you ever go ahead and bill them for

7   June so we could know exactly how much you charged hourwise?

8   A.   I'm sure our company did, yes.

9   Q.   Well, what -- what do you think you worked in June that

10  you got paid for State -- by State Farm for?

11  A.   I'm sorry.  I don't know, other than the estimate would be

12  reasonable.

13  Q.   Well, at the time I had -- was deposing you, it -- the

14  time hadn't even included that deposition; right?

15  A.   Right.  The deposition itself.

16  Q.   Right.

17       And -- and, by the way, that was a good long day, wasn't

18  it?

19  A.   Sorry.  I don't recall.

20  Q.   You don't remember.

21  A.   No.

22  Q.   Not very memorable for you, huh?

23  A.   Sorry.

24  Q.   Okay.  That's all right.  I'll do better next time.

25       Now, in any event, if it was 20 hours, let's just say,

Jon Derek VanDorn                                                    116
Cross-examination by Mr. Miller

1    that'd be another 6,000 for June; right.

2    A.    Yes, sir.

3    Q.    Now, of course, you've been getting ready -- working on

4    things to be ready to testify today.  Sure.

5    A.    Right.

6    Q.    Right?

7          And I think you've talked about some additional things

8    you've done or at least we'll sort them out here in a minute,

9    but how many more hours you reckon you've got to today?

10   A.    I would estimate another 20 hours.

11   Q.    Oh.

12         I've seen you out here for two whole days:  one day

13   watching Marks and another day waiting to -- I think it was two

14   days.

15         Do I got that right?

16   A.    No.  Just one.

17   Q.    One day.

18         Okay.  So that whole day and whatever you did this

19   weekend, and -- and you're saying you only have 20 more hours.

20   A.    Yeah.  I think that'd be right.

21   Q.    So we're talking, so far then, about 18 grand.

22   A.    Seems reasonable.

23   Q.    Well, I don't know about that.  We'll let other people

24   decide how reasonable it is.

25         But you're saying, when we see your bill someday, it's

Jon Derek VanDorn                                              117
Cross-examination by Mr. Miller

1   going to be about 18 grand total through today.

2   A.   The best that I can tell you, yes.

3   Q.   Okay.  But, when you're in court, you get more.

4   A.   That's right.

5   Q.   And, when you're in deposition, memorable or not, you get

6   more.

7   A.   That's right.

8   Q.   And what about when you're in court on Friday, watching

9   Mr. Marks?  Do you get more then?

10  A.   I'm not aware.  I don't know.

11  Q.   You don't know?

12       Well, what are you going to bill?

13  A.   Well, I submit hours, and it's up to our billing

14  department to bill.

15  Q.   Oh.

16       But the more you -- the -- the higher rate you get when

17  you're in court or in a deposition, did I hear you say the

18  other -- that's $445?

19  A.   The firm gets $445, yes.

20  Q.   And that's every hour.

21  A.   Yes, sir.

22  Q.   Now, last Friday, that 10 minutes, before we left, that

23  you were up here, I kind of noted that Mr. Leffel was acting

24  surprised at how much you charge.  Should he be surprised at

25  how much you charge?

Jon Derek VanDorn                                                    118
Cross-examination by Mr. Miller

1   A.   I don't -- I don't know what he should be surprised by.

2   Q.   Well, I mean, this isn't the first time you've worked for

3   him; right?

4   A.   Right.

5   Q.   And it's not clear -- clearly not the first time you've

6   worked for the law firm that he works for; right?

7   A.   I have worked in previous matters.

8   Q.   Other matters, not including Mr. Leffel; right?

9   A.   Right.

10  Q.   Would you say that it's a significant percentage of the

11  work you do for State Farm and the GableGotwals firm?

12  A.   Well, I wouldn't say "significant."

13  Q.   Let's see -- let's see what others might think.

14       At the time of your deposition, which was just five months

15  ago, you did tell us that you had about two to three dozen

16  reports you'd written for litigated matters after a lawsuit's

17  filed, like this case; right?

18  A.   Right.

19  Q.   Is that still a good number?

20  A.   Yeah.  I mean, there'd -- it'd be closer to the full

21  three -- three dozens by -- by now.

22  Q.   Okay.  So business is good.

23  A.   I'm busy.

24  Q.   Yeah.

25       So -- I bet.

Jon Derek VanDorn                                                    119
Cross-examination by Mr. Miller

1        So 36, let's say, reports you've written in litigation so

2   far.

3        And is that mostly just in those five years?

4   A.   Yes.

5   Q.   Okay.  So your other place, where you were before in

6   between State Farm and -- and Berryman, did you write any of

7   these litigation reports then?

8   A.   No.

9   Q.   I see.

10       So everything you've learned about litigation has been

11  with Mike Berryman's bunch --

12  A.   Mostly.

13  Q.   -- as far as -- as far as being a consultant.  Yeah?

14  A.   Yes.

15  Q.   Okay.  And, of those three dozen you had at the time, you

16  said, 8 to 12 were for State Farm; right?

17  A.   Yeah.

18       And I think -- it's worth mentioning I think this window

19  that we've talked about, it pertained to only insurance losses;

20  and I -- as I testified on Friday, I -- I'm involved in other

21  cases as well.

22  Q.   Right.  You bet.

23       But, right now, I'm asking you about, in this case --

24  A.   Okay.

25  Q.   -- of these 36 that you've -- at the time, 24 though 36

Jon Derek VanDorn                                          120
Cross-examination by Mr. Miller

1  you've written, back in June, you said that 8 to 12 were for

2  State Farm; right?

3  A.   Yes, sir.

4  Q.   So a full half to a third, depending on which numbers

5  count at the time, would have been State Farm --

6  A.   It would --

7  Q.   -- right?

8  A.   -- be half to a quarter, depending on which numbers you

9  use.

10  Q.   Well, really, if you had two dozen, and 12 of them were

11  State Farm, then that'd be half --

12  A.   Yes.

13  Q.   -- right?

14       And, if it was eight versus three dozen, it'd be actually

15  a little less than -- it would be a quarter, wouldn't it?

16  A.   Sorry.  Yeah.

17  Q.   Okay.  So a quarter to half to all the reports in

18  litigation that you've written at this rate of 295 a hour were

19  for State Farm.

20  A.   In insurance matters, yes.

21  Q.   Have those numbers also gone up since you've gotten more

22  reports written?

23  A.   I'd say, reasonably, it would be the same proportion.

24  Q.   So somewhere between a quarter and a half of everything

25  you do in -- in 295-an-hour consulting work is for State Farm.

Jon Derek VanDorn                                                    121
Cross-examination by Mr. Miller

1  A.   For insurance matters, yes.

2  Q.   Sure.

3       And I think you told me that the majority of them would

4  have been storm claims, although not all of them; right?

5  A.   Right.

6  Q.   And half of them -- half of those that we're talking

7  about, that 8 to 12, would have been for the GableGotwals firm

8  that Mr. Leffel and Ms. Williams work for; right?

9  A.   That's correct.

10 Q.   And two to four of them would have been for Mr. Leffel and

11 Ms. Williams themselves by your estimate.

12 A.   Right.

13 Q.   Right?

14      You couldn't remember exactly, which is two or four, but

15 you've worked with them several times.

16 A.   That's true.

17 Q.   Which gets me back to my point.  He should have well known

18 how much you charge; right?

19 A.   If he sees the bills.  I don't know who sees them.

20 Q.   I see.

21      Well, he was at the deposition you gave when I took your

22 question -- testimony, wasn't he?

23 A.   No.

24 Q.   Are you saying he hadn't read it?

25 A.   I don't know what he's done.

Jon Derek VanDorn                                                122
Cross-examination by Mr. Miller

 1  Q.   You haven't gone over your -- what you're going to testify

 2  with Mr. Leffel before you got in here today?

 3             MR. LEFFEL:  Objection, Your Honor.  Cumulative.

 4  A.   To some degree --

 5             THE COURT:  I'm sorry, Mr. VanDorn.

 6       Overruled.

 7       You may proceed.

 8             THE WITNESS:  Yes, ma'am.

 9  Q.   (By Mr. Miller) "To some degree" what?

10  A.   I'm sorry.  Can we reask the question?

11  Q.   Yeah.

12       Are you telling us that you haven't gone over your

13  deposition testimony with Mr. Leffel in preparation for your

14  trial testimony?

15  A.   Not in great detail.

16  Q.   You had actually testified in court with Mr. Leffel

17  presenting you for State Farm before; correct?

18  A.   Not that I recall, no.

19  Q.   Well, maybe I -- maybe I read it wrong.

20       If you'll look at your deposition at page 15, right there

21  in front of you, I'm at line 13, and I -- I was asking you

22  about all the cases that you'd testified in.  There were seven

23  of them; right?

24  A.   Yes, sir.

25  Q.   And I asked you at line 13 on that subject:

1            "And then in the Greer case, who were the lawyers you

2    worked with?"

3            And you said, "Lance Leffel and Ms. Williams."

4    A.   You're right.  I provided a deposition in that case.

5    Q.   I see.

6        Now, is it true that you have never, in all of your work,

7    written a litigation report of any kind that criticized State

8    Farm?

9    A.   That's true.

10   Q.   Not even a draft report.

11   A.   I'm not aware of a case where I've been hired to provide

12   opinions from the opposing side to State Farm.

13   Q.   You've never taken any work adverse to State Farm;

14   correct?

15   A.   Not that I recall.

16   Q.   As a matter of fact, you've never taken a insured's

17   request from the insured's side to analyze alleged mistakes

18   even in a State Farm estimate.

19       Forget litigation.  I'm talking about a State Farm

20   estimate.

21       Right?

22   A.   Not that I recall.

23   Q.   I mean, you told us in your direct Friday, you know, about

24   half the time, you're looking at just estimates, only

25   estimates, and you might write a -- a -- find a few things to

1   change.  Sometimes, that's from somebody who was a homeowner,

2   and, sometimes, that's from an insurance company; right?

3   A.   Right.  I'm hired for both those instances, yes.

4   Q.   But not when it comes to actually going to litigation.

5   That's where you draw the line; right?

6   A.   No.  It's not where I draw the line.  It's just I've never

7   actually been approached to be hired.

8   Q.   Well, all I know is that, in all the work you've done,

9   none of the analysis that you've done in any kind of litigated

10  matter went against any insurance company, much less State

11  Farm; correct?

12  A.   Sorry.  Can you repeat that?

13  Q.   Yeah.

14       In all the work you've done in these litigated matters,

15  you've never taken on a case that involved criticizing an

16  insurance company.  Not just State Farm; any of them.  Correct?

17  A.   No.  Not quite correct.  I've been involved in cases where

18  I provided "early stages of litigation" estimates to be used

19  in -- against insurance carriers or in -- in reconciliation

20  with insurance carriers.

21  Q.   Are you saying that there are things the insurance carrier

22  saw, or they were just using background?

23  A.   No.  They were produced to the insurance carrier.

24  Q.   Well, let's just see, then.  Let's see what -- maybe I got

25  the question wrong.

Jon Derek VanDorn                                                    125
Cross-examination by Mr. Miller

1          Let's look at 35, line 21, of your deposition.

2     A.   Okay.

3     Q.   Okay.  You ready?

4     A.   Yes.

5     Q.   All right.  The question I asked:  "Okay.  Now, have you

6     ever been hired by an insured or an insured's lawyer to analyze

7     estimates that they thought were inaccurate for some reason,

8     any reason, where you ended up writing a report that it was

9     exchanged in litigation?"

10         What'd you say?

11    A.   To that particular question, I answered, "Not that I

12    recall."

13    Q.   Actually, you said, "I don't recall any, no."

14    A.   Okay.

15    Q.   That's your answer; right?

16    A.   Yes, sir.

17         If I may, I -- I believe we extended that conversation.

18    Q.   You bet.  I'm going to take you right there.  Thank you.

19    A.   Sure.

20    Q.   I'm glad you did.

21         Let's look at page 36, line 25.  Okay?

22         That's just a question or two later, and I wanted to make

23    sure I understood what you were telling me, didn't I?

24         I kind of asked the same sort of question.  Remember that?

25    A.   Yes.

Jon Derek VanDorn                                              126
Cross-examination by Mr. Miller

1   Q.   And I asked you, "So if I hear you right, there have been

2   cases, not against State Farm, but against other insurers where

3   you offered an alternate estimate, which you thought was more

4   appropriate, on behalf of an insured or an insured's lawyer,

5   and that was submitted so that everybody on the other side knew

6   who wrote it, hoping to point out where they had missed

7   something or maybe several somethings?"

8        And you said?

9   A.   "Yes, that's fair."

10  Q.   But not one that went to litigation; correct?

11  A.   No.  The cases settled shortly after.

12  Q.   So let's look back and get the last question on the

13  subject.  It's 36, two.

14  A.   Okay.

15  Q.   And I asked, "Okay.  So if we got a copy of all 24 to 36

16  estimated reports -- estimate reports that have been written,

17  in addition to the seven cases we've got here, the ones you

18  testified in, we would -- you don't think we would find one

19  where you are criticizing an estimate written by an insurer; is

20  that fair?"

21       And you said what?

22  A.   "If there is one, I can't recall it.  So, no, I don't -- I

23  don't think you would."

24  Q.   In any event, at least as of the time of your deposition,

25  you made it very clear that you were not going to be offering

Jon Derek VanDorn                                            127
Cross-examination by Mr. Miller

 1  any opinions about whether State Farm was in good faith or bad

 2  faith in the way they handled this claim; correct?

 3  A.   Yes, sir.

 4  Q.   And so we kind of just stayed away from that because you

 5  weren't going to talk about it; right?

 6  A.   Right.

 7  Q.   Now, let's see what we can all agree on in here about

 8  hail.

 9       You called hail damage something that looks curvilinear.

10  Remember that word?

11  A.   Yes.

12  Q.   You had to explain what that meant to me, but that's your

13  word; right?

14  A.   Well, I didn't invent it, but, yeah.  I -- I introduced it

15  to our conversation.

16  Q.   Okay.  Fair enough.

17       But curvilinear, you went on to tell me, was kind of

18  circular, opposite of a straight line.

19  A.   Right.

20  Q.   Right?

21       Doesn't have to be round; correct?

22  A.   Right.  Has a rounded line.

23  Q.   There's going to be some rounded edges to it.

24  A.   Correct.

25  Q.   I think that's how you put it.

Jon Derek VanDorn                                                128
Cross-examination by Mr. Miller

1      And you're going to find that, in hail damage cases,

2   randomly across the roof.  Yeah?

3   A.   Yes.

4   Q.   Might be some more on one plane than another; right?

5   A.   I would expect that, yes.

6   Q.   Sure.

7      Very, very large hail you described as being 2 inches or

8   greater.  That's your definition; right?

9   A.   Yes.

10  Q.   Or I think I said two "verys."

11     You said very large hail is 2 inches or greater.

12  A.   I would agree with that, yes.

13  Q.   Well, you said it; right?

14     You agree with yourself.

15  A.   Yes.

16  Q.   Now -- and, when -- according to you, when there are -- is

17  a large hail falling, you're -- you should expect to see some

18  smaller hail that's coming down at the same time; right?

19  A.   Right.

20  Q.   You said the denting or tearing of a -- a mat is -- is

21  what you'd expect to see, not always but sometimes, under the

22  hail damage on the top side.  Under it, you'd expect to see

23  some denting or tearing.

24  A.   Right.  Where -- where there's a hail impact, you'd expect

25  to feel a bruise and then see damage to the mat from the

Jon Derek VanDorn                                                    129
Cross-examination by Mr. Miller

1    underside.

2    Q.    And the top -- top side -- you've already told us this --

3    this bruise is going to be soft.  That's what you told us.

4    A.    Yes, sir.

5    Q.    Okay.  Now, nothing has changed, in all that description

6    of how you investigate hail claims properly, since you were an

7    adjuster; correct?

8    A.    Not that I recall, no.

9    Q.    So any thought that -- that there's been a huge advent of

10   some new technology to help people understand what hail is, at

11   least in your world, you would say it's just like it was when

12   you were an adjuster.

13   A.    To the best of my recollection, yes.

14   Q.    Yeah.

15        And -- and, by the way -- you've probably told us this,

16   but was that 20 years ago or less?

17   A.    Yeah.  I started 24 years ago and moved from employment

18   there about 15 years ago.

19   Q.    All right.  So you had about 9 years, sounds like, in

20   there.

21   A.    Right.

22   Q.    All right.  Now, feeling for it -- feeling for hail is a

23   very important part of the process.  True?

24   A.    I would involve it in evaluation, yes.

25   Q.    The evaluator's got to be up on the roof if they're going

Jon Derek VanDorn                                                    130
Cross-examination by Mr. Miller

1   to make a legitimate evaluation; correct?

2   A.   Sure.

3   Q.   It's not just feeling it, although that's a big part of

4   it, but it's just seeing it in three-dimension; right?

5   A.   Sure.  That's -- the -- the person that's on the roof's

6   the source of the information.

7   Q.   Absolutely.

8        And the person on the roof has got to be able to discern

9   one spot from another, to decide a blemish that might be

10  footfall from something that might be hail; right?

11  A.   I think it's important, yes.

12  Q.   Right.

13       And -- and so a person, if they're going to be the one

14  discerning what the damage is, they need to have some

15  experience in -- at least some training in what it is that they

16  should be seeing when it's hail damage; right?

17  A.   Sure.  Some level of it, yes.

18  Q.   And -- and, like you've already told us, what you know

19  about that came from State Farm; right?

20  A.   That's where my education started, yes.

21  Q.   Right.

22       I mean, you didn't -- it wasn't on -- on your own, in your

23  own life, in your own world.  It was people that knew what hail

24  damage was helped you understand what hail damage was by

25  training; correct?

Jon Derek VanDorn                                          131
Cross-examination by Mr. Miller

1   A.   I agree.

2   Q.   And that included hands-on, as we like to say, training,

3   up on the roof; right?

4   A.   That was one source of the training, yes.

5   Q.   And -- and somebody, maybe someone like Jonathan Marks,

6   might say, "Now, look here.  Feel that?

7        "That's a hail bruise"; right?

8   A.   Right.

9   Q.   Because, if you -- if you didn't have that help,

10  understanding what you were feeling, as, for instance, a hail

11  bruise, it might be a little hard to know if what you're

12  feeling is related to hail; correct?

13  A.   Well, I -- I think it's pretty clear.  When you feel it,

14  you know it.

15  Q.   Exactly.

16       You have to be told that, "This is what you should expect

17  when you feel hail damage."

18  A.   Yeah.  I think, if you understood what it's going to feel

19  like before you went out there, that, when -- when you did go

20  out there, you would -- you would recognize it.

21  Q.   If anybody spent any time with you explaining it, maybe

22  you'd have a -- at least you'd be in a better position than if

23  you didn't get that explanation; right?

24  A.   Right.

25  Q.   But the truth is, when you got your training, you actually

Jon Derek VanDorn                                                    132
Cross-examination by Mr. Miller

1   were hands-on, on the roof, and people helping you who had

2   experience; right?

3   A.    That was part of my training, yes.

4   Q.    Yeah.  Fair enough.

5         By the way, I -- I believe it's your testimony that wear

6   and tear to a roof is part of what you call "the aging

7   process"; right?

8   A.    Yes.

9   Q.    And -- and I think you've already said it, but let's be

10  clear:  That's manifested, maybe, in other ways but certainly

11  by the loss of granules to the top side of the shingle?

12  A.    Right.

13  Q.    Fair?

14        And you expect to see it consistently; right?

15  A.    Across all slopes or the entirety of the slope.

16  Q.    Well, as opposed to the manufacturer's defect State Farm

17  has in their -- in their brochure where you can just see a

18  pattern and nowhere else around the pattern; right?

19  A.    It's a small picture.  It's a small sample, but,

20  oftentimes, that type of manufacturer defect -- one type of

21  manufacturer defect does -- is on a certain part of the roof,

22  yes.

23  Q.    But, if it's wear -- again, the point is, if it's wear and

24  tear from an average roof that's exposed equally to all the

25  elements -- not a tree rubbing on it or shade versus sun --

Jon Derek VanDorn                                        133
Cross-examination by Mr. Miller

1   generally exposed to all the elements together, it ought to

2   wear at the same rate; right?

3   A.    Yeah.  Again, with proper attic ventilation being a key

4   factor too.

5   Q.    All right.  And -- and across the whole roof.  Fair?

6   A.    Right.

7   Q.    Now, the -- we already talked a little bit about life

8   expectancy of a shingle.  You were talking about the 25-year

9   Malarkey.  You remember that?

10  A.    Yes.

11  Q.    But it's often common, actually, that these shingles have

12  a life expectancy attached to them, either in the title or in

13  their description, as part of the marketing; right?

14  A.    Right.

15  Q.    And a cheaper shingle might be a 25-year shingle, I guess,

16  with some other properties that are less frequently found --

17  or, I mean, more frequently found -- I'm not saying that right.

18  Can I start over?

19  A.    Sure.

20  Q.    The -- the -- the -- the lower-end shingles are not going

21  to have the same quality for several reasons, maybe, than a

22  40-year shingle, let's say.

23  A.    Right.

24  Q.    Okay.  But the life expectancy of the shingle in our state

25  is kind of a -- well, it's a goal, but it's not likely that

Jon Derek VanDorn                                                    134
Cross-examination by Mr. Miller

1  you're going to make it.  Agreed?

2  A.   Yeah.  It's -- there's a good chance it'll sustain

3  storm-related damage.

4  Q.   You bet.

5       I mean, what I'm saying is, when -- whoever's setting all

6  these timings for shingles -- I don't know how all that works,

7  but they might not be taking Oklahoma into account.  Fair?

8  A.   Right.  They're not factoring into it sudden storm-related

9  issues.

10  Q.   As a matter of fact, you told me back in June that you've

11  had three house- -- I think it was three houses.

12       Anyway, you've had your own house for your family for

13  24 years, since you've been an adult -- 24 of your adult years,

14  you've had a house; right?

15  A.   That's correct.

16  Q.   Okay.  I knew I'd get it out eventually.

17       And, in those 24 years, you've managed to have three

18  replacement roofs; correct?

19  A.   That's right.

20  Q.   So your roofs on your homes are making it about eight

21  years per because of storm damage; right?

22  A.   On average, yes.

23  Q.   Yeah.  Yeah.  I know one might be nine.  One might be

24  four.  I don't know.

25       But -- but the point is three roofs in 24 years; right?

Jon Derek VanDorn                                                      135
Cross-examination by Mr. Miller

1   A.   Right.

2   Q.   Did you have a -- a -- what kind of shingle did you have

3   on your roof?

4   A.   Couple of different.  I had a -- or a built-up gravel

5   ballast on one and, then, 30-year laminates on the other two.

6   Q.   Is this -- is this ballast thing that you're talking

7   about -- has it got an age that it is expected to last?

8   A.   No.  Not made by the manufacturer.

9   Q.   Okay.  But you thought it'd be more than eight years,

10  didn't you?

11  A.   Yes.

12  Q.   And the two 30-year shingles you're talking about -- well,

13  obviously, neither one of them made it; right?

14  A.   No.  The house I'm in now's never been replaced.  It's

15  nine years old.

16       Well, it's nine years since I got there.

17  Q.   I -- I see.

18       You got you a new house with a 30-year shingle on it.

19  9 years.

20  A.   Right.  It wasn't a new house, and the roof -- I don't

21  know how old it was when we bought it, but -- so the roof's

22  older than 9 years.

23  Q.   I see.

24       So, in other words, these three roof replacements you're

25  telling us about all happened in 16 -- 15 years' time, before

Jon Derek VanDorn                                                136
Cross-examination by Mr. Miller

1  this 9-year roof.

2  A.   Right.

3  Q.   Yeah.

4      Okay.  Do you agree that, generally, the better the

5  shingle, the less damage you're going to expect to see from a

6  hailstorm?

7  A.   I would agree that the better the shingle, the less damage

8  will occur based on specific thresholds.

9  Q.   Okay.  Well, I'm not sure how different it is, but okay.

10     Yeah.  You -- if it's a better shingle, the same storm

11 that hit the worst shingle next door, you expect to see less

12 damage on the better shingle.

13 A.   Correct.

14 Q.   Okay.  Just like Mr. Marks said.  You agree with that on

15 him -- with him, don't you?

16 A.   When he said that houses next door to each other may have

17 damage, and the other not, yes.  I would agree with that.

18 Q.   Well, he also said that, if one has a lesser-grade shingle

19 than the other, you're likely going to see more damage to the

20 lesser-grade shingle.

21 A.   I would agree.

22 Q.   Sure.

23     You did only go to the roof in question here one time.

24 A.   That's right.

25 Q.   Now, you had told me at deposition that you had not used

Jon Derek VanDorn                                                    137
Cross-examination by Mr. Miller

1   the AccuWeather report in your analysis at all.  Remember that?

2   A.   I don't recall.  Sorry.

3   Q.   Let's look at 135 --

4   A.   Okay.

5   Q.   -- maybe I got it wrong -- and if you'll go to...

6        I gave you the wrong page and number.

7        158.

8   A.   Okay.

9   Q.   And I'm at 158, line 25.

10  A.   Okay.

11  Q.   You got it?

12  A.   I do.

13  Q.   And I asked you, "Do you identify in your report anywhere,

14  either Sunday's or the one from March, what AccuWeather said

15  about hail at this house ever?"

16  A.   "I did not," was my answer.

17  Q.   Yes.

18       And...

19       I'm having trouble finding the other question, but I --

20  let me ask you again:  Do you remember if you used -- oh, I

21  think -- here it is.

22       Let's go to the next question --

23  A.   Okay.

24  Q.   -- at 159, line 5.

25       I'm sorry.  Line 13.

Jon Derek VanDorn                                        138
Cross-examination by Mr. Miller

1        You ready?

2   A.   Yes.

3   Q.   "No.  I don't care enough.  The bottom line is you did not

4   include the AccuWeather information in your report at all,

5   correct?"

6        And you said?

7   A.   "That's correct."

8   Q.   "And it's not part of your analysis then, I take it?"

9        And you said?

10  A.   "That's correct."

11  Q.   Okay.  Thank you.

12  A.   To clarify, you know, your question related to my report,

13  not my review of the documentation.

14  Q.   Right.

15       Did you offer up there that you had somehow used the

16  AccuWeather report in your analysis, because I asked about

17  analysis.

18  A.   Sure.  I understand.

19  Q.   Did you?

20  A.   Well, I reviewed it and considered it, and I've -- as I've

21  testified earlier today, it's one piece of the overall body of

22  evidence.

23  Q.   All right.  Now, do you know how many hail claims State

24  Farm worked from July 3rd of 2020 in that neighborhood?

25  A.   I do not.

Jon Derek VanDorn                                                   139
Cross-examination by Mr. Miller

1   Q.   Did you ever ask anybody to find out?

2   A.   No.

3   Q.   Well, do you know how many storm claims State Farm worked

4   for the date of loss:  July 3rd, 2020?

5   A.   I do not.

6   Q.   What about how many that Ms. Draper's team worked?

7        Do you know that?

8   A.   No.

9   Q.   Well, did they give you their discovery responses from

10  State Farm that have been given in this case?

11  A.   Just the claim file as far as I'm aware.

12  Q.   So you haven't actually seen the litigation discovery,

13  the -- the written questions and written answers, that have

14  been exchanged for the last 18 months with State Farm?

15  A.   I don't recall reading those statistics that you

16  mentioned.

17  Q.   I'm asking a different question.

18       Were you given any of that information from State Farm

19  that they said was an accurate reflection of -- of the

20  questions being posed, according to them?

21  A.   I don't recall receiving them.

22  Q.   How many proximity teams does State Farm have, do you

23  know, in Oklahoma -- I'm sorry -- in this state?

24  A.   I don't know.

25  Q.   Do you know enough to know that the one Ms. Jacome worked

Jon Derek VanDorn                                          140
Cross-examination by Mr. Miller

1   on was called "a proximity team"?

2   A.    No.  I didn't know that they called them that at this

3   time.

4   Q.    Did you know that it's the same essential function that

5   you were doing back in the time you worked for State Farm that

6   those folks are doing now?

7   A.    No.  I didn't know.

8   Q.    Know that?

9   A.    I hadn't heard the term "proximity."

10  Q.    Okay.  You showed us these pictures where you've overlaid

11  some red lines on what you call "a edge."  Remember that?

12  A.    Yes, sir.

13  Q.    Yeah?

14        Is it fair to say that this definition of a half edge --

15  I'm sorry -- a half inch from the shingle edge to be considered

16  the edge, that's -- that's something you came up with; right?

17  A.    Right, based on observations and --

18  Q.    Right.

19  A.    -- that's what I came up with.

20  Q.    Well, you've -- you've talked a lot about science and the

21  science of all this two or three or four times generally kind

22  of vaguely supporting your positions.

23        Is there any science that you've ever seen where somebody

24  identified the edge to be defined as the half inch around the

25  perimeter of a shingle?

Jon Derek VanDorn                                                    141
Cross-examination by Mr. Miller

1   A.    I'm not aware of a scientific study that involves that,

2   no, but --

3   Q.    No?

4   A.    -- I don't -- I don't think we've -- I'm aware of a case

5   similar to this that would require that analysis.

6   Q.    Well, I don't know about that.

7         But you do know about Haag; right?

8   A.    Yes.

9   Q.    In your training, even back when you were a -- State Farm

10  involved a lot of Haag engineering training; right?

11  A.    Right.

12  Q.    Back then, they were still using them as a engineer too,

13  weren't they?

14  A.    I know Haag was used at some point during my time, yes.

15  Q.    Yeah.

16        But Haag has all kinds of training materials.

17        Did anybody over here at -- representing State Farm ever

18  let you see any of those?

19  A.    Not in this matter.

20  Q.    Well, did -- did -- did State Farm -- I'm sorry.

21        Did Haag, in all their training materials, to your

22  knowledge, ever come up with this half inch from the edge of

23  the shingle or the perimeter of the shingle being the official

24  edge?

25        That ever happen that you've ever seen or heard about?

Jon Derek VanDorn                                              142
Cross-examination by Mr. Miller

1  A.    Well, I understand that sometimes there may be issues

2  related to that half -- half-inch edge -- excuse me -- in --

3  sorry -- in some of the materials, yes.

4  Q.    Well, that was after your deposition, right, because I

5  asked you about Haag, and you didn't know anything about it at

6  Haag time -- at the depo time, did you?

7  A.    You're right.

8  Q.    Yeah.

9        Now, I -- I -- I couldn't quite track on direct.

10       Are you saying that the edge of a shingle deteriorates

11 faster than the rest of it?

12       Are you saying that now?

13 A.    Yes.  I think -- I believe that it's expected that it'll

14 wear faster.

15 Q.    You okay?

16       You need a minute?

17 A.    Yeah.  No.  I'm okay.  I got a tickle.

18 Q.    All right.  So you do, today, believe that the edge of a

19 shingle will deteriorate faster than the face.  Yes?

20 A.    I believe they show, yeah, evidence of deterioration

21 faster, yes.

22 Q.    But, when I asked you that just five months ago, you said,

23 "No.  I don't believe that's certain."

24       Remember saying that?

25 A.    No.  Not exactly.  Sorry.

Jon Derek VanDorn                                          143
Cross-examination by Mr. Miller

1   Q.   Well, let's look up -- let's go ahead and look at it.

2   Page 123.

3   A.   Okay.

4   Q.   And I said, "How about this question, do you believe that

5   an edge -- the edge of a shingle deteriorates faster than the

6   field or the face of it, as you describe it?"

7        And you said what?

8   A.   I said, "No, I don't believe that's certain."

9   Q.   Okay.  But now you do believe it; correct?

10  A.   Yeah.  I've always known that to be true, so I'm --

11  Q.   Why would you tell me "no"?

12  A.   -- I know it's my responsibility to understand your

13  question.

14  Q.   So you're claiming you didn't understand me; is that

15  right?

16  A.   No.  I'm -- I'm -- I'm not alleging that.

17       That's the answer I gave you.

18  Q.   Well, I mean, I went on and asked you some more questions

19  about it.

20  A.   Okay.

21  Q.   Let's just look at that and see if that helped.

22       At 124, page 1.

23       You ready?

24  A.   Yes.

25  Q.   Sorry.  Line 1.

Jon Derek VanDorn                                         144
Cross-examination by Mr. Miller

1      And I said, "Well" -- on the same subject about wear is

2  the very next question.  Agreed?

3  A.   Yes.

4  Q.   Very next question.  True?

5  A.   Yes.

6  Q.   Okay.  "Well, do you believe it's the training that State

7  Farm adjusters receive from Haag?"

8      And you said what?

9  A.   "I don't recall getting that."

10  Q.   And then you went -- I started interrupt- --

11  A.   "That training."

12  Q.   Yeah.

13      "That training"; right?

14  A.   Yes.

15  Q.   Okay.  Well, "Do you know" -- my next question:  "Do you

16  know if the materials that have been disclosed in this case as

17  the training that State Farm adjusters in Oklahoma receive to

18  know how to assess damage to a roof from Haag include

19  information and direction that it's the edges of shingles that

20  deteriorate faster than the field of the shingle?"

21      That's the third question on the subject; right?

22  A.   Yes.

23  Q.   And what'd you say?

24  A.   "I don't know what the materials that have been produced

25  in this case say regarding training."

Jon Derek VanDorn                                          145
Cross-examination by Mr. Miller

1   Q.    Then I went on to say, "Well, all right.  What about this,

2   do you -- do the edges of shingles tend to demonstrate damage

3   when struck by hail more readily and more consistently and more

4   quickly than the field or face of the shingle?"

5         And what'd you say?

6   A.    "Not that I'm aware of."

7   Q.    Is that still your testimony?

8   A.    Well, as I testified earlier, I've known, before this

9   deposition and before the inspection of this roof, that it's

10  best to evaluate the -- the impacts or blemishes within the

11  face of the shingle rather than the edge, and there's a reason

12  for that.

13  Q.    How's that an answer to my question?

14        Are you saying the reasons that they -- the edges

15  deteriorate faster?

16  A.    Yes.  There's known to be --

17  Q.    How come --

18  A.    -- issues at the edges.

19  Q.    How come you didn't tell me that?

20  A.    I apologize.

21  Q.    I -- I've got 187 of your pages here, and I could -- I do

22  remember how long it was.  It was about five hours.

23        In five hours, you couldn't -- how many times did I say,

24  "If you think of anything while we're going through this -- I

25  don't care what it is -- just tell me, and we'll go back and

1  let you clarify because I want to know what you know."

2      Remember that?

3  A.   Yes, sir.

4  Q.   Over and over till the last question; right?

5  A.   Yes.

6  Q.   At line 19 of page 124, I asked you again -- same

7  subject -- "What's the Haag training say, that very training

8  that State Farm adjusters are given, regarding the likelihood

9  or increased likelihood that there will be damage to the edge

10  of a shingle versus the field or face from hail because it

11  deteriorates or weakens faster?"

12      And what'd you say?

13  A.   "I don't know the training materials that State Farm has

14  been provided."

15  Q.   And then I said, "Well, when you were being trained by

16  Haag at State Farm, do you remember learning that it's likely

17  that you will see more damage from hail on the edge of a

18  shingle than you will on the field or face of the shingle

19  because it deteriorates faster?"

20      And what'd you tell me then?

21  A.   As it pertains to hail, "No, I don't recall receiving that

22  training from Haag or while at State Farm."

23  Q.   But -- but now you say you've known it for a long time --

24  A.   Well, I know --

25  Q.   -- correct?

Jon Derek VanDorn                                                    147
Cross-examination by Mr. Miller

 1    A.    I'm sorry.

 2          I know the edges wear differently than the face of the

 3    shingles.

 4    Q.    Okay.  But, if they wear quicker, then they'd be more

 5    subject to deterioration -- I'm sorry.  Start over.

 6          If a shingle wears quicker at the edge, then it's also

 7    going to be more subject to damage no matter what the cause.

 8    Agreed?

 9    A.    That may be true in -- in an older roof, yes.

10    Q.    Oh, you don't think that a worn-out place on any roof is

11    going to be more susceptible to damage from any cause than a

12    brand-new place on a shingle?

13    A.    At some point, yes, but not on a roof that's seven years

14    old.

15    Q.    And what studies have you done -- seen that say that?

16    A.    Well, I guess I'm combining acquired knowledge.

17    Q.    Well, how about this:  To this day, has anybody from the

18    other side shown you any of the training materials from Haag

19    that have been produced in this litigation?

20    A.    No, sir.

21    Q.    So, if the jury's seeing things that say -- from Haag --

22    that the edges of shingles -- not just once but twice -- the

23    edges of shingles are more susceptible to deteriorate to hail

24    damage -- to hail damage than the rest of the shingle, you

25    would not argue with it.  Fair?

Jon Derek VanDorn                                               148
Cross-examination by Mr. Miller

1   A.   If that's what's been produced, yes.

2   Q.   On this roof, when you were up there -- I think you said

3   it was March 10th of '22; correct?

4   A.   Right.

5   Q.   I think that's right.

6        And you marked four 10-by-10 squares on -- one on each

7   slope.

8   A.   Right.

9   Q.   Right?

10       And that, you said, you found somewhere between 40 and 60

11  blemishes in the four squares; right?

12  A.   Yeah.  I think we worked some math to get to that point,

13  but we estimated somewhere around 10 per test square.

14  Q.   Well, actually, let's look at page 114, please, at

15  line 20.

16  A.   Okay.

17  Q.   And I said "at line 20."

18       "I see.  And tell us" -- well, I'm -- I'm up on "test

19  square," but let's go ahead and read it.

20       "And tell us what a test square is."

21       And you said?

22  A.   "A test square is a 100-square-foot area, typically ten

23  feet by ten feet, that is meant to be a sample of each slope."

24  Q.   Keep a-going.

25  A.   Oh.  "So this is the case there were -- and so, in this

Jon Derek VanDorn                                                          149
Cross-examination by Mr. Miller

1   case, there were four test squares conducted, and the shingles

2   within that 100-square-foot area or test squares are evaluated

3   for damage.

4   Q.   And I asked you the follow-up question, "And the blemishes

5   that you took pictures of, that only -- that only two are in

6   your report -- there are only two in your report, but you're

7   telling us there is 40 to 60 different blemishes photographed,

8   correct?"

9   A.   "I believe so, yes."

10  Q.   Okay.  And, then, I think you've already told us that we

11  average that out to somewhere between 10 and 15 per square;

12  right?

13  A.   Right.

14  Q.   And -- and, of course, that would be 40 to 60 for four

15  squares --

16  A.   Yes, sir.

17  Q.   -- right?

18       And you said most of them were curvilinear; right?

19  A.   Yes.

20  Q.   "Rounded."  You started using that, I think, "rounded,"

21  but same thing; right?

22  A.   Right.

23  Q.   And then you said you found those on all slopes, one end

24  to the other, of that roof; correct?

25  A.   I believe what I said were they were in the test squares

 1    for certain.

 2    Q.    Well, let's look at 117, and I asked you the question at

 3    line 10 -- you there?

 4    A.    Yes.

 5    Q.    "Right.  So did you get the indication that there were

 6    not -- let me ask it another way.  Were there blemishes on all

 7    slopes, from one end to the other, as far as you could see?"

 8          And you said what?

 9    A.    "I believe so, yes."

10    Q.    And you went on to tell me that the blemishes from one end

11    of the roof to the other, as far as you could see, all looked

12    similar; right?

13    A.    That's correct.

14    Q.    And rounded; right?

15    A.    Right.

16    Q.    Uh-huh.

17          And that you estimated that roof had 26 1/2 square; right?

18    A.    That's correct.

19    Q.    So even you said that these similar rounded/curvilinear

20    places on the roof would total 260 -- 260 or more based on your

21    estimate, because we were using your low numbers, weren't we?

22    A.    That would be, yes.

23    Q.    Right.

24          So it could easily be into 300s if we use the 15 per

25    square that you were telling us about at the top end.  Fair?

1   A.    Yes.

2   Q.    You also went on to say that, if those places -- those

3   blemishes were hail, it would have been consistent with

4   something one-and-a-quarter inch or bigger; correct?

5   A.    That's what I testified to, yes.

6   Q.    Now, in that deposition that was June 28th, you agreed

7   that some of those rounded marks that we were talking about

8   that are in the hundreds across the roof could have been hail;

9   right?

10  A.    That's correct.  I know of at least one -- one impact that

11  was on that roof.

12  Q.    Well, sir, we also know that you didn't say "one."  You

13  said "some of them could have been hail"; right?

14  A.    Okay.  Yes.

15  Q.    Isn't that what you said?

16        Do I need to show you?

17        I'll show you.

18  A.    No.  I don't -- I believe you're representing it right.

19  Q.    All right.  Okay.  Now, there's no place in your entire

20  report, Report Number 1 or Report Number 2, where you said

21  anything like that, did you?

22  A.    That's true.

23  Q.    You never said to the people reading the report, "Some of

24  this might be hail," did you?

25  A.    No.

1  Q.    No.

2        Now, you had mentioned that you -- on direct that you had

3  the Swain pictures that included Jonathan Marks up there.  I

4  think we even looked at -- I don't know if we looked at one yet

5  or not.  Maybe we didn't.

6        But you -- you had those by the time of your second report

7  for sure; right?

8  A.    That's correct.

9  Q.    And there was one place in particular that you identified

10 because Swain lifted a shingle up and showed the underside of

11 the mat; right?

12 A.    Right.  I believe he lifted five shingles.

13 Q.    Okay.  Well, that's -- well, let's just talk about those.

14 All right?

15        MR. MILLER:  If we could put up...

16        Excuse me.

17        Let's look up -- pull up Swain -- this is going to be JX21

18 at page 48.

19 Q.    (By Mr. Miller) All right.  Now, I want -- I want to help

20 you out and move this along.

21        Do you remember that's the one that he lifted up?

22 A.    I believe it is, yes.

23 Q.    Okay.  And is it true that you don't consider it to be

24 typical to need to lift a shingle in a -- in a inspection;

25 right?

Jon Derek VanDorn                                                         153
Cross-examination by Mr. Miller

1   A.   Sure.   The same thing can be found by feeling the blemish.

2   Q.   Yeah.

3        And -- and, by the way, you've told the jury that you felt

4   a lot of them; right?

5   A.   Yes.

6   Q.   But you didn't write that in your report either, did you?

7        Not the first or the second, did you?

8   A.   Not that specific line, no.

9   Q.   Well, not even a general line.

10       You never talked about feeling blemishes or spots or

11   rounded or curvilinear or anything else in your report, ever,

12   did you?

13  A.   Well, that's just part of all of my evaluations of the --

14  Q.   Did you --

15  A.   -- roof.

16  Q.   -- write it in your report, sir?

17       Simple question.

18           MR. LEFFEL:   Counsel, counsel, please let him answer

19   before you ask another question.

20           THE COURT:   Mr. Miller, let him finish his answer

21   before you ask the next question.

22       Thank you.

23       Please ask your -- reask your question.

24  Q.   (By Mr. Miller) I'm asking a very simple question now, I

25   believe.

Jon Derek VanDorn                                              154
Cross-examination by Mr. Miller

1       Did you put in your report, in March -- the March report

2   or the June report, either one of them, anything about touching

3   the shingles?

4   A.   No.  That is not in neither report.

5   Q.   Now, back to Swain -- the Swain picture.

6       Did I say 48?

7       I think I did.

8       And we're on 48.  Thank you.

9       Give me one second.

10  Q.   (By Mr. Miller) All right.  So, just because we have both

11  looked at this, and we know what it is, we know what's coming;

12  right?

13      The next pictures are going to show where he lifted it;

14  right?

15  A.   Right.

16  Q.   And so this is what can be seen on the top side.

17      By the way, what's the measurement here of that damage?

18  A.   About half an inch.

19  Q.   Okay.  And -- and you're talking about from the -- on the

20  right edge, all the way inside, to that damaged area of the

21  shingle; correct?

22  A.   Correct.

23  Q.   So you go from -- the way you would measure it is from

24  three-eighths to seven-eighths is what you'd claim to be a half

25  a inch.

Jon Derek VanDorn                                                155
Cross-examination by Mr. Miller

1    A.   Yeah.  It goes a little beyond seven-eighths.

2    Q.   It does, doesn't it?

3         It goes to about three-quarters without too much trouble,

4    making yourself look at it.  Yeah?

5    A.   Right.

6    Q.   And -- and you can tell that the biggest part of that

7    damage is on the edge side, isn't it?

8    A.   Right.  Almost the entirety of the blemish is

9    one-and-a-half inch from the edge.

10   Q.   And so the way this particular hail hit, that

11   five-eighths-inch portion that can be seen on the right side

12   doesn't impact anything on the left side; right?

13   A.   Right.

14   Q.   At least it doesn't leave damage.

15   A.   Right.

16   Q.   Fair?

17   A.   Yes, sir.

18   Q.   Now, part of that could be that there's a space there;

19   right?

20   A.   Right.  There's a keyhole there.

21   Q.   The -- the deceleration where the impact occurred and the

22   deceleration or the "delta v" that's happening right there, it

23   is exsorbing -- absorbing the energy before it ever gets to the

24   keyhole; right?

25   A.   Or it's over -- yes.  Right.  That's right.

1  Q.    Or -- or that hail might have blown -- blown up into a

2  bunch of pieces before it ever was a problem for the left tab.

3  Fair?

4  A.    If this was from a hail impact, that's true.

5  Q.    Okay.  Now, didn't you just tell me that there was one

6  place that Swain took a picture of what you know to be hail?

7  A.    Right.

8  Q.    Oh, so it was from a hail impact.

9  A.    This is the one, yes.

10  Q.    Yes.

11        Okay.  All right.  So let's go ahead and look at 49.

12        Now, here, he's taking a picture of the side; right?

13  A.    Right.

14  Q.    And it's -- it's kind of shooting down the tab is how I'd

15  say it, but you're looking from the keyhole side down the --

16  the shingle body.  Fair?

17  A.    Yes.

18  Q.    All right.  And you can see, even in this picture, that

19  there's some indentation without even going any higher; right?

20  A.    Right.

21  Q.    I mean, you can see this has affected the mat.  Fair?

22  A.    Yes.

23  Q.    But he did go higher in this particular one, and that's

24  going to be in Exhibit -- I'm sorry -- page 50; right?

25  A.    Yes.

Jon Derek VanDorn                                              157
Cross-examination by Mr. Miller

 1  Q.   And -- and tell us what we're seeing at the distal part of

 2  his finger there.

 3  A.   Well, you can see that there is a indention that --

 4  right -- that followed the cursor there and then a -- a tear in

 5  the edge of the shingle about halfway through.

 6  Q.   Okay.  Can you put a -- a red mark around that -- that

 7  semicircular area that -- or a curvilinear area that he's

 8  talking about?

 9       Like that?

10  A.   Yes.

11  Q.   Okay.  Thank you.

12       Let's go on and look at 51, and that's a little bit closer

13  up, and it's -- it's -- you can see there's some breaking

14  there.  Do you agree?

15  A.   Yes.

16  Q.   And, then, 52; and, here, we have from-a-further-off shot;

17  and it looks like a big part of the damage is actually even

18  further into the shingle there.  Would you agree?

19  A.   I suspect it mirrors the top side.

20  Q.   Okay.  Fair enough.  Fair enough.  All right.

21          MR. MILLER:  That's -- that's good, Janna.  Thank

22  you.  You can take that down.

23  Q.   (By Mr. Miller) Now, you say, though, that -- that his

24  other pictures where he lifts shingles don't show any damage.

25  A.   I didn't recognize them to have any hail damage.

Jon Derek VanDorn                                              158
Cross-examination by Mr. Miller

 1   Q.   Well, let's -- let's look at those real fast, then.

 2            MR. MILLER:  If you could put up...

 3        Let's go Swain 5, Picture 5, JX21.5.

 4   Q.   (By Mr. Miller) Now, here, this one -- is this one of

 5   those bridges you were telling us about?

 6   A.   Yeah.

 7   Q.   And that's something that happens with hail, doesn't it?

 8   A.   Sometimes, yes.

 9   Q.   You bet.

10        And this is a whole nother picture.  It's not the one we

11   were just looking at; right?

12   A.   Right.

13   Q.   All right.  And so he's put a tape on this one.

14        How big is that particular damage, according to his tape?

15   A.   It's about a -- a half on one side of the tab and a

16   quarter on the other.

17   Q.   Okay.  So three-quarters inch.

18   A.   Right.

19   Q.   Right?

20        And -- and, by the way, one-and-a-half or

21   one-and-a-quarter piece of hail is not going to leave a

22   one-and-a-half or one-and-a-quarter dent in the roof, is it?

23   A.   No.  That's right.

24   Q.   It's going to be smaller; right?

25   A.   Right.

Jon Derek VanDorn                                          159
Cross-examination by Mr. Miller

1    Q.    So you've got to work up from -- well, here, we have a

2    three-quarter-inch piece of -- or place of damage; right?

3    A.    Yes.

4    Q.    Okay.  Is that part of how you got to the

5    one-and-a-half -- or one-and-a-quarter?

6          Excuse me.

7          You said that these rounded places across the roof were

8    from one-and-a-quarter or bigger hail if they were from hail.

9    Is that how you got there?

10   A.    No.

11         So, yeah.  I think what I discussed in my report was that,

12   generally, a three-tab shingle requires one-and-a-quarter-inch

13   threshold size for hail, but we know that this Malarkey's

14   shingle more resistant than that.

15   Q.    Well, you know, you keep saying that kind of thing, but

16   the velocity, the wind, the way that the hail's propelled into

17   the roof has as much to do with it -- and the energy that's

18   impacted on the shingle as the size of the shingle.  Agreed?

19   A.    Well, those are all factors.

20   Q.    Sir, what I'm saying is just because it's a

21   one-and-a-quarter-inch size hail, for instance, because that's

22   the one we're talking about right now, doesn't mean it's going

23   to hit a roof with the same speed as the next storm.  Agreed?

24   A.    There's no guarantee of that.

25   Q.    Yeah.

Jon Derek VanDorn                                           160
Cross-examination by Mr. Miller

1      Anyway, back to this.  So we definitely have a bridging

2   curvilinear spot that's making impact damage on these two

3   shingles right across from each other.  Fair?

4   A.   We have a blemish that's curvilinear on both shingles.

5   Q.   Okay.  Let's look at Picture -- let's go to the one that

6   he lifts; and that's going to be Picture 8, page 8, I think;

7   and he's -- he's showing us here the left side.

8      Now, are you trying to tell the jury that you don't see

9   impact damage where this shingle is pushed down into the mat?

10  A.   Right.  So it may have that appearance because it's

11  thinner at that point because it's lost its granules in that

12  blemish.

13  Q.   Well, did you lift that shingle?

14  A.   No.

15  Q.   Did you ever look at that shingle?

16  A.   Maybe.  I don't know.

17  Q.   Well, do we have a picture in your stuff where it shows a

18  bridged three-quarter-inch damage to the -- to the -- to the

19  roof?

20  A.   Maybe.  I'm not sure.  Take a lot of photos.

21  Q.   Let's look at 35 -- is another one that you said you

22  wanted to talk about.

23     All right.  Now, this one is about how -- how big is this

24  one?

25  A.   I'm not sure what he's trying to measure.

Jon Derek VanDorn                                        161
Cross-examination by Mr. Miller

1    Q.   Well, he's -- he's put -- he's put a mark there; right?

2    A.   He's put a mark around some sporadic granular loss.

3    Q.   Okay.  Let's look at 37.

4         Is this of the same place?

5    A.   I don't know without seeing 36.

6    Q.   Okay.  We can look at 36 too.  I'm just trying to move

7    this along.

8    A.   Okay.  I assume so because that's the order of the photos.

9    Q.   Okay.  So he -- he's definitely looking at the -- the

10   bottom edge of this shingle, the one that was in 35 --

11   A.   Yes.

12   Q.   -- right?

13        Now we've seen 36.

14        Now let's look at 37.

15        Do you see the fibers damaged -- where the mat is damaged

16   to this shingle?

17   A.   Yes.  I see the very edge is worn.

18   Q.   And -- okay.

19        And do you see that, on the right side of the middle of

20   the damage, there's something extending down below the mat?

21   A.   I see a piece of fiberglass that is -- is sagging at the

22   edge, yes.

23   Q.   You know, if you don't want to see hail, it's pretty easy

24   to not see it, isn't it?

25        Would you agree?

Jon Derek VanDorn                                                    162
Cross-examination by Mr. Miller

1   A.   No.

2   Q.   No?

3   A.   I'd recognize hail --

4   Q.   Well, if you --

5   A.   -- whether I want to see it or not.

6   Q.   -- if you -- if you -- if you wanted to say it wasn't

7   hail, it'd be easy to do, wouldn't it?

8   A.   Well, I can tell you that that -- if you look at it from

9   left to right, you can see the -- the significant change in

10  that shingle, as it just gets thinner, because it's lost its

11  granules.

12  Q.   How about -- how about this, sir:  You were up on that

13  roof for how many hours?

14  A.   Little over an hour.

15  Q.   And did you lift a single shingle to look at any damage of

16  the underside that you saw on the top?

17  A.   I attempted to lift many shingles, and they were all fully

18  sealed.

19  Q.   Did you identify a shingle to lift?

20       Let's start that way.

21       "Yes" or "no"?

22  A.   I attempted to identify a shingle that was unsealed.

23  Q.   I know you say that.

24       Did you ever lift a shingle?

25  A.   There were none that were unsealed to lift.

Jon Derek VanDorn                                                    163
Cross-examination by Mr. Miller

1  Q.   Now, we've already seen pictures you took of Mr. Marks

2  there; right?

3  A.   Right.

4  Q.   And he wasn't alone.  There were representatives of both

5  law firms:  that one and this one; right?

6  A.   Right.

7  Q.   Did you ask anybody, "Hey, can I put a blade, a little

8  putty knife, under this and lift some of these shingles"?

9  A.   Well --

10 Q.   Did you -- did you ask anybody?

11 A.   No.

12 Q.   Now, you're well aware that there are all kinds of

13 adhesive products that allow a shingle on a roof to be resealed

14 to the deck or the -- the next layer of shingles.  You just

15 have to use it; right?

16 A.   Yes.  Another --

17 Q.   Do you carry -- do you carry that around in your vehicle

18 with you?

19 A.   Not currently.

20 Q.   Have you?

21 A.   No.  I leave that to my roofing contractor.

22 Q.   Well, you certainly -- you surely know that it exists and

23 that any roofing contractor will generally have it; right?

24 A.   I've used it in the past, yes.

25 Q.   No.  That's not what I asked you.

Jon Derek VanDorn                                              164
Cross-examination by Mr. Miller

1      Do you agree that, of the roofing contractors you know, if
2  they have any salt at all, if they know anything at all,
3  they're going to have a -- a tube of adhesive that they can use
4  to seal down some shingles, if they need to?
5      Agreed?
6  A.  Well, I believe it's possible.  I don't know.
7  Q.  All right.  Let's just do it this way:  You were deposed
8  on June 28th, and, at that time, you even admitted that day
9  that some of these blemishes could be hail, and now you're
10 telling us you just meant one of them, apparently; right?
11 A.  I seen one, yes.
12 Q.  At least one.
13     Okay.  And so you don't have any doubt that the one that
14 we have a lift of is -- all the way to the underside is -- is
15 hail.
16 A.  Right.
17 Q.  Okay.
18 A.  I don't question that.
19 Q.  So State Farm, two months later, sent some more money to
20 reconcile a bunch of other mistakes that had been pointed out
21 in discovery.  How come they didn't send some money to pay for
22 that one shingle?
23 A.  I don't know.
24 Q.  Well, you were working for State Farm; right?
25 A.  Yes.

Jon Derek VanDorn                                                    165
Cross-examination by Mr. Miller

1          Sorry.  Maybe -- I do have an answer.

2          Was it two months after my inspection?

3    Q.    Yes.

4          No.  It was two months after your deposition.

5    A.    I see.

6    Q.    It was four months after your inspection.

7    A.    I see.

8    Q.    You did rule out that the hundreds of spots you saw across

9    the roof that were rounded or semirounded and similar in

10   character and appearance from stem to stern or end -- one end

11   of the other, you did rule out that was a maintenance issue.

12   Agreed?

13   A.    Yeah.  I didn't see the -- the necessity to replace them

14   or repair them right at that moment.

15   Q.    No.  No.

16         I asked you do you think -- well, do you remember being

17   asked words to the effect of -- and I don't remember the exact

18   words, but, "Do you consider this to be any sort of a

19   maintenance issue by the owner that has caused all of these

20   spots that you're talking about?"

21         Do you remember that?

22   A.    Right.  Sort of.

23         So I don't believe it's deferred maintenance that's caused

24   these spots.

25   Q.    Let me -- let's go to page 180 at line 7.  Tell me when

Jon Derek VanDorn                                                166
Cross-examination by Mr. Miller

1  you're ready.

2  A.    Okay.

3  Q.    "Is there anything about the blemishes you saw on the roof

4  that would cause you to think the Bates did something in the

5  way they maintained their roof?"

6        And you said?

7  A.    "No."

8  Q.    And then I -- well, just hold your finger there because

9  let's see what you say here:  And was there anything at all

10  that ever made you think any of these places were intentionally

11  made by a human being?

12  A.    "No.  I don't have an accusation or any evidence of that,

13  no."

14  Q.    Okay.  We -- we scanned through several of your pictures

15  with counsel, and I noticed that you use a tape measure on some

16  places on -- seems like it was on a -- a fence and on, maybe,

17  every one of the so-called "soft metals."  You used a -- I said

18  "a tape," but it was like a -- one of those stick measurements

19  that unfold like that; right?

20  A.    Yes.

21  Q.    But I did not see anyplace in the roof where you measured

22  any of these hundreds of rounded-looking -- what you call

23  "blemishes."

24        You did not document that in any pictures, did you?

25  A.    That's right.

Jon Derek VanDorn                                           167
Cross-examination by Mr. Miller

1   Q.   Now, certainly, Mr. -- we've already seen -- Mr. Swain did

2   that several times, didn't he?

3   A.   He did.

4   Q.   Do you agree that the -- the angles and the distance, the

5   resolution, of the photographs being taken by someone that's

6   supposed to be fairly investigating hail damage possibilities

7   matter?

8   A.   Well, I think you need to take representative photos.

9   Q.   Well, what I'm saying is, if you're shooting a shot -- you

10  know, what you call "an overview shot" -- we saw some of

11  yours -- like, out toward the street, you're not taking that

12  certainly in a case like this to try to identify hail.  You

13  just want to see what it -- where everything is.

14  A.   Sure.

15  Q.   Yeah.  That's what I'm getting at.

16       So the -- the angle of the camera and the distance from

17  the roof and certainly how focused the camera would be, those

18  are all important in trying to determine whether or not you can

19  get an accurate reflection of whether something is hail damage.

20  Agreed?

21  A.   Well, yes.  In my evaluation, I'm looking at it closely;

22  but, to document it, yes.  You would want to take

23  representative photos.

24  Q.   Let's see how closely you looked.

25  A.   Okay.

Jon Derek VanDorn                                          168
Cross-examination by Mr. Miller

1          MR. MILLER:  Let's pull up DX2, Janna, at 275.

2      Janna, I'm going to have you go through these pretty fast,

3  but let me find where we begin.  Okay?

4  Q.   (By Mr. Miller) So, just to set the stage, here at 275,

5  we're looking down the roofline and...

6      Here we go.

7      We're looking down the roofline, and it's one of these

8  overview shots; right?

9  A.   Right.

10  Q.   And then --

11          MR. MILLER:  Let's pop through some of these, Janna.

12  Q.   (By Mr. Miller) So 276, and you're taking a step.

13      277, and you're taking the next step.

14      278.

15      279.

16      280.

17      281.

18      282.

19      283.

20      284 gets us to the edge of that area; right?

21  A.   Right.

22  Q.   Now, what I -- I want to take us back to 283, the one

23  right before that.  All right?

24      Now, did you take up a -- a closer picture of 283 than you

25  did of the other walking shots we just went through?

Jon Derek VanDorn                                          169
Cross-examination by Mr. Miller

1  A.   I'm not sure about that one.  Likely not.  I don't recall

2  it.

3  Q.   Okay.

4          MR. MILLER:  Well, could you show us, Janna, what --

5  the places I want to ask him specifically about?

6  Q.   (By Mr. Miller) You see those places that I've identified?

7  A.   Yes.

8  Q.   Did you document what those were?

9  A.   Not any closer than that photo.

10  Q.   Well, let's -- let's try again.

11          MR. MILLER:  Janna, if you'll back out, let's go to

12  241.

13  Q.   (By Mr. Miller) All right.  Here we go.

14          At 241, we've got something there in the dead center of

15  the -- of the ridge; right?

16  A.   Right.

17  Q.   Well, did you document what that was?

18  A.   Yes.  I looked at it and took that closer photo of it.

19  Q.   Is that the best photo you got of it?

20  A.   I think so, yes.

21  Q.   Yeah.

22          Did you ever put a tape on that?

23  A.   No.  I didn't.  It's not typically part of the evaluation.

24  Q.   With a tape on it?

25  A.   Right.

Jon Derek VanDorn                                          170
Cross-examination by Mr. Miller

1   Q.   Now -- well, what is that?

2   A.   I can't say for sure.  It's right at the very peak of the

3   ridge where the -- the three-tab shingle's been cut and then

4   bent over the ridge cap.

5   Q.   Okay.  So you don't know what it is?

6   A.   I can't answer that for certain, no.

7   Q.   All right.  So let's go ahead and go on to the next one,

8   242.

9        243.

10       -44.

11       245.

12       246.

13       247.

14       248.

15       249.

16       250.

17       You took the turn there.

18       251.

19       252.

20       253.

21       254.

22       255.

23       256, the one we're looking for.

24       All right.  So you did it again on another part of the

25   house.  You walked the whole thing, taking pictures; right?

Jon Derek VanDorn                                                171
Cross-examination by Mr. Miller

1   A.   Of the ridge cap, yes.

2   Q.   Of the ridge cap.  Sure.  Right.

3        Now, let's go back to 254.

4        Did you take any closer pictures of this one?

5   A.   Doesn't appear so, no.

6        MR. MILLER:  Well, could you put the marks on there

7   so we could ask him?

8   Q.   (By Mr. Miller) Did you do anything to document any of

9   these particular blemishes that we're seeing?

10  A.   Well, my evaluation's of the test squares for the slope to

11  shingles or the -- the slope shingles, but, in here, I'm

12  walking the ridge to document whether there's -- when there's

13  wind or hail damage to the ridge cap.

14  Q.   Sir, did you do anything to try to identify with a closer

15  shot what thing -- items are -- the places are on the ridge cap

16  here?

17  A.   Those two that appear to be on the ridge cap that are at

18  the edges, I -- I did not.

19  Q.   Sir, other than that one shot that we looked at a moment

20  ago, 241 --

21        MR. MILLER:  Let's go back to that.

22  Q.   (By Mr. Miller) I looked carefully in all your pictures,

23  but I know they're your pictures, so you're going to know

24  better than me.

25        Did you take a close-up of any of the things that you saw

Jon Derek VanDorn                                              172
Cross-examination by Mr. Miller

1  on the ridge that could be hail, beyond this one picture, 241,

2  of anything?

3  A.    I believe there might be one more somewhere there between

4  241 and 254.

5  Q.    Did we just pass it?

6  A.    I think so, yes.

7            MR. MILLER:  Well, let's go back to 254.

8  A.    It'd be closer to the 241 end, if I remember right.

9  Q.    (By Mr. Miller) Okay.  Should it be in the -- in the

10 series, like -- I went --

11 A.    Yes, sir.

12 Q.    Well, I went right through them.

13 A.    Very quickly, yes.  You did.

14 Q.    Okay.  Well, let's do it again then.

15       241 --

16            MR. MILLER:  Janna, I'm sorry.

17 Q.    (By Mr. Miller) 241.

18       242.

19       Stop me, now.  I don't want to go so fast.

20 A.    Yes, sir.

21 Q.    242.

22       243.

23       244.

24       245.

25       246.

Jon Derek VanDorn                                                      173
Cross-examination by Mr. Miller

1   A.   There you go.

2   Q.   Ah, thank you.

3        What is that?

4   A.   That's a blemish at the edge of the three-tab ridge

5   shingle.

6   Q.   So the only two close-ups you took of the ridge was the

7   two that we looked at, which are 254 and 246; correct?

8   A.   Right.

9        MR. MILLER:  Can you put up Swain real quick -- that

10  was JX21 -- and go to his picture at page 33?

11  Q.   (By Mr. Miller) Okay.  So he's got a -- a -- a -- here, on

12  243, he's got him -- I'm sorry -- -34 -- -33, he's got himself

13  a -- a picture kind of the end of the -- of the roof there,

14  doesn't he?

15  A.   Right.

16  Q.   And, then, he's marked these places; and, in the page --

17  in page 34 or Picture 34, he starts taking close-ups; right?

18  A.   Right.

19  Q.   28.

20       29.

21       (Discussion off the record.)

22  Q.   (By Mr. Miller) 28.

23       Another spot where he's going to focus in at 29.

24       30.

25       Now, I didn't see anything on the ridge that came close to

Jon Derek VanDorn                                                 174
Cross-examination by Mr. Miller

 1   bringing your camera as close as Mr. Swain did on his edge

 2   pictures.  Agreed?

 3   A.    Well, I think the two we looked at were within a few

 4   inches or a foot of it.

 5   Q.    Well, I know what.  The jury can tell because they'll be

 6   able to see how many tabs are represented in your pictures and

 7   how many are in his picture; right?

 8   A.    Yes.

 9   Q.    So, on the ridge, for instance, with Mr. Swain in this

10   picture, there looks to be somewhere between two and a very

11   small amount -- maybe more -- than two of the tabs on the

12   ridge.  Fair?

13   A.    Yes.

14         And I'll say they don't look curvilinear as you would

15   expect for hail.

16   Q.    Well, at this point, I think I'm going to let other people

17   decide what is curvilinear and not use your judgment.

18   A.    Okay.

19   Q.    Is that fair?

20         And so --

21             THE COURT:  Mr. Miller, if we can sidebar.

22             MR. MILLER:  Yes.

23         (Bench conference on the record.)

24             THE COURT:  Mr. Miller, you had indicated about

25   11:15, and I was given an 11:30.  You're now about -- my rough

Jon Derek VanDorn                                                      175
Cross-examination by Mr. Miller

 1   estimate's you're about -- had this witness the same amount of

 2   time that he was on direct.

 3        How much longer do you have?

 4        I can't hear you.

 5             MR. MILLER:  I would say 10 minutes, easily, is --

 6             THE COURT:  Okay.

 7             MR. MILLER:  -- is the most it would be.

 8             THE COURT:  Okay.  No more than 10.

 9             MR. MILLER:  Okay.

10             THE COURT:  Please proceed.

11             MR. MILLER:  All right.

12        (End of bench conference.)

13   Q.   (By Mr. Miller) If we could look at 2.336.

14        Here is some pictures of a valley.  Agreed?

15   A.   Yes.

16   Q.   And did you ever take any closer shots of anything in this

17   picture?

18   A.   Not that I recall.

19             MR. MILLER:  Would you put the red marks on it for

20   me?

21   Q.   (By Mr. Miller) Any of these ever get your attention?

22   A.   Always cautious of blemishes in valleys, and I believe the

23   literature says so:  that those are high water flow areas and

24   will lose granules at a faster rate than the rest of the roof.

25   Q.   Would that be part of the reason why they're more

Jon Derek VanDorn                                                    176
Cross-examination by Mr. Miller

1  susceptible to hail damage, according to Haag?

2  A.   Possibly.

3  Q.   Also, that there's less support underneath the shingles

4  there?

5       Another reason they're more susceptible to more hail

6  damage?

7  A.   There's more of a void there.

8  Q.   Right.

9       So that's all the training you've had from the scientists,

10  the engineers; right?

11  A.   Right.

12  Q.   All right.  Is it fair to say that you have no idea what

13  width of the reSAWN decking or the -- what you called "lumber,"

14  I think, decking, is under these shingles?

15  A.   No.  I don't know.

16  Q.   Right.

17       So you know it's a 1-by; right?

18  A.   That's correct.

19  Q.   But you don't know if it's 4 or up to 12 inches.  Have no

20  idea.

21  A.   That's right.

22  Q.   Now -- okay.

23       That could matter as far as the ability to support the

24  weight of the shingles; right -- how wide the boards are?

25       The wider the board, less capable of being strong?

Jon Derek VanDorn                                              177
Cross-examination by Mr. Miller

1   A.   Well, I think a one-by-four is suitable for structural

2   strength of a three-tab shingle.

3   Q.   I said the wider the board, the less suitable it is to be

4   used in decking.

5   A.   Oh, I see.

6   Q.   Would you agree?

7   A.   Yes.  I know, ideally, it's the narrower boards.

8   Q.   Right.

9        Like, a 1-by-6, that's the ones that are most commonly

10  accepted; right?

11  A.   You're right, yes.

12  Q.   Okay.  And so is it fair, from everything you've seen,

13  that you're the very first person ever at State Farm to bring

14  up this whole decking thing?

15  A.   I believe so, yes.

16  Q.   Nowhere in the claim file; right?

17  A.   Right.

18  Q.   Nobody had --

19  A.   That's true.

20  Q.   -- talked about it with Mr. Marks or the insured or their

21  son, nobody, ever.

22  A.   Not that I'm aware of.

23  Q.   And, in all those claims notes we've talked about, there's

24  nothing documenting anybody even contemplating whether or not

25  this 1-by decking is adequately together; right?

Jon Derek VanDorn                                                    178
Cross-examination by Mr. Miller

1    A.   Right, because they hadn't replaced the roof, and so it

2    wasn't a point to -- hadn't reached that point for

3    consideration yet.

4    Q.   Right.

5         That is true, but they -- you could look in the attic and

6    see what the -- at least from the attic space what it looks

7    like.

8    A.   You could, yes.

9    Q.   And -- and, by the way, I think you agree generally, in

10   the industry, anything over a quarter-inch spacing is too much

11   for this kind of decking material.

12   A.   Right.

13   Q.   So that spacing -- you can't find a place to get the nail

14   sometimes.  It misses.

15   A.   You may miss.

16   Q.   Because you can't see what you're hitting.

17   A.   Right.  You can only feel it.

18   Q.   Now, the garage door thing, you've mentioned, and we've

19   talked about.  Obviously, you believe State Farm made a mistake

20   there; right?

21   A.   I believe so.

22   Q.   Right.

23        Did not point it out as a mistake in your report, though,

24   did you?

25   A.   Well, I mentioned, as an observation, it didn't have hail

Jon Derek VanDorn                                                    179
Cross-examination by Mr. Miller

1  damage.

2  Q.   No.  I know.

3       But you didn't say, "This is a mistake State Farm made."

4  A.   No.  I didn't offer any opinions as to mistakes that they

5  made.

6  Q.   Now, I think we've seen in JX14.112 -- I think we've seen

7  where you told us that this particular 2012 claim photo of the

8  right elevation or right slope of this roof is the example of

9  what you want to see, because your theories of placement of

10  hail, percentage of the face versus percentage of the edge --

11  this is consistent with that; right?

12  A.   Right.

13  Q.   And -- and so you pulled the photograph from the right

14  slope out of the claim file and said, "Well, look here,

15  there's -- most of what's been marked by the adjuster is in the

16  face of the shingle."

17  A.   Right.

18  Q.   Now, by the way, that doesn't mean that that's all the

19  hail damage the adjuster saw; right?

20  A.   That's true.

21  Q.   I mean, once they get to five with this shingle,

22  apparently, that's enough, and they can quit if they want to;

23  right?

24  A.   Right.

25  Q.   Because that's why they write "five plus"; correct?

Jon Derek VanDorn                                              180
Cross-examination by Mr. Miller

1   A.   Correct.

2   Q.   I mean, here, we actually have seven, but -- seven places

3   they've chalked, but "five-plus" means, once I get to five, I

4   can quit.

5   A.   That would be my understanding, yes.

6   Q.   Okay.  Well, let's -- I'm kind of surprised at -- at you.

7   You didn't bring up the other slopes.

8        Let's look at that.  Let's look at JX14.108.

9        So, in 108, that'd be the back side slope; right?

10  A.   Right.

11  Q.   And, here --

12            MR. MILLER:  If we could show the red marks on it.

13  Q.   (By Mr. Miller) -- all of those places are on the edge, so

14  they got -- the edge got marked six out of eight times.

15  Agreed?

16       Did you ever look at that?

17  A.   Well, I've seen the photo, but, you know, I'm not sure I

18  agree with the arrows that are on there.

19  Q.   Well, we'll let -- we'll let other people decide if I'm

20  misleading them.

21       But the point is that those lines around the areas are --

22  appear to be related to the edges.  Agreed?

23  A.   It's possible.  It's in the area.

24  Q.   Yeah.

25       Okay.  Well, I mean, I'm going to let other folks decide.

Jon Derek VanDorn                                              181
Cross-examination by Mr. Miller

 1       But the bottom line is you didn't put this one up there
 2   even though it literally was six of eight marks on the edges;
 3   right?
 4   A.   Somewhere in the range, and there's a couple in question
 5   but four of eight, six of eight.
 6   Q.   Well, I know.  I'm sorry to catch you with -- this cold in
 7   the -- in the courtroom, but you never said all this before, so
 8   I'm trying to make sure I know -- let everybody know what's
 9   what.
10       You ready?
11   A.   Yes.
12   Q.   Let's look at the next one.
13   A.   Okay.
14   Q.   Let's look at page 114.
15       Now, here, on 114, we go to the left side, opposite of
16   where you went with your single example not only in your report
17   but twice being shown to this jury in this courtroom; right?
18   A.   Right.
19   Q.   Now, on this one, if you could look at the marks and how
20   they're -- there we go.
21       In this one, we've got edges, at least according to the
22   chalk, and I think they can see them quite well, in five of the
23   six we can see.  Agreed?
24   A.   I agree we can see.  That's true.
25   Q.   Again, five-plus, all you need, and five of the six on the

Jon Derek VanDorn                                                    182
Cross-examination by Mr. Miller

1    edges.

2    A.    Right.

3    Q.    Now, how did you not put that in the evidence here today

4    in front of this jury?

5    A.    Well, it's just not typical and --

6    Q.    Well, let's -- it's not typical per you.

7    A.    I -- I think per logic.

8    Q.    Logic?

9          What about what Haag says:  that -- oh, you don't know

10   about what Haag says or at least you forgot:  that the edges

11   are more susceptible to hail damage.

12         That matters, doesn't it?

13         Doesn't it?

14   A.    Yes.

15   Q.    Let's look at the -- let's look at the other one, the last

16   one.  It's at 117.

17         Here's the front.  Okay?

18         This is the front of that house in 2012.

19         You didn't put this in your report, did you?

20   A.    No.

21   Q.    No.

22         And you and Mr. Leffel didn't decide to show this to the

23   jury today twice or even once, did you?

24   A.    No.

25   Q.    Okay.

Jon Derek VanDorn                                              183
Cross-examination by Mr. Miller

1          MR. MILLER:  Well, go ahead and put the first set of

2    marks up there.

3    Q.   (By Mr. Miller) In this one, we can see that four of the

4    seven of the chalked marks, the ones they identify, appear to

5    be in the edges.  Agreed?

6    A.   Of what's circled, that's true.

7    Q.   So that's a lot more than your 18 percent, isn't it, or

8    whatever that number was you gave us.

9    A.   Well, we can see on this slope that there was a lot of

10   hail damage --

11   Q.   Would you --

12   A.   -- not circled.

13   Q.   Exactly.

14          Would you circle all of it that are edge related?

15          All of that I just circled is related to edge damage of

16   that one picture.  Agreed?

17   A.   In the ballpark, yes.

18   Q.   Man, that's -- including the four that they marked with

19   chalk, that'd be 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 --

20   16; and we don't even see all the square, do we?

21   A.   No.  Probably not.

22   Q.   No.  You don't.

23          There is not a single place --

24          MR. MILLER:  Take that down.

25          Thank you.

Jon Derek VanDorn                                                    184
Cross-examination by Mr. Miller

1   Q.   (By Mr. Miller) There is not a single place in your report

2   where you said the words even close to the effect that you've

3   said in this courtroom, where you said, "The damage to the roof

4   is not hail," not a single place in your report.  Agreed?

5   A.   I'm sorry.  Repeat that.

6   Q.   You never identified in either report that the damage, the

7   blemishes, whatever you want to call them to avoid

8   accountability, is not hail.  You never said that.

9   A.   I never said that there was hail damage on the roof.

10  Q.   You never said it wasn't hail.

11  A.   Okay.

12  Q.   True?

13  A.   That's true, yes.

14  Q.   The --

15  A.   I think, more clearly, I never said there was never hail

16  on the roof.

17  Q.   What?

18       Say that again.

19  A.   I'm sorry.  I said that there was not -- I never said that

20  I did not see hail on the roof.

21  Q.   You never said you saw anything that -- this is

22  probably --

23  A.   Sorry.

24  Q.   -- all my fault.

25  A.   Well, sorry, yeah.

Jon Derek VanDorn                                                          185
Cross-examination by Mr. Miller

1   Q.   Let me try again.  I bet --

2   A.   Okay.

3   Q.   -- it's all my fault.  It happens all the time to me.

4        Okay.  You ready?

5   A.   Yes.

6   Q.   There's no place in your report that you denied these

7   blemishes that are in the shingles was hail.  Agreed?

8   A.   Well, I said they were likely wear and tear.

9   Q.   You never said they were not hail.  You did today, but you

10  didn't say that in your report.  Agreed?

11  A.   No.  I guess I don't agree.

12  Q.   Oh.

13       Well, let's see.

14           THE COURT:  Mr. Miller, how close are you?

15           MR. MILLER:  Like, I'm on the last area, Judge.

16       If we could look at 149.5 -- or line 5, page 149.

17       (Discussion off the record.)

18  Q.   (By Mr. Miller) If you could look --

19  A.   Oh.

20  Q.   I'm sorry.

21       I'm so close to done.

22       If we could look at 149, line 5.

23  A.   Okay.  Sorry.

24  Q.   And I --

25  A.   Okay.  I'm there.

Jon Derek VanDorn                                                186
Cross-examination by Mr. Miller

1   Q.    -- and -- and I said to you, if you're ready, on line 5,

2   "Well, sir -- okay.  Did you ever identify in your report that

3   there was flaking, curling, cupping, cracking, closed or popped

4   blisters on this roof?"

5        And you said what?

6   A.   "I did not."

7   Q.   And we'd already identified that those things are wear.

8   Agreed?

9   A.    Right.

10  Q.   And, then, the next question:  "And you did not attribute

11  the damage in what you call the blemishes to any of those

12  causes; is that fair?"

13  A.   "I did not attribute the blemishes to a specific cause,

14  no."

15  Q.   Yeah.

16       And then I asked a follow-up.  I said, "Are you saying" --

17  at line 16.

18       "Are you saying, sir, that -- today would you testify that

19  you believe blistering, closed blistering, crack -- popped

20  blistering, cracking, curling, cupping or flaking, or footfall

21  for that matter, had anything to do with the 60 plus

22  blemishes -- I'm sorry, the 40 plus blemishes that you saw with

23  your own eyes inside those test squares?"

24  A.    "Yeah, I'm not providing a direct cause to those

25  blemishes."

Jon Derek VanDorn                                                187
Redirect Examination by Mr. Leffel

1  Q.   So you never said, at least in your deposition, that any

2  of the things that you were identifying was not hail; right?

3  A.   Sorry.  The "not" is still throwing me.

4  Q.   Well, you never said any of it was wear or any of those

5  terms we just went over.

6  A.   Sure.  I didn't attribute to one specific cause.

7  Q.   And actually went so far as to say, "I'm not" -- at least

8  as of the time of your depo, "I'm not attributing a cause for

9  these blemishes."

10       Remember that?

11 A.   Yes.

12 Q.   We just read it.

13 A.   We just read it.

14            MR. MILLER:  That's all, Judge.  Thank you.

15            THE COURT:  Mr. Leffel?

16            MR. LEFFEL:  Thank you, Your Honor.

17                     REDIRECT EXAMINATION

18 BY MR. LEFFEL:

19 Q.   Did you hear Mr. Marks testify yesterday that -- and let

20 me back up.

21       There was -- there was some questions you were -- you were

22 being asked, and I was, frankly, struggling to follow, but --

23 about the possibility of there being something being requested

24 of Mr. Marks in the claim file.  Do you recall that?

25 A.   Yes.

Jon Derek VanDorn                                                  188
Redirect Examination by Mr. Leffel

1   Q.   Is it possible you were just mistaken about that?

2   A.   I think so --

3   Q.   Okay.

4   A.   -- yes.

5   Q.   Well, here's what I really want to know:  Do you remember

6   when Mr. Marks was asked yesterday if he knew, as a former

7   State Farm adjuster and -- and -- and a guy who is a roofer

8   now, like, what needed to be done to request a second

9   inspection?

10  A.   I don't remember his exact answer, but it was along the

11  lines of he needed to produce new information.

12  Q.   Okay.  I think we talked a little bit about the photos in

13  JX26.

14          MR. LEFFEL:  Could someone pull that for us?

15  Q.   (By Mr. Leffel) So, yeah.  This is -- this is the -- the

16  Marks' email.

17          MR. LEFFEL:  In fact, Your Honor, may I approach the

18  witness?

19          THE COURT:  You may.

20  Q.   (By Mr. Leffel) Now, these photos -- this is JX26, not

21  from the claim file.  It was the one sent from Shari Bivins.

22  And it's got all the pictures that Mr. Marks elected to include

23  in his submission for a second inspection.

24      And so I want to give you a second to look through those,

25  but, as you're doing that, the question I want to ask you is if

Jon Derek VanDorn                                              189
Redirect Examination by Mr. Leffel

1   there are any pictures that you see anywhere in that submission

2   that demonstrate what we saw in the -- the one Corbin Swain

3   photo of a impact to the underside of a mat that we all agree

4   is a pretty good indication that there's been a hail hit in

5   that one shingle.  Okay?

6   A.   Okay.

7   Q.   Let me know when you're ready.

8   A.   Okay.  I've seen them all.

9   Q.   Did you find any photo that he included in his -- his

10  submission that went to the State Farm claim file that showed

11  an impact to an underside of a mat?

12  A.   No.  They're all top views.

13  Q.   Any close-ups of damage to the ridge?

14  A.   No.  I don't recall any.

15  Q.   Well, can -- you didn't have overview shots in there, did

16  you?

17  A.   No.

18  Q.   Okay.  Well, let me ask you this:  To your knowledge, was

19  this photo that was taken by, you know, Mr. Swain -- and I

20  think -- by the way, did you hear Mr. Marks testify that he

21  takes his pictures with an iPhone?

22  A.   Yes.

23  Q.   And that Mr. Swain got out there with one of these fancy,

24  you know, zoom lenses?

25       You remember that?

Jon Derek VanDorn                                                    190
Redirect Examination by Mr. Leffel

1   A.   Yes.

2   Q.   Okay.  So you may get a different -- and, in fact, I was

3   impressed with some of the photographs where they're lifting

4   the shingles.  I mean, some of the granules on there, did you

5   notice that they almost look like little boulders because it's

6   such a close-up shot; right?

7   A.   Right.

8   Q.   Okay.  But, to your knowledge, were any of those pictures

9   taken by Mr. Swain ever submitted to anyone at State Farm

10  during this claim?

11  A.   Not to my knowledge, no.

12  Q.   They only came in production during the litigation.  Is

13  that your understanding?

14  A.   Yes.

15  Q.   Okay.  And -- and not only did you look at the photographs

16  that Mr. Marks included in his emails, including ones that were

17  or were not in the claim file, but you looked at all the photos

18  that he produced in response to his subpoena; right?

19  A.   Right.

20  Q.   And did you see any photos anywhere in Mr. Marks's

21  photographs that supported this -- a photograph that showed a

22  impact to the underside of the mat?

23  A.   No.  I did not.

24  Q.   And do you know of any -- even though he took more

25  pictures, any, other than the 20 or 25 that are in the email,

Jon Derek VanDorn                                                     191
Redirect Examination by Mr. Leffel

1    that were ever submitted to State Farm?

2    A.   I don't know of any, no.

3    Q.   Do you remember him testifying that he showed Ms. Jacome a

4    spot on the roof where he lifted a shingle up and showed an

5    indentation to the underside of the mat?

6         Do you remember that?

7    A.   Yes.  I do.

8    Q.   Okay.  Do you find it curious that, if that was such a

9    significant event during that inspection, that he didn't

10   include one photograph of a impacted shingle under the mat when

11   he was submitting his email to -- to -- to Ms. Bivins several

12   weeks later?

13        MR. MILLER:  Objection, Judge.  Asking to comment on

14   the credibility of another witness.

15        THE COURT:  Overruled.

16   A.   No.  I don't -- I'm sorry.  Ask it again.

17        I'm sorry, Lance.  Can you ask it again?

18   Q.   (By Mr. Leffel) Yeah.  No -- no problem.

19        So what I'm saying is do you remember him testifying that

20   it was just -- there was just this light bulb moment, that --

21   "I said -- I showed Ms. Jacome the underside of a mat that had

22   an impact"?

23        Do you remember that testimony?

24   A.   Yes.

25   Q.   Okay.  And -- and I think you've confirmed that there was

Jon Derek VanDorn                                          192
Redirect Examination by Mr. Leffel

1  nowhere in any of those photos in the entirety of his file or

2  in the smaller part that he sent to State Farm that had a photo

3  of an impact to the underside of the mat.

4  A.   Right.

5  Q.   Okay.

6  A.   I remember him testifying that he showed her one, but he

7  didn't produce a photo --

8  Q.   And --

9  A.   -- that day.

10 Q.   -- I just asked you, if -- if that was such a -- if you

11 were in Mr. Marks's place, if that -- if that was such a

12 significant thing to you, would you have included a photograph

13 of that impact to support a second inspection?

14 A.   Yes.

15 Q.   Are you surprised Mr. Marks didn't do so?

16 A.   Yes.

17 Q.   When you reviewed Ms. Jacome's photos from the file or

18 even the photos that Mr. Marks submitted to State Farm from

19 February of '21, did you find any photos that confirmed the

20 presence of spatter?

21 A.   No.

22 Q.   Okay.  So you were out there a year later; right?

23 A.   Right.

24 Q.   Okay.  And the fact that you were out there a year later

25 and found at least one photo, looking hard, of some spatter on

Jon Derek VanDorn                                          193
Redirect Examination by Mr. Leffel

1   a fence doesn't necessarily mean that that spatter was present

2   when Mr. -- Ms. Jacome and Mr. Marks were out there in -- a

3   year earlier, does it?

4   A.   That's true.  It could have been more recent.

5   Q.   And the -- and the spatter that you documented on your one

6   photo of a few fence panels, it's possible that that wasn't

7   present in '21; right?

8   A.   It's possible, yes.

9   Q.   Okay.  In your review of Ms. Jacome's inspection, did she

10  do -- and the reason I'm asking this is you remember Mr. Miller

11  was asking you about her experience; right?

12  A.   Right.

13  Q.   Okay.  In your review of Ms. Jacome's inspection, did she

14  do the things that you would expect an experienced and

15  well-trained adjuster would do on a hail inspection?

16            MR. MILLER:  Objection.  Leading.

17            THE COURT:  Overruled.

18  A.   Based on the file contents, it looked like she did, yes.

19  Q.   (By Mr. Leffel) Did you find Ms. Jacome took photos that

20  showed both what she found in the way of damage and also what

21  she found that -- that she thought was not damaged?

22  A.   Yes.  I believe that's true.

23  Q.   Is that consistent with your understanding of good

24  claim-handling investigation?

25  A.   Yes.

Jon Derek VanDorn                                          194
Redirect Examination by Mr. Leffel

1    Q.   Okay.  Is that consistent with taking photos only to

2    support one conclusion?

3    A.   No.

4    Q.   Okay.  In fact, do you know that -- that Ms. Jacome paid

5    for things that were damaged and then declined to pay for

6    things that she didn't think were damaged; right?

7    A.   Right.

8    Q.   When you were an insurance adjuster, was that the job, to

9    pay what you owe?

10   A.   Yes.

11   Q.   Did you pay for things that you didn't owe?

12   A.   Not by practice but probably occasionally.

13   Q.   Sure.  It happens sometimes.

14        There was a lot of talk about the work that you've done

15   for insurance carriers and State Farm.  You recall that?

16   A.   Yes.

17   Q.   Okay.  But I recall on Friday you told us that a lot of

18   your work in other areas, such as premises liability, products

19   cases, construction defects, is, in fact, for Plaintiffs.

20   Fair?

21   A.   That's fair, yes.

22   Q.   I also understood that, when you get hired by a homeowner

23   or a property owner to assist them with an insurance claim --

24   do you also have to sometimes take a position adverse to the

25   insurance carrier that they're making the claim against?

Jon Derek VanDorn                                               195
Redirect Examination by Mr. Leffel

1   A.   Yes.

2   Q.   Okay.  So, if I understand, what -- what was established

3   through that testimony is that -- and I want you to listen very

4   carefully.  Okay?

5        You use your knowledge, your education, and your skill to

6   provide services to people, and you get paid for those things.

7   Is that -- is that what I -- is that what you said?

8             MR. MILLER:  Objection.  Leading.

9             THE COURT:  Overruled.

10  A.   Yes.  That's true.

11  Q.   (By Mr. Leffel) Okay.  Is there anything novel about using

12  your skill and experience and education to do something that

13  helps you earn a living?

14  A.   No.  Not at all.

15  Q.   How many times have you testified in court in front of a

16  jury?

17  A.   This is my first time as an expert witness.

18  Q.   Very first time -- of all that work, first time to be in

19  front of a jury.

20  A.   That's true.

21  Q.   Okay.  You know, you were asked about whether you'd ever

22  testified against a insurer.  Has any property owner ever asked

23  you to testify against an insurer?

24  A.   No.

25  Q.   Is there any wholesale prohibition you have against if you

Jon Derek VanDorn                                                    196
Redirect Examination by Mr. Leffel

1   were approached by the right party?

2   A.   No.  I'd be glad to do it.

3   Q.   Okay.  Did you have a chance to read Ms. Jacome's

4   deposition?

5   A.   I did, yes.

6   Q.   Okay.  I -- and -- and I wouldn't expect you -- but did --

7   did you read anything or do you recall reading anything about

8   her training?

9   A.   I have general remembrance of it, yes.

10  Q.   Okay.  Did you find that she was -- by the way, when you

11  were at State Farm, did you train in classrooms?

12  A.   Yes.

13  Q.   Did you sometimes watch videos?

14  A.   Yes.

15  Q.   Was there online training available?

16  A.   Not when I was at State Farm.

17  Q.   Okay.  Did you go out with more experienced adjusters to

18  learn the ropes?

19  A.   Yes, on occasion.

20  Q.   In look- -- in -- in -- in reading Ms. Jacome's, you know,

21  explanation for her training, did you find that she did things

22  that were similar to what you did in her training?

23  A.   Yes, from what I recall.

24  Q.   Okay.  Now, you were asked a question about how you came

25  up with this idea that the edge of a shingle is a half-inch

Jon Derek VanDorn                                                      197
Redirect Examination by Mr. Leffel

1  from the actual end of the tab; right?

2  A.   Right.

3  Q.   Okay.  And you were asked about Haag.  What -- what is

4  Haag.

5  A.   Haag is an engineering firm that -- that has provided

6  expert services and publications for storm assessment damages.

7  Q.   Okay.

8          MR. LEFFEL:  If we could pull up JX11 at 11:56.

9      (Video played.)

10         MR. LEFFEL:  That's good.  Thank you.

11  Q.   (By Mr. Leffel) Mr. VanDorn, is that consistent what --

12  with your understanding of the edge of a shingle and how it can

13  be impacted or affected?

14  A.   Sure.  That -- that was my experience and -- and

15  knowledge.

16  Q.   Okay.  And I -- and I -- and I may have missed it.  Did --

17  did -- did he say anything about how he defines what the edge

18  is there?

19  A.   Yeah.  He mentioned the half-inch --

20  Q.   Okay.

21  A.   -- boundary, yes.

22  Q.   Same as you; right?

23  A.   Yes.

24  Q.   Okay.  Does anything that Mr. Miller asked you about

25  this -- this general susceptibility of the edge to -- to -- to

Jon Derek VanDorn                                              198
Redirect Examination by Mr. Leffel

1  damage, whether it be by wear, hail, or something else, change

2  your opinion that -- again, just using logic, if the face of

3  the shingle is -- is multiple times bigger than the edge,

4  that -- that, with the randomness of hail, we would expect to

5  see, as a general rule, more damage in the field than at the

6  edges?

7  A.    No, especially in this case with the extreme inverse ratio

8  of the -- of the blemishes at the edge versus what's expected.

9  Q.    There was, I think, a question where you were asked -- and

10 maybe it was in your deposition where you said or -- or

11 acknowledged -- looking at all the evidence on this case, all

12 the evidence of photos of this -- of this roof, you -- I think

13 he was asking you, "Can you -- can you tell the world with 100

14 percent certainty that none of the blemishes on this roof were

15 caused by hail?"

16        And I think you -- did I remember correctly?

17        You said, "No.  I can't say that."

18 A.    Right.  That's correct.

19 Q.    Okay.  And, in fact, you -- you -- you -- you

20 volunteered -- did you volunteer to Mr. Miller that you knew of

21 at least one photo that you thought probably was hail damage?

22 A.    That's true.

23 Q.    Okay.  Other than that one photograph in the hundreds and

24 hundreds of photographs in this case, are you aware of any

25 other photograph that you saw that you believe absolutely

Jon Derek VanDorn                                                  199
Redirect Examination by Mr. Leffel

1    confirmed for you, just by looking at the photograph, that that

2    was hail damage?

3    A.   No.  I'm not.

4    Q.   Okay.  Let me take you through a couple of those JX21s,

5    which are the Swain photos.

6         By the way, was that one photo you saw something that was

7    ever submitted to State Farm during the claim?

8    A.   It was not.  Not that I'm aware of.

9    Q.   So could it have been part of what State Farm knew or

10   believed could have been part -- or could it have been

11   something that they considered?

12   A.   No.

13            MR. LEFFEL:  Let's take a look at JX21.10.

14   Q.   (By Mr. Leffel) Okay.  Looking only at that photograph,

15   Mr. VanDorn, could you tell this jury whether that photograph

16   shows hail damage?

17   A.   No.

18   Q.   Okay.

19            MR. LEFFEL:  Let's go to the next slide.

20   Q.   (By Mr. Leffel) Okay.  Now he is lifting up the tab.  Do

21   you see evidence of hail that -- damage in that photo?

22   A.   I do not.  I just see a thinning of the shingle because of

23   the granule loss.

24   Q.   So, upon further investigation, seeing a different angle,

25   do you believe that's hail?

Jon Derek VanDorn                                                    200
Redirect Examination by Mr. Leffel

1  A.   I do not.

2  Q.   Okay.  Why not?

3  A.   Well, it doesn't have the indention that we'd expect to

4  see, nor any -- or any sort of tear in the shingle.

5         MR. LEFFEL:  Let's go to JX21.11.

6       I'm sorry.  That's where we are.

7       JX21.35, and this may have actually been one that we

8  talked about earlier.

9  Q.   (By Mr. Leffel) Looking only at JX21.35, could you tell us

10 whether or not that granulation loss is hail?

11 A.   No.

12 Q.   Okay.

13        MR. LEFFEL:  Let's go to the next photo.

14 Q.   (By Mr. Leffel) Now that it's been lifted, can you tell us

15 whether or not you believe it's hail?

16 A.   No.

17 Q.   And -- no, it's not hail?

18 A.   It -- it's not hail, yes.

19 Q.   Okay.  And -- and why do you say that?

20 A.   Well, because it doesn't have the indention that we expect

21 to see.

22 Q.   I'm not going to do any more because I feel like we've all

23 seen enough photographs.

24      But, again, other than the -- the one photo, are you aware

25 of any other photos that you think confirmed hail damage?

Jon Derek VanDorn                                              201
Redirect Examination by Mr. Leffel

1    A.   No.

2    Q.   And what did you tell us would need to be done if one

3    shingle was confirmed to have hail damage on a roof?

4    A.   To extract that single shingle and replace it.

5    Q.   Do you total a roof based on that?

6    A.   No.

7    Q.   By the way, we're talking about this gentleman, Mr. Swain.

8    To your knowledge, is Mr. Swain a witness that's going to come

9    talk to this jury?

10   A.   No.  Not to my knowledge.

11   Q.   Are you aware of any report that Mr. Swain wrote

12   explaining or confirming the presence of hail on this house?

13   A.   No.

14   Q.   Okay.  Are you -- are you aware that he wrote any report

15   at all that you've seen?

16   A.   Not that I've seen.

17   Q.   Talked a lot about some of -- of your walking of the

18   ridge.  You remember that?

19   A.   Yes.

20   Q.   Okay.  You were walking that -- that ridge to take those

21   photos; right?

22   A.   That's correct.

23   Q.   When people are inspecting a roof like this, where do they

24   tend to walk?

25   A.   On the ridge or valleys.

Jon Derek VanDorn                                                    202
Redirect Examination by Mr. Leffel

1   Q.   Okay.  And, as you're looking at some of those blemishes,

2   are all blemishes hail damage?

3   A.   No.

4   Q.   Can blemishes be caused by footfall?

5   A.   They can be, yes.

6   Q.   Do you remember when we talked about the fact that, just

7   since, like, May of '19, there's been no fewer than, like,

8   seven different inspections on that roof?

9        Do you recall that?

10  A.   Yes, sir.

11  Q.   Okay.  We saw in your photographs from your inspection

12  that Mr. Marks was up on the roof with you; right?

13  A.   Right.

14  Q.   So there could be multiple sets of feet up there during

15  any one of those six to seven inspections; right?

16  A.   That's right.

17  Q.   Okay.  And did you ever see any photograph submitted by

18  Mr. Marks to State Farm that showed that one of these blemishes

19  on the ridge -- where it -- he's pulling up the tab and showing

20  the underside and confirming hail damage?

21  A.   No.

22  Q.   Is a blemish the same as hail damage?

23  A.   No.  It's not always.

24  Q.   Mr. Miller said something to you about trying to avoid

25  accountability.  Did you hear that?

Jon Derek VanDorn                                                203
Recross-examination by Mr. Miller

1   A.   I believe so.

2   Q.   Okay.  Are you the person that's responsible for making

3   the call on this claim?

4   A.   I'm not, no.

5   Q.   Are you employed by State Farm?

6   A.   No.

7   Q.   Okay.  Are you trying to call things as best you can based

8   on the facts that are presented to you?

9              MR. MILLER:  Judge, I object.  It's self-serving and

10  leading.

11             THE COURT:  Overruled.

12  A.   No.  I'm not.

13  Q.   (By Mr. Leffel) What do you think would happen to your

14  work as an expert if you took positions that lacked

15  credibility?

16  A.   It'd be damaging for certain.

17             MR. LEFFEL:  Pass the witness, Your Honor.

18             THE COURT:  Mr. Miller?

19             MR. MILLER:  Just one thing, I think, Judge.

20                      RECROSS-EXAMINATION

21  BY MR. MILLER:

22  Q.   We've watched that Haag video a couple of times now,

23  and -- and Mr. Leffel and you have said the same thing about

24  it.  I want to make sure that -- I want the jury to know what

25  you're really interpreting when you see something.  Okay?

Jon Derek VanDorn                                                          204
Recross-examination by Mr. Miller

1        So that's the purpose of my question.

2        Are you ready?

3   A.   Yes.

4   Q.   Now, my -- what I want to know is are you saying that you

5   think that the Haag man was defining the edge of a shingle as a

6   half-inch back of the edge or the -- the perimeter?

7   A.   I think he was setting a recommended barrier for it, yes.

8   Q.   So you didn't understand that he was talking about the

9   fact that anything less than a half-inch he calls "a chip"?

10       It wasn't about the edge.

11       If it's a chip on the edge, and it's less than a

12  half-inch, he calls that "a chip," not "hail."  Anything over a

13  half-inch, he calls "hail."

14       You did hear that part, didn't you?

15  A.   I did, yes.

16  Q.   Okay.  And -- and, in fact, what he said was -- and -- and

17  everybody can watch it again in here.  I'll show it to you if

18  you need me to.

19       But what he said was that it's not that under a half-inch

20  is not hail.  It's just -- it doesn't affect the water-shedding

21  ability, so they don't call it "damage."

22       Then he goes on to say, "You can do what you want based on

23  your insurance policy.  I'm just telling you, as an engineer,

24  it's not going to hurt the shingle if it's less than a half an

25  inch."

Jon Derek VanDorn                                                    205
Recross-examination by Mr. Miller

1      Did you hear that part?

2   A.   I did hear that part, yes.

3   Q.   Yeah.

4      So he's just saying that less than a half-inch on the edge

5   is not necessarily a call on hail or not.  It's just he doesn't

6   think it's going to hurt anything.

7   A.   Well, I didn't hear that -- to be entirely true, he said

8   at the very beginning of the video that, oftentimes, the

9   last -- or the -- the area at 1 inch in -- inside is due to

10  footfall or slow water shedding through that keyhole.

11  Q.   Well, I think we're going to have to play it again, but

12  I'll do that -- we'll let the jury do that when they want to.

13     But you didn't watch the very beginning of the video, did

14  you?

15  A.   I watched from 11 minutes and change, when it started.

16  Q.   Is that the place where he said very clearly that the

17  edges are susceptible to wear faster than the rest of the

18  shingle?

19  A.   Yes.

20  Q.   And that's where the edges are susceptible to hail damage

21  faster than the rest of the shingle.

22  A.   Yes.

23  Q.   Okay.

24          MR. MILLER:  That's all.

25          THE COURT:  Thank you, Mr. Miller.

Jon Derek VanDorn                                                    206
Recross-examination by Mr. Miller

1          Are we done with Mr. VanDorn?

2               MR. LEFFEL:  Yes, Your Honor.

3               MR. MILLER:  I am.

4               THE COURT:  Okay.  Mr. VanDorn, you may step down.

5     You're excused.

6          (End of the trial testimony of Jon Derek VanDorn on

7     November 7, 2022.)

8                          REPORTER'S CERTIFICATE

9          I, CASSY KERR, Federal Official Court Reporter in and for

10    the United States District Court for the Western District of

11    Oklahoma, do hereby certify that, pursuant to Title 28, Section

12    753, United States Code, the foregoing is a true and correct

13    transcript of the stenographically reported proceedings held in

14    the above-entitled matter, and the transcript page format is in

15    conformance with the regulations of the Judicial Conference of

16    the United States.

17         DATED THIS 20th day of June, 2025.

18         /s/Cassy Kerr
           Cassy Kerr, CSR, CCR, RPR, CRR, CRC
19         Oklahoma CSR License No. 1367
           Federal Official Court Reporter

20

21

22

23

24

25